**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| ANTHOLOGY INC., *et al.*,[1] | ) ) | Case No. 25-90498 (ARP) |
| Debtors. | ) ) | (Joint Administration Requested) |
|  | ) ) | **Re: Docket No. __** |

**ORDER (I) APPROVING**
**BIDDING PROCEDURES FOR THE SALE OF**
**CERTAIN OF THE DEBTORS' ASSETS, (II) SCHEDULING**
**CERTAIN DATES WITH RESPECT THERETO, (III) APPROVING**
**THE FORM AND MANNER OF NOTICE THEREOF, (IV) APPROVING THE**
**STALKING HORSE AGREEMENTS AND BID PROTECTIONS, (V) APPROVING**
**CONTRACT ASSUMPTION AND ASSIGNMENT PROCEDURES, (VI) AUTHORIZING**
**THE SALE OF ASSETS FREE AND CLEAR, AND (VII) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession

(collectively, the "Debtors") for entry of an order (this "Order"): (a) authorizing and approving

the Bidding Procedures, attached hereto as **Exhibit 1**; (b) scheduling certain related dates and

deadlines in connection with the Bidding Procedures; (c) approving the form and manner of the

notice of the Sale Transaction and Auction, if any (the "Notice of Sale and Auction"), attached

hereto as **Exhibit 2**; (d) approving the form and notice of successful bidder (the "Notice of

Successful Bidder") attached hereto as **Exhibit 3**; (e) authorizing and approving the Stalking

Horse Bidders and the Bid Protections (as defined in the Bidding Procedures) on the terms

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.stretto.com/Anthology. The location of Debtor Anthology Inc.'s corporate headquarters and the Debtors' service address in these chapter 11 cases is 5201 Congress Avenue, Boca Raton, Florida 33487.

[2]   Capitalized terms used but not otherwise defined herein have the meanings given to them in the Motion or the Bidding Procedures as applicable.

substantially set forth in the Stalking Horse Agreements, attached as <u>Exhibit 1</u> to the Bidding Procedures; (f) approving procedures for the assumption and assignment of certain executory contracts and unexpired leases in connection with any sale and approving the form and manner of notice thereof, attached hereto as **<u>Exhibit 4</u>**; and (g) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declaration, the Jeswani Declaration, and this Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Order of Reference to Bankruptcy Judges* from the United States District Court for the Southern District of Texas, entered May 24, 2012; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b); and this Court having found that it may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "<u>Hearing</u>"), if any; and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing, if any establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is **FOUND AND DETERMINED THAT**:

     A.    <u>Jurisdiction and Venue</u>. This Court has jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. § 1334, and venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

B.      Findings and Conclusions.  The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

C.      Bases for Relief.  The bases for the relief requested in the Motion are sections 105, 363, 365, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006(a), and 9007, 9008, and Bankruptcy Local Rules 1075-1 and 9013-1(i).  The Debtors have articulated good and sufficient reasons for this Court to grant the relief requested in the Motion.

D.      Notice of the Bidding Procedures Motion.  As reflected in the certificate of service filed on [●] [Docket No. [●]] (the "Certificate of Service"), the Motion and notice of the Hearing were served on this Court's electronic filing system and the parties set forth in the Motion. The notice of the Motion and of the Hearing is reasonable and sufficient in light of the circumstances and nature of the relief requested in the Motion, and no other or further notice of the Motion is necessary.  A reasonable and fair opportunity to object to the Motion and the relief granted in this Order has been afforded under the circumstances.

E.      Bidding Procedures.  The Debtors have articulated good and sufficient reasons for authorizing and approving the Bidding Procedures, attached hereto as **Exhibit 1**, which are fair, reasonable, and appropriate under the circumstances, are designed to maximize value for the benefit of the Debtors' estates, their creditors, and other parties in interest, and are consistent with the Debtors' exercise of their respective duties under applicable law.

F.      Notice of Sale and Auction.  The Notice of Sale and Auction, substantially in the form attached hereto as **Exhibit 2**, is reasonably calculated to provide interested parties with timely and proper notice of the Auction and proposed Sale Transaction(s), including, without limitation:  (a) the date, time, and place of the Auction (if any); (b) the Bidding Procedures and

certain dates and deadlines related thereto; and (c) a description of the applicable Sale Transaction as being free and clear of liens, claims, encumbrances, and other interests (except as set forth in the applicable purchase agreement), with all such liens, claims, encumbrances, and other interests attaching with the same validity and priority to the applicable Sale Transaction proceeds, and no other or further notice of the Auction or Sale Transaction shall be required.

G.      Notice of Successful Bidder.  The Notice of Successful Bidder, substantially in the form attached hereto as **Exhibit 3**, is reasonably calculated to provide interested parties with timely and proper notice of the proposed Successful Bid, including, without limitation:  (a) the Successful Bidder; (b) the Back-Up Bidder, if applicable; (c) the key terms of the proposed Sale Transaction; and (d) the date, time, and place of the Sale Hearing.

H.      Stalking Horse Agreements.   The Stalking Horse Bids contemplated by the applicable Stalking Horse Agreements, attached to the Bidding Procedures, as Exhibit 1-2, satisfy the requirements necessary to be deemed a Qualified Bid.  The Stalking Horse Bids were negotiated by the parties at arm's-length and in good faith by the Debtors and the applicable Stalking Horse Bidders.  The Debtors have demonstrated compelling and sound business justifications for approval of, and authorization to perform under, the Stalking Horse Agreements. The Stalking Horse Agreements represent the highest or otherwise best offer the Debtors have received to date for the 363 Assets as a result of their efforts to market the 363 Assets for sale. The Stalking Horse Bidders are providing a material benefit to the Debtors and their creditors by, among other things, increasing the likelihood that, given the circumstances, the best possible price for the 363 Assets will be received.  As such, the contributions of the Stalking Horse Bidders to the process have provided a substantial benefit to the Debtors, their estates, and creditors in these chapter 11 cases.

4

I.        Designation of the Stalking Horse Bidders.  Each Stalking Horse Bidder shall act as the "stalking horse bidder" pursuant to their respective Stalking Horse Agreement, and the Stalking Horse Bids shall be subject to higher or better offers for the applicable Asset Package in accordance with the Bidding Procedures.  Each Stalking Horse Bidder is not an "insider" or "affiliate" of any of the Debtors, as those terms are defined in section 101 of the Bankruptcy Code, and no common identity of incorporators, directors, or controlling stockholders exists between the Stalking Horse Bidder and the Debtors.  Pursuit of the Stalking Horse Bidders as "stalking-horse" bidders and their Stalking Horse Bids as "stalking-horse" purchase agreements is in the best interests of the Debtors and the Debtors' estates and creditors, and it reflects a sound exercise of the Debtors' business judgment.

J.        Bid Protections.  The Bid Protections provided to the Stalking Horse Bidders (a) are an actual and necessary cost and expense of preserving the Debtors' estates within the meaning of sections 503(b) and 507(a)(2) of the Bankruptcy Code, (b) are commensurate to the real and material benefits conferred upon the Debtors' estates by the Stalking Horse Bidders, and (c) are fair, reasonable, and appropriate, including in light of the commitments that have been made and the efforts that have been and will be expended by the Stalking Horse Bidders.  The Bid Protections are a material inducement for, and a condition of, the Stalking Horse Bidders to be bound by their respective Stalking Horse Agreement.

K.        Assumption and Assignment Procedures.  The Cure Notice, substantially in the form attached hereto as **Exhibit 4**, is reasonably calculated to provide all non-Debtor counterparties to the Debtors' Contracts with proper notice of the potential assumption and assignment of their Contract, the proposed cure amounts relating thereto, and the related Assumption and Assignment Procedures, and no other or further notice of such intention, the cure

amounts, or the Assumption and Assignment Procedures shall be required; *provided* that, the mere listing of any Contract on the Cure Notice does not require or guarantee that such Contract will be assumed and assigned, and all rights of the Debtors with respect to such Contracts are reserved. The Assumption and Assignment Procedures are reasonable and appropriate and comply with the provisions of section 365 of the Bankruptcy Code and Bankruptcy Rule 6006.

L.      Notice.  All other notices to be provided pursuant to the procedures set forth in the Motion are good and sufficient notice to all parties in interest of all matters pertinent hereto. No further notice is required.

M.      Relief Is Warranted.  The legal and factual bases set forth in the Motion establish just cause for the relief granted herein.  Entry of this Order is in the best interests of the Debtors and their estates, creditors, interest holders, and all other parties in interest.

**IT IS HEREBY ORDERED THAT**:

1.      All objections to the relief requested in the Motion that have not been withdrawn, waived, or settled as announced to this Court at the hearing on the Motion or by stipulation filed with this Court, are overruled.

## I.      Important Dates and Deadlines.

2.      The following dates and deadlines are approved, subject to the right of the Debtors to modify the following dates without further order of this Court by filing notice of such modification with this Court or otherwise in accordance with the terms of this Order:

| Event or Deadline | Date and Time (all times in prevailing Central Time) |
|---|---|
| Bidding Procedures and Stalking Horse APA Objection Deadline | October 21, 2025 at 4:00 p.m. |
| Bidding Procedures Hearing | November 3, 2025 |
| Deadline to File Cure Notice | As soon as reasonably practicable after entry of the Bidding Procedures Order. |
| Deadline to Serve Notice of Sale and Auction | Within three Business Days after the entry of the Bidding Procedures Order. |
| Deadline to Publish Notice of Sale and Auction | Within five Business Days after the entry of the Bidding Procedures Order. |
| Bid Deadline | November 13, 2025 at 4:00 p.m. |
| Cure Objection Deadline | November 14, 2025 at 4:00 p.m. |
| Auction(s) (if required) | November 17, 2025 at 4:00 p.m. |
| Supplemental Cure Notice Objection Deadline | Within fourteen days following the service of the Supplemental Cure Notice. |
| Deadline to file Successful Bidder Notice | Within one Business Day following the Auction(s) (if any). |
| Sale Transaction Objection Deadline | November 19, 2025 at 4:00 p.m. |
| Supplemental Adequate Assurance Objection Deadline (if applicable) | November 19, 2025 at 4:00 p.m. |
| Sale Hearing | November 20, 2025 |

3.    All objections must:  (a) be in writing; (b) conform to the applicable provisions of the Bankruptcy Rules and the Bankruptcy Local Rules; (c) state with particularity the legal and factual basis for the objection and the specific grounds therefor; and (d) be filed with this Court so as to be *actually received* no later than the applicable deadline, including as established herein, by Clerk of this Court and the following parties:

| Debtors |
|---|
| Anthology Inc. 5201 Congress Avenue Boca Raton, Florida 33487 Attn: Heath C. Gray |

7

| Proposed Co-Counsel to the Debtors | |
|---|---|
| Kirkland & Ellis LLP<br>333 W Wolf Point Plaza<br>Chicago, Illinois 60654<br><br>Attn.: Chad J. Husnick, P.C. and Charles B. Sterrett<br><br>and<br><br>Kirkland & Ellis LLP<br>601 Lexington Avenue<br>New York, New York 10022<br><br>Attn.:  Melissa Mertz | Haynes and Boone, LLP<br>1221 McKinney Street, Suite 4000<br>Houston, Texas 77010<br><br>Attn.:  Charles A. Beckham, Jr. and Arsalan Muhammad |
| **Office of the United States Trustee (Region 7)** | |
| Office of The United States Trustee<br>515 Rusk Street, Suite 3516<br>Houston, Texas 77002 | |

4.      *Failure to Object*.  If any party fails to timely file an objection by the applicable deadline, including as established herein, or otherwise abide by the procedures set forth in the Bidding Procedures regarding an objection to the Sale Transaction, such party shall be barred from asserting, at the Sale Hearing or otherwise, any objection to the relief requested in the Motion or to the consummation and performance of the Sale Transaction, including the transfer of the 363 Assets to the Successful Bidder, free and clear of all liens, claims, interests, and encumbrances pursuant to section 363(f) of the Bankruptcy Code, and shall be deemed to "consent" for the purposes of section 363(f) of the Bankruptcy Code.

5.      The Debtors shall present the results of the Auction, if any, or otherwise present any Successful Bidders to this Court in advance of the Sale Hearing.

6.      *Sale Hearing*.  This Court will hold a hearing to consider approval of the Sale Transaction(s) contemplated by each Successful Bid (a "Sale Hearing").  The Sale Hearing will be

held on **November 20, 2025**.  The Sale Hearing may be adjourned by announcement in open Court or on this Court's calendar without any further notice required.

## II.   Auction, Bidding Procedures, and Related Relief.

7.      The Bidding Procedures, attached hereto as **<u>Exhibit 1</u>**, are approved in their entirety and incorporated by reference as though fully set forth herein, including, for the avoidance of doubt, any consent and consultation rights contained therein.  The failure to specifically include or reference any particular provision of the Bidding Procedures in the Motion or this Order shall not diminish or otherwise impair the effectiveness of such procedures.  In the event of a conflict between this Order and the Bidding Procedures, this Order shall control.  The Debtors are authorized to solicit Bids and conduct an Auction, if necessary, on the terms set forth in the Bidding Procedures and to take all actions as are necessary or appropriate to implement the Bidding Procedures.  The Bidding Procedures shall govern the submission, receipt, and analysis of all Bids, and any party desiring to submit a Bid for the 363 Assets must do so strictly in accordance with the terms of the Bidding Procedures and this Order.

8.      Each bidder participating at the Auction, if any, shall be required to confirm that it has not engaged in any collusion with respect to the bidding or any Sale Transaction, as set forth in the Bidding Procedures, and the Auction, if any, shall be transcribed or recorded.

9.      Pursuant to the Bidding Procedures, the Debtors may, subject to the consent and consultation rights set forth in the Bidding Procedures and pursuant to <u>Section XVI</u> thereof:  (a) determine which Qualified Bid or Stalking Horse Bid is the highest or otherwise best offer for the 363 Assets; (b) at any time prior to entry of an order of this Court approving the Successful Bid, reject any Bid (other than the Stalking Horse Bid(s)) that the Debtors determine is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code

or the Bidding Procedures, or (iii) contrary to the best interests of the Debtors' estates and their creditors; (c) waive terms and conditions set forth herein with respect to all Qualified Bidders to the extent permissible under this Order or the Bidding Procedures; (d) impose such other terms and conditions upon Qualified Bidders as the Debtors determine to be in the best interests of the Debtors' estates in these chapter 11 cases; and (e) modify the Bidding Procedures, including the dates and deadlines set forth therein.

10. The Stalking Horse Bidders shall be permitted to participate in the Auction, as set forth in the Bidding Procedures.

11. If the Debtors receive more than one Qualified Bid or Stalking Horse Bid from Qualified Bidders for the same Asset Package, then the Debtors shall conduct the Auction in accordance with the Bidding Procedures. If one or more Qualified Bid(s) exist for acquiring specific Asset Packages, then the Debtors may, in the exercise of their reasonable business judgment and in consultation with the Consultation Party, first conduct a sub-Auction for each of the 363 Assets that has at least one Qualified Bid pursuant to the Bidding Procedures.

12. If no Qualified Bids (or Bids that may be remedied into Qualified Bids pursuant to the Bidding Procedures and are actually remedied into Qualified Bids prior to the Auction) other than the applicable Stalking Horse Bid for any Asset Package is received by the Bid Deadline, the Debtors, in consultation with the Consultation Party, shall not conduct an Auction for such Asset Package, and the applicable Stalking Horse Bidder shall be deemed the Successful Bidder, and its Stalking Horse Bid shall be deemed the Successful Bids for such Asset Package. In such circumstance, the Debtors shall (a) notify this Court in writing that the Auction is cancelled for such Asset Package and (b) file a notice of cancellation of the Auction for such Asset Package (a "Notice of Cancellation of Auction").

**III.    Notice of Sale and Auction.**

13.    The Notice of Sale and Auction, substantially in the form attached hereto as **Exhibit 2**, is approved.  Within three Business Days following the entry of this Order or as soon as reasonably practicable thereafter, the Debtors shall cause the Notice of Sale and Auction to be served     upon     parties in interest     and     posted     on     the     Debtors'     Case Website:  https://cases.stretto.com/Anthology.

14.    Within five Business Days following the entry of this Order or as soon as reasonably practicable thereafter, the Debtors shall cause a version of the Notice of Sale and Auction (modified for publication) to be published once in *The New York Times* (national edition), *Financial Times* (global edition), and any such other national or foreign publications that the Debtors deem appropriate and disclose in the claims and noticing agent's affidavits of service to provide notice to any other potential interested parties.  Such notice shall be deemed sufficient and proper notice of the Sale Transaction and the Auction.

**IV.    Notice of Successful Bidder.**

15.    The Notice of Successful Bidder, substantially in the form attached hereto as **Exhibit 3**, is approved.  Within one Business Day after the conclusion of the Auction (if any) or as soon as is reasonably practicable thereafter, the Debtors shall cause the Notice of Successful Bidder to be served upon parties in interest and posted on the Debtors' Case Website:  https://cases.stretto.com/Anthology.

**V.    The Stalking Horse Bids, Designation of Stalking Horse Bidders, and Bid Protections.**

16.    The Debtors are authorized to enter into and perform under the Stalking Horse Agreements, attached as Exhibit 1-2 to the Bidding Procedures and the terms of the Stalking Horse Agreements which are approved in their entirety, subject to the solicitation of higher or otherwise better offers for the 363 Assets and entry of the Sale Order.  The Stalking Horse Bidders are each

deemed a Qualified Bidder and the Stalking Horse Bids are each deemed to be Qualified Bids for the applicable Asset Package(s).

17.     The Bid Protections are approved in their entirety and are payable in accordance with, and subject to the terms of, the applicable Stalking Horse Agreements.  The Debtors' obligation to provide the Bid Protections shall survive termination of the applicable Stalking Horse Agreements, dismissal or conversion of any of the chapter 11 cases, and confirmation of any plan of reorganization.  No person or entity other than the Stalking Horse Bidders shall be entitled to any Bid Protections, including Breakup Fees, "topping," termination, or other similar fee or payment, and by submitting a Bid, such person or entity is deemed to have waived their right to request or to file with this Court any request for Bid Protections or any fee of any nature, whether by virtue of section 503(b) of the Bankruptcy Code or otherwise.

18.     The Stalking Horse Bidders and its counsel and advisors have acted in "good faith" within the meaning of section 363(m) of the Bankruptcy Code in connection with the Stalking Horse Bidders' negotiation of the Bid Protections, the Bidding Procedures, and the entry into the applicable Stalking Horse Agreements.

## VI.     Assumption and Assignment Procedures.

19.     The Assumption and Assignment Procedures set forth below are approved:

(a)     **Cure Notice**.  As soon as reasonably practicable after entry of the Bidding Procedures Order, the Debtors shall file with this Court and serve via first class mail, electronic mail, or overnight delivery, the Cure Notice, attached as Exhibit 4 to the proposed Bidding Procedures Order, on certain non-Debtor Contract counterparties (collectively, the "Contract Counterparties," and each, a "Contract Counterparty"), and post the Cure Notice to the Case Website:  https://cases.stretto.com/Anthology.

(b)     **Content of Cure Notice**.  The Cure Notice shall notify the applicable Contract Counterparties that the Contracts may be subject to assumption and assignment in connection with the Sale Transaction(s), and contain the following information:  (x)(i) a list of the applicable Contracts that may be assumed and assigned in connection with the Sale Transaction(s)

12

(the "<u>Assigned Contracts</u>," and each individually, a "<u>Assigned Contract</u>"); (ii) the applicable Contract Counterparties; (iii) the Debtors' good faith estimate of the proposed amount necessary, if any, to cure all monetary defaults, if any, under each Transferred Contract (the "<u>Cure Costs</u>"); and (iv) the deadline by which any Contract Counterparty to a Assigned Contract must file an objection to the proposed assumption, assignment, cure, and/or adequate assurance as it relates to a Stalking Horse Bid (collectively, a "<u>Cure Objection</u>") or (y) the adequate assurance of a Successful Bidder other than a Stalking Horse Bidder (a "<u>Supplemental Adequate Assurance Objection</u>"); *provided* that service of a Cure Notice does not constitute an admission that such Contract is an executory contract or unexpired lease or that such Contract will be assumed at any point by the Debtors or assumed and assigned pursuant to any Successful Bid.

(c) **<u>Cure Objections</u>**. Cure Objections, if any, must: (i) be in writing; (ii) comply with the applicable provisions of the Bankruptcy Rules, the Bankruptcy Local Rules, and any order governing the administration of these chapter 11 cases; (iii) state with specificity the nature of the objection and, if the Cure Objection pertains to the proposed Cure Costs, state the cure amount alleged to be owed to the objecting Contract Counterparty, together with any applicable and appropriate documentation in support thereof; and (iv) be filed with this Court prior to **November 14, 2025 at 4:00 p.m. (prevailing Central Time)** (the "<u>Cure Objection Deadline</u>"); *provided* that, the Debtors may modify the Cure Objection Deadline by filing a notice of such modification on this Court's docket.

(d) **<u>Supplemental Adequate Assurance Objections</u>**. Supplemental Adequate Assurance Objections, if applicable, must: (i) be in writing; (ii) comply with the applicable provisions of the Bankruptcy Rules, the Bankruptcy Local Rules, and any order governing the administration of these chapter 11 cases; (iii) state with specificity the nature of the objection; and (iv) be filed with this Court prior to **November 19, 2025 at 4:00 p.m. (prevailing Central Time)** (the "<u>Supplemental Adequate Assurance Objection Deadline</u>"); *provided* that, the Debtors may modify the Supplemental Adequate Assurance Objection Deadline by filing a notice of such modification of this Court's docket.

(e) **<u>Effects of Filing a Cure Objection</u>**. A properly filed Cure Objection will reserve such objecting party's rights against the Debtors only with respect to the assumption and assignment of the Contract at issue, and/or objection to the accompanying Cure Costs, as set forth in the Cure Objection, but will not constitute an objection to the remaining relief requested in the Motion.

(f) **<u>Dispute Resolution</u>**. Any Cure Objection to the proposed assumption and assignment of a Contract or Cure Costs that remains unresolved after the Sale Hearing shall be heard at such later date as may be agreed upon by the parties or fixed by this Court. To the extent that any Cure Objection cannot

be resolved by the parties, such Contract shall be assumed and assigned only upon satisfactory resolution of the Cure Objection, to be determined in the applicable Successful Bidder's reasonable discretion.  To the extent a Cure Objection remains unresolved, the Contract may be conditionally assumed and assigned, subject to the consent of the Successful Bidder, pending a resolution of the Cure Objection after notice and a hearing.  If a Cure Objection is not satisfactorily resolved, the Successful Bidder may determine that such Contract should be rejected and not assigned, in which case the Successful Bidder will not be responsible for any Cure Costs in respect of such Contract.  Notwithstanding the foregoing, if a Cure Objection relates solely to the Cure Costs (any such objection, a "Cure Dispute"), the applicable Contract may be assumed by the Debtors and assigned to the Successful Bidder, *provided* that the cure amount the Contract Counterparty asserts is required to be paid under Bankruptcy Code section 365(b)(1)(A) and (B) (or such lower amount as agreed to by the Contract Counterparty) is deposited in a segregated account by the Debtors pending this Court's adjudication of the Cure Dispute or the parties' consensual resolution of the Cure Dispute.

(g)     **Supplemental Cure Notice**.   If the Debtors discover Contracts inadvertently omitted from the Cure Notice or the Successful Bidder identifies other Contracts that it desires to assume or assume and assign in connection with a Sale Transaction, the Debtors may, after consultation with the Successful Bidder, at any time before the closing of the Sale Transaction supplement the Cure Notice with previously omitted Contracts or modify a previously filed Cure Notice, including by modifying the previously stated Cure Costs associated with any Contracts (the "Supplemental Cure Notice").   The Debtors shall serve such Supplemental Cure Notice on the Contract Counterparties to Contracts that were added or removed or to the Contract Counterparties to Contracts for which the Cure Costs were changed.  For the avoidance of doubt, within one day of any Auction, for any Sale Transaction, to the extent the Debtors seek to assume and assign an executory contract and/or unexpired lease, the Debtors will provide information of all proposed forms of adequate assurance of future performance they have received from the Successful Bidder other than a Stalking Horse Bidder, to any Contract Counterparty and/or their counsel, if such party requests the adequate assurance information.   Requests by contract or lease counterparties to receive adequate assurance information via e-mail may be made to Debtors' counsel at:     chad.husnick@kirkland.com,   charles.sterrett@kirkland.com,   and melissa.mertz@kirkland.com.

(h)     **Objection to the Supplemental Cure Notice**.  Any Contract Counterparty listed on the Supplemental Cure Notice may file an objection (a "Supplemental Cure Objection") only if such objection is to the proposed assumption or assumption and assignment of the applicable Contracts or the proposed Cure Costs included in the Supplemental Cure Notice, if any.  All

Supplemental Cure Objections must: (i) state, with specificity, the legal and factual basis for the objection as well as what Cure Costs are required, if any; (ii) include appropriate documentation in support thereof; and (iii) be filed no later than 4:00 p.m. (prevailing Central Time) on the date that is fourteen days following the date of service of such Supplemental Cure Notice, which date will be set forth in the Supplemental Cure Notice.

(i)     **Dispute Resolution of Supplemental Cure Objection**.  If a Contract Counterparty files a Supplemental Cure Objection in a manner that is consistent with the requirements set forth above, and the parties are unable to consensually resolve the dispute, the Debtors shall seek an expedited hearing before this Court to determine the Cure Costs, if any, and approve the assumption of the relevant Contracts.  If there is no such objection, then the Debtors shall obtain an order of this Court fixing the Cure Costs and approving the assumption of any Contract listed on a Supplemental Cure Notice.  Notwithstanding the foregoing, if a Supplemental Cure Objection relates solely to the Cure Costs, the applicable Contract may be assumed by the Debtors and assigned to the Successful Bidder provided that the cure amount the Contract Counterparty asserts is required to be paid under Bankruptcy Code section 365(b)(1)(A) and (B) (or such lower amount as agreed to by the Contract Counterparty) is deposited in a segregated account by the Debtors pending this Court's adjudication of the Cure Dispute or the parties' consensual resolution of the Cure Dispute.

(j)     **No Cure Objections**.  If there are no Cure Objections or Supplemental Cure Objections, or if a Contract Counterparty does not file and serve a Cure Objection or a Supplemental Cure Objection in a manner that is consistent with the requirements set forth above, and absent a subsequent order of this Court establishing an alternative Cure Cost, (i) the Cure Costs, if any, set forth in the Cure Notice (or Supplemental Cure Notice) shall be controlling, notwithstanding anything to the contrary in any Contract or any other document, and (ii) the Contract Counterparty will be deemed to have consented to the assumption or assumption and assignment of the Contract and the Cure Costs, if any, and will be forever barred from objecting to the assumption or assumption and assignment of such Contract and rights thereunder, including the Cure Costs, if any, and from asserting any other claims related to such Contract against the Debtors or the Successful Bidder, or the property of any of them.

(k)     **Other Assumption Objections**.  If there is no Cure Objections or Supplemental Adequate Assurance Objection or an objecting party does not file and serve a Cure Objection or Supplemental Adequate Assurance Objection in a manner that is consistent with the requirements set forth above, and absent a subsequent order of this Court, (i) the assumption shall be effective, notwithstanding anything to the contrary in any Contract or any other document, and (ii) the Contract Counterparty will be deemed to have consented to the assumption or assumption and assignment of the

15

Contract, and will be forever barred from asserting any other claims related to such Contract against the Debtors or the Successful Bidder, or the property of each party.

20. The inclusion of a Contract in a Cure Notice or Supplemental Cure Notice will not: (a) obligate any Debtor to assume such Contract or a Successful Bidder to take assignment of such Contract; or (b) constitute any admission or agreement of the Debtors that such contract is an executory contract or unexpired lease. Only those Contracts that are included on a schedule of Assigned Contracts attached to the executed definitive asset purchase agreement with a Successful Bidder (including amendments or modifications to such schedules in accordance with such asset purchase agreement) will be assumed and assigned to the applicable Successful Bidder.

## VII. Reservation of Rights.

21. Except as otherwise set forth in the Bidding Procedures, pursuant to Section XVI thereof, the Debtors shall have the right, in their reasonable discretion and subject to the exercise of their business judgment, to modify or terminate the Bidding Procedures, to waive terms and conditions set forth in the Bidding Procedures with respect to any Potential Bidders, accelerate or extend the dates and deadlines set forth in the Bidding Procedures, announce at any Auction modified or additional procedures for conducting the Auctions, alter the assumptions set forth in the Bidding Procedures, provide reasonable accommodations to any Potential Bidder with respect to such terms, conditions, and deadlines of the bidding and auction process to promote bids (including, without limitation, extending deadlines as may be required to comply with any additional filing and review procedures with the applicable regulators in connection with any law or regulation) and/or to terminate discussions with any and all prospective acquirers and investors at any time and without specifying the reasons therefore, in each case to the extent not materially inconsistent with the objectives of the Bidding Procedures and/or this Order. For the avoidance of doubt, nothing in this Order or the Bidding Procedures shall authorize the Debtors to modify

the Bid Protections provided for in the Stalking Horse Agreements without the consent of the Stalking Horse Bidders, as applicable.

22.     Notwithstanding anything to the contrary herein, the Order and the relief granted herein is without prejudice to the rights of any party to object or respond to any proposed Sale Transaction or any other document or instrument contemplated by any of the foregoing, and all such rights are reserved and preserved in all respects.

## VIII.     Fiduciary Out.

23.     Notwithstanding anything to the contrary in the Bidding Procedures, nothing in this Order, the Bidding Procedures, or otherwise shall require the Debtors or the board of directors, board of managers, or such similar governing body of the Debtors to take any action or to refrain from taking any action related to any sale transaction or with respect to the Bidding Procedures to the extent such Debtors, board of directors, board of managers, or such similar governing body reasonably determines in good faith, after consultation with outside counsel, that taking or failing to take such action, as applicable, would be inconsistent with applicable law or its fiduciary obligations under applicable law.

24.     Notwithstanding the foregoing, any Stalking Horse Bidder's rights under the applicable Stalking Horse Agreement, including, without limitation, the right to terminate its Stalking Horse Agreement and be paid any Bid Protections owing thereunder as a result of actions taken (or failure to take such action) by a Debtor shall not be limited, delayed, or modified in any way by this Order, including paragraph 23 hereof.

## IX.     Miscellaneous.

25.     Notwithstanding anything to the contrary in this Order or the Bidding Procedures, the Debtors reserve the right to designate one or more additional Stalking Horse Bidders for any Asset Package(s) (i) for which a Stalking Horse Bidder has not been selected as of the date of this

17

Order or (ii) that had a Stalking Horse Bidder selected as of the date of this Order, if such applicable Stalking Horse Agreement is terminated prior to the Bid Deadline.

26.     The Ad Hoc Group and any bidder or group of bidders holding a perfected security interest in any of the 363 Assets may seek to credit bid all, or a portion of, such bidder's claims for its respective collateral in accordance with section 363(k) of the Bankruptcy Code (each such bid, a "Credit Bid"); *provided* that such Credit Bid complies with the terms of the Bidding Procedures.

27.     Any Credit Bid by a Secured Creditor will be deemed to be a cash Bid solely for purposes of evaluating Bids (including the Debtors' evaluation of Qualified Bids and Overbids). The fact that a Bid is composed of a credit bid (whether in whole or in part) shall not be a detrimental factor in the Debtors' determination of the highest or otherwise best Bid for such 363 Asset.

28.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

29.     Pursuant to the Bidding Procedures, the Debtors may determine in their reasonable business judgment and in consultation with the Ad Hoc Group to suspend or cancel the sale process with respect to all or any portion of the 363 Assets.

30.     The requirements set forth in Bankruptcy Local Rules and the Complex Rules are satisfied by the contents of the Motion.

31.     All persons or entities (whether or not Qualified Bidders) that participate in the bidding process shall be deemed to have knowingly and voluntarily (a) consented to the entry of a final order by this Court in connection with the Motion and (b) waived any right to jury trial in connection with any disputes relating to any of the foregoing matters.

32.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

33.     Nothing in this Order or the Bidding Procedures shall be deemed a waiver of any rights, remedies, or defenses that the Debtors have under applicable bankruptcy and non-bankruptcy law, under any indemnity agreements, or any rights, remedies or defenses of the Debtors with respect thereto, including seeking relief from this Court with regard to the Auction, the Bidding Procedures, the Sale Transaction, and any related items.

34.     The Debtors are authorized to make nonsubstantive changes to the Bidding Procedures, the Assumption and Assignment Procedures, and any related documents without further order of this Court, including, without limitation, changes to correct typographical and grammatical errors.

35.     Notwithstanding any Bankruptcy Rule to the contrary, the terms and conditions of this Order are immediately effective and enforceable upon its entry.

36.     Notwithstanding anything to the contrary herein, nothing contained in the Motion or any actions taken pursuant to any order granting the relief requested by the Motion, and no action taken by the Debtors pursuant to the relief requested or granted (including any payment made in accordance with any such order), is intended as or shall be construed or deemed to be: (a) an implication or admission as to the amount of, basis for, priority, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's rights to dispute any claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in the Motion or any order granting the relief requested by the Motion or a finding that any particular claim is an administrative expense

19

claim or other priority claim; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of any claims, causes of action, or other rights of the Debtors or any other party in interest against any person or entity under the Bankruptcy Code or any other applicable law; (h) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy under section 365 of the Bankruptcy Code; (i) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in the Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens; (j) a waiver of the obligation of any party in interest to file a proof of claim; or (k) otherwise affecting the Debtors' rights under section 365 of the Bankruptcy Code to assume or reject any executory contract or unexpired lease.  If this Court grants the relief sought herein, any payment made pursuant to this Court's order is not intended and should not be construed as an admission as to the validity, priority, or amount of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

37.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order.

38.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

Houston, Texas
Dated: [●], 2025

_____
UNITED STATES BANKRUPTCY JUDGE

20

**Exhibit 1**

**Bidding Procedures**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ANThOLOGY INC., *et al.*,[1] | ) | Case No. 25-90458 (ARP) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

## BIDDING PROCEDURES

On September 29, 2025 (the "Petition Date"), the above-captioned debtors and debtors in possession (collectively, the "Debtors") commenced filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of Texas (the "Court").

On [●], 2025, the Court entered the *Order (I) Approving Bidding Procedures for the Sale of Certain of the Debtors' Assets, (II) Scheduling Certain Dates With Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Stalking Horse Agreements and Bid Protections, (V) Approving Contract Assumption and Assignment Procedures, (VI) Authorizing the Sale of Assets Free and Clear, and (VII) Granting Related Relief* (the "Bidding Procedures Order"),[2] approving the bidding procedures (the "Bidding Procedures").

On September 29, 2025, following a robust prepetition marketing process for the Debtors' assets (the "Prepetition Sale Process"), the Debtors entered into (i) an asset purchase agreement with Ellucian Company LLC (the "Ellucian Stalking Horse Bid") for assets comprising the Debtors' Enterprise Operations Business Segment (the "Enterprise Operations Asset Package") and (ii) an asset purchase agreement with Encoura, LLC (the "Encoura Stalking Horse Bid") for assets comprising the Debtors' Lifecycle Engagement Business Segment (the "Lifecycle Engagement Asset Package") and Student Success & Other Business Segment (the "Student Success & Other Asset Package") (together, the "Stalking Horse Bids", and each of Ellucian Company LLC and Encoura, LLC a "Stalking Horse Bidder" and, collectively, the "Stalking Horse Bidders," and each such asset purchase agreement a "Stalking Horse Agreement") whereby the Stalking Horse Bidders will each serve as the stalking horse bidder for the applicable

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.stretto.com/Anthology. The location of Debtor Anthology Inc.'s corporate headquarters and the Debtors' service address in these chapter 11 cases is 5201 Congress Avenue, Boca Raton, Florida 33487.

[2]   Unless otherwise specified herein, capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Bidding Procedures Order or the *Declaration of Heath C. Gray, Chief Restructuring Officer of Anthology Inc., in Support of the Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), as applicable.

Asset Package. The Debtors obtained approval of the Stalking Horse Agreements pursuant to the Bidding Procedures Order. The Stalking Horse Agreements are attached hereto as **Exhibits 1 and 2**.

These Bidding Procedures set forth the process by which the Debtors are authorized to conduct a marketing and auction process for the sale (the "Sale") of all the assets comprising the Debtors' Asset Packages (as defined herein and collectively, the "363 Assets"), through one or more transactions (each, a "Sale Transaction").

> **Copies of the Bidding Procedures Order and other related documents are available by visiting the Debtors' restructuring website at https://cases.stretto.com/Anthology or by telephone at (833) 882-2627 in the U.S. and Canada or +1 (949) 617-2255 internationally.**

## I.   CONSULTATION PROCESS.

As set forth herein, the Debtors will consult with the ad hoc group of secured prepetition and DIP lenders (the "Ad Hoc Group") and any official committee appointed in these chapter 11 cases (the "Committee," and, together with the Ad Hoc Group, the "Consultation Parties") throughout the sale process; *provided*, *however*, that the Ad Hoc Group (including any of its members or affiliates of its members)[3] or any member of the Committee shall not be a Consultation Party with respect to any particular Asset Package(s), including with respect to the evaluation and qualification of competing Bids for such Asset Package(s) or with respect to seeking and/or obtaining information about other Bids (as defined herein), during any period when the Ad Hoc Group has submitted a Qualified Bid or a member of the Committee is a Potential Bidder, a Stalking Horse Bidder, a Qualified Bidder, a Successful Bidder, or a Back-Up Bidder (each as defined herein) (as determined by the Debtors in their reasonable discretion), in each case, with respect to any material assets in such Asset Package, including through a Credit Bid (as defined herein) pursuant to Section VIII[4] herein, but shall remain the Consultation Parties for other purposes set forth in these Bidding Procedures and the Bidding Procedures Order.

---

[3]   For the avoidance of doubt, the submission of the Encoura Stalking Horse Bid by an affiliate of a member of the Ad Hoc Group (or a Bid by any other member or affiliate of any member of the Ad Hoc Group) does not impact the Ad Hoc Group's status as a Consultation Party; *provided* that, the Debtors and Ad Hoc Group have implemented and will continue to implement information sharing procedures to ensure that information relevant to the Encoura Stalking Horse Bid or any Bid of such member or affiliate of such member is not shared with the Encoura Stalking Horse Bidder or other bidding member, as applicable; *provided* further that, if the Ad Hoc Group submits a bid for any 363 Assets or Asset Package on behalf of the Ad Hoc Group, the Ad Hoc Group will be barred as a Consultation Party.

[4]   For the avoidance of doubt, where consultation rights are granted to the Ad Hoc Group in its capacity as such (separate from its capacity as a Consultation Party), such rights are held by the Ad Hoc Group in its capacity as such and are not dependent on the status of any Bid submitted by the Ad Hoc Group. For the avoidance of doubt, nothing contained in these Bidding Procedures shall be construed as a commitment by, or requirement that, the Ad Hoc Group submit any bid on any 363 Assets.

## II.     ASSETS TO BE AUCTIONED.

These Bidding Procedures set forth the terms by which prospective bidders may qualify for and participate in an Auction, thereby competing to make the highest or otherwise best offer or combination of offers for the 363 Assets.  The Debtors' assets subject to these bidding procedures are categorized in three of the Debtors' four main business segments: (i) Enterprise Operations; (ii) Lifecycle Engagement; and (iii) Student Success & Other (each as further described in the First Day Declaration) (each, an "Asset Package," and collectively, the "Asset Packages").  As set forth in the First Day Declaration, the assets comprising the Debtors' Teaching & Learning Business Segment are anticipated to be restructured through a plan of reorganization and are not currently subject to these Bidding Procedures.  Accordingly, Potential Bidders (as defined herein) may submit a Bid for (i) all or substantially all 363 Assets or (ii) the assets comprising one or more Asset Package(s)).  The Debtors will consider bids for any or all of the 363 Assets in a single bid from a single bidder or in multiple bids from multiple bidders.  Any bid for less than all of the 363 Assets, even if such bid is the highest or otherwise best bid for such portion of the 363 Assets, is subject to a higher or otherwise better bid for all 363 Assets, if the Debtors determine, in the exercise of their business judgment, that such bid is in the best interests of the estates.  Additionally, any bid on all of the 363 Assets is subject to bids on individual Asset Package(s) that are, in the aggregate, higher or otherwise better bids.

The Debtors may determine, in consultation with the Consultation Parties, whether to proceed with any Sale Transaction pursuant to the Bidding Procedures; *provided* that any such action would be subject to any applicable remedies under the applicable Stalking Horse Agreement.

The sale of any 363 Assets within the applicable Asset Package(s) that are owned by any non-Debtor subsidiaries and the definitive documentation for the conveyance of such 363 Assets will be governed by applicable law.

Except as otherwise provided in the Stalking Horse Agreements or Modified APAs (as defined herein) submitted by a Successful Bidder (as defined herein), all of the Debtors' right, title, and interest in and to the 363 Assets subject thereto shall be sold free and clear of any pledges, liens, security interests, encumbrances, claims, charges, options, and interests thereon (collectively, the "Interests"), subject only to the Assumed Liabilities and Permitted Liens  (each as defined in the Stalking Horse Agreements or the Modified APA of the applicable Successful Bidder), to the maximum extent permitted by section 363 of the Bankruptcy Code, with such Interests to attach to the net proceeds of the sale(s) of the 363 Assets with the same validity, force, effect, and priority as such Interests applied against the 363 Assets as of the date the Debtors' commenced these chapter 11 cases, subject to any rights, claims, and defenses of the Debtors.

3

**III.   KEY DATES AND DEADLINES; PUBLIC ANNOUNCEMENT OF AUCTION.**

| Event or Deadline | Date and Time (all times in prevailing Central Time) |
|---|---|
| Bidding Procedures and Stalking Horse APA Objection Deadline | October 21, 2025 at 4:00 p.m. |
| Bidding Procedures Hearing | November 3, 2025 |
| Deadline to File Cure Notice | As soon as reasonably practicable after entry of the Bidding Procedures Order. |
| Deadline to Serve Notice of Sale and Auction | Within three Business Days after the entry of the Bidding Procedures Order. |
| Deadline to Publish Notice of Sale and Auction | Within five Business Days after the entry of the Bidding Procedures Order. |
| Bid Deadline | November 13, 2025 at 4:00 p.m. |
| Cure Objection Deadline | November 14, 2025 at 4:00 p.m. |
| Auction(s) (if required) | November 17, 2025 at 4:00 p.m. |
| Supplemental Cure Notice Objection Deadline | Within fourteen days following the service of the Supplemental Cure Notice. |
| Deadline to file Successful Bidder Notice | Within one Business Day following the Auction(s) (if any). |
| Sale Transaction Objection Deadline | November 19, 2025 at 4:00 p.m. |
| Supplemental Adequate Assurance Objection Deadline (if applicable) | November 19, 2025 at 4:00 p.m. |
| Sale Hearing | November 20, 2025 |

Within three Business Days after entry of the Bidding Procedures Order, or as soon as is reasonably practicable thereafter, the Debtors shall serve on the parties that receive notice of the Motion (a) the Bidding Procedures Order and the Bidding Procedures and (b) a notice setting forth (i) the date, time, and place of the Auction(s) and the hearing to consider the approval of the Sale Transaction(s) and (ii) the deadlines and procedures for objecting to the proposed Sale Transaction(s) in the form attached to the Bidding Procedures Order as Exhibit 2 (the "Sale and Auction Notice") and shall post the Sale and Auction Notice on the website of the Debtors' proposed claims and noticing agent at https://cases.stretto.com/Anthology.  In addition, within five Business Days after the entry of the Bidding Procedures Order, or as soon thereafter as is practicable, the Debtors will publish the Sale and Auction Notice, with any modifications necessary for ease of publication, on one occasion in *The New York Times* (national edition), *Financial Times* (global edition), and/or another national or foreign publication that the Debtors deem appropriate to provide notice to any potential interested parties.

## IV.    CONTACT PARTIES; PARTICIPATION REQUIREMENTS.

### A.    Contact Parties.

During the Prepetition Sale Process, the Debtors, in consultation with the Debtors' proposed investment banker, PJT Partners LP ("PJT"), developed a list of buyers whom they believe may be interested in, and whom the Debtors reasonably believe would have the financial resources to consummate, one or more Sale Transactions.  The list of potential buyers includes, among others, parties the Debtors or PJT previously contacted regarding a possible transaction, regardless of whether these parties expressed any interest in pursuing a transaction (collectively, the "Contact Parties").  On April 22, 2025, PJT initiated outreach to the Contact Parties regarding the opportunity to acquire the 363 Assets, in whole or in part.  Of those Contact Parties reached out to by PJT, twenty executed a form confidentiality agreement.

The Debtors may distribute (if not already distributed) to each of the Contact Parties and any other Potential Bidder an "Information Package" consisting of:

(i)    a copy of the Bidding Procedures and Bidding Procedures Order;

(ii)    a form confidentiality agreement (if one is not signed already); and

(iii)    any other materials appropriate under the circumstances.

### B.    Participation Requirements.

For a Potential Bidder to participate in the bidding process for a Sale Transaction and to receive access to due diligence materials (the "Diligence Materials"), a person or entity must deliver or have previously delivered to PJT the following documents and information:

(i)    an executed confidentiality agreement on terms acceptable to the Debtors (a "Confidentiality Agreement");

(ii)    a statement specifying the identity of the Asset Package(s) to be acquired by such party;

(iii)    reasonable evidence demonstrating the party's financial capability to consummate a Sale Transaction with respect to the 363 Assets in which the party is preliminarily interested, as determined by the Debtors in their reasonable business judgment and in consultation with the Consultation Parties (together with the Confidentiality Agreement, the "Preliminary Bid Documents"); and

(iv)    the identification of the party and any principals and representatives thereof who are authorized to appear and act on such party's behalf for all purposes regarding the contemplated Sale Transaction(s).

***No party will be permitted to conduct any due diligence prior to entering into a Confidentiality Agreement.***  Such person or entity that has delivered an executed Confidentiality

5

Agreement and reasonable evidence demonstrating the party's financial capability to consummate a Sale Transaction with respect to the 363 Assets in which the party is preliminarily interested, as determined by the Debtors in their reasonable business judgment and in consultation with the Consultation Parties, shall be considered a potential bidder (a "Potential Bidder"). For the avoidance of doubt, any Stalking Horse Bidder that has executed a Stalking Horse Agreement with the Debtors shall not be considered a Potential Bidder for purposes of these Bidding Procedures.

Further, to receive access to diligence sessions with the Debtors' management team, Potential Bidders shall submit a letter of intent specifying, among other things, with respect to any proposed Sale, (a) the identity of the Asset Package(s) to be acquired, (b) the amount and type of consideration, and (c) any other material terms to be included in a Bid by such party.

Each Potential Bidder, including any Qualified Bidder (as defined herein), but excluding any Stalking Horse Bidder, shall comply with all reasonable requests with respect to information and due diligence access requested by the Debtors or their advisors regarding such Potential Bidder, as applicable, and its contemplated Sale Transaction. Failure by a Potential Bidder, including any Qualified Bidder, to comply with such reasonable requests for additional information and due diligence access may be a basis for the Debtors, in consultation with the Consultation Parties, to determine that such Potential Bidder or Qualified Bidder may no longer participate in diligence (including access to the Diligence Materials) or the Auction, or that a bid made by such Potential Bidder is not a Qualified Bid (as defined herein).

**C.     Diligence Materials.**

The Debtors will afford any Potential Bidder the time and opportunity to conduct due diligence within the deadlines set forth in these Bidding Procedures. Until the Bid Deadline (as defined herein), Potential Bidders shall be eligible to receive due diligence information and access to the Debtors' electronic data room (the "Data Room"). For all Potential Bidders, the due diligence period will end on the Bid Deadline. Debtors may, in their reasonable business judgment and in consultation with the Consultation Parties, but shall have no obligation to, furnish any additional due diligence information to any person following the Bid Deadline, except with respect to each Stalking Horse Bidder, whose access to due diligence information following the Bid Deadline shall be governed by the applicable Stalking Horse Agreement.

In addition, the Debtors will provide Potential Bidders and Stalking Horse Bidders with due diligence access (including Data Room access) and additional information, as may be requested by a Potential Bidder or a Stalking Horse Bidder, to the extent that the Debtors determine, in consultation with the Consultation Parties, that such requests are reasonable and appropriate under the circumstances; *provided* that, the Debtors are under no obligation to provide additional information, as may be requested by a Potential Bidder, to a Potential Bidder and, as such, may decline to provide such information to such a Potential Bidder. The Debtors will endeavor to post substantially all written due diligence provided to any Potential Bidder to the Data Room.

Neither the Debtors nor any of their representatives shall be obligated to furnish any information of any kind whatsoever relating to the 363 Assets (a) to any person or entity who is not a Potential Bidder and (b) if and to the extent doing so would (1) violate any law to which the

6

Debtors are subject, including any privacy law, (2) result in the disclosure of any trade secrets of third parties in breach of any contract with such third party, (3) violate any legally binding obligation of any Debtor with respect to confidentiality, non-disclosure or privacy or (4) jeopardize protections afforded to any Debtor under the attorney-client privilege or the attorney work product doctrine (*provided* that, in case of each of clauses (1) through (4), the Debtors shall use commercially reasonable efforts to (x) provide such access as can be provided (or otherwise convey such information regarding the applicable matter as can be conveyed) without violating such privilege, doctrine, contract, obligation or law and (y) provide such information in a manner without violating such privilege, doctrine, contract, obligation, or law); *provided* that, the foregoing shall not modify or limit in any respect the rights of any Stalking Horse Bidder to receive information pursuant to the applicable Stalking Horse Agreement.

The Debtors reserve the right to withhold or modify any Diligence Materials that the Debtors determine, in consultation with the Consultation Parties, are sensitive or otherwise not appropriate for disclosure to a Potential Bidder whom the Debtors determine is a competitor, vendor, or customer of the Debtors or is affiliated with any competitor, vendor, or customer of the Debtors. Except as set forth in the applicable Stalking Horse Agreement, neither the Debtors nor their representatives shall be obligated to furnish information of any kind whatsoever to any person that is not determined to be a Potential Bidder.

Notwithstanding any prepetition non-disclosure, confidentiality, or similar contractual provisions relating to any due diligence information, the Debtors shall be authorized to provide due diligence information to Potential Bidders and Stalking Horse Bidders that have entered into a Confidentiality Agreement.

**All requests for diligence and any and all substantive direct communications with Potential Bidders and Qualified Bidders shall be through PJT (email being sufficient)**.

The Debtors have designated PJT to coordinate all reasonable requests for additional information and due diligence access. They can be reached at project_alphabet@pjtpartners.com.

**Each Potential Bidder shall comply with all reasonable requests with respect to information and due diligence access by the Debtors or their advisors regarding such Potential Bidder and its contemplated Sale Transaction.**

**D.       Restrictions on Communications.**

There shall be no communications between or among the Potential Bidders unless PJT or Kirkland & Ellis LLP ("Kirkland") has previously authorized such communication in writing (email being sufficient). Further, during any period when the Ad Hoc Group is a Stalking Horse Bidder, a Qualified Bidder, a Successful Bidder, or a Back-Up Bidder (each as defined herein), there shall be no communications between Potential Bidders and the Ad Hoc Group with respect to any 363 Assets that are part of any applicable Ad Hoc Group bid, unless PJT or Kirkland has previously authorized such communication in writing (email being sufficient). Should any Potential Bidder attempt to communicate directly with the Ad Hoc Group in violation of this Section IV.D, the Ad Hoc Group shall immediately direct the Potential Bidder to PJT. Potential Bidders shall not, directly or indirectly, contact or initiate or engage in discussions in respect of

7

matters relating to the Debtors or a potential transaction with any customer, supplier, or other contractual counterparty of the Debtors without the prior written consent (email being sufficient) of the Debtors; *provided* that the Debtors shall consult with the Ad Hoc Group prior to providing such consent.

The Debtors reserve the right, in their business judgment and in consultation with the Consultation Parties, to disqualify any Potential Bidders that have communications between or amongst themselves without the prior authorization of the Debtors' advisors. The Debtors further reserve their right, in their business judgment, to disqualify any Potential Bidders that have violated the restrictions on communications set forth in this provision.

## V.   BID DEADLINE.

To be eligible to participate in the Auction, a Potential Bidder must submit a written offer for a Sale Transaction of one or more Asset Package(s) (each, a "Bid") that must (i) be determined by the Debtors to satisfy each of the conditions set forth in Section VI "Qualified Bid Requirements" and (ii) be ***actually received*** by PJT and Kirkland **on or before November 13, 2025 at 4:00 p.m. (prevailing Central Time)** (the "Bid Deadline").

The Debtors may extend the Bid Deadline for any reason whatsoever, in their business judgment and in consultation with the Consultation Parties, for all or certain Potential Bidders.

The notice and contact information of the Debtors and certain of the Debtors' advisors is listed in the chart below (collectively, the "Notice Parties"). Unless specifically provided otherwise herein, e-mail notice shall be sufficient.

| NOTICE PARTIES AND CONTACT INFORMATION |
|---|
| **Debtors** |
| Anthology Inc.<br>5201 Congress Avenue<br>Boca Raton, Florida 33487<br>Attn.: Heath C. Gray (heath.gray@fticonsulting.com) |
| **Proposed Co-Counsel to the Debtors** |
| Kirkland & Ellis LLP<br>333 West Wolf Point Plaza<br>Chicago, Illinois 60654<br>Attn.:  Chad J. Husnick, P.C. (chad.husnick@kirkland.com) and Charles B. Sterrett (charles.sterrett@kirkland.com)<br><br>and<br><br>Kirkland & Ellis LLP<br>601 Lexington Avenue New York, New York 10022<br>Attn.:  Melissa Mertz (melissa.mertz@kirkland.com) |

| |
|---|
| and |
| Haynes and Boone, LLP |
| 1221 McKinney Street, Suite 4000 |
| Houston, Texas 77010 |
| Attn.:  Charles A. Beckham, Jr. (charles.beckham@haynesboone.com) and Arsalan |
| Muhammad (arsalan.muhammad@haynesboone.com) |
| **Proposed Investment Banker to the Debtors** |
| PJT Partners LP |
| 280 Park Avenue |
| New York, NY 10017 |
| Attn.:  Brent Herlihy (herlihy@pjtpartners.com), Jitesh Jeswani |
| (jitesh.jeswani@pjtpartners.com), Meera Satiani (satiani@pjtpartners.com), and Jamal Davis |
| (jamal.davis@pjtpartners.com) |

## VI.    QUALIFIED BID REQUIREMENTS.

To participate in the Auction, a Potential Bidder must deliver to PJT and Kirkland an irrevocable Bid, and shall meet the following criteria, in each case, on or prior to the Bid Deadline:

1.    Identity & Corporate Authority:   Each Bid must fully disclose (a) the identity of each entity and each entity's shareholders, partners, investors, and ultimate controlling entities that will be bidding for or purchasing the applicable 363 Assets or otherwise participating in connection with such Bid (including any equity owners or sponsors, if the purchaser is an entity formed for the purpose of consummating the Sale Transaction(s) contemplated by such Bid) and (b) the complete terms of any such participation, along with sufficient evidence that the Potential Bidder is legally empowered, by power of attorney or otherwise, to complete the transactions on the terms contemplated by the parties, and has obtained all necessary authorizations or approvals from its shareholders and/or its board of managers or directors, or any other internal and other approvals, as applicable, with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid.  Each Bid must also include contact information for the specific person(s) and counsel whom the Debtors' advisors should contact regarding such Bid.  A Bid must also fully disclose any business relationships, affiliations, or agreements with the Debtors, the Ad Hoc Group, any known Potential Bidder or Qualified Bidder, or any officer, director, or equity security holder of the Debtors;

2.    Identity of 363 Assets and Assumed Liabilities; Purchase Price:  Each Bid must clearly state the following:  (a) the Asset Package(s) to be purchased; (b) the liabilities and obligations to be assumed, including any debt and cure costs to be assumed; and (c) any executory contracts (the "Executory

9

Contracts") and any unexpired leases (the "Unexpired Leases") to be received by assignment.  Each Bid must also clearly set forth the aggregate purchase price to be paid (the "Purchase Price").  To be considered a Qualified Bid, any Bid (other than a Credit Bid) must provide that the Purchase Price will be payable solely in cash.  Any Bid for substantially all of the 363 Assets must also include a statement as to whether the Bid is conditioned on purchasing all 363 Assets or whether the Bid should be viewed as a separate Bid for one or more Asset Packages.  The Debtors reserve the right to ask any Potential Bidder to allocate the value ascribed to a Bid for any particular Asset Package and to inquire about any significant assumptions on which such valuations are based;

3.  Same or Better Terms; Bid Documents:  Each Bid must include duly executed and non-contingent, where applicable, transaction documents necessary to effectuate the transactions contemplated in the Bid (the "Bid Documents").  The Bid Documents shall include:  (a) a purchase agreement based on the form asset purchase agreement (the "Form APA") or the Stalking Horse Agreement, as applicable, that the Debtors shall make available to Potential Bidders via the Data Room pursuant to the diligence process (each such amended and modified purchase agreement, a "Modified APA"), duly executed by the Potential Bidder and including the exhibits, schedules, and ancillary agreements related thereto and any other related material documents integral to such Bid, and containing only changes to the Form APA or applicable Stalking Horse Agreement that are reasonably necessary to effectuate the Bid; (b) a redline copy of the Modified APA marked to reflect any amendments or modifications made to the Form APA or applicable Stalking Horse Agreement; (c) any other material documents integral to such Bid; and (d) a statement from the Potential Bidder that (i) it is prepared to enter into and consummate the proposed Sale Transaction contemplated in the Modified APA, no later than thirty days after the conclusion of the Auction(s) (the "Closing"), subject to any necessary regulatory approvals, as specified by the Potential Bidder (or, if no Auction(s) are held, the Bid Deadline) and (ii) the Qualified Bid will be irrevocable (whether or not such Qualified Bid is selected as the Successful Bid or the Back-Up Bid (both as defined herein)) until the consummation of the Sale Transaction, or if the Back-Up Bid, until the time period set forth in Section XII;

4.  Good Faith Deposit:  Each Bid or a Credit Bid (as defined herein), must be accompanied by a cash deposit in the amount equal to 10% of the cash purchase price contemplated in such Bid, before any adjustments to the purchase price, to be wired to an interest-bearing escrow account to be identified and established by the Debtors (the "Good Faith Deposit").  To the extent that a Bid is modified before, during, or after the Auction(s) in any manner that increases the purchase price contemplated by such Bid, and such Bid is determined to be the Successful Bid or the Back-Up Bid, the Successful Bidder or the Back-Up Bidder (as defined herein) shall,

10

promptly and in no event later than two Business Days following the conclusion of the Auction, adjust its Good Faith Deposit so that it equals 10% of the increased cash purchase price.  Each Bid shall include a written acknowledgement from the bidder that, in the event of the bidders' breach of, or failure to perform under, the Bid Documents, the Debtors and their estates shall be entitled to retain the Good Faith Deposit as part of the damages resulting to the Debtors and their estates for such breach or failure to perform, and pursue all other available legal and equitable remedies.  For the avoidance of doubt, the Debtors' retention of a Good Faith Deposit shall not constitute a waiver of any of the Debtors' legal or equitable rights relating to a Successful Bidder's or a Back-Up Bidder's breach of failure to perform, and all such rights and remedies are preserved;

5.     Minimum Bid:  Each Bid for the 363 Assets subject to a Stalking Horse Bid, must consist of consideration to be paid at the Closing of the Sale Transaction contemplated by the Modified APA in an amount no less than the amount of the applicable Stalking Horse Bid for those 363 Assets, *plus* the amount of the applicable Bid Protections (as defined herein) *plus* $1,000,000 (the "Bid Increment"); *provided* that, any individual Bids for Lifecycle Engagement and Student Success & Other Asset Packages shall automatically satisfy the minimum Bid requirement irrespective of the amount offered for the applicable Asset Package; *provided, further,* that individual Bids for Lifecycle Engagement and Student Success & Other Asset Packages shall be deemed Qualified Bids to the extent that the Debtors have determined, in their reasonable business judgement and in consultation with the Consultation Parties, that such Bid otherwise fulfils all other requirements of a Qualified Bid;

6.     Sources of Financing:  Each Bid must include written evidence (that is satisfactory to the Debtors, in consultation with the Consultation Parties) that demonstrates that the Potential Bidder has the necessary financial ability to timely close the Sale Transaction contemplated by such Bid, including:

    1. contact names and telephone numbers for verification of financing sources;

    2. evidence of the bidder's internal resources and, if applicable, proof of fully executed and effective financing commitments with limited conditionality customary for transactions of this type from one or more reputable sources in an aggregate amount equal to the Cash portion of such Bid (including, if applicable, the payment of cure amounts), in each case, as are needed to close the Sale Transaction;

    3. a description of the bidder's pro forma capital structure; and

    4. any other financial disclosure or credit-quality support information

11

or enhancement reasonably requested by the Debtors demonstrating that such bidder has the ability to close the proposed Sale Transaction.

To the extent that the Bid is not accompanied by evidence of the Potential Bidder's capacity to consummate the Sale Transaction set forth in its Bid with cash on hand, the Bid must include committed financing, documented to the Debtors' satisfaction, in consultation with the Consultation Parties, that demonstrates that the Potential Bidder has received sufficient debt and/or equity funding commitments to satisfy the Potential Bidder's obligations under the proposed Sale Transaction and other obligations under its Bid.   Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Debtors;

7. <u>No Qualified Bidder Bid Protections</u>:   Other than the Stalking Horse Bidders, each Qualified Bid must include a statement that the Bid does not entitle such bidder to any Breakup Fee, termination fee, Expense Reimbursement, or similar type of payment or reimbursement and a waiver of any substantial contribution administrative expense claim under section 503(b) of the Bankruptcy Code related to bidding for the applicable 363 Assets;

8. <u>Employee Obligations</u>:  Each Bid must indicate which employees or groups of employees of the Debtors the Potential Bidder intends to hire;

9. <u>Contingencies; No Financing or Diligence Outs</u>:  Each Bid shall not include any conditions or contingencies relating to the validity, effectiveness, or binding nature of the Bid, including, without limitation, contingencies for due diligence and inspection or financing of any kind (including any conditions pertaining to financial performance, conditions, or prospects, internal approvals, or the absence of any material adverse effect);

10. <u>As-Is, Where-Is</u>:  Each Bid must include a written acknowledgement and representation that the Potential Bidder:  (a) has had an opportunity to conduct any and all due diligence regarding the Sale Transaction prior to making its offer; (b) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the 363 Assets in making its Bid; (c) did not rely, is not relying, and will not rely on or receive from any person or entity (including any of the Debtors or their advisors or other representatives) any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, including regarding the completeness of any information provided in connection therewith or the Auction(s) (if any), except as expressly stated in the Potential Bidder's purchase agreement; and (d) agrees that upon Closing the Debtors shall sell and transfer to the

Successful Bidder and the Successful Bidder shall accept the 363 Assets, to the extent expressly provided in the Court's order approving the Sale Transaction with respect to such 363 Assets.  Neither the Debtors nor any of their advisors will be liable for or bound by any express or implied warranties, guaranties, statements, representations, or information pertaining to the 363 Assets or relating thereto that the Debtors, any advisor, or agent representing or purporting to represent the Debtors to whomever might have made or furnished, directly or indirectly, orally or in writing, unless (with respect to the Debtors only) specifically set forth in the Court's order approving a Sale Transaction with respect to such 363 Assets;

11.  Joint Bids and Merger Proposals:  The Debtors will be authorized to approve joint Bids in their business judgment, in consultation with the Consultation Parties, on a case-by-case basis, including if a Bid contemplates additional financing from one or several participating parties; *provided* that the Bid is otherwise in compliance with the Bidding Procedures and the Potential Bidders have adhered to the restrictions on communications between Potential Bidders, as set forth herein;

12.  Adequate Assurance of Future Performance:  Unless agreed otherwise in the Stalking Horse Agreement for the applicable 363 Assets, each Bid must (a) provide for the payment of all cure amounts (the "Cure Amounts") related to the Executory Contracts and Unexpired Leases to be assumed by the Potential Bidder and (b) demonstrate, in the Debtor's business judgment, that the Potential Bidder can provide adequate assurance of future performance under all such Executory Contracts and Unexpired Leases sufficient to satisfy the requirements of sections 365(b)(3) and 365(f)(2)(B) of the Bankruptcy Code, which shall include audited and unaudited financial statements, tax returns, bank account statements, and a description of the business to be conducted at the premises, and such other documentation as the Debtors may reasonably request (the "Adequate Assurance Package").  The Adequate Assurance Package should be submitted in its own compiled PDF document;

13.  Acknowledgement of No Collusion:  Each Bid shall include a written acknowledgement from the Potential Bidder that it has not engaged and will not engage in any collusion with respect to any Bids or the Sale Transaction and will be prepared to announce the same on the record at the Auction, if any;

14.  Good Faith Offer:  Each Bid must be timely and properly submitted and represent an irrevocable, binding, good faith, and *bona fide* offer to consummate the Sale Transaction for the 363 Assets identified in such Bid if such Bid is selected as the Successful Bid or the Back-Up Bid;

15.  Back-Up Bid:  Each Bid shall provide that the Potential Bidder will serve as Back-Up Bidder if the Potential Bidder's Bid is selected as the next

13

highest or otherwise best bid for the applicable 363 Assets after the Successful Bid. Each Bid must include a written commitment by the applicable Potential Bidder to serve as a Back-Up Bidder in the event that such Potential Bidder's Bid is selected as the next highest or otherwise best bid for the applicable 363 Assets after the Successful Bid; *provided* that, the foregoing shall not apply to any Potential Bidder that (1) both (a) qualifies as a Secured Creditor (as defined herein) and (b) submits a Bid that contemplates providing consideration pursuant to section 363(k) of the Bankruptcy Code or (2) is not subject to such requirement pursuant to the applicable Stalking Horse Agreement;

16.  Regulatory and Third-Party Approvals:  Each Bid must include: (a) a description of all governmental, licensing, regulatory, or other approvals or consents that are required for the Potential Bidder to consummate the Sale Transaction(s), if any; (b) evidence satisfactory to the Debtors of the ability to obtain such consents or approvals in a timely manner, as well as a description of any material contingencies or other conditions that will be imposed upon, or that will otherwise apply to, the obtainment or effectiveness of any such consents or approvals, and those actions the Potential Bidder will take to ensure receipt of such approvals as promptly as possible; and (c) all forms necessary for submission of such regulatory consents or approvals (other than Hart-Scott-Rodino and non-U.S. antitrust filings), if any.  Each Bid must further include:  (x) an estimated timeframe for obtaining any required governmental, licensing, regulatory, or other approvals or consents for consummating any proposed Sale Transaction(s); (y) the basis for such estimate; and (z) in the case that receipt of any such governmental, licensing, regulatory, or other approvals or consents is estimated to take more than thirty days following execution and delivery of the applicable purchase agreement, those actions the Potential Bidder will take to ensure receipt of such approvals as promptly as possible;

17.  Consent to Jurisdiction; Waiver of Jury Trial:  Each Potential Bidder must:  (a) consent to the jurisdiction of the Court to enter an order or orders, which shall be binding in all respects, in any way related to the Debtors' qualification of Bids, to the Auction, the Sale Transaction(s) and the construction and enforcement of these Bidding Procedures, any written indications of interest, Preliminary Bid Documents, the Bids, the Bid Documents, and any and all other agreements entered into in connection with any proposed Sale Transaction, and the Closing, as applicable; and (b) waive any right to a jury trial in connection with any disputes relating to the Debtors' qualification of Bids, to the Auction, the Sale Transaction(s) and the construction and enforcement of these Bidding Procedures, any written indications of interest, Preliminary Bid Documents, the Bids, the Bid Documents, and any and all other agreements entered into in connection with any proposed Sale Transaction, and the Closing, as applicable.  Any parties raising a dispute relating to these Bidding

14

Procedures must request that such dispute be heard by the Court on an expedited basis;

18. <u>Irrevocable Bid</u>.  Each Bid must contain a statement by the applicable bidder acknowledging and agreeing that such Bid and each of its provisions is binding upon the bidder and irrevocable in all respects; and

19. <u>Compliance with Bidding Procedures</u>.  Each Bid must contain a covenant that the applicable bidder will comply with the terms of these Bidding Procedures and the Bidding Procedures Order.

Only Bids fulfilling all of the preceding requirements contained in this section as determined or otherwise waived in the Debtors' business judgment and in consultation with the Consultation Parties may be deemed qualified bids (the "<u>Qualified Bids</u>"), and only those parties submitting Qualified Bids, in the Debtors' business judgment and in consultation with the Consultation Parties, may be deemed to be qualified bidders (the "<u>Qualified Bidders</u>").  For the avoidance of doubt, each Stalking Horse Bid shall be deemed to fulfil all of the preceding requirements contained in this section, and all Stalking Horse Bids shall be considered Qualified Bids for all purposes under these Bidding Procedures.

As soon as practicable after the Bid Deadline and, in any event at least one calendar day prior to the Auction, the Debtors and their advisors shall reasonably determine which Potential Bidders are Qualified Bidders and will notify such Potential Bidders whether the Bids submitted constitute Qualified Bids.  Any Bid that is not deemed a Qualified Bid shall not be considered by the Debtors; *provided* that, if the Debtors receive a Bid prior to the Bid Deadline that does not satisfy the requirements of a Qualified Bid, the Debtors may provide (but shall not be obligated to provide) such Potential Bidder with the opportunity to remedy any deficiencies prior to the Auction.

Without the prior written consent of the Debtors, a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase the consideration contemplated by the Qualified Bid or otherwise improve the terms thereof in a manner that is more favorable to the Debtors (as determined by the Debtors in consultation with the Consultation Parties), during the period that such Qualified Bid remains binding as specified in these Bidding Procedures; *provided* that, any such Qualified Bid may be improved at the Auction(s) as set forth herein.  Any improved Qualified Bid must continue to comply with the requirements for Qualified Bids set forth in these Bidding Procedures.

## VII.   STALKING HORSE BIDDERS AND BID PROTECTIONS.

In connection with the Stalking Horse Agreements, as applicable, and in recognition of such Stalking Horse Bidder's expenditure of time, energy, and resources, the Debtors have received authority of the Court (i) provide a breakup fee (the "<u>Breakup Fee</u>") and/or (ii) reimburse such Stalking Horse Bidder's reasonable and documented out-of-pocket fees and expenses (including attorney's fees and expenses) actually incurred in connection with preparation and negotiation of the applicable Stalking Horse Agreement (the "<u>Expense Reimbursement</u>" and,

15

together with the Breakup Fee, the "Bid Protections"), in each case as set forth in the applicable Stalking Horse Agreement.

For the avoidance of doubt, no Qualified Bidder other than each Stalking Horse Bidder for the 363 Assets shall be entitled to any form of Bid Protections.

## VIII.   CREDIT BIDDING.

Any Qualified Bidder or a group constituting a Qualified Bidder that has a valid and perfected lien on any 363 Assets of the Debtors' estates (a "Secured Creditor") shall be entitled to credit bid all or a portion of the face value of such Secured Creditor's claims against the Debtors toward the Purchase Price specified in such Qualified Bidder's Bid (a "Credit Bid"); *provided* that, a Secured Creditor shall be entitled to credit bid its claim(s) only with respect to 363 Assets that are subject to a valid and perfected lien in favor of such Secured Creditor as to such claim(s) and in a manner consistent with any applicable agreements among lenders or intercreditor agreements. Notwithstanding anything to the contrary herein, each of the Prepetition Agent, the DIP Agent, the Ad Hoc Group, and the Prepetition Lenders (as defined in the First Day Declaration) may, subject to section 363(k) of the Bankruptcy Code and the Complex Case Procedures, submit a Credit Bid of all or any portion of the aggregate amount of their respective secured claims, including any postpetition financing claims, pursuant to section 363(k); *provided* that, any such Credit Bid must be submitted no later than the Bid Deadline.

Any Credit Bid by a Secured Creditor will be deemed to be a cash Bid, and not a detrimental factor, for all purposes of evaluating Bids (including the Debtors' evaluation of Qualified Bids and Overbids (as defined herein)).  Notwithstanding anything to the contrary contained herein or the Bidding Procedures Order, any Secured Creditor submitting a Credit Bid, whether acting as a Stalking Horse Bidder or otherwise, shall be deemed to be a Potential Bidder (provided that no Stalking Horse Bidder shall be a Potential Bidder), shall be deemed to have submitted a Qualified Bid, and may participate in any Auction with respect to any 363 Assets constituting collateral of such Secured Creditor without the requirements to submit a Good Faith Deposit, any additional diligence information, or any Bid Documents other than a Modified APA or each other Bid Documents as reasonably requested by the Debtors.

## IX.    EVALUATION OF QUALIFIED BIDS.

Prior to the Auction(s) (if held), the Debtors shall evaluate each Qualified Bid and Stalking Horse Bid and identify the Qualified Bid(s) and/or Stalking Horse Bid(s) that is, in the Debtors' business judgment and in consultation with the Consultation Parties, the highest or otherwise best bid for each Asset Package, as applicable (each such bid, a "Starting Bid").  If there is a Stalking Horse Bid for one or more Asset Packages, any Starting Bid that is not a Stalking Horse Bid shall include the amount provided for in the Stalking Horse Bid(s), *plus* the amount of the Bid Protections, *plus* the applicable Bid Increment.

When determining the highest or otherwise best Qualified Bid and/or Stalking Horse Bid, as compared to other Qualified Bids, the Debtors may consider the following factors, in addition to any other factors that the Debtors, in their reasonable business judgment and in consultation with the Consultation Parties, deem relevant to the value and certainty of the Qualified Bid to the

Debtors' estates:  (a) the amount of the Purchase Price of the Qualified Bid; (b) the number, type, and nature of any changes to the Modified APA requested by each bidder, including the Asset Package(s) to be acquired; (c) the extent to which such modifications are likely to delay Closing of the Sale Transaction contemplated by such Qualified Bid and the cost to the Debtors of such modifications or delay; (d) the assets and liabilities excluded from the Qualified Bid and any Executory Contracts or Unexpired Leases or other liabilities proposed to be assumed; (e) any contingencies or conditions to the Closing of the Sale Transaction contemplated by such Qualified Bid; (f) the likelihood of the bidder's ability to close the Sale Transaction contemplated by such Qualified Bid and the timing thereof; (g) the tax consequences of such Qualified Bid; (h) any regulatory requirements applicable to the Debtors or the Qualified Bidder; (i) the net effect of any changes to the value to be received by the Debtors' estates; and (j) any other qualitative or quantitative factor that the Debtors, in consultation with the Consultation Parties, reasonably determine to be relevant to determining which bid(s) are in the best interest of their estates (collectively, the "Bid Assessment Criteria").  Prior to or at the start of an Auction, the Debtors shall notify the applicable Stalking Horse Bidder and all Qualified Bidders as to which Qualified Bid or Stalking Horse Bid is the Starting Bid for the Auction with respect to the applicable Asset Package(s).  At such time, the Debtors shall also distribute copies of the Starting Bid(s) to each Qualified Bidder.

## X.    AUCTION.

For purposes of this Section X, all Stalking Horse Bids shall be deemed to be Qualified Bids.  Other than as expressly set forth herein, if more than one Qualified Bid is received for any particular Asset Package(s) by the Bid Deadline, the Debtors shall conduct an Auction to determine the Successful Bidder (or Back-Up Bidder, as applicable) in their business judgment, in consultation with the Consultation Parties, with respect to one or more Asset Packages in accordance with the Auction Procedures (as defined herein).

Presently, a combined Stalking Horse Bid exists for the Lifecycle Engagement and Student Success & Other Asset Packages.  If the Debtors receive more than one Qualified Bid that is not the Stalking Horse Bid for each of these individual Asset Packages prior to the Bid Deadline, the Debtors shall conduct separate Auctions for these Asset Packages only among the Qualified Bids that are not the Stalking Horse Bid (the "Initial Auction").  If, at the Initial Auction, if any, for these individual Asset Packages, the overall offered amount by the winning bidder(s) of the Initial Auction(s) (the "Initial Auction Winning Bidder(s)") exceeds that of the Stalking Horse Bidder, *plus* the amount of the applicable Bid Protections, *plus* the Bid Increment, the Debtors will conduct an additional Auction (the "Additional Auction," and together with the Initial Auction, the "Auctions" and each an "Auction").  The participation in such Additional Auction will be offered to the Initial Auction Winning Bidder(s) and the applicable Stalking Horse Bidder to determine the Successful Bidder.

Additionally, the Debtors reserve the right to negotiate joint Bids for these Asset Packages. If the amount of any joint Bid exceeds that of the Stalking Horse Bidder, *plus* the applicable Bid Protections, *plus* the Bid Increment, there will be no Initial Auction; *provided* that, the joint Bidders, if any, and the Stalking Horse Bidder will be offered participation in an Additional Auction notwithstanding the absence of an Initial Auction.

17

If no Qualified Bids (or Bid that may be remedied into a Qualified Bid pursuant to these Bidding Procedures and is actually remedied into a Qualified Bid prior to the Auction) other than the Stalking Horse Bid is received by the Bid Deadline for any Asset Package(s), the Debtors may, in consultation with the Consultation Parties, cancel the Auction with respect to such Asset Package(s), designate the applicable Stalking Horse Bid(s) as the Successful Bid(s) with respect to the corresponding Asset Package(s), and pursue entry of an order approving the applicable Stalking Horse Bid. The Debtors shall file notice of any cancellation of part or all of the Initial Auction and designation of the Stalking Horse Bid(s) as the Successful Bid(s) with the Court within one Business Day of making such a determination.

### A.      Location and Date of Auction.

The Initial Auction (if any) and the Additional Auction (if any) shall take place on **November 17, 2025, at 4:00 p.m. (prevailing Central Time)** via videoconference or such other form of remote communication arranged by counsel to the Debtors or in person at Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, at the Debtor's election, or such other time or other place as the Debtors determine, and shall be conducted according to the Auction Procedures.

### B.      Attendees and Participants.

Except as otherwise determined by the Debtors, only the following parties, and their respective representatives and counsel, may attend the Auction: (i) the Debtors and their advisors; (ii) any Qualified Bidder and its advisors (including, for the avoidance of doubt, any Stalking Horse Bidder and its advisors); (iii) the Ad Hoc Group and its advisors (including advisors for individual Ad Hoc Group members); and (iv) any other parties subject to a Confidentiality Agreement that the Debtors deem appropriate. Only Qualified Bidders will be entitled to make any Bids at the Auction(s) (but which shall not include any Potential Bidder that is not a Qualified Bidder). Each Qualified Bidder must appear in person or through one or more duly authorized representatives (other than its counsel) bearing a valid and enforceable power of attorney or other written proof evidencing their ability to bind the applicable Qualified Bidder, which document(s) shall be delivered to the Debtors prior to the commencement of the Auction.

All parties attending the Auction(s) must comply with their applicable Confidentiality Agreements.

### C.      Auction Procedures.

Each Auction will be conducted in accordance with the following procedures (the "Auction Procedures"):

> 1.      The Debtors Shall Conduct the Auction: The Debtors, with the assistance of their advisors, shall direct and preside over the Auction. The Debtors, in consultation with the Consultation Parties, may run one or more separate Auctions for one or more of the Asset Packages. Other than as expressly set forth herein, the Debtors may conduct the Auction in the manner they determine, in consultation with the Consultation Parties, will result in the highest or otherwise best offer for the 363 Assets so long as such conduct

18

is not inconsistent in any material respect with the other terms and provisions of these Bidding Procedures;

2. Additional Procedures: At the commencement of or during the Auction, the Debtors may announce additional or modified procedures for conducting the Auction and related rules governing the Auction, including time periods available to all Qualified Bidders to submit successive bid(s) or otherwise modify the Bidding Procedures, including the Auction Procedures, at any time, in each case, pursuant to Section XVI of the Bidding Procedures;

3. Starting Bid: Bidding shall begin with the applicable Starting Bid as described in Section IX hereto;

4. Terms of Overbids: Subsequent Bids at the Auction (each an "Overbid"), including any Bids by the applicable Stalking Horse Bidder(s), must be made in minimum increments of $1 million (the "Minimum Overbid") of additional value over the prevailing highest or otherwise best bid (the "Prevailing Highest Bid"), and each successive Overbid shall exceed the then-Prevailing Highest Bid by an amount not less than the Minimum Overbid;

5. Announcement and Consideration of Overbids: All Overbids shall be made and received on an open basis. At the start of the Auction, the Debtors shall announce the order of bidding. The first Qualified Bidder to bid at the Auction must submit an Overbid in an amount equal to the Starting Bid, *plus* at least the Minimum Overbid for its bid to be considered, in the Debtors' business judgment and in consultation with the Consultation Parties the Prevailing Highest Bid. The bidding will continue one Qualified Bidder at a time, with each Qualified Bidder being required to submit an Overbid to the then-Prevailing Highest Bid before the next Qualified Bidder is permitted to bid. Each Qualified Bidder will be permitted a reasonable time to respond to the Overbids at the Auction, as determined by the Debtors;

6. No Overbid-Skipping: To remain eligible to participate in the Auction, each Qualified Bidder must submit an Overbid to the then-Prevailing Highest Bid. To the extent a Qualified Bidder fails to submit an Overbid during its turn, such Qualified Bidder shall be disqualified from continuing to participate in the Auction;

7. Transcription: The Auction will be transcribed or recorded to ensure an accurate recording of the bidding at the Auction;

8. Acknowledgment of No Collusion: Each Qualified Bidder will be required to confirm on the record that it has not engaged, and will not engage, in any collusion with respect to the bidding or any Sale Transaction. For the avoidance of doubt, this requirement does not restrict Qualified Bidders

19

from working with other Qualified Bidders with the Debtors' prior written consent, which consent shall be provided in consultation with the Consultation Parties;

9. <u>Acknowledgment of Good Faith</u>:  Each Qualified Bidder will be required to confirm on the record that its bid is a good faith, *bona fide* offer and it intends to consummate the Sale Transaction(s) if selected as the Successful Bid in accordance with these Bidding Procedures (as may be modified in accordance herewith at the Auction); and

10. <u>Reservation of Rights</u>:  The Debtors reserve the right, in their reasonable business judgment, and in consultation with the Consultation Parties, to adjourn the Auction one or more times to, among other things:  (a) facilitate discussions between the Debtors and individual Qualified Bidders; (b) allow Qualified Bidders to consider how they wish to proceed; and (c) give Qualified Bidders the opportunity to provide the Debtors with additional evidence that the Qualified Bidder has sufficient internal resources, or has received sufficient non contingent debt and/or equity funding commitments, to consummate the proposed Sale Transaction at the prevailing Overbid amount.

For the avoidance of doubt, nothing in the Auction Procedures (if any Auction(s) are held) will prevent the Debtors from exercising their respective fiduciary duties under <u>Section XVII</u> herein and applicable law.

## XI.    ACCEPTANCE OF THE SUCCESSFUL BID.

Each Auction shall continue until:  (a) there is only one Qualified Bid for the 363 Assets (or one or more Qualified Bids for the Asset Packages) that the Debtors determine, in their reasonable business judgment and in consultation with the Consultation Parties is (or are) the highest or otherwise best Qualified Bid (or Qualified Bids) (each such Qualified Bid, a "<u>Successful Bid</u>" and the Qualified Bidder submitting any such Successful Bid, the "<u>Successful Bidder</u>"), taking into account the factors the Debtors, in consultation with the Consultation Parties, reasonably deem relevant to the value and certainty of the Qualified Bid(s) to the Debtors' estates included in the Bid Assessment Criteria; and (b) the Debtors determine, in their reasonable business judgment and in consultation with the Consultation Parties that further bidding is unlikely to result in a different Successful Bid or Successful Bids that would be reasonably acceptable to the Debtors, at which point, the Auction will be closed.

The Debtors shall, promptly after the earlier of (i) the conclusion of the Auction or (ii) the selection of a Successful Bidder, but in any event within one Business Day thereafter, file with the Court and serve on the parties that receive notice of the Motion, the notice of Successful Bid and the Successful Bidder in the form attached to the Bidding Procedures Order as <u>Exhibit 4</u> (the "<u>Successful Bidder Notice</u>").  Following conclusion of the Auction and selection of a Successful Bidder, the Debtors shall present the results of the Auction at the Sale Hearing (as defined herein) and shall seek Court approval to enter into a binding purchase agreement with the

20

Successful Bidder on the terms of the Successful Bid (the order approving such entry, the "Sale Order").

Each Successful Bidder and the Debtors shall, as soon as commercially reasonable and practicable, complete and sign all agreements, contracts, instruments, or other documents evidencing and containing the terms upon which each such Successful Bid was made.

## XII.   DESIGNATION OF A BACK-UP BIDDER.

Notwithstanding anything in these Bidding Procedures to the contrary, if an Auction is conducted, the Qualified Bidder(s) with the next highest or otherwise best Bid to the Successful Bid(s) at the Auction for the applicable 363 Assets (each a "Back-Up Bid"), as determined by the Debtors, in the exercise of their reasonable business judgment and in consultation with the Consultation Parties will be designated as a back-up bidder (each a "Back-Up Bidder"); *provided* that, the foregoing shall not apply to any bidder that is not subject to such requirement pursuant to the applicable Stalking Horse Agreement.  The identity of the Back-Up Bidder(s) (if any) and the amount and material terms of the Back-Up Bid(s) shall be announced by the Debtors at the same time the Debtors announce the identity of the Successful Bidder(s).

If a Successful Bid is terminated for any reason prior to consummation of the Sale Transaction contemplated thereby (a "Successful Bid Failure"), the Back-Up Bidder will automatically be deemed to have submitted the Successful Bid, and the Back-Up Bidder shall be deemed the Successful Bidder and shall be required to consummate any Sale Transaction with the Debtors as soon as is reasonably practicable.  The Debtors shall be authorized, without further order or direction of the Court, to consummate the Sale Transaction contemplated by the applicable Back-Up Bid with the applicable Back-Up Bidder; *provided* that, the Debtors shall file notice of such Successful Bid Failure with the Court at least twenty-four hours prior to the consummation of the Back-Up Bid.

The Back-Up Bidder(s) shall be required to keep its (or their) initial Qualified Bid(s) open and irrevocable until the earliest to occur of (a) sixty days after the Sale Hearing, unless otherwise agreed with a Stalking Horse Bidder in the applicable Stalking Horse Agreement, (b) consummation of a Sale Transaction with one or more Successful Bidders with respect to the 363 Assets subject to the Back-Up Bid, or (c) the release of such Back-Up Bid by the Debtors in writing (email being sufficient) after consultation with the Consultation Parties.

## XIII.   SALE HEARING AND APPROVAL OF THE SALE TRANSACTION.

A hearing to consider the approval of the Sale Transaction(s) (the "Sale Hearing"), is currently scheduled to take place on **November 20, at [[●] a.m. / p.m.] (prevailing Central Time)**, before Honorable Judge Pérez, at the United States Bankruptcy Court for the Southern District of Texas, 515 Rusk Street, Suite 400, 4th floor, Houston, Texas 77002, or conducted consistent with the procedures established pursuant to the Court.

At the Sale Hearing, certain findings will be sought from the Court, including, among other things, that:  (a) each Auction was conducted (if held) and each Successful Bidder was selected, in each case in accordance with the Bidding Procedures; (b) each Auction (if held) was fair in substance and procedure; (c) the Successful Bid(s) and Back-Up Bid(s) were Qualified Bids or

Stalking Horse Bids as defined in the Bidding Procedures; and (d) consummation of any Sale Transaction as contemplated by the Successful Bid(s) will provide the highest or otherwise best offer for the 363 Assets and is in the best interests of the Debtors and their estates. **The Sale Hearing may be continued to a later date by the Debtors, in consultation with the Consultation Parties, by sending notice to creditors or other parties in interest prior to, or making an announcement at, the Sale Hearing**; *provided* that, such actions may constitute a breach of a Stalking Horse Agreement in accordance with its terms; and any Stalking Horse Bidder's rights under the applicable Stalking Horse Agreement, including without limitation, the right to terminate its Stalking Horse Agreement and be paid any Bid Protections owing thereunder as a result of such actions shall not be limited, delayed or modified in any way by these Bidding Procedures, including this Section XIII. **No further notice of any such continuance will be required to be provided to any party (including the Stalking Horse Bidders).**

All objections to the Sale Transaction(s) and entry of any Sale Order must: (a) be in writing; (b) state with particularity the legal and factual basis for the objection and the specific grounds therefor; (c) comply with the Bankruptcy Code, Bankruptcy Rules, Bankruptcy Local Rules, and all orders of the Court; and (d) be filed with the Court and served **so as to be actually received by the Debtors and the Notice Parties by November 19, 2025 at 4:00 p.m. (prevailing Central Time)**.

## XIV.   RETURN OF GOOD FAITH DEPOSITS.

The Good Faith Deposit(s) of the Successful Bidder or Successful Bidders will, upon consummation of the Successful Bid or Successful Bids, become property of the Debtors' estates and be credited to the portion of such Successful Bidder's or Successful Bidders' applicable Purchase Price. Any such Good Faith Deposits will be returned to (a) Qualified Bidders (including Stalking Horse Bidders) that are not Successful Bidders or Back-Up Bidders on the date that is five Business Days after the Auction, if any, or in accordance with the Stalking Horse Agreement, as applicable, and (b) Back-Up Bidders on the date that is five Business Days after the earliest to occur of (i) sixty days after the Sale Hearing, (ii) consummation of a Sale Transaction with one or more Successful Bidders with respect to the 363 Assets subject to the Back-Up Bid, or (iii) the release of such Back-Up Bid by the Debtors in writing (email being sufficient) after the consultation with the Consultation Parties.

Unless otherwise provided in any Modified APA, all such deposits shall be held in escrow and at no time shall be deemed property of the Debtors' estates absent further order or direction of the Court.

## XV.   "AS IS, WHERE IS".

Consummation of any Sale Transaction will be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtors or their estates, except as specifically accepted and agreed to by the Debtors in the executed definitive written documentation for the Sale Transaction (the "Definitive Sale Documents"). Consummation of any Sale Transaction will be without any representations or warranties whatsoever by the Debtors' representatives or advisors. Unless otherwise specifically accepted and agreed to by the Debtors in Definitive Sale Documents, all of the Debtors' right, title, and interest in and to the 363 Assets

22

disposed of in a Sale Transaction will be transferred to the Successful Bidder (or Back-Up Bidder, as applicable) free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options, and interests in accordance with sections 363(f) of the Bankruptcy Code.

By submitting a Bid, each Potential Bidder will be deemed to acknowledge and represent that it (a) has had an opportunity to conduct adequate due diligence regarding the Debtors and the proposed Sale Transaction prior to making its Bid, (b) has relied solely on its own independent review, investigation, and inspection of any document, including executory contracts and unexpired leases, in making its Bid, and (c) did not rely on or receive from any person or entity (including any of the Debtors or their advisors or other representatives) any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, with respect to the Sale Transaction or the completeness of any information provided in connection with the Sale Transaction or the Auction(s) (if any).

## XVI.    RESERVATION OF RIGHTS OF THE DEBTORS AND MODIFICATIONS.

The Debtors reserve the right to modify these Bidding Procedures in their reasonable business judgment in accordance with the terms of these Bidding Procedures, including Section XVII hereof, and in consultation with the Consultation Parties in any manner that will best promote the goals of the bidding process, or impose, at or before the Auction, additional customary terms and conditions on the sale of the applicable 363 Assets, including, without limitation: (a) extending the deadlines set forth in the Bidding Procedures; (b) adjourning the Auction(s) without further notice; (c) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (d) canceling the Auction; (e) rejecting any or all Bids or Qualified Bids; and (f) adjusting the applicable Bid Increment or Minimum Overbid; *provided* that, (i) the Debtors may not amend these Bidding Procedures or the bidding process to reduce or otherwise modify their obligations to consult with any Consultation Parties or the Ad Hoc Group, as applicable, without the consent of such Consultation Parties or the Ad Hoc Group, as applicable, (with an email from counsel being sufficient) and (ii) the Debtors shall not modify the provisions of Section VII clause 2 or Section VIII herein, or otherwise modify these Bidding Procedures in a manner that alters or limits the rights of, or imposes additional burdens on, the Ad Hoc Group, including, without limitation, by (x) requiring the Ad Hoc Group to include a deposit as part of a Credit Bid or (y) removing, limiting, or imposing additional conditions on, the rights of any party to Credit Bid and/or to be deemed a Qualified Bidder (and their Bids deemed Qualified Bids) without the reasonable consent of the Ad Hoc Group (with an email from counsel being sufficient, which consent shall not be unreasonably withheld, conditioned, or delayed); *provided* that, such actions may constitute a breach of a Stalking Horse Agreement in accordance with its terms; and any Stalking Horse Bidder's rights under the applicable Stalking Horse Agreement, including, without limitation, the right to terminate its Stalking Horse Agreement and be paid any Bid Protections owing thereunder as a result of such actions shall not be limited, delayed or modified in any way by these Bidding Procedures, including this Section XVI.

All parties expressly reserve all of their rights (and do not waive any such rights) to seek Court relief with regard to the Auction, the Bidding Procedures, the Sale Transaction, the Stalking Horse Agreements, and any related items (including, if necessary, to seek an extension of the Bid Deadline).

## XVII.  FIDUCIARY OUT.

Notwithstanding anything to the contrary in these Bidding Procedures or any document filed with or entered by the Court, nothing in these Bidding Procedures or the Bidding Procedures Order shall require a Debtor or the board of directors, board of managers, or similar governing body of a Debtor, or special committee of any board of any Debtor, to take any action or to refrain from taking any action related to any sale transaction or with respect to these Bidding Procedures, to the extent such Debtor, board of director, board of managers, or such similar governing body reasonably determines in good faith, in consultation with counsel, that taking or failing to take such action, as applicable, would be inconsistent with applicable law or its fiduciary obligations under applicable law; *provided* that, such actions may constitute a breach of a Stalking Horse Agreement in accordance with its terms; and any Stalking Horse Bidder's right under the applicable Stalking Horse Agreement, including, without limitation, the right to terminate its Stalking Horse Agreement and be paid any Bid Protections owing thereunder as a result of such actions shall not be limited, delayed or modified in any way by these Bidding Procedures, including this Section XVII.

Further, notwithstanding anything to the contrary in these Bidding Procedures or any document filed with or entered by the Court, until the closing of the Auction(s) (if any), the Debtors and their respective directors, managers, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the right consistent with its fiduciary duties, to:  (a) consider, respond to, and facilitate alternate proposals for sales or other transactions involving any or all of the 363 Assets (each an "Alternate Proposal"); (b) provide access to non-public information concerning the Debtors to any entity or enter into confidentiality agreements or nondisclosure agreements with any entity that provides an Alternate Proposal; (c) maintain or continue discussions or negotiations with respect to Alternate Proposals; (d) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiations of Alternate Proposals; and (e) enter into or continue discussions or negotiations with any person or entity regarding any Alternate Proposal.

## XVIII. CONSENT TO JURISDICTION.

All Qualified Bidders at each Auction shall be deemed to have consented to the jurisdiction of the Court and waived any right to a jury trial in connection with any disputes relating to the Auction or the construction and enforcement of these Bidding Procedures.

## Exhibit 1

**Ellucian Stalking Horse Agreement**

**<u>Execution Version</u>**

ASSET PURCHASE AGREEMENT

AMONG,

ANTHOLOGY INC.,

ITS DEBTOR AFFILIATES

and

ELLUCIAN COMPANY, LLC

Dated as of September 29, 2025

**TABLE OF CONTENTS**

Page

**ARTICLE I PURCHASE AND SALE**................................................................................1

SECTION 1.01.    Purchase and Sale ................................................................1
SECTION 1.02.    Transferred Assets and Excluded Assets................................2
SECTION 1.03.    Consents to Certain Assignments ........................................5
SECTION 1.04.    Assumption of Liabilities; Retained Liabilities......................6
SECTION 1.05.    Assumption and Assignment of Contracts ............................8
SECTION 1.06.    Additional and Eliminated Transferred Contracts..................9

**ARTICLE II CLOSING**.................................................................................................10

SECTION 2.01.    Closing...............................................................................10
SECTION 2.02.    Transactions To Be Effected at the Closing .......................10
SECTION 2.03.    Post-Closing Adjustment ...................................................12
SECTION 2.04.    Withholding .......................................................................14

**ARTICLE III REPRESENTATIONS AND WARRANTIES OF SELLER**..........................14

SECTION 3.01.    Organization and Standing .................................................14
SECTION 3.02.    Authority; Execution and Delivery; Enforceability..............15
SECTION 3.03.    Non-Contravention and Approvals.......................................15
SECTION 3.04.    Financial Statements..........................................................16
SECTION 3.05.    Absence of Certain Changes................................................16
SECTION 3.06.    Title to Assets ...................................................................16
SECTION 3.07.    Real Property .....................................................................17
SECTION 3.08.    Intellectual Property...........................................................17
SECTION 3.09.    Contracts ...........................................................................19
SECTION 3.10.    Permits ..............................................................................20
SECTION 3.11.    Taxes.................................................................................20
SECTION 3.12.    Legal Proceedings..............................................................21
SECTION 3.13.    Employee Benefit Plans; Labor ..........................................21
SECTION 3.14.    Compliance with Laws .......................................................24
SECTION 3.15.    Sufficiency of Assets.........................................................25
SECTION 3.16.    Certain Business Relationships with Affiliates ...................26
SECTION 3.17.    No Undisclosed Liabilities .................................................26
SECTION 3.18.    Environmental Matters .......................................................26
SECTION 3.19.    Brokers and Finders...........................................................27
SECTION 3.20.    Insurance ...........................................................................27

**ARTICLE IV REPRESENTATIONS AND WARRANTIES OF PURCHASER**.................27

SECTION 4.01.    Organization .......................................................................27
SECTION 4.02.    Authority; Execution and Delivery; Enforceability..............27
SECTION 4.03.    Non-Contravention and Approvals.......................................28

i

SECTION 4.04.	Legal Proceedings................................................................................28
SECTION 4.05.	Availability of Funds ...........................................................................29
SECTION 4.06.	Brokers and Finders ............................................................................29
SECTION 4.07.	Seller's Representations; Independent Investigation...........................29

**ARTICLE V COVENANTS** ........................................................................................30

SECTION 5.01.	Conduct of Business ...........................................................................30
SECTION 5.02.	Access to Information..........................................................................32
SECTION 5.03.	Confidentiality ....................................................................................33
SECTION 5.04.	Regulatory and Other Authorizations; Notices and Consents .............33
SECTION 5.05.	Non-Solicit...........................................................................................34
SECTION 5.06.	Services from Affiliates.......................................................................35
SECTION 5.07.	Publicity...............................................................................................35
SECTION 5.08.	Use of Transferred Names and Marks .................................................35
SECTION 5.09.	Seller Guarantees ................................................................................40
SECTION 5.10.	Insurance..............................................................................................40
SECTION 5.11.	Waiver of Conflicts .............................................................................40
SECTION 5.12.	Further Action; Wrong Pockets...........................................................41
SECTION 5.13.	Accounts Payable and Payroll ............................................................42
SECTION 5.14.	Transition Services Cooperation..........................................................42
SECTION 5.15.	Freedom to Operate License ...............................................................42
SECTION 5.16.	Internet Transition ..............................................................................44
SECTION 5.17.	Specified Source Code License ...........................................................45
SECTION 5.18.	Social Media Accounts........................................................................45
SECTION 5.19.	Separation & Migration Plans .............................................................46
SECTION 5.20.	Transfer of In-Scope Foreign Assets ...................................................46
SECTION 5.21.	Consents; Mixed-Use Contracts. ........................................................48
SECTION 5.22.	Intellectual Property............................................................................51
SECTION 5.23.	Source Code Escrow and Maintenance ...............................................51

**ARTICLE VI BANKRUPTCY COURT MATTERS** .................................................52

SECTION 6.01.	Bankruptcy Actions .............................................................................52
SECTION 6.02.	Sale Order............................................................................................54
SECTION 6.03.	Approval ..............................................................................................55
SECTION 6.04.	Notices and Consents..........................................................................55
SECTION 6.05.	Cure Payments; Cure of Defaults ........................................................55
SECTION 6.06.	Milestones............................................................................................56

**ARTICLE VII EMPLOYMENT MATTERS** ...........................................................56

SECTION 7.01.	Employee Lease Agreement................................................................56
SECTION 7.02.	Non-ARD Employees; Offer of Employment .....................................57
SECTION 7.03.	Terms of Employment .........................................................................58
SECTION 7.04.	401(k) Plan ..........................................................................................58
SECTION 7.05.	Health and Welfare Benefit Plans........................................................59

ii

SECTION 7.06.   Credit for Service with Seller ...........................................................59
SECTION 7.07.   COBRA and HIPAA ...................................................................60
SECTION 7.08.   Workers' Compensation ..............................................................60
SECTION 7.09.   Liabilities .................................................................................60
SECTION 7.10.   Severance Liability ....................................................................60
SECTION 7.11.   Earned Vacation.........................................................................61
SECTION 7.12.   Administration, Employee Communications, Cooperation................61
SECTION 7.13.   Retention Plans .........................................................................61
SECTION 7.14.   Non-US Employees .....................................................................61
SECTION 7.15.   ARD Employees .........................................................................61

**ARTICLE VIII CONDITIONS TO CLOSING**..................................................................63

SECTION 8.01.   Conditions to Each Party's Obligation ..............................................63
SECTION 8.02.   Conditions to Obligation of Purchaser ...............................................63
SECTION 8.03.   Conditions to Obligation of Seller.....................................................64

**ARTICLE IX TERMINATION** ............................................................................65

SECTION 9.01.   Termination ...............................................................................65
SECTION 9.02.   Effect of Termination ..................................................................68

**ARTICLE X INDEMNIFICATION; SURVIVAL** .........................................................69

SECTION 10.01.  Indemnification by Seller ..............................................................69
SECTION 10.02.  Indemnification by Purchaser .........................................................70
SECTION 10.03.  Indemnification Procedures ...........................................................70
SECTION 10.04.  Limitations on Indemnification .......................................................72
SECTION 10.05.  Calculation of Indemnity Payments ..................................................72
SECTION 10.06.  Exclusivity ...............................................................................73
SECTION 10.07.  Tax Treatment of Indemnification.....................................................73
SECTION 10.08.  Survival....................................................................................73

**ARTICLE XI TAX MATTERS**.............................................................................74

SECTION 11.01.  Tax Covenants ...........................................................................74

**ARTICLE XII MISCELLANEOUS** .......................................................................76

SECTION 12.01.  Assignment ...............................................................................76
SECTION 12.02.  No Third-Party Beneficiaries...........................................................76
SECTION 12.03.  Expenses ..................................................................................76
SECTION 12.04.  Notices.....................................................................................76
SECTION 12.05.  Interpretation; Certain Definitions....................................................78
SECTION 12.06.  Counterparts..............................................................................90
SECTION 12.07.  Entire Agreement........................................................................90
SECTION 12.08.  Severability ..............................................................................91
SECTION 12.09.  Governing Law ...........................................................................91

SECTION 12.10. Jurisdiction.................................................................................91
SECTION 12.11. Service of Process.......................................................................91
SECTION 12.12. Waiver of Jury Trial....................................................................91
SECTION 12.13. Amendments and Waivers...........................................................92
SECTION 12.14. Specific Performance...................................................................92
SECTION 12.15. Joint Drafting..............................................................................92
SECTION 12.16. Currency .....................................................................................92
SECTION 12.17. Non-Recourse .............................................................................92

**EXHIBITS**

Exhibit A      Form of Bill of Sale, Assignment and Assumption Agreement
Exhibit B      Form of Intellectual Property Assignment
Exhibit C      Transition Services Agreement Term Sheet
Exhibit D      Form of Employee Leasing Agreement

# INDEX OF DEFINED TERMS

| Defined Term | Page |
|---|---|
| Accounting Principles | 78 |
| Accounts Receivable | 3 |
| Acquisition | 2 |
| Additional In-Scope Foreign Assets | 46 |
| Adjusted Purchase Price | 12 |
| Affiliate | 78 |
| Agreed Portion | 70 |
| Agreement | 1 |
| Allocation | 73 |
| Allocation Methodology | 73 |
| Alternative Transaction | 78 |
| Ancillary Agreements | 15 |
| Anthology Brand | 36 |
| Anti-Corruption Laws | 78 |
| Anti-Money Laundering Laws | 78 |
| Anthology Brand | 36 |
| Anthology Domains | 38 |
| Anthology Social Media Accounts | 46 |
| ARD | 78 |
| ARD Employee | 79 |
| ARD Transferred Employee | 61 |
| ARR-Impacting Contracts, | 26 |
| Assumed Benefits Obligations | 6 |
| Assumed Employee Benefit Plan | 4 |
| Assumed Lease | 79 |
| Assumed Liabilities | 6 |
| Assumed Taxes | 79 |
| Auction | 79 |
| Avoidance Actions | 3 |
| Bankruptcy Cases | 1 |
| Bankruptcy Code | 1 |
| Bankruptcy Court | 1 |
| Base Purchase Price | 79 |
| Bidding Procedures Order | 79 |
| Bill of Sale, Assignment and Assumption Agreement | 10 |
| Blackstone | 34 |
| Breakup Fee | 67 |
| Business | 79 |
| Business Contracts | 20 |
| Business Day | 80 |
| CampusNexus Brand | 36 |
| CampusNexus Domains | 39 |
| CampusNexus Wind-Down Uses | 39 |
| CampusNexus Brand | 36 |
| CampusNexus Domains | 38 |
| CampusNexus Wind-Down Uses | 39 |
| Canadian Transferred Employees | 80 |
| Cap | 91 |
| Cash and Cash Equivalents | 80 |
| Causes of Actions | 3 |
| Claim | 80 |
| Claim Notice | 70 |
| Claimed Amount | 70 |
| Closing | 10 |
| Closing Cure Payment | 12 |
| Closing Date | 10 |
| Closing Prepaid Expenses | 12 |

| Defined Term | Page |
|---|---|
| Closing Statement | 12 |
| Code | 80 |
| Colombia Transferred Employees | 80 |
| Comparable Position | 55 |
| Confidentiality Agreement | 33 |
| Consent | 15 |
| Continuation Period | 56 |
| Continued Use Period | 36 |
| Contract | 80 |
| control | 78 |
| Customer Payment Shortfall | 50 |
| Cure Payments | 80 |
| Data Privacy Laws | 81 |
| Debtors | 81 |
| DIP Order | 81 |
| Disclosure Schedule | 14 |
| Domain | 38 |
| Effect | 81 |
| Electronic Delivery | 89 |
| Employee | 81 |
| Employee Benefit Plan | 21 |
| Employee Lease Arrangement | 55 |
| Employee Transfer Date | 81 |
| Employee Transition Period | 55 |
| Employment Liabilities | 60 |
| Employment Liability | 60 |
| Employment Obligations | 81 |
| End Date | 64 |
| Enforceability Exceptions | 15 |
| Environmental Laws | 81 |
| ERISA | 81 |
| ERISA Affiliate | 81 |
| Estate | 82 |
| Estimated Closing Statement | 11 |
| Estimated Prepaid Expenses | 11 |
| Estimated Purchase Price | 11 |
| Excluded Assets | 3 |
| Excluded Contracts | 82 |
| Existing Stock | 36 |
| Expense Reimbursement | 67 |
| Exploit | 82 |
| Export Control Laws | 82 |
| Ex-US Allocable Purchase Price | 11 |
| Final Cure Payments | 14 |
| Final Order | 82 |
| Final Prepaid Expenses | 13 |
| Final Purchase Price | 13 |
| Financial Statements | 16 |
| Fraud | 82 |
| GAAP | 78 |
| Good Faith Deposit | 64 |
| Government Contract | 83 |
| Governmental Entity | 15 |
| Hazardous Materials | 83 |
| including | 83 |
| Income Tax | 83 |
| Income Taxes | 83 |

Indemnified Party ...................................................69
Indemnifying Party ................................................69
Independent Expert ................................................13
India Transferred Employees.................................83
In-Scope Foreign Assets ........................................46
Insurance Policies, ................................................27
Intellectual Property..............................................83
Intellectual Property Registrations .......................17
Internal Uses……………………………………..38
Internal Uses ..........................................................38
IP Assignment Agreement .....................................10
IT Systems .............................................................18
ITA..........................................................................22
Judgment.................................................................15
Knowledge of Seller ..............................................83
Law .........................................................................15
Leased Property ......................................................17
Liabilities ...............................................................83
Licensed Retained IP .............................................43
Licenses Transferred IP .........................................43
Liens .......................................................................83
Local Transfer Agreements ....................................10
Losses .....................................................................68
made available ........................................................84
Material Adverse Effect..........................................84
Material Adverse Effect..........................................62
Migration Plan .......................................................45
Milestones...............................................................54
Mixed-Use Contract Separation Arrangements.................85
Mixed-Use Contracts .............................................85
Mixed-Use Contracts Consents ..............................48
Most Recent Quarter-End Date ..............................85
Mutual Rejection Notice.........................................50
Mutually Rejected Mixed-Use Contract.................50
Non-ARD Employee ..............................................85
Non-ARD Transferred Employees .........................56
Non-Recourse Party................................................91
Notice of Objection................................................12
Objection Period .....................................................12
Order ......................................................................85
Ordinary Course Agreements .................................17
Other Businesses.....................................................85
Other Purchaser ......................................................85
Tao ..........................................................................87
Transitional Use Period………………………….36
Permit......................................................................85
Permitted Liens.......................................................17
person......................................................................85
Personal Data .........................................................85
Petition Date ............................................................1
Pre-Closing Tax Period...........................................85
Prepaid Expenses ......................................................3
Proceeding ..............................................................85
Purchase Price Allocation.......................................11
Purchaser...................................................................1
Purchaser 401(k) Plan.............................................57
Purchaser Group .....................................................41

Purchaser Health Plans ...................................................57
Purchaser Indemnitees ....................................................68
Purchaser Material Adverse Effect..................................28
Purchaser Subsidiary .......................................................27
Related to the Business.....................................................86
Rendered Accounts Receivable .......................................86
Replacement Contracts ....................................................47
Representatives..................................................................86
Required Terms .................................................................86
Resolution Period..............................................................13
Response ...........................................................................70
Retained Anthology Business...........................................86
Retained Intellectual Property ..........................................86
Retained Liabilities.............................................................7
Retention Agreements .......................................................60
Sale Hearing......................................................................86
Sale Order .........................................................................86
Sanctioned Country ..........................................................86
Sanctioned Person.............................................................86
Sanctions...........................................................................87
Securities Act....................................................................87
Seller....................................................................................1
Seller Credit Support Obligations....................................40
Seller Group......................................................................40
Seller Health Plans............................................................58
Seller Indemnitees ............................................................69
Seller Post-Closing Payment ...........................................14
Separation Plan .................................................................45
Social Media Accounts……………………………….46
Specified Representations..................................................87
Specified Source Code......................................................87
Straddle Period..................................................................74
Subsidiary .........................................................................87
Tarrant County Matter ......................................................87
Tax .....................................................................................87
Tax Return .........................................................................88
Taxes..................................................................................87
Taxing Authority ..............................................................87
Third Party Claim .............................................................69
Transfer Taxes ..................................................................88
Transferred Assets ..............................................................2
Transferred Contracts .......................................................88
Transferred Employee Records ........................................88
Transferred Employees......................................................88
Transferred Intellectual Property......................................88
Transferred Names and Marks..........................................36
Transferred or Licensed Source Code ..............................52
Transition Services Agreement.........................................10
Transitional Use Period ....................................................36
U.S. Transferred Employees.............................................88
U.S. Trustee ......................................................................88
Undisclosed Contract........................................................88
Vista...................................................................................34
WARN Act ........................................................................24
Willful Breach ..................................................................88
Wind Down Period ...........................................................36

vi

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT is dated as of September 28, 2025 (this "**Agreement**"), and is by and among Anthology Inc., a Florida corporation (the "**Seller**"), the Debtor Affiliates, and Ellucian Company, LLC, a Delaware limited liability company ("**Purchaser**").

**WHEREAS**, Seller and/or the Debtor Affiliates, as applicable, owns all of the Transferred Assets;

**WHEREAS**, on September 29, 2025 (the "**Petition Date**"), Seller, together with Seller's Subsidiaries and Affiliates, commenced voluntary cases under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**"), which cases are jointly administered for procedural purposes under Case No. [●] (collectively, the "**Bankruptcy Cases**");

**WHEREAS**, on the terms and subject to the conditions set forth herein, each of Seller and Debtor Affiliates desires to sell, transfer, assign and deliver to Purchaser (or any Affiliate designated by Purchaser, as applicable), and Purchaser (or any Affiliate designated by Purchaser, as applicable) desires to purchase, acquire, assume and accept from each of Seller and Debtor Affiliates all of its right, title and interest in and to all of the Transferred Assets, and assume all of the Assumed Liabilities in a sale authorized by the Bankruptcy Court pursuant to, inter alia, sections 105, 363 and 365 of the Bankruptcy Code, all on the terms and subject to the conditions set forth in this Agreement and subject to the entry and terms of the Sale Order;

**WHEREAS**, Purchaser acknowledges that the Business is currently managed across multiple business units and functional organizations within Seller and relies upon resources and assets of Seller and certain of its Subsidiaries and/or Affiliates, as applicable, that will not be transferred in connection with this Agreement;

**WHEREAS**, the parties hereto desire to consummate the proposed transactions set forth in this Agreement as promptly as practicable after the Bankruptcy Court enters the Sale Order; and

**NOW, THEREFORE**, in consideration of the premises and the mutual agreements and covenants set forth in this Agreement and intending to be legally bound, the parties hereby agree as follows.

## ARTICLE I

## PURCHASE AND SALE

SECTION 1.01.    <u>Purchase and Sale</u>. Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, upon the terms and subject to the conditions of this Agreement, at the Closing, Seller and the Debtor Affiliates shall sell, transfer, assign, convey and deliver to Purchaser (or any Affiliate designated by Purchaser, as applicable), and Purchaser (or any Affiliate designated by Purchaser, as applicable) will purchase, acquire and accept from Seller (or the applicable Debtor Affiliate) free and clear of all Liens (other than Permitted Liens), all of Seller's and/or its Affiliates' direct or indirect right, title and interest in, to and under the Transferred Assets, in each

case as of the Closing, for (A) the Estimated Purchase Price, payable as set forth in Section 2.02(b) and subject to adjustment pursuant to Section 2.02(b) below, and (B) the assumption by Purchaser only of the Assumed Liabilities (and no other liabilities of Seller or its Affiliates, whether known or unknown, fixed or contingent, asserted or unasserted, except to the extent expressly set forth in Section 1.04(a)). The purchase and sale of the Transferred Assets and the assumption of the Assumed Liabilities are collectively referred to in this Agreement as the "**Acquisition**".

SECTION 1.02.    Transferred Assets and Excluded Assets.

(a)    The term "**Transferred Assets**" means all of Seller's and/or its Debtors Affiliates' right, title and interest in, to and under the assets (including software) Related to the Business, including the following assets as of the Closing:

(i)    the Transferred Contracts;

(ii)    the Transferred Intellectual Property (which, for clarity, excludes the Anthology Domains);

(iii)    lists of, and currently available contact information for, current and prospective customers, vendors and suppliers, in each case Related to the Business;

(iv)    sales, marketing and promotional information, literature and manuals, in each case Related to the Business;

(v)    originals or copies (to the extent originals are not available or must be retained by Seller or its Affiliates) of all books, records, customer and other reports, files and papers, correspondence and other documents, invoices, or Tax Returns (not including, for the avoidance of doubt, any affiliated, combined, or consolidated Tax Returns of Seller or its Affiliates, other than Tax Returns solely related to the Transferred Assets), whether in hard copy or computer or other electronic format, including manuals and data, strategic plans, internal financial statements, marketing and promotional surveys, material and research and files relating to the Transferred Intellectual Property, in each case that are Related to the Business, in each case other than (A) any books, records or other materials originals of which Seller or its Affiliates are required by Law to retain (in which case copies of which, to the extent permitted by Law, will be made available to Purchaser) and (B) personnel, medical and employment records for employees and former employees of the Business other than Transferred Employee Records;

(vi)    all Transferred Employee Records;

(vii)    all insurance benefits, including rights and proceeds, arising from or Related to the Business, the Transferred Assets or the Assumed Liabilities;

(viii)    all of Seller's or its Affiliates' rights under warranties, indemnities and all similar rights against third parties to the extent related to any Transferred Assets;

(ix)    all Permits which are held by Seller or its Affiliates and required for the conduct of the Business as currently conducted or for the ownership and use of the Transferred Assets;

2

(x)    all goodwill Related to the Business;

(xi)    all inventory Related to the Business which constitutes current assets as determined in accordance with the Accounting Principles;

(xii)    all prepaid expenses, credits, advance payments, claims, security, refunds, rights of recovery, rights of set-off, rights of recoupment, deposits, charges, sums and fees Related to the Business which constitute current assets as determined in accordance with the Accounting Principles (the "**Prepaid Expenses**");

(xiii)    Tax refunds (or claims therefor) or other Tax receivables, in each case attributable solely to Assumed Taxes;

(xiv)    (A) all avoidance claims or causes of action arising under sections 544, 547, 548, 549 and 550 of the Bankruptcy Code and any similar state Law (the "**Avoidance Actions**"), (B) all other claims, causes of action, lawsuits, judgments, privileges, counterclaims, defenses, rights of recovery, rights of set-off, rights of subrogation and all other rights of any kind under applicable Laws ("**Causes of Actions**"), including any other provision of the Bankruptcy Code, including all Causes of Action relating to vendors, service providers, and personnel used in or Related to the Business other than the Tarrant County Matter. Notwithstanding the foregoing, neither the Purchaser, nor any Person claiming by, through or on behalf of the Purchaser (including by operation of Law, sale, assignment, conveyance or otherwise) shall pursue, prosecute, litigate, institute or commence an action based on, or assert, sell, convey, assign or file any claim that relates to the Avoidance Actions;

(xv)    all accounts or notes receivable held by Seller or its Affiliates to the extent arising out of or Related to the Business or the Transferred Assets and any security, claim, remedy or other right related to any of the foregoing ("**Accounts Receivable**"), other than Rendered Accounts Receivable;

(xvi)    without duplication, all rights, claims and interests of Seller or its Affiliates in and to any portion of the revenue to the extent attributable to the Business under any Mixed-Use Contract (including any related Accounts Receivable, whether or not invoiced, accrued, billed or received, other than Rendered Accounts Receivable); and

(xvii)    the assets set forth on Section 1.02(a)(xvii) of the Disclosure Schedule.

The Transferred Assets shall exclude, for the avoidance of doubt, the Excluded Assets.

(b)    The term "**Excluded Assets**" means any right, title and interest in, to or under any assets, properties, rights, privileges, contracts and claims of Seller or its Affiliates wherever located, whether tangible or intangible, real, personal or mixed, not included in the Transferred Assets (as further provided in Section 1.02(c)) as of the Closing, including for the avoidance of doubt the following (including those that are Related to the Business):

(i)    Cash and Cash Equivalents, if any;

3

(ii)      all Employee Benefit Plans and any assets in respect of any such Employee Benefit Plan, except for (i) the Retention Agreements being assumed by Purchaser pursuant to Article VII or (ii) any Employee Benefit Plan maintained pursuant to the Laws of a country other than the United States for employees located outside of the United States that are transferred to Purchaser by operation of Law (each an "**Assumed Employee Benefit Plan**" );

(iii)     all personnel, employment and medical records that are not Transferred Employee Records;

(iv)      Excluded Contracts and any other interest in Contracts other than the Transferred Contracts;

(v)       all right, title and interest in, to and under the Retained Intellectual Property;

(vi)      all causes of action, lawsuits, judgments, claims, rights of recovery, right of setoff or reimbursement, defenses and demands of any nature available to or being pursued by Seller or any of its Affiliates, whether arising by way of counterclaim or otherwise that are not Related to the Business;

(vii)     all rights under and claims to any coverage or recovery under any Insurance Policy that are not Related to the Business;

(viii)    all minute books, organizational documents, stock registers and such other books and records of Seller as pertaining to ownership, organization or existence of Seller;

(ix)      all Tax Returns of Seller or any of its Affiliates (and all books and records, including work papers) related thereto, other than any Tax Returns that constitute Transferred Assets;

(x)       any Tax refund (or claims therefor), or other Tax receivable (other than Tax refunds (or claim therefor) or other Tax receivables in each case attributable solely to Assumed Taxes);

(xi)      the Final Purchase Price and all other rights of Seller and its Affiliates under or pursuant to this Agreement and the Schedules attached hereto and any other agreements entered into by Seller or any of its Affiliates pursuant to this Agreement;

(xii)     any assets held by any Affiliates of Seller organized under the laws of any country other than the United States of America;

(xiii)    those assets set forth on Section 1.02(b)(xiii) of the Disclosure Schedule;

(xiv)    Rendered Accounts Receivable;

(xv)     any Leased Property;

(xvi)    Tarrant County Matter;

4

(xvii)   Anthology Social Media Accounts;

(xviii)  physical and cloud-based servers; and

(xix)    the Anthology Domains.

provided that, notwithstanding the foregoing, other than Retained Intellectual Property (unless otherwise specified under this Agreement), Seller shall and shall cause its Affiliates (including Debtor Affiliates) to, upon Purchaser's reasonable request, provide Purchaser with copies (redacted as necessary for privilege) of any Excluded Asset documentation that is reasonably necessary for Purchaser's post-Closing operation of the Transferred Assets; provided, further, that nothing in this Section 1.02(b) shall limit Purchaser's rights to receive, as between the parties hereto, the services, benefits and economics under any Mixed-Use Contract to the extent Related to the Business as set forth in Section 5.21.

(c)     Notwithstanding anything to the contrary contained in Section 1.02(a), Seller shall not sell, transfer, assign or deliver to Purchaser, and Purchaser shall not purchase, acquire or accept, and the Transferred Assets shall not include, Seller's right, title and interest in, to or under any assets of Seller not included in the Transferred Assets.

(d)     Notwithstanding anything to the contrary contained in this Agreement, Purchaser acknowledges and agrees that all of the following shall remain the property of Seller, and neither Purchaser nor any of its Affiliates shall have any interest therein: (x) all attorney-client work product and other legal privileges of Seller and its Affiliates not Related to the Business, (y) all records and reports prepared or received by Seller, any of its Affiliates or Representatives in connection with the sale of the Business and the transactions contemplated hereby, including all analyses relating to the Business of Purchaser or its Affiliates so prepared or received (but excluding any materials made available to Purchaser or its Representatives and any financial information relating directly to the Business that would be reasonably required for the financial planning or reporting obligations of Purchaser) and (z) all confidentiality agreements with prospective purchasers of the Business or any portion thereof (except that Seller shall, to the extent permitted by the terms thereof without consent of the counterparty thereto, assign to Purchaser at the Closing all of Seller's rights under such agreements to confidential treatment of information relating to the conduct of the Business and/or with respect to solicitation and hiring of Transferred Employees), and all bids and expressions of interest received from third parties with respect thereto. In addition, Seller shall have the right to retain copies of the documents, materials and data Related to the Business prior to the Closing Date, subject to their compliance with Section 5.03(b).

SECTION 1.03.    Consents to Certain Assignments.

(a)     Notwithstanding anything to the contrary contained in this Agreement, this Agreement shall not constitute an agreement to sell, transfer, assign or deliver, directly or indirectly, any Transferred Asset, or any benefit arising thereunder, if, notwithstanding the operation of the Bankruptcy Code, an attempted direct or indirect sale, transfer, assignment or delivery thereof, without the consent of or notice to a third party (including a Governmental Entity), would constitute a breach, default, violation or other contravention of the rights of such third party, would be ineffective with respect to any party to a Contract concerning such

5

Transferred Asset or would in any way adversely affect any of the rights of Purchaser, as assignee or transferee of such Contract or with respect to such Transferred Asset. Purchaser agrees that neither Seller nor any of its Affiliates shall have any liability whatsoever to Purchaser arising out of or relating to the failure to obtain any such consent or give any such notice.

(b)     If any such consent is not obtained or notice is not given prior to the Closing, the Closing shall nonetheless take place on the terms set forth herein and, thereafter, through the earlier time as such consent is obtained or notice is given or twelve (12) months following the Closing (or, if the Transferred Asset is a Contract, the remaining term of the Contract, if shorter), Purchaser shall use its commercially reasonable efforts (not including the giving of any consideration) to secure such consent or give such notice as promptly as practicable after the Closing and Seller and the Debtor Affiliates shall provide or cause to be provided commercially reasonable assistance to Purchaser (not including the giving of any consideration) reasonably requested by Purchaser to secure such consent or give such notice, or cooperate in good faith with Purchaser (with each party being responsible for its own out-of-pocket expenses, but without requiring the payment of any amounts by either party to any party in order to obtain such party's consent and without any further consideration paid by Purchaser to Seller) in any lawful and commercially reasonable arrangement reasonably proposed by Purchaser under which (i) Purchaser shall obtain (without infringing upon the legal rights of such third party or violating any Law) the economic rights and benefits (net of the amount of any related Tax costs imposed on Seller or its Affiliates) under the Transferred Asset with respect to which the consent has not been obtained and (ii) Purchaser shall assume any related economic burden (including the amount of any related Tax costs imposed on Seller or its Affiliates) and risk of assumption with respect to such Transferred Asset (excluding, for the avoidance of doubt, any Retained Liabilities).

SECTION 1.04.     Assumption of Liabilities; Retained Liabilities.

(a)     Upon the terms and subject to the conditions of this Agreement, Purchaser (or any Affiliate designated by Purchaser, as applicable) shall assume, effective as of the Closing, and shall pay, perform and discharge when due only the following obligations, Liabilities and commitments of Seller, in each case, without duplication and only to the extent not paid prior to the Closing and excluding any Retained Liabilities (collectively, the "**Assumed Liabilities**"):

(i)     obligations, liabilities and commitments of Seller to the extent solely arising out of the operation or conduct of the Business by Purchaser after the Closing Date and accruing after the Closing Date;

(ii)     all liabilities, obligations and commitments assumed by Purchaser pursuant to Article VII, in each case, solely to the extent occurring or arising, or payable on or after Closing (the "**Assumed Benefits Obligations**");

(iii)     all liabilities, obligations and commitments relating to, or arising from, the Purchaser's or its Affiliate's or designee's employment or termination of employment of, or terms and conditions of employment, or other facts, claims, or other matters to the extent concerning any Transferred Employee and occurring or arising, or payable, after the Closing;

6

(iv)　　all liabilities and obligations arising under or in connection with any Assumed Employee Benefit Plan; and

(v)　　other than the Assumed Benefit Obligations, all obligations, liabilities and commitments arising out of any Transferred Contract prior to the Closing Date for the servicing of any deferred revenue following the Closing Date and paying any accounts payable arising under such Transferred Contract to the extent the goods or services generating such accounts payable are to be provided after the Closing, but only to the extent that such obligations, liabilities and commitments were incurred in the ordinary course of business and do not relate to any failure to perform, improper performance, warranty or other breach, default or violation by Seller on or prior to the Closing;

(vi)　　all Taxes with respect to the Transferred Assets, the Assumed Liabilities, or the Business for any taxable period (or portion thereof) beginning after the Closing Date (in the case of a Straddle Period, allocated in accordance with Section 11.01(e)); and

(vii)　　all Transfer Taxes; and

(viii)　　without duplication, but subject to the provisions of Section 5.21 (including Section 5.21(g)), obligations, liabilities and commitments of Seller or its Affiliates, including payments or performance, to the extent attributable to the Business following the Closing under any Mixed-Use Contract (including any related accounts payable to trade creditors, to the extent arising out of or Related to the Business or the Transferred Assets following the Closing, and whether or not invoiced, accrued, billed or received, other than obligations of the type set forth in Section 1.04(b)), including claims related thereto.

For the avoidance of doubt, Purchaser shall not assume, and nothing herein shall be construed as Purchaser assuming, any liabilities or obligations of Seller or its Affiliates arising out of (x) any actual or alleged breach of Contract, violation of Law, fraud, willful misconduct or gross negligence by Seller or its Affiliates occurring prior to the Closing Date, or (y) any Proceedings arising out of or relating to (i) the conduct or operations of the Business prior to the Closing, (ii) any business of Seller or its Affiliates other than the Business or (iii) any Excluded Asset or Retained Liability.

(b)　　The term "**Retained Liabilities**" means all liabilities of Seller or any of its Affiliates other than Assumed Liabilities, including:

(i)　　all obligations, liabilities and commitments of Seller and its Affiliates under this Agreement, the Schedules attached hereto and any other agreements entered into by Seller and any of its Affiliates in connection with the transactions contemplated by this Agreement;

(ii)　　(A) all Tax liabilities of Seller or any of its Affiliates, including any member of any consolidated, affiliated, combined or unitary group of which Seller is or has been a member for Taxes (other than any such amounts included in Assumed Taxes) and (B) all Taxes with respect to the Transferred Assets, the Assumed Liabilities, or the Business for any Pre-Closing Tax Period (in the case of a Straddle Period, allocated in accordance with Section 11.01(e)) (other than, in any such case, any such amounts included in Assumed Taxes or borne by Purchaser under Section 11.01);

7

(iii)     all obligations, liabilities and commitments expressly retained by Seller pursuant to Article VII, and those that are otherwise relating to, or arising from, the Employees, including the employment or termination of employment, terms and conditions of employment, or other facts, claims, or other matters to the extent concerning any Transferred Employee and occurring or arising at or prior to the Closing;

(iv)     all obligations, liabilities and commitments for current accounts payable to trade creditors prior to the Closing Date, solely to the extent such products were delivered or services were rendered to the Seller or any of its Subsidiaries or Affiliates prior to the Closing;

(v)     all obligations, liabilities and commitments in respect of indebtedness for borrowed money owing or guaranteed by Seller or any of its Subsidiaries or Affiliates (subject to Section 5.09);

(vi)     all obligations, liabilities and commitments in respect of the Employee Benefit Plans which are not Assumed Employee Benefit Plans, whether relating to the period before, on, or after the Closing Date;

(vii)     all obligations, liabilities and commitments to the extent related to or arising out of any Excluded Asset;

(viii)     all obligations, liabilities and commitments relating to any existing Liens (other than Permitted Liens);

(ix)     all obligations, liabilities and commitments arising under or relating to Environmental Laws or Hazardous Materials;

(x)     all Cure Payments; and

(xi)     all obligations, liabilities and commitments subject to administrative expense status under section 503(b)(9) of the Bankruptcy Code.

SECTION 1.05.     Assumption and Assignment of Contracts.

(a)     Promptly, but in any event, within thirty (30) days from the date hereof, Seller shall deliver Section 1.05(a) of the Disclosure Schedule to Purchaser, which shall contain Seller's good-faith best estimate, as certified by the Chief Executive Officer or Chief Financial Officer of Seller, of the amount of Cure Payments with respect to each (x) Transferred Contract, or (y) other Contract Related to the Business (excluding any Mixed-Use Contracts); provided, however, that from and after the date of delivery of Section 1.05(a) of the Disclosure Schedule hereunder until five (5) Business Days prior to the Auction, Seller will update or cause to be updated or supplemented Section 1.05(a) of the Disclosure Schedule to include and/or add additional Transferred Contracts or Assumed Leases in compliance with the terms of this Agreement (with the prior written consent of Purchaser) or other Contracts or leases relating to the Business (with the prior written consent of Purchaser) and/or, in each case, to include revised Cure Payments with respect to any Contracts set forth therein, which updates shall amend Section 1.05(a) of the Disclosure Schedule for all purposes hereof. Prior to the Sale Hearing, Seller shall commence appropriate Proceedings before the Bankruptcy Court and otherwise take all reasonably necessary actions in order to determine

8

Cure Payments with respect to any Transferred Contract or Assumed Lease entered into prior to the Petition Date. Notwithstanding the foregoing, at any time and from time to time prior to the Closing, Purchaser may identify any Transferred Contract or Assumed Lease as one that Purchaser no longer desires to have assigned to it in accordance with Section 1.06. Payment of all Cure Payments for each Transferred Contract or Assumed Lease that is assumed and assigned to Purchaser shall be the sole responsibility of Seller and its Affiliates, irrespective of the aggregate amount of such Cure Payments (whether reflected on Section 1.05(a) of the Disclosure Schedule or otherwise) and shall be paid by Seller, and neither Purchaser nor any of its Affiliates shall have any liability therefor, except as expressly set forth in Section 6.05.

(b)      At the Closing, Seller and its Affiliates shall assign to Purchaser the Transferred Contracts and Assumed Leases, in each case pursuant to Section 365 of the Bankruptcy Code and the Sale Order, subject to provision by Purchaser of adequate assurance as may be required under Section 365 of the Bankruptcy Code and payment of the Cure Payments by Seller in respect of the Transferred Contracts and Assumed Leases as contemplated hereby. The Cure Payments in respect of all of the Transferred Contracts, Mixed-Use Contracts and Assumed Leases shall be borne by Seller, shall be paid by Seller, and shall not be the obligation, liability or responsibility of Purchaser or any of its Affiliates, except as expressly set forth in Section 6.05. Seller shall be solely responsible for the payment, performance and discharge when due of the Liabilities under the Transferred Contracts, Mixed-Use Contracts and Assumed Leases arising or otherwise payable on or prior to the Closing Date, and such Liabilities shall not be the obligation, Liability or responsibility of Purchaser or any of its Affiliates.

SECTION 1.06.    Additional and Eliminated Transferred Contracts. Notwithstanding anything in this Agreement to the contrary, Purchaser may, from time to time and in its sole and absolute discretion, amend or revise Section 1.05(a) of the Disclosure Schedule in order to reclassify any Transferred Contract or Assumed Lease as a Contract that is not assumed; provided, that removal of a Contract as a Transferred Contract shall not reduce or otherwise modify the Estimated Purchase Price. Purchaser may designate any Contract or lease to which Seller or any of its Affiliates is a party (which is Related to the Business) as a Transferred Contract or Assumed Lease at any time through and until the Closing, provided that any such designation after the scheduled Auction date with respect to a Contract (excluding any Mixed-Use Contracts and Undisclosed Contracts) may result in an adjustment pursuant to Section 2.03(c). Automatically upon the designation of any Contract as a Transferred Contract or Assumed Lease on Section 1.05(a) of the Disclosure Schedule by the Purchaser in accordance with the previous sentence, it shall be a Transferred Contract or Assumed Lease, as applicable, for all purposes of this Agreement. Automatically upon the removal of any Contract from the list of Transferred Contracts or Assumed Leases on Section 1.05(a) of the Disclosure Schedule by Purchaser in accordance with the first sentence of this Section 1.06, it shall be an Excluded Asset for all purposes of this Agreement, and no Liabilities arising thereunder or relating thereto shall be assumed by Purchaser or any of its Affiliates or be the obligation, Liability or responsibility of Purchaser or any of its Affiliates. If any Contract is added to the list of Transferred Contracts or Assumed Leases, then Seller shall, and shall cause its Affiliates to, take such steps and actions as are reasonably necessary, to cause such Contract to be assumed and assigned to Purchaser or any of its applicable designees as promptly as possible at or following the Closing.

9

## ARTICLE II

## CLOSING

SECTION 2.01.    Closing. Subject to the terms and conditions of this Agreement, the closing of the Acquisition (the "**Closing**") shall take place (i) by electronic exchange of documents (or, if the parties agree to hold a physical closing, at the offices of Kirkland & Ellis LLP, 601 Lexington Avenue, New York, NY 10022, United States), at 8:00 a.m. Eastern Time no later than the fifth (5th) Business Day following the date on which there first occurs the satisfaction (or, to the extent permitted, the waiver) of the conditions set forth in Article VIII (other than any condition which by its nature is to be satisfied at the Closing, but subject to satisfaction or waiver of all such conditions) or (ii) at such other place, time and date as may be mutually agreed in writing by Seller and Purchaser. The date on which the Closing occurs is referred to in this Agreement as the "**Closing Date**".

SECTION 2.02.    Transactions To Be Effected at the Closing.

(a)    Except as provided in Section 2.03, at the Closing, Seller (or an Affiliate and/or Debtor Affiliate, as applicable, designated by Seller), shall deliver or cause to be delivered to Purchaser (or an Affiliate designated by Purchaser), as applicable:

(i)    a Sale Order entered by the Bankruptcy Court which shall have become a Final Order;

(ii)    duly executed copies of (A) a bill of sale, assignment and assumption agreement substantially in the form attached hereto as Exhibit A ("**Bill of Sale, Assignment and Assumption Agreement**") and (B) applicable conveyance, transfer, and/or assumption legal instruments of equivalent nature for the In-Scope Foreign Assets (the "**Local Transfer Agreements**" );

(iii)    a duly executed Intellectual Property Assignment substantially in the form attached hereto as Exhibit B ("**IP Assignment Agreement**") for recordation with the appropriate Governmental Entity, as applicable;

subject to Section 5.14, a duly executed counterpart to the Transition Services Agreement in a form consistent with the terms of Exhibit C or otherwise mutually agreeable to Seller and Purchaser ("**Transition Services Agreement**");

(iv)    an IRS Form W-9 or IRS Form W-8, as applicable executed by Seller or Seller's regarded owner for U.S. federal Income Tax purposes and any other Debtor Affiliate or such Debtor Affiliate's registered owner for U.S. federal Income Tax purposes, as applicable; provided, that the failure to deliver such form shall not be deemed a breach of any condition or covenant in this Agreement;

(v)    (A) possession or control of all physical or tangible materials included in the Transferred Assets and (B) all passwords or other information required to transfer to Purchaser any domain names or social or mobile media identifiers or accounts included in the Transferred Assets;

(vi)     the certificates of Seller to be received by Purchaser pursuant to Section 8.02; and

(vii)     such other documents as Purchaser may reasonably request that are customary for a transaction of this nature and necessary to evidence or consummate the transactions contemplated by this Agreement, including the documents and instruments described in this Agreement, including all such documents and instruments required to vest in Purchaser good and marketable title to the Transferred Assets, free and clear of all Liens other than Permitted Liens.

(b)     At the Closing, Purchaser shall deliver (i) to Seller, payment, by wire transfer of immediately available funds to one or more accounts designated in writing by Seller (such designation to be made at least two (2) Business Days prior to the Closing Date), of an aggregate amount equal to (A) the Base Purchase Price, *plus* (B) the amount of Prepaid Expenses as of the close of business on the Business Day immediately preceding the Closing Date (the "**Estimated Prepaid Expenses**"), each such amount as estimated in good faith by Seller, which estimate will be delivered to Purchaser at least three (3) Business Days prior to the Closing and with respect to which Seller shall, in good faith, consider and discuss with Purchaser any reasonable comments provided at least one (1) Business Day prior to the Closing (the "**Estimated Closing Statement**") (such result being hereinafter called the "**Estimated Purchase Price**"), and (ii) to Seller, as applicable, duly executed counterparts to (A) the Bill of Sale, Assignment and Assumption Agreement, (B) the Local Transfer Agreements, (C) the IP Assignment Agreement, and (D) the Transition Services Agreement. Section 2.02(b) of the Disclosure Schedule sets forth Seller's good faith estimate of Prepaid Expenses as of the date of this Agreement, and such Prepaid Expenses shall not increase the Estimated Purchase Price or the Final Purchase Price, as applicable, in an amount such that the Closing would require the consent of any Governmental Authority or the expiration of any related waiting period; provided that in no event shall the Prepaid Expenses exceed $6,000,000. The Estimated Purchase Price shall include amounts allocated to In-Scope Foreign Assets, and such In-Scope Foreign Assets will be subject to the applicable Local Transfer Agreement and will be allocated values in accordance with the Purchase Price Allocation (the "**Ex-US Allocable Purchase Price**" ). Ex-US Allocable Purchase Price shall be paid directly to Seller's applicable Affiliate or otherwise in accordance with applicable Laws of the jurisdiction where such Seller's Affiliate is organized. As soon as commercially practicable, but no later than twenty-five (25) Business Days prior to the Closing Date, Purchaser shall provide a proposed allocation to Seller setting forth the amount of the Final Purchase Price (and other amounts treated as part of the purchase price for U.S. federal Income Tax purposes) allocable to the In-Scope Foreign Assets among each jurisdiction selling any In-Scope Foreign Assets (on a country-by-country basis) for Seller's review, comment and consent (such consent not to be unreasonably withheld, conditioned or delayed) (the "**Purchase Price Allocation**" ). If Seller delivers a written objection within ten (10) Business Days after receipt of the draft Purchase Price Allocation proposed by Purchaser, then Purchaser and Seller shall negotiate in good faith to resolve any such objection, and, if Seller and Purchaser cannot resolve such dispute within five (5) Business Days of Purchaser's receipt of Seller's objection, then a nationally recognized accounting firm (the "**Accounting Firm**") mutually acceptable to Purchaser and Seller shall resolve such dispute, with the costs of such resolution to be borne by Purchaser, on the one hand, and Seller, on the other hand, as determined by the Accounting Firm based on the inverse of the percentage that the Independent Expert's determination (before such allocation) bears to the total amount of the disputed items. For purposes

11

of illustration only, if the disputed items are $100 and if the final written determination of the Accounting Firm states that $80 of the disputed items are resolved in Purchaser's favor and $20 of the disputed items are resolved in Seller's favor, Purchaser would bear twenty percent (20%) of the Accounting Firm's fees and expenses, on the one hand, and Seller would bear eighty percent (80%) of such fees and expenses, on the other hand.

SECTION 2.03.    Post-Closing Adjustment.

(a)    Closing Statement. Within sixty (60) days after the Closing Date, Purchaser shall prepare and deliver to Seller a statement (the "**Closing Statement**"), setting forth (i) the Base Purchase Price, *plus* (ii) the amount of Prepaid Expenses as of the close of business on the Business Day immediately preceding the Closing Date ("**Closing Prepaid Expenses**" ), *plus* (iii) any Cure Payments associated with Contracts (excluding any Mixed-Use Contracts and any Undisclosed Contract) added to Section 1.05 of the Disclosure Schedule by Purchaser following the Auction ("**Closing Cure Payment**") (such result being hereinafter called the "**Adjusted Purchase Price**"). The Closing Statement shall be prepared using the Accounting Principles set forth on Section 2.03(a) of the Disclosure Schedules and include reasonably detailed information appropriate to support such calculation. If the Closing Statement is not delivered to Seller within such sixty (60)-day period, then Seller will have the right to elect that Seller's estimates set forth in the Estimated Closing Statement will constitute the amounts for Closing Prepaid Expenses and the Adjusted Purchase Price and will be final, conclusive and binding upon, and nonappealable by, the parties hereto.

(b)    Objections; Resolution of Disputes.

(i)    Unless Seller notifies Purchaser in writing, within forty-five (45) days (such period, the "**Objection Period**") after the earlier of (A) Seller's receipt of the Closing Statement and (B) the expiration of the sixty (60)-day period contemplated by Section 2.03(a), of any objection to the computation of Closing Prepaid Expenses and the Closing Cure Payments set forth therein (or, if the Closing Statement was not delivered in accordance with Section 2.03(a), any objection to computation of the Estimated Closing Statement) (a "**Notice of Objection**"), the Closing Statement (or the Estimated Closing Statement, as applicable) shall become final and binding Closing Statement. During the Objection Period and for purposes of Seller's review of the Closing Statement, if any, and preparation of any Notice of Objection, Purchaser shall permit Seller and its Representatives to review the working papers of Purchaser and its accountants to the extent that they relate to the Closing Statement (subject to Section 5.02(a) and Section 5.03) and, at Seller's request, shall provide Seller and its Representatives (Y) information reasonably relating to the Closing Statement reasonably requested and (Z) reasonable access during normal business hours to the personnel, properties, books and records of and relating to the Closing Statement. Any Notice of Objection shall specify the basis for the objections set forth therein, provided (1) such access does not unreasonably interfere with the normal operations of Purchaser and its Affiliates and (2) nothing herein shall require Purchaser or any of its Affiliates to provide access or disclose any information to Seller or any of its accountants or advisors if such access or disclosure would be in violation of applicable Law or the regulations of any Governmental Authority or the provisions of any contract to which Purchaser or any of its Affiliates is a party.

12

(ii)     If Seller provides the Notice of Objection to Purchaser within the Objection Period, Purchaser and Seller shall, during the 30-day period following Purchaser's receipt of the Notice of Objection (such 30-day period, the "**Resolution Period**"), attempt in good faith to resolve Seller's objections. During the Resolution Period, Purchaser and its Representatives shall be permitted to review the working papers of Seller and its accountants relating to the Notice of Objection and the basis therefor (subject to Section 5.02(a)). If Purchaser and Seller are unable to resolve all such objections within the Resolution Period (or such longer period as they may mutually agree), the matters remaining in dispute shall be submitted to a nationally recognized consulting or valuation firm with an expertise in purchase price adjustment dispute resolution mutually selected by Seller and Purchaser (such agreed firm being the "**Independent Expert**"). The Independent Expert shall be engaged within 20 days following expiration of the Resolution Period pursuant to an engagement letter among Purchaser, Seller and the Independent Expert. The Independent Expert shall be instructed, pursuant to such engagement letter, to act as expert and not arbitrator, and to resolve only those matters set forth in the Notice of Objection remaining in dispute based solely on the written submissions of the parties and not to otherwise investigate any matter independently. Purchaser and Seller each agree to use commercially reasonable efforts to furnish to the Independent Expert access to such individuals and such information, books and records as may be reasonably required by the Independent Expert to make its final determination. Purchaser and Seller shall also instruct the Independent Expert to render its reasoned written decision as promptly as practicable but in no event later than 30 days from the date that information related to the unresolved objections was first presented to the Independent Expert by Purchaser and Seller. With respect to each disputed line item, such decision shall not be in excess of the higher, nor less than the lower, of the amounts advocated by Purchaser in the Closing Statement (or, if the Closing Statement was not delivered in accordance with Section 2.03(a), in the Estimated Closing Statement) or Seller in the Notice of Objection with respect to such disputed line item. The resolution of disputed items by the Independent Expert shall be final and binding on the parties, and the determination of the Independent Expert shall constitute an arbitral award that is final, binding and non-appealable and upon which a judgment may be entered by a court having jurisdiction thereover. Each party will bear its own costs and expenses in connection with the resolution of such disputed items by the Independent Expert, and the fees and expenses of the Independent Expert incurred pursuant to this Section 2.03(c) shall be borne by Purchaser, on the one hand, and Seller, on the other hand, as determined by the Independent Expert based on the inverse of the percentage that the Independent Expert's determination (before such allocation) bears to the total amount of the disputed items. For purposes of illustration only, if the disputed items are $100 and if the final written determination of the Independent Expert states that $80 of the disputed items are resolved in Purchaser's favor and $20 of the disputed items are resolved in Seller's favor, Purchaser would bear twenty percent (20%) of the Independent Expert's fees and expenses, on the one hand, and Seller would bear eighty percent (80%) of such fees and expenses, on the other hand. After the final determination of the Closing Prepaid Expenses, except in the case of fraud, Purchaser and Seller shall have no further right to make any claims against the other Party or any of its affiliates in respect of the Closing Prepaid Expenses or any payment made pursuant to Section 2.03(c).

(c)     Adjustment Payment. When used hereunder, the "**Final Purchase Price**" means an aggregate amount equal to (i) the Base Purchase Price, *plus* (ii) Closing Prepaid Expenses, as finally determined pursuant to Section 2.03 ("**Final Prepaid Expenses**""), *plus* any Cure Payments associated with Contracts (including any Mixed-Use Contracts, but excluding any

13

Undisclosed Contracts) added to the list of Transferred Contracts and Assumed Leases on Section 1.05(a) of the Disclosure Schedule following the scheduled date of the Auction by Purchaser ("**Final Cure Payments**"). Within ten days after final determination of Final Rendered Accounts Receivable, Final Prepaid Expenses and Final Cure Payments have been finally determined in accordance with Section 2.03(b), (i) if the Estimated Purchase Price is less than the Final Purchase Price, Purchaser shall pay to Seller the entire amount of such shortfall, and (ii) if the Estimated Purchase Price is greater than the Final Purchase Price, Seller shall pay to Purchaser the entire amount of such excess (a "**Seller Post-Closing Payment**" ). Any payment hereunder shall be made by wire transfer of immediately available funds to an account designated in writing by Purchaser or Seller, as the case may be (such designation to be made at least three Business Days prior to the date on which such payment is due). Pursuant to the Sale Order, any claim of Purchaser in respect of the Seller Post-Closing Payment is and constitutes an allowed superpriority administrative expense claim against Seller under sections 105(a), 503(b) and 507(a)(2) of the Bankruptcy Code with priority over all other administrative expenses of Seller of the kind specified in section 503(b) of the Bankruptcy Code; provided that the priority of such superpriority administrative claims shall be subject and subordinated to the Carve Out (as defined in the DIP Order as in effect on the date of this Agreement) in all respects.

(d) Adjustments for Tax Purposes. Any payments made pursuant to Section 2.02(b) shall be treated as an adjustment to the Final Purchase Price by the parties for Tax purposes, unless otherwise required by Law.

(e) Reserve. At Closing, Seller shall establish a reserve (which shall not be available for distributions to any creditor) sufficient to pay Purchaser any amounts that may be payable pursuant to Section 2.03(c).

SECTION 2.04. Withholding. Purchaser and its Affiliates and agents may deduct and withhold any required Taxes from any payments to be made pursuant to this Agreement to the extent required by applicable Tax Law; provided, however, that, prior to making any such deduction or withholding on any amount, Purchaser shall use commercially reasonable efforts to provide the recipient with notice of intent to make such deduction or withholding and to cooperate with any reasonable request of the recipient to avoid or minimize the need to make such deduction or withholding to the extent permitted by applicable Tax Law. To the extent that any such amounts are so withheld, such withheld amounts will be treated for all purposes of this Agreement as having been delivered and paid to the person in respect of which such withholding was made.

## ARTICLE III

### REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth in the disclosure schedules (the "**Disclosure Schedule**"), Seller hereby represents and warrants to Purchaser as follows.

SECTION 3.01. Organization and Standing. Each of Seller and its Business Affiliates conveying the Transferred Assets is a legal entity duly organized, validly existing and, where applicable, in good standing under the Laws of the jurisdiction of its organization or incorporation. Each of Seller and such Business Affiliates has the full requisite corporate power and authority to

own, operate, lease or otherwise hold the Transferred Assets owned, leased or otherwise held by it, and to conduct the Business as currently conducted by it.

SECTION 3.02.    Authority; Execution and Delivery; Enforceability. Each of Seller and its Business Affiliates, as applicable, has the requisite corporate (or similar organizational) power and authority to execute and deliver this Agreement and the other agreements and instruments to be executed and delivered by it in connection with this Agreement (the "**Ancillary Agreements**") to which it will be a party and to consummate the transactions contemplated to be consummated by it by this Agreement and such Ancillary Agreements. Each of Seller and its Affiliates has taken all corporate (or similar organizational) action required by its certificate of incorporation and bylaws (or similar organizational documents) to authorize the execution and delivery of this Agreement and the Ancillary Agreements to which it will be a party and to authorize the consummation of the transactions contemplated to be consummated by it by this Agreement and such Ancillary Agreements. Each of Seller and its Affiliates has duly executed and delivered this Agreement and, prior to Closing, will have duly executed and delivered each Ancillary Agreement to which it will be a party, and (assuming the due authorization, execution and delivery by Purchaser) this Agreement constitutes, and each Ancillary Agreement to which it will be a party will after the Closing (assuming the due authorization, execution and delivery by the other parties thereto) constitute, its legal, valid and binding obligation of Seller and its Affiliates (as applicable), enforceable against it in accordance with its terms subject, as to enforcement, to applicable bankruptcy, insolvency, moratorium, reorganization, fraudulent conveyance or similar Laws affecting the enforcement of creditors' rights generally and to general equitable principles (whether considered in a proceeding in equity or at law) (the "**Enforceability Exceptions**" ").

SECTION 3.03.    Non-Contravention and Approvals.

(a)    The execution, delivery and performance by Seller and its Business Affiliates (as applicable) of this Agreement does not, and neither the execution, delivery and performance by each of Seller and its Affiliates of each Ancillary Agreement to which it will be a party nor the consummation by Seller of the transactions contemplated to be consummated by it by this Agreement and such Ancillary Agreements will, (i) conflict with or result in a violation or breach of, or default under, any provision of the certificate of incorporation or bylaws (or similar organizational documents), (ii) except as set forth in Section 3.03(a) of the Disclosure Schedule, result in any breach of or constitute a default under any Business Contract, (iii) conflict with or violate any judgment, order, determination or decree ("**Judgment**") or federal, national, supranational, state, provincial or local or administrative statute, law (including common law), ordinance, rule, code or regulation ("**Law**") applicable to Seller, the Business or any of the Transferred Assets, or (iv) result in the creation or imposition of any Lien (other than Permitted Liens or Liens arising from any act of Purchaser or its Affiliates) upon any of the Transferred Assets or give any person the right to accelerate, terminate, modify or cancel any Business Contract, except, in the case of clauses (ii) and (iii), any such items that would not reasonably be expected to have a Material Adverse Effect.

(b)    No approval or authorization ("**Consent**") of, or registration, declaration or filing with, any federal, national, supranational, state, provincial, local or foreign court of competent jurisdiction, governmental or quasi-governmental agency, authority, instrumentality or regulatory body (a "**Governmental Entity**") is required to be obtained or made by Seller or its Business

Affiliates, as applicable, in connection with the execution, delivery and performance of this Agreement and the Ancillary Agreements to which they will be a party or the consummation of the Acquisition, other than those set forth in Section 3.03(b) of the Disclosure Schedule and (ii) those the failure of which to obtain or make would not reasonably be expected to have a Material Adverse Effect.

SECTION 3.04.    Financial Statements. Prior to the date hereof, true, complete and correct copies of the financial statements Related to the Business set forth on Section 3.04 of the Disclosure Schedule have been made available to Purchaser (the "**Financial Statements**"). The Financial Statements fairly present, in all material respects the financial position and results of operations of Seller, including with respect to the Business, as of the respective dates and for the periods indicated, except for (a) certain assets, liabilities and expenses have been prepared using an allocation methodology determined by Seller and (b) the absence of normal, recurring year-end audit adjustments and notes thereto, and thus the Financial Statements do not necessarily reflect what the financial position and results of operations and cash flows of the Business would have been had the Business operated independently of Seller as of the dates or for the periods presented. The Financial Statements have been prepared in accordance with GAAP applied on a consistent basis throughout the period involved, subject, in the case of the unaudited financial statements, to normal and recurring year-end adjustments and the absence of notes (none of which, that, if presented, would not individually or in the aggregate be material to the Business).

SECTION 3.05.    Absence of Certain Changes. From December 31, 2024 until the date hereof, the Business has been conducted in the ordinary course of business consistent with past practice (other than, with respect to Intellectual Property, an action that would not constitute a breach of the covenants set forth in Section 5.01(a)(ii)), and there has not been any event, occurrence or development that has had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (b) there has not been any material change in any method of accounting or accounting practice for the Business, except as required by GAAP or as disclosed in the notes to the Financial Statements, and (c) except for matters relating to the process for the sale of the Business or as otherwise set forth in Section 3.05 of the Disclosure Schedule, neither Seller, its Business Affiliates nor any of its Subsidiaries has taken any action that, if taken after the date of this Agreement, would constitute a material breach of any of the covenants set forth in Section 5.01, other than any actions that are expressly contemplated by this Agreement or any Ancillary Agreement.

SECTION 3.06.    Title to Assets.

(a)    Seller or its Business Affiliates, as the case may be, has, and as of the Closing will have, good, valid, exclusive and marketable title to all Transferred Assets (other than (x) those identified in Section 3.06(a) of the Disclosure Schedule, and (y) those that are leased or licensed assets, in each case free and clear of all Liens), except for such Liens as are set forth in Section 3.06(a) of the Disclosure Schedule, (ii) mechanics', carriers', workmen's, repairmen's or other like Liens arising or incurred in the ordinary course of business for amounts not yet past due, (iii) Liens arising under original purchase price conditional sales Contracts and equipment leases with third parties entered into in the ordinary course of business, (iv) Liens for Taxes or other amounts due to Governmental Entities that are not due and payable or being contested in good faith, or the nonpayment of which is permitted or required by the Bankruptcy Code, (v) Liens

16

disclosed in the Financial Statements or any notes thereto that will be released at the Closing, (vi) non-exclusive licenses of Transferred Intellectual Property granted to third-parties in the ordinary course of business consistent with past practice and (vii) other imperfections of title, licenses or Liens, if any, which do not materially impair the continued use and operation of the assets to which they relate in the conduct of the Business as currently conducted (the Liens described in clauses (i) through (vii) above are referred to herein, collectively, as "**Permitted Liens**").

SECTION 3.07.    Real Property. Section 3.07 of the Disclosure Schedule sets forth all real property and interests in real property leased, subleased, licensed or occupied by Seller or any of its Subsidiaries and used or held for use primarily in the operation or conduct of the Business (the real property or interests in such real property a "**Leased Property**"). Seller or its Subsidiaries collectively, and have valid leasehold estates or, as the case may be, valid leasehold interests, in all Leased Property. There is no lease, sublease, license, use, occupancy, or similar agreement granting to any party (other than Seller or any of its Subsidiaries) any occupancy or use rights for any Leased Property and Seller and its Subsidiaries do not own any real property or interests in real property that are used or held for use in the operation or conduct of the Business.

SECTION 3.08.    Intellectual Property.

(a)    Section 3.08(a) of the Disclosure Schedule sets forth  all unexpired patents, all unexpired trademark registrations, all unexpired copyright registrations, all unexpired domain name registrations (collectively, the "**Intellectual Property Registrations**" ), and all pending applications for issuance or registration of any of the foregoing, in each case, that are included in the Transferred Assets,  all material unregistered trademarks, service marks or trade dress that are included in the Transferred Assets, and (iii) all material software included in the Transferred Assets. Each Intellectual Property Registration is subsisting, unexpired, and to the Knowledge of the Seller, valid and enforceable. Except as set forth in Section 3.08(a) of the Disclosure Schedule, Seller exclusively owns all right, title and interest in and to the Transferred Intellectual Property, free and clear of all Liens, other than Permitted Liens.

(b)    Except as set forth in Section 3.08(b) of the Disclosure Schedule or as provided in any Contract set forth in Section 3.09 of the Disclosure Schedule, Seller and/or its Affiliates have not entered into a written agreement (i) granting any license to any Transferred Intellectual Property, or (ii) under which Seller and/or its Affiliates receives a license to Intellectual Property Related to the Business, in each case, except (A) non-exclusive licenses granted by Seller to distributors, end users, or customers in the ordinary course of business consistent with past practice, (B) incidental licenses granted by Seller to third parties providing services to Seller in the ordinary course of business for the sole purpose of providing such services, and (C) agreements granting rights or licenses to Seller and/or its Affiliates with respect to Intellectual Property that are generally commercially available on a subscription basis or pursuant to standard or non-negotiated license agreements, including shrink-wrap and click-wrap agreements for software (including open source software and free software) with annual fees of less than $150,000 ((A) - (C), collectively, "**Ordinary Course Agreements**" ).

(c)    Except as set forth in Section 3.08(b) of the Disclosure Schedule, and except as would not reasonably be expected to be material to the Business, taken as a whole, (i) the conduct of the Business does not infringe, misappropriate or otherwise violate, and has not since the date

17

that is three (3) years prior to the date hereof infringed, misappropriated or otherwise violated, any Intellectual Property of any person, (ii) no Proceedings are pending or threatened in writing against Seller and/or its Affiliates by any third party (A) claiming infringement, misappropriation or other violation of Intellectual Property owned by such third party in connection with the conduct of the Business as currently conducted or as conducted at any time since the date that is three (3) years prior to the date hereof, or (B) challenging Seller's and/or its Affiliates' ownership or use, or the validity or enforceability, of any Transferred Intellectual Property, and (iii) to the Knowledge of Seller, no third party is infringing, misappropriating or otherwise violating any Transferred Intellectual Property or has, since the date that is three (3) years prior to the date hereof, infringed, misappropriated or otherwise violated any Transferred Intellectual Property, and no Proceedings are pending or threatened in writing by Seller and/or its Affiliates against any third party alleging the same.

(d)     The software included in the Transferred Intellectual Property or the Specified Source Code does not constitute, contain, incorporate, link to or use any open source software (including any software that is licensed under terms similar or comparable to any material terms of the Open Source Software Definition as promulgated by the Open Source Initiative) or interact with any such open source software in a manner that would limit the right to restrict sublicensing of, or require the distribution or disclosure to third parties of any source code for: (i) any software contained in the Transferred Intellectual Property, or (ii) any other software which contains, incorporates, links to or uses the Specified Source Code (including any compiled versions thereof or any derivative work based thereon). Neither the Seller nor its Affiliates has disclosed or is obligated to disclose any proprietary source code, the rights to which are included in the Transferred Intellectual Property, other than to employees and contractors who need access thereto to perform their duties for the Business and in all cases pursuant to non-disclosure agreements that prohibit use or disclosure thereof except for the sole benefit of the Seller or its applicable Affiliate.

(e)     Seller and its Affiliates have taken steps that are, as a whole, commercially reasonable to protect the confidentiality of any trade secrets and material confidential information included in the Transferred Intellectual Property.

(f)     Since the date that is three (3) years prior to the date hereof, and except as would not reasonably be expected to be material to the Business, taken as a whole, the Business has not suffered a security incident with respect to any Personal Data that required notice be sent to affected individuals under Data Privacy Laws or that imposed a risk that Seller and/or its Affiliates will incur liability or expense. Each of Seller and its Affiliates, as applicable, has taken steps that are, as a whole, reasonable under the circumstances to protect from malware or other contaminants the information technology systems included in the Transferred Assets (the "**IT Systems**"), and there have not been any failures, breakdowns, outages, or other adverse events that have occurred with respect to any IT Systems, other than those that have been fully remedied. Each of Seller and its Affiliates, as applicable, has in place commercially reasonable disaster recovery plans and procedures for the IT Systems and has taken commercially reasonable steps to safeguard the integrity, redundancy, continuous operation and security of the IT Systems (and all Personal Data, contained therein or processed thereby).

(g)      The conduct of the Business is, and has been since the date that is three (3) years prior to the date hereof, in compliance in all material respects with Data Privacy Laws and Seller's and/or its Affiliates' (as applicable) own public-facing privacy policies.

(h)      The consummation of the Acquisition will not result in any loss, limitation, or impairment of the Purchaser's rights to own, use, or access any Personal Data forming part of the Transferred Assets.

SECTION 3.09.    Contracts.

(a)      Section 3.09(a) of the Disclosure Schedule sets forth, as of the date hereof, each of the following Contracts to which, Related to the Business, Seller and/or its Business Affiliates, as applicable, are party, other than any Employee Benefit Plan:

(i)      a Contract, including customer contracts and Government Contracts, for the sale of any product or service by the Business involving aggregate payments of more than $750,000 for the 12-month period ended June 30, 2025;

(ii)      a Contract for the purchase by the Business of materials, supplies, equipment or services, including capital commitments or expenditures, involving aggregate payments of more than $50,000 for the 12-month period ended June 30, 2025;

(iii)      a Contract concerning the establishment, control, maintenance or operation of a joint venture, strategic alliance, partnership or other similar agreement or arrangement, in each case that is material to the Business;

(iv)      the lease, sublease or license agreements pertaining to each Leased Property;

(v)      a Contract (A) pursuant to which a third party distributor (other than any Affiliate of Seller) has the right to distribute or resell products of the Business in a particular market and (B) involving aggregate payments in excess of $100,000 for the 12-month period ended June 30, 2025;

(vi)      any other Contract not otherwise required to be set forth in any Section or subsection of the Disclosure Schedule that has an aggregate future liability to any person in excess of $500,000;

(vii)      a Transferred Contract, or any Contract containing an obligation that constitutes an Assumed Liability;

(viii)      settlements (A) in excess of $500,000 entered into since the date that is three (3) years prior to the date hereof with respect to any Proceeding or (B) for which the Business has ongoing material monetary or non-monetary Liabilities thereunder;

(ix)      all Governmental Contracts;

19

(x)     all Contracts that (A) contain a non-compete clause binding the Business or otherwise limit the ability of the Business to engage or compete in any line of business or with any person or in any geographic area or during a period of time or (B) limit the Business from soliciting, hiring or otherwise engaging with any prospective employee, consultant, contractor, customer or supplier;

(xi)     all other Contracts that are material to the Transferred Assets or the operation of the Business and not previously disclosed pursuant to this <u>Section 3.09(a)</u>.

(b)     All Contracts required to be set forth in <u>Section 3.08</u> or <u>Section 3.09</u> of the Disclosure Schedule (such Contracts, the "**Business Contracts**") and all Ordinary Course Agreements are valid, binding, adequately stamped and duly registered (where required by applicable Law) and in full force and effect, subject, as to enforcement, to the Enforceability Exceptions, except for such failures to be valid, binding and in full force and effect that would not reasonably be expected to have a Material Adverse Effect. Seller has made available to Purchaser true, correct and complete copies of all Business Contracts prior to the date hereof. Except as set forth in <u>Section 3.09(b)</u> of the Disclosure Schedule, neither Seller nor any of its Business Affiliates is in breach or default under the Business Contracts or the Ordinary Course Agreements, and, to the Knowledge of Seller, no other party to any Business Contract or Ordinary Course Agreement is in breach or default thereunder, except in each case to the extent that such breach or default would not reasonably be expected to have a Material Adverse Effect.

SECTION 3.10.     <u>Permits</u>.

(a)     <u>Section 3.10(a)</u> of the Disclosure Schedule lists all material Permits required in connection with the operation of the Transferred Assets and the Business as currently operated as of the date hereof. Seller has made available to Purchaser true, correct and complete copies of all material Permits prior to the date hereof.

(b)     Except as set forth in <u>Section 3.10(b)</u> of the Disclosure Schedule, no Proceeding is pending or, to the Knowledge of Seller, threatened in writing that would be reasonably expected to result in the revocation, cancellation, non-renewal or suspension of any such Permit the loss of which would reasonably be expected to have a Material Adverse Effect.

SECTION 3.11.     <u>Taxes</u>.

(a)     Seller (or its applicable Affiliate) has prepared (or caused to be prepared) and timely filed (taking into account valid extensions of time within which to file) all material Tax Returns which arise from or with respect to the Transferred Assets or the Business and such Tax Returns are complete and accurate in all material respects;

(b)     Seller (or its applicable Affiliate) has timely paid in full all material Taxes which arise from or with respect to the Transferred Assets or the Business (whether or not shown on any Tax Return), except to the extent the nonpayment thereof is permitted or required by the Bankruptcy Code; and

(c)     There are no audits, investigations, disputes, notices of deficiency, claims or other actions or proceedings for or relating to any Liability for any material Taxes of Seller or its

Affiliates with respect to the Transferred Assets or the Business that are pending or threatened in writing.

(d)      There are no Liens for Taxes (other than Permitted Liens) with respect to the Transferred Assets or the Business.

This Section 3.11, Section 3.05 (to the extent referring to Section 5.01(a)(vii)) and Section 3.13 (insofar as it relates to Taxes) contain the sole and exclusive representations and warranties with respect to Taxes. No representation or warranty is made with respect to the validity of any Tax position or the availability of any Tax attribute for any Tax period (or any portion thereof) following the Closing.

SECTION 3.12.      Legal Proceedings. Section 3.12 of the Disclosure Schedule sets forth, as of the date hereof, each Proceeding pending or, to the Knowledge of Seller, threatened in writing against Seller and/or its Business Affiliates Related to the Business or related to the Transferred Assets and which, in all cases, is reasonably likely to result in a Material Adverse Effect. Except as set forth in Section 3.12 of the Disclosure Schedule, neither Seller nor any of its Business Affiliates is not party or subject to or in default under any unsatisfied Judgment that is applicable to the conduct of the Business, other than such Judgments that are not reasonably likely to result in a Material Adverse Effect. This Section 3.12 does not relate to (a) Intellectual Property matters, which are the subject of Section 3.08, or (b) tax matters, which are the subject of Section 3.11.

SECTION 3.13.      Employee Benefit Plans; Labor.

(a)      Section 3.13(a) of the Disclosure Schedule contains a true and complete list of each material Employee Benefit Plan other than any Employee Benefit Plan required to be maintained by applicable Law and any employment agreement or offer letter that provides for severance or termination pay above what is required under applicable Law. "Employee Benefit Plan" means each "employee benefit plan" within the meaning of Section 3(3) of ERISA (whether or not subject to ERISA), and each other benefit, welfare, fringe benefit, supplemental unemployment, retirement, superannuation, pension, deferred compensation, bonus, commission, change of control, retention, vacation pay, sick leave, paid time off, medical, dental, vision, disability, life, loan, death benefit, severance, separation, salary continuation, termination indemnity, end of service, vacation, incentive bonus, thirteen month, equity-based compensation, stock compensation, stock purchase, stock option, stock appreciation, other stock-based award, phantom stock option, or other plan, program, practice, agreement or arrangement in each case that is sponsored, maintained, contributed to, or required to be contributed to, by Seller or its Subsidiaries for the benefit of any Employee or for which Seller or any of its Subsidiaries has any present or contingent liability in respect of any Employee, other than (i) any such plan or arrangement maintained by a Governmental Entity or (ii) governmental plan or program requiring the mandatory payment of social insurance taxes or similar contributions to a government fund with respect to the wages of an employee (each an "**Employee Benefit Plan**"). Prior to the date of this Agreement, true and correct copies of each material Employee Benefit Plan (but only to the extent reasonably available with respect to any Non-U.S. Employee Benefit Plan) (or, where oral, summaries of the material terms thereof) have been made available to Purchaser.

21

(b)      To the extent permitted by applicable Law, <u>Section 3.13(b)</u> of the Disclosure Schedule sets out a true and complete list of Employee names, identification numbers and with respect to each such Employee, their date of hire, compensation (broken down to include hourly wage rate or base salary, commissions, and bonus targets as of August 20, 2025 (each as applicable)), location of work (by country for Employees located outside of the U.S., and U.S. state for Employees located in the U.S., as applicable), leave status and expected return to work date. <u>Section 3.13(b)</u> of Disclosure Schedule may be amended from time to time (i) as mutually agreed between Purchaser and Seller, with consent by Purchaser not to be unreasonably withheld, (ii) to reflect resignations, or (iii) to reflect hires and terminations (in accordance with the terms of this Agreement).

(c)      Neither Seller nor any of its Subsidiaries maintains, is required to contribute to, or has any liability with respect to (including on account of an ERISA Affiliate) any employee benefit plan (i) in the United States that (a) constitutes a "multiemployer plan" (within the meaning of Section 3(37) of ERISA) subject to Title IV of ERISA, or (b) is subject to Title IV or Section 302 of ERISA or Section 412 or 4971 of the Code, (ii) in the United Kingdom that is a United Kingdom occupational pension scheme that provided benefits other than those provided in the event of old age, invalidity or death, or (iii) in the Netherlands that is a Netherlands industry-sector pension scheme, or (iv) in Canada that (a) is a "registered pension plan", "retirement compensation arrangement" or "employee life and health trust" as such terms are defined in subsection 248(1) of the Income Tax Act, R.S.C. 1985, c. 1 (5th Supplement) (the "**ITA**" ), (b) contains a "defined benefit provision" as that term is defined in subsection 147.1(1) of the ITA (c) is a "multi-employer pension plan" as that term is defined in subsection 1(1) of the Pension Benefits Act (Ontario) or an equivalent plan under pension standards legislation of another applicable Canadian jurisdiction and any "multi-employer plan" as that term is defined in subsection 8500(1) of the Income Tax Regulations (Canada), (d) is or has been found or alleged by any Governmental Entity to be a "salary deferral arrangement" for purposes of subsection 248(1) of the ITA, or (e) is a "health and welfare trust" as defined in Canada Revenue Agency Income Tax Folio S2-F1-C1.

(d)      Except as required by Law, no Employee Benefit Plan provides post-retirement or post-employment health or life insurance benefits to or in respect of any Employees.

(e)      Each Employee Benefit Plan which is intended to be qualified within the meaning of Section 401(a) of the Code has received a favorable determination letter as to its qualification, or if such Employee Benefit Plan is a prototype plan, the opinion or notification letter for each such Employee Benefit Plan, and nothing has occurred, whether by action or failure to act, that has resulted, or would reasonably be expected to cause or result, in the loss of such qualification. Except as would not reasonably be expected to result in any material liability to Purchaser or its Affiliates (either individually or in the aggregate): (i) each Employee Benefit Plan has been established and administered in accordance with its terms, and is in compliance with, and in good standing under, the applicable provisions of ERISA, the Code and other applicable Laws, rules and regulations; (ii) no event has occurred and no condition exists with respect to any Employee Benefit Plan that would subject Purchaser or its Affiliates, either directly or indirectly, to any tax, fine, lien, penalty or other liability imposed by ERISA, the Code or other applicable Laws, rules and regulations.

22

(f)      (i) No labor organization, trade union, employee association, works council or other collective bargaining representative has been certified or recognized as representing any of the Employees, and (ii) to the Knowledge of Seller, there are no ongoing union organizing activities involving Employees, and nor have there been within the past three (3) years. Within the past three (3) years there have been no strikes, lockouts, material slowdowns, work stoppages or similar material labor disputes against the Business, and, to the Knowledge of Seller, no such actions are currently threatened by any Employees.

(g)      With respect to the Business, each of Seller and its Business Affiliates is, and for the past three (3) years has been in compliance, in all material respects, with all applicable Laws governing employment or labor, including but not limited to those regarding terms and conditions of employment, health and safety, wages and hours, working time, employee classification (with respect to both overtime exempt vs. non-exempt status and employee vs. independent contractor status), child labor, immigration, employment discrimination, pay equity, pay transparency, harassment, accessibility, language, disability rights or benefits, equal opportunity and equal pay, whistleblowing, vacation and vacation pay, plant closures and layoffs, affirmative action, workers' compensation, labor relations, employee leave issues (including family and sickness leave and pay) and unemployment insurance. Except as would not result in material liability with respect to the Business, for the past three (3) years, all wages, salaries, benefits, bonuses, severance and other compensation due and payable to Employees and former employees of the Business have, in all material respects, been timely and fully paid, and all amounts required to be withheld or contributed under applicable Law have, in all material respects, been duly withheld, contributed, and remitted to the appropriate Governmental Entity or fund in a timely manner.

(h)      With respect to each Employee Benefit Plan maintained pursuant to the Laws of a country other than the United States: (i) such Employee Benefit Plan has been maintained in all material respects in accordance with all applicable requirements (including applicable Law), and (ii) any Employee Benefit Plan that is intended to qualify for special Tax treatment meets all requirements for such treatment in all material respects.

(i)      All material contributions, premiums or Taxes required to be made or paid in respect of each Assumed Employee Benefit Plan by the Seller or any of its Subsidiaries under the terms of each Assumed Employee Benefit Plan or by Laws have been made in a timely fashion in accordance with the terms of each Assumed Employee Benefit Plan and applicable Laws.

(j)      No Employee Benefit Plan exists that, as a result of the execution of this Agreement (whether alone or in connection with any subsequent event(s)) would reasonably be expected to: (i) entitle any Employee to severance pay, unemployment compensation or any other payment or benefit, (ii) accelerate the time of payment or vesting, or increase the amount of compensation or benefit due to any Employee, (iii) directly or indirectly cause Seller or its Affiliates to transfer or set aside any assets to fund any benefits under any Employee Benefit Plan, (iv) limit or restrict the right to amend, terminate or transfer the assets of any Employee Benefit Plan on or following the Closing Date or (v) result in any payment or benefit that would constitute an "excess parachute payment" (as such term is defined in Section 280G(b)(1) of the Code) to any current or former Employee.

23

(k)      Except as set forth in <u>Section 3.13(k)</u> of the Disclosure Schedule, there are no pending, and for the past three (3) years there have been no material Claims with respect to the Business against Seller or any Affiliate or, to the Knowledge of Seller, threatened in writing to be brought or filed, in connection with the employment of any Employee.

(l)      During the past year, solely with respect to the Business, neither Seller nor any Business Affiliate has engaged in any employee layoffs, furloughs or other actions which triggered the notice and/or consultation requirements pursuant to application of the U.S. Workers' Adjustment and Retraining Notification Act or any similar foreign, state or local Law governing collective redundancies, mass layoffs, retrenchments or plant closures (collectively, the "**WARN Act**") or has any outstanding liabilities incurred pursuant to the WARN Act. Solely with respect to the Business, no layoffs, furloughs, plant closures, reductions in force or other workforce actions are currently planned, pending or under consideration that would, individually or in the aggregate, reasonably be expected to trigger notice obligations under the WARN Act.

(m)      To the Knowledge of Seller, all Employees are authorized to work in their usual local of work, and for each such Employee, Seller or any of its Affiliates have, in all material respects, properly completed and maintained Forms I-9, work permit, or other records in compliance with applicable Law.

(n)      Except as would not reasonably be expected to result in material liability for Seller, with respect to the Business, each of Seller and its Affiliates has taken reasonable steps to properly classify each natural person who is a current or former individual service provider of the Business at all times in the past three (3) years: (i) as either an employee or individual independent contractor under applicable Law; and (ii) for Employees, overtime exempt or non-exempt under applicable Law.

(o)      In the past year, (i) Seller and its Affiliates have not been a party to a settlement agreement with a current or former Employee to resolve allegations of sexual harassment against any Employee that directly reports to the Chief Executive Officer or any Employee holding the title of Vice President or above; and (ii) to the Knowledge of Seller, no allegation of sexual harassment in violation of applicable Law has been made by or against any Employee holding the title of Vice President or above.

(p)      To the Knowledge of Seller, no Employee holding the title of Vice President or above has given written notice of termination of his or her employment.

(q)      All Transferred Intellectual Property created, developed, conceived, or reduced to practice by any employee in the course of their employment with Seller or any of its Affiliates has been duly and validly assigned to Seller or its Affiliate, or has vested in Seller or its Affiliate by operation of applicable Law.

SECTION 3.14.    <u>Compliance with Laws</u>.

(a)      Except as set forth in <u>Section 3.14</u> of the Disclosure Schedule, since the date that is three (3) years prior to the date hereof, the Business has been and continues to be in compliance with all applicable Laws, except for instances of noncompliance that would not reasonably be expected to have a Material Adverse Effect.

24

(b)     Since April 24, 2019, the Business and its officers and directors, and, to the knowledge of the Business, employees and agents of the Business: (i) has at all times complied with Anti-Corruption Laws, Anti-Money Laundering Laws, Sanctions, and Export Control Laws; (ii) is not, and has not been, a Sanctioned Person or acting for or on behalf of a Sanctioned Person, and has not participated in any transaction or business dealing with any Sanctioned Person or in any Sanctioned Country; (iii) is not and has not been subject to any investigation by any Governmental Entity related to any actual or alleged breach of any Anti-Corruption Law, Anti-Money Laundering Law, Export Control Law, or Sanctions; and (iv) is not otherwise engaged in any activity, practice or conduct in violation of any Sanctions or applicable Anti-Money Laundering Laws or Export Control Law. The Business maintains in effect policies and procedures reasonably designed to ensure compliance by the Business and its directors, officers, employees, agents, and representatives with Anti-Corruption Laws, Anti-Money Laundering Laws, Sanctions, and Export Control Laws.

(c)     The Business is not a "covered foreign person," as that term is defined in 31 C.F.R. § 850.209. Neither the Business nor any of its Subsidiaries or consolidated affiliated entities engage, or have plans to engage, in a "Covered Activity", as that term is defined in 31 C.F.R. § 850.221, and the Business does not, directly or indirectly, hold a board seat on, have a voting or equity interest in, or have any contractual power to direct or cause the direction of the management or policies of any person or persons that engages or plans to engage in any "Covered Activity" and from which the Business derives more than 50% of its revenue or net income individually, or as aggregated across such persons from each of which the Business derives at least $50,000 (or equivalent) of its revenue or net income, on an annual basis, or for which Seller incurs more than 50% of its capital expenditure or operating expenses individually, or as aggregated across such persons for each of which Seller incurs at least $50,000 (or equivalent) of its capital expenditure or operating expenses, on an annual basis.

(d)     There are no outstanding Orders and no unsatisfied judgments, penalties or awards against, relating to or affecting the Business or the Transferred Assets.

SECTION 3.15.     Sufficiency of Assets.

(a)     Except as set forth in Section 3.15 of the Disclosure Schedule, the Transferred Assets, together with any services provided by or assets conveyed by Seller or its Affiliates (including Business Affiliates) pursuant to any Ancillary Agreement, are all of the assets, properties and rights that are legally and operationally necessary to carry on the Business (immediately following the Closing) in all material respects as it is currently being conducted and constitute substantially all of the assets owned by Seller or its Affiliates or that are used or held for use by Seller or its Affiliates in the conduct of the Business as it is currently being conducted.

(b)     The difference between an amount of contracted annualized recurring revenue received by Seller from customer Contracts and Government Contracts for (i) the 12-months period ("**ARR Period**") ended August 31, 2025, and (ii) for such ARR Period ended June, 30, 2025 is not material for the Business taken as a whole, and reflects fluctuations that are attributable to seasonality solely Related to the Business or otherwise in the ordinary course of the Business. Without limiting the foregoing, with respect to the ARR Period, (x) all the customer Contracts and Government Contracts that were in effect, entered into, renewed, amended or otherwise first

25

recognized during ARR ended June, 30, 2025 that resulted in the fluctuations to the contracted annualized recurring revenue (the "**ARR-Impacting Contracts**") are Transferred Contracts or Mixed-Use Contracts identified as such on Section 12.05(b)(v) or Section 5.21 of the Disclosure Schedule, respectively, except as would not be material to the Business, taken as a whole, and (y) neither Seller nor any of its Affiliates has reclassified, repurposed, assigned, novated or transferred to any other business, division or line of business of Seller or its Affiliates any such Contract that would otherwise constitute a Transferred Contract, or otherwise taken any action that would cause any such Contract to cease to be a Transferred Asset, in each case as of the date hereof and, in each case, except as would not be material to the Business, taken as a whole.

(c)     This Section 3.15 shall not constitute a representation regarding the infringement, misappropriation or other violation of Intellectual Property.

SECTION 3.16.     Certain Business Relationships with Affiliates. Except (a) for the exclusion of the Excluded Assets, (b) for the services and benefits provided to the Business by Seller and its Affiliates or Subsidiaries (as applicable), and (c) as set forth in Section 3.16 of the Disclosure Schedule, there are no Contracts or other arrangements involving the Business in which Seller, its Affiliates, or any of its or their respective directors, officers, or employees or any immediate family members thereof is a party, has a financial interest, or otherwise owns or leases any Transferred Asset, or owes any money to, or is owed any money by the Business, other than pursuant to commercial relationships or services.

SECTION 3.17.     No Undisclosed Liabilities. There are no liabilities included within the Assumed Liabilities other than:

(a)     liabilities provided for in the Financial Statements or any notes thereto;

(b)     liabilities incurred in the ordinary course of business since the Most Recent Quarter-End Date;

(c)     liabilities set forth in Section 3.17 of the Disclosure Schedule;

(d)     liabilities and obligations incurred in connection with or as a result of the Acquisition and the other transactions contemplated hereby or the public announcement thereof; and

(e)     other liabilities which, individually or in the aggregate, would not reasonably be expected to be material to the Business.

SECTION 3.18.     Environmental Matters. Except as set forth in Section 3.18 of the Disclosure Schedule, and except for any matter that would not be material, (a) with respect to the Business and the Transferred Assets, neither Seller nor any of its Business Affiliates is not and has not been in violation of any applicable Environmental Laws or any Permits issued or required under Environmental Laws, (b) neither Seller nor any of its Business Affiliates has received any written notice, report or other information regarding any actual or alleged violation of, or liability under, Environmental Laws with respect to (and there are no Proceedings pursuant to Environmental Law pending or, to the Knowledge of Seller, threatened against Seller which relates to) the Business or the Transferred Assets, and (c) there has been no release or disposal of,

26

contamination by, or exposure of any person to any Hazardous Material so as to give rise to any liability (contingent or otherwise) under Environmental Laws with respect to the Business or the Transferred Assets.

SECTION 3.19.    Brokers and Finders. There is no investment banker, broker, finder, financial advisor or other intermediary that has been retained by or is authorized to act on behalf of Seller or any of its Subsidiaries that might be entitled to any fee or commission in connection with the Acquisition other than PJT Partners L.P., whose fees and expenses will be paid by Seller or its Subsidiaries as a Retained Liability.

SECTION 3.20.    Insurance. Section 3.20 of the Disclosure Schedule sets forth a true and complete list of all current material policies or binders of fire, liability, product liability, umbrella liability, real and personal property, workers' compensation, vehicular, fiduciary liability and other casualty and property insurance issued to Seller or any of its Affiliates (excluding any policy underlying any Employee Benefit Plan) for which the policy period has not yet ended, only to the extent such policies provide coverage for the Business, the Transferred Assets or the Assumed Liabilities, including any self-funded insurance policies or arrangements (collectively the "**Insurance Policies,**"), are in full force and effect, all premiums thereon have been timely paid or, if not yet due, accrued, and no written notice of cancellation, termination or non-renewal has been received by Seller, or any of its Subsidiaries with respect to any such Insurance Policy. Section 3.20 of the Disclosure Schedule sets forth, as of the date hereof, a list of all claims currently pending under any such Insurance Policies which are Related to the Business, the Transferred Assets or the Assumed Liabilities. All premiums due on the Insurance Policies have either been paid or, if not yet due, accrued.

**ARTICLE IV**

**REPRESENTATIONS AND WARRANTIES OF PURCHASER**

Purchaser hereby represents and warrants to Seller as follows.

SECTION 4.01.    Organization. Each of Purchaser and each Subsidiary of Purchaser that is specified to be a party to any Ancillary Agreement (each, a "**Purchaser Subsidiary**") is a legal entity duly organized, validly existing and, where applicable, in good standing under the Laws of the jurisdiction of its organization or incorporation.

SECTION 4.02.    Authority; Execution and Delivery; Enforceability. Purchaser has the requisite corporate (or similar organizational) power and authority to execute and deliver this Agreement and the Ancillary Agreements to which it will be a party and to consummate the Acquisition and the other transactions contemplated by this Agreement and such Ancillary Agreements. Each Purchaser Subsidiary has the requisite corporate (or similar organizational) power and authority to execute the Ancillary Agreements to which it will be a party and to consummate the transactions contemplated to be consummated by it by such Ancillary Agreements. Purchaser has taken all corporate (or similar organizational) action required by its organizational documents to authorize the execution and delivery of this Agreement and the Ancillary Agreements to which it will be a party and to authorize the consummation of the Acquisition and the other transactions contemplated by this Agreement and the Ancillary

27

Agreements. Each Purchaser Subsidiary will, prior to the Closing, have taken all corporate (or similar organizational) action required by its organizational documents to authorize the execution and delivery of the Ancillary Agreements to which it will be a party and to authorize the consummation of the transactions contemplated to be consummated by it by such Ancillary Agreements. Purchaser has duly executed and delivered this Agreement and, prior to the Closing, will have duly executed and delivered each Ancillary Agreement to which it will be a party, and (assuming the due authorization, execution and delivery by Seller) this Agreement constitutes, and each Ancillary Agreement to which it will be a party will after the Closing (assuming the due authorization, execution and delivery of the other parties thereto) constitute, its legal, valid and binding obligation, enforceable against it in accordance with its terms subject, as to enforcement, to the Enforceability Exceptions. Prior to the Closing, each Purchaser Subsidiary will have duly executed and delivered each Ancillary Agreement to which it will be a party, and each Ancillary Agreement to which it will be a party will after the Closing (assuming the due authorization, execution and delivery by the other parties thereto) constitute its legal, valid and binding obligation, enforceable against it in accordance with its terms subject, as to enforcement, to the Enforceability Exceptions.

SECTION 4.03.   Non-Contravention and Approvals.

(a)     The execution, delivery and performance by Purchaser of this Agreement does not, and neither the execution, delivery and performance by Purchaser and each of Purchaser Subsidiaries of each Ancillary Agreement to which it will be a party nor the consummation by Purchaser of the Acquisition and the other transactions contemplated to be consummated by it by this Agreement and such Ancillary Agreements and by each Purchaser Subsidiary of the transactions contemplated to be consummated by it by such Ancillary Agreements will, (i) conflict with or violate the organizational documents of Purchaser or any Purchaser Subsidiary, (ii) result in a breach of or constitute a default under any Contract to which Purchaser or any Purchaser Subsidiary is a party or by which any of its properties or assets is bound, (iii) conflict with or violate any Judgment or Law applicable to Purchaser or any Purchaser Subsidiary or its properties or assets or (iv) result in the creation of any Lien upon any of the properties or assets of Purchaser or any Purchaser Subsidiary, except, in the case of clauses (ii), (iii) and (iv), any such items that would not reasonably be expected to have a material adverse effect on the ability of Purchaser to consummate the Acquisition and the other transactions contemplated by this Agreement (a "**Purchaser Material Adverse Effect**").

(b)     No Consent of, or registration, declaration or filing with, any Governmental Entity is required to be obtained or made by Purchaser or any of its Affiliate in connection with the execution, delivery and performance of this Agreement or the Ancillary Agreements or the consummation of the Acquisition, other than those that may be required solely by reason of Seller's (as opposed to any other third party's) participation in the Acquisition and the other transactions contemplated by this Agreement and by the Ancillary Agreements and (ii) those the failure of which to obtain or make would not reasonably be expected to have a Purchaser Material Adverse Effect.

SECTION 4.04.   Legal Proceedings. There are not any (a) outstanding Judgments against Purchaser or any of its Affiliates or (b) Proceedings pending or, to the knowledge of Purchaser, threatened in writing against Purchaser or any of its Affiliates that, in any such case,

28

would reasonably be expected, individually or in the aggregate, to have a Purchaser Material Adverse Effect.

SECTION 4.05.    Availability of Funds. Purchaser has or will have sufficient cash on hand or other sources of immediately available funds to enable it to make payment of (a) the Estimated Purchase Price pursuant to Section 2.02(b) and subject to adjustment pursuant to Section 2.03 and (b) any other amounts payable by Purchaser pursuant to this Agreement and consummate the transactions contemplated by this Agreement.

SECTION 4.06.    Brokers and Finders. There is no investment banker, broker, finder, financial advisor or other intermediary who has been retained by or is authorized to act on behalf of Purchaser that might be entitled to any fee or commission in connection with the Acquisition, whose fees and expenses shall be paid by Purchaser or its Affiliates.

SECTION 4.07.    Seller's Representations; Independent Investigation.

(a)    Purchaser is a sophisticated purchaser, possesses such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of its investment under this Agreement. Purchaser acknowledges and agrees that, other than the representations and warranties of Seller specifically contained in Article III, there are no representations or warranties of Seller or any other person either expressed or implied with respect to the Business, the Transferred Assets, the Assumed Liabilities or the transactions contemplated hereby, individually or collectively. Purchaser, together with and on behalf of its Affiliates and Representatives, specifically disclaims that it or they are relying upon or have relied upon any such other representations or warranties that may have been made by any person, and Purchaser, together with and on behalf of its Affiliates and Representatives, acknowledges and agrees that Seller and its Affiliates have specifically disclaimed and do hereby specifically disclaim any such other representation or warranty made by any person. Without limiting the generality of the foregoing, Purchaser acknowledges and agrees that, except as expressly set forth in any representation or warranty in Article III or any certificate delivered pursuant to this Agreement, none of Seller, its Affiliates or its Representatives makes any representations or warranties relating to (i) the maintenance, repair, condition, design, performance or marketability of any Transferred Asset, including merchantability of fitness for a particular purpose, (ii) the operation of the Business by Purchaser after the Closing, (iii) the maturity or acceleration of any contingent liability or other liability not yet due and owing relating to the Business, or (iv) the probable success or profitability of the Business after the Closing. Purchaser acknowledges and agrees that it shall obtain rights in the Transferred Assets in their present condition and state of repair, "as is" and "where is".

(b)    Except as expressly set forth in any representation or warranty in Article III, Purchaser acknowledges and agrees that no person, including the Purchaser Indemnitees, shall have any claim (whether in warranty, contract, tort (including negligence or strict liability) or otherwise) or right to indemnification pursuant to Article X (or otherwise) with respect to, and no such person is relying on, any information, documents or materials made available or otherwise furnished to or for Purchaser, its Affiliates or its Representatives by Seller, any of its Affiliates, or any of its Representatives, including any financial projections or other statements regarding future performance, any management presentation or confidential information memoranda regarding,

29

among other things, the Business provided to Purchaser, its Affiliates or its Representatives and any other information, documents or material, whether oral or written, made available to Purchaser, its Affiliates or its Representatives in any "data room", presentation, "break-out" discussions, responses to questions submitted on behalf of Purchaser, its Affiliates or its Representatives or otherwise furnished to Purchaser, its Affiliates or its Representatives in any form in expectation of the transactions contemplated hereby.

(c)     Purchaser, its Affiliates and its Representatives have received and may continue to receive from Seller, its Affiliates and its Representatives certain estimates, projections and other forecasts for the Business and certain plan and budget information. Purchaser acknowledges that these estimates, projections, forecasts, plans and budgets, and the assumptions on which they are based, were prepared for specific purposes and may vary significantly from each other. Further, Purchaser acknowledges that there are uncertainties inherent in attempting to make such estimates, projections, forecasts, plans and budgets, that Purchaser is taking full responsibility for making its own evaluation of the adequacy and accuracy of all estimates, projections, forecasts, plans and budgets so furnished to it, its Affiliates or its Representatives (including the reasonableness of the assumptions underlying such estimates, projections, forecasts, plans and budgets) and that, except as expressly set forth in any representation or warranty in Article III or any certificate delivered pursuant to this Agreement, Purchaser is not relying on any estimates, projections, forecasts, plans or budgets made available or otherwise furnished by Seller, its Affiliates or its Representatives, and Purchaser shall not, and shall cause its Affiliates and its Representatives not to, hold any such person liable with respect thereto (whether in warranty, contract, tort (including negligence or strict liability) or otherwise). Nothing in this Section 4.07 or elsewhere in this Agreement shall limit Purchaser's right to seek and obtain any monetary or equitable relief on account of Fraud of Seller, its Affiliates or its Representatives.

**ARTICLE V**

**COVENANTS**

SECTION 5.01.     Conduct of Business.

(a)     Except for matters (1) set forth in Section 5.01 of the Disclosure Schedule, (2) consented to by Purchaser in writing (such consent, not to be unreasonably withheld or delayed), (3) otherwise contemplated by or reasonably necessary to carry out the terms of this Agreement, and (4) as required by Law from the date of this Agreement to the Closing Date, Seller, the Debtor Affiliates and/or its Business Affiliates, as applicable, shall cause the Business (x) to be conducted in all material respects in the ordinary course in a manner substantially consistent in all material respects with past practice, (y) use reasonable best efforts to maintain and substantially preserve intact its current Business organization and the relationships of its employees, customers, suppliers, regulators and others having material relationships with the Business, and (z) not to take any of the following actions with respect to the Business:

(i)     except (x) as required by an Employee Benefit Plan set forth on Section 3.13(a) of the Disclosure Schedule, or (y) as required by any applicable Law, (A) grant or promise to grant any increase in compensation or benefits to Employees whose annual base salary is at or above $100,000 in the ordinary course of business consistent with past practice; (B) offer

or agree to any new severance or termination pay to any Employee, (C) establish, adopt, enter into, materially amend, increase the benefits or compensation provided under, or terminate any Assumed Employee Benefit Plan; (D) grant or promise to grant any equity or equity-based awards to any Employee, (E) hire or terminate (other than for cause) any Employee whose annual base salary is at or above $100,000 other than new hires to replace Employees who resign or voluntarily depart after the date of this Agreement provided such new hires are employed on substantially the same terms as the terms of the Employee who is being replaced, (F) grant or promise to grant to any Employee any right to a retention or transaction bonus, (G) grant or promise to grant to any Employee any right to reimbursement, indemnification or payment for any Taxes, including any Taxes incurred under Section 409A or 4999 of the Code; or (H) loan or advance any money or other property to any Employee;

(ii)     sell, lease, license, assign, or otherwise dispose of any Transferred Assets, other than (A) pursuant to existing Contracts, (B) at the end of their useful lives or out of redundancy, (C) expirations of Intellectual Property Registrations in accordance with the applicable statutory term, or (D) non-exclusive licenses of the Transferred Intellectual Property granted in the ordinary course of business consistent with past practice;

(iii)     sell, lease license, assign or otherwise dispose of any Intellectual Property that is licensed by the Seller to the Purchaser pursuant to Section 5.15 or Section 5.17 (except to the extent Seller obtains a license back permitting the grant of the licenses in Section 5.15 and Section 5.17, or to the extent the foregoing otherwise does not affect Seller's ability to grant such licenses);

(iv)     subject the Transferred Assets to any Lien, other than a Permitted Lien;

(v)     materially amend, modify, supplement or terminate any Transferred Contract or enter into any Transferred Contract, in each case except in the ordinary course of Business, or undertake any of the foregoing if such action would reasonably be expected to cause the Prepaid Expenses of the Business as of the Closing to be materially different from the Prepaid Expenses of the Business as of the date of this Agreement;

(vi)     fail to preserve and maintain all Permits required for the conduct of the Business as currently conducted or the ownership and use of the Transferred Assets;

(vii)     declare and pay dividends or make distributions or other transfers of any assets that would otherwise constitute Transferred Assets;

(viii)     make (other than if supported at a "more likely than not" (or higher) level of confidence, made in connection with filing Tax Returns in the ordinary course of business, and is consistent with past practice), revoke or change any material Tax election; adopt or change any material Tax accounting method; file any amended material Tax Return; enter into any closing agreement; settle any material Tax claim or assessment or surrender any right to claim a refund of material Taxes (other than as required by applicable Law), in each case, with respect to the Business or the Transferred Assets (and for the avoidance of doubt, without regard to any consolidated, combined, or similar Tax Return of any Seller or its Affiliates);

31

(ix)     acquire any assets that would constitute Transferred Assets, except in the ordinary course of business;

(x)     enter into a Contract to do any of the foregoing;

(xi)     voluntarily recognize any trade union, works council or other collective bargaining representative as the bargaining representative for any Employee or enter into a collective bargaining agreement; or

(xii)     with respect to the Transferred Employees, effectuate or announce any "mass layoff", "plant closing" or other action which would trigger the notice requirements of the WARN Act.

(b)     Nothing contained in this Agreement is intended to give Purchaser or its Affiliates, directly or indirectly, the right to control or direct the Business prior to the Closing, and nothing contained in this Agreement is intended to give Seller or its Affiliates, directly or indirectly, the right to control or direct Purchaser's operations. Prior to the Closing, each of Purchaser, on the one hand, and Seller and its Affiliates, on the other hand, shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision over its and its Affiliates respective operations.

SECTION 5.02.     Access to Information.

(a)     Prior to the Closing, Seller shall, and shall cause its Affiliates to, afford to Purchaser and its financing sources and Representatives prompt and reasonable access during normal business hours, upon reasonable prior notice, to the properties, books and records to the extent relating exclusively to the Business (other than the Excluded Assets and Retained Liabilities); provided, however, that such access does not interfere or disrupt the normal operations of any of Seller or any of its Affiliates or the Business. Nothing contained in this Section 5.02 shall obligate Seller or its Affiliates to, in Seller's absolute and sole discretion, (i) breach any fiduciary duty, duty of confidentiality owed to any person (whether such duty arises contractually, statutorily or otherwise), Law or any Contract with any other person, (ii) waive or jeopardize any privileges, including the attorney-client privilege, or any work product protection, or (iii) share any information which constitutes trade secrets. Prior to the Closing, when accessing any properties of Seller or its Affiliates pursuant to and in accordance with this Section 5.02(a), Purchaser shall, and shall cause its financing sources and Representatives to, comply with all safety and security requirements for such property communicated to them. All requests for information made pursuant to this Section 5.02(a) shall be directed to Anna Hogan and Ramona Desantis (each, a "**Designated Person**") or to such person or persons as may be designated in writing by Seller, and Purchaser shall not directly or indirectly contact any officer, director, employee, customer, vendor, supplier, agent or Representative of Seller or any of its Affiliates without the prior approval of a Designated Person or such designated person(s). Neither the auditors and independent accountants of Seller or its Affiliates nor the auditors and independent accountants of Purchaser and its respective Affiliates shall be obligated to make any work papers available to any person under this Agreement, unless and until such person has signed a customary confidentiality and hold harmless agreement relating to such access to work papers in form and substance reasonably acceptable to such auditors or independent accountants. If so reasonably requested by Seller, Purchaser shall, and shall cause

32

Representatives (as applicable) to, enter into a customary joint defense agreement with Seller or its Affiliates with respect to any information to be provided to Purchaser pursuant to this Section 5.02(a). Notwithstanding the foregoing, Purchaser shall not conduct pursuant to such access, without the prior written consent of Seller, which consent Seller may withhold in its sole discretion, any environmental sampling or other intrusive investigation of air, surface water, groundwater, soil or building materials at or in connection with any property or operations associated or affiliated in any way with the Business, Transferred Assets or Seller. No sampling or investigation by Purchaser or other information received by Purchaser shall operate as a waiver or otherwise affect any representation, warranty, certificate or agreement given or made by Seller in this Agreement.

(b)     After the Closing Date, Purchaser shall, and Purchaser shall cause its Affiliates to, grant such access, upon reasonable prior notice during normal business hours, to financial records and other information in their possession related to their conduct of the Business and such cooperation and assistance in each case as shall be reasonably required to enable Seller and its Affiliates to complete their legal, contractual, regulatory, stock exchange and financial reporting requirements, including in respect of litigation and insurance matters. Seller shall promptly reimburse Purchaser for Purchaser's reasonable out-of-pocket expenses associated with requests made by Seller and its Affiliates under this Section 5.02(b), but no other charges shall be payable by Seller and its Affiliates to Purchaser in connection with such requests.

SECTION 5.03.     Confidentiality.

(a)     Purchaser acknowledges that the information provided to it in connection with the Acquisition and the consummation of the other transactions contemplated by this Agreement, including pursuant to Section 5.02(a), is subject to the terms of a nondisclosure agreement between Purchaser and Seller (the "**Confidentiality Agreement**"). Effective upon, and only upon, the Closing, the Confidentiality Agreement shall terminate with respect to information relating to the Business; and any and all other information provided to it by any of Seller, any of its Affiliates or its Representatives concerning any of Seller or any of its Affiliates (other than information to the extent relating to the Business) shall remain subject to the terms and conditions of the Confidentiality Agreement after the Closing. Seller shall not use such information in any manner that is competitive with or detrimental to the Business as operated by Purchaser.

(b)     For a period of three years following the Closing, Seller shall, and shall cause its Subsidiaries to, treat as confidential and shall safeguard any and all confidential or proprietary information, knowledge and data about the Business by using the same degree of care, but no less than a reasonable standard of care, to prevent the unauthorized use, dissemination or disclosure of such information, knowledge and data as Seller used with respect thereto prior to the execution of this Agreement and as required of Purchaser under the Confidentiality Agreement.

SECTION 5.04.     Regulatory and Other Authorizations; Notices and Consents.

(a)     Subject to the terms and conditions of this Agreement (including the other provisions of this Section 5.04), each party shall use reasonable best efforts to take, or cause to be taken, actions, and to do, or cause to be done, and to assist and cooperate with the other parties in doing, actions reasonably necessary, proper or advisable to cause the conditions to Closing to be

33

satisfied and to consummate and make effective, in the most expeditious manner practicable (and in any event prior to the End Date), the transactions contemplated by this Agreement. Notwithstanding anything in this Agreement to the contrary, nothing in this Section 5.04 or any other provision of this Agreement shall require any of Purchaser or any of its affiliates (including Blackstone Inc. ("**Blackstone**") or Vista Equity Partners ("**Vista**") and any investment funds or investment vehicles affiliated with, or managed or advised by, Blackstone or Vista or any portfolio company (as such term is commonly understood in the private equity industry) to sell, divest or otherwise dispose of, or agree to any other structural or conduct remedy with respect to, any investment of Blackstone or Vista or of any such investment fund or investment vehicle), or any interest therein.

(b)　　Each party shall promptly notify the other of any substantive communication it or any of its Affiliates receives from any Governmental Entity relating to the matters that are the subject of this Agreement and permit the other to review in advance any proposed substantive communication to any Governmental Entity. Each party shall not agree to participate in any meeting with any Governmental Entity relating to the matters that are the subject of this Agreement unless it consults with the other in advance and, to the extent permitted by such Governmental Entity, gives the other the opportunity to attend and participate at such meeting. If a party receives a request for information or documentary material from a Governmental Entity in relation to the transactions contemplated here, it shall promptly make an appropriate response to such request. The parties will provide each other with copies of all correspondence, filings or communications between them or any of their Representatives and any Governmental Entity related to the transactions contemplated by this Agreement; provided, however, that such materials may be redacted or withheld (x) to remove references concerning the valuation of the Business or the value of Seller and its Subsidiaries after the consummation of the Acquisition or other competitively sensitive material, (y) as necessary to comply with contractual arrangements, and (z) as necessary to address reasonable privilege or confidentiality concerns; provided that the parties may, as they deem advisable and necessary, designate any competitively sensitive materials provided to the other party under this Section 5.04 as "outside counsel only."

(c)　　Purchaser shall not enter into or consummate any acquisition transaction that would reasonably be expected to make it materially more difficult, or to materially increase the time required, to reach Closing or obtain the satisfaction of the conditions to Closing set forth in Section 8.01.

SECTION 5.05.　　Non-Solicit.

(a)　　For a period of one year from and after the Closing Date, Seller shall not, and shall not permit any of its Affiliates to, directly or indirectly, (i) cause, induce or encourage any of the actual clients, customers, suppliers or licensors of the Business (including any existing client or customer of Seller and any person that becomes a client or customer of the Business three (3) months after the Closing), or any other person who has a material business relationship with the Business, to terminate or modify any such actual or prospective relationship, and (ii) solicit to hire any employee who is an executive or other senior managerial employee of the Business or otherwise; provided, however, that (i) each party and its Subsidiaries may solicit to hire, and hire, any employee who is no longer employed by the other party or any of its Affiliates and has not been so employed by the other party or any of its Affiliates for at least 90 days, (ii) each party and

its Subsidiaries shall be free to conduct general, non-directed solicitation advertisements or web postings for employment or utilizing an independent employment search firm who has been instructed not to target employees of the other party and its Affiliates and such party and its Subsidiaries may hire persons who respond on their own initiative to such advertising, postings or contacts from search firms, and (iii) each party and its Subsidiaries may solicit to hire, and hire, any employee who was terminated by the other party or any of its Affiliates.

SECTION 5.06.    Services from Affiliates. Purchaser acknowledges that the Business currently receives or benefits from certain shared management and administrative and corporate services and benefits provided by Seller or its Affiliates, including management, operations and information technology (including information technology support and website hosting and data center services), customer service, finance, accounting and payroll and back office services and processing, financial systems, treasury services (including banking, insurance, administration, taxation and internal audit), office space, facilities and office management services, business development and marketing services, research and development and product support services, procurement services, risk management, corporate communications, general administrative services, executive and management services, legal services, human resources and personnel services and travel services. Other than as may be provided pursuant to the terms of an Ancillary Agreement or in respect of Deferred Assets and Deferred Liabilities prior to a Deferred Closing, Purchaser further acknowledges that all such services and benefits shall cease, and any agreement in respect thereof shall terminate with respect to the Business as of the Closing, and thereafter, Seller's and its Affiliates' sole obligation with respect to the provision of any services with respect to the Business shall be as set forth in the Ancillary Agreements.

SECTION 5.07.    Publicity. Other than the press release to be agreed by Purchaser and Seller to be issued following the execution of this Agreement, neither of Purchaser, on the one hand, nor Seller, on the other hand, will issue or permit any of its respective Affiliates to issue any press release, website posting or other public announcement with respect to this Agreement or the transactions contemplated hereby without the prior consent of the other party, except as may be required by Law, contract or stock exchange rules or regulations (in which case whichever of Purchaser or its Affiliates or Seller or its Affiliates, as applicable, is required to make the release or statement shall allow the other reasonable time to comment on such release or statement in advance of such issuance); provided, however, that Purchaser, on the one hand, and Seller and its Affiliates, on the other hand, may make internal announcements to its employees that are consistent with, and following, the parties' prior public disclosures regarding the transactions contemplated by this Agreement.

SECTION 5.08.    Use of Transferred Names and Marks.

(a)    Seller and the Debtor Affiliates hereby acknowledge that, following the Closing, Purchaser or its Affiliates will own all right, title and interest in and to the trademarks "Anthology" and "CampusNexus" together with all variations, translations, acronyms and other derivations thereof and all trademarks, service marks, Internet domain names (except as provided in this Section 5.08), logos, trade names, trade dress, company names and other identifiers of source or goodwill containing, incorporating or associated with any of the foregoing (each, as applicable, the "**Anthology Brand**" and the "**CampusNexus Brand**" and collectively, the "**Transferred Names and Marks**"), and that, except as expressly provided in this Section 5.08, any and all right

35

of the Seller, its Affiliates or service providers to use the Transferred Names and Marks shall terminate as of the Closing and shall immediately revert to Purchaser and its Affiliates, along with any and all goodwill associated therewith. Seller further acknowledges that neither it nor its Affiliates or successors has any rights, directly or indirectly, to use the Transferred Names and Marks, except as expressly provided in this Section 5.08.

(b)      Purchaser hereby grants to Seller and its Affiliates, for a period of twelve (12) months after the Closing Date (such period the "**Continued Use Period**", and plus the Wind-Down Period, the "**Transitional Use Period**"), a limited, non-exclusive, non-sublicensable and non-transferable (except as set forth in this Section 5.08) license to use, solely in connection with the operation of the Retained Anthology Businesses as operated during the twelve (12) month period prior to the Closing, the Transferred Names and Marks solely in the manner in which such Transferred Names and Marks were used by the Retained Anthology Business as of the Closing (including for operations of the Anthology Social Media Accounts). For the avoidance of doubt, neither Seller nor its Affiliates shall, without Purchaser's prior, written consent, use the Transferred Names and Marks in connection with any new products or services, or on any new signs, letterheads, invoices, advertisements, promotional materials, Internet domain names, website content, other Internet or electronic communications vehicles, inventory or other documents or materials other than those used by the Retained Anthology Business during the twelve (12) month period prior to the Closing. Notwithstanding the foregoing, Purchaser acknowledges that this Section 5.08(b) shall not limit the rights granted to Seller and its Affiliates under Section 5.08(d), and in no event shall Seller or its Affiliates be required to modify or cease use of the Transferred Names and Marks if such activity is permitted under, and in compliance with, Section 5.08(d).

(c)      Upon the conclusion of the Continued Use Period, Seller and its Affiliates may continue to use the Transferred Names and Marks as described in Section 5.08(b) for an additional twelve (12) months (the "**Wind Down Period**"), provided that Seller's and its Affiliates' use of the Transferred Names and Marks shall be limited to the Retained Anthology Business' existing stocks of signs, letterheads, invoice, advertisements and promotional materials and all Internet domain names, website content, other Internet or electronic communications vehicles, inventory and other documents and materials in existence and used by the Business as of the end of the initial twelve (12) month period prior to the Closing (collectively, the "**Existing Stock**"), after which period Seller and its Affiliates shall promptly cause the removal or obliteration of all Transferred Names and Marks from such Existing Stock or cease using such Existing Stock. Notwithstanding the foregoing, Purchaser acknowledges that this Section 5.08(c) shall not limit the rights granted to Seller and its Affiliates under Section 5.08(d), and in no event shall Seller or its Affiliates be required to modify or cease use of the Transferred Names and Marks if such activity is permitted under, and in compliance with, Section 5.08(d).

(d)      Purchaser hereby acknowledges that Seller and its Affiliates intend to use, in connection with the Retained Businesses, the Transferred Names and Marks for non-external facing references and identifiers in Seller's or its Affiliates' archives, software, networks, tools and systems, which shall include embedded references in source code, object code, APIs, SDKs, libraries, documentation, and references to the Anthology Domains or CampusNexus Domains, as permitted in this Section 5.08, in each case used solely for internal purposes as well as in non-external-facing intercompany and customer integrations that are in existence as of the Closing.

36

Purchaser and Seller each acknowledges and agrees that no use described in this Section 5.08(d) is a trademark use that requires a trademark license. Seller and its Affiliates (i) will not make any use under this Section 5.08(d) that would be reasonably likely to give rise to confusion as to the source, origin, sponsorship, endorsement or certification of any good or service and (ii) acknowledges that no license under the Transferred Names and Marks is granted with respect to the uses described in this Section 5.08(d).

(e)  Except as expressly set forth in this Section 5.08, no other right to use the Transferred Names and Marks is granted by Purchaser or any of its Affiliates to Seller, its Affiliates or, after the Closing, the Retained Anthology Business, whether by implication or otherwise, and nothing hereunder permits Seller, its Affiliates or, after the Closing, any Retained Anthology Business: (i) to use the Transferred Names and Marks in any manner, other than as set forth in this Section 5.08, or (ii) to register or seek to register, or to permit any third party to register or to seek to register, any of the Transferred Names and Marks in any jurisdiction, including, without limiting the rights with respect to the Anthology Domains or the CampusNexus Domains described in this Section 5.08, in any domain name.

(f)  Seller and the Debtor Affiliates shall ensure that any public-facing use of the Transferred Names and Marks by the Retained Anthology Business after the Closing, as provided in this Section 5.08, shall be only with respect to goods and services of a level of quality equal to or greater than the quality of goods and services with respect to which the Retained Anthology Business used the Transferred Names and Marks prior to the Closing. Any and all goodwill generated by the use of the Transferred Names and Marks under this Section 5.08 inure solely to the benefit of Purchaser and its Affiliates. In any event, and, without limiting any of Seller's obligations under this Section 5.08, Seller and each Debtor Affiliate shall not, and shall cause their respective Affiliates and, after the Closing, the Retained Anthology Business not to, (i) during the Wind Down Period, alter the use of the Transferred Names and Marks on the Existing Stock, other than to remove or conceal such Transferred Names and Marks or apply notices of ownership, or (ii) use the Transferred Names and Marks in any manner that may damage, harm, disparage or tarnish the reputation of Purchaser, its Affiliates or the Business or the goodwill associated with the Transferred Names and Marks. Seller and each Debtor Affiliate shall not, and shall cause their respective Affiliates not to use or adopt any name confusingly similar to the Transferred Names and Marks.

(g)  Seller and Purchaser acknowledge that, notwithstanding the ownership of the Transferred Names and Marks described in Section 5.08(a), Seller may retain the registration for the "anthology.com" domain name, the domain names set forth on Section 5.08(g) of the Disclosure Schedule, and any other domain names that include "anthology" or any abbreviation or derivation thereof held by Seller or its Affiliates as of the date hereof that the parties hereto agree, prior to Closing, are in internal use by Seller or its Affiliates and need to be retained in order to perform the tasks described in Section 5.08(d) and Section 5.08(g) (the "**Anthology Domains**"). Notwithstanding the foregoing, from the date hereof and perpetually thereafter, Seller hereby covenants not to sell or transfer the Anthology Domains to a Person who is not an Affiliate. Seller shall ensure that any Affiliate to which Seller transfers the Anthology Domains assumes in writing all of Seller's obligation under this Section 5.08(g), and Seller shall promptly provide a copy of such writing to Purchaser and shall in any event remain primarily responsible for such Affiliate's compliance with this Section. For five (5) years after Closing, Seller and each Debtor Affiliate

37

shall, and shall cause their respective Affiliates to, comply with customary maintenance requirements to ensure that no material bugs or errors occur with respect to the Anthology Domains or the content hosted under the Anthology Domains. Subject to Section 5.08(f) and except as otherwise provided in this Section 5.08, Purchaser hereby grants to Seller and its Affiliates a non-exclusive right and license to use the Anthology Brands (i) for the time period for which Seller retains the Anthology Domains, for the purpose of operating and renewing the Anthology Domains solely for the purposes described in this Section 5.08 and Section 5.16, (ii) perpetually, for regulatory filings where use of an Anthology Brand is required by Law, and (iii) for external facing employee email addresses and customer integrations, solely during the Transitional Use Period (or such other period as may be agreed in the Separation Plan or the Migration Plan).  Purchaser hereby acknowledges that Seller and its Affiliates further intend to use the Anthology Domain for an indefinite period for non-external uses for Seller's or its Affiliates' software, networks and systems, which shall include intercompany or customer system integrations, as well as use in connection with system generated messages and other communications (collectively, "**Internal Uses**").  Purchaser and Seller each acknowledge and agree that no Internal Use shall be a trademark use that requires a trademark license. Seller and each Debtor Affiliate (i) will not make, and will ensure that none of their respective Affiliates make any Internal Use in a manner that would be reasonably likely to give rise to confusion as to the source, origin, sponsorship, endorsement or certification of any good or service and (ii) acknowledges that no license under the Transferred Names and Marks is granted with respect to Internal Uses.  For the avoidance of doubt, Seller and Purchaser acknowledge the retention of the Anthology Domains by Seller is for administrative and operational convenience and that such registration confers no additional rights to Seller or its Affiliates in the Transferred Names and Marks except as expressly provided herein.

(h)      Seller and Purchaser acknowledge that, notwithstanding the ownership of the Transferred Names and Marks described in Section 5.08(a), Seller may retain the registration for the "CampusNexus" domain name, the domain names set forth on Section 5.08(h) of the Disclosure Schedule, and any other domain names that include "CampusNexus" or any abbreviation or derivation thereof held by Seller or its Affiliates as of the date hereof that the parties hereto agree, prior to Closing, are in internal use by Seller or its Affiliates and need to be retained in order to perform the tasks described in Section 5.08(d) and Section 5.08(h) (the "**CampusNexus Domains**") which shall be operated by Seller during the Transitional Use Period. Notwithstanding the foregoing, (i) from the date hereof, Seller and each Debtor Affiliate covenants not to sell or transfer, and shall ensure their respective Affiliates do not sell or transfer the CampusNexus Domains to a Person who is not an Affiliate, and (ii) Seller shall only utilize the CampusNexus Domains as permitted by this Section 5.08(h) or Section 5.16 (or as otherwise agreed by the parties hereto, including in connection with the Separation Plan or Migration Plan). Seller and each Debtor Affiliate shall ensure that any Affiliate to which Seller transfers the CampusNexus Domains assumes in writing all of Seller's obligation under this Section 5.08(h), and Seller shall promptly provide a copy of such writing to Purchaser and shall in any event remain primarily responsible for such Affiliate's compliance with this Section.  Subject to Section 5.08(f) and except as provided in this Section 5.08, Purchaser hereby grants to Seller and its Affiliates a non-exclusive right and license to use the CampusNexus Brands for the purpose of operating and renewing the CampusNexus Domains solely for the purposes described in this Section 5.08 and Section 5.16, and for existing customer integrations  in each case solely during the Transitional Use Period. Further, Seller and each Debtor Affiliate shall,  and shall cause their respective Affiliates to, conduct all activities with the CampusNexus Domains that are reasonably necessary

38

to wind down use by Seller or any acquiror of a Retained Business of the CampusNexus Domains from source code, IT systems and cybersecurity infrastructure, including removing embedded domain references, updating routing and revising authentications (the "**CampusNexus Wind-Down Uses**"); provided that (i) Purchaser, Seller, and each Debtor Affiliate each acknowledges and agrees that no CampusNexus Wind-Down Uses shall be trademark uses that require a trademark license, and (ii) Seller and each Debtor Affiliate (x) will not make, and will ensure that none of their respective Affiliates make, any CampusNexus Wind-Down Use in a manner that would be reasonably likely to give rise to confusion as to the source, origin, sponsorship, endorsement or certification of any good or service and (y) acknowledges that no license under the Transferred Names and Marks is granted with respect to CampusNexus Wind-Down Uses. Upon expiration of the Transitional Use Period, Seller and each Debtor Affiliate shall, and shall ensure that their respective Affiliates shall, promptly transfer ownership and control of the CampusNexus Domains to Purchaser, and Seller and each Debtor Affiliate shall, and shall ensure that their respective Affiliates shall, conduct all reasonably requested activities to effect and evidence such transfer. For the avoidance of doubt, Seller and Purchaser acknowledge the retention of the CampusNexus Domains by Seller is for administrative and operational convenience and that such registration confers no additional rights to Seller or its Affiliates in the Transferred Names and Marks except as expressly provided herein.

(i)      Seller and each Debtor Affiliate agrees that none of Purchaser or its Affiliates shall have any responsibility for, and Seller shall indemnify the Purchaser Indemnitees with respect to, claims by third parties arising out of, the willful misuse by the Retained Anthology Business of any Transferred Names and Marks after the Closing in violation of applicable Laws or breach of this Agreement. Any such indemnification (or claim therefor) shall be subject in all respects to Sections 10.03 and 10.04, *mutatis mutandis*. Notwithstanding anything in this Agreement to the contrary, Seller and each Debtor Affiliate hereby acknowledges and agrees that in the event of any breach or threatened breach of this Section 5.08, Purchaser (A) shall be entitled to seek a preliminary injunction, temporary restraining order or other equivalent relief restraining Seller and any of its Affiliates from any such breach or threatened breach and (B) shall not be required to provide any bond or other security in connection with any such injunction, order or other relief.

(j)      Seller may (i) sublicense or transfer its rights under this Section 5.08 to an acquiror of a Retained Business, provided that such sublicense or transfer shall be subject to all the obligations and limitations applicable to Seller under this Section 5.08, and (ii) sublicense its rights under this Section 5.08 to service providers engaged by Seller during the Transitional Use Period, provided that such sublicense shall be for the sole purpose of providing services to Seller, its Affiliates or their respective customers and that such sublicense shall further be subject to all the obligations and limitations applicable to Seller under this Section 5.08. Seller shall remain primarily responsible for any such sublicensee's or transferee's compliance with this Section. If the closing for a sale of a Retained Business (other than to a direct competitor of the Business) occurs more than two (2) months after the Closing during the Continued Used Period or during the first six (6) months of the Wind Down Period, and rights granted under this Section 5.08 are sublicensed or transferred to the relevant acquiror, then the Continued Use Period or the Wind Down Period for such rights, as applicable, will be deemed to have been, solely with respect to such acquiror and such rights, extended for a period of three (3) months.

39

SECTION 5.09.    Seller Guarantees. Purchaser acknowledges that in the course of conduct of the Business, Seller and its Affiliates have entered into the arrangements set forth in Section 5.09 of the Disclosure Schedule (a) in which guarantees, letters of credit, bonds or similar arrangements were issued by Seller or its Affiliates and (b) in which Seller or its Affiliates are the primary obligors on other Contracts, in any such case to support or facilitate the Business. The arrangements entered into by Seller and its Affiliates referred to in the foregoing clauses (a) and (b) solely to the extent relating to the Transferred Assets or the Assumed Liabilities, including those set forth in Section 5.09 of the Disclosure Schedule, are hereinafter referred to as the "**Seller Credit Support Obligations**". It is understood that the Seller Credit Support Obligations are not intended to continue after the Closing. Purchaser agrees that it shall use its commercially reasonable efforts to obtain replacement of the Seller Credit Support Obligations that will be in effect at the Closing or, in the case of Seller Credit Support Obligations described in the foregoing clause (b), will use its commercially reasonable efforts to arrange for itself or one of its Subsidiaries to be substituted as the primary obligor thereon as of the Closing through an assumption, accession, acknowledgement or similar agreement with the beneficiary of the applicable Seller Credit Support Obligation. All costs and expenses incurred in connection with providing replacement credit support or the release or substitution of the Seller Credit Support Obligations shall be borne by Purchaser.

SECTION 5.10.    Insurance. For the avoidance of doubt, except with respect to insurance policies constituting Transferred Assets, Seller and its Affiliates shall retain all rights to control its insurance policies and programs, including the right to exhaust, settle, release, commute, buy-back or otherwise resolve disputes with respect to any of their insurance policies and programs, notwithstanding whether any such policies or programs apply to any liabilities of Purchaser or its Affiliates and nothing herein shall require Seller or any of its Affiliates to maintain any insurance after the Closing. Notwithstanding anything to the contrary contained in this Agreement, Purchaser and its Affiliates may, to the extent permitted under the applicable insurance policy, file and control claims under any occurrence-based insurance policy of Seller or its Affiliates for losses arising out of pre-Closing events relating to the Business, provided that (i) Purchaser promptly notifies Seller of any such claim, and (ii) any proceeds of such insurance shall be applied first to reimburse Purchaser for the covered loss and then, to the extent of any excess, to Seller.

SECTION 5.11.    Waiver of Conflicts. Recognizing that Kirkland & Ellis LLP has acted as legal counsel to one or more of Seller and its Affiliates (individually and collectively, the "**Seller Group**") prior to the Closing, and that Kirkland & Ellis LLP intends to act as legal counsel to one or more of Seller and its Affiliates after the Closing, in the event that a dispute or other matter arises between or among the Purchaser and any of its representatives and Affiliates (individually and collectively, the "**Purchaser Group**" ), on the one hand, and the Seller Group, on the other hand, regarding this Agreement and/or the transactions contemplated hereby, Purchaser hereby agrees on its own behalf and on behalf of the Purchaser Group, that, Kirkland & Ellis LLP may represent one or more of Seller or its Affiliates in such dispute even though the interests of such person(s) may be directly adverse to Purchaser. Purchaser represents that Purchaser's own attorney has explained and helped Purchaser evaluate the implications and risks of waiving the right to assert future conflict against Kirkland & Ellis LLP as set forth herein, and Purchaser's consent with respect to this waiver is fully informed. In addition, all communications involving attorney-client confidences between any of Seller or its Affiliates and Kirkland & Ellis LLP in the course of the negotiation, documentation and consummation of the transactions contemplated hereby

40

(including, for the avoidance of doubt, all of the client files and records in the possession of Kirkland & Ellis LLP related to this Agreement and the transactions contemplated hereby) shall be deemed to be attorney-client confidences that belong solely to Seller and its Affiliates, and the attorney-client privilege and the expectation of client confidence belongs to, and shall be controlled by, the Seller Group and will not pass to or be claimed by Purchaser. Without limiting the generality of the foregoing, upon and after the Closing, (a) Seller and its Affiliates shall be the sole holders of the attorney-client privilege with respect to such engagement, and (b) to the extent that files of Kirkland & Ellis LLP in respect of such engagement constitute property of the client, only Seller and its Affiliates shall hold such property rights. Notwithstanding the foregoing, in the event that a dispute arises between the Purchaser on the one hand, and a third party, on the other hand, after the Closing, the Purchaser may assert the attorney-client privilege to prevent disclosure of confidential communications to such third party; provided, however, that the Purchaser may not intentionally waive such privilege without the prior written consent of Seller (which consent shall not be unreasonably withheld, conditioned or delayed).

SECTION 5.12.    Further Action; Wrong Pockets.

(a)    On the terms and subject to the conditions of this Agreement, each party will use its commercially reasonable efforts to take or cause to be taken in an expeditious manner all actions and to do or cause to be done all things necessary, appropriate or advisable to satisfy the conditions to the Closing (and refrain from taking any action that would reasonably be expected to have the effect of delaying, impairing or impeding the Closing), to consummate the transactions contemplated hereby and to comply promptly with all legal requirements that may be imposed on it or any of its Affiliates with respect to the Closing, in each case as promptly as practicable, including by forming or causing to be formed a duly organized and validly existing Affiliate of Purchaser in good standing in any jurisdiction where such Affiliate is required under the Law of such jurisdiction to be its designee to purchase any of the Transferred Assets and utilizing such Affiliate for such purpose (and, to the extent requested by Seller, entering into local sales agreements consistent with the terms of this Agreement if required or advisable under the Laws of any foreign jurisdictions).

(b)    If, at any time following the Closing, either party hereto becomes aware that any Transferred Asset which should have been transferred to, or any Assumed Liability which should have been assumed by, Purchaser or any Affiliate designated by the Purchaser, as applicable pursuant to the terms of this Agreement was not transferred to or assumed by Purchaser or any Affiliate designated by the Purchaser, as applicable, as contemplated by this Agreement, then (i) Seller shall promptly transfer or cause its Affiliates to transfer such Transferred Asset to Purchaser or any Affiliate designated by the Purchaser, as applicable, and (ii) Purchaser shall promptly assume or cause such Affiliates to assume such Assumed Liability, in each case for no consideration and at Seller's expense.

(c)    If, at any time following the Closing, either party hereto becomes aware that any Excluded Asset which should have been retained by, or any Excluded Contracts which should have been retained by, Seller or any Affiliate of Seller pursuant to the terms of this Agreement was transferred to or assumed by Purchaser or any Affiliate designated by Purchaser, then (i) Purchaser shall promptly transfer or cause such Affiliate to transfer such Excluded Asset to Seller or any

41

Affiliate of Seller, and (ii) Seller shall promptly assume or cause its Affiliates to assume such Excluded Contract, in each case for no consideration and at Purchaser's expense.

(d)     Following the Closing, Purchaser covenants and agrees to remit, net of the amount of any related Tax costs (if any) imposed on Purchaser or its Affiliates, with reasonable promptness and, in any event, not later than ten (10) Business Days of receipt, to Seller any payments received, which payments are on, or in respect of accounts receivable owned by, or otherwise payable to, Seller prior to the Closing. Seller covenants and agrees to remit, net of the amount of any related Tax costs (if any) imposed on Seller or its Affiliates, with reasonable promptness and, in any event, not later than ten (10) Business Days of receipt, to Purchaser any payments received that are payable to Purchaser, including for the avoidance of doubt, any payments that are on, or in respect of, accounts receivable owned by, or otherwise payable to, Purchaser following the Closing.

SECTION 5.13.    Accounts Payable and Payroll. Subject to the terms and subject to the conditions of this Agreement, from and after the Closing, Seller shall, or shall cause one of its Affiliates to, pay, perform and discharge when due current accounts payable to trade creditors and unpaid salaries and wages to Employees, in each case, to the extent Related to the Business and as in existence as of immediately prior to the Closing. If Seller fails to make any such payment within sixty (60) days of the date it first becomes due, Purchaser may (but shall not be obligated to) make such payment on Seller's behalf, and Seller shall reimburse Purchaser for the full amount paid (together with reasonable out-of-pocket costs of collection) within fifteen (15) Business Days after receipt of Purchaser's written demand.

SECTION 5.14.    Transition Services Cooperation. From the date hereof until the Closing, the parties hereto shall negotiate in good faith the terms of the Transition Services Agreement consistent with the terms set forth in Exhibit C attached hereto. The parties hereto agree that execution of a Transition Services Agreement is not a condition to Closing. If the Transition Services Agreement is not executed and delivered by the parties hereto in accordance with Section 2.02, then the parties hereto will use best efforts to finalize the terms of the Transition Services Agreement as soon as practicable thereafter and will operate under the terms set forth in Exhibit C (as if such terms were binding contractual commitments and not terms to be included in a definitive agreement) until such time as the Transition Services Agreement is executed. Seven (7) calendar days before the Closing, Seller will deliver to Purchaser a forecast of Service Charges (defined in Exhibit C to this Agreement) projected to be incurred under the Transition Services Agreement by Purchaser during the remaining term of the then-current calendar quarter (with, at minimum, a thirty (30)-day period included). Within ten (10) Business Days following the Closing Date, Purchaser will remit to Seller those Service Charges estimated in such forecast for the first (1st) month of the Transition Services Agreement.

SECTION 5.15.    Freedom to Operate License.

(a)     Seller (on behalf of itself and its Affiliates that are not Debtor Affiliates) and each Debtor Affiliate hereby grants to Purchaser (and its Affiliates) a nonexclusive, royalty-free, perpetual, irrevocable, sublicensable (solely as permitted in Section 5.15(d)), right and license to Exploit all Retained Intellectual Property (excluding any Trademarks, the Specified Source Code, Intellectual Property subject to a Transferred Contract, and Intellectual Property related to the Services (as defined in Exhibit C to this Agreement) under the Transition Services Agreement),

42

owned or used by Seller (or its Affiliates) at any time during the twelve (12) months prior to Closing, to conduct the Business as conducted during the twelve (12) months prior to Closing (and any natural extensions or evolutions thereof); provided that any Retained Intellectual Property which the Seller (or its Affiliates) uses pursuant to a right or license granted by a third-party licensor ("**Licensed Retained IP**") can be validly sublicensed to Purchaser without payment to, or consent of, the third-party licensor; provided further that, for a period of six (6) months after Closing, when reasonably requested by Purchaser, Seller shall (and shall cause its Affiliates that are not Debtor Affiliates to) and Debtor Affiliates shall use commercially reasonable efforts to procure sublicensing consents from such third-party licensors of the Licensed Retained IP if Purchaser agrees to bear all costs and expenses reasonably necessary to facilitate the sublicense to the extent that such costs and expenses are approved, in writing, in advance, by Purchaser. Purchaser (on behalf of itself and its Affiliates) hereby grants to Seller (and its Affiliates) a nonexclusive, royalty-free, perpetual, irrevocable sublicensable (solely as permitted in Section 5.15(d)), right and license to Exploit all Intellectual Property related to any services provided by Purchaser to Seller under the Transition Services Agreement) to conduct the Businesses as conducted during the twelve (12) months prior to Closing (and any natural extensions or evolutions thereof); provided that any Transferred Intellectual Property which the Purchaser (or its Affiliates) uses pursuant to a right or license granted by a third-party licensor ("**Licensed Transferred IP**" ) can be validly sublicensed to Seller without payment to, or consent of, the third-party licensor; provided further that, for a period of six (6) months after Closing, when reasonably requested by Seller, Purchaser shall (and shall cause its Affiliates to) use commercially reasonable efforts to procure sublicensing consents from such third-party licensors of the Licensed Transferred IP if Seller agrees to bear all costs and expenses reasonably necessary to facilitate the sublicense to the extent that such costs and expenses are approved, in writing, in advance, by Seller.

(b)      Seller and Purchaser acknowledge and agree that nothing in this Section 5.15 shall oblige any party to provide to any person any (i) physical materials, including any Software (in computer readable form and/or human readable form), except as set forth in the following sentence, or (ii) support, maintenance, hosting or other similar services. However, to the extent reasonably required for the effective exercise of any rights granted by a party hereto or its Affiliates to the other party or its Affiliates under Section 5.15(a) with respect to Intellectual Property, for a period of six (6) months after Closing, the party granting such rights shall (or shall cause its Affiliates to) provide embodiments of such Intellectual Property and related materials that are not already: (A) included in the books and records comprising the Transferred Assets, (B) contained in the Specified Source Code, or (C) in the possession or control of a Transferred Employee, upon request from the party receiving such rights or its Affiliate. Upon the reasonable request of the party receiving such rights, at such party's sole cost and expense (which shall be reasonable), the party granting the rights set forth in this Section 5.15 shall create, recreate, or specially compile any such embodiments and related materials, for Intellectual Property owned by such party, if such activity requires no more than ten (10) hours of personnel time; provided that, if the parties hereto reasonably determine in good faith that such Intellectual Property is material to the Business or Retained Business (as applicable, and as conducted at Closing), and that more than ten (10) hours of personnel time would be required for such activities, then the parties hereto shall cooperate in good faith to establish and perform a reasonable procedure for conducting such activities.

43

(c)     Notwithstanding anything to the contrary in this Agreement, Seller and Purchaser may assign their respective licenses set forth in this Section 5.15 in whole or in part in connection with a merger, consolidation or sale of all or substantially all of, or any portion of the assets of, their respective businesses to which the licenses relate.

(d)     Seller and Purchaser and their respective Affiliates may sublicense their respective licenses set forth in this Section 5.15 to (i) their vendors, consultants, contractors and suppliers, in connection with the provision of services and products to their respective businesses to which the licenses relate, and (ii) their distributors, strategic partners, customers and end-users, in connection with the distribution, licensing, offering and sale of the current and future products and services of their respective businesses to which the licenses relate, but in each case solely within the permitted scope of the applicable license granted hereunder.

(e)     Seller and Purchaser intend and agree that, for purposes of Section 365(n) of the Bankruptcy Code (and any amendment thereto) and any equivalent applicable Law in any foreign jurisdiction, each of the above licenses will be treated as a license to intellectual property (as defined in Section 101(35A) of the Bankruptcy Code).

(f)     The licenses in this Section 5.15 are intended to run with the Intellectual Property subject to such licenses. Each of Seller and Purchaser and their respective Affiliates, as applicable, must transfer its licenses granted herein to the successor or acquirer of any of their Intellectual Property subject thereto, and such successor or acquirer shall be deemed to assume its obligations by operation of applicable Law.

SECTION 5.16.    Internet Transition. To facilitate a well-ordered transition of the Business, Seller and the Debtor Affiliates will, and will cause their respective Affiliates to: (i) beginning on a date to be agreed upon by the parties hereto in good faith (which shall, in any event, be less than thirty (30) days after the Closing), through the date that is five (5) years after the Closing, maintain "anthology.com" as a landing page solely displaying navigation panes for products and services of the Business and the Retained Businesses in a mutually agreed format, and (ii) for a period of five (5) years after the Closing, redirect traffic and content from email addresses and URLs that are specific to the Business to email addresses and URLs requested by Purchaser. During the Transitional Use Period (and, with respect to the Anthology Domains, during the remainder of the five (5) year period described in this Section), Seller and the Debtor Affiliates will, and will cause their respective Affiliates to, use good faith efforts to update the content hosted under the Anthology Domains and CampusNexus Domains as reasonably requested by Purchaser, provided that such updates (A) do not materially frustrate Seller's (or its Affiliates', sublicensees' or transferees') ability to exercise rights afforded under Section 5.08 or this Section 5.16, or (B) do not alter information, description or marketing of the Retained Businesses (absent Purchaser's prior written consent which will not be unreasonably withheld). Without limiting the foregoing, Seller and the Debtor Affiliates shall not, and will ensure that their respective Affiliates do not, without Purchaser's prior, written consent, alter the configuration of, or the content hosted under, any of the Anthology Domains or the CampusNexus Domains as such configurations and content existed as of the Closing in a manner that would interfere with or disrupt the operation of any Transferred Asset or the Business. After such five (5) year period, Seller and the Debtor Affiliates shall, and shall cause their respective Affiliates to, discontinue all public-facing uses of the Anthology Domains. The parties hereto shall reasonably cooperate in good faith to address and

44

resolve any residual uses of domains and URLs controlled by the other party that exist in software (including website configurations) as of the Closing to minimize to the extent practicable interruptions to a party's or its customer's operations. The parties hereto will cooperate in good faith to develop a comprehensive plan regarding domain name transition matters as part of the Separation Plan and/or the Migration Plan. If agreed by the parties hereto, with regards to domain transition matters, the terms of the Separation Plan and Migration Plan shall supersede the requirements of this Section 5.16.

SECTION 5.17.     Specified Source Code License.

(a)     Seller (on behalf of itself and its Affiliates that are not Debtor Affiliates) and each Debtor Affiliate hereby grants to Purchaser (and its Affiliates) a nonexclusive, perpetual, irrevocable, royalty-free, freely sublicensable, license to Exploit all rights (including Intellectual Property) owned or used by Seller (or its Affiliates) as of the date hereof or the Closing in the Specified Source Code in connection with the operation or conduct of the Business (and any natural extensions or evolutions thereof). Each party hereto acknowledges and agrees that, subject to Section 5.17, neither Seller (or its Affiliates) on the one hand, nor the Purchaser (or its Affiliates) on the other hand, shall be obligated to provide to any person any updates or modifications to the Specified Source Code made after Closing, or any support, maintenance, hosting or other services of any kind. Notwithstanding anything to the contrary in this Agreement, Purchaser may assign this license in whole or in part in connection with a sale of all or any portion of any business or product that includes any of the Specified Source Code. Seller agrees that, for purposes of Section 365(n) of the Bankruptcy Code (and any amendment thereto) and any equivalent applicable Law in any foreign jurisdiction, this license will be treated as a license to intellectual property (as defined in Section 101(35A) of the Bankruptcy Code). To the extent Purchaser does not obtain a copy of the Specified Source Code and any related documentation used by Seller or its Affiliates to operate or support the same through access to cloud or other storage or a separate source code repository in connection with the consummation of the transactions contemplated hereby at the Closing, Seller will (and will cause its applicable Affiliates that are not Debtor Affiliates) or the applicable Debtor Affiliates will promptly deliver a copy of the same to Purchaser upon request.

(b)     The license in this Section 5.17 is intended to run with the Intellectual Property subject to such license. Seller and its Affiliates must transfer its license granted herein to the successor or acquirer of any of its Intellectual Property subject thereto, and such successor or acquirer shall be deemed to assume its obligations by operation of applicable Law.

SECTION 5.18.     Social Media Accounts. The parties hereto acknowledge that no social media accounts, or other digital presences or profiles (including on platforms such as Instagram, Facebook, LinkedIn and YouTube) ("**Social Media Accounts**") are Related to the Business, but that, Seller owns and controls Social Media Accounts that include, or are entitled with a variation of, the Anthology Brand (the "**Anthology Social Media Accounts**"). The parties hereto agree that the Anthology Social Media Accounts are Excluded Assets. Notwithstanding the foregoing: (a) Seller shall remove all Anthology Brands from the Anthology Social Media Accounts by expiration of the Continued Use Period, (b) during the Continued Use Period, Seller shall use commercially reasonable efforts to remove and, at Purchaser's reasonable request, deliver to Purchaser the content from the Anthology Social Media Accounts identified by Purchaser that

45

Relates to the Business (unless otherwise agreed upon by the Parties in good faith), (c) during the Continued Use Period, Seller shall make posts (or other announcements, as applicable given the Social Media Accounts) regarding the Business on behalf of Purchaser, that are mutually agreed upon by the parties (with Seller's consent not to be unreasonably withheld), (d) Seller shall take no action on Anthology Social Media Accounts to disparage the Anthology Brand, the Business or Purchaser, (e) for the first two (2) years after the Closing, (i) Seller shall take no action on its Social Media Accounts to disparage the Anthology Brand, the Business or the Purchaser, and (ii) Purchaser shall take no action on its Social Media Accounts to disparage the Retained Businesses or Seller, and (f) the parties hereto shall discuss in good faith, in connection with the Separation Plan and Migration Plan, whether additional activities are required to facilitate a transition of the Anthology Brands off the Anthology Social Media Accounts.

SECTION 5.19.    Separation & Migration Plans. No later than ten (10) days prior to the Closing, the parties hereto will agree upon (i) a separation plan (the "**Separation Plan**"), which shall set forth those steps necessary to enable the separation of the Transferred Assets from the Retained Businesses, and (ii) a migration plan (the "**Migration Plan**"), which shall set forth those steps necessary to enable the migration of the Transferred Assets to Purchaser, in each case, by the Closing, unless mutually agreed to by the parties hereto, such that, other than for the rights and obligations under the Transition Services Agreement and subject to Section 5.15, Section 5.16 and Section 5.21, neither Purchaser nor its Affiliates, as applicable, shall depend in any respect on any asset, right, service or benefit owned by any Seller or its Affiliates, as applicable, and shall be able to operate the Business substantially in the same manner as it operated immediately prior to the Closing. The parties hereto will use commercially reasonable efforts to effect the Separation Plan and the Migration Plan, and (subject to the terms and conditions hereof) each Party shall bear its own costs incurred in connection with the same. The parties hereto may update the Separation Plan and Migration Plan by mutual agreement from time to time to account for agreed upon changes or additional details, activities and timelines, including with respect to transition matters relating to domain names.

SECTION 5.20.    Transfer of In-Scope Foreign Assets.

(a)    Seller and Purchaser acknowledge and agree that the assets or rights listed on Section 5.20 of the Disclosure Schedule (the "**In-Scope Foreign Assets**" ) are owned by Affiliates of Seller that are neither party to the Bankruptcy Cases nor subject to the Bankruptcy Code. With respect to such In-Scope Foreign Assets, Seller (by and through such Seller's relevant Affiliates) and Purchaser (by and through such Purchaser's relevant Affiliates) shall work in good faith to negotiate the Local Transfer Agreements in a form consistent with the terms hereof and otherwise mutually agreeable to Seller and Purchaser for (i) the conveyance to Purchaser or its designated Affiliate(s) of the In-Scope Foreign Assets that are Related to the Business (the "**Assigned Foreign Assets**") and (ii) the license to Purchaser or its designated Affiliate(s) under any Retained Intellectual Property that is subject to the licenses described in Section 5.15(a) or 5.17(a) and is included in the In-Scope Foreign Assets (the "**Licensed Foreign Assets**"), in each case subject to the governing Laws of the applicable jurisdictions and in a manner that will not result in Purchaser and/or any of its Affiliates, as applicable, being in contravention of any applicable Law upon, as a result of, or following such conveyance. In connection with the foregoing, Seller and Purchaser shall, and shall cause their respective relevant Affiliates to, (i) execute and deliver the Local Transfer Agreements and all ancillary conveyance instruments, licenses, assignments and

46

assumptions necessary under applicable Law to transfer, assign, convey and deliver the Assigned Foreign Assets and to license and deliver the Licensed Foreign Assets to Purchaser or one or more Affiliates designated by Purchaser, (ii) consummate the transactions contemplated thereby, including obtaining all required corporate, board and shareholder approvals, making all required filings, registrations and recordings (including notarizations, legalizations, apostilles and certified translations as applicable), and (iii) except with respect to the transfer of title or grant of license (as applicable) (which shall be effected pursuant to the Local Transfer Agreements), otherwise treat the Assigned Foreign Assets as Transferred Assets hereunder and treat such Licensed Foreign Assets as Intellectual Property licensed hereunder. For the avoidance of doubt, the licenses granted herein under the Licensed Foreign Assets shall include (i) the nonexclusive, royalty-free, perpetual, irrevocable, sublicensable (with respect to the license corresponding to the license granted in Section 5.15(a), solely as permitted in Section 5.15(d), *mutatis mutandis*), right and license to Exploit the Licensed Foreign Assets and (ii) rights to receive embodiments of Licensed Foreign Assets, in each case that are comparable to the corresponding rights provided in Section 5.15 and Section 5.17. Notwithstanding anything to the contrary in this Agreement, no Local Transfer Agreement, ancillary instrument or step taken to effect the transfer, assignment, conveyance, license or delivery of any In-Scope Foreign Asset shall require or result in Purchaser or any of its Affiliates taking title to, holding, using or operating (x) any such In-Scope Foreign Asset in a manner that would contravene any Law applicable to Purchaser or such Affiliate, and (y) any In-Scope Foreign Asset with a counterparty that is or is acting for or on behalf of a Sanctioned Person or with whom doing Business would violate the Anti-Corruption Laws, Anti-Money Laundering Laws, Sanctions, and Export Control Laws.

(b)     From the date hereof until the Closing, Purchaser and Seller may identify additional assets or rights owned by Affiliates of Seller that the parties mutually and reasonably agree in good faith are Related to the Business and that Purchaser desires to have transferred, or that the parties mutually and reasonably agree in good faith are subject to the licenses described in Section 5.15(a) and Section 5.17(a), in each case pursuant to one or more Local Transfer Agreements (the "**Additional In-Scope Foreign Assets**"). Upon Purchaser's and Seller's mutual consent (such consent not to be unreasonably withheld, conditioned or delayed):

(i)     each Additional In-Scope Foreign Asset shall, subject to applicable Law, be deemed an In-Scope Foreign Asset for all purposes of this Agreement;

(ii)     Section 5.20 of the Disclosure Schedule shall be deemed automatically supplemented to include such assets; and

(iii)     Seller shall, and shall cause its relevant Affiliates to, take all actions described in clauses 5.20(i) through (iii) above with respect thereto.

Any such addition and transfer shall be effected in compliance with applicable Law and shall not require or result in Purchaser or any of its Affiliates taking title to, holding, using or operating (x) any such Additional In-Scope Foreign Asset in a manner that would contravene any Law applicable to Purchaser or such Affiliate, and (y) any Additional In-Scope Foreign Asset with a counterparty that is or is acting for or on behalf of a Sanctioned Person or with whom doing Business would violate the Anti-Corruption Laws, Anti-Money Laundering Laws, Sanctions, and Export Control Laws.

SECTION 5.21.    Consents; Mixed-Use Contracts.

(a)    Seller, the Debtor Affiliates and Purchaser hereby agree that (i) each Mixed-Use Contract listed in Section 5.21 of the Disclosure Schedule shall be retained by the Estate as an Excluded Asset and shall not be assigned to Purchaser at Closing, and (ii) the Parties intend and agree that the separation of each Mixed-Use Contract will be effected post-Closing in accordance with this Section 5.21.

(b)    Seller, the Debtor Affiliates and Purchaser shall, and shall cause their respective Affiliates to, mutually use commercially reasonable efforts to obtain or structure an arrangement for the Purchaser, Seller or their respective Affiliates, as applicable, to receive the rights and benefits, and bear the obligations and burdens, of such portions of any such Mixed-Use Contract to the extent relating to the Business in the case of a Transferred Asset or relating to the Excluded Asset in the case of Seller, and shall use commercially reasonable good faith efforts to replace each Mixed-Use Contract with alternative arrangements for the benefits of Purchaser and Seller. Seller, the Debtor Affiliates and Purchaser shall use commercially reasonable good faith efforts to obtain terms under such alternative arrangements that are, taken as a whole, materially comparable to those of such Mixed-Use Contract, on terms and conditions which, taken as a whole, are materially similar to those of such Mixed-Use Contract immediately prior to the Closing, other than in case of renewals, terminations, and terms and conditions changes in the ordinary course; provided, however, that customary, ordinary-course changes effected in connection with any renewal, expiration or termination (including adjustments to pricing or other commercial terms made in connection with a renewal) shall be permitted and shall not be deemed to render such alternative arrangements materially dissimilar (each contract in sub-clauses (A) and (B), a "**Replacement Contract**", and collectively, the "**Replacement Contracts**"); provided, that neither Seller, Purchaser nor their respective Affiliates shall be required to take any action that would constitute a breach or other contravention of the rights of any Person(s), be ineffective under, or contravene, any applicable Law or any such Mixed-Use Contract or adversely affect the contractual rights of the Parties or their Affiliates.

(c)    Seller and each Debtor Affiliate shall (i) hold in trust and promptly (and in any event within five (5) Business Days following receipt) remit to Purchaser any revenue received by Seller or its Affiliates under such Mixed-Use Contract included in the Transferred Assets or Related to the Business, and (ii) provide Purchaser with customary audit and information rights reasonably necessary to verify such amounts, in each case without duplication of any proration or purchase price adjustment provided elsewhere in this Agreement. Subject to the other provisions of this Section 5.21, Purchaser shall be responsible for performing all obligations (including timely payment obligations) and Liabilities (excluding any Retained Liabilities) solely to the extent arising under the portion of the Mixed-Use Contract attributable to the Transferred Assets, Assumed Liabilities and/or the Business.

(d)    Seller and each Debtor Affiliate shall, and shall cause its Affiliates to, (i) use commercially reasonable efforts to obtain all consents, approvals, permissions, waivers, authorizations and licenses ("**Mixed-Use Contract Consents**") and (ii) send all third-party notices, in each case, as required for Seller or its Affiliates to effect the arrangements described in this Section 5.21. From and after the Closing and until execution of the relevant Replacement Contract, as between Seller and Purchaser, the economic benefits and burdens of such Mixed-Use

48

Contract that are attributable to the portion relating to the Business, Transferred Assets or Assumed Liabilities shall be for the account of Purchaser and those attributable to the portion relating to the Excluded Assets or Retained Liabilities shall be for the account of Seller.

(e)       With respect to Liabilities, including but not limited to payment or performance obligations, pursuant to, under or relating to any Mixed-Use Contract, from and after the Closing, such Liabilities shall be allocated between (A) Seller, on the one hand, to the extent arising out of or Related to the Excluded Assets or Retained Liabilities, and (B) Purchaser, on the other hand, to the extent arising out of or relating to the Transferred Assets or the Assumed Liabilities. Notwithstanding the foregoing, each of Seller and Purchaser shall be responsible for any or all Liabilities arising from its (or its Affiliates') direct breach of any Mixed-Use Contract caused by or attributable to Seller or Purchaser or their Affiliates, respectively.

(f)       Notwithstanding anything to the contrary contained herein, none of Seller, Purchaser nor any of their respective Affiliates shall have any obligation to make any payments, incur any Liability or grant any concessions to obtain any consents of third parties or effect the transfers or arrangements contemplated by this Section 5.21, and the failure to receive any Mixed-Use Contract Consents or to effect any transfers or arrangements for Mixed-Use Contracts contemplated by this Section 5.21; provided that prior to refusing any such payment, incurrence of Liability or granting of any concession, Seller or its Affiliates, as applicable, shall provide Purchaser with reasonable notice and time to review and assess whether Purchaser deems such Mixed-Use Contract important to Purchaser's business and operations, and if so, to allow Purchaser (or any Affiliate designated by Purchaser, as applicable), on behalf of Seller or its Affiliates, to make such payments, incur such Liability or grant such concessions (provided that Purchaser shall remit such payments to Seller, and guarantee the performance of such Liability or concession, as applicable) as may be required to obtain the consents of such third parties or effect the transfers or arrangements contemplated by this Section 5.21. To the extent necessary to implement the foregoing and permitted by Law and the applicable Mixed-Use Contract, the Estate shall communicate with counterparties, deliver notices and execute ministerial documentation in respect of Mixed-Use Contracts solely to effect the arrangements contemplated by this Section 5.21.

(g)       Until the Effective Separation of each Mixed-Use Contract and notwithstanding anything to the contrary in this Agreement:

(i)       Seller and each Debtor Affiliate shall (i) to the extent such portion of the Mixed-Use Contract is related to the Excluded Asset or Retained Liability, remain in full compliance with, and perform, such Mixed-Use Contract (provided that neither Seller or its Affiliates shall be liable or indemnify for non-compliance caused by third-parties, including other purchasers of Excluded Assets and/or Retained Liabilities), and (ii) indemnify, defend and hold harmless Purchaser and its Affiliates and their respective Representatives from and against any and all Losses arising out of, resulting from or relating to any breach, default or non-compliance under such portion of the Mixed-Use Contract that is related to the Excluded Asset or Retained Liability (and only to the extent such Loss is caused by Seller or its Affiliates and not any third-party, including other purchasers of the Excluded Assets and/or Retained Liability) during such period (whether arising before, on or after the Closing); and

49

(ii) Purchaser shall (i) to the extent such portion of the Mixed-Use Contract is related to the Transferred Asset, Assumed Liability or the Business, remain in full compliance with, and perform, such Mixed-Use Contract (provided that neither Purchaser or its Affiliates shall be liable or indemnify for non-compliance caused by third-parties, including other purchasers of Excluded Assets and/or Retained Liabilities), and (ii) indemnify, defend and hold harmless Seller and its Affiliates and their respective Representatives from and against any and all Losses arising out of, resulting from or relating to any breach, default or non-compliance under such portion of the Mixed-Use Contract that is related to the Transferred Asset, Assumed Liability or the Business (and only to the extent such Loss is caused by Purchaser or its Affiliates and not any third-party, including other purchasers of the Excluded Assets and/or Retained Liabilities) during such period.

(h) Notwithstanding anything to the contrary in this Agreement (including Section 5.01) and subject to Section 5.21(i), Seller and each Debtor Affiliate shall, and shall cause its Affiliates to, use commercially reasonable good faith efforts to ensure Mixed-Use Contracts, to the extent such Mixed-Use Contracts have not been replaced with Replacement Contracts, are continued prior to the expiration of the terms of such Mixed-Use Contract and are renewed in the ordinary course; provided, that the foregoing shall not restrict termination of any Mixed-Use Contract solely in connection with, and contemporaneously with, the execution of relevant Replacement Contract(s) pursuant to Section 5.21(b) with no interruption of the services, rights or benefits used by the Business.

(i) Notwithstanding anything to the contrary in this Agreement (including Sections 5.20(b), (g) and (h)), if Seller and Purchaser both determine upon mutual consent (such consent not to be unreasonably withheld, conditioned or delayed), to reject a Mixed-Use Contract, then, upon written notice by each of Seller and Purchaser identifying such Mixed-Use Contract for rejection (a "**Mutual Rejection Notice**"), such Mixed-Use Contract shall be deemed a "**Mutually Rejected Mixed-Use Contract**." In respect of any Mutually Rejected Mixed-Use Contract: (A) the Debtor shall use best efforts to reject such contract in the Bankruptcy Cases, and any rejection damages or other Liabilities arising therefrom shall be Retained Liabilities and (B) until the effective date of such rejection, the Parties' respective performance obligations and economic allocation with respect to such contract shall continue in accordance with this Section 5.21.

(j) In the event of the termination of any Mixed-Use Contract by the counterparty (and not by Seller or Seller's successor with respect to such Mixed-Use Contract (each, an "**Other Owner Party**")) (for clarity, such termination shall not be based on the right of the counterparty to the Mixed-Use Contract to terminate for convenience in order for this Section 5.21(j) to apply), solely due to the intentional act, omission, or failure to perform by Purchaser, resulting in intentional breach by Purchaser under such Mixed-Use Contract, and upon written notice of such intentional breach by the counterparty to the Mixed-Use Contract or the Seller acting in good faith (and without any requirement that the counterparty's notice specify the foregoing or that Purchaser has "actual knowledge" or act with "reckless disregard"), Purchaser shall indemnify such Other Owner Party for the loss of the annual recurring revenue payable under such contract attributable ("**Attributable ARR**") to the Other Owner Parties that results from such termination for the remaining then-current term of the Mixed-Use Contract (which shall exclude any renewal terms, automatic or otherwise) ("**Remaining Term**"); provided, that Purchaser shall have no indemnification obligations to any such Other Owner Party if, following such termination, such Other Owner Party enters into a Contract with such counterparty such that such Other Owner Party

50

is in a substantially comparable economic position as it was immediately prior to such termination. Nothing in this Section 5.21(j) shall restrict in any way the ability of Purchaser or its affiliates to exercise any termination right it may have under any Mixed-Use Contract without liability hereunder. Notwithstanding anything to the contrary in this Agreement, in no event shall the Liability for Purchaser's account pursuant to this Section 5.21(j), individually, exceed the Attributable ARR of such Other Owner Party for the Remaining Term assuming a termination of such Mixed-Use Contract as of the date of this Agreement; provided that, in no event shall the liability of the Purchaser, in the aggregate, exceed the Purchase Price.

(k)     In the event of the termination of any Mixed-Use Contract by the counterparty (and not by Purchaser) (for clarity, such termination shall not be based on the right of the counterparty to the Mixed-Use Contract to terminate for convenience in order for this Section 5.21(k) to apply), solely due to the intentional act, omission, or failure to perform by any Other Owner Party, resulting in intentional breach by the Other Owner Party, and upon written notice of such intentional breach by the counterparty to the Mixed-Use Contract or the Purchaser acting in good faith (and without any requirement that the counterparty's notice specify the foregoing or that the Other Owner Party has "actual knowledge" or act with "reckless disregard"), such Other Owner Party shall indemnify Purchaser for the loss of the Attributable ARR to Purchaser that results from such termination for the Remaining Term; provided, that such Other Owner Party shall have no indemnification obligations to Purchaser if, following such termination, Purchaser enters into a Contract with such counterparty such that Purchaser is in a substantially comparable economic position as it was immediately prior to such termination. Nothing in this Section 5.21(k) shall restrict in any way the ability of any Other Owner Party or its affiliates to exercise any termination right it may have under any Mixed-Use Contract without liability hereunder. Notwithstanding anything to the contrary in this Agreement, in no event shall the Liability for any Other Owner Party's account pursuant to this Section 5.21(k), individually, exceed the Attributable ARR of Purchaser for the Remaining Term assuming a termination of such Mixed-Use Contract as of the date of this Agreement; provided that, in no event shall the liability of the Other Owner Party exceed the aggregate purchase price paid by such Other Owner Party to Seller in connection with the disposition of other business segments of Seller (other than the Business) that operate under such Mixed-Use Contract; provided, further, in no event shall the aggregate liability of Seller or the Estate, as applicable, exceed the Purchase Price. The Other Owner Party shall be, and the Estate shall cause the Other Owner Party to be, responsible for the foregoing obligations, and, to the extent the Other Owner Party fails to pay any amounts owed pursuant to this Section 5.21(k), the Purchaser shall be entitled to recover such amounts directly from the Estate.

SECTION 5.22.     Intellectual Property. Prior to the Closing, Seller shall (and shall cause its applicable Affiliates that are not Debtor Affiliates to), and applicable Debtor Affiliates shall, use commercially reasonable efforts to take the actions set forth on Section 5.22 of the Disclosure Schedule.

SECTION 5.23.     Source Code Escrow and Maintenance. Promptly after the date of this Agreement, Seller and Purchaser shall (i) discuss in good faith whether certain source code for software owned by Seller or its Affiliates should reasonably be placed in escrow at or before the Closing for the purpose of ensuring that source code for software that is included in the Transferred Intellectual Property, or that is subject to the licenses provided in Section 5.15 or Section 5.17 (the "**Transferred or Licensed Source Code**"), but that is omitted from the source code expected to

51

be delivered by Seller to Purchaser at or promptly after Closing, is reasonably available to Purchaser, provided, that such discussion regarding the escrow, and the Transferred or Licensed Source Code to be escrowed, will not involve source code which is subject to such licenses if Seller reasonably expects that such code will be sold to another acquiror of a Retained Business within the one (1) year period following the date hereof), and (ii) meet (either in person or virtually) for the purpose of collaboratively identifying in good faith whether the Transferred or Licensed Source Code expected to be delivered by Seller at Closing is insufficient to operate the Business, as conducted at Closing, in all material respects, which meetings will include Seller's senior software architects for any Transferred or Licensed Source Code or Persons holding similar positions. Purchaser shall be solely responsible for the reasonable costs incurred by Seller in connection with any activities agreed upon by the Parties in accordance with (i) and (ii) (excluding legal fees and salaries or other compensation of Persons attending the foregoing meetings). Throughout the period commencing on the date hereof and continuing until the date that is six (6) months after Closing, Seller and each Debtor Affiliate shall take commercially reasonable technical and organizational measures, consistent with ordinary course practices of Seller at Closing, including secure backups, disaster recovery procedures, and redundant storage, to securely maintain all versions of the Transferred or Licensed Source Code and all backups related thereto.

## ARTICLE VI

## BANKRUPTCY COURT MATTERS

SECTION 6.01.    Bankruptcy Actions.

(a)    Seller and Debtor Affiliates shall use its commercially reasonable efforts to obtain entry by the Bankruptcy Court of the Bidding Procedures Order and the Sale Order and any other Orders reasonably necessary to consummate the Acquisition.

(b)    The Bidding Procedures Order shall approve the execution, delivery, and performance of this Agreement by Seller (including, in consideration of the value provided to Seller by Purchaser's negotiation and execution of this Agreement, payment of the Expense Reimbursement pursuant to Section 9.02(c) and Breakup Fee pursuant to Section 9.02(a)), other than the performance of those obligations to be performed at or after the Closing. All Required Terms of the Bidding Procedures Order shall be acceptable to Purchaser in its sole discretion; all other terms of the Bidding Procedures Order relating to this Agreement and the bidding procedures to be employed with respect thereto shall be in form and substance reasonably acceptable to Purchaser. Purchaser agrees that it will use commercially reasonable efforts reasonably requested by Seller to assist in obtaining Bankruptcy Court approval of the Bidding Procedures Order, excluding any changes (x) to this Agreement, the Sale Order or the Required Terms, in each case which Purchaser may refuse in its sole discretion and (y) to the Bidding Procedures Order other than the Required Terms, which changes shall be reasonably acceptable to Purchaser (such acceptance not to be unreasonably withheld, conditioned or delayed). In the event the entry of the Bidding Procedures Order shall be appealed, Seller shall use commercially reasonable efforts to defend such appeal.

(c)    The bidding procedures to be employed with respect to this Agreement shall be those attached to the Bidding Procedures Order. Purchaser agrees and acknowledges that Seller,

52

including through their representatives, are and may continue soliciting inquiries, proposals or offers from third parties in connection with any Alternative Transaction pursuant to the terms of the Bidding Procedures Order. Seller may modify the Bidding Procedures Order or the Sale Order pursuant to discussions with the U.S. Trustee assigned to the Bankruptcy Case, the Bankruptcy Court, any creditor or committee representing a group of creditors in the Bankruptcy Case, or any other party in interest; provided that Seller shall provide Purchaser with prior written notice of any proposed modifications to the Bidding Procedures Order or the Sale Order and shall not make any such modifications without the prior written consent of Purchaser, which (x) in the case of the Sale Order and the Required Terms of the Bidding Procedures Order, may be withheld in Purchaser's sole discretion, and (y) in the case of the other terms of the Bidding Procedures Order other than the Required Terms, may not be unreasonably withheld, conditioned or delayed.

(d)     Subject to the last sentence of Section 6.01(b), Purchaser shall use commercially reasonable efforts to take all actions as are reasonably requested by Seller to assist in obtaining the Bankruptcy Court's entry of the Sale Order and any other Order reasonably necessary to consummate the Acquisition, including for the purposes of providing assurances of performance by Purchaser under this Agreement and demonstrating that the Purchaser is a "good faith" Purchaser under section 363(m) of the Bankruptcy Code, as well as reasonably demonstrating the Purchaser's ability to pay and perform or otherwise satisfy any Assumed Liabilities following the Closing.

(e)     Seller and Purchaser shall (i) appear formally or informally in the Bankruptcy Court if reasonably requested by the other party or required by the Bankruptcy Court in connection with the Acquisition and (ii) keep the other reasonably apprised of the status of material matters related to the Agreement, including, upon reasonable request, furnishing the other as soon as reasonably practicable with copies of notices or other communications received from the Bankruptcy Court or any third party and/or any Governmental Entity with respect to the Acquisition.

(f)     If an Auction is conducted for the Transferred Assets, and Purchaser is not the prevailing parties at the conclusion of such Auction (such prevailing party, the "**Successful Bidder**") but is the next highest bidder at the Auction, Purchaser shall be required to serve as a back-up bidder for the Transferred Assets (the "**Backup Bidder**"). If Purchaser is the Backup Bidder for the Transferred Assets, Purchaser's bid to consummate the Acquisition on the terms and conditions set forth in this Agreement shall remain open and irrevocable until the earliest to occur of (i) sixty (60) days after the Sale Hearing, (ii) consummation of an Alternative Transaction, and (iii) Seller's release of Purchaser from the requirement to serve as a Backup Bidder. If the Successful Bidder fails to consummate the applicable Alternative Transaction as a result of a breach or failure to perform on the part of such Successful Bidder, the Backup Bidder will be deemed to have the new prevailing bid. In such event, Seller may consummate the Acquisition on the terms and conditions set forth in this Agreement.

(g)     If Purchaser is the successful bidder at the Auction, Seller shall schedule a hearing with the Bankruptcy Court to consider entry of the Sale Order no later than two (2) business days after the Auction, subject, with the reasonable consent of Purchaser to the availability of the Bankruptcy Court. Seller shall file such motions or pleadings as may be appropriate or necessary to assume and assign the Transferred Contracts and to determine the amount of the Cure Payments.

53

(h)      Seller shall use commercially reasonable efforts to cooperate with Purchaser concerning the Bidding Procedures Order, the Sale Order, any other orders of the Bankruptcy Court relating to the Acquisition, and the bankruptcy proceedings in connection therewith; provided (x) the Required Terms of the Bidding Procedures Order and Sale Order shall each be acceptable to Purchaser in its sole discretion and (y) the other terms of the Bidding Procedures Order shall be reasonably acceptable to Purchaser. Seller shall provide Purchaser with copies of all applications, pleadings, notices, proposed orders and other documents related to the Bidding Procedures Order, the Sale Order, or any other orders of the Bankruptcy Court relating to the Acquisition or that describe or reference Purchaser or its affiliates, in each case, sufficiently in advance of the proposed filing date so as to permit the Purchaser sufficient time to review and comment on such drafts. Such pleadings and proposed orders shall be in form and substance reasonably acceptable to Purchaser. Seller shall use commercially reasonable efforts to give Purchaser reasonable advance notice of any hearings regarding the motions required to obtain the issuance of the Bidding Procedures Order and the Sale Order.

(i)      Seller and Purchaser acknowledge that this Agreement and the sale of the Transferred Assets are subject to Bankruptcy Court approval and, solely in accordance with the Bidding Procedures Order, higher and better bids.

(j)      Purchaser shall use commercially reasonable efforts to provide adequate assurance of future performance as required under section 365 of the Bankruptcy Code for each Transferred Contract. Purchaser agrees that they will take all commercially reasonable actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been a sufficient demonstration of adequate assurance of future performance under the Transferred Contracts, such as furnishing affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court. If, notwithstanding the foregoing, the Bankruptcy Court or other court of competent jurisdiction determines in a Final Order that adequate assurance of future performance has not been provided with respect to a contract, such contract shall be deemed to be an Excluded Contract.

(k)      Notwithstanding anything to the contrary in this Agreement, Seller shall be permitted to amend, modify or supplement the Bidding Procedures Order solely to modify the bidding procedures for the Other Businesses; provided that such amendments, modifications or supplements may not have any effect, directly or indirectly, upon the bidding procedures for the Business, the Business itself, the Acquisition (including the expected timing of the Closing) or the other transactions contemplated by this Agreement.

SECTION 6.02.    Sale Order. Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, the Sale Order, among other things, shall: (a) approve (i) the execution, delivery and performance by Seller of this Agreement, (ii) the sale of the Transferred Assets to Purchaser on the terms set forth in this Agreement and free and clear of all Liens (other than Permitted Liens), and (iii) the performance by Seller of their obligations under this Agreement; (b) authorize and empower Seller to assume and assign to the Purchaser the Transferred Contracts; (c) find that the Purchaser is "good faith" buyers within the meaning of section 363(m) of the Bankruptcy Code, find that Purchaser is not a successor to Seller, and grant Purchaser the protections of section 363(m) of the Bankruptcy Code; (d) find that, other than as expressly set forth in this Agreement, Purchaser shall have no Liability or responsibility for any Liability or other obligation

54

of Seller arising under or related to the Transferred Assets, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, environmental, successor, or transferee Liability, labor law, de facto merger, or substantial continuity; (e) find that Purchaser has provided adequate assurance (as that term is used in section 365 of the Bankruptcy Code) of future performance in connection with the assumption of the Transferred Contracts; (f) find that Purchaser shall have no Liability for any Excluded Asset or Retained Liability; (g) find that the consideration provided by Purchaser pursuant to this Agreement constitutes reasonably equivalent value and fair consideration for the Transferred Assets; (h) find that Purchaser and Seller did not engage in any conduct which would allow this Agreement to be set aside pursuant to section 363(n) of the Bankruptcy Code; and (i) order that, notwithstanding the provisions of the Federal Rules of Bankruptcy Procedures 6004(h) and 6006(d), the Sale Order is not stayed and is effective immediately upon entry.

SECTION 6.03.    Approval. Seller's obligations under this Agreement and in connection with the Acquisition are subject to entry of the Bidding Procedures Order and the Sale Order. Nothing in this Agreement shall require Purchaser or Seller or their respective Affiliates and advisors to give testimony to or submit a motion to the Bankruptcy Court that is untruthful or to violate any duty of candor to the Bankruptcy Court, or shall require Seller to violate any fiduciary duty to the Bankruptcy Court or its stakeholders.

SECTION 6.04.    Notices and Consents. Prior to the Closing and as necessary following the Closing, Seller will give, or will cause to be given, any notices or other communication to third parties requested by Purchaser in connection with the Acquisition and the transactions contemplated by this Agreement. Each of the parties hereto will use its commercially reasonable efforts to obtain any third-party consents, authorizations, Permits or sublicenses, in each case, as are necessary and appropriate to consummate the Acquisition. Seller shall control all correspondence and negotiations with third parties regarding any such matters; provided that Seller keep Purchaser reasonably apprised of the status of such correspondence and negotiations and work cooperatively in connection with obtaining any such third-party consents, including, upon reasonable request, promptly furnishing Purchaser with copies of notices or other communications received by Seller with respect thereto. Seller shall not be obligated to initiate any legal proceedings to obtain such consent authorization, Permit or approval. Purchaser's receipt of information pursuant to this Section 6.04 shall not operate as a waiver or otherwise affect any representation, warranty or agreement given or made by Seller in this Agreement (including Section 9.01 and Section 10.01) and shall not be deemed to amend or supplement the Disclosure Schedule.

SECTION 6.05.    Cure Payments; Cure of Defaults.

(a)    Subject to entry of the Sale Order, on or prior to the Closing, Seller shall pay the Cure Payments and any other amounts, and Seller shall pay any other amounts and cure any and all other defaults and breaches under the Transferred Contracts so that such Transferred Contracts may be assumed by Seller and assigned to the applicable Purchaser in accordance with the provisions of section 365 of the Bankruptcy Code and this Agreement. Seller agrees that it will promptly take such actions as are reasonably necessary to obtain a Final Order of the Bankruptcy Court providing for the assumption and assignment of such Contracts.

(b)      With respect to any Contract solely Related to the Business which is not a Transferred Contract or Assumed Lease on the Closing Date and provided such Contract has not been rejected by Seller after the Closing Date pursuant to Section 365 of the Bankruptcy Code, upon written notice(s) from Purchaser to Seller given at any time after the Closing Date, Seller shall promptly take all actions reasonably necessary to assume and assign to Purchaser pursuant to Section 365 of the Bankruptcy Code any such Contract(s) set forth in Purchaser's notice(s); provided, that any Cure Payment applicable thereto shall be satisfied solely by Purchaser, and provided, that such assumption and assignment (and payment by Purchaser of such Cure Payment), shall not affect the amount of the Final Purchase Price. Notwithstanding anything in this Agreement to the contrary, on the date any such Contract is assumed and assigned to Purchaser pursuant to this Section 6.05, such Contract shall thereafter be deemed a Transferred Asset for all purposes under this Agreement.

SECTION 6.06.     Milestones.

(a)      Seller shall satisfy the following milestones (the "**Milestones**"), and the extension of any of the Milestones shall require prior written consent of Purchaser, which may be withheld in Purchaser's sole discretion:

(i)      The Bankruptcy Court shall have entered the Bidding Procedures Order on or before November 13, 2025;

(ii)      The Auction shall have occurred on or before November 18, 2025; and

(iii)      The Sale Order shall have been entered by the Bankruptcy Court on or before November 21, 2025.

## ARTICLE VII

## EMPLOYMENT MATTERS

SECTION 7.01.     Employee Lease Agreement. During the period beginning on the Closing Date and ending on the Employee Transfer Date (the "**Employee Transition Period**" ), Seller and each Debtor Affiliate agrees to provide for the services of the U.S. Transferred Employees, the Canadian Transferred Employees, the Colombia Transferred Employees and the India Transferred Employees to be made available to Purchaser and its Affiliates until the Employee Transfer Date, which services shall be substantially similar to those services the U.S. Transferred Employees, the Canadian Transferred Employees, the Colombia Transferred Employees and the India Transferred Employees provided immediately prior to the Closing (the "**Employee Lease Arrangement**" ). The terms of the Employee Lease Arrangement shall be governed by a separate employee lease agreement to be entered into as soon as practicable following the date hereof, in substantially the form attached hereto as Exhibit D. Nothing herein shall be construed as a representation, guarantee, or promise that any U.S. Transferred Employee, Canadian Transferred Employee, Colombia Transferred Employee or any India Transferred Employee will remain employed for any period of time and, for the avoidance of doubt, Seller will not be in breach of this provision due to any U.S. Transferred Employee, Canadian Transferred

56

Employee, Colombia Transferred Employee or India Transferred Employee ceasing employment during the Employee Transition Period.

SECTION 7.02.    Non-ARD Employees; Offer of Employment. Not later than 10 days prior to the Closing Date (or if required by applicable Law, such greater period as required by applicable Law and practices), Purchaser or one of its Affiliates shall offer employment with Purchaser or one of its Affiliates to each individual who is a Non-ARD Employee, commencing as of the Closing Date or the Employee Transfer Date, as applicable, and conditional upon the Closing, in a position that is comparable in the aggregate to such Non-ARD Employee's position immediately prior to the Closing (including location of employment within a reasonable commuting distance sufficient to not implicate the WARN Act or constitute a constructive dismissal as a result of such distance), including with respect to level of responsibility, compensation (other than equity, equity-based or long-term incentive awards) and employee benefits (other than defined benefit pension benefits and post-retirement health and welfare benefits) as set forth in this Article VII (a "**Comparable Position**"). In respect of each Non-ARD Employee based in a jurisdiction, other than in Canada, where a tripartite agreement would minimize the expenses of a transfer or avoid termination related payments (to be determined in good faith by Seller), Purchaser shall, or shall cause one of its Affiliates to, make the offer of employment, and Purchaser (or one of its Affiliates) and Seller (or one of its Affiliates) shall execute a tripartite agreement with such Non-ARD Employee who is willing to accept the transfer of their employment to the Purchaser (or one of its Affiliates), recording the terms of transfer of employment for such Non-ARD Employee (in accordance with the provisions contained in this Article VII). As soon as reasonably practicable, but no later than ten (10) days prior to the time that offers of employment are to be made, Seller shall provide to Purchaser the initial draft of the form tripartite agreement to be presented to the Non-ARD Employee for Purchaser's review and comment, and Seller shall consider, in good faith, any reasonable comments receive from Purchaser within seven (7) days of providing the initial draft. Notwithstanding the above, with respect to any Non-ARD Employee on disability or other leave of absence and provided that such leave is expected to end prior to the date that is six months following the Closing Date, Purchaser or one of its Affiliates shall offer employment with Purchaser or one of its Affiliates in a Comparable Position, commencing not on the Closing Date or the Employee Transfer Date, as applicable, but instead on such date specified in a written notice to the Purchaser as the date upon which that the Non-ARD Employee's leave of absence will end; provided that such return to work date is not later than six (6) months following the Closing Date or the Employee Transfer Date, as applicable. The Non-ARD Employees who accept the offer of and commence employment with Purchaser or one of Purchaser's Affiliates shall be referred to as "**Non-ARD Transferred Employees**". To the extent permitted by applicable law, each Non-ARD Transferred Employees offer of employment with Purchaser or its Affiliates shall be contingent upon such Non-ARD Transferred Employee's successful completion of a standard background check in accordance with Purchaser's (or its Affiliates') ordinary course employment practices. Nothing herein shall be construed as a representation or guarantee by Seller or any of its Affiliates that any or all of the Non-ARD Employees will accept the offer of employment from Purchaser or one of Purchaser's Affiliates or will continue in employment with Purchaser or one of Purchaser's Affiliates following the Closing Date or the Employee Transfer Date, as applicable. Purchaser and Seller shall cooperate in good faith to carry out all actions necessary under applicable Law to effect the offers of employment and the transfer of employment to the Purchaser of each such Non-ARD Transferred Employee who has accepted that offer. Seller shall cooperate in good faith with

Purchaser in connection with Purchaser's (or its Affiliate's) distribution of offers to the Non-ARD Employees (including by providing access to and contact information for such individuals). In the event (i) Purchaser fails to make such offers in compliance with this Section 7.02, Purchaser shall be solely responsible for all such liabilities related to Seller or its Affiliates' termination of such Non-ARD's Employee's employment, or (ii) a Non-ARD Employee rejects Purchaser's compliant offer, Seller or its Affiliates shall be solely responsible for, all such liabilities related to Seller or its Affiliates' termination of such Non-ARD's Employee's employment.

SECTION 7.03.    Terms of Employment.

(a)    During the period that begins as of the Closing Date or the Employee Transfer Date, as applicable, and continues through the date that is twelve months after the Closing Date (the "**Continuation Period**"), Purchaser or one of Purchaser's Affiliates shall provide to each Non-ARD Transferred Employee a base salary or hourly wage that is not less than such Non-ARD Transferred Employee's base salary or hourly wage in effect immediately prior to the Closing (or, in the case of a Non-ARD Transferred Employee on disability or other leave of absence immediately prior to the Closing, the base salary or hourly wage in effect immediately prior to such leave or such higher rate as required under Law) and employee benefits that are no less favorable, in the aggregate, to those provided to similarly-situated employees of Purchaser or its Affiliates.

(b)    Except as specifically provided in this Article VII, Purchaser and Purchaser's Affiliates shall assume, and be responsible for, all obligations, liabilities and commitments with respect to employment, employee benefits and related matters with respect to all Non-ARD Transferred Employees that arise or are payable after the Closing (or in case of a Non-ARD Transferred Employee who is on leave of absence on the Closing Date, such later date when the Non-ARD Transferred Employee commences employment with Purchaser or any Affiliate of Purchaser in accordance with Section 7.02), other than obligations, liabilities and commitments in respect of (i) awards of equity or equity based compensation granted to Transferred Employees prior to the Closing, (ii) compensation accrued with respect to any period prior to the Closing under any Employee Benefit Plan maintained by Seller or any of its Affiliates other than any Assumed Employee Benefit Plan, (iii) any Employee Benefit Plan that is not an Assumed Employee Benefit Plan, and (iv) employment prior to the Closing or in case of a Non-ARD Transferred Employee who is on leave of absence on the Closing Date, such later date when the Non-ARD Transferred Employee commences employment with Purchaser or any Affiliate of Purchaser in accordance with Section 7.02.

SECTION 7.04.    401(k) Plan. As of the Employee Transfer Date, Purchaser or one of Purchaser's Affiliates shall maintain or cause to be maintained a defined contribution plan that (a) meets the requirements of Section 401(a) of the Code and (b) includes a qualified cash or deferred arrangement within the meaning of Section 401(k) of the Code (such plan being referred to as the "**Purchaser 401(k) Plan**"). Effective as soon as practical following the Employee Transfer Date, all Non-ARD Transferred Employees who were eligible to participate in the Seller 401(k) Plan immediately prior to the Employee Transfer Date shall be eligible to participate in the Purchaser 401(k) Plan. Under the terms of the Seller 401(k) Plan, each Non-ARD Transferred Employee who has an account under the Seller 401(k) Plan shall be eligible to receive an immediate distribution from such Seller 401(k) Plan following the Employee Transfer Date. The

Purchaser shall ensure that the Purchaser 401(k) Plan accept the rollover of any "eligible rollover distributions" (within the meaning of Section 402(c)(4) of the Code) from the Seller 401(k) Plan for the Non-ARD Transferred Employees.

SECTION 7.05.    Health and Welfare Benefit Plans.

(a)    As of the Closing Date or the Employee Transfer Date, as applicable, subject to any greater requirements of applicable Law, Purchaser or one of Purchaser's Affiliates shall maintain or cause to be maintained benefit plans to provide medical care, dental care and vision care for the Transferred Employees (collectively, the "**Purchaser Health Plans**") on terms and conditions (including those related to coverage and Employee-paid costs) that are at least as generous in the aggregate as the terms and conditions of the medical, dental, and vision plans offered to similarly-situated employees of Purchaser or its Affiliates. Purchaser shall, or shall cause its Affiliates to, use commercially reasonable efforts to waive any waiting period, pre-existing condition exclusion or similar limitation to the participation of any Transferred Employee (or dependent thereof) in the Purchaser Health Plans, and credit all payments, charges and expenses of such Transferred Employees (and their eligible dependents) that were applied toward the deductible and out-of-pocket maximums under the medical, dental, and vision plans listed on Section 7.05(a) of the Disclosure Schedule (the "**Seller Health Plans**") during the plan year in which the Closing Date or the Employee Transfer Date, as applicable occurs toward any deductible and out-of-pocket maximum applicable under the Purchaser Health Plans for the plan year in which the Closing Date or the Employee Transfer Date, as applicable, occurs.

(b)    During the Continuation Period, subject to any greater requirements of applicable Law, Purchaser or one of Purchaser's Affiliates shall provide each Transferred Employee with coverage and benefits pursuant to welfare benefit plans (other than the Purchaser Health Plans), programs, policies, and arrangements maintained by Purchaser or one of Purchaser's Affiliates that are, in the aggregate, at least as generous in the aggregate as the benefits offered to similarly-situated employees of Purchaser or its Affiliates.

(c)    Effective as of the Closing Date or the Employee Transfer Date, as applicable (or in case of a Non-ARD Transferred Employee who is on leave of absence on the Closing Date or the Employee Transfer Date, as applicable, such later date when the Non-ARD Transferred Employee commences employment with Purchaser or any Affiliate of Purchaser in accordance Section 7.02), the Transferred Employees shall cease to be eligible to participate in the Seller Health Plans and Employee Benefit Plans that are group welfare plans in accordance with their terms.

SECTION 7.06.    Credit for Service with Seller. Where applicable, and automatically applicable if required by Law, Purchaser and Purchaser's Affiliates shall credit each Transferred Employee's length of service with Seller and its Affiliates as disclosed in Section 7.06 of the Disclosure Schedule for all employment purposes (including eligibility, vesting and benefit accrual and calculating entitlement to vacation days, sick days and severance payments but excluding vesting of any equity or equity-based arrangements) under any employee benefit plan, program, or policy maintained by Purchaser or one of Purchaser's Affiliates for the benefit of Transferred Employees following the Closing Date or the Employee Transfer Date, as applicable, to the same extent such service was recognized under a corresponding Employee Benefit maintained by Seller

or any of its Affiliates immediately prior to the Closing Date or the Employee Transfer Date, as applicable, (including the severance arrangements described in Section 7.10) provided that, unless required by applicable Law, such service credit shall not apply (i) to the extent such credit would result in a duplication of benefits, (ii) with respect to benefit accruals under any defined benefit pension plan or benefit plan that provides retiree or other post-employment health and welfare benefits, or equity or equity-based or other long-term incentive plan, program policy, practice, agreement or arrangement, (iii) to any newly-established employee benefit plan sponsored or maintained by Purchaser or any of its Affiliates in which similarly-situated employees of Purchaser or its Affiliates do not receive credit or (iv) to any benefit plan that is a frozen plan or provides grandfathered benefits.

SECTION 7.07.    COBRA and HIPAA. Effective as of the Closing, (i) Seller shall comply with, and retain any obligations, liabilities and commitments with respect to the requirements of Part B of Subtitle B of Title I of ERISA and Code Section 4980B for any individual who is terminated at or prior to Closing and (ii) Purchaser and Purchaser's Affiliates shall assume all obligations, liabilities and commitments with respect to Non-ARD Transferred Employees and their eligible dependents, in respect of health insurance under the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, the Health Insurance Portability and Accountability Act of 1996, Sections 601 et seq. and Sections 701 et seq. of ERISA, Section 4980B and Sections 9801 et seq. of the Code and similar applicable state Laws.

SECTION 7.08.    Workers' Compensation. Effective as of the Closing, Purchaser and Purchaser's Affiliates shall be responsible for all workers' compensation benefits or premiums payable to or on behalf of the Transferred Employees, except that Seller and its Affiliates shall be responsible for all workers' compensation benefits payable under the terms and conditions of the workers' compensation programs maintained by Seller and its Affiliates for claims by or on behalf of Non-ARD Transferred Employees relating to events occurring prior to the Closing Date. Seller has procured and delivered to Purchaser an up-to-date Purchase Certificate or similar document evidencing that all workers compensation/workplace safety and insurance premiums and other liabilities have been paid and discharged in relation to the Employees located in Canada.

SECTION 7.09.    Liabilities. From and after the Closing, subject to applicable Laws, Purchaser shall assume, honour and be solely responsible for paying, providing and satisfying when due the following: (a) all accrued and unused vacation, personal days, sick pay and other paid time off for Transferred Employees earned but unused as of the Closing Date as such liabilities have been disclosed by Seller on Seller's balance sheet, and (b) all compensation (including salary, wages, commissions, bonuses, incentive compensation, overtime, premium pay and shift differentials), vacation, personal days, sick pay and other paid time off, benefits and benefit claims (other than, for greater certainty, under or in connection with any Employee Benefit Plan that is not an Assumed Employee Benefit Plan, whether any such claim arises or is made before, at, or after the Closing Date), severance and termination pay (including any employer Taxes or other payments related thereto), notice and benefits under all applicable Laws in each case, accruing, incurred or arising as a result of employment or separation from employment with Purchaser after the Closing Date with respect to Transferred Employees.

SECTION 7.10.    Severance Liability. If the employment of a Transferred Employee is terminated by Purchaser or one of Purchaser's Affiliates before the end of the Continuation Period,

60

Purchaser or one of Purchaser's Affiliates shall pay severance benefits to such Transferred Employee equal to the greater of (a) with respect to ARD Automatic Transferred Employees, the severance benefits available to each ARD Automatic Transferred Employee pursuant to the applicable Employee Benefit Plan, as set forth in Section 7.10 of the Disclosure Schedule or (b) the severance benefits required under applicable Law. Effective as of the Closing, with respect to the ARD Automatic Transferred Employees, Purchaser and Purchaser's Affiliates shall assume, except as provided on Section 7.10 of the Disclosure Schedule, (x) all legally binding agreements with such Transferred Employees set forth on Section 7.10 of the Disclosure Schedule, and (y) all obligations, liabilities and commitments in respect of claims made by any Transferred Employee for severance or other termination benefits (including claims for wrongful dismissal, notice of termination of employment, pay in lieu of notice or breach of contract) arising out of, relating to or in connection with any failure to offer employment to, or, with respect to ARD Automatic Transferred Employees, to continue the employment of, any such Transferred Employee on terms and conditions that would preclude any claims of actual or constructive dismissal or similar claims under any Law or other failure to comply with the terms of this Agreement.

SECTION 7.11.    Earned Vacation. Following the Closing, Purchaser will honor, as to each Transferred Employee all accrued and unpaid hours of vacation, personal hours or days earned and sick leave applicable to such Transferred Employee as of the Closing relating to the period prior to the Closing.

SECTION 7.12.    Administration, Employee Communications, Cooperation. Following the date of this Agreement, Seller (and its Affiliates) shall, and Purchaser (and its Affiliates) shall, reasonably cooperate and use good faith efforts in all matters reasonably necessary to effect the transactions contemplated by this Article VII, including exchanging information and data relating to workers' compensation, employee benefits and employee benefit plan coverages (except to the extent prohibited by Law), making any and all required filings and notices, making any and all required communications with Transferred Employees and obtaining any governmental approvals required hereunder.

SECTION 7.13.    Retention Plans. Seller or its Affiliates entered into retention agreements with certain Transferred Employees, each of which are set forth in Section 7.13 of the Disclosure Schedule (the "**Retention Agreements**"). Purchaser shall make any payments required to be made solely pursuant to the Retention Agreements and shall assume such Liabilities with respect thereto that arise, or become payable, following the Closing.

SECTION 7.14.    Non-US Employees. For any Non-ARD Transferred Employees who are principally based outside the United States, the provisions of Sections 7.02 through 7.14 shall apply to such employees mutatis mutandis to the maximum extent permitted by applicable Law.

SECTION 7.15.    ARD Employees.

(a)    In this Section 7.15 "**Employment Liability**" and "**Employment Liabilities**" includes any award, compensation or benefits, damages, fine, loss, order, penalty or payment made by way of settlement and costs and expenses reasonably incurred in connection with a claim or investigation (including any investigation by any enforcement, regulatory or supervisory body and

of implementing any requirements which may arise from any such investigation), and legal costs and expenses being assessed on an indemnity basis.

(b)     The Seller and Purchaser acknowledge and agree that the sale of the Business is a "transfer" or "relevant transfer" (as applicable) within the meaning of the ARD and that, subject to the provision of this Section 7.15, each ARD Employees will transfer automatically to Purchaser or any of its Affiliates on the Closing. Accordingly, from Closing, Purchaser, or one of its Affiliates, shall employ each ARD Employee whose employment transfers automatically by operation of Law, on their existing terms that exist immediately before Closing save for any terms that are excluded or may (at Purchaser's or any of its Affiliates' discretion and in compliance with applicable Law) be excluded under the ARD, unless such individual objects to the transfer in such a way as to prevent the transfer of their employment by operation of Law (if such a right exists under the Laws of the relevant jurisdiction). Each ARD Employee whose employment automatically transfers to Purchaser, or one of its Affiliates, on the Closing by operation of Law pursuant to the ARD (and who does not object to the transfer) shall be referred to herein as an "**ARD Transferred Employee**". Purchaser, or one of its Affiliates, shall indemnify the relevant Seller against any Employment Liability arising out of or in connection with any ARD Employee objecting to the transfer of their employment under the ARD. If an ARD Employee objects to his or her employment transferring to Purchaser or one of its Affiliates pursuant to the ARD, Purchaser shall not, and shall cause its Affiliates not to, solicit, entice away, employ, offer to employ, or contract with any such ARD Transferred Employee for a period of twelve months following the Closing, except where prior written consent has been obtained from Seller.

(c)     With respect to any ARD Employee who Seller and Purchaser mutually agree after the date of this Agreement shall not transfer automatically by operation of Law or with respect to any ARD Employee's employment otherwise does not transfer to Purchaser or one of its Affiliates in accordance with the ARD as intended, such ARD Employee shall then be a Non-ARD Employee and Purchaser or one of its Affiliates shall offer such employee employment in accordance with Section 7.02; provided that such offer shall be on the terms that would have applied, including recognition of continuity of service, had the employee transferred to Purchaser or one of its Affiliates pursuant to the ARD.

(d)     Purchaser and Seller shall, and shall cause their Affiliates to, reasonably cooperate in good faith to timely satisfy their respective Employment Obligations with relevant ARD Employees, trade unions, works councils, staff associations or other employee representative groups in respect of the ARD Employees. Purchaser, or one its Affiliates, shall indemnify Seller and its Affiliates against any Employment Liabilities which arise out of, or in connection with, (i) Purchaser or its Affiliates failing to provide information in a timely fashion when reasonably requested in writing to do so by Seller or its Affiliates in connection with their satisfaction of the Employment Obligations, (ii) a complaint or failure, or alleged failure, by Purchaser or its Affiliates to comply with or breach, or alleged breach, by Purchaser or its Affiliates of the Employment Obligations save where that complaint, failure or breach is caused by the Seller's or one of its Affiliates' failure to comply with its Employment Obligations or (iii) Purchaser or its Affiliates failing to comply with the provisions of this Section 7.15 or with the ARD. Seller or one of its Affiliates, shall indemnify Purchaser and its Affiliates against any Employment Liabilities they incur which arise out of, or in connection with, a complaint or failure, or alleged failure, by Seller or its Affiliates to comply with or breach, or alleged breach, by Seller or its Affiliates of the

62

Employment Obligations, save where that complaint, failure or breach is caused by the Purchaser's or one of its Affiliates' failure to comply with its Employment Obligations.

The provisions of this Article VII are solely for the benefit of the parties to this Agreement, and neither any union nor any current or former Employee, nor any other individual associated therewith, is or shall be regarded for any purpose as a third-party beneficiary to this Agreement. Notwithstanding anything to the contrary in this Agreement, no provision of this Agreement is intended to, or does, (i) constitute the establishment of, or an amendment to, any Employee Benefit Plans or employee benefit plan of Purchaser or its Affiliates, (ii) alter or limit the ability of (x) Purchaser or its Affiliates to amend, modify or terminate any employee benefit plan of Purchaser or its Affiliates or (y) Seller or its Affiliates to amend, modify or terminate any Employee Benefit Plan or any other benefit plan, program, agreement or arrangement, (iii) give any third party any right to enforce the provisions of this Article VII, (iv) confer upon any such individual or legal representative any rights under or with respect to any plan, program or arrangement described in or contemplated by this Agreement, and each such individual or legal representative shall be entitled to look only to the express terms of any such plan, program or arrangement for his or her rights thereunder or (v) confer upon any Employee any right to employment or continued employment for any period of time by reason of this Agreement, or any right to a particular term or condition of employment.

## ARTICLE VIII

## CONDITIONS TO CLOSING

SECTION 8.01.    Conditions to Each Party's Obligation. The obligations of Purchaser and Seller to consummate the Closing are subject to the satisfaction (or waiver by Purchaser and Seller) at or prior to the Closing of the following conditions:

(a)    No Injunctions or Restraints. No Law or Judgment shall be in effect that prohibits, enjoins or otherwise restrains the Closing or imposes any condition that declares unlawful such transactions or causes such transactions contemplated by this Agreement to be rescinded.

(b)    Sale Order. The Bankruptcy Court shall have entered the Sale Order in form and substance acceptable to Purchaser in its sole discretion and such Sale Order shall be a Final Order (unless such Final Order requirement is waived by the Purchaser in its sole discretion).

SECTION 8.02.    Conditions to Obligation of Purchaser. The obligation of Purchaser to consummate the Closing is subject to the satisfaction (or waiver by Purchaser) at or prior to the Closing of the following conditions:

(a)    Representations and Warranties. Each of (i) the Specified Representations shall be true and correct in all respects on the date hereof and at the Closing (except, in each case, to the extent that such representation and warranty speaks only as of a particular date, in which case such representation and warranty shall be true and correct in all respects as of such earlier date), except for such inaccuracies that individually, or in the aggregate, are *de minimis*, (ii) the representations and warranties set forth in Section 3.15 shall be true and correct in all material respects on the date hereof and at the Closing, (iii) the representations and warranties set forth in Section 3.05(a) shall

63

be true and correct in all respects on the date hereof and at the Closing, and (iv) all other representations and warranties (disregarding all qualifications and exceptions contained therein relating to materiality, including references to "**Material Adverse Effect**") of Seller set forth in this Agreement (other than the Specified Representations) shall be true and correct on the date hereof and at the Closing (except, in each case, to the extent that such representation and warranty speaks only as of a particular date, in which case such representation and warranty shall be true and correct as of such earlier date), except where the failure of any such representation and warranty of Seller described in this <u>clause (iv)</u> to be so true and correct would not reasonably be expected to have a Material Adverse Effect. Purchaser shall have received a certificate signed by an authorized officer of Seller as to the satisfaction of the foregoing condition.

(b)     <u>Performance of Obligations of Seller</u>. Seller shall have performed or complied with or caused to be performed or complied with, in all material respects, the obligations and covenants required by this Agreement to be performed or complied with by it by the time of the Closing. Purchaser shall have received a certificate signed by an authorized officer of Seller as to the satisfaction of the foregoing condition.

(c)     <u>No Material Adverse Effect</u>. Since the date of this Agreement, there shall not have been a Material Adverse Effect. Purchaser shall have received a certificate signed by an authorized officer of Seller as to the satisfaction of the foregoing condition.

(d)     <u>Unaudited Financial Statements</u>. Seller shall have delivered to Purchaser unaudited historical carve-out balance sheets of the Business in a form reasonably satisfactory to Purchaser as of June 30, 2025 and related unaudited historical carve-out statements of operations and cash flows of the Business, and changes in Seller's net investment in the Business, for the fiscal year ended June 30, 2025.

(e)     <u>Bidding Procedures Order</u>. The Bankruptcy Court shall have entered the Bidding Procedures Order, which provisions related to this Agreement shall be reasonably acceptable to Purchaser and such Bidding Procedures Order shall be a Final Order (unless such Final Order requirement is waived by the Purchaser in its sole discretion).

(f)     <u>Contracts</u>. The Bankruptcy Court shall have entered the Bidding Procedures Order, with (x) Required Terms in form and substance acceptable to Purchaser in its sole discretion and (y) other terms reasonably acceptable to Purchaser, and such Bidding Procedures Order shall be a Final Order (unless such Final Order requirement is waived by the Purchaser in its sole discretion).

(g)     <u>Cure Payments</u>. All Cure Payments shall have been paid in full by Seller or otherwise satisfied in a manner that is reasonably acceptable to Purchaser and Purchaser shall have received reasonable evidence thereof.

SECTION 8.03.     <u>Conditions to Obligation of Seller</u>. The obligation of Seller to consummate the Closing is subject to the satisfaction (or waiver by Seller) on or prior to the Closing Date of the following conditions:

(a)     <u>Representations and Warranties</u>. Each of the representations and warranties (disregarding all qualifications and exceptions contained therein relating to materiality, including references to "Material Adverse Effect") of Purchaser set forth in this Agreement shall be true and

64

correct on the date hereof and at the Closing (except, in each case, to the extent that such representation and warranty speaks only as of a particular date, in which case such representation and warranty shall be true and correct as of such earlier date), except where the failure of any such representation and warranty of Purchaser to be so true and correct would not reasonably be expected to have a Purchaser Material Adverse Effect. Seller shall have received a certificate signed by an authorized officer of Purchaser as to the satisfaction of the foregoing condition.

(b)      Performance of Obligations of Purchaser. Purchaser shall have performed or complied with or caused to be performed or complied with, in all material respects, the obligations and covenants required by this Agreement to be performed or complied with by Purchaser by the time of the Closing. Seller shall have received a certificate signed by an authorized officer of Purchaser as to the satisfaction of the foregoing condition.

(c)      Good Faith Deposit. Purchaser shall make, within one (1) Business Day of entry of the Bidding Procedures Order, an earnest money deposit (the "**Good Faith Deposit**") in escrow with a designee of the Seller in the amount of ten percent (10%) of the Base Purchase Price by wire transfer of immediately available funds. The Good Faith Deposit shall not be subject to any lien, attachment, trustee process, or any other judicial process of any creditor of any of Seller or Purchaser. The Good Faith Deposit shall be applied against payment of the Estimated Purchase Price on the Closing Date. If this Agreement has been terminated by any Party prior to the Closing, other than as contemplated by Section 9.01(d), then within two (2) Business Days of such termination, Seller shall return the Good Faith Deposit by wire transfer of immediately available funds to an account designated by Purchaser. Notwithstanding anything to the contrary in this Agreement, under no circumstances shall (i) the Good Faith Deposit be payable or retained on more than one occasion and (ii) Seller, its Affiliates and their Representatives be entitled to aggregate monetary damages, as a result of the failure of the Acquisition to be consummated or for a breach or failure to perform hereunder or for any representation, warranty, covenant, agreement or obligation made or alleged to have been made in connection with this Agreement, other than the Good Faith Deposit. Purchaser's Affiliates and its and their Representatives are intended third-party beneficiaries of this Section 8.03(c).

## ARTICLE IX

## TERMINATION

SECTION 9.01.      Termination. This Agreement may be terminated and the Acquisition and the other transactions contemplated by this Agreement abandoned at any time prior to the Closing:

(a)      by mutual written consent of Seller and Purchaser; or

(b)      by either Seller or Purchaser:

(i)      if the consummation of the Acquisition or any of the other transactions contemplated hereby is restrained, enjoined, declared unlawful or otherwise prohibited by any non-appealable final judgment of the Bankruptcy Court or any Law or Order enacted or issued by any other Governmental Entity having competent jurisdiction; provided that, solely with respect to a

final judgment, Law or Order from a court or a Governmental Entity other than the Bankruptcy Court, such final Judgment has not been vacated, reversed, or stayed within fifteen (15) Business Days; provided, however, that the right to terminate this Agreement under this Section 9.01(b)(i) shall not be available to any party whose failure to perform any of its obligations under this Agreement has been the primary cause of the issuance of such non-appealable final Judgment; or

(ii)    if the Closing does not occur on or prior to March 27, 2026 (the "**End Date**"); provided, however, that if the sole reason that the Closing has not occurred is that one or more of the conditions to Closing in Section 8.01(a) or Section 8.01(b) has not been satisfied on or prior to such date, the End Date shall automatically be extended to April 27, 2026; provided, further, that the right to terminate this Agreement under this Section 9.01(b)(ii) shall not be available to any party whose failure to perform any of its obligations under this Agreement, including the obligations of Purchaser under Section 5.04, has been the primary cause of the failure of the Closing not to have occurred on or before the End Date (or any extension thereof); or

(iii)    other than upon motion or other request by or on behalf of the Debtors or their Affiliates, or that is supported by, consented to or not objected to by the Debtors or their Affiliates, if the Bankruptcy Case is dismissed or converted to a case or cases under Chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers to operate or manage the financial affairs or reorganization of Seller is appointed in the Bankruptcy Case; or

(c)    by Purchaser:

(i)    if Seller shall have breached or failed to perform any of its representations, warranties, covenants or agreements contained in this Agreement, which breach or failure to perform (i) would give rise to the failure of a condition set forth in Section 8.01 or 8.02 and (ii) cannot be cured by Seller by the End Date, or if capable of being cured, shall not have commenced to have been cured by the earlier of (A) the thirtieth day following receipt by Seller of written notice of such material breach or failure to perform from Purchaser stating Purchaser's intention to terminate this Agreement pursuant to this Section 9.01(c) and the basis for such termination and (B) the End Date; provided, however, that Purchaser shall not have the right to terminate this Agreement pursuant to this Section 9.01(c) if Purchaser is then in breach of any representations, warranties, covenants or other agreements hereunder that would result in the conditions to Closing set forth in Sections 8.01 and/or 8.03 not being satisfied (other than those conditions that (Y) by their terms are to be satisfied at the Closing (but subject to such conditions being capable of being satisfied as of such date) or (Z) the failure of which to be satisfied is attributable primarily to a material breach by Seller of its representations, warranties, covenants and agreements contained in this Agreement);

(ii)    if the Bankruptcy Case is dismissed or converted to a case or cases under Chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers to operate or manage the financial affairs or reorganization of Seller is appointed in the Bankruptcy Case;

(iii)    if the Bankruptcy Court enters either the Required Terms of the Bidding Procedures Order or the Sale Order not in a form satisfactory to Purchaser in its sole discretion, or the other terms of the Bidding Procedures Order in a form not reasonably satisfactory to Purchaser;

(iv)     other than as contemplated by the Bidding Procedures Order, if Seller (i) makes any filing with the Bankruptcy Court or enters into any document or makes any public statement (including a statement to the Bankruptcy Court) indicating that it intends to consummate an Alternative Transaction, (ii) consummates an Alternative Transaction or (iii) seeks to have the Bankruptcy Court enter an Order dismissing, or converting into cases under chapter 7 of the Bankruptcy Code, any of the Bankruptcy Cases, or appointing a trustee in any of the Bankruptcy Cases or appointing a trustee or an examiner with expanded powers to operate or manage the financial affairs or reorganization of Seller in any of the Bankruptcy Cases;

(v)     if any Milestone shall not have occurred by the applicable date set forth in Section 6.06 and has not been extended by written agreement between Purchaser and Seller (email from counsel being sufficient);

(vi)     subject to Section 6.01(k), if (A) following entry by the Bankruptcy Court of the Bidding Procedures Order, such order is (x) amended, modified or supplemented in any respect without Purchaser's prior written consent (which, (i) in the case of the amendments, modifications or supplements to the Required Terms, may be withheld in Purchaser's sole discretion and (ii) in the case of the other terms of the Bidding Procedures Order shall not be unreasonably withheld, conditioned, or delayed) or (y) voided, reversed or vacated or is subject to a stay or (B) following entry by the Bankruptcy Court of the Sale Order, the Sale Order is (x) amended, modified or supplemented in any respect without Purchaser's prior written consent (which may be withheld in Purchaser's sole discretion) or (y) voided, reversed or vacated or is subject to a stay; provided that any such order(s) voiding, reversing, vacating or staying the Sale Order has not itself been voided, reversed or vacated within fifteen (15) Business Days; or

(d)     by Seller:

(i)     if Purchaser shall have breached or failed to perform any of its representations, warranties, covenants or agreements contained in this Agreement, which breach or failure to perform (A) would give rise to the failure of a condition set forth in Section 8.01 or 8.03 and (B) cannot be cured by Purchaser by the End Date, or if capable of being cured, shall not have commenced to have been cured by the earlier of (1) the thirtieth day following receipt by Purchaser of written notice of such material breach or failure to perform from Seller stating Seller's intention to terminate this Agreement pursuant to this Section 9.01(d)(i) and the basis for such termination and (2) the End Date; provided, however, that Seller shall not have the right to terminate this Agreement pursuant to this Section 9.01(d)(i) if Seller is then in breach of any representations, warranties, covenants or other agreements hereunder that would result in the conditions to Closing set forth in Sections 8.01 and/or 8.02 not being satisfied (other than those conditions that (Y) by their terms are to be satisfied at the Closing (but subject to such conditions being capable of being satisfied as of such date) or (Z) the failure of which to be satisfied is attributable primarily to a material breach by Purchaser of its representations, warranties, covenants and agreements contained in this Agreement); or

(ii)     if (A) Purchaser is required to consummate the Closing pursuant to Section 2.01 and Purchaser fails to consummate the Closing by the date the Closing is required to have occurred pursuant to Section 2.01, (B) Seller has irrevocably confirmed by notice to Purchaser that all conditions set forth in Section 8.03 have been satisfied or that it is willing to

67

waive any unsatisfied conditions in Section 8.03 and (C) the Acquisition shall not have been consummated within three (3) Business Days after delivery of such notice; or

(e)      if, Seller enters into a definitive agreement(s) with respect to one or more Alternative Transactions with one or more persons other than the Purchaser or the successful bidder (in its capacity as such) at the Auction, the Bankruptcy Court approves an Alternative Transaction other than with the successful bidder (in its capacity as such), or Seller consummates an Alternative Transaction with the successful bidder; or

(f)      if the Purchaser is not the successful bidder at the Auction.

SECTION 9.02.     Effect of Termination.

(a)      In the event this Agreement is terminated pursuant to Section 9.01, this Agreement shall become null and void and no party hereto nor any of its partners, officers, directors, managers or equityholders will have any Liability under this Agreement, except pursuant to the surviving Sections of this Agreement as set forth in the next sentence. Section 9.01, this Section 9.02 and Article XII shall survive any such termination. If this Agreement is terminated pursuant to Section 9.01(c)(i)-(ii), Section 9.01(c)(iv), Section 9.01(c)(vi), Section 9.01(e) or Section 9.01(f), (except in the event of Fraud or Willful Breach by Seller or Purchaser), the maximum Liability of Seller under this Agreement shall be equal to the Expense Reimbursement and the Breakup Fee to the extent payable. For the avoidance of doubt, (A) the Expense Reimbursement and the Breakup Fee shall, if applicable, be paid upon termination of this Agreement in accordance with Section 9.01 and (B) Purchaser shall have no Liability whatsoever except in the event of Fraud or Willful Breach by Purchaser (subject to the Cap).

(b)      If this Agreement is terminated pursuant to Section 9.01(d), then the Seller shall retain the Good Faith Deposit. The Parties agree that the Seller's right to retain the Good Faith Deposit shall not be a penalty and shall constitute liquidated damages for any and all losses, liabilities, costs and expenses suffered or incurred by Seller or any other person in connection with this Agreement, and notwithstanding anything in this Agreement that may be deemed to the contrary, the Good Faith Deposit shall be the sole and exclusive remedy (whether at law, in equity, in contract, in tort or otherwise) of the Seller and its Affiliates against Purchaser or any Non-Recourse Party of Purchaser in connection with such termination or any loss or other liability of any kind under or related to this Agreement, except as provided in Section 12.14.

(c)      If this Agreement is terminated after entry of the Bidding Procedures Order pursuant to Section 9.01(b)(iii), Section 9.01(c), Section 9.01(e) or Section 9.01(f) then Seller will pay to Purchaser by wire transfer of immediately available funds within three (3) Business Days following such termination of this Agreement an amount equal to the reasonable and documented out-of-pocket costs and expenses (including fees and expenses of counsel) incurred by Purchaser in connection with the negotiation, diligence, execution, performance and enforcement of this Agreement, which amount shall not exceed $1,400,000 (the "**Expense Reimbursement**").

(d)      In consideration for Purchaser having expended considerable time and expense in connection with this Agreement, if this Agreement is terminated after entry of the Bidding Procedures Order pursuant to Section 9.01(b)(iii), Section 9.01(c)(i)-(iv), Section 9.01(c)(vi),

68

Section 9.01(e), or Section 9.01(f), Seller shall pay to Purchaser a break-up fee in an amount equal to $2,100,000 (the "**Breakup Fee**") by wire transfer of immediately available funds within three (3) Business Days following the consummation of any Alternative Transaction, any other plan of reorganization or liquidation in the Bankruptcy Cases; provided, that in the case of a termination pursuant to Section 9.01(c)(iv), the Breakup Fee shall be payable solely upon consummation of a Tail Period Alternative Transaction (and in the case of a Tail Period Alternative Transaction that is a chapter 11 plan, the consummation of such transaction shall be the effective date of such plan).

(e)      Each of the parties hereto acknowledges and agrees that the agreements contained in this Section 9.02 are an integral part of this Agreement and that the Expense Reimbursement and the Breakup Fee are not a penalty. Rather, the parties hereto agree that the Breakup Fee and Expense Reimbursement represent value provided to Seller and liquidated damages in a reasonable amount that will reasonably compensate Purchaser in the circumstances in which such Expense Reimbursement or Breakup Fee, as applicable, is payable for the efforts and resources expended and opportunities foregone by Purchaser while negotiating and pursuing this Agreement and in reasonable reliance on this Agreement and on the reasonable expectation of the consummation of the transactions contemplated herein, which amount would otherwise be impossible to calculate with precision.

(f)      Pursuant to and solely upon entry of the Bidding Procedures Order, the claim of Purchaser in respect of the Seller Post-Closing Payment, Expense Reimbursement and the Breakup Fee is and constitutes an allowed superpriority administrative expense claim against Seller under sections 105(a), 503(b) and 507(a)(2) of the Bankruptcy Code with priority over all other administrative expenses of Seller of the kind specified in section 503(b) of the Bankruptcy Code; provided that the priority of such superpriority administrative claims shall be subject and subordinate to the Carve Out (as defined in the DIP Order as in effect on the date of this Agreement) in all respects; provided further that, so long as the Seller uses reasonable efforts to obtain superpriority status for such administrative expense claims, the failure of the Bankruptcy Court to grant superpriority status for such administrative expense claims shall not form a basis for Purchaser to terminate this Agreement.

## ARTICLE X

## INDEMNIFICATION; SURVIVAL

SECTION 10.01.   Indemnification by Seller.

(a)      Subject to the limitations set forth in Section 10.04, from and after the Closing, Seller and the Debtor Affiliates shall indemnify Purchaser and its Affiliates and each of their officers, directors, employees, stockholders, agents and representatives (the "**Purchaser Indemnitees**" ) from and against any and all losses, liabilities, damages or expenses, including reasonable third-party legal fees and expenses in connection with defending any Proceeding (collectively, "**Losses**"), to the extent arising or resulting from any of the following:

(i)      any breach of any covenant of Seller or its Affiliates to be performed solely following the Closing contained in this Agreement;

(ii)     the failure of Seller or its Affiliates to pay, perform or otherwise discharge when due and payable any Retained Liability; and

(iii)     the conduct of the Business prior to Closing.

(b)     Pursuant to the Sale Order, any claim of Purchaser in respect of the Losses is and constitutes an allowed superpriority administrative expense claim against Seller under sections 105(a), 503(b) and 507(a)(2) of the Bankruptcy Code with priority over all other administrative expenses of Seller of the kind specified in section 503(b) of the Bankruptcy Code; provided that the priority of such superpriority administrative claims shall be subject and subordinated to the Carve Out (as defined in the DIP Order as in effect on the date of this Agreement) in all respects.

SECTION 10.02.   Indemnification by Purchaser. Subject to the limitations set forth in Section 10.04, from and after the Closing, Purchaser shall indemnify Seller and its Affiliates and each of its officers, directors, employees, stockholders, agents and representatives (the "**Seller Indemnitees**") from and against any and all Losses, to the extent arising or resulting from any of the following:

(a)     any breach of any covenant of Purchaser to be performed solely following the Closing contained in this Agreement;

(b)     the failure of Purchaser or any of its Affiliates to pay, perform or otherwise discharge when due and payable any Assumed Liability; and

(c)     the conduct of the Business following the Closing.

SECTION 10.03.   Indemnification Procedures.

(a)     Third Party Claims. If any party (the "**Indemnified Party**") receives written notice of the commencement of any Proceeding or the assertion of any claim by a third party or the imposition of any penalty or assessment (in each case other than with respect to Taxes) for which indemnity may be sought under Section 10.01 or Section 10.02 (a "**Third Party Claim**"), and such Indemnified Party intends to seek indemnity pursuant to this Article X, the Indemnified Party shall promptly (but no later than thirty days of receiving such notice) provide the other party (the "**Indemnifying Party**") with written notice of such Third Party Claim, stating the nature, basis, the amount thereof (to the extent known or estimated, which amount shall not be conclusive of the final amount of such Third Party Claim), the method of computation thereof (to the extent known or estimated), any other remedy sought thereunder, any relevant time constraints relating thereto, and, to the extent practicable, any other material details pertaining thereto, along with copies of the relevant documents evidencing such Third Party Claim and the basis for indemnification sought. Failure of the Indemnified Party to give such notice will not relieve the Indemnifying Party from its indemnification obligations hereunder, except to the extent that the Indemnifying Party is actually prejudiced thereby. The Indemnifying Party will have 30 days from receipt of any such notice of a Third Party Claim to give notice to the Indemnified Party whether it is assuming and controlling the defense, appeal or settlement proceedings thereof with counsel of the Indemnifying Party's choice. So long as the Indemnifying Party has assumed the defense, appeal or settlement proceedings of the Third Party Claim in accordance herewith, (i) the Indemnified Party may retain separate co-counsel at its sole cost and expense and participate in (but not control) the defense,

70

appeal or settlement proceedings of the Third Party Claim, (ii) the Indemnified Party will not admit any liability, file any papers or consent to the entry of any judgment or enter into any settlement agreement, compromise or discharge with respect to the Third Party Claim without the prior written consent of the Indemnifying Party and (iii) the Indemnifying Party will not admit to any wrongdoing by the Indemnified Party. The Indemnifying Party shall have the right to settle any Third Party Claim for which it obtains a full release of the Indemnified Party with respect to such Third Party Claim or to which settlement the Indemnified Party consents in writing (such consent not to be unreasonably withheld, conditioned or delayed). The parties will act in good faith in responding to, defending against, settling or otherwise dealing with Third Party Claims. The parties will also cooperate in any such defense, appeal or settlement proceedings, and give each other reasonable access to all information relevant thereto. Whether or not the Indemnifying Party has assumed the defense, appeal or settlement proceedings with respect to a Third Party Claim, such Indemnifying Party will not be obligated to indemnify the Indemnified Party hereunder for any settlement entered into or any judgment that was consented to without the Indemnifying Party's prior written consent (such consent not to be unreasonably withheld, conditioned or delayed).

(b)     Other Claims.

(i)     An Indemnified Party shall give the Indemnifying Party written notice (a "**Claim Notice**") of any matter that an Indemnified Party has determined in good faith has given or could give rise to a right of indemnification under this Agreement, within 30 days of such determination, stating the amount of the Loss, if known (the "**Claimed Amount**"), and the method of computation thereof, and containing a reference to the provisions of this Agreement in respect of which such right of indemnification is claimed or arises.

(ii)     Within 30 days after delivery of a Claim Notice, the Indemnifying Party will deliver to the Indemnified Party a written response (the "**Response**") in which the Indemnifying Party will: (A) agree that the Indemnified Party is entitled to receive all of the Claimed Amount, and, within five Business Days of the Indemnified Party's receipt of the Response, the Indemnifying Party will pay the Claimed Amount to the Indemnified Party by wire transfer of immediately available funds to the bank account to be designated by such Indemnified Party in a written notice at least three (3) Business Days before such payment; (B) agree that the Indemnified Party is entitled to receive part, but not all, of the Claimed Amount (such portion, the "**Agreed Portion**"), and, within five Business Days of the Indemnified Party's receipt of the Response, the Indemnifying Party will pay the Agreed Portion to the Indemnified Party by wire transfer of immediately available funds to the bank account to be designated by such Indemnified Party in a written notice at least three (3) Business Days before such payment; or (C) dispute that the Indemnified Party is entitled to receive any of the Claimed Amount. If no Response is delivered by the Indemnifying Party to the Indemnified Party within such 30-day period, then the Indemnifying Party shall be deemed to have rejected such claim, in which case the Indemnified Party shall be free to pursue such remedies as may be available to the Indemnified Party on the terms and subject to the provisions of this Agreement.

(iii)     In the event that the Indemnifying Party disputes (or is deemed to have disputed) the Claimed Amount (or the portion of the Claimed Amount not comprising the Agreed

71

Portion), such dispute will be governed by a Proceeding subject to the terms of <u>Section 12.09</u>, <u>Section 12.10</u>, <u>Section 12.11</u> and <u>Section 12.12</u>.

SECTION 10.04.   <u>Limitations on Indemnification</u>.

(i)      <u>General Limitations</u>. Notwithstanding anything to the contrary contained in this Agreement, (a) no party's aggregate indemnification obligations shall exceed the Final Purchase Price, and (b) no party shall (i) have any liability for an otherwise indemnifiable Loss that is contingent unless and until such contingent Loss becomes an actual Loss of the Indemnified Party and is due and payable, so long as the claim for such Loss was timely submitted pursuant to the provisions of this <u>Article X</u>, and (ii) be liable for any otherwise indemnifiable Loss arising out of any breach of any covenant or agreement of such party unless a claim therefore is asserted with specificity and in writing by the Indemnified Party timely in accordance with <u>Section 10.08</u>, failing which such claim shall be deemed waived and extinguished.

(b)      <u>Exclusion of Certain Damages</u>. Notwithstanding anything to the contrary contained in this Agreement, in no event shall any party be liable for, and in no event shall "Losses" include, special, indirect, incidental, exemplary, punitive or consequential damages of the other party (including for lost profits or revenues), caused by or resulting from the actions of such party or the breach of its covenants, agreements, representations or warranties hereunder and whether or not based on or in warranty, contract, tort (including negligence or strict liability) or otherwise; <u>provided</u>, <u>however</u>, that nothing in this <u>Section 10.04(b)</u> shall preclude any recovery by an Indemnified Party against an Indemnifying Party for amounts payable to a third party in a Third Party Claim.

SECTION 10.05.   <u>Calculation of Indemnity Payments</u>.

(a)      The amount of any Loss for which indemnification is provided under this <u>Article X</u> or <u>Article XI</u> shall be net of any amounts recovered by the Indemnified Party (including under insurance policies) with respect to such Loss.

(b)      If an Indemnified Party recovers an amount from a third party in respect of Losses that are the subject of indemnification hereunder after all or a portion of such Losses have been paid by an Indemnifying Party pursuant to this <u>Article X</u>, then the Indemnified Party shall promptly remit to the Indemnifying Party the excess (if any) of (A) (i) the amount paid by the Indemnifying Party in respect of such Losses plus (ii) the amount received by the Indemnified Party in respect thereof minus (B) the full amount of the Losses. In the event that an Indemnified Party has any rights against a third party with respect to any occurrence, claim or loss that results in a payment by an Indemnifying Party under this <u>Article X</u>, such Indemnifying Party shall be subrogated to such rights to the extent of such payment. Without limiting the generality of any other provision hereof, each Indemnified Party shall duly execute upon request all instruments reasonably necessary to evidence and perfect the subrogation and subordination rights detailed herein, and otherwise cooperate in the prosecution of such claims.

(c)      Each party shall, and shall cause its respective Subsidiaries to, take all reasonable steps to mitigate any Loss indemnifiable hereunder upon and after becoming aware of any event

that could reasonably be expected to give rise to any Loss. No party shall be entitled to any payment, adjustment or indemnification more than once with respect to the same matter.

SECTION 10.06. Exclusivity. Except with respect to the rights, remedies and indemnities, as applicable, contemplated by Section 12.14, from and after the Closing, Purchaser's sole and exclusive remedy with respect to any and all claims relating to this Agreement, the Business, the Transferred Assets, the Assumed Liabilities, or the transactions contemplated by this Agreement shall be pursuant to the indemnification provisions set forth in this Article X. In furtherance of the foregoing, Purchaser hereby waives, from and after the Closing, any and all rights, claims and causes of action relating to this Agreement or the transactions contemplated by this Agreement, whether based on warranty, in contract, in tort (including negligence or strict liability) or otherwise, that Purchaser or any other Purchaser Indemnitee may have against Seller, any of its Affiliates or any other person, arising under or based upon any Law (including with respect to environmental matters generally and any matters under the Comprehensive Environmental Response, Compensation, and Liability Act), except pursuant to Section 12.14, and the indemnification provisions set forth in this Article X. Notwithstanding anything to the contrary contained in this Agreement, no breach of any representation, warranty, covenant or agreement contained herein shall give rise to any right on the part of Purchaser, on the one hand, or Seller, on the other hand, after the consummation of the transactions contemplated by this Agreement, to rescind this Agreement or any of the transactions contemplated hereby. No past, present or future Representative, incorporator, member, partner or stockholder of Seller or any of its Affiliates shall have any liability, whether based on warranty, in contract, in tort (including negligence or strict liability) or otherwise, for any obligations or liabilities of Seller or any of its Affiliates arising under, in connection with or related to this Agreement or for any claim based on, in respect of or by reason of the Acquisition, including any alleged non-disclosure or misrepresentations made by any such persons.

SECTION 10.07. Tax Treatment of Indemnification. For all Tax purposes, Purchaser and Seller agree to treat any indemnity payment under this Agreement as an adjustment to the Final Purchase Price unless a final determination of a Taxing Authority provides otherwise.

SECTION 10.08. Survival. None of the representations and warranties and the covenants and agreements of the parties which by their terms contemplate performance at or prior to the Closing contained in this Agreement shall survive the Closing and each such representation, warranty, covenant and agreement shall terminate at and as of the Closing. Covenants and agreements which by their terms contemplate performance after the Closing (including Sections 5.08, 5.14 and 5.16) shall survive the Closing only until the expiration of the term of the undertaking set forth in such agreements and covenants. After the Closing, no party shall have any liability or obligation of any nature with respect to any representation, warranty, agreement or covenant after the termination thereof, except for claims against a party involving Fraud or Willful Breach by such party.

## ARTICLE XI

## TAX MATTERS

SECTION 11.01.   Tax Covenants.

(a)   Purchase Price Allocation. For U.S. federal and applicable state and local income Tax purposes, Purchaser and Seller shall (and shall cause their Affiliates to) allocate the portion of the Final Purchase Price (and any Assumed Liabilities or other amounts treated as part of the purchase price for U.S. federal income Tax purposes), but excluding the portion of the Final Purchase Price allocated to the In-Scope Foreign Assets (in accordance with Section 2.2(b)), allocable to the Transferred Assets among the Transferred Assets in accordance with the methodology set forth in Section 11.01(a) of the Disclosure Schedule (the "**Allocation Methodology**" "). As soon as commercially practicable, but no later than 120 days following the Closing Date, Purchaser shall provide a proposed allocation to Seller setting forth the allocation of such portion of the Final Purchase Price (and other amounts treated as part of the purchase price for U.S. federal Income Tax purposes) allocable to such Transferred Assets among such Transferred Assets in accordance with the Allocation Methodology (the "**Allocation**") for Seller's review, comment and consent (such consent not to be unreasonably withheld, conditioned or delayed). If Seller delivers a written objection within 30 days after receipt of the draft Allocation proposed by Purchaser, then Purchaser and Seller shall negotiate in good faith to resolve any such objection, and, if Seller and Purchaser cannot resolve such dispute within 45 days of Purchaser's receipt of Seller's objection, then a nationally recognized accounting firm mutually acceptable to Purchaser and Seller shall resolve such dispute, with the costs of such resolution to be evenly split by Purchaser, on the one hand, and Seller, on the other hand, and the resolution of such dispute shall be final and binding on the parties. The parties shall (and shall cause its Affiliates to) file all Tax Returns in accordance with such agreed Allocation (as finally determined under this Section 11.01(a)) and not take any Tax-related action inconsistent with the Allocation, in each case, unless otherwise required by a "determination" within the meaning of Section 1313(a) of the Code.

(b)   Transfer Taxes. Purchaser shall pay all Transfer Taxes. Purchaser and Seller shall, and shall cause its Affiliates to, reasonably cooperate in timely making all filings, returns, reports and forms as may be required in connection with Purchaser's payment of any Transfer Taxes.

(c)   Tax Returns.

(i)   Seller shall prepare and timely file (or cause to be prepared and timely filed) the following Tax Returns on a basis consistent with existing practice for preparing such Tax Returns: all Tax Returns with respect to the Transferred Assets for any Tax period ending on or before the Closing Date the due date of which, taking into account applicable extensions, is after the Closing Date. Purchaser shall not be responsible for paying any Taxes reflected on any Tax Return that Seller is obligated to prepare and file under this Section 11.01(c). Notwithstanding anything herein to the contrary and for the avoidance of doubt, Seller shall prepare all income Tax Returns of Seller and its Affiliates, and Purchaser shall have no rights with respect to any such Tax Returns.

74

(ii)    Purchaser shall prepare and timely file (or cause to be prepared and timely filed) all Tax Returns with respect to the Transferred Assets for any Tax period ending after the Closing Date. With respect to any taxable period that includes but does not on end on the Closing Date, Purchaser shall prepare such Tax Returns consistent with past practices, jurisdictions and methodologies, except as otherwise required by Law, and shall provide Seller or their successors in rights, as applicable, with a draft of such material Tax Returns at least 30 days prior to the filing of any such material Tax Return (or, for such material Tax Returns filed on a monthly basis, as soon as reasonably practicable prior to the applicable filing deadline) for their review and comment. Seller shall submit any comments to the Purchaser at least 5 days prior to the due date of such material Tax Return, which Purchaser shall consider in good faith. Without limitation of its rights pursuant to Article X, Purchaser shall be responsible for paying any Taxes reflected on any Tax Return that Purchaser is obligated to prepare and file under this Section 11.01(c).

(d)    Cooperation. From and after the Closing Date, Seller and Purchaser shall reasonably cooperate, and shall cause its Affiliates, officers, employees, agents, auditors and representatives reasonably to cooperate, in preparing and filing all Tax Returns relating to the Transferred Assets or the Business, including maintaining and making available to each other all records necessary in connection with Taxes and in resolving all disputes and audits with respect to all taxable periods relating to Taxes; provided that Seller shall be deemed to satisfy such obligation to provide such access with respect to Tax Returns by providing such access to Tax Returns that are reasonably redacted to remove any information that relates solely to Seller and not to the Transferred Assets or the Business. Seller and its Affiliates will need access, from time to time after the Closing Date, to certain accounting and Tax records and information held by Purchaser or its Affiliates to the extent such records and information pertain to events occurring prior to the Closing. Therefore, Purchaser shall, and shall cause each of its Affiliates to, (i) use its reasonable efforts to properly retain and maintain such records until such time as Seller agrees that such retention and maintenance is no longer necessary and (ii) upon reasonable advance notice to Purchaser, allow Seller and its Representatives (and Representatives of any of its Affiliates), during Purchaser's normal business hours, to inspect, review and make copies of such records as Seller or any of its Affiliates may deem necessary or appropriate from time to time; provided that any such inspection or visit visiting shall be conducted under the supervision of Purchaser's personnel and in such a manner as not to interfere with the conduct of the Business or any other businesses of Purchaser.

(e)    Straddle Periods. For all purposes of this Agreement, in the case of a taxable period that includes (but does not end on) the Closing Date (a "**Straddle Period**"), all Taxes based on or measured by income, gross or net sales, or payments or receipts shall be allocated between the portion of such Straddle Period that ends on the Closing Date and the portion of such Straddle Period that begins after the Closing Date based on an interim closing of the books (except that exemptions, allowances or deductions that are calculated on an annual basis (including depreciation and amortization deductions), other than with respect to property placed in service after the Closing Date, shall be allocated on a daily basis) and any other Taxes shall be allocated between the portion of such Straddle Period that ends on the Closing Date and the portion of such Straddle Period that begins after the Closing Date on a per diem basis.

(f)    Employment Tax Reporting Responsibility. Purchaser shall (or shall cause its applicable Affiliate to) follow the alternate procedure for United States employment tax

75

withholding as provided in Section 5 of Revenue Procedure 2004-53, 2004-2 C.B. 320. Seller shall (or shall cause its applicable Affiliate to) provide to Purchaser (or its applicable Affiliate) all information required to be provided by the predecessor under such Revenue Procedure and any other information required by Purchaser (or its applicable Affiliate) in connection with its reporting obligations thereunder.

## ARTICLE XII

## MISCELLANEOUS

SECTION 12.01.   Assignment. Neither this Agreement nor any of the rights and obligations of the parties hereunder may be assigned by Purchaser, on the one hand, or Seller, on the other hand, without the prior written consent of Seller (in the case of Purchaser) or Purchaser (in the case of Seller), as applicable; provided that (a) Purchaser may, without Seller's consent, assign its rights and obligations, in whole or in part, to one or more controlled Affiliates or acquisition vehicles designated by Purchaser (including immediately prior to the Closing) and (b) Seller may assign any of its rights and obligations hereunder to any of its wholly owned Affiliate, but provided, further, that no such assignment shall release the applicable assignor from any liability or obligation under this Agreement in the event its obligations are not performed. Subject to the first sentence of this Section 12.01, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns. Any attempted assignment or transfer in violation of this Section 12.01 shall be null and void.

SECTION 12.02.   No Third-Party Beneficiaries. Except as provided in (a) Article X with respect to the Indemnified Parties, and (b) Section 7.15 for the benefit of any current or former directors, officers or employees, this Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein expressed or implied shall give or be construed to give to any person, other than the parties hereto and such successors and assigns, any legal or equitable rights hereunder. Nothing in this Agreement shall constitute an amendment to any Employee Benefit Plan, and no Employee Benefit Plan shall be amended absent a separate written amendment that complies with such Employee Benefit Plan's amendment procedures.

SECTION 12.03.   Expenses. Each of the parties shall pay its own legal, accounting and other fees and expenses incurred in connection with the preparation, execution and delivery of this Agreement and all documents and instruments executed pursuant hereto and the consummation of the transactions contemplated hereby and any other costs and expenses incurred by such party (including, for the avoidance of doubt, costs and expenses of Purchaser incurred in connection with the acquisition of the Transferred Assets and the assumption of the Assumed Liabilities or otherwise in connection with the operation or conduct of the Business on or after the Closing), except the Expense Reimbursement or as otherwise expressly set forth herein or in any Ancillary Agreement.

SECTION 12.04.   Notices. All notices, requests, permissions, waivers and other communications hereunder shall be in writing and shall be deemed to have been duly given (a) five (5) Business Days following sending by registered or certified mail, postage prepaid, (b) when delivered, if delivered personally to the intended recipient, (c) one (1) Business Day

76

following sending by overnight delivery via a national courier service and (d) when delivered by fax or email (in each case in this clause (d) (i) followed by delivery of an original via overnight courier and (ii) solely if receipt is confirmed prior to 5 p.m. at the place of receipt on a Business Day (or the following Business Day if receipt is confirmed after 5:00 p.m. at the place of receipt or a day other than a Business Day)) and, in each case, addressed to a party at the following address for such party.

    (i)    if to Seller,

Anthology, Inc.
5201 Congress Avenue
Boca Raton, FL 33487
Attention:    Michael Pohorylo, Chief Legal Officer, General Counsel & Secretary

                Heath C. Gray, Chief Restructuring Officer
Email:    michael.pohorylo@anthology.com; heath.gray@fticonsulting.com

with copies to (which shall not constitute notice):

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Attention:    Peter Martelli, P.C.; Dave Gusella, P.C.; Dan Li
Email:    peter.martelli@kirkland.com;  dave.gusella@kirkland.com; dan.li@kirkland.com

    (ii)    if to Purchaser,

Ellucian Company LLC
2003 Edmund Halley Drive
Reston, VA 20191
2003 Edmund Halley Drive
Attention:    Chief Legal Officer
Email:    ask.legal@ellucian.com

with copies to (which shall not constitute notice):

Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
Attention:        William J. Allen; David Zylberberg; Elisha D. Graff
Email:             william.allen@stblaw.com; david.zylberberg@stblaw.com;
                      egraff@stblaw.com

or to such other address(es) as shall be furnished in writing by any such party to the other party hereto in accordance with the provisions of this Section 12.04.

SECTION 12.05.   Interpretation; Certain Definitions.

(a)      Any matter set forth in any provision, subprovision, Section or subsection of the Disclosure Schedule shall be deemed to be disclosed for each other provision, subprovision, Section or subsection of the Disclosure Schedule to the extent it is reasonably apparent from the face of such disclosure that such disclosure is applicable to such other provision, subprovision, Section or subsection of the Disclosure Schedule. No reference to or disclosure of any matter or item in this Agreement or in the Disclosure Schedule, as applicable, shall be construed as an admission or indication that such matter or item is material or that such matter or item is required to be referred to or disclosed in this Agreement. Without limiting the foregoing, no such reference to or disclosure of a possible breach or violation of any Contract, Law or Judgment shall be construed as an admission or indication that a breach or violation exists or has actually occurred. The Disclosure Schedule is hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in the Disclosure Schedule or in any Exhibit but not otherwise defined therein, shall have the meaning as defined in this Agreement. References to defined terms in the singular shall include the plural and references to defined terms in the plural shall include the singular. The word "extent" in the phrase "to the extent" means the degree to which a subject or other thing extends, and such phrase does not mean simply "if". The term "day" means a calendar day unless expressly stated to be a Business Day. The descriptive headings of the several Articles, Sections and subsections of this Agreement, the Table of Contents to this Agreement and the Disclosure Schedule are inserted for convenience only, do not constitute a part of this Agreement and shall not affect in any way the meaning or interpretation of this Agreement. All references herein to "Articles", "Sections", "Exhibits" or "Schedules" shall be deemed to be references to Articles or Sections hereof or Exhibits or Schedules hereto unless otherwise indicated. The terms "hereof", "herein", "hereby" and derivative or similar words refer to this entire Agreement, including all Exhibits and Schedules. The use of "or" is not intended to be exclusive unless expressly indicated otherwise. Reference to any agreement (including this Agreement), document or instrument shall mean such agreement, document or instrument as amended or modified and in effect from time to time in accordance with the terms thereof and, if applicable, the terms hereof. Reference to any legislation or to any provision of any legislation shall include any modification, amendment, re-enactment thereof, any legislative provision substituted therefore and all rules, regulations and statutory instruments issued or related to such legislation.

(b)      For all purposes hereof:

"**Accounting Principles**" means the accounting principles, practices, methodologies and policies under United States generally accepted accounting principles ("**GAAP**"), except as set forth in Section 12.05(b)(i) of the Disclosure Schedule.

"**Affiliate**" means, with respect to any person, any person or entity controlling, controlled by or under common control with such person. For purposes of this definition, "**control**" means, with respect to any entity, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such entity, whether through the ownership of voting securities (or other ownership interest), by contract or otherwise, provided that, except for the definition of "**Non-Recourse Party**", for purposes of this Agreement, Blackstone and Vista and any investment funds, investment vehicles or portfolio companies affiliated with, or managed or advised by them shall not be or be deemed Affiliates of Purchaser or its Subsidiaries.

"**Alternative Transaction**" means any transaction (or series of transactions), whether direct or indirect, other than the transactions expressly contemplated by this Agreement and the Ancillary Agreements, whereby any person or group of persons or creditors of the Seller or its Affiliates (in each case, other than Seller and its Affiliates or Purchaser and its Affiliates) acquires or is granted, in the aggregate, (i) beneficial ownership of a majority of the equity interests of Seller or its Affiliates or the Business or (ii) a material portion of the Transferred Assets and Assumed Liabilities, in each case whether by sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, liquidation, asset sale, share issuance, consent solicitation, exchange offer, tender offer, recapitalization, or plan of reorganization or liquidation, share exchange, business combination, joint venture, debt incurrence, or similar transaction involving Seller and/or any of its Subsidiaries (including, for the avoidance of doubt, (x) a transaction premised on a sale of assets under section 363 of the Bankruptcy Code and (y) a plan of reorganization for Seller or any of its subsidiaries). Notwithstanding the foregoing, a liquidation or wind-down of Seller's estates that does not involve a subsequent going concern sale, transfer or other disposition (including by plan, credit bid or foreclosure) of the Transferred Assets to a third party (including creditors of Seller or its Affiliates) shall not be an Alternative Transaction.

"**Anti-Corruption Laws**" means laws, rules, and regulations of any jurisdiction applicable to Seller or its Subsidiaries from time to time concerning or related to bribery or corruption including without limitation the U.S. Foreign Corrupt Practices Act of 1977.

"**Anti-Money Laundering Laws**" means Laws related to money laundering, anti-terrorism, proceeds of crime, or financial record keeping, including without limitation the Bank Secrecy Act, as amended by Title III of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (USA PATRIOT Act).

"**ARD**" means (i) in relation to any European Union member states, the Acquired Rights Directive pursuant to EC Directive no. 2001/23 dated 12 March 2001, as amended from time to time, and any domestic legislation implementing such directive into the national law, (b) in relation to the United Kingdom, the Transfer of Undertakings (Protection of Employment) Regulations

2006, and (c) in relation to any non-European Union member state, any national, provincial or local legislation that is broadly similar in effect to the provisions of the Acquired Rights Directive (2001/23/EC), in each case, as amended from time to time.

"**ARD Employee**" means an Employee who immediately before Closing is employed in a jurisdiction set forth on Schedule 12.05(b).

"**Assumed Lease**" means each lease, sublease or license granting any interest in the Leased Property.

"**Assumed Taxes**" means (i) all unpaid Taxes described in Section 1.04(a)(ii) and (ii) any Transfer Taxes.

"**Auction**" shall have the meaning ascribed to such term in the Bidding Procedures Order.

"**Base Purchase Price**" means $70,000,000 in cash.

"**Bidding Procedures Order**" means an Order of the Bankruptcy Court approving (i) bidding procedures to be employed with respect to this Agreement and the Acquisition, and (ii) the execution, delivery, and performance of this Agreement by Seller (including payment of the Expense Reimbursement pursuant to Section 9.02(c) and Breakup Fee pursuant to Section 9.02(a)), other than the performance of those obligations to be performed at or after the Closing, which Order shall be in form and substance reasonably satisfactory to the parties hereto.

"**Business**" means the business of Seller and its Affiliates which provides Software-as-a-Service or on-premise (1) student information services solutions, including (a) any associated ERP capabilities, (b) all necessary professional services, managed services, training, maintenance, and support, and (c) all integrations and integration development between the student information services solutions and other products and services offered by Seller and its Affiliates or any third party (2) enterprise operations solutions, including (x) all necessary professional services, managed services, training, maintenance and support, (y) all integrations and integration development between enterprise operations solutions and other products and services offered by Seller and its Affiliates or any third party, and (z) any products of Seller and its Affiliates providing (i) finance and human capital management (HCM) solutions, (ii) payroll solutions, and (iii) student verification solutions, in each case (1) and (2), as such business operated and existed as of Closing.

"**Business Affiliates**" means each of (1) Anthology International Private Limited, a private limited company incorporated in India, (2) Campus Management Corp UK Ltd UK, a private company limited by shares incorporated in the United Kingdom, (3) Bb Tecnologia Mexico S. de R.L. de C.V., a *sociedad de responsabilidad limitada de capital variable* incorporated in Mexico, (4) Blackboard Canada Inc., a incorporated company incorporated in Canada, (5) Consultora Nivel 7 S.A.S., a *sociedad por acciones simplificada* incorporated in Spain, (6) BB Information Technology India Pvt Ltd, a private limited company incorporated in India, (7) Blackboard Pty Ltd Australia, a proprietary limited company incorporated in Australia, (8) Blackboard UK Limited, a private limited company incorporated in the United Kingdom, (9) Blackboard Int BV Netherlands, a private limited company incorporated in the Netherlands.

"**Business Day**" means any day, other than a Saturday or a Sunday, on which commercial banks are not required or authorized to close in New York City.

"**Canadian Transferred Employees**" means any Non-ARD Employee located in Canada.

"**Cash and Cash Equivalents**" means all cash and cash equivalents, including checks, money orders, marketable securities, short-term instruments, negotiable instruments, funds in time and demand deposits or similar accounts on hand, in lock boxes, in financial institutions or elsewhere, including all cash residing in any collateral cash account securing any obligation or contingent obligation, together with all accrued but unpaid interest thereon, and all bank, brokerage or other similar accounts, all deposits in transit reduced by issued or outstanding checks, drafts and pending electronic debits. All cash and cash equivalents as determined shall be in accordance with GAAP.

"**Claim**" means, collectively, any and all "claims" as defined in Section 101(5) of the Bankruptcy Code and jurisprudence interpreting the Bankruptcy Code, causes of actions, payments, charges, judgments, assessments, losses, monetary damages, penalties, fines, fees, interest obligations, deficiencies, debts, obligations, costs and expenses and other liabilities (whether absolute, accrued, contingent, fixed or otherwise, or whether known or unknown, or due or to become due or otherwise), including any Claims: (i) based on or arising under any federal or state labor, employment or pension Laws, employment agreements, including any employee claims related to worker's compensation, occupational disease, discrimination, retirement or unemployment or temporary disability; (ii) based upon or relating to any putative successor or transferee liability; (iii) relating to the Excluded Assets or Retained Liabilities; (iv) based upon or relating to any unexpired and executory contract or unexpired lease that is not a Transferred Contract that will be assumed and assigned pursuant to the Sale Order and this Agreement; (v) based upon or relating to any bulk sales, transfer taxes or similar law; (vi) based upon or relating to any tax statutes or ordinances, including the Code and any Taxes arising under or out of, in connection with, or in any way relating to the operation of the Debtors' assets prior to the Closing, including any ad valorem taxes assessed by any applicable Taxing Authority; and (vii) any asserted against any of the Debtors or any of their respective affiliates, directors, officers, agents, successors or assigns in connection with or relating to the Debtors, their operations, their businesses, their liabilities, the Transferred Contracts or the transactions contemplated herein.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Colombia Transferred Employees**" means any Non-ARD Employee located in Colombia.

"**Contract**" means any contract, subcontract, agreement, undertaking, indenture, note, bond, mortgage, lease, sublease, license, sublicense, commitment, sale and purchase order or other legally binding instrument that purports to be binding on any person or any part of its assets or property and to which Seller or any of its Business Affiliates or Subsidiaries is a party.

"**Cure Payments**" means the amount required to be paid with respect to each Transferred Contract and Assumed Lease to cure all defaults under such Contract to the extent required by Section 365 of the Bankruptcy Code and to otherwise satisfy all requirements imposed by Section

81

365 of the Bankruptcy Code in order to effectuate, pursuant to the Bankruptcy Code, the assumption by Seller and its Affiliates and assignment to Purchaser of each such Contract, in each case, as determined by an Order of the Bankruptcy Court (including any Order approving procedures for the notice of proposed cure amounts and establishment of the amount of Cure Payment in respect of any Contract or any Order resolving any dispute as to the amount of any Cure Payment).

"**Data Privacy Laws**" shall mean Laws or binding industry standards applicable to the conduct of the Business governing the use, collection, storage, transmission, disclosure, processing, security, privacy, or breach notification of any Personal Data.

"**Debtor Affiliates**" means, Blackboard LLC, a Delaware limited liability company, Anthology Inc. of Missouri, a Delaware corporation, Anthology Inc. of NY, a Delaware corporation, AY Software Services, Inc., a Delaware corporation, Blackboard Tennessee LLC, a Delaware limited liability company, Admissions US, LLC, a Delaware limited liability company, Bb Acquisition Corp., a Delaware corporation, Campus Management Acquisition Corp., a Delaware corporation, Academic Management Systems, LLC, a Delaware limited liability company, Bb Management LLC, a Delaware limited liability company, Edcentric Holdings, LLC, a Delaware limited liability company, Blackboard Campuswide of Texas, Inc., a Texas corporation, Edcentric, Inc., a Delaware corporation, Astra Acquisition Corp., a Delaware corporation, Blackboard Collaborate Inc., a Delaware corporation, Edcentric Midco, Inc., a Delaware corporation, Blackboard Holdings, LLC, a Delaware limited liability company, Higher One Real Estate SP, LLC, a Delaware limited liability company, Blackboard International LLC, a Delaware limited liability company, MyEdu Corporation, a Delaware corporation, ApplyYourself, Inc., a Delaware corporation, Blackboard Student Services Inc., a Delaware corporation, OrgSync, Inc., a Texas corporation, Astra Intermediate Holding Corp., a Delaware corporation, Blackboard Super Holdco, LLC, a Delaware limited liability company, Perceptis, LLC, a Ohio limited liability company.

"**Debtors**" means, collectively, the debtors-in-possession under the Bankruptcy Cases.

"**DIP Order**" means the Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief or the Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief, as applicable.

"**Effect**" means any event, fact, condition, change, occurrence or effect.

"**Employee**" means each employee, director, or officer of Seller (or any of its Affiliates) who is listed on Section 12.05(b)(ii) of the Disclosure Schedule, as may be amended from time to time (i) as mutually agreed between Purchaser and Seller, with consent by Purchaser not to be

unreasonably withheld, (ii) to reflect resignations, or (iii) to reflect hires and terminations (in accordance with the terms of Section 5.01(a)(i)(E) of this Agreement).

"**Employee Transfer Date**" means (i) with respect to India Transferred Employees, April 1, 2026 and (ii) with respect to U.S. Transferred Employees, the Canadian Transferred Employees and Colombia Transferred Employees, February 1, 2026, or, if mutually agreed by Seller and Purchaser after the date hereof, December 31, 2025.

"**Employment Obligations**" means any and all information, notification and consultation obligations applicable in the jurisdictions in which the ARD Employees are employed immediately before Closing.

"**Environmental Laws**" means all Laws and Judgments relating to pollution, public or worker health or safety, or protection of the environment or natural resources, including those Laws relating to exposure to, or releases or threatened releases of, Hazardous Materials.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**ERISA Affiliate**" means, with respect to any entity, trade or business, any other entity, trade or business that is, or was at the relevant time, a member of a group described in Section 414(b), (c), (m) or (o) of the Code or Section 4001(b)(1) of ERISA that includes or included the first entity, trade or business, or that is, or was at the relevant time, a member of the same "controlled group" as the first entity, trade or business pursuant to Section 4001(a)(14) of ERISA.

"**Estate**"  shall mean the estate of the Seller and/or its Affiliates, as applicable, created by Section 541 of the Bankruptcy Code upon the date of filing of the Chapter 11 case.

"**Excluded Contracts**" means (i) all Contracts other than the Transferred Contracts,(ii) all Mixed-Use Contracts, and (iii) the Contracts set forth in Section 12.05(b)(iii) of the Disclosure Schedule.

"**Export Control Laws**" means all U.S. and relevant foreign export control laws, including, but not limited to, the statutory and regulatory requirements under the International Traffic in Arms Regulations (22 C.F.R. pt. 120 et seq.), the Export Administration Regulations (15 C.F.R. pt. 730 et seq.), the laws administered by U.S. Customs and Border Protection, and other similar export control laws or restrictions of any jurisdiction applicable to the Business.

"**Exploit**" means to use, exercise and exploit all rights in, to and under the applicable Intellectual Property, including all rights to use, execute, reproduce, adapt, disclose, display, perform, distribute, sell, otherwise dispose of, import, make modifications, and create derivative works and improvements.

"**Final Order**" means a judgment or Order of the Bankruptcy Court (or any other court of competent jurisdiction) entered on the docket in the Bankruptcy Case (or the docket of such other court), which has not been modified, amended, reversed, vacated or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, stay, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, stay, reargument or rehearing shall then be pending or (b) if an appeal, writ of certiorari, new trial, stay, reargument

or rehearing thereof has been sought, such Order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument or rehearing shall have expired, as a result of which such Proceeding or Order shall have become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedures, or any analogous rule under the Federal Rules of Bankruptcy Procedure, may be filed relating to such Order, shall not cause an Order not to be a Final Order.

"**Fraud**" means actual and intentional common law fraud committed by a party with respect to the making of the representations, warranties and covenants set forth in Article III and Article IV (as each such representation, warranty or covenant is qualified by the applicable disclosures and exceptions in the Disclosure Schedule), as applicable, with specific intent to deceive and mislead another party and to induce such party to enter into this Agreement; provided, that, such actual and intentional fraud of a party shall only be deemed to exist if a party had actual knowledge (as opposed to any claim based on constructive knowledge, negligent or reckless misrepresentation or similar theory) of the breach of the applicable representation and warranty when such representation or warranty was made, with a specific intent to induce the party to whom such representation or warranty was made to act or refrain from acting in reliance upon it and causing such party to rely thereon and causing such party to suffer damage as a result of such reliance.

"**Government Contract**" means any Contract, including any prime contract, subcontract, teaming agreement or arrangement, joint venture, basic ordering agreement, letter contract, purchase order, multiple award schedule contract, delivery order, task order, grant, cooperative agreement, bid, change order, arrangement or other commitment or funding vehicle of any kind, between (A) a Governmental Entity, (B) any prime contractor to a Governmental Entity with respect to a Contract entered into with a Governmental Entity or (C) any subcontractor with respect to any Contract described in clause (A) or (B).

"**Hazardous Materials**" means any material, waste or substance (i) defined or regulated under any Environmental Law as a hazardous substance, hazardous waste, hazardous material, toxic substance, pollutant or contaminant (or words of similar import or meaning), or (ii) for which liability or standards of conduct may be imposed under any Environmental Law, including asbestos, polychlorinated biphenyls, per- and polyfluoroalkyl substances, and petroleum.

"**including**" (and, with correlative meaning, "include" and "includes") means including, without limiting the generality of any description preceding or succeeding such term, and the rule of *ejusdem generis* will not be applicable to limit a general statement preceded by, followed by or referable to an enumeration of specific matters, to matters similar to those specifically mentioned.

"**Income Tax**" or "**Income Taxes**" means all income or franchise Taxes imposed on or measured by net income (however denominated).

"**India Transferred Employees**" means any Non-ARD Employee located in India.

"**Intellectual Property**" means all worldwide intellectual property rights, including all: (i) patents and patent applications; (ii) trademarks, service marks, trade names, trade dress, and other indications of source or origin, in each case whether registered or unregistered, and all goodwill associated therewith; (iii) domain name registrations and social and mobile media identifiers; (iv) copyrights (registered or unregistered); and (v) trade secrets and other rights in confidential information.

"**Knowledge of Seller**" means the actual knowledge, after reasonable inquiry of their respective direct reports, of the persons set forth on Section 12.05(b)(iv) of the Disclosure Schedule.

"**Liabilities**" means any and all Claims, debts, indebtedness, Liens, losses, damages, adverse Claims, liabilities, fines, penalties, duties, responsibilities, obligations and expenses (including reasonable attorneys' fees and reasonable costs of investigation and defense) of any kind, character, or description, whether known or unknown, direct or indirect, fixed, absolute or contingent, matured or unmatured, accrued or unaccrued, asserted or unasserted, ascertained or ascertainable, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, vested or unvested, executory, determined, determinable, in contract, tort, strict liability, or otherwise, or otherwise due or to become due.

"**Liens**" means, collectively, all encumbrances, charges, liens (as defined in section 101(37) of the Bankruptcy Code) (whether consensual, statutory, possessory, judicial, or otherwise), claims (as defined in section 101(5) of the Bankruptcy Code), demands, debts, mortgages, leases, subleases, licenses, hypothecations, deeds of trust, pledges, levies, security interests or similar interest, title defect, options, rights of use or possession, rights of first offer or first refusal (or any other type of preferential arrangement), puts, calls, profit sharing interests, rights of consent, restrictive covenants, encroachments, Orders, servitude, restrictions on transferability of any type (other than restrictions on transfer arising under applicable securities Laws), charges, easements, rights of way, transfer restrictions under any shareholder agreement, fines, judgments, liabilities, obligations, commitments, assessments, fees, conditional sale or other title retention agreement, successor liability, any rights that purport to give any party a right or option to effect any forfeiture, modification, or termination of Seller's or Purchaser's interest in the Transferred Assets, or any similar rights, or other imposition, imperfection or use of any nature whatsoever, whether imposed by contract, law, equity or otherwise, and whether known or unknown.

"**made available**" means, with respect to any document, that such document (i) was in the electronic data room at the close of business two days prior to the date hereof or (ii) was delivered to Purchaser or its Representatives by any of Seller or its Affiliates or Representatives at the close of business two days prior to the date hereof.

"**Material Adverse Effect**" means any Effect that has or would reasonably be expected to, individually or in the aggregate, (a) have a material adverse effect on the Business, results of operations, properties, assets (including the Transferred Assets) or condition (financial or otherwise) of the Business or (b) materially impair or delay the ability of Seller to perform its obligations under this Agreement and consummate the transactions contemplated hereby; provided, however, that solely with respect to clause (a) above, none of the following, and no

Effect arising out of or resulting from the following, shall constitute or be taken into account, individually or in the aggregate, in determining whether there has been or will be a Material Adverse Effect (except to the extent any such Effect has had, or would reasonably be expected to have, a disproportionate adverse impact on the Business relative to other companies operating in the industries in which the Business competes): (i) any action by Seller or any of its Affiliates (1) expressly required to be undertaken under this Agreement, or (2) which Purchaser has expressly requested in writing; (ii) any Effect affecting the industry or industry sectors in which the Business operates generally or the United States or worldwide economy generally or credit or other financial markets, (iii) national, international or any foreign or domestic regional economic, financial or capital markets (including changes in interest rates, foreign exchange rates or tariffs), social or political conditions (including changes therein) or events in general, including the results of any primary or general elections, or any statements or other proclamations of public officials, or changes in policy related thereto; (iv) any natural disaster or pandemic or any acts of terrorism, sabotage, military action or war (whether or not declared), or any escalation or worsening thereof, or any other *force majeure* event, whether or not caused by any person, or any national or international calamity or crisis; (v) any failure of the Business to meet internal or public forecasts, projections, predictions, guidance, estimates, milestones or budgets (<u>provided</u> that the underlying causes of such failures (subject to the other provisions of this definition)) shall not be excluded; (vi) the announcement or pendency of the Acquisition or a potential transaction involving the Business, including any loss of, or impact on the relation of the Business with, any employees, customers, suppliers, partners or distributors; (vii) any change in Laws or GAAP or the enforcement thereof, or (viii) the commencement, continuation or status of the Bankruptcy Cases.

"**Mixed-Use Contracts**" means any Contract that includes both terms and conditions that are Related to the Business and terms and conditions that relate to other businesses of Seller or its Affiliates between (i) Seller or any of its Affiliates, on the one hand and (ii) a supplier, vendor, distributor, reseller or customer of Seller or such Affiliate, on the other hand.

"**Mixed-Use Contract Separation Arrangements**" means any combination of assumption and assignment, divisional novation, amendment, consent to separate billing, sublicensing, subcontracting, or replacement arrangements designed to give Purchaser (or any Affiliate designated by Purchaser, as applicable) the rights, benefits and services under the Mixed-Use Contracts necessary for the continued operation of the Business in all material respects.

"**Most Recent Quarter-End Date**" means the last day of the most recently completed fiscal quarter of Seller prior to the date hereof.

"**Non-ARD Employee**" means any Employee who is not an ARD Employee.

"**Order**" means any order, injunction, order, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Entity, including any order entered by the Bankruptcy Court in the Bankruptcy Cases.

"**Other Businesses**" means any businesses of Seller and its Affiliates other than the Business.

"**Other Purchaser**"  means (i) any Person (other than Purchaser and its Affiliates) that acquires from Seller or any of its Affiliates any assets, business or division to which any Mixed-Use Contract relates, or (ii) Seller or its Affiliates, if Seller or any of its Affiliate reorganizes pursuant to a chapter 11 plan of the Bankruptcy Code or dismisses its Bankruptcy Case without consummating a sale or a chapter 11 plan for substantially all of its assets.

"**Permit**" means all permits, licenses, authorizations, clearances, closures, decisions, registrations, concessions, grants, franchises, certificates, waivers and filings issued or required by any Governmental Entity under applicable Law, in each case, required or necessary for the ownership or operation of the Business as is conducted as of the date hereof.

"**person**" means any individual, firm, corporation, partnership, limited liability company, trust, joint venture, Governmental Entity or other entity.

"**Personal Data**" means any personal information that (i) whether alone or in combination with other data or information, is used to identify or could reasonably be linked to an individual or household, or (ii) is defined as "personal data", "personally identifiable information", "personal information" or any other similar term under applicable Laws.

"**Pre-Closing Tax Period**" means all taxable periods ending on or prior to the Closing Date and the portion ending on the Closing Date of any taxable period that includes but does not end on the Closing Date.

"**Proceeding**" means any claim, cause of action, lawsuit, litigation, arbitration, mediation, audit, charge, investigation (including any informal claims or demands, or formal or informal request for documents, information, or testimony), hearing, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), inquiry or prosecution of any kind whatsoever, whether arising under federal, state, provincial, or local law, whether civil or criminal, whether legal, equitable, common law, statutory, regulatory, administrative, arbitral or mediation, whether sounding in contract or tort, or whether at law or in equity, or otherwise under any legal or equitable theory, seeking any form of relief whatsoever. For the avoidance of doubt, Proceeding includes any claim as such term is defined in section 101(5) of the Bankruptcy Code, whether or not filed, scheduled or otherwise asserted and whether or not allowed or disallowed.

"**Related to the Business**" means used or held for use primarily in or primarily arising out of the operation or conduct of the Business as currently conducted by Seller or any of its Subsidiaries or Affiliates.

"**Rendered Accounts Receivable**" means any Accounts Receivable to the extent arising from services rendered by Seller or any of its Affiliates prior to the Closing.

"**Representatives**" means any directors, officers, employees, investment bankers, financial advisors, attorneys, accountants or other advisors, agents or representatives of a person.

"**Required Terms**"  means the following terms of the Bidding Procedures Order and the bidding procedures attached thereto, each as defined therein: (i) the requirements for a potential bidder for the Business to become a Qualified Bidder, (ii) the Minimum Overbid for the Business, (iii) the date of the Auction for the Business and (iv) the date of the Sale Hearing for the Business.

"**Retained Anthology Business**" means the business(es) of Seller and its Affiliates, other than the Business, which used the Transferred Name and Mark during the twelve (12) months prior to the date hereof.

"**Retained Intellectual Property**" means (i) all Intellectual Property set forth in Section 12.05(b)(vi) of the Disclosure Schedule, (ii) the Anthology Domains, and (iii) all other Intellectual Property other than the Transferred Intellectual Property.

"**Sale Hearing**" means the hearing for approval of, among other things, the Acquisition and entry of the Sale Order.

"**Sale Order**" means an Order of the Bankruptcy Court approving this Agreement and the Acquisition, which Order shall be in form and substance reasonably satisfactory to the parties hereto.

"**Sanctioned Country**" means, at any time, a country, region, or territory which is itself the subject or target of any Sanctions (at the time of this Agreement, the Crimea region of Ukraine, so-called Donetsk People's Republic, and so-called Luhansk People's Republic regions of Ukraine, Cuba, Iran, and North Korea) and Syria.

"**Sanctioned Person**" means, at any time, (a) any person listed in any Sanctions-related list of designated persons maintained by (i) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, the United Nations Security Council, the European Union, any EU Member State, His Majesty's Treasury of the United Kingdom; or any other relevant Sanctions authority; (b) any person operating, organized or resident in a Sanctioned Country; (c) any person owned or controlled by any such person or persons described in the forgoing clauses (a) or (b); or (d) any person otherwise the target or subject of any Sanctions.

"**Sanctions**" means economic or financial sanctions Laws or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State; or (b) the United Nations Security Council, the European Union, any EU Member State, His Majesty's Treasury of the United Kingdom; or (c) any other relevant sanctions authority.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Specified Representations**" means the representations and warranties of Seller set forth in Section 3.01 (*Organization and Standing*), Section 3.02 (*Authority; Execution and Delivery; Enforceability*), Section 3.05(a) (*Absence of Certain Changes*), Section 3.06 (*Title to Assets*), and Section 3.19 (*Brokers and Finders*).

"**Specified Source Code**" means the source code for the software solutions included in the Retained Intellectual Property set forth on Section 12.05(b)(ix) of the Disclosure Schedule, in each case, in the possession or control of Seller at the Closing.

88

"**Subsidiary**" of any person means another person, an amount of the voting securities, other voting ownership or voting partnership interests of which is sufficient to elect at least a majority of its Board of Directors or other governing body (or, if there are no such voting interests, fifty percent (50%) or more of the equity interests of which) is owned directly or indirectly by such first person or by another Subsidiary of such first person.

"**Tail Period Alternative Transaction**" means an Alternative Transaction pursuant to which Seller or any of its Affiliates enters into an agreement to pursue (or, in the case of an Alternative Transaction that is a chapter 11 plan, for which the Seller or any of its Affiliates files a proposed chapter 11 plan or disclosure statement with respect thereto) within four (4) months of the termination of this Agreement.

"**Tarrant County Matter**" means *Anthology Inc. v. Tarrant County College District*, United States District Court for the Northern District of Texas, No. 4:24-cv-279-P, as further described on Section 3.12 of the Disclosure Schedule.

"**Tax**" or "**Taxes**" means all forms of taxation imposed by any federal, state, provincial, local, foreign or other Taxing Authority, including income, franchise, property, sales, use, excise, employment, unemployment, payroll, social security, estimated, value added, ad valorem, transfer, recapture, withholding, health and other taxes, charges, imposts or fees of any kind in the nature of a tax, including any interest, penalties and additions thereto.

"**Taxing Authority**" means any federal, state, provincial, local or foreign government, any subdivision, agency, commission or authority thereof or any quasi-governmental body exercising tax regulatory authority or the power to administer, collect, determine or impose any tax.

"**Tax Return**" means any report, return, document, declaration or other information or filing supplied or required to be supplied to any Taxing Authority with respect to Taxes, including any amendment made with respect thereto or any attachment thereto.

"**Transferred Contracts**"" means the Contracts identified as Transferred Contract on Section 12.05(b)(v) of the Disclosure Schedule.

"**Transferred Employee Records**"" means all physical or electronic copies of all personnel records (including those as required by applicable Law and those pertaining to performance, training history, job experience and history, and for the three year period immediately preceding the Closing, compensation history) for Transferred Employees, except where (i) the transfer or disclosure of such records is prohibited by applicable Law or would include medical records, or (ii) consent of the relevant employee is required by applicable Law but not given.

"**Transferred Employees**"" means Non-ARD Transferred Employees and ARD Transferred Employees.

"**Transferred Intellectual Property**"" means all rights of Seller or any of its Affiliates in or to any Intellectual Property Related to the Business, including the Intellectual Property set forth on Section 12.05(b)(viii) of the Disclosure Schedule but excluding (even to the extent otherwise

89

Related to the Business) all Intellectual Property set forth in Section 12.05(b)(vi) of the Disclosure Schedule and the Anthology Domains.

"**Transfer Taxes**" means all sales, use, transfer, recording, ad valorem, privilege, documentary, registration, conveyance, excise, license, stamp or similar fees and Taxes resulting from the transactions effectuated pursuant to this Agreement, including any related penalties, interest and additions thereto imposed by a Taxing authority.

"**Undisclosed Contract**" means any Contract that was not disclosed on Section 1.05(a) of the Disclosure Schedule at least five (5) Business Days prior to the Bid Deadline (as defined in the Bidding Procedures Order).

"**U.S. Transferred Employees**" means any Non-ARD Employee located in the United States.

"**U.S. Trustee**" means the Office of the United States Trustee for the Southern District of Texas.

"**Willful Breach**"  means a Party's knowing and intentional material breach of any of its representations or warranties as set forth in this Agreement, or such party's material breach of any of its covenants or other agreements set forth in this Agreement, which material breach constitutes, or is a consequence of, a purposeful act or failure to act by such party with the knowledge that the taking of such act or failure to take such act would cause a breach of this Agreement.

SECTION 12.06.   Counterparts. This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement, and shall become effective when each party hereto shall have received counterparts hereof signed by each of the other parties hereto. Any such counterpart, to the extent delivered by means of a facsimile machine or by .pdf, .tif, .gif, .peg or similar attachment to electronic mail (any such delivery, an "**Electronic Delivery**") shall be treated in all manner and respects as an original executed counterpart and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person. At the request of any party hereto, each other party hereto shall re-execute the original form of this Agreement and deliver such form to all other parties. No party hereto shall raise the use of Electronic Delivery to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of Electronic Delivery as a defense to the formation of a contract, and each such party forever waives any such defense, except to the extent such defense relates to lack of authenticity.

SECTION 12.07.   Entire Agreement. This Agreement, and the Exhibits and Disclosure Schedule annexed hereto, the Confidentiality Agreement and the Ancillary Agreements, and the other agreements, certificates, and other documents contemplated hereby and thereby constitute the entire understanding between the parties with respect to the subject matter hereof and thereof, and supersede all other understandings and negotiations with respect thereto. The parties agree to define their rights, liabilities and obligations with respect to such understanding and the transactions contemplated hereby exclusively in contract pursuant to the express terms and provisions of this Agreement, and the parties expressly disclaim that they are owed any duties or are entitled to any remedies not expressly set forth in this Agreement or any Ancillary Agreement.

90

In the event of any conflict between the provisions of this Agreement (including the Disclosure Schedule and Exhibits), on the one hand, and the provisions of the Confidentiality Agreement or the Ancillary Agreements (including the schedules and exhibits thereto), on the other hand, the provisions of this Agreement shall control.

SECTION 12.08.  Severability. In the event that any provision contained in this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any jurisdiction, such provision shall be ineffective as to such jurisdiction to the extent of such invalidity, illegality or unenforceability without invalidating or affecting the remaining provisions hereof or affecting the validity, legality or enforceability of such provision in any other jurisdiction; provided that this Agreement shall not be enforced without giving effect to the limitations on liability of Purchaser and its Non-Recourse Parties contained herein.

SECTION 12.09.  Governing Law. This Agreement, the negotiation, execution or performance of this Agreement and any disputes arising under or related hereto (whether for breach of contract, tortious conduct or otherwise) shall be governed by and construed in accordance with the Laws of the State of New York, without reference to its conflicts of law principles.

SECTION 12.10.  Jurisdiction. Each party irrevocably agrees that any Proceeding against them arising out of or in connection with this Agreement or the transactions contemplated by this Agreement or disputes relating hereto (whether for breach of contract, tortious conduct or otherwise) shall be brought exclusively in the United States District Court for the Southern District of New York, or, if such court does not have jurisdiction, the state courts of New York located in New York County, and hereby irrevocably accepts and submits to the exclusive jurisdiction and venue of the aforesaid courts in personam with respect to any such Proceeding and waives to the fullest extent permitted by Law any objection that it may now or hereafter have that any such Proceeding has been brought in an inconvenient forum. Notwithstanding the foregoing, any final judgment in any suit, action or other Proceeding may be enforced in other jurisdictions by suit on the judgment in any other manner provided by applicable Law.

SECTION 12.11.  Service of Process. Each of the parties consents to service of any process, summons, notice or document that may be served in any Proceeding in the United States District Court for the Southern District of New York or the state courts of New York located in New York County. Each in any manner permitted by applicable Law and agrees that service of process on such party as provided for notices in Section 12.04 (other than by fax or email) to such party's respective address set forth in Section 12.04 is reasonably calculated to give actual notice and shall be deemed effective service of process on such person.

SECTION 12.12.  Waiver of Jury Trial. EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT TO ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY ANCILLARY AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY OR DISPUTES RELATING HERETO OR THERETO. EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER

AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTY HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 12.12.

SECTION 12.13.    Amendments and Waivers. This Agreement may be amended, modified, superseded or canceled and any of the terms, covenants, representations, warranties or conditions hereof may be waived only by an instrument in writing signed by each of the parties or, in the case of a waiver, by or on behalf of the party waiving compliance. No course of dealing between the parties shall be effective to amend or waive any provision of this Agreement.

SECTION 12.14.    Specific Performance. The parties agree that irreparable damage for which monetary relief, even if available, would not be an adequate remedy, would occur if this Agreement is not performed in accordance with its specific terms or is otherwise breached (including if any party hereto fails to take any actions required hereunder to consummate the transactions contemplated by this Agreement, including the Acquisition). The parties acknowledge and agree that (a) the parties shall be entitled, to an injunction or injunctions, specific performance or other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof (including, for the avoidance of doubt, to cause the Sale Order to become a Final Order) in any court of competent jurisdiction without proof of damages or inadequacy of legal remedy and without the posting or provision of any bond or other security, this being in addition to any other remedy to which they are entitled under this Agreement and (b) the right of specific enforcement is an integral part of the transactions contemplated by this Agreement and, without that right, neither Seller nor Purchaser would have entered into this Agreement. The parties hereto agree not to assert that a remedy of specific enforcement is unenforceable, invalid, contrary to Law or inequitable for any reason, and not to assert that a remedy of monetary damages would provide an adequate remedy or that the parties otherwise have an adequate remedy at law. The parties hereto acknowledge and agree that any party seeking an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this Section 12.14 shall not be required to provide or post any bond or other security in connection with any such order or injunction. Notwithstanding anything to the contrary contained in this Agreement, under no circumstances will Seller or its Affiliates be entitled to receive (i) both a grant of specific performance resulting in the consummation of the transactions contemplated hereby and monetary damages or (ii) monetary damages under this Agreement or in connection with the transactions contemplated hereby from (A) Purchaser in excess of the Good Faith Deposit, (the "**Cap**" ) or (B) any Non-Recourse Party.

SECTION 12.15.    Joint Drafting. The parties hereto have been represented by counsel in the negotiations and preparation of this Agreement; therefore, this Agreement will be deemed to be drafted by each of the parties hereto, and no rule of construction will be invoked respecting the authorship of this Agreement.

SECTION 12.16.    Currency. Unless otherwise specified in this Agreement, all references to currency, monetary values and dollars set forth herein shall mean United States (U.S.) dollars and all payments hereunder shall be made in United States dollars.

SECTION 12.17.    Non-Recourse. This Agreement may be enforced only against, and any Proceeding based upon, arising out of, or related to this Agreement or the transaction contemplated

hereby may be brought only against, the persons that are expressly named as parties and then only to the extent of, and with respect to, the specific obligations set forth herein with respect to such party. With respect to each party hereto, no direct or indirect past, present, or future Affiliate, director, officer, member, manager, partner, equityholder, investor, employee, agent or Representative of such party, and no direct or indirect past, present, or future director, officer, member, manager, partner, equityholder, investor, employee, agent or Representative of any Affiliate of such party (collectively, but not including the parties hereto, each a "**Non-Recourse Party**" ) shall have any obligation or liability of any kind (whether in contract or tort, at law, in equity or otherwise, or based upon any theory that seeks to impose liability upon a person against any person related to such other first person) for any of the representations, warranties, covenants, agreements or other obligations or liabilities of such party or for any claim based on, arising out of, or related to this Agreement or the transaction contemplated hereby. Without limiting the foregoing, to the maximum extent permitted by applicable Law, each party hereby waives and releases any and all rights, claims, demands or causes of action that may otherwise be available in law or in equity, or granted by statute, to avoid or disregard the entity form of a party or otherwise impose liability of a party on any Non-Recourse Party, whether granted by statute or based on theories of equity, agency, control, instrumentality, alter ego, domination, sham, single business enterprise, piercing the veil, unfairness, undercapitalization, or otherwise; and

[SIGNATURE PAGE FOLLOWS]

93

IN WITNESS WHEREOF, Seller and Purchaser have duly executed this Agreement as of the date first written above.

**SELLER:**

ANTHOLOGY INC.

By: *Michael Pohorylo* _____
Name:  Michael Pohorylo
Title:   Secretary

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

**DEBTOR AFFILIATE:**

BLACKBOARD LLC

By: Michael Pohorylo
        Name:  Michael Pohorylo
        Title:   Secretary

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

**DEBTOR AFFILIATE:**

ANTHOLOGY INC. OF MISSOURI

By: _Michael Pohorylo_ _____
       Name: Michael Pohorylo
       Title:  Secretary

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

**DEBTOR AFFILIATE:**

ANTHOLOGY INC. OF NY

By: _Michael Pohorylo_ _____
Name: Michael Pohorylo
Title: Secretary

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

**DEBTOR AFFILIATE:**

ADMISSIONS US, LLC

By: _Michael Pohorylo_
Name: Michael Pohorylo
Title: Secretary

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

**DEBTOR AFFILIATE:**

ACADEMIC MANAGEMENT SYSTEMS, LLC

By: Michael Pohorylo

Name:  Michael Pohorylo
Title:   Secretary

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

**DEBTOR AFFILIATE:**

ASTRA ACQUISITION CORP.

By: _Michael Pohorylo_ _____
       Name:  Michael Pohorylo
       Title:    Secretary

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

**DEBTOR AFFILIATE:**

APPLYYOURSELF, INC.

By: Michael Pohorylo

Name: Michael Pohorylo

Title: Secretary

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

**DEBTOR AFFILIATE:**

ASTRA INTERMEDIATE HOLDING CORP.

By: _Michael Pohorylo_ _____
      Name:  Michael Pohorylo
      Title:   Secretary

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

**DEBTOR AFFILIATE:**

AY SOFTWARE SERVICES, INC.

By: _Michael Pohorylo_ _____
Name: Michael Pohorylo
Title:  Secretary

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

**DEBTOR AFFILIATE:**

BB ACQUISITION CORP.

By: _____
Name: Michael Pohorylo
Title:  Secretary

**DEBTOR AFFILIATE:**

BB MANAGEMENT LLC

By: Michael Pohorylo
        Name: Michael Pohorylo
        Title:  Secretary

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

**DEBTOR AFFILIATE:**

BLACKBOARD CAMPUSWIDE OF TEXAS, INC.

By: _Michael Pohorylo_ _____
Name:  Michael Pohorylo
Title:   Secretary

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

**DEBTOR AFFILIATE:**

BLACKBOARD COLLABORATE INC.

By: _Michael Pohorylo_____
        Name:  Michael Pohorylo
        Title:   Secretary

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

**DEBTOR AFFILIATE:**

BLACKBOARD HOLDINGS, LLC

By: _Michael Pohorylo_ _____
      Name:  Michael Pohorylo
      Title:   Secretary

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

Docusign Envelope ID: 1726E86C-9938-4C24-9041-D24E489C4A05

**DEBTOR AFFILIATE:**

BLACKBOARD INTERNATIONAL LLC

By: _Michael Pohorylo_
_____
    Name:  Michael Pohorylo
    Title:   Secretary

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

**DEBTOR AFFILIATE:**

BLACKBOARD STUDENT SERVICES INC.

By:  Michael Pohorylo
        Name:  Michael Pohorylo
        Title:   Secretary

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

**DEBTOR AFFILIATE:**

BLACKBOARD SUPER HOLDCO, LLC

By: Michael Pohorylo
　　　Name: Michael Pohorylo
　　　Title:　Secretary

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

**DEBTOR AFFILIATE:**

BLACKBOARD TENNESSEE LLC

By: _Michael Pohorylo_
      Name: Michael Pohorylo
      Title: Secretary

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

**DEBTOR AFFILIATE:**

CAMPUS MANAGEMENT ACQUISITION CORP.

By: *Michael Pohorylo*
    Signed by:
    0A62C98353894A3...

    Name:  Michael Pohorylo
    Title:   Secretary

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

**DEBTOR AFFILIATE:**

EDCENTRIC HOLDINGS, LLC

By: _Michael Pohorylo_
       Name:  Michael Pohorylo
       Title:   Secretary

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

**DEBTOR AFFILIATE:**

EDCENTRIC, INC.

By: Michael Pohorylo
      Name: Michael Pohorylo
      Title:   Secretary

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

**DEBTOR AFFILIATE:**

EDCENTRIC MIDCO, INC.

By: _Michael Pohorylo_ _____
Name: Michael Pohorylo
Title: Secretary

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

**DEBTOR AFFILIATE:**

HIGHER ONE REAL ESTATE SP, LLC

By: _Michael Pohorylo_ _____
       Name: Michael Pohorylo
       Title:  Secretary

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

**DEBTOR AFFILIATE:**

MYEDU CORPORATION

By: _Michael Pohorylo_
Signed by:
0A62C98353894A3...

     Name:  Michael Pohorylo
     Title:   Secretary

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

**DEBTOR AFFILIATE:**

ORGSYNC, INC.

By: Michael Pohorylo
Signed by: 0A62C98353894A3...

Name: Michael Pohorylo
Title:   Secretary

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

**DEBTOR AFFILIATE:**

PERCEPTIS, LLC

By: Michael Pohorylo
0A62C98353894A3...

    Name:  Michael Pohorylo
    Title:   Secretary

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

IN WITNESS WHEREOF, Seller and Purchaser have duly executed this Agreement as of the date first written above.

**ELLUCIAN COMPANY LLC**

By: _____

Name: Harshan Bhangdia
Title:  Chief Financial Officer

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

**Exhibit A**
**Form of Bill of Sale, Assignment and Assumption Agreement**

*[Attached]*

Exhibit A – Form of Bill of Sale, Assignment and Assumption Agreement

## BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT (this "**Agreement**") is entered into as of September 29, 2025, by and between Ellucian Company, LLC, a Delaware limited liability company ("**Purchaser**"), the Debtor Affiliates, and Anthology Inc., a Florida corporation (as in existence on the date hereof, as a debtor-in-possession, and as a reorganized debtor, as applicable, "**Seller**", and together with Purchaser and Debtor Affiliates, the "**Parties**"). Each capitalized term used but not otherwise defined in this Agreement shall have the meaning ascribed to such term in the APA (as defined below).

**WHEREAS**, reference is made to that certain Asset Purchase Agreement, dated as of September 29, 2025 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**APA**"), by and among Purchaser, the Debtor Affiliates, and Seller, pursuant to which each of Seller and the Debtor Affiliates has agreed to (and to cause its Business Affiliates to), sell, transfer, assign, convey and deliver to Purchaser (or any Affiliate designated by Purchaser, as applicable), and Purchaser (or any Affiliate designated by Purchaser, as applicable) has agreed to purchase, acquire and accept from Seller (or the applicable Debtor Affiliate), free and clear of all Liens (other than Permitted Liens) all of Seller's and/or its Affiliates' direct or indirect right, title and interest in, to and under the Transferred Assets, and to assume the Assumed Liabilities as set forth hereunder, for good and valuable consideration and in accordance with the terms, and subject to the conditions, set forth in the APA; and

**WHEREAS**, Seller and the Debtor Affiliates, as applicable, desire to (to cause its Business Affiliates to) deliver to Purchaser (or any Affiliate designated by Purchaser, as applicable) such instruments of sale, transfer, assignment, conveyance, contribution and delivery as are required to vest in Purchaser (or any Affiliate designated by Purchaser, as applicable) all of Seller's or its Affiliates' rights, title and interest in and to the Transferred Assets free and clear of any Liens, other than Permitted Liens, and Purchaser (or any Affiliate designated by Purchaser, as applicable) desires to deliver to Seller, the Debtor Affiliates and/or its Business Affiliates such instruments as are required in order to effectuate and evidence the assumption by Purchaser (or any Affiliate designated by Purchaser, as applicable) of the Assumed Liabilities.

**NOW, THEREFORE**, pursuant to the APA and in consideration of the mutual promises contained in the APA, and for other good and valuable consideration, the receipt and sufficiency of which each of Seller, Debtor Affiliates and Purchaser acknowledge, and the Parties agree as follows:

1.      Transfer of Transferred Assets. Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, on the terms, and subject to the conditions set forth in the APA, including, in all respects, Section 1.01 of the APA, and in the Sale Order, each of Seller, Debtor Affiliates and the Business Affiliates, as applicable, hereby sells, conveys, assigns, transfers and delivers to Purchaser (or any Affiliate designated by Purchaser, as applicable), and Purchaser (or any Affiliate designated by Purchaser, as applicable) hereby accepts, all of the Seller's, Debtor Affiliates' and Business Affiliates' (as applicable) right, title and interest in, to and under the Transferred Assets, free and clear of any Liens, other than Permitted Liens.

2.      Assumption of Assumed Liabilities. In accordance with the terms, and subject to the conditions, set forth in the APA, including in all respects to Section 1.01 of the APA, and the Sale Order, each of Seller and its Debtor Affiliates and Business Affiliates, as applicable, hereby assigns, and Purchaser (or any Affiliate designated by Purchaser, as applicable) hereby assumes and agrees to pay, perform or discharge when due or required to be performed, as the case may be, the Assumed Liabilities (in accordance with their respective terms and subject to the respective conditions thereof). For the avoidance of doubt, notwithstanding the foregoing, Purchaser does not assume any Liabilities of the Seller or its Debtor Affiliates and Business Affiliates other than the Assumed Liabilities, and, on the terms and subject to the conditions set forth in the APA, the Parties agree that all such Liabilities of the Seller, its Debtor Affiliates and Business Affiliates, other than the Assumed Liabilities, will remain the sole responsibility of the Seller, its Debtor Affiliates or Business Affiliates, as applicable.

3.      Terms of the APA. This Agreement in no way modifies, replaces, supersedes, defeats, limits, expands, diminishes or otherwise alters any right, obligation, claim or remedy under the APA, including any rights any party may have under the representations, warranties, covenants, agreements and indemnities set forth in the APA. This Agreement is expressly made subject to the terms and provisions of the APA and shall be construed consistently therewith, and the APA shall remain in full force and effect on its terms, separate and apart from this Agreement. Notwithstanding any other provision in this Agreement to the contrary, in the event and to the extent that there shall be a conflict, ambiguity or inconsistency between the provisions of this Agreement and the provisions of the APA, the provisions of the APA shall control.

4.      Miscellaneous.

(a)      Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement, the negotiation, execution or performance of this Agreement and any disputes arising under or related hereto (whether for breach of contract, tortious conduct or otherwise) shall be governed by and construed in accordance with the Laws of the State of New York, without reference to its conflicts of law principles.

(b)      EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT TO ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, THE APA OR ANY OTHER ANCILLARY AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY OR DISPUTES RELATING HERETO OR THERETO. EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 4(B).

5.        Each of Section 5.12 (*Further Action; Wrong Pockets*), Section 12.01 (*Assignment*), Section 12.02 (*No Third-Party Beneficiaries*), Section 12.03 (*Expenses*), Section 12.04 (*Notices*), Section 12.05 (*Interpretation; Certain Definitions*), Section 12.06 (*Counterparts*), Section 12.08 (*Severability*), Section 12.10 (*Jurisdiction*), Section 12.13 (*Amendments and Waivers*), Section 12.15 (*Joint Drafting*) and Section 12.17 (*Non-Recourse*) of the APA are hereby incorporated by reference into this Agreement, the terms of which shall apply to this Agreement, *mutatis mutandis* as though set forth herein.

6.        The Parties shall (a) execute and deliver, or cause to be executed and delivered, such documents and other instruments and (b) take, or cause to be taken, all such further actions as may be reasonably required to carry out the provisions of this Agreement and give effect to the transactions in accordance with the terms of this Agreement.

7.        This Agreement, the APA and the Exhibits and Disclosure Schedule annexed thereto, the Confidentiality Agreement and the other Ancillary Agreements, and the other agreements, certificates, and other documents contemplated hereby and thereby constitute the entire understanding between the Parties with respect to the subject matter hereof and thereof, and supersede all other understandings and negotiations with respect thereto. The Parties agree to define their rights, liabilities and obligations with respect to such understanding and the transactions contemplated hereby and thereby exclusively in contract pursuant to the express terms and provisions of the APA, and the Parties expressly disclaim that they are owed any duties or are entitled to any remedies not expressly set forth in the APA, this Agreement or any other Ancillary Agreement.

*[Remainder of this page is intentionally left blank]*

IN WITNESS WHEREOF, the Parties have caused this Bill of Sale, Assignment and Assumption Agreement to be executed and delivered as of the date first above written.

**SELLER:**

**ANTHOLOGY INC.**, a Florida corporation

By: _____
Name:
Title:

[Signature Page to Bill of Sale, Assignment and Assumption Agreement]

**DEBTOR AFFILIATES:**

**BLACKBOARD LLC**

By: _____
        Name:
        Title:

**ANTHOLOGY INC. OF MISSOURI**

By: _____
        Name:
        Title:

**ANTHOLOGY INC. OF NY**

By: _____
        Name:
        Title:

**AY SOFTWARE SERVICES, INC.**

By: _____
        Name:
        Title:

**BLACKBOARD TENNESSEE LLC**

By: _____
        Name:
        Title:

**ADMISSIONS US, LLC**

By: _____
        Name:
        Title:

[Signature Page to Bill of Sale, Assignment and Assumption Agreement]

**BB ACQUISITION CORP.**


By: _____
       Name:
       Title:

**CAMPUS MANAGEMENT ACQUISITION CORP.**


By: _____
       Name:
       Title:

**ACADEMIC MANAGEMENT SYSTEMS, LLC**


By: _____
       Name:
       Title:

**BB MANAGEMENT LLC**


By: _____
       Name:
       Title:

**EDCENTRIC HOLDINGS, LLC**


By: _____
       Name:
       Title:


**BLACKBOARD CAMPUSWIDE OF TEXAS, INC.**


By: _____
       Name:
       Title:

[Signature Page to Bill of Sale, Assignment and Assumption Agreement]

**EDCENTRIC, INC**

By: _____
　　　Name:
　　　Title:

**ASTRA ACQUISITION CORP.**

By: _____
　　　Name:
　　　Title:

**BLACKBOARD COLLABORATE INC.**

By: _____
　　　Name:
　　　Title:

**EDCENTRIC MIDCO, INC.**

By: _____
　　　Name:
　　　Title:

**BLACKBOARD HOLDINGS, LLC**

By: _____
　　　Name:
　　　Title:

**HIGHER ONE REAL ESTATE SP, LLC**

By: _____
　　　Name:
　　　Title:

[Signature Page to Bill of Sale, Assignment and Assumption Agreement]

**BLACKBOARD INTERNATIONAL LLC**

By: _____
     Name:
     Title:

**MYEDU CORPORATION**

By: _____
     Name:
     Title:

**APPLYYOURSELF, INC.**

By: _____
     Name:
     Title:

**BLACKBOARD STUDENT SERVICES INC.**

By: _____
     Name:
     Title:

**ORGSYNC, INC.**

By: _____
     Name:
     Title:

**ASTRA INTERMEDIATE HOLDING CORP.**

By: _____
     Name:
     Title:

[Signature Page to Bill of Sale, Assignment and Assumption Agreement]

**BLACKBOARD SUPER HOLDCO, LLC**

By: _____
      Name:
      Title:

**PERCEPTIS, LLC**

By: _____
      Name:
      Title:

[Signature Page to Bill of Sale, Assignment and Assumption Agreement]

IN WITNESS WHEREOF, the Parties have caused this Bill of Sale, Assignment and Assumption Agreement to be executed and delivered as of the date first above written.

<strong><u>PURCHASER:</u></strong>

**ELLUCIAN COMPANY, LLC**, a Delaware limited liability company

By: _____

Name:

Title:

[Signature Page to Bill of Sale, Assignment and Assumption Agreement]

**Exhibit B**
**Form of Intellectual Property Assignment**

*[Attached]*

## INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT

This INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT (this "**Assignment**") is made and entered into as of September 29 (the "**Effective Date**") by and between Anthology Inc., a Florida corporation, and each Debtor Affiliate (each an "**Assignor**" and together, the "**Assignors**") and Ellucian Company, LLC, a Delaware limited liability company ("**Assignee**").  Each of the Assignors and Assignee are individually referred to herein as a "**Party**," and collectively as the "**Parties**." Unless otherwise defined herein, all capitalized terms used in this Assignment shall have the meanings set forth in the APA (as defined below).

**WHEREAS**, reference is made to that certain Asset Purchase Agreement, dated as of September 29, 2025 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**APA**"), by and among Purchaser and Seller, pursuant to which Seller and/or its Affiliates, as applicable, have agreed to sell, transfer, assign, convey and deliver to Purchaser (or any Affiliate designated by Purchaser, as applicable), and Purchaser (or any Affiliate designated by Purchaser, as applicable) has agreed to purchase, acquire and accept from Seller and/or its Affiliates, as applicable, free and clear of all Liens (other than Permitted Liens) all of Seller's and/or its Affiliates' direct or indirect right, title and interest in, to and under the Transferred Assets, including the Transferred Intellectual Property as set forth in Schedule A;

**NOW THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.      Assignment.  Each Assignor hereby irrevocably, absolutely and unconditionally assigns, transfers, conveys and delivers to the Assignee all of Assignor's rights, title and interests of every kind, nature and description in, to and under the Transferred Intellectual Property (in all forms and media, whether tangible or intangible, including any digital or cloud-stored embodiments thereof). The assignment of the rights, title or interests in the Transferred Intellectual Property pursuant to this Section 1 shall include (a) the assignment of all of each such Assignor's rights, title and interests in the Transferred Intellectual Property, including any and all goodwill associated or connected with the Transferred Intellectual Property or symbolized thereby, (b) the rights, as applicable: (i) to sue and recover damages and obtain equitable or other relief for any past, present or future infringement, dilution, misappropriation or other violation or conflict associated with such Transferred Intellectual Property, (ii) to collect future royalties, damages, proceeds and other payments under such Transferred Intellectual Property, (iii) to claim priority based on such Transferred Intellectual Property under the laws of any jurisdiction and/or under international conventions or treaties, and (iv) to prosecute, register, maintain and defend such Transferred Intellectual Property before any public or private agency, office or registrar.

2.      Recordation and Authorization. Each Assignor hereby authorizes Assignee to record this Assignment with any relevant Governmental Entity so as to perfect its ownership of the registrations and registration applications included in the Transferred Intellectual Property. Each Assignor hereby authorizes and requests the United States Commissioner of Patents and Trademarks, empowered officials of the United States Copyright Office and the domain name registrar, and officials of corresponding entities or agencies in any applicable jurisdictions, and any other relevant authority, to transfer all registrations and registration applications included in

1

the Transferred Intellectual Property to Assignee as assignee of Assignor's right, title and interest therein, in accordance with this Assignment, and to issue to Assignee all Intellectual Property and all registrations thereof which may issue with respect to any applications included in such Transferred Intellectual Property.

3.       Delivery. Pursuant to the requirements of the APA, the Local Transfer Agreements, or as otherwise agreed by the Parties in accordance with the Migration Plan or the Separation Plan, on the Effective Date, each applicable Assignor shall deliver (or cause to be delivered) to Assignee (a) all tangible embodiments of the Transferred Intellectual Property (excluding source code) that are not already in the possession of Assignee; and (b) the source code comprising part of the Transferred Intellectual Property, which the Parties acknowledge and agree is not maintained by Assignor in any tangible format and constitutes an intangible digital asset stored in Assignor's cloud environment ("**Digital Source Code**"). The Digital Source Code (together with associated electronic documentation) shall be transferred to Assignee by digital compressed folder transfer to the repository or environment agreed upon by the Parties in good faith in connection with the Separation Plan or the Migration Plan. For purposes of performance and delivery under this Assignment, the digital compressed folder transfer shall be deemed to occur, and delivery of the Digital Source Code shall be deemed made, at Assignee's headquarters located in the Commonwealth of Virginia, upon Assignee's receipt of access credentials and the successful completion of the digital compressed folder transfer. Nothing in this Section 3 requires Assignor to produce or deliver the Digital Source Code on any physical media or other tangible embodiment.

4.       Entire Agreement.  This Assignment, the APA and the Exhibits and Disclosure Schedule annexed thereto, the Confidentiality Agreement and the other Ancillary Agreements, and the other agreements, certificates, and other documents contemplated hereby and thereby constitute the entire understanding between the Parties with respect to the subject matter hereof and thereof, and supersede all other understandings and negotiations with respect thereto.

5.       Other Miscellaneous Provisions.  Each of Section 12.01 (Assignment), Section 12.02 (No Third-Party Beneficiaries), Section 12.04 (Notices), Section 12.05 (Interpretation; Certain Definitions), Section 12.06 (Counterparts), Section 12.08 (Severability), Section 12.09 (Governing Law), Section 12.10 (Jurisdiction), and Section 12.13 (Amendments and Waivers) of the APA are hereby incorporated by reference into this Agreement, the terms of which shall apply to this Agreement, *mutatis mutandis* as though set forth herein.

*Remainder of page intentionally left blank.*

2

IN WITNESS WHEREOF, the Parties have caused this Assignment to be executed by their duly authorized representatives as of the Effective Date.

ASSIGNOR:          [●][1]

          By:   _____

              Name:

              Title:

---

[1] **Note to Draft**: Signature page for each assignor to be provided at closing.

3

IN WITNESS WHEREOF, the Parties have caused this Assignment to be executed by their duly authorized representatives as of the Effective Date.


ASSIGNEE:                    [•]

                             By:    _____

                                    Name:

                                    Title:

4

Schedule A

(see attached)

**Exhibit C**
**Transition Services Agreement Term Sheet**

*[Attached]*

Exhibit C – Transition Services Agreement Term Sheet

**Exhibit D**
**Form of Employee Leasing Agreement**

*[Attached]*

# EMPLOYEE TRANSITIONAL SERVICES AGREEMENT[1]

THIS EMPLOYEE TRANSITIONAL SERVICES AGREEMENT (this "Agreement"), dated as of [●] [●], 2025, is by and between Anthology Inc., a Florida corporation, for itself and its Subsidiaries ("Provider"), and Ellucian Company, LLC, a Delaware limited liability company, for itself and its Subsidiaries ("Recipient"). Capitalized terms used in this Agreement shall have the respective meanings ascribed to them in the Purchase Agreement (as hereinafter defined).

## R E C I T A L S:

WHEREAS, in connection with the transactions contemplated by that certain Asset Purchase Agreement, dated as of [●], 2025 (as amended, restated, waived, supplemented or otherwise modified from time to time, the "Purchase Agreement"), by and among the parties hereto, during the term of this Agreement, Recipient desires to avail itself of the services of the employees of Provider listed from time to time on Schedule A hereto, as the same may be amended or supplemented from time to time (i) by Provider with the consent of Recipient, such consent not to be unreasonably withheld or (ii) to reflect hires and terminations (in accordance with the terms hereof) (the "Employees" and each, an "Employee"), and Provider desires to make such Employees available to Recipient, upon the terms and subject to the conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants and agreements hereinafter contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, each intending to be legally bound, hereby agree as follows:

## 1. SERVICES TO BE PROVIDED.

(a)     Subject to and in accordance with the terms of this Agreement, Provider agrees to provide Recipient with, and Recipient agrees that in conducting its business it will utilize, the services of the Employees (the "Services") during the Employee Transition Period. In providing the Services, the Employees shall have the same duties and functions, and will provide the same services, as the Employees had and as the Employees provided to Provider or any of its Affiliates prior to the Closing Date; *provided*, *however*, that the Employees will not provide any services in respect of the Excluded Assets. Except as otherwise directed by Recipient, subject to the requirements set forth in Section 7.01 of the Purchase Agreement, the Services shall be rendered at the same place where the Services were provided immediately prior to the Closing Date; *provided, however*, that it is understood and agreed that: (i) Employees who work from their home shall continue to do so and it will not be a violation of this Agreement if any Employee's home location changes during the Employee Transition Period, subject to the Provider using commercially reasonable efforts to ensure that such changes do not result in any disruption to the Services; and (ii) Recipient not bearing any costs, expenses or liabilities arising out of or in connection with any change in an Employee's home location, all of which shall remain the sole

---

[1]     **Note to Draft**: Agreement to cover US, India and Canada employees. Colombia employee services to be addressed in a separate governing document to be negotiated between signing and closing, but will contain substantively the same terms. Subject to review/confirmation with applicable local counsel.

responsibility of the Provider unless any such change is at Recipient's direction, instruction or request, in which case Recipient will bear any costs, expenses, or liabilities arising out of or in connection with any such change. For purposes of this Agreement, "Employee Transition Period" means the period commencing on the Closing Date and ending on (i) with respect to Employees located in India, April 1, 2026 and (ii) with respect to all other Employees, February 1, 2026 (or such earlier date in accordance with Section 5(a) of this Agreement).

(b)     During the Employee Transition Period, each Employee shall in all respects continue as an employee of Provider while rendering the Services for Recipient under the terms of this Agreement.  In connection with an Employee's employment by Provider, and subject to Section 2 and Section 6, below, Provider shall be responsible for all matters relating to the Employee's employment by Provider, including, but not limited to, compliance with all applicable Laws, the payment of the Employee's compensation and withholding the appropriate income and employment taxes and national insurance, social security and other contributions, statutory payments (including any social security contributions as may be applicable), the payment of all federal, state, provincial and local employment taxes and national insurance, social security and other contributions, providing workers' compensation and other mandatory insurance coverage for the Employees, the payment of any obligations in respect of any Provider benefit plans in which the Employees are eligible or legally entitled to participate, and the payment of any obligations in respect of any employment agreement between Provider and any Employee (collectively, the "Employment Obligations").  This Agreement is not intended to be construed as creating an employer/employee relationship between Recipient and the Employees, or a joint employer or co-employer relationship between Recipient and Provider relating to the Employees.  Recipient shall have the authority to designate all tasks to be performed and shall have the authority to instruct and oversee Employees in the manner, means and method of accomplishing all tasks and Recipient shall use commercially reasonable efforts to cause all of Recipient's employees, agents, service providers and other personnel who designate, instruct, oversee or otherwise interact with the Employees to comply with all applicable Laws in connection with such directions, instructions, oversight, interactions or other dealings with respect to the Employees. However, Provider shall continue to deal with any management issues requiring action, investigation and/or decisions by the Provider concerning the Employees, where relevant following consultation with the Recipient, including in particular (by way of illustration only and without limitation) periods of vacation, sick leave or other leave (such as family-related leave), any complaint about the Employee and any complaint or grievance raised by the Employee and the foregoing shall be included in the definition of "Employment Obligations."

(c)     Recipient acknowledges that if any Employee at any time leaves the employ of Provider or refuses to provide services to Recipient or such Employee's employment is otherwise terminated in accordance with Section 3, Provider shall not be under any further obligation to provide the Services of such Employee under this Agreement and Recipient shall be under no obligation to utilize the Services of such Employees; *provided*, that in such event, Provider will use its commercially reasonable efforts to onboard a replacement for such Employee found and identified for employment by Recipient.

(d)     During the Employee Transition Period, Recipient shall have day-to-day direction with regard to the Services; *provided*, *however*, that the Employees shall be subject to Provider's policies and other procedures in effect from time to time with respect to its employees,

2

including, without limitation, those relating to the workplace, harassment, discrimination, human rights, and other conditions of employment.

(e)     Provider shall act under this Agreement solely as an independent contractor and not as an agent of Recipient.  This Agreement is by and between independent business entities. Provider and Recipient acknowledge and agree that in performing the Services contemplated by this Section 1, the Employees are not and shall not be deemed to be employees of Recipient for any purpose.

## 2.     FEES AND EXPENSES FOR SERVICES TO BE PROVIDED.

(a)     For the Services rendered by the Employees in accordance with this Agreement, during the term of this Agreement, Recipient (or its applicable Subsidiary) shall reimburse Provider (or its applicable Subsidiary) in respect of the total fully-burdened employee wage rate or base salary which includes commissions, shift and pay premiums, overtime pay, bonuses, payroll taxes, annual bonus, savings and retirement benefits, long-term incentives, the premiums for the insurances referred to in clause 4 below, claims costs for self-insured benefits, medical, dental and vision coverage, holiday, vacation and sick pay, life and disability benefits (including workers compensation), other customary allowances, severance or other termination payments (if applicable and to the extent payments arise as a result of a termination that complies with Section 3 of this Agreement) and any other compensation paid, or other benefits provided, by Provider to Employees  (collectively, "Compensation") as well as for all reasonable documented, and determined in good faith by Provider to be necessary, costs, expenses, liabilities and obligations incurred by Provider with respect to all other Employment Obligations or otherwise relating to the Employees that arise during the Employee Transition Period, including without limitation and without duplication of items addressed through the [Transition Services Agreement], all costs relating to Human Resources administration for the Employees  (such costs, the "Other Employee Costs"). Provider shall provide to the Recipient reasonable supporting documentation evidencing such Other Employee Costs. In addition, the Recipient shall pay the Provider the applicable goods and services tax that may be levied on the Compensation and Other Employee Costs.

(b)     Provider agrees, that during the Employee Transition Period, without the prior written consent of Recipient, it will not: (i) increase the compensation or benefits payable to any Employee beyond the compensation or benefits payable immediately prior to the Closing; *provided*, *however*, that, upon written notice to Recipient, Provider shall be permitted to increase such compensation without the consent of Recipient to the extent required by applicable federal, state, provincial or local Law, (ii) relocate or reassign any Employee to new duties, or (iii) make any increase in the number of Employees.

(c)     Provider agrees that during the Employee Transition Period, without the prior written consent of Recipient, it will not introduce, enter into, adopt, or execute any new employment benefits, retention, severance, or golden parachute agreements (whether individual or collective in nature), nor introduce any new benefit plans, programs, or arrangements with respect to any Employee beyond those that existed immediately prior to the Closing.

3

(d)     Provider (or its applicable Subsidiary) shall provide Recipient (or its applicable Subsidiary) with written notice of the amounts to be paid to Provider (or its applicable Subsidiary) under this <u>Section 2</u> (i) to the extent administratively feasible, at least 10 business days prior to the date that known Compensation amounts are due to be paid to the Employees (or its applicable Subsidiary) with respect to known Compensation and (ii) within 20 business days following the end of each month (or partial month, as applicable) of the Employee Transition Period with respect to the Other Employee Costs.  To the extent Compensation amounts accrue or come owing such that it is not administratively feasible for Provider to provide 10 business days' notice to Recipient before such amounts are due, Provider shall use commercially reasonable efforts to provide Recipient with prompt written notice of such Compensation amounts, it being understood and agreed that Recipient shall be responsible for paying or reimbursing Provider (as applicable) for all such Compensation amounts. The amounts required to be paid or reimbursed (as applicable) by Recipient (or its applicable Subsidiary) to Provider (or its applicable Subsidiary) shall, in each case, be paid by Recipient (or its applicable Subsidiary) via wire transfer of immediately available funds to an account designated by Provider (or its applicable Subsidiary) on or prior to the due date Provider specifies in the applicable written notice from Provider (or its applicable Subsidiary), it being acknowledged and agreed that Recipient shall be solely responsible for all liabilities relating to any delay by Recipient to timely pay the Compensation amounts in accordance with this <u>Section 2(d).</u>

**3.      TERMINATION OF EMPLOYEES.**

During the Employee Transition Period, Provider shall not terminate any Employees (other than for cause) without the express written consent of Recipient.  For the avoidance of doubt, Recipient acknowledges and agrees that nothing herein shall be interpreted as a commitment by Provider to retain any Employee who has voluntarily resigned from employment.

**4.      INSURANCE WITH RESPECT TO EMPLOYEES.**

During the Employee Transition Period, and subject to <u>Section 2</u>, above, and <u>Section 6</u>, below, Provider shall maintain with respect to the Employees all insurance coverages required to be maintained for employees, including without limitation, worker's compensation insurance, employers' liability insurance, COBRA coverage, disability insurance and unemployment insurance, to the extent required under applicable local, state, provincial and federal laws in the jurisdictions in which the Employees are employed and the foregoing shall be included in the definition of "Employment Obligations" and, for the avoidance of doubt, the costs and expenses related to the provision of such insurance coverages will be included in "Other Employee Costs."

**5.      TERM.**

(a)     This Agreement shall be effective as of the Closing Date and shall continue and remain in force and effect until the end of the Employee Transition Period; *provided*, *however*, that this Agreement may be sooner terminated by mutual agreement of the parties hereto. Notwithstanding any other provision in this Agreement to the contrary, whether any Services under this Agreement are terminated by Provider or Recipient, or any particular Service provided

by the Employees is terminated by Recipient, upon termination of this Agreement, Recipient will remain liable for the payment of Compensation and Other Employee Costs accruing for the period prior to termination during the Employee Transition Period even though such amounts may not become due until after termination; provided however, that Recipient shall have no liability for the payment of any Compensation and Other Employee Costs to the extent arising out of the Provider's gross negligence, willful misconduct or willful and unlawful acts and the Provider shall be required to indemnify the Recipient for any such payments.

(b)     The obligation of parties hereto under this Agreement shall survive the expiration, or earlier termination, of this Agreement, to the extent necessary to give full effect thereto.

**6.     INDEMNIFICATION.**

Recipient assumes the risk of all damage, loss, cost and expense associated in any way with the employment of, or rendering of services by, the Employees during the Employee Transition Period. Recipient shall indemnify, defend and hold harmless Provider and its Affiliates, and their respective agents, employees, directors, officers, attorneys, representatives, successors and assigns, from and against any and all liabilities, damages, costs, Compensation, Other Employee Costs, losses, expenses, fines, penalties and attorneys' fees of any kind (collectively referred to as "Losses") that may accrue to or be sustained by Provider or such other persons on account of any claim, demand, charge, suit, action, investigation or proceeding made or brought against Provider or such other persons by any person or entity related to or arising from any matter relating to the employment of the Employees by Provider during the Employee Transition Period or relating to the arrangements provided under this Agreement; *provided* that Recipient shall not be required to indemnify Provider, and the Provider shall be required to indemnify the Recipient, for any (i) Losses that were caused by the willful and unlawful acts of Provider (other than solely by virtue of the fact of entering into this Agreement) and (ii) Losses relating to the employment of the Employees prior to the Closing. The foregoing indemnification obligations survive the termination of this Agreement.

**7.     MISCELLANEOUS.**

(a)     <u>Governing Law</u>. This Agreement will be governed by and construed and interpreted in accordance with the substantive Laws of the State of New York, without giving effect to any conflicts of Law, rule or principle that might require the application of the Laws of another jurisdiction.

(b)     <u>Paragraph and Section Headings</u>.  The headings of the sections and subsections of this Agreement are inserted for convenience only and shall not be deemed to constitute a part thereof, affect the meaning or interpretation of this Agreement or of any term or provision hereof.

(c)     <u>Local Deployment</u>. Anthology Inc. shall, and shall cause Anthology International Private Limited ("<u>Anthology India</u>"), and Ellucian Company LLC shall, and shall cause Ellucian Higher Education Systems India Private Limited ("<u>Ellucian India</u>"), to enter into an agreement in such manner and form as may be mutually agreed between the Provider and the

Recipient, pursuant to which the Employees of Anthology India shall render Services to Ellucian India for the duration of the Employee Transition Period. Both Anthology India and Ellucian India shall ensure compliance with all applicable Laws in India in relation to such arrangement. This arrangement may, with such modifications as may be necessary to reflect local legal and regulatory requirements, be adopted and implemented by any Subsidiary of the respective parties in their relevant jurisdictions.

(d)     Notices.  All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be given (and shall be deemed to have been duly given upon receipt) by delivery in person, by cable, telegram, facsimile or telex, or by registered or certified mail (postage prepaid, return receipt requested) to the relevant party hereto as follows:

To Provider:

Anthology, Inc.
5201 Congress Avenue
Boca Raton, FL 33487
Attention:     Michael Pohorylo, Chief Legal
               Officer, General Counsel & Secretary
               Heath C. Gray, Chief Restructuring
               Officer
Email:         michael.pohorylo@anthology.com;
               heath.gray@fticonsulting.com

with copies to (which shall not constitute notice):

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Attention:     Peter Martelli, P.C.; Dave Gusella, P.C.; Dan Li
Email:         peter.martelli@kirkland.com;  dave.gusella@kirkland.com;
dan.li@kirkland.com

To Recipient:

Ellucian Company LLC
2003 Edmund Halley Drive
Reston, VA 20191
2003 Edmund Halley Drive
Attention:     Chief Legal Officer
Email:         ask.legal@ellucian.com

6

with copies to (which shall not constitute notice):

Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
Attention:     William J. Allen; David Zylberberg; Elisha D. Graff
Email:     william.allen@stblaw.com; david.zylberberg@stblaw.com; egraff@stblaw.com

or to such other address(es) as the party hereto to whom notice is given may have previously furnished to the other in writing in the manner set forth above.

(e)     <u>Successors and Assigns</u>.  Except as otherwise provided in this Agreement, no party hereto shall assign this Agreement or any rights or obligations hereunder without the prior written consent of the other party hereto and any such attempted assignment without such prior written consent shall be void and of no force and effect; *provided*, *however*, that the Recipient may assign its rights hereunder to an Affiliate; *provided*, *further*, that no such assignment shall reduce or otherwise vitiate any of the obligations of the Recipient or the Provider hereunder.  This Agreement shall inure to the benefit of and shall be binding upon the successors and permitted assigns of the parties hereto.

(f)     <u>Entire Agreement; Amendment and Waiver</u>.  This Agreement and the Purchase Agreement (including, without limitation, Section 2.03(b) thereof and the ancillary documents attached thereto) constitute the entire understanding of the parties hereto with respect to the provision of the Services and supersede all prior agreements or understandings with respect to the subject matter hereof among such parties.  This Agreement may be amended, and the observance of any term of this Agreement may be waived, with (and only with) the written consent of Recipient and Provider.  Neither course of dealing between Recipient and Provider nor any delay in exercising any rights hereunder shall operate as a waiver of any rights of either party hereto.

(g)     <u>Severability</u>.  In the event that any one or more of the provisions or parts of a provision contained in this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or part of a provision of this Agreement or any other jurisdiction, but this Agreement shall be reformed and construed in any such jurisdiction as if such invalid or illegal or unenforceable provision or part of a provision had never been contained herein and such provision or part shall be reformed so that it would be valid, legal and enforceable to the maximum extent permitted in such jurisdiction, provided that any such reform or construction does not affect the economic or legal substance of the transactions contemplated hereby in a manner adverse to any party.

(h)     <u>No Third Party Beneficiaries</u>.  This Agreement is not intended to create any rights in favor of any person other than the parties hereto, including without limitation, the Employees.  Nothing contained herein is intended to confer upon any Employee any right to continued employment by Provider or Recipient or any of their respective subsidiaries.

7

(i)     Counterparts.    This Agreement may be executed in one or more counterparts for the convenience of the parties hereto, each of which shall be deemed an original and all of which together will constitute one and the same instrument.  Facsimile signatures shall be treated as original signatures for all purposes hereunder.

**[remainder of page intentionally left blank]**

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first set forth above.

**ANTHOLOGY INC.**

By:_____
    Name: [●]
    Title: [●]

*[Signature Page to Employee Lease Agreement]*

**ELLUCIAN COMPANY, LLC**


By:_____
    Name: [●]
    Title: [●]

*[Signature Page to Employee Lease Agreement]*

**SCHEDULE A**
**Employees**

*[See attached]*

**Exhibit 2**

**Encoura Stalking Horse Agreement**

**CONFIDENTIAL**
**EXECUTION VERSION**

ASSET PURCHASE AGREEMENT

AMONG

ANTHOLOGY INC.,

BLACKBOARD LLC,

ANTHOLOGY INC. OF MISSOURI,

ANTHOLOGY INC. OF NY,

EACH DEBTOR AFFILIATE SIGNATORY HERETO,

and

ENCOURA LE LLC

Dated as of September 29, 2025

#4922-9262-9841

TABLE OF CONTENTS

Page

ASSET PURCHASE AGREEMENT ........................................................................................ I

TABLE OF CONTENTS ......................................................................................................... II

INDEX OF DEFINED TERMS ............................................................................................ VI

ASSET PURCHASE AGREEMENT .......................................................................................1

ARTICLE I PURCHASE AND SALE .....................................................................................2

SECTION 1.01.   Purchase and Sale ..................................................................... 2
SECTION 1.02.   Transferred Assets and Excluded Assets ................................... 2
SECTION 1.03.   Consents to Certain Assignments ............................................. 5
SECTION 1.04.   Assumption of Liabilities; Retained Liabilities ......................... 6
SECTION 1.05.   Assumption and Assignment of Contracts .................................. 8
SECTION 1.06.   Additional and Eliminated Transferred Contracts ..................... 9
SECTION 1.07.   Purchase Price ......................................................................... 10

ARTICLE II CLOSING ......................................................................................................... 10

SECTION 2.01.   Closing ..................................................................................... 11
SECTION 2.02.   Effectiveness ............................................................................ 11
SECTION 2.03.   Transactions To Be Effected at the Closing .............................. 11
SECTION 2.04.   Sale Free and Clear ................................................................. 12
SECTION 2.05.   Withholding ............................................................................. 12

ARTICLE III REPRESENTATIONS AND WARRANTIES OF SELLER .............................. 12

SECTION 3.01.   Organization and Standing ....................................................... 12
SECTION 3.02.   Authority; Execution and Delivery; Enforceability ................... 12
SECTION 3.03.   Non-Contravention and Approvals ............................................ 13
SECTION 3.04.   Financial Statements ................................................................ 13
SECTION 3.05.   Absence of Certain Changes ..................................................... 14
SECTION 3.06.   Title to Assets; Condition of Assets .......................................... 14
SECTION 3.07.   Real Property ........................................................................... 15
SECTION 3.08.   Intellectual Property ................................................................ 15
SECTION 3.09.   Contracts ................................................................................. 18
SECTION 3.10.   Permits .................................................................................... 20
SECTION 3.11.   Taxes ....................................................................................... 20
SECTION 3.12.   Legal Proceedings .................................................................... 21
SECTION 3.13.   Employee Benefit Plans; Labor ................................................ 21
SECTION 3.14.   Compliance with Laws ............................................................. 23
SECTION 3.15.   Sufficiency of Assets ................................................................ 23
SECTION 3.16.   Certain Business Relationships with Affiliates .......................... 24

SECTION 3.17.   No Undisclosed Liabilities ................................................. 24
SECTION 3.18.   Environmental Matters ........................................................ 24
SECTION 3.19.   Brokers and Finders ............................................................ 24
SECTION 3.20.   Insurance ............................................................................. 24
SECTION 3.21.   Customers; Vendors ........................................................... 25

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF PURCHASER ...................... 25

SECTION 4.01.   Organization ........................................................................ 25
SECTION 4.02.   Authority; Execution and Delivery; Enforceability ........... 25
SECTION 4.03.   Non-Contravention and Approvals ..................................... 26
SECTION 4.04.   Legal Proceedings .............................................................. 27
SECTION 4.05.   Availability of Funds .......................................................... 27
SECTION 4.06.   Brokers and Finders ............................................................ 28
SECTION 4.07.   Seller's Representations; Independent Investigation .......... 28

ARTICLE V COVENANTS .................................................................................... 29

SECTION 5.01.   Conduct of Business ........................................................... 29
SECTION 5.02.   Access to Information .......................................................... 30
SECTION 5.03.   Confidentiality .................................................................... 32
SECTION 5.04.   Regulatory and Other Authorizations; Notices and Consents ........... 32
SECTION 5.05.   Services from Affiliates ...................................................... 33
SECTION 5.06.   Publicity .............................................................................. 33
SECTION 5.07.   Use of Retained Names and Marks ..................................... 34
SECTION 5.08.   Seller Guarantees ................................................................ 36
SECTION 5.09.   Insurance ............................................................................. 36
SECTION 5.10.   Waiver of Conflicts ............................................................. 37
SECTION 5.11.   Further Action; Wrong Pockets .......................................... 38
SECTION 5.12.   [Reserved ............................................................................ 38
SECTION 5.13.   Accounts Payable and Payroll; Accounts Receivable ........ 38
SECTION 5.14.   Transition Services Cooperation ......................................... 39
SECTION 5.15.   Freedom to Operate License ............................................... 39
SECTION 5.16.   Delivered Source Code License .......................................... 40
SECTION 5.17.   Separation and Migration Plan ........................................... 40
SECTION 5.18.   In-Scope Foreign Asset and In-Scope Foreign Liability Definitive Documentation ................................................... 40
SECTION 5.19.   Consents; Mixed-Use Contracts. ........................................ 41
SECTION 5.20.   Access to CampusNexus, Blackboard and Anthology Domains ........ 43
SECTION 5.21.   Excess Parachute Payment .................................................. 44

ARTICLE VI BANKRUPTCY COURT MATTERS ................................................... 44

SECTION 6.01.   Bankruptcy Actions ............................................................ 44
SECTION 6.02.   Sale Order ........................................................................... 46
SECTION 6.03.   Approval .............................................................................. 47
SECTION 6.04.   Notices and Consents .......................................................... 47

iii

SECTION 6.05.   Cure Payments; Cure of Defaults ....................................................... 47

ARTICLE VII EMPLOYMENT MATTERS.......................................................................... 48

SECTION 7.01.   Employees......................................................................................... 48
SECTION 7.02.   401(k) Plan ........................................................................................ 50
SECTION 7.03.   Health and Welfare Benefit Plans..................................................... 50
SECTION 7.04.   Credit for Service with Seller ........................................................... 50
SECTION 7.05.   Commissions...................................................................................... 50
SECTION 7.06.   Workers' Compensation ..................................................................... 51
SECTION 7.07.   Matters Relating to Certain Personnel ............................................. 51
SECTION 7.08.   Administration, Employee Communications, Cooperation ............... 51
SECTION 7.09.   WARN Act........................................................................................... 51
SECTION 7.10.   ARD Employees ................................................................................. 52
SECTION 7.11.   No Third-Party Beneficiaries............................................................ 52

ARTICLE VIII CONDITIONS TO CLOSING......................................................................... 53

SECTION 8.01.   Conditions to Each Party's Obligation ............................................. 53
SECTION 8.02.   Conditions to Obligation of Purchaser.............................................. 53
SECTION 8.03.   Conditions to Obligation of Seller .................................................... 54
SECTION 8.04.   Frustration of Closing Conditions...................................................... 54

ARTICLE IX TERMINATION.............................................................................................. 54

SECTION 9.01.   Termination........................................................................................ 54
SECTION 9.02.   Effect of Termination......................................................................... 57

ARTICLE X INDEMNIFICATION; SURVIVAL .................................................................... 58

SECTION 10.01.  Indemnification by Seller.................................................................. 58
SECTION 10.02.  Indemnification by Purchaser ........................................................... 59
SECTION 10.03.  Indemnification Procedures .............................................................. 59
SECTION 10.04.  Limitations on Indemnification......................................................... 61
SECTION 10.05.  Calculation of Indemnity Payments.................................................. 61
SECTION 10.06.  Exclusivity ........................................................................................ 62
SECTION 10.07.  Tax Treatment of Indemnification .................................................... 62
SECTION 10.08.  Survival.............................................................................................. 62

ARTICLE XI TAX MATTERS............................................................................................. 63

SECTION 11.01.  Tax Covenants ................................................................................... 63

ARTICLE XII MISCELLANEOUS........................................................................................ 64

SECTION 12.01.  Assignment ........................................................................................ 64
SECTION 12.02.  No Third-Party Beneficiaries............................................................ 65
SECTION 12.03.  Expenses ............................................................................................ 65

iv

SECTION 12.04.  Notices ............................................................................................. 65
SECTION 12.05.  Interpretation; Certain Definitions.................................................. 66
SECTION 12.06.  Limitation on Damages..................................................................... 77
SECTION 12.07.  Counterparts..................................................................................... 77
SECTION 12.08.  Entire Agreement............................................................................. 77
SECTION 12.09.  Severability ...................................................................................... 78
SECTION 12.10.  Governing Law ................................................................................ 78
SECTION 12.11.  Jurisdiction...................................................................................... 78
SECTION 12.12.  Waiver of Jury Trial........................................................................ 78
SECTION 12.13.  Amendments and Waivers .............................................................. 78
SECTION 12.14.  Specific Performance ...................................................................... 79
SECTION 12.15.  Joint Drafting .................................................................................. 79
SECTION 12.16.  No Right of Set-Off ........................................................................ 79
SECTION 12.17.  Currency........................................................................................... 79

EXHIBITS

A      Form of Bill of Sale, Assignment and Assumption Agreement
B      [Reserved]
C      [Reserved]
D      Transition Services Agreement Term Sheet

INDEX OF DEFINED TERMS

| Defined Term | Page |
|---|---|
| Accounting Month End | 68 |
| Acquisition | 2 |
| affiliate | 68 |
| Agreed Portion | 61 |
| Agreement | 1 |
| AI | 68 |
| AI Input Data | 68 |
| AI Technology | 68 |
| Allocation | 64 |
| Allocation Methodology | 63 |
| Alternative Transaction | 68 |
| Ancillary Agreements | 13 |
| Anthology Domains | 44 |
| ARD | 68 |
| ARD Employee | 68 |
| ARD Transferred Employee | 53 |
| Assumed Benefit Obligations | 6 |
| Assumed Liabilities | 6 |
| Assumed Taxes | 6 |
| Attributable ARR | 43 |
| Auction | 69 |
| Avoidance Actions | 3 |
| Back-to-Back Arrangement | 42 |
| Backup Bidder | 46 |
| Bankruptcy Cases | 1 |
| Bankruptcy Code | 1 |
| Bankruptcy Court | 1 |
| Base Purchase Price | 69 |
| Bidding Procedures Order | 69 |
| Bill of Sale, Assignment and Assumption Agreement | 11 |
| Blackboard Domains | 44 |
| Breakup Fee | 58 |
| Business | 69 |
| Business Contracts | 20 |
| Business Day | 69 |
| Business Portion | 41 |
| CampusNexus Domains | 44 |
| Cash and Cash Equivalents | 69 |
| Cash Equity | 27 |
| Claim | 69 |
| Claim Notice | 61 |
| Claimed Amount | 61 |
| Closing | 11 |
| Closing Date | 11 |
| Closing Date Cure Payments | 69 |
| Code | 69 |
| Collective Bargaining Agreement | 22 |

| Defined Term | Page |
|---|---|
| Company Products | 17 |
| Company Registered IP | 16 |
| Completion Date | 69 |
| Confidentiality Agreement | 32 |
| Consent | 13 |
| Contaminants | 17 |
| Contract | 69 |
| Contract Separation | 42 |
| Contributor | 16 |
| control | 68 |
| Cure Deadline | 8 |
| Cure Payment End Date | 9 |
| Cure Payment Escrow Account | 12 |
| Cure Payment Escrow Agent | 70 |
| Cure Payment Escrow Agreement | 70 |
| Cure Payment Escrow Amount | 70 |
| Cure Payment Escrow Funds | 70 |
| Cure Payments | 70 |
| Data Protection Laws | 70 |
| Data Protection Requirements | 70 |
| Debtor Affiliates | 70 |
| Debtors | 71 |
| Delivered Source Code | 71 |
| DIP Credit Agreement | 71 |
| DIP Order | 71 |
| Directed Purchase Price | 10 |
| Disclosure Schedule | 12 |
| Earned Commissions | 51 |
| Effect | 71 |
| Effective Time | 11 |
| Electronic Delivery | 78 |
| Employee | 71 |
| Employee Benefit Plan | 21 |
| Employee Census | 49 |
| Employee Records | 71 |
| End Date | 55 |
| Enforceability Exceptions | 13 |
| Environmental Laws | 71 |
| Equity Commitment Letter | 27 |
| Equity Interest | 72 |
| Equity Investors | 27 |
| ERISA | 72 |
| ERISA Affiliate | 72 |
| Excluded Assets | 3 |
| Excluded Contracts | 72 |
| Existing Stock | 35 |
| Expense Reimbursement | 58 |
| External Events | 75 |

vi

FCPA .............................................................23
Final Order....................................................72
Financial Statements .....................................14
GAAP............................................................72
Good Faith Deposit Escrow Account...............58
Good Faith Deposit Escrow Agent .................72
Good Faith Deposit Escrow Agreement ..........72
Good Faith Deposit Escrow Amount...............72
Good Faith Deposit Escrow Funds .................72
Government Contract......................................73
Governmental Entity.......................................13
Hazardous Materials ......................................73
Identified Employees .....................................49
including .......................................................73
Income Tax ...................................................73
Indemnified Party..........................................60
Indemnifying Party ........................................60
Initial Offeree Census ...................................49
In-Scope Foreign Assets ................................73
In-Scope Foreign Liabilities ...........................73
Insurance Policies .........................................25
Intellectual Property.......................................73
IP Assignment................................................74
IT Systems ....................................................74
Judgment.......................................................13
Knowledge of Seller ......................................74
Law ..............................................................13
Liability.........................................................74
Liens.............................................................74
Local Transfer Agreement ..............................41
Losses...........................................................59
made available ..............................................74
Material Adverse Effect...................................74
Material Customer .........................................25
Material Vendor.............................................25
Migration Plan ..............................................41
Mixed-Use Contract Schedule ........................41
Mixed-Use Contracts .....................................75
Non-ARD Employee........................................75
Non-ARD Transferred Employees....................50
Open Source Software ...................................75
Other Owner Party .........................................42
Permitted Liens .............................................15
person...........................................................76
Personal Data ................................................76
Petition Date..................................................1
Pre-Closing Tax Period...................................76
Proceeding.....................................................5
Purchase Price...............................................10
Purchase Price Allocation...............................10
Purchaser.......................................................1

Purchaser Group ............................................37
Purchaser Health Plans ..................................51
Purchaser Indemnitees...................................59
Purchaser Material Adverse Effect..................27
Purchaser Subsidiary .....................................26
Real Property Agreements...............................15
Related to the Business...................................76
Remaining Cure Payment Escrow Funds ........76
Remaining Good Faith Deposit Escrow Funds 76
Remaining Term.............................................43
Representatives...............................................76
Required Domains ..........................................44
Response........................................................61
Retained Intellectual Property ........................76
Retained Liabilities.........................................6
Retained Names and Marks............................34
Sale Hearing .................................................76
Sale Order.....................................................77
Securities Act.................................................77
Security Incident............................................77
Seller.............................................................1
Seller Credit Support Obligations....................36
Seller Group...................................................37
Seller Indemnitees .........................................59
Separation Plan .............................................41
Software.........................................................77
Specified Employees ......................................52
Specified Representations................................77
Straddle Period ..............................................65
Stranded Mixed-Use Contract .........................42
subsidiary......................................................77
Successful Bidder ..........................................46
Tax................................................................77
Tax Return .....................................................77
Taxes.............................................................77
Taxing Authority ............................................77
Third Party Claim ..........................................60
Transfer Taxes ...............................................77
Transferred Assets ..........................................2
Transferred Contracts .....................................78
Transferred Employees....................................78
Transferred Intellectual Property.....................78
Transferred Mixed-Use Contract.....................42
Transition Services Agreement........................78
Transitional Period ........................................44
TSA Term Sheet..............................................78
Union............................................................22
US Qualifying Offer .......................................49
VDR...............................................................78
WARN Act .....................................................52

ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT is dated as of September 29, 2025 (this "**Agreement**"), and is by and among (a) each of ANTHOLOGY INC., a Florida corporation, Blackboard LLC, a Delaware limited liability company, Anthology Inc. of Missouri, a Delaware corporation, and Anthology Inc. of NY, a Delaware corporation, each as in existence on the date hereof, or in its capacity as debtor-in-possession, reorganized debtor, as applicable, or any successor, assign, representative, or designee with respect to all or substantially all of the Seller's estates, including any trustee assigned in any chapter 11 cases or appointed in connection with a conversion to chapter 7, or any plan administrator or liquidating trustee under a confirmed chapter 11 plan (collectively, and individually as the context requires, "**Seller**"), (b) each Debtor Affiliate signatory hereto and (c) ENCOURA LE LLC, a Delaware limited liability company ("**Purchaser**").

WHEREAS, Seller owns, directly or indirectly, all of the Transferred Assets;

WHEREAS, on September 29, 2025 (the "**Petition Date**"), Seller, together with Seller's subsidiaries and certain of Seller's affiliates, commenced voluntary cases under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**"), which cases are jointly administered for procedural purposes under Case No. _____ (collectively, the "**Bankruptcy Cases**");

WHEREAS, on the terms and subject to the conditions set forth herein, Seller desires to sell, transfer, assign and deliver to Purchaser all of Seller's right, title and interest in, to and under the Transferred Assets and assign to Purchaser the Assumed Liabilities, in each case in a sale authorized by the Bankruptcy Court pursuant to, inter alia, sections 105, 363 and 365 of the Bankruptcy Code, subject to the entry and terms of the Sale Order;

WHEREAS, on the terms and subject to the conditions set forth herein, Purchaser desires to purchase, acquire, assume and accept from Seller all of Seller's right, title and interest in, to and under the Transferred Assets and assume the Assumed Liabilities, in each case in a sale authorized by the Bankruptcy Court pursuant to, inter alia, sections 105, 363 and 365 of the Bankruptcy Code, subject to the entry and terms of the Sale Order;

WHEREAS, concurrently with the execution and delivery of this Agreement, and as a condition and inducement to the willingness of Seller to enter into this Agreement, Purchaser has entered into the Equity Commitment Letter;

WHEREAS, Purchaser acknowledges that the Business is currently managed across multiple business units and functional organizations within Seller and relies upon resources and assets of Seller and certain of its subsidiaries that will not be transferred in connection with this Agreement; and

WHEREAS, the parties hereto desire to consummate the proposed transactions set forth in this Agreement as promptly as practicable after the Bankruptcy Court enters the Sale Order.

1

NOW, THEREFORE, in consideration of the premises and the mutual agreements and covenants set forth in this Agreement and intending to be legally bound, the parties hereby agree as follows.

ARTICLE I

PURCHASE AND SALE

SECTION 1.01.        Purchase and Sale. Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, upon the terms and subject to the conditions of this Agreement, at the Closing and effective as of the Closing, Seller shall, and shall cause Astra Intermediate Holding Corp. and its subsidiaries (including Seller and its subsidiaries to), sell, transfer, assign and deliver to Purchaser, and Purchaser shall purchase, acquire, assume and accept from Seller (or any Debtor Affiliate designated by Seller, as applicable), all of Seller's right, title and interest in, to and under the Transferred Assets. The purchase and sale of the Transferred Assets and the assumption of the Assumed Liabilities are collectively referred to in this Agreement as the "**Acquisition**".

SECTION 1.02.        Transferred Assets and Excluded Assets.

(a)        The term "**Transferred Assets**" means all of Astra Intermediate Holding Corp.'s and its subsidiaries' (including Seller's and its subsidiaries') respective right, title and interest in, to and under the following assets as of the Closing:

(i)        subject to Section 2.03, the Transferred Contracts;

(ii)        subject to Section 2.03, the Transferred Intellectual Property, together with (A) the right to sue and recover damages and payments for present and future infringement, misappropriation, violation or conflict of or any of the foregoing and all rights to protection of interests therein, (B) all income, royalties and payments receivable with respect to any of the foregoing, (C) all Proceedings, claims and rights of recovery with respect to any of the foregoing, (D) any and all corresponding rights throughout the world with respect any of the foregoing and (E) all tangible embodiments of any of the foregoing, including Software (including source code contained in source code repositories such as GitHub and Software-related information and work flows contained in tools and software development environments such GitHub, Atlassian Jira Products and Azure DevOps, to the extent applicable), works of authorship, educational content, textbooks, teaching and learning materials, translations, marketing and advertising materials, training materials, documentation, websites, website content and technology;

(iii)        lists of, and currently available contact information for, current and prospective customers, vendors and suppliers, in each case Related to the Business;

(iv)        sales, marketing and promotional information, literature and manuals, in each case Related to the Business;

(v)        all books, records, customer and other reports, Tax Returns (not including, for the avoidance of doubt, any affiliated, combined or consolidated Tax Returns of Seller or its affiliates), files and papers, correspondence and other documents, invoices, whether in hard copy or computer or other electronic format, including manuals and data, in each case that are Related

2

to the Business, including information security and related certification information Related to the Business such as, to the extent applicable, security submission material for SOC 2, TX-RAMP, and State RAMP activity addressing controls and applications, in each case other than (A) any books, records or other materials originals of which Seller is required by Law to retain (in which case copies of which, to the extent permitted by Law, will be made available to Purchaser at Purchaser's reasonable request) and (B) personnel, medical and employment records for employees and former employees of the Business (other than any employment records required by applicable Law to transfer);

(vi)     all billed and unbilled accounts receivable, notes receivable and similar rights to receive payment or rebates existing as of immediately prior to the Closing and arising out of the operation of the Business (to be determined using the same allocation methodologies as applied in the A/R Report);

(vii)    all goodwill generated by or associated with the Business or the other Transferred Assets;

(viii)   all inventory Related to the Business;

(ix)     credits, deferred charges, advance payments, refunds, security deposits and prepaid expenses Related to the Business;

(x)      any assets in respect of any Assumed Benefit Obligations;

(xi)     all avoidance Claims or causes of action arising under sections 544, 547, 548, 549 and 550 of the Bankruptcy Code and any similar state Law (the "**Avoidance Actions**"), and all other Claims, causes of action, lawsuits, judgements, privileges, counterclaims, defenses, rights of recovery, rights of set-off, rights of subrogation and all other rights of any kind under any other provision of the Bankruptcy Code or applicable Laws, including all actions relating to vendors and service providers used in the Business; provided, that, to the extent any Avoidance Actions are prosecuted between the execution of this Agreement and the Closing, any proceeds of such Avoidance Actions shall also be a Transferred Asset. Seller shall retain the right to assert setoff rights that arise from Avoidance Actions in relation to any Liability that is not an Assumed Liability; and

(xii)    subject to Section 2.03, the assets set forth on Section 1.02(a)(xii) of the Disclosure Schedule.

(b)      The term "**Excluded Assets**" means any right, title and interest in, to or under any assets of Astra Intermediate Holding Corp. and its subsidiaries (including Seller and its subsidiaries) (including those that are Related to the Business) wherever located, whether tangible or intangible, real, personal or mixed, not included in the Transferred Assets (as further provided in Section 1.02(c)) as of the Closing, including for the avoidance of doubt:

(i)      all Cash and Cash Equivalents, if any;

3

(ii)     all Employee Benefit Plans and any assets in respect of any such Employee Benefit Plan, except for those assets which are being transferred to Purchaser pursuant to Section 1.02(a)(x) in connection with any Assumed Benefit Obligations;

(iii)    all personnel, employment and medical records, including the Employee Records;

(iv)    all Excluded Contracts;

(v)     all right, title and interest in, to and under the Retained Intellectual Property;

(vi)    all causes of action, lawsuits, judgments, Claims, rights of recovery, right of setoff or reimbursement, defenses and demands of any nature available to or being pursued by Seller or any of its affiliates, whether arising by way of counterclaim or otherwise;

(vii)   all rights under and Claims to any coverage or recovery under any Insurance Policy;

(viii)  all minute books, organizational documents, stock registers and such other books and records of Seller as pertaining to ownership, organization or existence of Seller;

(ix)    all Tax Returns of Seller or any of its affiliates (and all books and records, including note papers related thereto), other than any Tax Returns that constitute Transferred Assets;

(x)     any Tax refund (or Claim therefor) other than Tax refunds to the extent attributable to Assumed Taxes;

(xi)    the Purchase Price and all other rights of Seller and its affiliates under or pursuant to this Agreement and the Schedules attached hereto and any other agreements entered into by Seller or any of its affiliates pursuant to this Agreement;

(xii)   all Equity Interests of, or held or owned, beneficially or of record, by, Seller or any of its subsidiaries;

(xiii)  physical and cloud-based servers (other than (A) those that are exclusively related to the Business and (B) with respect to data or other information that is a Transferred Asset and that is stored or held by such excluded servers); and

(xiv)   those assets set forth on Section 1.02(b)(xiv) of the Disclosure Schedule.

(c)     Notwithstanding anything to the contrary contained in Section 1.02(a), Seller shall not sell, transfer, assign or deliver to Purchaser, and Purchaser shall not purchase, acquire or accept, and the Transferred Assets shall not include, Seller's right, title and interest in, to or under any assets of Seller not expressly included in the Transferred Assets. Notwithstanding anything to the contrary contained in this Agreement, Purchaser acknowledges and agrees that all of the following shall remain the property of Seller, and neither Purchaser nor any of its affiliates shall have any interest therein: (i) all attorney-client work product and other legal privileges of Seller

4

and its affiliates, (ii) all records and reports prepared or received by Seller, any of its affiliates or Representatives in connection with the sale of the Business and the transactions contemplated hereby, including all analyses relating to the Business of Purchaser or its affiliates so prepared or received (but excluding any materials made available to Purchaser or its Representatives and any financial information relating directly to the Business that would be reasonably required for the financial planning or reporting obligations of Purchaser) and (iii) all confidentiality agreements with prospective purchasers of the Business or any portion thereof (except that Seller shall, to the extent permitted by the terms thereof without consent of the counterparty thereto, assign to Purchaser at the Closing all of Seller's rights under such agreements to confidential treatment of information relating to the conduct of the Business, and waive any conflicting obligations solely with respect to Purchaser's solicitation and hiring of Transferred Employees), and all bids and expressions of interest received from third parties with respect thereto. In addition, Seller shall have the right to retain copies of the documents, materials and data Related to the Business prior to the Closing Date, subject to its compliance with Section 5.03(b).

SECTION 1.03.        Consents to Certain Assignments.

(a)        Notwithstanding anything to the contrary contained in this Agreement, this Agreement shall not constitute an agreement to sell, transfer, assign or deliver, directly or indirectly, any Transferred Asset, or any benefit arising thereunder, if a direct or indirect sale, transfer, assignment or delivery thereof, without the consent of or notice to a third party (including a Governmental Entity), would constitute a breach, default, violation or other contravention of the rights of such third party, would be ineffective with respect to any party to a Contract concerning such Transferred Asset or would in any way adversely affect the rights, upon transfer, of Purchaser with respect to such Transferred Asset. Purchaser agrees that neither Seller nor any of its affiliates shall have any liability whatsoever to Purchaser arising out of or relating to the failure to obtain any such consent or give any such notice, and no representation, warranty or covenant of Seller herein shall be breached or deemed breached, and no condition shall be deemed not satisfied, as a result of such failure or any suit, action or proceeding (a "**Proceeding**") or investigation commenced or threatened by or on behalf of any person arising out of or relating to the failure to obtain any such consent.

(b)        Subject to Section 1.03(a) and Section 5.04, each party hereto agrees to cooperate with the other party hereto and use its reasonable best efforts to obtain or deliver, as applicable, prior to the Closing, any and all consents or notices necessary or appropriate to assign the Transferred Assets.

(c)        If any such consent is not obtained or notice is not given prior to the Closing, the Closing shall nonetheless take place on the terms set forth herein and, thereafter, through the earlier time as such consent is obtained or notice is given or twelve (12) months following the Closing (or, if the Transferred Asset is a Contract, the remaining term of the Contract, if shorter), each party hereto shall use its commercially reasonable efforts to secure such consent or give such notice as promptly as practicable after the Closing and the other party hereto shall provide or cause to be provided commercially reasonable assistance to such first party (not including the giving of any consideration) reasonably requested by such first party to secure such consent or give such notice, or cooperate in good faith with such first party (with each party being responsible for its own out-of-pocket expenses, but without requiring the payment of any

5

amounts by Seller to any party in order to obtain such party's consent and without any further consideration paid by Purchaser to Seller) in any lawful and commercially reasonable arrangement reasonably proposed by Purchaser under which (i) Purchaser shall obtain (without infringing upon the legal rights of such third party or violating any Law) the economic rights and benefits under the Transferred Asset with respect to which the consent has not been obtained and (ii) Purchaser shall assume any related economic burden and risk of assumption with respect to such Transferred Asset. Following the Closing, until such consent is obtained or such notice is given, Purchaser shall, and shall cause each of its affiliates to, comply with the terms of any Contract constituting a Transferred Asset that has not yet been transferred or assigned due to the failure to receive such consent as if such Contract had been so transferred or assigned.

SECTION 1.04.        Assumption of Liabilities; Retained Liabilities.

(a)        Upon the terms and subject to the conditions of this Agreement, Purchaser shall assume, effective as of the Closing, and shall pay, perform and discharge when due, any and all of the following liabilities of Astra Intermediate Holding Corp. and its subsidiaries (including Seller and its subsidiaries), in each case, to the extent arising following the Closing (and in each case, excluding any Retained Liabilities) (collectively, the "**Assumed Liabilities**"):

(i)        the sponsorship of and all obligations, liabilities and commitments arising under, pursuant to or in connection with any Employee Benefit Plan set forth on Section 1.04(a)(i) of the Disclosure Schedule, which schedule shall be delivered by Purchaser based on information provided by Seller and delivered to Seller no later than the thirtieth (30th) day prior to the Closing Date (or such later date as may be mutually agreed to by the parties hereto) and, for the avoidance of doubt, any liability or obligation pursuant to or in connection with an Employee Benefit Plan that will be Purchaser's post-Closing liability or obligation under operation of Law with respect to any Transferred Employee (collectively, the "**Assumed Benefit Obligations**");

(ii)        without duplication: (A) all Taxes arising out of the conduct of the Business or the ownership or operation of the Transferred Assets from and after the Closing Date; (B) all accrued but unpaid employee wage withholding, payroll Taxes, and other ordinary course operational liabilities in respect of Taxes relating to or arising in respect of the Transferred Employees; and (C) all Transfer Taxes (clauses (A) through (C), "**Assumed Taxes**");

(iii)        all liabilities, obligations and commitments assumed pursuant to Article VII or otherwise relating to, or arising from, the employment or termination of employment, terms and conditions of employment, or other facts, Claims, or other matters to the extent concerning any Transferred Employee, solely to the extent such liabilities, obligations or commitments relate to periods following the Closing;

(iv)        all such obligations, liabilities and commitments arising out of any Transferred Contract; and

(v)        all Cure Payments payable by Purchaser pursuant to Section 1.05.

(b)        The term "**Retained Liabilities**" means all of the liabilities of Seller or any of its affiliates other than the Assumed Liabilities, including:

6

(i)      all obligations, liabilities and commitments of Seller and its affiliates under this Agreement, the Schedules attached hereto and any other agreements entered into by Seller and any of its affiliates in connection with the transactions contemplated by this Agreement;

(ii)      all Tax liabilities of Seller other than any such amounts included in Assumed Taxes;

(iii)      all obligations, liabilities and commitments expressly retained by Seller pursuant to Article VII;

(iv)      (A) all indebtedness of Seller or any of its subsidiaries, whether or not contingent, for borrowed money, (B) all obligations of Seller or any of its subsidiaries evidenced by notes, bonds, debentures or other similar instruments, (C) all reimbursement obligations of Seller or any of its subsidiaries and commitments that assure creditors against loss, in each case, including under letters of credit, performance bonds, surety bonds, bank guarantees or similar facilities, but only to the extent drawn upon, (D) all obligations of Seller or any of its subsidiaries under any interest rate swap arrangement or other hedging arrangement, (E) all earnout obligations or similar obligations of Seller or any of its subsidiaries to pay the deferred purchase price in respect of any historical acquisitions, (F) any capitalized financing leases or financing synthetic lease obligations of Seller or any of its subsidiaries, including any lease obligations that should have been on the books and records of financial statements of Seller and its subsidiaries as a capitalized or synthetic lease obligation in accordance with GAAP, (G) any unpaid dividends, distributions or any amounts owed to any affiliate or related party of Seller, including all amounts incurred, accrued or payable under any management, advisory or similar agreement between Astra Intermediate Holding Corp. or any of its subsidiaries, on the one hand, and any direct or indirect equityholder of Astra Intermediate Holding Corp. or any of its affiliates (other than Astra Intermediate Holding Corp. and its subsidiaries), on the other hand, whether or not arising as a result of the transactions contemplated hereby, (H) the principal and accrued and unpaid interest thereon and any prepayment, redemption or change of control fees, premiums, penalties or other amounts payable that would arise at the Closing as a result of the discharge of the obligations referred to in clauses (A) through (G), and (I) all indebtedness of others referred to in clauses (A) through (H) above guaranteed directly or indirectly in any manner by Seller or any of its subsidiaries;

(v)      other than Transfer Taxes, (A) all fees, expenses and costs incurred by Seller or any of its affiliates in connection with this Agreement, the Exhibits attached hereto and any other agreements entered into by Seller and any of its affiliates in connection with the transaction contemplated hereby, including fees, expenses and costs of financial advisors, accountants, legal advisors and other third party advisors, (B) all fees, expenses and costs incurred by Seller or any of its affiliates in connection with the sale process in respect of the sale of all or any portion of Astra Intermediate Holding Corp. and its subsidiaries, (C) any bonus, commission (subject to Section 7.05), severance or other incentive compensation in effect prior to the Closing, including any change in control, retention, stay bonus or transaction bonus or payment obligation and (D) the employer portion of employment Taxes payable in respect of clause (C);

(vi)      other than the Assumed Benefit Obligations, all obligations, liabilities and commitments in respect of the Employee Benefit Plans;

7

(vii)   all liabilities, obligations and commitments relating to, or arising from, the employment or termination of employment, terms and conditions of employment, or other facts, claims, or other matters to the extent concerning any Transferred Employee or any other current or former employee, consultant or other service provider of Seller to the extent such liabilities, obligations and commitments relate to periods at or prior to the Closing;

(viii)   all liabilities, obligations and commitments to the extent relating to, or arising from, any Excluded Asset;

(ix)   all obligations, liabilities and commitments for current accounts payable to trade creditors; and

(x)   those liabilities set forth on Section 1.04(b)(ix) of the Disclosure Schedule.

SECTION 1.05.   Assumption and Assignment of Contracts.

(a)   Promptly, but in any event, within thirty (30) days from the date of this Agreement, Seller shall deliver Section 1.05(a) of the Disclosure Schedule to Purchaser, which shall contain, with respect to each Transferred Contract, Seller's good-faith best estimate, as certified by the Chief Financial Officer of Seller, of the amount of Cure Payments with respect to each such Transferred Contract; provided, however, that from and after the date of delivery of Section 1.05(a) of the Disclosure Schedule hereunder through (and including) the date that is five (5) Business Days prior to the earlier of (i) the commencement of the Auction and (ii) the Sale Hearing (the "**Cure Deadline**"), promptly following any changes to the information set forth on Section 1.05(a) of the Disclosure Schedule, Seller shall provide updates or supplements to Section 1.05(a) of the Disclosure Schedule to include Transferred Contracts in compliance with the terms of this Agreement (with the prior written consent of Purchaser) and/or to include revised Cure Payments with respect to any Transferred Contracts set forth therein, which updates shall amend Section 1.05(a) of the Disclosure Schedule for all purposes hereof. The amount of Cure Payment contained in Section 1.05(a) of the Disclosure Schedule as of the Cure Deadline shall be identical to the amount of Cure Payments listed on any public notices filed in accordance with the Bidding Procedures Order, unless agreed between Seller and Purchaser in writing (with an email consent from counsel being sufficient). Prior to the Sale Hearing, Seller shall commence appropriate proceedings before the Bankruptcy Court and otherwise take all reasonably necessary actions in order to determine Cure Payments with respect to any Transferred Contract entered into prior to the Petition Date. Payment of all Cure Payments for each Transferred Contract that is assumed and assigned to Purchaser shall be the sole responsibility of Purchaser and its affiliates, irrespective of the aggregate amount of such Cure Payments (whether reflected on Section 1.05(a) of the Disclosure Schedule or otherwise) and shall be paid by Purchaser.

(b)   At the Closing, Seller and its affiliates shall assign to Purchaser the Transferred Contracts, in each case pursuant to Section 365 of the Bankruptcy Code and the Sale Order, subject to provision by Purchaser of adequate assurance as may be required under Section 365 of the Bankruptcy Code and payment of the Cure Payments in respect of Transferred Contracts as contemplated hereby. The Cure Payments in respect of all of the Transferred Contracts shall be borne by Purchaser, shall be paid by Purchaser, and shall not be the obligation, liability or responsibility of Seller or any of its affiliates. Seller shall be solely responsible for the payment,

8

performance and discharge when due of the Liabilities under the Transferred Contracts arising or otherwise payable on or prior to the Closing Date, and such Liabilities shall not be the obligation, Liability or responsibility of Purchaser or any of its affiliates.

(c)    If, at any time following the Closing Date until the earliest of (i) the Plan Effective Date or (ii) ninety (90) days from Closing  (the "**Cure Payment End Date**"), Purchaser makes, in respect of any Transferred Contract, any Cure Payment in excess of the Cure Payment for such Transferred Contract included in the Closing Date Cure Payment paid by Purchaser on the Closing Date in accordance with Section 2.03(d), then, within five (5) Business Days following such payment by Purchaser and notice thereof to Seller by Purchaser, Purchaser and Seller shall execute and deliver joint written instructions to the Cure Payment Escrow Agent instructing the Cure Payment Escrow Agent to disburse, pursuant to the written payment instructions of Purchaser delivered to the Cure Payment Escrow Agent in accordance with the Cure Payment Escrow Agreement, to Purchaser such amount paid by Purchaser in excess of the Closing Date Cure Payments, from the Remaining Cure Payment Escrow Funds; provided that, for the avoidance of doubt, nothing in this Section 1.05(c) shall delay, hinder, or prevent the Plan Effective Date from occurring. Following the Cure Payment End Date (or, if earlier, the final resolution of the amount of the Cure Payments for all Transferred Contracts and any disbursements to Purchaser in connection therewith pursuant to the immediately preceding sentence), any Remaining Cure Payment Escrow Funds following all disbursement required pursuant to the immediately preceding sentence shall then be released to Seller, and Purchaser and Seller shall execute and deliver joint written instructions to the Cure Payment Escrow Agent instructing the Cure Payment Escrow Agent to disburse, pursuant to the written payment instructions of Purchaser delivered to the Cure Payment Escrow Agent in accordance with the Cure Payment Escrow Agreement, such Remaining Cure Payment Escrow Funds to Seller. Purchaser shall provide Seller with prompt written notice of any additional Cure Payment made in accordance with this Section 1.05(c). Any payments made pursuant to this Section 1.05(c) shall be treated as an adjustment to the Purchase Price by the parties for Tax purposes, unless otherwise required by Law.

SECTION 1.06.    Additional    and    Eliminated    Transferred    Contracts. Notwithstanding anything in this Agreement to the contrary, Purchaser may, from time to time and in its sole and absolute discretion, amend or revise Section 1.05(a) of the Disclosure Schedule in order to eliminate any Contract from Section 1.05(a) of the Disclosure Schedule or to add any Contract to which Seller or any of its affiliates is a party up to one (1) Business Day prior to the Closing; provided that (a) Purchaser shall not be permitted to add any Mixed-Use Contract to Section 1.05(a) of the Disclosure Schedule unless Seller has modified the designation of such Mixed-Use Contract from assumption to rejection, and (b) the amounts of any Cure Payment on account of the Contracts added to Section 1.05(a) of the Disclosure Schedule after the scheduled day of the Auction shall not be included in the Closing Date Cure Payment, and any Cure Payment for such Contracts shall be the sole obligation of Purchaser; provided, however, Purchaser shall bear no Cure Payment obligations on account of any Contracts added to Section 1.05(a) of the Disclosure Schedule after the scheduled day of the Auction where the addition of such Contracts to Section 1.05(a) of the Disclosure Schedule was necessitated by Seller's modified designation of such Contracts from assumption to rejection and such Cure Payment obligations shall be for Seller's account and included in the Closing Date Cure Payment. Automatically upon the addition of any Contract to Section 1.05(a) of the Disclosure Schedule by Purchaser in accordance with the

9

previous sentence, it shall be a Transferred Contract for all purposes of this Agreement. Automatically upon the deletion of any Contract from Section 1.05(a) of the Disclosure Schedule by Purchaser in accordance with the first sentence of this Section 1.06, it shall be an Excluded Asset for all purposes of this Agreement and no Liabilities arising thereunder or relating thereto shall be assumed by Purchaser or any of its affiliates or be the obligation, Liability or responsibility of Purchaser or any of its affiliates. If any Contract is added to the list of Transferred Contracts, then Seller shall, and shall cause its affiliates to, take such steps as are reasonably necessary to cause such Contract to be assumed and assigned to Purchaser as promptly as possible at or following the Closing.

SECTION 1.07.        Purchase Price.

(a)        Subject to the terms and conditions hereof, the aggregate consideration to be paid by Purchaser for the Transferred Assets shall be (i) an amount equal to (A) the Base Purchase Price, *minus* (B) the aggregate Cure Payments (the "**Purchase Price**") and (ii) the assumption by Purchaser of the Assumed Liabilities. The amount to be paid by Purchaser at Closing shall be (1) an amount equal to (w) the Base Purchase Price, *minus* (x) the Cure Payment Escrow Amount, *minus* (y) the Closing Date Cure Payments, *minus* (z) the Good Faith Deposit Escrow Amount (the "**Directed Purchase Price**"), payable as set forth in Section 2.03(b), which amount shall be subject to adjustment after the Closing pursuant to Section 1.05 and (2) the Cure Payments, payable as set forth in Section 2.03(d).

(b)        No later than the later of (i) twenty-five (25) Business Days prior to the anticipated Closing Date, and (ii) ten (10) Business Days following the date on which Seller provides all information requested pursuant to the last sentence of this Section 1.07(b), Purchaser shall provide a proposed allocation (the "**Purchase Price Allocation**") to Seller setting forth the allocation of the portion of the Purchase Price (and other amounts treated as part of the Purchase Price for U.S. federal Income Tax purposes) allocable to the In-Scope Foreign Assets among each jurisdiction selling any In-Scope Foreign Assets (on a country-by-country basis) for Seller's review and comment.  If Seller delivers a written objection to the draft Purchase Price Allocation proposed by Purchaser pursuant to the immediately preceding sentence within five (5) Business Days after receipt of the same, then Purchaser and Seller shall negotiate in good faith to resolve any such objection, and, if Seller and Purchaser cannot resolve such dispute within five (5) Business Days of Purchaser's receipt of Seller's written objection, then an independent, nationally recognized accounting firm mutually acceptable to Purchaser and Seller shall resolve such dispute, and the costs of such firm shall be borne 50% by Purchaser, on the one hand, and 50% by Seller, on the other hand.  Prior to the delivery of the draft Purchase Price Allocation by Purchaser pursuant to the first sentence of this Section 1.07(b), Seller shall, and shall cause its affiliates to, provide Purchaser with any and all information reasonably requested by Purchaser and is Representatives in connection with Purchaser's preparation of such draft Purchase Price Allocation.

ARTICLE II

CLOSING

10

SECTION 2.01.        Closing. Subject to the terms and conditions of this Agreement, the closing of the Acquisition (the "**Closing**") shall take place (a) by electronic exchange of documents (or, if the parties agree to hold a physical closing, at the offices of Kirkland & Ellis LLP, 601 Lexington Avenue, New York, NY 10022, United States), at 8:00 a.m. Eastern time no later than the later of (i) the second (2nd) Business Day following the date on which there first occurs the satisfaction (or, to the extent permitted, the waiver) of the conditions set forth in Article VIII (other than any condition which by its nature is to be satisfied at the Closing, but subject to satisfaction or waiver of all such conditions) and (ii) the fifteenth (15th) day following the Completion Date or (b) at such other place, time and date as may be mutually agreed in writing by Seller and Purchaser; provided that Purchaser may, with the consent of Seller (such consent not to be unreasonably withheld or delayed), elect to delay the Closing to the day immediately after the Accounting Month End immediately following the later of (x) the date on which there first occurs the satisfaction (or, to the extent permitted, the waiver) of the conditions set forth in Article VIII (other than any condition which by its nature is to be satisfied at the Closing, but subject to satisfaction or waiver of all such conditions) and (y) the fifteenth (15th) day following the Completion Date. The date on which the Closing occurs is referred to in this Agreement as the "**Closing Date**".

SECTION 2.02.        Effectiveness. For all economic and accounting purposes (in each case, to the extent permitted by applicable Law), the consummation of the transactions contemplated by this Agreement shall be deemed to take place on the Closing Date at 12:01 a.m., New York City time (such time, the "**Effective Time**"); provided that, in the event that Purchaser has exercised its right to extend the date of Closing pursuant to the proviso in Section 2.01, if the Closing Date is not on the day immediately after the applicable Accounting Month End, the Effective Time shall be deemed to be 12:01 a.m., New York City time, on the day immediately after the applicable Accounting Month End.

SECTION 2.03.        Transactions To Be Effected at the Closing.

(a)        At the Closing, Seller (or an affiliate and/or Debtor Affiliate, as applicable, designated by Seller) shall deliver or cause to be delivered to Purchaser, as applicable, (i) a bill of sale, assignment and assumption agreement substantially in the form attached hereto as Exhibit A (the "**Bill of Sale, Assignment and Assumption Agreement**"), duly executed by Seller, (ii) the IP Assignment, duly executed by Seller, (iii) subject to Section 5.14, the Transition Services Agreement, duly executed by Seller, (iv)  a true and correct copy of the Delivered Source Code, as such Delivered Source Code exists as of the Closing Date, which will be delivered to Purchaser by compressed folder transfer to the repository or environment as agreed upon by the parties in connection with the Separation Plan or the Migration Plan, (v) a certificate, dated as of the Closing Date, duly executed by an authorized officer of Seller certifying that the conditions set forth in Section 8.02(a), Section 8.02(b) and Section 8.02(c) have been satisfied, (vi) the Cure Payment Escrow Agreement, duly executed by Seller, (vii) an IRS Form W-9, duly executed by Seller or Seller's regarded owner for U.S. federal Income Tax purposes and (viii) all Local Transfer Agreements, duly executed by Seller.

(b)        At the Closing, Purchaser shall deliver to Seller (i) payment, by wire transfer of immediately available funds to one or more accounts designated in writing by Seller (such designation to be made at least two (2) Business Days prior to the Closing Date), of the Directed

11

Purchase Price, (ii) the Bill of Sale, Assignment and Assumption Agreement, duly executed by Purchaser, (iii) the IP Assignment, duly executed by Purchaser, (iv) subject to Section 5.14, the Transition Services Agreement, duly executed by Purchaser, (v) the Cure Payment Escrow Agreement, duly executed by Purchaser and (vi) a certificate, dated as of the Closing Date, duly executed by an authorized officer of Purchaser certifying that the conditions set forth in Section 8.03(a) and Section 8.03(b) have been satisfied and (vii) all Local Transfer Agreements, duly executed by Purchaser.

(c)     At the Closing, Purchaser shall pay, or cause to be paid, to the Cure Payment Escrow Agent the Cure Payment Escrow Amount for deposit into a separate escrow account (the "**Cure Payment Escrow Account**") established pursuant to the terms of the Cure Payment Escrow Agreement, to the account or accounts designated by the Cure Payment Escrow Agent.

(d)     At the Closing, Purchaser shall pay, or cause to be paid, to the applicable person, the Closing Date Cure Payments in accordance with Section 1.05.

SECTION 2.04.     Sale Free and Clear. Seller acknowledges and agrees, and the Sale Order shall provide that, on the Closing Date and concurrently with the Closing, Purchaser shall acquire the Transferred Assets free and clear of all Liens and Liabilities (other than the Permitted Liens, if any, and Assumed Liabilities), pursuant to section 363 of the Bankruptcy Code.

SECTION 2.05.     Withholding. So long as Seller provides the form required pursuant to Section 2.03(a)(vii), Purchaser shall not be entitled to deduct and withhold any Taxes from any amounts payable pursuant to this Agreement.

ARTICLE III

REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth in the disclosure schedules (the "**Disclosure Schedule**"), Seller hereby represents and warrants to Purchaser that the statements contained in this Article III are true and correct as of the date of this Agreement and as of the Closing Date (except in the case of representations and warranties that speak only of a specified date, in which case such representations and warranties shall be true and correct as of such specified date).

SECTION 3.01.     Organization and Standing. Seller is a legal entity duly organized, validly existing and, where applicable, in good standing under the Laws of the jurisdiction of its organization or incorporation. Except as set forth in Section 3.01 of the Disclosure Schedule, Seller is duly authorized, qualified to do business and in good standing under all applicable Laws of any jurisdictions (domestic and foreign) in which the character or the location of the assets owned or leased by it or the nature of the business conducted by it requires such authorization or qualification. Seller has the requisite corporate power and authority to enable it to own, operate, lease or otherwise hold the Transferred Assets owned, leased or otherwise held by it, and to conduct the Business as currently conducted by it.

SECTION 3.02.     Authority; Execution and Delivery; Enforceability. Subject to the entry of the Sale Order, each of Seller and its affiliates has the requisite corporate (or similar organizational) power and authority to execute and deliver this Agreement and the other

12

agreements and instruments to be executed and delivered by it in connection with this Agreement (the "**Ancillary Agreements**") to which it will be a party and to consummate the transactions contemplated to be consummated by it by this Agreement and such Ancillary Agreements. Each of Seller and its affiliates has taken all corporate (or similar organizational) action required by its certificate of incorporation and bylaws (or similar organizational documents) to authorize the execution and delivery of this Agreement and the Ancillary Agreements to which it will be a party and to authorize the consummation of the transactions contemplated to be consummated by it by this Agreement and such Ancillary Agreements. Each of Seller and its affiliates has duly executed and delivered this Agreement and, prior to the Closing, will have duly executed and delivered each Ancillary Agreement to which it will be a party, and this Agreement (assuming the due authorization, execution and delivery by Purchaser) constitutes, and each Ancillary Agreement to which it will be a party will after the Closing (assuming the due authorization, execution and delivery by the other parties thereto) constitute, its legal, valid and binding obligation, enforceable against it in accordance with its terms subject, as to enforcement, to applicable bankruptcy, insolvency, moratorium, reorganization, fraudulent conveyance or similar Laws affecting the enforcement of creditors' rights generally and to general equitable principles (whether considered in a proceeding in equity or at law) (the "**Enforceability Exceptions**").

SECTION 3.03.        Non-Contravention and Approvals.

(a)        The execution, delivery and performance by Seller of this Agreement does not, and neither the execution, delivery and performance by each of Seller and its affiliates of each Ancillary Agreement to which it will be a party nor the consummation by Seller of the transactions contemplated to be consummated by it by this Agreement and such Ancillary Agreements will, (i) conflict with or violate its certificate of incorporation or bylaws (or similar organizational documents), (ii) except as set forth in Section 3.03(a) of the Disclosure Schedule, result in any breach of or constitute a default under any Business Contract, (iii) conflict with or violate any judgment, order or decree ("**Judgment**") or federal, national, supranational, state, provincial or local or administrative statute, law, ordinance, rule, code or regulation ("**Law**") applicable to Seller or any of the Transferred Assets or (iv) result in the creation of any Lien (other than Permitted Liens or Liens arising from any act of Purchaser or its affiliates) upon any of the Transferred Assets, except, in the case of clauses (ii) and (iii), any such items that would not reasonably be expected to be material to the Business.

(b)        No consent, approval or authorization ("**Consent**") of, or registration, declaration or filing with, any federal, national, supranational, state, provincial, local or foreign court of competent jurisdiction, governmental or quasi-governmental agency, authority, instrumentality or regulatory body (a "**Governmental Entity**") is required to be obtained or made by Seller in connection with the execution, delivery and performance of this Agreement and the Ancillary Agreements to which they will be a party or the consummation of the Acquisition, other than (i) those set forth in Section 3.03(b) of the Disclosure Schedule and (ii) those the failure of which to obtain or make would not reasonably be expected to be material to the Business.

SECTION 3.04.        Financial Statements

(a)     Prior to the date of this Agreement, the financial statements Related to the Business set forth on Section 3.04(a) of the Disclosure Schedule have been made available to Purchaser (the "**Financial Statements**").

(b)     The Financial Statements (i) are, in all material respects, correct and complete as of the dates thereof and for the periods indicated, except for the absence of normal, recurring year-end audit adjustments and notes thereto, which in each case would not be, individually or in the aggregate, material to the Business, (ii) have been prepared in accordance with GAAP based on the books and records of the Business and (iii) present fairly, in all material respects, the financial position and results of operations of the Business at the dates set forth therein and for the periods covered thereby.

(c)     Attached to Section 3.04(c) of the Disclosure Schedule is a report of all accounts receivable of the Business as of June 30, 2025 (such report the "**A/R Report**" and such date the "**A/R Report Date**"). The A/R Report (i) represents a complete and accurate listing, in all material respects, of all customer accounts receivable earned by Business as of the A/R Report Date, which are (A) all operating in nature and arising from bona fide, arms' length sales transactions incurred in the ordinary course of business and (B) to the Knowledge of Seller, are not subject to any setoffs or counterclaims, except as would not be material to the Business, taken as a whole, and (ii) completely and accurately, in all material respects, identifies and allocates the amount of all such accounts receivable to the Business by customer, amount, and Business line. Since June 30, 2025, Seller and the Business have not amended, altered, modified, or otherwise changed the allocation methodology from that set forth in and applied in the A/R Report.

SECTION 3.05.     Absence of Certain Changes. Since June 30, 2025, (a) there has not been any event, occurrence or development that has had a Material Adverse Effect, (b) except for matters relating to the process for the sale of the Business or as otherwise set forth in Section 3.05 of the Disclosure Schedule, neither Seller nor any of its subsidiaries has taken any action that, if taken after the date of this Agreement, would constitute a material breach of any of the covenants set forth in Section 5.01, other than any actions that are expressly contemplated by this Agreement or any Ancillary Agreement and (c) Seller has not taken any action (or omitted from taking any action) that would have required the consent of Purchaser pursuant to Section 5.01 had such action been taken (or omitted from being taken) following the date of this Agreement.

SECTION 3.06.     Title to Assets; Condition of Assets.

(a)     Seller or its Debtor Affiliates, as the case may be, has, and as of the close of business on the date immediately prior to the Closing Date will have, good, valid and marketable title to all material Transferred Assets (other than (x) those identified in Section 3.06(a)(i) of the Disclosure Schedule, (y) those that are leased or licensed assets and (z) those that are depleted, sold or disposed of in the ordinary course of business), in each case free and clear of all Liens, except for (i) such Liens as are set forth in Section 3.06(a)(ii) of the Disclosure Schedule, (ii) mechanics', carriers', workmen's, repairmen's or other like Liens arising or incurred in the ordinary course of business, (iii) Liens arising under original purchase price conditional sales Contracts and equipment leases with third parties entered into in the ordinary course of business, (iv) Liens for Taxes that are not due and payable, or being contested in good faith, or the

14

nonpayment of which is permitted or required by the Bankruptcy Code, (v) Liens disclosed in the Financial Statements or any notes thereto, (vi) recorded easements, covenants, restrictions, rights-of-way, zoning, building restrictions and other similar matters and (vii) non-exclusive licenses of Intellectual Property (the Liens described in clauses (i) through (vii) above are referred to herein, collectively, as "**Permitted Liens**").

(b)    There are no outstanding rights (including any right of first refusal or right of first offer), options, or Contracts giving any person any current or future right to require Seller to sell or transfer to such person or to any third party any interest in any of the Transferred Assets. There are no facts or conditions affecting the Transferred Assets that could, individually or in the aggregate, interfere in any material respect with the use, occupancy or operation of the Transferred Assets as currently used, occupied or operated.

SECTION 3.07.    Real Property.

(a)    No real property owned by Seller or any of its subsidiaries is used or held for use in the operation or conduct of the Business.

(b)    Section 3.07(b)(i) of the Disclosure Schedule sets forth all real property leases, easements and licenses to which Seller or any of its subsidiaries is a tenant, subtenant, licensee, easement holder, or otherwise an occupant of real property that is not owned by Seller or any of its subsidiaries and which is used in the operation or conduct of the Business (the "**Real Property Agreements**"). Except as set forth on Section 3.07(b)(ii) of the Disclosure Schedule: (i) each Real Property Agreement constitutes a valid, binding and enforceable obligation of Seller or its subsidiaries, as applicable, (ii) none of Seller or any of its subsidiaries is in material default or breach under any Real Property Agreement, (iii) to the Knowledge of Seller, no counterparty to any Real Property Agreement is in material default or breach under any Real Property Agreement, (iv) none of Seller or any of its subsidiaries has subleased to any person the right to use or occupy any property leased under any Real Property Agreements, which individually or in the aggregate would have a material and adverse impact upon the use of the real property subject to such Real Property Agreements by Seller or any of its subsidiaries and (v) there are no claims affecting any such Real Property Agreement of which Seller has received notice in writing, except as would not, individually or in the aggregate, be reasonably be expected to be material to the Business.

SECTION 3.08.    Intellectual Property.

(a)    Section 3.08(a)(i) of the Disclosure Schedule sets forth, as of the date of this Agreement, all unexpired patents, all unexpired trademark registrations, all unexpired copyright registrations, all unexpired domain name registrations and all pending applications for issuance or registration of any of the foregoing, in each case, that are included in the Transferred Intellectual Property (the "**Company Registered IP**"). Except as set forth in Section 3.08(a)(ii) of the Disclosure Schedule, Seller exclusively owns the Transferred Intellectual Property, free and clear of all Liens, other than Permitted Liens. None of the Transferred Intellectual Property has been adjudged invalid or unenforceable in whole or in part by any Governmental Entity, and no Proceeding or claim is pending or, to the Knowledge of Seller, threatened in writing alleging that any of the Transferred Intellectual Property is invalid or unenforceable in whole or in part.

15

(b)      Except as set forth in Section 3.08(b) of the Disclosure Schedule, to the Knowledge of Seller, the operation of the Business, as presently conducted, does not infringe, misappropriate or otherwise violate, and has not, in the last three (3) years, infringed, misappropriated or violated, the Intellectual Property of any other person, except for such infringement as would not reasonably be expected to be material to the conduct of the Business (taken as a whole).

(c)      Except as set forth in Section 3.08(c) of the Disclosure Schedule (i) there are no, and in the last three (3) years have been no, Proceedings pending or, to the Knowledge of Seller, threatened in writing, as of the date of this Agreement, against Seller by any third party (A) claiming infringement, misappropriation or other violation of Intellectual Property owned by such third party in connection with the conduct of the Business, or (B) challenging or contesting the ownership, scope, validity or enforceability of the Transferred Intellectual Property (excluding office actions and similar prosecution matters before the United States Patent and Trademark Office or other similar applicable Governmental Entity), in each case of clauses (A) and (B), that would reasonably be expected to result in material liability to the Business, and (ii) to the Knowledge of Seller, no third party is infringing, misappropriating or otherwise violating any Transferred Intellectual Property in any material respect.

(d)      Seller has taken commercially reasonable steps to protect the confidentiality of any trade secrets or other confidential information included in the Transferred Intellectual Property that are material to the Business as is currently conducted.

(e)      Any person who created any Transferred Intellectual Property material to the Business (each such person, a "**Contributor**") has executed a valid, enforceable Contract with Seller whereby such Contributor assigned all such Contributor's right, title and interest in and to such Transferred Intellectual Property to Seller (or such Transferred Intellectual Property otherwise is owned by Seller under operation of law) and agrees to maintain the confidentiality of all trade secrets and confidential, non-public and proprietary information of the Business except, in each case, as would not reasonably be expected to be material to the conduct of the Business (taken as a whole). No funding, facilities, personnel or other resources of any Governmental Entity, academic institution or research organization were used to develop, create or invent, in whole or in part, any Transferred Intellectual Property material to the Business; provided that, for clarity, the foregoing is not applicable to creations, developments, or modifications resulting from work performed for, or suggestions received from, customers, which creations, developments, or modifications are exclusively owned by Seller to the extent included in any Transferred Intellectual Property.

(f)      The Business has not used any Open Source Software in any manner that requires any material Software included in the Transferred Intellectual Property to be disclosed, distributed, or licensed in source code form to any other person. Except as set forth in Section 3.08(f) of the Disclosure Schedule (and other than to employees and development contractors in the ordinary course subject to appropriate confidentiality obligations), the Business has not disclosed or delivered, to any person (including any escrow agent), any material source code included in the Transferred Intellectual Property and the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby will not in the disclosure or delivery of any such source code (other than to Purchaser).

16

(g)     Except as would not reasonably be expected to be material to the conduct of the Business (taken as a whole), all products and services offered for sale, sold, marketed, licensed or offered (including as a platform) by Seller as of the date hereof (the "**Company Products**") and the Software included in the Transferred Intellectual Property are substantially free of any material defects, bugs and errors, and, to the Knowledge of Seller, do not contain or make available any disabling codes or instructions, spyware, Trojan horses, worms, trap doors, backdoors, logic bombs, time bombs, cancelbots, viruses or other Software or programming routines that permit or cause unauthorized access to, or disruption, impairment, modification, recordation, misuse, transmission, disablement or destruction of Software, data, systems or other materials ("**Contaminants**"). The Business has implemented and maintains commercially reasonable safeguards designed to prevent the introduction of Contaminants into the Software included in the Transferred Intellectual Property, the Company Products and the IT Systems.

(h)     Except as would not materially adversely affect the Business (taken as a whole), the Business (i) has used, developed and/or deployed AI Technology in compliance with applicable Contracts and Laws (including Data Protection Laws), (ii) have not included and do not include any Personal Data, trade secrets or material confidential or proprietary information of the Business, or of any person under an obligation of confidentiality, in or as part of any AI Input Data or prompts or inputs into any AI Technology, except in cases where (A) such AI Technology does not use such AI Input Data, information, prompts or services to train the machine learning or algorithm of such tools or improve the services related to such tools or (B) to the Knowledge of Seller, Seller has all rights, including applicable licenses, consents, and permissions, to use the AI Input Data to train, validate, test, improve and deploy such AI Technology, (iii) has not used AI Technology to create or develop any material Transferred Intellectual Property and (iv) has implemented and maintained, and is in material compliance with, commercially reasonable procedures to identify and mitigate bias (or other harm to consumers) in the AI Input Data and AI Technology outputs as required by applicable Law.

(i)     To the Knowledge of Seller, the Transferred Intellectual Property, together with any Intellectual Property licensed under any Transferred Contract, Section 5.15, and Section 5.16, and taken in conjunction with the services, to be provided to Purchaser under the TSA Term Sheet, collectively, constitute all the material Intellectual Property used or held for use in the sale and provision of the Company Products and the conduct and operation of the Business as currently conducted.

(j)     Except as would not reasonably be expected to be material to the conduct of the Business (taken as a whole), (i) there are no royalties, fees or other payments payable by Seller to any person, with regards to use of the Transferred Intellectual Property, that shall become payable as a result of the consummation of the transactions contemplated by this Agreement, and (ii) immediately following the Closing, all Transferred Intellectual Property will be fully transferable, alienable or licensable (subject to Permitted Liens existing as of the Closing) by Purchaser without restriction, consent or permission, and without payment of any kind to any third party arising from the transactions contemplated.

(k)     Except as would not reasonably be expected to be material to the conduct of the Business (taken as a whole), during the three (3) years prior to the date hereof, (i) the Business has not suffered a material Security Incident, including any unauthorized access, use,

17

modification, or disclosure, or other adverse events or incidents related to Personal Data, which would, in each instance, require notification to any person under any Data Protection Requirement, (ii) there have not been any material failures, breakdowns, outages, or other adverse events that have occurred with respect to any IT Systems that have not since been remedied in all material respects, (iii) the Business has implemented and maintained for the past three (3) years commercially reasonable organizational, physical, administrative and technical safeguards, designed to protect the confidentiality, and security of all Personal Data and the IT Systems (and the confidential data processed thereon) and (iv) the Business has obtained and maintains all consents, or otherwise has all rights under applicable Data Protection Requirements, necessary to collect, use, transfer and otherwise process all Personal Data held by or on behalf of the Business. Seller has in place commercially reasonable disaster recovery plans and procedures for the IT Systems and have taken commercially reasonable steps to safeguard the security of the IT Systems.

(l)      Except as would not reasonably be expected to be material to the conduct of the Business (taken as a whole), the conduct of the Business is, and has been in the three (3) years prior to the date hereof, in compliance with all Data Protection Requirements.

(m)      Seller has not received any subpoenas, demands, or other written notices from any Governmental Entity investigating, inquiring into, or otherwise relating to any actual or potential violation of any Data Protection Law and, to the Knowledge of Seller, Seller or the Business is not under investigation by any Governmental Entity or any actual or potential violation of any Data Protection Law.

SECTION 3.09.      Contracts.

(a)      Section 3.09(a) of the Disclosure Schedule sets forth, as of the date of this Agreement, each of the following Contracts to which Seller is a party or by which Seller or any of its assets or properties are bound, in each case related to the Business, any Transferred Asset or any Assumed Liability, other than any Employee Benefit Plan:

(i)      a Contract, including customer contracts and Government Contracts, for the sale of any product or service by the Business involving aggregate payments of more than $500,000 for the twelve (12)-month period ended June 30, 2025;

(ii)      a Contract for the purchase by the Business of materials, supplies, equipment or services, including capital commitments or expenditures, involving aggregate payments of more than $250,000 for the twelve (12)-month period ended June 30, 2025;

(iii)      a Contract concerning the establishment, control, maintenance or operation of a joint venture or other similar agreement or arrangement;

(iv)      a Contract (A) whereby Seller or its affiliates grant a license to any material Transferred Intellectual Property, or (B) granting to Seller or its affiliates a license to material Intellectual Property that is Related to the Business, whether licensed out by Seller to any other person or licensed in to Seller by any other person (excluding any (1) "off-the-shelf" or other software that is readily available (regardless of whether negotiated or modified); (2) software

18

licenses that have a purchase price or annual license fee of less than $250,000; (3) non-exclusive licenses granted in the ordinary course of business; and (4) licenses to Open Source Software);

(v)     each Real Property Agreement;

(vi)     a Contract (A) pursuant to which a third party distributor (other than any affiliate of Seller) has the right to distribute or resell products of the Business in a particular market and (B) involving aggregate payments in excess of $100,000 for the twelve (12)-month period ended June 30, 2025;

(vii)     any Contract (or group of related Contracts) containing aggregate future capital expenditure obligations in excess of $500,000;

(viii)     any Contract that is a mortgage, indenture, guaranty, loan or credit agreement, security agreement or evidencing indebtedness or is a Contract creating or granting any Lien on any assets or properties of Seller, other than Permitted Liens;

(ix)     any Contract for the acquisition of any person or any business unit thereof or the disposition of any business unit or assets (in each case, whether by merger, sale of stock, sale of assets or otherwise), other than Contracts (A) for acquisitions or dispositions of inventory in the ordinary course of business or (B) for acquisitions or dispositions that were consummated more than five (5) years prior to the date of this Agreement;

(x)     any royalty or similar Contract based on the revenues or profits;

(xi)     any Contract that (A) grants to a third party any exclusive supply or distribution agreement or other exclusive rights, (B) grants to a third party any material "most favored nation" status, rights of first refusal, rights of first negotiation or similar rights with respect to any product, service or Intellectual Property or (C) commits any person to buy a minimum quantity of goods or services provided by another person, or commits any person to provide a minimum quantity of goods or services to another person, in each case, other than any Contracts entered into in the ordinary course of business;

(xii)     any Contract involving any resolution or settlement of any actual or threatened action that imposes continuing obligations (other than de minimis obligations) following the date of this Agreement;

(xiii)     any Contract containing covenants that (A) restrict or limit in any respect the ability to engage in any line of business within any geographic area or (B) otherwise restrict the ability to solicit or hire any person or solicit business from any person, other than any Contracts entered into in the ordinary course of business or any non-disclosure agreements entered into in connection with any potential transactions; and

(xiv)     any other Contract not otherwise required to be set forth in any Section or subsection of the Disclosure Schedule that has an aggregate future liability to any person in excess of $500,000.

(b)     All Contracts set forth on or required to be set forth in Section 3.08 and Section 3.09 of the Disclosure Schedule (such Contracts, the "**Business Contracts**") are valid, binding and in full force and effect, subject, as to enforcement, to the Enforceability Exceptions, except for such failures to be valid, binding and in full force and effect that would not reasonably be expected to be material to the Business. Except as set forth in Section 3.09(b) of the Disclosure Schedule, no Seller is in breach or default under the Business Contracts, and, to the Knowledge of Seller, no other party to any Business Contract, is in breach or default thereunder, except in each case to the extent that such breach or default would not reasonably be expected to be material to the Business.

SECTION 3.10.     Permits. Seller holds all permits, licenses, variances, exemptions, certifications, registrations, orders and other authorizations, consents and approvals of all Governmental Entities necessary for the conduct of the Business as presently conducted, except as has not been, and would not reasonably be expected to be, material to the Business. Except as set forth in Section 3.10 of the Disclosure Schedule, no Proceeding is pending or, to the Knowledge of Seller, threatened in writing that would be reasonably expected to result in the revocation, cancellation or suspension of any such permit the loss of which would reasonably be expected to be material to the Business.

SECTION 3.11.     Taxes.

(a)     Except as would not, individually or in the aggregate, reasonably be expected to be material to the Business:

(i)     Seller (or its applicable affiliate) has prepared (or caused to be prepared) and timely filed (taking into account valid extensions of time within which to file) all income and other material Tax Returns with respect to the Transferred Assets or the Business and such Tax Returns are complete and accurate in all material respects;

(ii)     Seller (or its applicable affiliate) has timely paid all income and other material Taxes which arise from or with respect to the Transferred Assets or the Business, except to the extent the nonpayment thereof is permitted or required by the Bankruptcy Code, but only if such nonpayment cannot reasonably be expected to adversely impact Purchaser or the Business post-Closing;

(iii)     Seller has deducted and withheld and paid over to the appropriate Taxing Authority all amounts of material Taxes with respect to the Business and Transferred Assets, including with respect to Transferred Employees, any independent contractor, creditor or other party required to have been deducted and withheld;

(iv)     Seller has not waived any statute of limitations in respect of Taxes with respect to the Business or the Transferred Assets or agreed to any extension of time with respect to an assessment or deficiency for Taxes with respect to the Business or the Transferred Assets (other than pursuant to automatic extensions of time to file Tax Returns obtained in the ordinary course); and

(v)     There are no Liens for Taxes (other than Permitted Liens) on the Transferred Assets.

20

(b)     This Section 3.11 and Section 3.13 (in so far as it relates to Taxes) contains the sole and exclusive representations and warranties with respect to Taxes. No representation or warranty is made with respect to the validity of any Tax position or the availability of any Tax attribute for any Tax period (or any portion thereof) following the Closing.

SECTION 3.12.     Legal Proceedings. Section 3.12 of the Disclosure Schedule sets forth, as of the date of this Agreement, each Proceeding pending or, to the Knowledge of Seller, threatened in writing against Seller related to the Business, any Transferred Asset or any Assumed Liability and which, in all cases, is reasonably likely to be material to the Business. Except as set forth in Section 3.12 of the Disclosure Schedule, Seller is not party or subject to or in default under any unsatisfied Judgment that is applicable to the conduct of the Business, other than such Judgments that are not reasonably likely to be material to the Business. This Section 3.12 does not relate to (a) Intellectual Property matters, which are the subject of Section 3.08, (b) tax matters, which are the subject of Section 3.11, or (c) environmental matters, which are the subject of Section 3.18.

SECTION 3.13.     Employee Benefit Plans; Labor.

(a)     Section 3.13(a) of the Disclosure Schedule contains a true and complete list of each material Employee Benefit Plan; provided, that with respect to employment agreements and offer letters that do not provide for special bonuses or severance or termination pay in excess of that required under applicable Law, such requirement to list those items on Section 3.13(a) of the Disclosure Schedule on an individualized basis shall be deemed satisfied by listing the forms thereof. For purposes of this Agreement, "**Employee Benefit Plan**" means each "employee benefit plan" within the meaning of Section 3(3) of ERISA (whether or not subject to ERISA) and each other retirement, superannuation, pension, deferred compensation, medical, dental, disability, life, death benefit, loan, severance, termination indemnity, end of service vacation, employment, incentive bonus, thirteenth month, retention, equity-based compensation, and stock purchase plan, program, agreement or arrangement (whether written or unwritten), in each case that is sponsored or maintained or contributed to (or required to be contributed to) by Seller or its subsidiaries for the benefit of any Employee; provided that any governmental plan or program requiring the mandatory payment of social insurance taxes or similar contributions to a governmental fund with respect to the wages of an employee will not be considered an "Employee Benefit Plan". Prior to the date of this Agreement, copies of summaries of the material terms of the Employee Benefit Plans have been made available to Purchaser or, to the extent not provided prior to the date of this Agreement, shall be provided within ten (10) Business Days following the date of this Agreement.

(b)     No Employee Benefit Plan is, and Seller does not maintain, sponsor or contribute to, or has within the past six (6) years maintained, sponsored or contributed to or have Liability with respect to (including on account of an ERISA Affiliate): (i) an employee benefit plan subject to Section 412 of the Code or Title IV of ERISA, (ii) a "multiemployer plan" (within the meaning of Section 3(37) of ERISA) subject to Title IV of ERISA or (iii) any plan that has two or more contributing sponsors at least two (2) of whom are not under common control, within the meaning of Section 4063 of ERISA.

(c)      Each Employee Benefit Plan has been established, operated and maintained in compliance in all material respects with ERISA and the Code, as applicable, and other applicable Laws, and in accordance with the terms of such Employee Benefit Plan, in all material respects.

(d)      Except as set forth on Section 3.13(d) of the Disclosure Schedule, the execution and delivery of this Agreement or the Closing will not (either alone or in combination with another event) (i) result in any payment or benefit becoming due, or increase the amount of any payment or benefit due, to any current or former employee, consultant or other service provider of the Business or (ii) result in the acceleration of the time of funding, payment or vesting of any compensation or benefits to, or the forgiveness of indebtedness of any current for former employee, consultant or other service provider of the Business.

(e)      No amount paid or payable (whether in cash, in property, or in the form of benefits) in connection with the transactions contemplated hereby (either solely as a result thereof or as a result of such transactions in conjunction with any other event) will constitute an "excess parachute payment" within the meaning of Section 280G of the Code. No current or former Employee has any right to receive any reimbursement or "gross-up" for any Tax under Section 409A or 280G of the Code (or any similar provision of state, local or foreign law) under any Employee Benefit Plan or otherwise.

(f)      Seller is not negotiating, party or subject to any collective bargaining agreements, works council agreements, trade union agreements or similar Contracts (each a "**Collective Bargaining Agreement**") with any labor union, works council, or labor organization (each a "**Union**" and collectively "**Unions**"). Within the past three years, to the Knowledge of Seller, (i) no Union or group of employees has sought to organize any Employees for purposes of collective bargaining, and no Union or group of Employees has made a demand for recognition or certification to represent any of the Employees, or filed an application or petition for recognition, election, or certification with any Governmental Entity to represent any of the Employees, and (ii) there have been no actual or threatened strikes, lockouts, slowdowns, work stoppages, handbilling, picketing, walkouts, sit-ins or other forms of organized material labor disruption by any Employees against the Business.

(g)      To the Knowledge of Seller, with respect to the Business, Seller is and for the last three years has been, in compliance in all material respects with all applicable Laws relating to labor and employment, including but not limited to all Laws relating to employment practices; terms and conditions of employment; the hiring and termination of employees; equal employment opportunity; discrimination, harassment, sexual harassment, and retaliation; disability; family and medical leave and other paid time off; classification of U.S. employees as exempt or non-exempt; classification of individual independent contractors; immigration (including the competition of Forms I-9 for all U.S. employees and the proper confirmation of employee visas); wages and hours, including hours of work and payment of wages; workers' compensation and unemployment benefits and insurance; occupational safety and health and working conditions; background checks; the use of artificial intelligence, algorithmic decision-making tools in connection with employment-related matters; restrictive covenants; plant closings; and collective bargaining and labor relations. There is no, and during the last three years there has not been any, pending or, to the Knowledge of Seller, threatened, Proceedings brought by or on behalf of, or otherwise involving or relating to, any Employee or former employee that provided services to

22

the Business, or any Governmental Entity, alleging a material violation of, or that otherwise involves or relates to, the Business and any applicable labor or employment Law that would reasonably be expected to be, individually or in the aggregate, material to the Business.

(h)      Within the past year, Seller has reasonably investigated all sexual harassment, or other unlawful harassment, discrimination, or retaliation allegations against (i) any Employee that directly reports to the Chief Executive Officer, (ii) any Employee that directly reports to a direct report of the Chief Executive Officer or (iii) any Employee in a managerial or supervisory role with the title of Vice President or above that have been reported (and subsequently documented) by any Employee to a member of management or human resources personnel of Seller or of which Seller otherwise has Knowledge. With respect to each such allegation (except those Seller reasonably deemed to not have merit), Seller has taken prompt corrective action reasonably calculated to prevent further improper action. To the Knowledge of Seller, there are no such allegations that could reasonably be expected to be material to the Business.

(i)      With respect to each Employee Benefit Plan maintained pursuant to the Laws of a country other than the United States: (i) such Employee Benefit Plan has been maintained in all material respects in accordance with all applicable requirements (including applicable Law), and (ii) any Employee Benefit Plan that is intended to qualify for special Tax treatment meets all material requirements for such treatment.

SECTION 3.14.      Compliance with Laws.

(a)      Except as set forth in Section 3.14(a) of the Disclosure Schedule, the Business is in compliance with, and for the past three (3) years has been in compliance with, all applicable Laws, except for instances of noncompliance that would not reasonably be expected to be material to the Business.

(b)      Within the past year, except as would not have a Material Adverse Effect, in each case to the extent they are required to comply therewith, related to the Business, any Transferred Asset or any Assumed Liability, none of Seller or any of its subsidiaries nor, to the Knowledge of Seller, any director or officer of Seller has violated in any material respect the Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder (the "**FCPA**") or similar non-U.S. Laws, including by making use of the mails or any means or instrumentality of interstate commerce corruptly in furtherance of an offer, payment, promise to pay or authorization of the payment of any money, or other property, gift, promise to give, or authorization of the giving of anything of value to any "foreign official" (as such term is defined in the FCPA) or any foreign political party or official thereof or any candidate for foreign political office, in contravention of the FCPA or similar non-U.S. Laws.

SECTION 3.15.      Sufficiency of Assets. Except as set forth in Section 3.15 of the Disclosure Schedule, the Transferred Assets, together with any services or rights provided by Seller or its subsidiaries pursuant to any Ancillary Agreement (but excluding any assets, properties, capabilities, and rights that constitute or rely on Excluded Assets and any assets disposed in the ordinary course) or under Section 5.07 or Section 5.15, are all of the assets, properties and rights that are necessary to carry on the Business (immediately following the Closing) in all material respects as it is currently being conducted and constitute substantially all of the assets owned by

23

Seller or its subsidiaries that are primarily used or primarily held for use by Seller in the conduct of the Business as it is currently being conducted. This Section 3.15 shall not constitute a representation regarding the infringement, misappropriation or other violation of Intellectual Property.

SECTION 3.16.    Certain Business Relationships with Affiliates. Except (a) for the exclusion of the Excluded Assets, (b) the Ancillary Agreements and (c) as set forth in Section 3.16 of the Disclosure Schedule, no affiliate of Seller owes any money to, or is owed any money by, the Business, other than pursuant to commercial relationships or services.

SECTION 3.17.    No Undisclosed Liabilities. There are no liabilities of the Business other than:

(a)     liabilities adequately provided for in the most recent Financial Statements;

(b)     liabilities incurred in the ordinary course of business since the most recent Financial Statements (other than incurred as a result of a violation of Law, any action or any breach or default under any Business Contract or this Agreement);

(c)     liabilities set forth in Section 3.17 of the Disclosure Schedule;

(d)     liabilities and obligations incurred in connection with or as a result of the Acquisition and the other transactions contemplated hereby or the public announcement thereof; and

(e)     other liabilities that are not material to the Business.

SECTION 3.18.    Environmental Matters. Except as set forth in Section 3.18 of the Disclosure Schedule, and except for any matter that would not reasonably be expected to have a Material Adverse Effect, (a) the Business is not in violation of applicable Environmental Laws or any permits issued under Environmental Laws, and (b) there are no Proceedings pursuant to Environmental Law pending or, to the Knowledge of Seller, threatened in writing against Seller which relates to the Business.

SECTION 3.19.    Brokers and Finders. There is no investment banker, broker, finder, financial advisor or other intermediary that has been retained by or is authorized to act on behalf of Seller or any of its subsidiaries that might be entitled to any fee or commission in connection with the Acquisition other than PJT Partners L.P., whose fees and expenses will be paid by Seller or its subsidiaries.

SECTION 3.20.    Insurance. As of the date of this Agreement, all material policies or binders of fire, liability, product liability, umbrella liability, real and personal property, workers' compensation, vehicular, fiduciary liability and other casualty and property insurance issued to Seller or any of its affiliates (excluding any policy underlying any Employee Benefit Plan) for which the policy period has not yet ended, only to the extent such policies provide coverage for the Business, the Transferred Assets or the Assumed Liabilities, including any self-funded insurance policies or arrangements (collectively the "**Insurance Policies**"), are in full force and effect, all premiums thereon have been timely paid or, if not yet due, accrued, and no written

24

notice of cancellation, termination or non-renewal has been received by Seller, or any of its subsidiaries with respect to any such Insurance Policy. Section 3.20 of the Disclosure Schedule sets forth, as of the date of this Agreement, a list of all material claims currently pending under any such Insurance Policies which are related to the Business, any Transferred Asset or any Assumed Liability.

SECTION 3.21.        Customers; Vendors.

(a)        Section 3.21(a) of the Disclosure Schedule sets forth a true, correct and complete list of the twenty (20) largest customers (each, a "**Material Customer**") of the Business based on revenue generated by such customers during the twelve (12)-month period ended June 30, 2025, showing the aggregate sales to each such Material Customer during such period. For the past two (2) years, none of Seller or any of its subsidiaries has been, or is currently, engaged in any material dispute with any Material Customer. Since June 30, 2024, none of Seller or its subsidiaries has received any written communication from any Material Customer of any intention or threat to terminate or materially reduce purchases from, or otherwise adversely change in any material respect their relationship with, Seller or any of its subsidiaries.

(b)        Section 3.21(b) of the Disclosure Schedule sets forth a true, correct and complete list of the twenty (20) largest vendors (each, a "**Material Vendor**") of the Business based on expenditures incurred by Seller and/or its subsidiaries during the twelve (12) month period ended June 30, 2025, showing aggregate amount invoiced by each such Material Vendor during such period. For the past two (2) years, none of Seller nor any of its subsidiaries has been, or is currently, engaged in any material dispute with any Material Vendor. Since June 30, 2024, none of Seller or its subsidiaries has received any written communication from any Material Vendor of any intention or threat to terminate or materially reduce its provision of goods or services to, or otherwise adversely change in any material respect their relationship with, Seller or any of its subsidiaries.

ARTICLE IV

REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Seller that the statements contained in this Article IV are true and correct as of the date of this Agreement and as of the Closing Date (except in the case of representations and warranties that speak only of a specified date, in which case such representations and warranties shall be true and correct as of such specified date).

SECTION 4.01.        Organization. Each of Purchaser and each subsidiary of Purchaser that is specified to be a party to any Ancillary Agreement, if any (each, a "**Purchaser Subsidiary**"), is a legal entity duly organized, validly existing and, where applicable, in good standing under the Laws of the jurisdiction of its organization or incorporation.

SECTION 4.02.        Authority; Execution and Delivery; Enforceability. Subject to the entry of the Sale Order, Purchaser has the requisite corporate (or similar organizational) power and authority to execute and deliver this Agreement and the Ancillary Agreements to which it will be a party and to consummate the Acquisition and the other transactions contemplated by

25

this Agreement and such Ancillary Agreements. Each Purchaser Subsidiary has the requisite corporate (or similar organizational) power and authority to execute the Ancillary Agreements to which it will be a party and to consummate the transactions contemplated to be consummated by it by such Ancillary Agreements. Purchaser has taken all corporate (or similar organizational) action required by its organizational documents to authorize the execution and delivery of this Agreement and the Ancillary Agreements to which it will be a party and to authorize the consummation of the transactions contemplated by this Agreement and the Ancillary Agreements. Each Purchaser Subsidiary will, prior to the Closing, have taken all corporate (or similar organizational) action required by its organizational documents to authorize the execution and delivery of the Ancillary Agreements to which it will be a party and to authorize the consummation of the transactions contemplated to be consummated by it by such Ancillary Agreements. Purchaser has duly executed and delivered this Agreement and, prior to the Closing, will have duly executed and delivered each Ancillary Agreement to which it will be a party, and this Agreement (assuming the due authorization, execution and delivery by Seller) constitutes, and each Ancillary Agreement to which it will be a party will after the Closing (assuming the due authorization, execution and delivery of the other parties thereto) constitute, its legal, valid and binding obligation, enforceable against it in accordance with its terms subject, as to enforcement, to the Enforceability Exceptions. Prior to the Closing, each Purchaser Subsidiary will have duly executed and delivered each Ancillary Agreement to which it will be a party, and each Ancillary Agreement to which it will be a party will after the Closing (assuming the due authorization, execution and delivery by the other parties thereto) constitute its legal, valid and binding obligation, enforceable against it in accordance with its terms subject, as to enforcement, to the Enforceability Exceptions.

SECTION 4.03.    Non-Contravention and Approvals.

(a)    The execution, delivery and performance by Purchaser of this Agreement does not, and neither the execution, delivery and performance by Purchaser and each Purchaser Subsidiary of each Ancillary Agreement to which it will be a party nor the consummation by Purchaser of the Acquisition and the other transactions contemplated to be consummated by it by this Agreement and such Ancillary Agreements and by each Purchaser Subsidiary of the transactions contemplated to be consummated by it by such Ancillary Agreements will, (i) conflict with or violate the organizational documents of Purchaser or any Purchaser Subsidiary, (ii) result in a breach of or constitute a default under any Contract to which Purchaser or any Purchaser Subsidiary is a party or by which any of its properties or assets is bound, (iii) conflict with or violate any Judgment or Law applicable to Purchaser or any Purchaser Subsidiary or its properties or assets or (iv) result in the creation of any Lien upon any of the properties or assets of Purchaser or any Purchaser Subsidiary, except, in the case of clauses (ii), (iii) and (iv), any such items that would not reasonably be expected to have a material adverse effect on the ability of Purchaser to consummate the Acquisition and the other transactions contemplated by this Agreement (a "**Purchaser Material Adverse Effect**").

(b)    No Consent of, or registration, declaration or filing with, any Governmental Entity is required to be obtained or made by or with respect to Purchaser or any Purchaser affiliate in connection with the execution, delivery and performance of this Agreement or the Ancillary Agreements or the consummation of the Acquisition, other than (i) those that may be required solely by reason of Seller's (as opposed to any other third party's) participation in the Acquisition and the other transactions contemplated by this Agreement and by the Ancillary Agreements and

26

(ii) those, individually or in the aggregate, the failure of which to obtain or make would not reasonably be expected to have a Purchaser Material Adverse Effect.

SECTION 4.04. Legal Proceedings. There is no Proceeding pending or, to the knowledge of Purchaser, threatened in writing against Purchaser which is reasonably likely to have a Purchaser Material Adverse Effect. Purchaser is not a party or subject to or in default under any unsatisfied Judgment, other than such Judgments that are not reasonably likely to have a Purchaser Material Adverse Effect.

SECTION 4.05. Availability of Funds.

(a) Purchaser has received and accepted the executed equity commitment letter dated as of the date hereof, which equity commitment letter provides that Seller is a third party beneficiary thereof (the "**Equity Commitment Letter**"), from Nexus Special Situations III, L.P. and Nexus Special Situations IV, L.P. (collectively, the "**Equity Investors**") relating to the commitment of the Equity Investors to provide cash equity in the aggregate amount set forth therein (the "**Cash Equity**"). A complete and correct copy of the executed Equity Commitment Letter (including all exhibits, schedules, annexes and amendments to such equity commitment letter) has been provided to Seller prior to the date of this Agreement, and, as of the date of this Agreement, there have been no amendments or modifications to the Equity Commitment Letter since Purchaser provided such complete and correct copy thereof to Seller.

(b) The Equity Commitment Letter shall provide that the Cash Equity shall only be conditioned on the conditions precedent to the obligations of the parties thereunder to make the Cash Equity available to Purchaser on the terms therein. There are no side letters or other agreements, Contracts or arrangements related to the funding or investing, as applicable, of any of the Cash Equity, other than as expressly set forth in the Equity Commitment Letter that has been provided to Seller prior to the date of this Agreement, and there are no contingencies that would permit the Equity Investors to reduce the total amount of the Cash Equity. All of the conditions to the Cash Equity have been, or contemporaneously with the Acquisition will be, satisfied.

(c) The Cash Equity, when funded in accordance with the Equity Commitment Letter (including after giving effect to all flex terms in the related fee letter), shall provide Purchaser with acquisition financing at the Closing sufficient, when taken together with the other funds available to Purchaser at the Closing, for the payment of the aggregate consideration payable pursuant to Article II, the satisfaction of all of Purchaser's obligations under this Agreement and the Ancillary Agreements and the payment of all costs and fees to be borne by Purchaser and its affiliates.

(d) The Equity Commitment Letter is legal, valid, binding and in full force and effect, and assuming the satisfaction of the conditions set forth in Section 8.01 and Section 8.02, no event, fact or circumstance has occurred that, with or without notice, lapse of time, or both, would reasonably be expected to constitute a default or breach or a failure to satisfy a condition precedent on the part of Purchaser under the terms and conditions of the Equity Commitment Letter.

SECTION 4.06.        Brokers and Finders. There is no investment banker, broker, finder, financial advisor or other intermediary who has been retained by or is authorized to act on behalf of Purchaser that might be entitled to any fee or commission in connection with the Acquisition that would be payable by Seller or its affiliates.

SECTION 4.07.        Seller's Representations; Independent Investigation.

(a)        Purchaser is a sophisticated purchaser, possesses such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of its investment under this Agreement. Purchaser acknowledges and agrees that, other than the representations and warranties of Seller specifically contained in Article III, there are no representations or warranties of Seller or any other person either expressed or implied with respect to the Business, the Transferred Assets, the Assumed Liabilities or the transactions contemplated hereby, individually or collectively. Purchaser, together with and on behalf of its affiliates and Representatives, specifically disclaims that it or they are relying upon or have relied upon any such other representations or warranties that may have been made by any person, and Purchaser, together with and on behalf of its affiliates and Representatives, acknowledges and agrees that Seller and its affiliates have specifically disclaimed and do hereby specifically disclaim any such other representation or warranty made by any person. Without limiting the generality of the foregoing, Purchaser acknowledges and agrees that none of Seller, its affiliates or its Representatives makes any representations or warranties relating to (i) the maintenance, repair, condition, design, performance or marketability of any Transferred Asset, including merchantability of fitness for a particular purpose, (ii) the operation of the Business by Purchaser after the Closing, (iii) the maturity or acceleration of any contingent liability or other liability not yet due and owing relating to the Business or (iv) the probable success or profitability of the Business after the Closing. Purchaser acknowledges and agrees that it shall obtain rights in the Transferred Assets in their present condition and state of repair, "as is" and "where is".

(b)        Purchaser acknowledges that it, its affiliates and its Representatives have been permitted full access to and conducted an independent investigation of the books and records, facilities, equipment, personnel, Contracts and other properties and assets of the Business, the Transferred Assets and the Assumed Liabilities that it, its affiliates and its Representatives have desired or requested to see and review, and that it, its affiliates and its Representatives have had a full opportunity to meet with the officers and employees of Seller and its affiliates to discuss the Business, the Transferred Assets and the Assumed Liabilities.

(c)        Purchaser, its affiliates and its Representatives have received and may continue to receive from Seller, its affiliates and its Representatives certain estimates, projections and other forecasts for the Business and certain plan and budget information. Purchaser acknowledges that these estimates, projections, forecasts, plans and budgets, and the assumptions on which they are based, were prepared for specific purposes and may vary significantly from each other. Further, Purchaser acknowledges that there are uncertainties inherent in attempting to make such estimates, projections, forecasts, plans and budgets, that Purchaser is taking full responsibility for making its own evaluation of the adequacy and accuracy of all estimates, projections, forecasts, plans and budgets so furnished to it, its affiliates or its Representatives (including the reasonableness of the assumptions underlying such estimates, projections, forecasts, plans and budgets) and that Purchaser is not relying on any estimates, projections, forecasts, plans or

28

budgets made available or otherwise furnished by Seller, its affiliates or its Representatives, and Purchaser shall not, and shall cause its affiliates and its Representatives not to, hold any such person liable with respect thereto (whether in warranty, contract, tort (including negligence or strict liability) or otherwise).

ARTICLE V

COVENANTS

SECTION 5.01.         Conduct of Business.

(a)      Except for matters (1) set forth in Section 5.01 of the Disclosure Schedule, (2) consented to in writing by Purchaser (such consent not to be unreasonably withheld, conditioned or delayed), (3) otherwise expressly contemplated by the express terms of this Agreement, or (4) as required by Law, from the date of this Agreement to the Closing Date, Seller shall (w) cause the Business to be conducted in all material respects in the ordinary course in a manner substantially consistent with past practice, (x) substantially preserve Seller's legal existence and business organization; and (y) substantially preserve in all material respects the goodwill and present business relationships with all material customers, suppliers and others having material business relationships with them, in each case with respect to the Business, subject to ordinary course terminations and (z) not to take any of the following actions with respect to, or otherwise related to, the Business:

(i)      (A) increase compensation to Employees, other than (y) base salary increases for Employees with a title below Vice President in the ordinary course of business pursuant to Seller's corporate merit increase program, with such increases not to exceed three percent (3%) in the aggregate (as compared to all impacted employees' base salaries in effect prior to such increases) or (z) as required by applicable Laws, (B) grant, award or promise any severance, retention, transaction, change of control or similar bonus to any Employee, or (C) hire or terminate the employment, other than for cause, of any Employee whose base salary exceeds $100,000, other than new hires to replace Employees who resign or voluntarily depart after the date of this Agreement provided such new hires are employed on substantially the same terms and compensation as the terms and compensation of the Employee who is being replaced;

(ii)      sell, lease, license or otherwise dispose of any Transferred Assets (other than Transferred Intellectual Property), other than pursuant to existing Contracts as of the date of this Agreement;

(iii)      (A) sell, assign, transfer or otherwise dispose of, abandon, or permit to lapse or dedicate to the public domain any Transferred Intellectual Property, other than (i) expirations of Company Registered IP in accordance with the applicable statutory term, or (ii) trademarks included in the Company Registered IP that have lapsed or been abandoned for nonuse by Seller or its affiliates in the ordinary course of business and Seller or its affiliates will not renew or maintain, (B) license any Transferred Intellectual Property, other than non-exclusive licenses in the ordinary course of business, or (C) disclose any trade secret or source code included in the Transferred Intellectual Property to a third party, other than pursuant to a valid and binding

29

confidentiality agreement or other binding obligation of confidentiality Seller has entered into in the ordinary course of business;

      (iv)    subject the Transferred Assets to any Lien, other than a Permitted Lien;

      (v)    amend, modify, accelerate or terminate, as applicable, any Transferred Contract, except in the ordinary course of business;

      (vi)    waive, release, assign, settle or compromise any material rights or claims, or any material litigation or arbitration related to the Business, any Transferred Asset or any Assumed Liability, except in each case any such matter involving solely monetary damages not in excess of $250,000 individually or in the aggregate;

      (vii)    declare and pay dividends or make distributions or other transfers;

      (viii)    to the extent relating to the Business or the Transferred Assets: (A) make (other than if consistent with past practice), revoke or change any material Tax election, (B) adopt or change any Tax accounting method or period, (C) file any material amended Tax Return, (D) enter into any closing agreement or settlement with respect to a material amount of Taxes, (E) settle any claim or assessment for a material amount of Taxes, (F) consent to any extension or waiver of the statute of limitations period applicable to any such Tax claim or assessment outside of the ordinary course of business or (G) knowingly surrender any right to claim a refund of a material amount of Taxes, in each case, to the extent such action could reasonably be expected to adversely impact Purchaser;

      (ix)    authorize, or make any commitment with respect to, capital expenditures that are, in the aggregate, in excess of $400,000 per month for Seller and its subsidiaries, except as contemplated or required pursuant to existing Contracts set forth in Section 5.01(a)(ix) of the Disclosure Schedule;

      (x)    commence or settle any Proceeding (excluding any Proceedings that do not involve injunctive or equitable relief against Seller or any of its subsidiaries and that do not involve liability against Seller or any of its subsidiaries in excess of $250,000 individually or in the aggregate), or waive or release any right or claim against a third person; or

      (xi)    enter into a Contract to do any of the foregoing.

      (b)    Nothing contained in this Agreement is intended to give Purchaser or its affiliates, directly or indirectly, the right to control or direct the Business prior to the Closing, and nothing contained in this Agreement is intended to give Seller or its affiliates, directly or indirectly, the right to control or direct Purchaser's operations. Prior to the Closing, each of Purchaser, on the one hand, and Seller and its affiliates, on the other hand, shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision over its and its affiliates' respective operations.

      SECTION 5.02.    Access to Information.

30

(a)     Prior to the Closing, Seller shall, and shall cause its affiliates to, afford to Purchaser and its financing sources and Representatives reasonable access during normal business hours, upon reasonable prior notice, to the properties, books and records to the extent related to the Business (other than the Excluded Assets and Retained Liabilities), any Transferred Asset or any Assumed Liability and furnish Purchaser with such reasonable, additional financial and operating data and other information related to the Business, any Transferred Asset or any Assumed Liability as Purchaser may from time to time reasonably request and that Seller or its affiliates have in their possession or control; provided, however, that such access does not interfere or disrupt the normal operations of any of Seller or any of its affiliates or the Business. Nothing contained in this Section 5.02 shall obligate Seller or its affiliates to, in Seller's reasonable discretion, (i) breach any fiduciary duty, duty of confidentiality owed to any person (whether such duty arises contractually, statutorily or otherwise), Law or any Contract with any other person, (ii) waive or jeopardize any privileges, including the attorney-client privilege, or any work product protection, (iii) share any information which constitutes trade secrets or other sensitive information or (iv) cause significant competitive harm to Seller or the Business if the transactions contemplated hereby are not consummated; provided that if access is restricted pursuant to the foregoing, Seller shall, to the extent legally permissible, reasonably necessary and practicable, cooperate with Purchaser and make appropriate substitute arrangements. Prior to the Closing, when accessing any properties of Seller or its affiliates pursuant to and in accordance with this Section 5.02(a), Purchaser shall, and shall cause its financing sources and Representatives to, comply with all safety and security requirements for such property communicated to them. All requests for information made pursuant to this Section 5.02(a) shall be directed to Anna Hogan and Ramona Desantis (each a "**Designated Person**") or to such person or persons as may be designated in writing by Seller, and Purchaser shall not directly or indirectly contact any other officer, director or employee, agent, customer, vendor, supplier or Representative of Seller or any of its affiliates without the prior approval of a Designated Person or such other designated person(s); provided, however, subject to the provisions set forth in the Confidentiality Agreement, Purchaser may engage in communications with customers, vendors, suppliers or Representatives of the Seller (A) in the ordinary course of business unrelated to the Acquisition and other transactions contemplated by this Agreement and Ancillary Agreements or (B) as permitted by this Agreement and the Confidentiality Agreement. Neither the auditors and independent accountants of Seller or its affiliates nor the auditors and independent accountants of Purchaser or its affiliates shall be obligated to make any work papers available to any person under this Agreement, unless and until such person has signed a customary confidentiality and hold harmless agreement relating to such access to work papers in form and substance reasonably acceptable to such auditors or independent accountants. If so reasonably requested by Seller, Purchaser shall, and shall cause its financing sources and Representatives (as applicable) to, enter into a customary joint defense agreement with Seller or its affiliates with respect to any information to be provided to Purchaser pursuant to this Section 5.02(a). Notwithstanding the foregoing, Purchaser shall not conduct, without the prior written consent of Seller, which consent Seller may withhold in its sole discretion, any environmental or health or safety assessment or investigation, including any sampling or other intrusive investigation of air, surface water, groundwater, soil or anything else, at or in connection with any property or operations associated or affiliated in any way with the Business, Transferred Assets or Seller.

(b)     Within five (5) Business Days following the Completion Date, Seller shall use commercially reasonable efforts to introduce Purchaser to any customer, potential customer,

vendor or potential vendor of the Business reasonably requested by Purchaser, to the extent such introductions are permitted by applicable Law. Notwithstanding anything to the contrary in this Agreement, from and after date of this Agreement, except as otherwise required under applicable Law, Purchaser may discuss the terms of this Agreement with any customer, potential customer, vendor or potential vendor of the Business.

(c)     After the Closing Date, Purchaser shall, and Purchaser shall cause its affiliates to, grant such access, upon reasonable prior notice during normal business hours, to financial records and other information in their possession related to their conduct of the Business and such cooperation and assistance in each case as shall be reasonably required to enable Seller and its affiliates to complete their legal, contractual, regulatory, stock exchange and financial reporting requirements and for any other reasonable business purpose, including in respect of litigation and insurance matters. Seller shall promptly reimburse Purchaser for Purchaser's reasonable out-of-pocket expenses associated with requests made by Seller and its affiliates under this Section 5.02(c), but no other charges shall be payable by Seller and its affiliates to Purchaser in connection with such requests.

SECTION 5.03.     Confidentiality.

(a)     It is understood by the parties that the Confidentiality Agreement, dated as of June 29, 2025, by and between Seller and Encoura, LLC (the "**Confidentiality Agreement**") will survive the execution and delivery of this Agreement and will terminate pursuant to the terms of the Confidentiality Agreement.

(b)     Subject to Section 5.02(b), unless the prior written consent of the other party is obtained, except as otherwise required by applicable Laws, or in connection with the seeking of any consent to the assignment of, or notice under, any of the Transferred Contracts or as reasonably necessary to satisfy any of the parties' conditions or pre-Closing covenants, each of the parties shall keep confidential and not disclose, and cause its affiliates, its Representatives and its affiliates' Representatives to keep confidential and not disclose the terms and status of this Agreement and the other transaction documents, the Acquisition and the identity of the other party. Notwithstanding the foregoing, subject to the Confidentiality Agreement, each of the parties shall have the right to communicate and discuss with, and provide to, its respective Representatives, any information regarding the terms and status of this Agreement and the other transaction documents and the Acquisition.

(c)     Notwithstanding anything to the contrary in this Agreement, to the extent any affiliate of Purchaser is party to a confidentiality agreement with Seller or its affiliates (other than the Confidentiality Agreement), any rights and obligations of such affiliate with respect to any information furnished thereunder shall be governed exclusively by such confidentiality agreement and not this Agreement.

SECTION 5.04.     Regulatory and Other Authorizations; Notices and Consents.

(a)     Each party shall use, and shall cause its affiliates to use, its reasonable best efforts to promptly obtain all expirations of legal waiting periods, authorizations, consents, orders and approvals of all Governmental Entities applicable to the transactions contemplated by this

32

Agreement. Purchaser will pay all fees or make other payments to any Governmental Entity in order to obtain any such authorizations, consents, orders or approvals.Each party shall promptly notify the other of any communication it or any of its affiliates receives from any Governmental Entity relating to the matters that are the subject of this Agreement and permit the other to review in advance any material proposed communication to any Governmental Entity. Each party shall not agree to participate in any meeting with any Governmental Entity relating to the matters that are the subject of this Agreement unless it consults with the other in advance and, to the extent permitted by such Governmental Entity, gives the other the opportunity to attend and participate at such meeting. If a party receives a request for information or documentary material from a Governmental Entity in relation to the transactions contemplated here, it shall promptly make an appropriate response to such request. The parties will provide each other with copies of all material correspondence, filings or communications between them or any of their Representatives and any Governmental Entity related to the transactions contemplated by this Agreement; provided, however, that such materials may be redacted or withheld (i) to remove references concerning the valuation of the Business or the value of Seller and its subsidiaries after the consummation of the Acquisition, (ii) as necessary to comply with contractual arrangements, and (iii) as necessary to address reasonable privilege or confidentiality concerns.

(c)     Purchaser shall not, nor shall it permit its affiliates to, enter into or consummate any transaction that would reasonably be expected to make it materially more difficult, or materially increase the time required, to reach Closing or obtain the satisfaction of the conditions to Closing set forth in Section 8.01.

SECTION 5.05.     Services from Affiliates. Purchaser acknowledges that the Business currently receives or benefits from certain shared management and administrative and corporate services and benefits provided by Seller or its affiliates, including management, operations and information technology (including information technology support and website hosting and data center services), customer service, finance, accounting and payroll and back office services and processing, financial systems, treasury services (including banking, insurance, administration, taxation and internal audit), office space, facilities and office management services, business development and marketing services, research and development and product support services, procurement services, risk management, corporate communications, general administrative services, executive and management services, legal services, human resources and personnel services and travel services. Other than as may be provided pursuant to the terms of an Ancillary Agreement, Purchaser further acknowledges that all such services and benefits shall cease, and any agreement in respect thereof shall terminate with respect to the Business as of the Closing, and thereafter, Seller's and its affiliates' sole obligation with respect to the provision of any services with respect to the Business shall be as set forth in the Ancillary Agreements.

SECTION 5.06.     Publicity. Other than the press release to be agreed by Purchaser and Seller to be issued following the execution of this Agreement, neither of Purchaser, on the one hand, nor Seller, on the other hand, will issue or permit any of its respective affiliates to issue any press release, website posting or other public announcement with respect to this Agreement or the transactions contemplated hereby without the prior consent of the other party, except as may be required by Law or stock exchange rules or regulations (in which case whichever of Purchaser or its affiliates or Seller or its affiliates, as applicable, is required to make the release or statement shall use commercially reasonable efforts to allow the other reasonable time to

33

comment on such release or statement in advance of such issuance); provided, however, that Purchaser, on the one hand, and Seller and its affiliates, on the other hand, may make internal announcements to its employees that are consistent with, and following, the parties' prior public disclosures regarding the transactions contemplated by this Agreement, but provided, further, that any such formal communication by Seller to its employees relating to Purchaser shall, when administratively feasible, be subject to prior review by Purchaser and provided, further, for the avoidance of doubt, that this review right shall not apply to any communications relating to obligations under the WARN Act. Notwithstanding the foregoing, but subject to the Confidentiality Agreement, nothing in this Section 5.06 shall prevent any affiliate of Seller or Purchaser that is a private equity or similar investment fund, or any manager or general partner of any such fund, from reporting or disclosing with respect to fundraising, marketing, informational or reporting activities, on a confidential basis, to its partners, investors, potential investors or similar parties (in each case that are bound to an obligation of confidentiality with respect to), general information regarding this Agreement and the transactions contemplated by this Agreement.

SECTION 5.07.      Use of Retained Names and Marks.

(a)      Purchaser hereby acknowledges that Seller or its affiliates own all right, title and interest in and to the Trademarks included in the Retained Intellectual Property, including the trademarks, service marks, domain names, logos and names set forth in Section 5.07 of the Disclosure Schedule, together with all variations, translations, acronyms and other derivations thereof and all trademarks, service marks, Internet domain names, logos, trade names, trade dress, company names and other identifiers of source or goodwill containing, incorporating or associated with any of the foregoing (collectively, the "**Retained Names and Marks**"), and that, except as expressly provided in Section 5.07(c), any and all right of the Business to use the Retained Names and Marks shall terminate as of the Closing and shall immediately revert to Seller and its affiliates, along with any and all goodwill associated therewith. Purchaser further acknowledges that it has no rights, and is not acquiring any rights, directly or indirectly, to use the Retained Names and Marks, except as expressly provided in Section 5.07(c).

(b)      Each of Purchaser and Seller (and its affiliates) shall, for a period of twelve (12) months after the Closing Date, be entitled to use, solely in connection with the operation of the Business or the Retained Businesses, as applicable, as operated immediately prior to the Closing, all existing stocks of signs, letterheads, invoices, advertisements and promotional materials and all Internet domain names, website content, other Internet or electronic communications vehicles, inventory and other documents and materials in existence and used by the Business or the Retained Businesses, as applicable, as of the Closing (collectively, the "**Existing Stock**"), in each case, containing the Trademarks included in the Transferred Intellectual Property or the Retained Names and Marks (as applicable), after which period Purchaser and Seller (and its affiliates), as applicable, shall promptly cause the removal or obliteration of all Retained Names and Marks and Trademarks included in the Transferred Intellectual Property (as applicable) from such Existing Stock or cease using such Existing Stock. Seller and its affiliates may sublicense the licenses and rights granted herein to the successor or acquirer of a Retained Business.

(c)      Except as expressly provided in this Section 5.07, no other right to use the Retained Names and Marks or Trademarks included in the Transferred Intellectual Property is

34

granted after the Closing, whether by implication or otherwise, and nothing hereunder permits either party hereto, its affiliates or, after the Closing, the Business or the Retained Businesses (in each case, as applicable): (i) to use the Retained Names and Marks or Trademarks included in the Transferred Intellectual Property in any manner, other than in connection with the Existing Stock as set forth in Section 5.07(b), or (ii) to register or seek to register, or to permit any third party to register or to seek to register, any of the Retained Names and Marks or Trademarks included in the Transferred Intellectual Property in any jurisdiction. Each party hereto shall ensure that all use of the Retained Names and Marks and Trademarks included in the Transferred Intellectual Property (as applicable), after the Closing, as provided in Section 5.07(b), shall be only with respect to goods and services of a level of quality equal to or greater than the quality of goods and services with respect to which the Business or the Retained Businesses (as applicable) used the Retained Names and Marks or Trademarks included in the Transferred Intellectual Property (as applicable) prior to the Closing. Any and all goodwill generated by the use of the Retained Names and Marks or Trademarks included in the Transferred Intellectual Property under Section 5.07(b) shall inure solely to the benefit of Purchaser (with respect to the Trademarks included in the Transferred Intellectual Property) or Seller and its affiliates (with respect to the Retained Names and Marks), as applicable. In any event, and, without limiting any of the party's hereto obligations under this Section 5.07, each party hereto shall not, and shall cause its affiliates and, after the Closing, the Business and the Retained Businesses (as applicable) not to, (i) alter the use of the Retained Names and Marks or Trademarks included in the Transferred Intellectual Property on the Existing Stock, other than to remove or conceal the foregoing or apply notices of ownership, or (ii) use the Retained Names and Marks or Trademarks included in the Transferred Intellectual Property in any manner that may damage, harm, disparage or tarnish the reputation of the other party hereto or its affiliates or the goodwill associated with the Retained Names and Mark and Trademarks included in the Transferred Intellectual Property. Purchaser shall not, and shall cause its affiliates and, after the Closing, the Business not to use or adopt any name confusingly similar to the Retained Names and Marks. Seller shall not, and shall cause its affiliates, and after the Closing, the Retained Businesses while owned and operated by Seller (or its affiliates) not to use or adopt any name confusingly similar to the Trademarks included in the Transferred Intellectual Property.

(d)     Purchaser agrees that none of Seller or its affiliates shall have any responsibility for Claims by third parties arising out of, or relating to, the use by the Business of any Retained Names and Marks after the Closing. In addition to any and all other available remedies, Purchaser shall defend, indemnify and hold harmless the Seller Indemnitees from and against any and all such Claims that may arise out of the use of the Retained Names and Marks by the Business. Notwithstanding anything in this Agreement to the contrary, Purchaser hereby acknowledges and agrees that in the event of any breach or threatened breach of this Section 5.07, Seller, in addition to any other remedies available to them, (A) shall be entitled to a preliminary injunction, temporary restraining order or other equivalent relief restraining Purchaser and any of its affiliates (including, after the Closing, the Business) from any such breach or threatened breach and (B) shall not be required to provide any bond or other security in connection with any such injunction, order or other relief.

(e)     Seller agrees that none of Purchaser or its affiliates shall have any responsibility for Claims by third parties arising out of, or relating to, the use by the Retained Businesses, while owned and operated by Seller, of the Trademarks included in the Transferred Intellectual Property

35

after the Closing. In addition to any and all other available remedies, Seller shall defend, indemnify and hold harmless the Purchaser Indemnitees from and against any and all such Claims that may arise out of the use of the Trademarks included in the Transferred Intellectual Property by a Retained Business, while owned and operated by Seller, in violation or outside the scope permitted by this Section 5.07. Notwithstanding anything in this Agreement to the contrary, Seller hereby acknowledges and agrees that in the event of any breach or threatened breach of this Section 5.07, Purchaser, in addition to any other remedies available to them, (A) shall be entitled to a preliminary injunction, temporary restraining order or other equivalent relief restraining Seller and any of its affiliates (including, after the Closing, the Retained Businesses while owned and operated by Seller) from any such breach or threatened breach and (B) shall not be required to provide any bond or other security in connection with any such injunction, order or other relief.

SECTION 5.08.        Seller Guarantees. Purchaser acknowledges that in the course of conduct of the Business, Seller and its affiliates may have entered into various arrangements (a) in which guarantees, letters of credit, bonds or similar arrangements were issued by Seller or its affiliates and (b) in which Seller or its affiliates are the primary obligors on other Contracts, in any such case to support or facilitate the Business. The arrangements entered into by Seller and its affiliates referred to in the foregoing clauses (a) and (b), including those set forth in Section 5.08 of the Disclosure Schedule, are hereinafter referred to as the "**Seller Credit Support Obligations**". It is understood that the Seller Credit Support Obligations are not intended to continue after the Closing. Purchaser agrees that it shall use its reasonable best efforts to obtain replacement Seller Credit Support Obligations (which shall include the full and unconditional release of Seller and its affiliates) that will be in effect at the Closing or, in the case of Seller Credit Support Obligations described in the foregoing clause (b), will use its reasonable best efforts to arrange for itself or one of its subsidiaries to be substituted as the primary obligor thereon as of the Closing through an assumption, accession, acknowledgement or similar agreement (which shall include the full and unconditional release of Seller and its affiliates) with the beneficiary of the applicable Seller Credit Support Obligation. If Purchaser is not successful in replacing and releasing Seller and its affiliates from any Seller Credit Support Obligation by the Closing Date, then from the Closing until the date that Seller is released from each Seller Credit Support Obligation (i) Seller shall, and shall cause its affiliates to, cause any such Seller Credit Support Obligation to remain in effect, (ii) Purchaser shall continue to use its reasonable best efforts to replace and obtain promptly the complete and unconditional release Seller and its affiliates from each such Seller Credit Support Obligation following the Closing, and (iii) Purchaser shall indemnify Seller and its affiliates from and against any and all Losses incurred by any of them relating to any such Seller Credit Support Obligations. All costs and expenses incurred in connection with providing replacement credit support or the release or substitution of the Seller Credit Support Obligations shall be borne by Purchaser.

SECTION 5.09.        Insurance. For the avoidance of doubt, Seller and its affiliates shall retain all rights to control its insurance policies and programs, including the right to exhaust, settle, release, commute, buy-back or otherwise resolve disputes with respect to any of their insurance policies and programs, notwithstanding whether any such policies or programs apply to any liabilities of Purchaser or its affiliates and nothing herein shall require Seller or any of its affiliates to maintain any insurance after the Closing; provided, however, that, in respect of any claim arising from an event or occurrence with respect to Seller prior to the Closing Date, if

36

such claim may be made against any occurrence-based insurance policy of Seller or any of its affiliates (excluding amounts within self-insured retentions as it relates to the policy in place at the time of loss), then Seller shall promptly notify Purchaser in writing thereof and, upon written request of Purchaser, to the extent permitted by the terms of such insurance policies, on behalf of Purchaser, file or send any necessary notices and otherwise continue (at Purchaser's expense) to pursue such claim and recover proceeds under the terms of such insurance policies to be turned over to Purchaser, after deducting any reasonable and actually paid premiums, deductibles, reasonably foreseeable premium increases and reasonable costs and expenses (including legal fees and expenses), in each case, incurred by Seller in connection with pursuing and recovering such claims and reasonably attributable to such claims, and Seller agree to otherwise reasonably cooperate in good faith with Purchaser or its affiliates to make the benefits and proceeds of any such insurance policies available to Purchaser or its affiliates to the extent not prohibited by Law or as permitted by the terms of such insurance policies. Notwithstanding anything to the contrary contained in this Agreement, but subject to the immediately preceding sentence, neither Purchaser nor any of its affiliates shall make any claims under any other insurance policies (including any claims-made insurance policies) of Seller or its affiliates. To the extent a claim is paid under an insurance policy of any of Seller or its affiliates pursuant to this Section 5.09, none of the Purchaser Indemnitees shall be entitled to indemnification pursuant to Article X.

SECTION 5.10.        Waiver of Conflicts. Recognizing that Kirkland & Ellis LLP has acted as legal counsel to one or more of Seller and its affiliates (individually and collectively, the "**Seller Group**") prior to the Closing, and that Kirkland & Ellis LLP intends to act as legal counsel to one or more of Seller and its affiliates after the Closing, Purchaser hereby (i) waives, on its own behalf and on behalf of its Representatives and affiliates (individually and collectively, the "**Purchaser Group**"), and shall cause any affiliate thereof to consent to and waive, any claim they have or may have that Kirkland & Ellis LLP has a conflict of interest or is otherwise prohibited from engaging in such representation and (ii) acknowledge and agree, on its own behalf and on behalf of its affiliates that, in the event that any dispute arises after the Closing between the Purchaser Group and Seller or its affiliates, Kirkland & Ellis LLP may represent one or more of Seller or its affiliates in such dispute even though the interests of such person(s) may be directly adverse to Purchaser. Purchaser represents that Purchaser's own attorney has explained and helped Purchaser evaluate the implications and risks of waiving the right to assert future conflict against Kirkland & Ellis LLP, and Purchaser's consent with respect to this waiver is fully informed. In addition, all communications involving attorney-client confidences between any of Seller or its affiliates and Kirkland & Ellis LLP in the course of the negotiation, documentation and consummation of the transactions contemplated hereby (including, for the avoidance of doubt, all of the client files and records in the possession of Kirkland & Ellis LLP related to this Agreement and the transactions contemplated hereby) shall be deemed to be attorney-client confidences that belong solely to Seller and its affiliates, and the attorney-client privilege and the expectation of client confidence belongs to, and shall be controlled by, the Seller Group and will not pass to or be claimed by Purchaser. Without limiting the generality of the foregoing, upon and after the Closing, (a) Seller and its affiliates shall be the sole holders of the attorney-client privilege with respect to such engagement, and (b) to the extent that files of Kirkland & Ellis LLP in respect of such engagement constitute property of the client, only Seller and its affiliates shall hold such property rights. Accordingly, as to any such communications prior to the Closing, Purchaser together with any of its affiliates, subsidiaries, successors or assigns, further agree that no such

37

person may use or rely on or access without consent any of such communications in a manner that may be adverse to Seller or any of its affiliates.

SECTION 5.11.    Further Action; Wrong Pockets.

(a)    On the terms and subject to the conditions of this Agreement, each party will use its commercially reasonable efforts to take or cause to be taken in an expeditious manner all actions and to do or cause to be done all things necessary, appropriate or advisable to satisfy the conditions to the Closing (and refrain from taking any action that would reasonably be expected to have the effect of delaying, impairing or impeding the Closing), to consummate the transactions contemplated hereby and to comply promptly with all legal requirements that may be imposed on it or any of its affiliates with respect to the Closing, in each case as promptly as practicable, including by forming or causing to be formed a duly organized and validly existing affiliate of Purchaser in good standing in any jurisdiction where such affiliate is required under the Law of such jurisdiction to be its designee to purchase any of the Transferred Assets and utilizing such affiliate for such purpose (and, to the extent requested by Seller, entering into local sales agreements consistent with the terms of this Agreement if required or advisable under the Laws of any foreign jurisdictions).

(b)    If, following the Closing, any right, property or asset not forming part of the Transferred Assets is found to have been transferred to Purchaser in error, either directly or indirectly, Purchaser shall transfer, or shall cause its affiliates to transfer, at no cost to Seller or its affiliates, such right, property or asset (and any related liability) as soon as practicable to Seller or the affiliate of Seller indicated by Seller. If, following the Closing, any right, property or asset forming part of the Transferred Assets is found to not have been transferred to Purchaser in error, either directly or indirectly, Seller shall transfer, or shall cause its affiliates to transfer, at no cost to Purchaser or its affiliates, such right, property or asset (and any related liability) as soon as practicable to Purchaser or the affiliate of Purchaser indicated by Purchaser.

(c)    Following the Closing, each party hereto covenants and agrees to remit, with reasonable promptness, to the other party hereto any payments received, which payments are on, or in respect of accounts receivable owned by, or otherwise payable to, such other party hereto.

SECTION 5.12.    [Reserved.]

SECTION 5.13.    Accounts Payable and Payroll; Accounts Receivable.

(a)    Subject to the terms and subject to the conditions of this Agreement, other than the Assumed Benefit Obligations, from and after the Closing, Seller shall, or shall cause one of its subsidiaries to, pay, perform and discharge when due current accounts payable to trade creditors and unpaid salaries and wages to Employees, in each case, to the extent Related to the Business and as in existence on or as of immediately prior to the Closing.

(b)    From the date hereof through the Closing, Seller and the Business shall not (A) accelerate the collection of any account receivable outside of the ordinary course of business or (B) amend, alter, modify, or otherwise change the allocation methodology from that set forth in and applied in the A/R Report.

38

SECTION 5.14.      Transition Services Cooperation. From the date hereof until the Closing, the parties hereto shall use their respective reasonable best efforts to negotiate the terms of the Transition Services Agreement. Seller agrees to introduce Purchaser to purchasers of the other businesses of Seller in connection with the provision or receipt of services by the Business under the Transition Services Agreement. The parties hereto agree that execution of a Transition Services Agreement is not a condition to Closing (it being understood and agreed that this sentence shall not modify, in any respect, the condition to Closing set forth in Section 8.02(b)). If the Transition Services Agreement is not executed and delivered by the parties hereto in accordance with Section 2.03, then the parties hereto will use best efforts to finalize the terms of the Transition Services Agreement as soon as practicable thereafter and will operate under the terms of the TSA Term Sheet (as if such terms were binding contractual commitments and not terms to be included in a definitive agreement, and which TSA Term Sheet shall be updated by the parties to reflect any deviations from the TSA Term Sheet as of the date this Agreement that are agreed by the parties as part of the negotiation of the Transition Services Agreement) until such time as the Transition Services Agreement is executed. Ten (10) Business Days before the Closing, Seller will deliver to Purchaser a forecast of Service Charges (defined the TSA Term Sheet) projected to be incurred under the Transition Services Agreement by Purchaser during the first three (3) months following the Closing. Immediately following the Closing Date, Purchaser will remit to Seller those Service Charges estimated in such forecast for the first (1st) month of the Transition Services Agreement.

SECTION 5.15.      Freedom to Operate License.

(a)      Seller (on behalf of itself and its affiliates) hereby grants to Purchaser (and its affiliates) a nonexclusive, royalty-free, freely sublicensable, right and license to exploit all Retained Intellectual Property (excluding any Trademarks and the Delivered Source Code), owned by Seller (or its affiliates) at Closing, to conduct the Business as conducted during the twelve (12) months prior to Closing (and any natural extensions or evolutions thereof). Purchaser (on behalf of itself and its affiliates) hereby grants to Seller (and its affiliates) a nonexclusive, royalty-free, freely sublicensable, right and license to exploit all Transferred Intellectual Property (excluding Trademarks) to conduct the Retained Businesses as conducted during the twelve (12) months prior to Closing (and any natural extensions or evolutions thereof).

(b)      The rights granted under and pursuant to Section 5.15 are rights to use intangible property only, and each of Seller and Purchaser acknowledge and agree that nothing in this Section 5.15 shall oblige any party to deliver, or otherwise provide, to any person any (i) physical materials, including any Software (in computer readable form and/or human readable form), or (ii) support, maintenance, hosting or other services of any kind.

(c)      Notwithstanding anything to the contrary in this Agreement, Seller and Purchaser may assign their respective licenses set forth in this Section 5.15 in whole or in part in connection with a merger, consolidation or sale of all or substantially all of, or any portion of the assets of, their respective businesses to which the licenses relate.

(d)      Seller and Purchaser and their respective affiliates may sublicense their respective licenses set forth in this Section 5.15 to (i) their vendors, consultants, contractors and suppliers, in connection with the provision of services and products to their respective businesses to which the licenses relate, and (ii) their distributors, strategic partners, customers and end-users, in

39

connection with the distribution, licensing, offering and sale of the current and future products and services of their respective businesses to which the licenses relate, but in each case solely within the permitted scope of the applicable license granted hereunder.

(e)     Seller and Purchaser intend and agree that, for purposes of Section 365(n) of the Bankruptcy Code (and any amendment thereto) and any equivalent applicable Law in any foreign jurisdiction, each of the above licenses will be treated as a license to intellectual property (as defined in Section 101(35A) of the Bankruptcy Code).

(f)     The licenses in this Section 5.15 are intended to run with the Intellectual Property subject to such licenses. Each of Seller and Purchaser and their respective affiliates, as applicable, must transfer its licenses granted herein to the successor or acquirer of any of their Intellectual Property subject thereto, and such successor or acquirer shall be deemed to assume its obligations by operation of applicable Law.

SECTION 5.16.     Delivered Source Code License. Notwithstanding anything in this Agreement to the contrary, except with respect to any of the representations and warranties in Section 3.08, Purchaser acknowledges that the Delivered Source Code is provided "as is" absent express or implied warranties, including warranties regarding functionality, fitness for a particular purpose or non-infringement. Seller (on behalf of itself and its affiliates) hereby grants to Purchaser (and its affiliates) a nonexclusive, perpetual, royalty-free, freely sublicensable, license to exploit all rights owned by Seller (and its affiliates) as of the Closing in the Delivered Source Code in connection with the operation or conduct of the Business (and any natural extensions or evolutions thereof).  Purchaser acknowledges and agrees that nothing in this Section 5.16 shall oblige Seller (or its affiliates) to provide to any person any updates or modifications to the Delivered Source Code made after Closing, or any support, maintenance, hosting or other services of any kind. Notwithstanding anything to the contrary in this Agreement, Purchaser may assign this license in whole or in part in connection with a sale of all or any portion of any business or product that includes any of the Delivered Source Code. Seller agrees that, for purposes of Section 365(n) of the Bankruptcy Code (and any amendment thereto) and any equivalent applicable Law in any foreign jurisdiction, this license will be treated as a license to intellectual property (as defined in Section 101(35A) of the Bankruptcy Code).

SECTION 5.17.     Separation and Migration Plans. No later than ten (10) Business Days prior to the Closing, Purchaser and Seller will agree upon a separation plan (the "**Separation Plan**"), which shall set forth those steps necessary to enable the separation of the Transferred Assets from the Retained Businesses, and a migration plan (the "**Migration Plan**"), which shall set forth those steps necessary to enable the migration of the Transferred Assets to Purchaser, in each case, by the Closing, unless otherwise mutually agreed to by Purchaser and Seller. Purchaser and Seller will use commercially reasonable efforts to effect the Separation Plan and the Migration Plan, and each party hereto shall bear its own costs incurred in connection with the same.  The parties hereto will update the Separation Plan and Migration Plan by mutual agreement from time to time to account for agreed upon changes or additional details, activities, and timelines.

SECTION 5.18.     In-Scope Foreign Asset and In-Scope Foreign Liability Definitive Documentation. Seller and Purchaser acknowledge and agree that the In-Scope Foreign

40

Assets and In-Scope Foreign Liabilities are owned or held by, or obligations or liabilities of, affiliates of Seller that are neither party to the Bankruptcy Cases nor subject to the Bankruptcy Code. With respect to such In-Scope Foreign Assets, Seller (by and through such Seller's relevant affiliates) and Purchaser (by and through such Purchaser's relevant affiliates) shall work in good faith to negotiate short-form assignment and assumption agreements (each, a "**Local Transfer Agreements**") in a form consistent with the terms hereof and otherwise mutually agreeable to Seller and Purchaser, including with respect to any provisions necessary or advisable to satisfy the requirements of local applicable Laws, for the conveyance of the In-Scope Foreign Assets and assumption of the In-Scope Foreign Liabilities. To the maximum extent possible, each Local Transfer Agreement shall serve solely to effect the legal transfer of the applicable Transferred Assets and assumption of the applicable Assumed Liabilities and shall not have any effect on the value being received by Purchaser or given by Seller, including the allocation of assets and Liabilities as between them, all of which shall be determined by this Agreement.

SECTION 5.19.      Consents; Mixed-Use Contracts.

(a)      Within ten (10) days following the date of this Agreement, Seller shall provide to Purchaser a list of the Mixed-Use Contracts (the "**Mixed-Use Contract Schedule**"), which Mixed-Use Contract Schedule shall include, with respect to each Mixed-Use Contract, (i) the annual recurring revenue thereunder and (ii) Seller's proposed allocation of such Mixed-Use Contract as between (A) the portion of the rights and benefits under such Mixed-Use Contract related to the Business (the "**Business Portion**") and (B) the portion of such Mixed-Use Contract that does not constitute the Business Portion. Purchaser shall have fifteen (15) days from the date of delivery of such list to remove any such Mixed-Use Contracts allocated to Purchaser, Seller and Purchaser shall cooperate in good faith to identify and add to the allocation to Purchaser any other Mixed-Use Contracts that are Related to the Business but were not so allocated by Seller in the list. Within three (3) days following such fifteen (15)-day period, Seller shall deliver to Purchaser an updated Mixed-Use Contract Schedule reflecting such additions and subtractions. Seller shall use commercially reasonable efforts to provide Purchaser with copies of Mixed-Use Contracts within ten (10) Business Days following the date of this Agreement, to the extent not already provided.

(b)      Following the Closing Date, Seller and Purchaser shall use their respective commercially reasonable efforts to cause each counterparty to a Mixed-Use Contract to enter into separate Contracts (i) with Purchaser or its designated affiliate in respect of the Business Portion of such Mixed-Use Contract (a "**Transferred Mixed-Use Contract**"), and (ii) with the Seller in respect of all other goods or services other than the Business Portion of such Mixed-Use Contract, in each case, on terms substantially similar to those in existence on the date hereof in respect of those respective goods or services (such act, the "**Contract Separation**").

(c)      With respect to each Mixed-Use Contract, from the Closing until the earliest of (i) completing the Contract Separation for such Mixed-Use Contract, and (ii) the expiration of such Mixed-Use Contract in accordance with its terms (without any extensions or renewals thereof), Purchaser and Seller shall (A) provide or cause to be provided to the other parties all commercially reasonable assistance as is reasonably requested in connection with completing the Contract Separation for such Mixed-Use Contract and (B) use reasonable best efforts to put in place a subleasing, sublicensing, subcontracting or other arrangements (a "**Back-to-Back**

41

**Arrangement**") pursuant to which (1) Purchaser shall provide servicing to the counterparty to such Mixed-Use Contract on the terms required by such Mixed-Use Contract and (2) Purchaser shall bear (and indemnify and hold harmless Seller against) all Liabilities and obtain (and receive from Seller, to the extent accruing to Seller) all claims, rights and benefits with respect to such Mixed-Use Contract that would accrue to Purchaser pursuant to this Agreement if the requisite Contract Separation were completed prior to the Closing.

(d)       Notwithstanding anything to the contrary contained herein, neither Seller nor any of its affiliates shall have any obligation to make any payments, incur any material Liability or grant any material concessions to obtain any consents of third parties or effect any Contract Separation or put in place any Back-to-Back Arrangement, in each case, pursuant to this Section 5.19.

(e)       Following the Closing, if any Mixed-Use Contract is terminated by the counterparty (and not by Seller or Seller's successor with respect to such Mixed-Use Contract (such successor, an " **Other Owner Party**")) to such Mixed-Use Contract pursuant to, and as permitted by, the express terms of such Mixed-Use Contract solely as a result of, and solely due to, the intentional breach by Purchaser of such Mixed-Use Contract (for clarity, such termination shall not be based on the right of the counterparty to the Mixed-Use Contract to terminate for convenience in order for this Section 5.19(e) to apply), it being understood that Purchaser shall receive the full benefit of any and all notice requirements and cure periods under such Mixed-Use Contract in connection with any such termination for intentional breach, then upon written notice of such termination for intentional breach by the counterparty to the Mixed-Use Contract or the Seller acting in good faith on behalf of the Other Owner Party (and without any requirement that the counterparty's notice specify the foregoing or that Purchaser has "actual knowledge" or act with "reckless disregard," but such notice shall comply with the requirements under such Mixed-Use Contract for a termination for intentional breach), Purchaser shall indemnify such Other Owner Party for the loss of the annual recurring revenue payable under such contract attributable ("**Attributable ARR**") to Seller for the benefit of the Other Owner Parties for the remaining then-current term of the Mixed-Use Contract (which shall exclude any renewal terms, automatic or otherwise) ("**Remaining Term**"); provided, that Purchaser shall have no indemnification obligations under this Section 5.19(e) (i) with respect to any Mixed-Use Contract a copy of which has not been provided to Purchaser prior to the intentional breach giving rise to the applicable termination; provided, that if Purchaser has been made aware of the terms of such Mixed-Use Contract or if there is no formal executed Mixed-Use Contract to provide, or such Mixed Use Contract is expired, but the parties thereto continue to operate and perform their respective obligations thereunder as if Mixed-Use Contract is still in effect, Purchaser's indemnification obligations under this Section 5.19(e)(i) with respect to such contracts are not affected by the immediately foregoing proviso, or (ii) to any such Other Owner Party if, following such termination, such Other Owner Party enters into a Contract with such counterparty such that such Other Owner Party is in a substantially comparable economic position as it was immediately prior to such termination. Nothing in this Section 5.19(e) shall restrict in any way the ability of Purchaser or its affiliates to exercise any termination right it may have under any Mixed-Use Contract without liability hereunder. Notwithstanding anything to the contrary in this Agreement, in no event shall the Liability for Purchaser's account pursuant to this Section 5.19(e), (A) individually with respect to any Mixed-Use Contract, exceed the Attributable ARR of such Other Owner Party for the Remaining Term assuming a termination of such Mixed-Use Contract as of

42

the date of this Agreement, and (B) in the aggregate with respect to all Mixed-Use Contracts, exceed the Purchase Price.

(f)  Following the Closing, if any Mixed-Use Contract is terminated by the counterparty (and not by Seller or Purchaser) to such Mixed-Use Contract pursuant to, and as permitted by, the express terms of such Mixed-Use Contract solely as a result of, and solely due to, the intentional breach by such Other Owner Party of such Mixed-Use Contract (for clarity, such termination shall not be based on the right of the counterparty to the Mixed-Use Contract to terminate for convenience in order for this Section 5.19(f) to apply), it being understood that the Other Owner Party shall receive the full benefit of any and all notice requirements and cure periods under such Mixed-Use Contract in connection with any such termination for intentional breach, then upon written notice of such termination for intentional breach by the counterparty to the Mixed-Use Contract or the Seller acting in good faith on behalf of Purchaser (and without any requirement that the counterparty's notice specify the foregoing or that the Other Owner Party has "actual knowledge" or act with "reckless disregard," but such notice shall comply with the requirements under such Mixed-Use Contract for a termination for intentional breach), the Other Owner Party shall indemnify Purchaser for the loss of Attributable ARR to Seller for the benefit of Purchaser under such Mixed-Use Contract for the Remaining Term; provided, that the Other Owner Party shall have no indemnification obligations under this Section 5.19(f) (i) with respect to any Mixed-Use Contract a copy of which has not been provided to the Other Owner Party prior to the intentional breach giving rise to the applicable claim; provided, that if the Other Owner Party has been made aware of the terms of such Mixed-Use Contract or if there is no formal executed Mixed-Use Contract to provide, or such Mixed Use Contract is expired, but the parties thereto continue to operate and perform their respective obligations thereunder as if Mixed-Use Contract is still in effect, the Other Owner Party's indemnification obligations under this Section 5.19(f)(i) with respect to such contracts are not affected by the immediately foregoing proviso, or (ii) to Purchaser if, following such termination, Purchaser enters into a Contract with such counterparty such that Purchaser is in a substantially comparable economic position as it was immediately prior to such termination. Nothing in this Section 5.19(f) shall restrict in any way the ability of an Other Owner Party or its affiliates to exercise any termination right it may have under any Mixed-Use Contract without liability hereunder. Notwithstanding anything to the contrary in this Agreement, in no event shall the Liability for an Other Owner Party's account pursuant to this Section 5.19(f), (A) individually with respect to any Mixed-Use Contract, exceed the Attributable ARR of the Purchaser for the Remaining Term assuming a termination of such Mixed-Use Contract as of the date of this Agreement, and (B) in the aggregate with respect to all Mixed-Use Contracts, exceed the aggregate purchase price paid by such Other Owner Party to Seller in connection with the disposition of other business segments of Seller (other than the Business) that operate under such Mixed-Use Contract.

SECTION 5.20.  Access to CampusNexus, Blackboard and Anthology Domains.  Purchaser acknowledges that certain Transferred Assets and aspects of the Business rely upon access to the (i) the Required Domains (as defined below) and (ii) the domain names set forth in Section 5.20 of the Disclosure Schedules (those domains identified as CampusNexus Domains in Section 5.20 of the Disclosure Schedules, the "**CampusNexus Domains**", those domains identified as Blackboard Domains in Section 5.20 of the Disclosure Schedules, the "**Blackboard Domains**", and those domains identified as Anthology Domains in Section 5.20 of the Disclosure Schedules, the "**Anthology Domains**"). Seller and Purchaser acknowledge that the

43

CampusNexus Domains are Excluded Assets. Seller shall maintain Purchaser's access to the CampusNexus Domains during the twelve (12) months after Closing (the "**Transitional Period**"). Purchaser shall have the right to continue to access the CampusNexus Domains (i) during the Transitional Period solely for the purpose of enabling ongoing operations of the Business (in a manner consistent with operations of the Business within the twelve (12) months prior to Closing), and (ii) such access shall terminate automatically upon expiration of the Transitional Period. Seller and Purchaser agree that the Blackboard Domains and Anthology Domains are Transferred Assets. Notwithstanding the foregoing, upon expiration of the Transitional Period, Purchaser and its affiliates shall cease all external-facing uses of the Blackboard Domains and Anthology Domains, provided that, for clarity, Purchaser and its affiliates will in no event be required to modify or remove internal references or uses of the Blackboard Domains or Anthology Domains. For the avoidance of doubt, Seller and Purchaser acknowledge that the inclusion of the Anthology Domains and the Blackboard Domains in the Transferred Assets in and of itself confers no rights to Purchaser and its Affiliates in the Retained Names and Marks, except as expressly provided herein. To the extent Purchaser identifies domain names within three (3) months after Closing that are necessary for Purchaser to continue in all material respects, the ongoing operations of the Business as conducted at Closing, and such domain names are owned and controlled by Seller (the "**Required Domains**"), Seller shall use commercially reasonable efforts to grant Purchaser access to the Required Domains during the Transitional Period solely for the purpose of enabling ongoing operations of the Business as conducted at Closing. For the avoidance of doubt, Seller and Purchaser acknowledge that Purchaser shall not be permitted to use the Required Domains for externally-facing uses; provided that, if identified Required Domains were used in the Business in an externally-facing matter prior to Closing, Seller and Purchaser will discuss in good faith a commercially reasonable solution (i) designed to permit Purchaser's external use of such Required Domain in a manner consistent with how such Required Domain was used in the Business prior to Closing, for the Transitional Period, and (ii) that does not adversely impact the Business or any of the Retained Businesses.

SECTION 5.21.    Excess Parachute Payment. To the extent that any amount paid or payable (whether in cash, in property, or in the form of benefits) in connection with the transactions contemplated hereby (either solely as a result thereof or as a result of such transactions in conjunction with any other event) would reasonably be expected to constitute an "excess parachute payment" within the meaning of Section 280G of the Code, then prior to the Closing, Seller shall make commercially reasonable efforts (including with respect to any applicable disclosures to the Bankruptcy Court) to have such payments cleansed pursuant to the process contemplated by Revenue Ruling 2004-87.

## ARTICLE VI
## BANKRUPTCY COURT MATTERS

SECTION 6.01.    Bankruptcy Actions.

(a)    The Bidding Procedures Order shall approve the execution, delivery, and performance of this Agreement by Seller (including payment of the Expense Reimbursement pursuant to Section 9.02(b) and Breakup Fee pursuant to Section 9.02(c)). Purchaser agrees that it will take reasonable actions requested by any Seller to assist in obtaining Bankruptcy Court

approval of the Bidding Procedures Order. In the event the entry of the Bidding Procedures Order shall be appealed, Seller shall use commercially reasonable best efforts to defend such appeal.

(b)     The bidding procedures to be employed with respect to this Agreement shall be those reflected in the Bidding Procedures Order. Purchaser agrees and acknowledges that Seller, including through Seller's Representatives, is and may continue soliciting inquiries, proposals or offers from third parties in connection with any Alternative Transaction, solely in accordance with the terms of the Bidding Procedures Order. Seller may modify the Bidding Procedures Order or the Sale Order pursuant to discussions with Purchaser, the United States Trustee assigned to the Bankruptcy Case, the Bankruptcy Court, any creditor or committee representing a group of creditors in the Bankruptcy Case, or any other party in interest. However, any such modifications to the Bidding Procedures Order or the Sale Order shall be mutually acceptable to Purchaser and Seller.

(c)     From the date of this Agreement until the earlier of (i) the termination of this Agreement in accordance with Article IX and (ii) the Closing Date, Seller shall use its commercially reasonable best efforts to obtain entry by the Bankruptcy Court of the Bidding Procedures Order and the Sale Order and any other Final Orders reasonably necessary to consummate the Acquisition.

(d)     Subject to the last sentence of Section 6.01(b), Purchaser shall take reasonable actions requested by Seller to assist in obtaining the Bankruptcy Court's entry of the Sale Order and any other Final Order reasonably necessary to consummate the Acquisition, including for the purposes of providing assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" buyer under section 363(m) of the Bankruptcy Code, as well as reasonably demonstrating Purchaser's ability to pay and perform or otherwise satisfy any Assumed Liabilities following the Closing.

(e)     Seller and Purchaser shall (i) appear formally or informally in the Bankruptcy Court if reasonably requested by the other party or required by the Bankruptcy Court in connection with the Acquisition and (ii) keep the other reasonably apprised of the status of material matters related to this Agreement, including, upon reasonable request promptly furnishing the other with copies of notices or other communications received from the Bankruptcy Court or any third party and/or any Governmental Entity with respect to the Acquisition.

(f)     Notwithstanding anything to the contrary contained in the Bidding Procedures Order or any other court order, if an Auction is conducted, and Purchaser is not the prevailing party at the conclusion of such Auction (such prevailing party, the "**Successful Bidder**") but are the next highest bidder at the Auction, Purchaser shall be required to serve as a back-up bidder (the "**Backup Bidder**"). If Purchaser is the Backup Bidder, Purchaser's bid to consummate the Acquisition on the terms and conditions set forth in this Agreement shall remain open and irrevocable until the earliest to occur: (i) the four (4) weeks after the Auction or (ii) the approval of the Sale order with a Successful Bidder other than the Purchaser. If the Successful Bidder fails to consummate the applicable Alternative Transaction as a result of a breach or failure to perform on the part of such Successful Bidder, Purchaser will be deemed to have the new prevailing bid.

In such event, Seller may consummate the Acquisition on the terms and conditions set forth in this Agreement.

(g)      If Purchaser is the Successful Bidder or Backup Bidder, Seller shall schedule a hearing with the Bankruptcy Court to consider entry of the Sale Order no later than 55 days following the Petition Date, or as soon as reasonably practical thereafter, or such date as may be extended pursuant to the terms of the DIP Credit Agreement. Seller shall file such motions or pleadings as may be appropriate or necessary to assume and assign the Transferred Contracts and to determine the amount of the Cure Payments, each in accordance with the Bidding Procedures Order.

(h)      Seller shall use commercially reasonable efforts to cooperate with Purchaser concerning the Bidding Procedures Order, the Sale Order, any other orders of the Bankruptcy Court or other court of competent jurisdiction relating to the Acquisition, and the proceedings in connection therewith. Seller shall use commercially reasonable efforts to provide Purchaser with copies of all applications, pleadings, notices, proposed orders and other documents relating to such proceedings sufficiently in advance of the proposed filing date, but in no event less than one (1) calendar day prior to the proposed filing date, so as to permit Purchaser sufficient time to review and comment on such drafts. With respect to all provisions in those documents that impact Purchaser or relate to the Acquisition, such pleadings and proposed orders shall be in form and substance mutually acceptable to Purchaser and Seller. Seller shall use commercially reasonable efforts to give Purchaser reasonable advance notice of any hearings regarding the motions required to obtain the issuance of the Bidding Procedures Order and the Sale Order.

(i)      In compliance with the terms of the Bidding Procedures Order, Seller and Purchaser acknowledge that this Agreement and the sale of the Transferred Assets are subject to higher and better bids in accordance with the Bidding Procedures Order and Bankruptcy Court approval.

(j)      Purchaser shall provide adequate assurance of future performance as required under section 365 of the Bankruptcy Code for each Transferred Contract. Purchaser agrees that they will take all commercially reasonable actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been a sufficient demonstration of adequate assurance of future performance under the Transferred Contracts, such as furnishing affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court.

SECTION 6.02.      Sale Order. Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, the Sale Order, among other things, shall: (a) approve (i) the execution, delivery and performance by Seller of this Agreement, (ii) the sale of the Transferred Assets to Purchaser on the terms set forth in this Agreement and free and clear of all Liens (other than Permitted Liens), and (iii) the performance by Seller of its obligations under this Agreement; (b) authorize and empower Seller to assume and assign to Purchaser the Transferred Contracts; (c) find that Purchaser is a "good faith" buyer within the meaning of section 363(m) of the Bankruptcy Code, find that Purchaser is not a successor to Seller, and grant Purchaser the protections of section 363(m) of the Bankruptcy Code; (d) find that, other than as expressly set forth in this Agreement, Purchaser shall have no Liability or responsibility for any Liability or other obligation

46

of Seller arising under or related to the Transferred Assets, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, environmental, successor, or transferee Liability, labor law, de facto merger, or substantial continuity; (e) find that Purchaser has provided adequate assurance (as that term is used in section 365 of the Bankruptcy Code) of future performance in connection with the assumption of the Transferred Contracts; (f) find that Purchaser shall have no Liability for any Retained Liabilities; (g) find that the consideration provided by Purchaser pursuant to this Agreement constitutes reasonably equivalent value and fair consideration for the Transferred Assets; (h) find that Purchaser and Seller did not engage in any conduct which would allow this Agreement to be set aside pursuant to section 363(n) of the Bankruptcy Code; and (i) order that, notwithstanding the provisions of the Federal Rules of Bankruptcy Procedures 6004(h) and 6006(d), the Sale Order is not stayed and is effective immediately upon entry.

SECTION 6.03.        Approval. Seller's obligations under this Agreement and in connection with the Acquisition are subject to entry of and, to the extent entered, the terms of any Orders of the Bankruptcy Court (including entry of the Bidding Procedures Order and the Sale Order). Nothing in this Agreement shall require Seller or its affiliates to give testimony to or submit a motion to the Bankruptcy Court that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or its stakeholders.

SECTION 6.04.        Notices and Consents. Prior to the Closing and as necessary following the Closing, Seller will give, or will cause to be given, any notices to third parties necessary and appropriate to consummate the Acquisition. Seller and Purchaser shall use their commercially reasonable efforts to obtain any third-party consents, authorizations, permits or sublicenses, in each case, as are necessary and appropriate to consummate the Acquisition. Seller shall consult with Purchaser with respect to all correspondence and negotiations with third parties regarding any such matters and reasonably consider in good faith and incorporate the reasonable comments of Purchaser regarding the same.

SECTION 6.05.        Cure Payments; Cure of Defaults.

(a)        Subject to entry of the Sale Order, at or prior to the Closing, Purchaser shall pay the Cure Payments and any other amounts, and Seller, at Purchaser's cost, as applicable, shall pay any other amounts and cure any and all other defaults and breaches under the Transferred Contracts so that such Transferred Contracts may be assumed by Seller and assigned to the applicable Purchaser in accordance with the provisions of section 365 of the Bankruptcy Code and this Agreement. Seller agrees that it will promptly take such actions as are reasonably necessary to obtain a Final Order of the Bankruptcy Court providing for the assumption and assignment of such Contracts.

(b)        With respect to any Contract Related to the Business which is not a Transferred Contract on the Closing Date and provided such Contract has not been rejected by Seller after the Closing Date pursuant to Section 365 of the Bankruptcy Code, upon written notice(s) from Purchaser to Seller seeking to assume any such Contract Related to the Business given at any time after the Closing Date, Seller shall promptly take all actions reasonably necessary to assume and assign to Purchaser pursuant to Section 365 of the Bankruptcy Code any such Contract(s) set forth in Purchaser's notice(s); provided, that any Cure Payment applicable thereto shall be

47

satisfied solely by Purchaser. Notwithstanding anything in this Agreement to the contrary, on the date any such Contract is assumed and assigned to Purchaser pursuant to this Section 6.05, such Contract shall thereafter be deemed a Transferred Asset for all purposes under this Agreement.

(c)     Seller shall not reject any Contract Related to the Business until at least ten (10) days following the Closing Date.

ARTICLE VII

EMPLOYMENT MATTERS

SECTION 7.01.     Employees.Employee Census.  Not later than ten (10) days following the date of this Agreement, to the extent permitted by applicable Law, Seller or one of its affiliates shall provide to Purchaser an updated list of all Employees, including the following information to the extent permitted by applicable Law: (a) name or employee ID number; (b) position and hire date; (c) current base salary or hourly wage rate; (d) work location (by U.S. state for Employees in the U.S. and country for Employees outside of the U.S.); (e) leave status (if applicable, and including type of leave and, if known, expected return date); (f) classification as exempt or non-exempt under the Fair Labor Standards Act or other applicable state or local law; (g) immigration or visa status (if applicable); and (h) union status (if applicable) as may be updated from time to time (i) as mutually agreed between Purchaser and Seller, with consent by Purchaser not to be unreasonably withheld, (ii) to reflect resignations, or (iii) to reflect hires to replace Employees who are no longer employed and terminations (in accordance with the terms of Section 5.01 of this Agreement) (the "**Employee Census**").

(b)     Employment Offers.  Purchaser shall make a U.S. Qualifying Offer (as defined below) to at least 75% of the number of U.S.-based employees identified on the *Census – LE* tab and the *Census – SS* tab of the census entitled LESS Assets_v dated September 27, 2025 (the "**Initial Offeree Census**" and such 75% threshold, the "**U.S. Threshold**").  Purchaser shall make an offer of employment to, or otherwise effectuate the transfer of employment of, at least 70% of the number of non-U.S. based employees identified on the *Census – LE* tab and *the Census – SS* tab of the Initial Offeree Census.  For purposes of calculating such 75% or 70%, as applicable, (i) employees attributable to positions identified as "open" shall not be counted toward the denominator, and (ii) the number of employees included in the denominator in respect of *Student Success – CSA* employees will be equal to the number of *Student Success – CSA* employees actually employed as of the date the applicable employment offers are made. Within thirty (30) days following the date on which Seller has delivered the Employee Census, Purchaser will provide Seller with a written list of all employees who will receive offers of employment/transfer of employment consistent with this Section 7.01(b) (the "**Identified Employees**").  With respect to U.S. based Identified Employees, which shall meet, at minimum, the U.S. Threshold (the "**U.S. Identified Employees**"), such offers of employment will be for substantially the same position, responsibilities, work location and substantially the same base salary or wage rate as was in effect as of immediately prior to the Closing (a "**U.S. Qualifying Offer**").  With respect to non-U.S.-based Identified Employees (the "**Non-U.S. Identified Employees**"), such offers or transfers of employment, as applicable, shall, (x) with respect to any Identified Employees who are subject to the

48

ARD, comply with the applicable requirements of the ARD, as determined in accordance with Section 7.10, and (y) with respect to Non-U.S. Non-ARD Employees, be sufficient such that statutory termination-related payments and statutory severance obligations are not triggered, as determined by Purchaser after good faith consultation with Seller (each, as applicable, a "**Non-U.S. Qualifying Offer**"). Purchaser or one of its affiliates shall make the offers of employment contemplated by this Section 7.01(b) not later than fifteen (15) days prior to the Closing (or if required by applicable Law, such greater period as required by applicable Law, as determined by the Purchaser in good faith consultation with Seller). With respect to employees located outside of the U.S., Purchaser shall be permitted to effectuate any offers/transfers of employment through an "employer of record" or similar third-party employing entity.

(c)    Seller shall accept the resignation or terminate (as applicable), or shall cause such actions to be taken, on or prior to the Closing Date, the employment of all Non-ARD Employees who are offered and accept offers of employment with Purchaser which are compliant with this Section 7.01, and Purchaser shall keep Seller informed in writing of all such offers and acceptances. Following the date hereof, Purchaser and Seller will work in good faith to determine the extent to which entering into tripartite agreements in Non-U.S. jurisdictions applicable to any Identified Employee would minimize the expenses of a transfer/avoid termination related payments with respect to any such Identified Employee and, if so, Purchaser and Seller will work in good faith to enter into any such agreement(s). The Non-ARD Employees who accept an offer of employment with Purchaser or one of Purchaser's affiliates and commence employment with Purchaser or one of its affiliates shall be referred to as "**Non-ARD Transferred Employees**". Nothing herein shall be construed as a representation or guarantee by Seller or any of its affiliates that any Employees identified as of the date of this Agreement or otherwise listed on Section 12.05(b)(ii) of the Disclosure Schedule will remain employed as of the Closing (acknowledging Seller's obligations in Section 5.01) or that any or all of the Employees will accept any offer of employment from Purchaser or one of Purchaser's affiliates or will continue in employment with Purchaser or one of Purchaser's affiliates following the Closing. Further, nothing herein will, after the Closing Date, impose on Purchaser any obligation to retain any Non-ARD Transferred Employee in its employment for any amount of time or on any terms and conditions of employment. The employment of each such Transferred Employee with Purchaser will commence immediately after the Closing Date, provided, however, that in the case of any individual who is offered employment by Purchaser and accepts such offer, but who is absent from active employment and receiving short-term disability or workers' compensation benefits, the employment of any such individual with Purchaser would commence upon his or her return to active work, and such individual would become a Transferred Employee as of such date. Seller or its affiliates shall be solely responsible for all liabilities related to Seller's or its affiliates' termination of employment of any employee of Seller that occurs before, at or after the Closing; provided, that Purchaser shall be solely responsible for all severance, termination payments and other termination and separation related liabilities (arising before, at or after Closing), in each case solely to the extent such amounts (x) are required to be paid or provided by applicable non-U.S. law or statute, arising from or relating to Seller's or its affiliate's termination of employment of (i) 95% of those Employees listed on the Initial Offeree Census based outside of the United States who are not Non-U.S. Identified Employees and (ii) any Non-U.S. Identified Employee who does not receive a Non-U.S. Qualifying Offer from purchaser or its affiliates; or (y) are owed to U.S. Identified Employees

49

and result from Purchaser failing to provide U.S. Qualifying Offers in satisfaction of the U.S. Threshold. Except as otherwise required by Law, specified in this Agreement or otherwise agreed in writing by Purchaser, Purchaser shall not be obligated to provide any severance, separation pay, or other payments, rights or benefits, including any key employee retention payments, to any Employee on account of any termination of such Employee's employment at or before the Closing, and such payments, rights and/or benefits (if any) shall remain obligations of Seller.

SECTION 7.02.        401(k) Plan. All Non-ARD Transferred Employees who were eligible to participate in the Seller 401(k) Plan immediately prior to the Closing shall be eligible to participate in Purchaser's 401(k) plan upon commencement of the post-Closing eligibility period established by Purchaser, which shall be as soon as administratively practicable following the Closing. Seller shall cause, as of the Closing Date, all accrued benefits of all Non-ARD Transferred Employees under the Seller 401(k) Plan to be fully vested. Purchaser's 401(k) plan shall accept the rollover of any "eligible rollover distribution" (within the meaning of Section 402(c)(4) of the Code) from the Seller 401(k) Plan, including plan loans.

SECTION 7.03.        Health and Welfare Benefit Plans. Purchaser or one of Purchaser's affiliates shall cause Non-ARD Transferred Employees to be eligible to participate in health and welfare benefit plans at levels that are substantially comparable in the aggregate to the health and welfare benefit plans offered to similarly-situated employees of Purchaser or its sole member that are located in the same country as such Non-ARD Transferred Employee, if any (collectively, the "**Purchaser Health and Welfare Plans**"). Purchaser shall, or shall cause its affiliates to, take commercially reasonable efforts to waive any waiting period, pre-existing condition exclusion or similar limitation to the participation of any Non-ARD Transferred Employees (or dependent thereof) in the Purchaser Health and Welfare Plans, and credit all payments, charges and expenses of such Non-ARD Transferred Employees (and their eligible dependents) that were applied toward the deductible and out-of-pocket maximums under the medical, dental and vision plans sponsored by Seller in which such employees participated during the plan year in which the Closing occurs toward any deductible and out-of-pocket maximum applicable under the analogous Purchaser Health and Welfare Plans for the plan year in which the Closing occurs.

SECTION 7.04.        Credit for Service with Seller. Where applicable, and automatically applicable if required by Law, Purchaser and Purchaser's affiliates shall credit each Non-ARD Transferred Employees' length of service with Seller and its affiliates for purposes of eligibility, vesting and calculating entitlement to vacation days and sick days (but not with respect to benefit accrual and not with respect to any severance, defined benefit, or equity compensation plans of Purchaser unless required by applicable Law) to the same extent such service was recognized under the plan, program, policy or arrangement of Seller or any of its affiliates that most closely resembles that to be offered by Purchaser or one of Purchaser's affiliates (other than with respect to severance, defined benefit, or equity compensation plans of Purchaser unless required by applicable Law).

SECTION 7.05.        Commissions. With respect to Non-ARD Transferred Employees, Seller shall calculate the amount of all commissions earned in respect of periods prior to and including the Closing, with the amount of commissions attributable to completed performance periods being based on the amount of commissions actually earned, and the amount

50

of commissions attributable to the performance period in which the Closing occurs being based on Seller's good faith estimate of the commissions earned through the Closing as a fraction of such uncompleted performance period (and otherwise consistent with past practices and the terms of the applicable commission plan or program) (such amounts, the "**Earned Commissions**"). Seller shall retain all liabilities for, and remain solely responsible for paying, the Earned Commissions, which Earned Commissions shall be paid within 30 days of the end of the month following the Closing, consistent with the current commission payment practices of Seller.

SECTION 7.06.    Workers' Compensation. Effective as of the Closing, Purchaser and Purchaser's affiliates shall be responsible for all workers' compensation benefits payable to or on behalf of the Transferred Employees relating to events occurring after the Closing Date. Seller and its subsidiaries shall be responsible for all workers' compensation benefits payable under the terms and conditions of the workers' compensation programs maintained by Seller and its subsidiaries for claims by or on behalf of Non-ARD Transferred Employees relating to events occurring on or prior to the Closing Date.

SECTION 7.07.    Matters Relating to Certain Personnel. Within five (5) business days following the date of this Agreement, Seller will provide Purchaser with a schedule (by name or employee ID number and position) of those Employees who are engineers (a) exclusively dedicated to the Business and the Transferred Assets or (b) primarily dedicated to the Business and the Transferred Assets (the "**Specified Employees**"). For the period commencing on the date of this Agreement through the Closing, Seller shall use good faith efforts to cause the Specified Employees to continue to exclusively provide services with respect to the Business and the Transferred Assets, it being acknowledged and agreed that nothing herein shall be a promise or guarantee that any Specified Employee will remain employed for any set period (acknowledging Seller's obligations in Section 5.01). With respect to those Specified Employees who are engineers but who are not exclusively dedicated to the Business and the Transferred Assets, Seller shall make good faith efforts to transition such engineers to be exclusively dedicated to the Business and Transferred Assets prior to the Closing.

SECTION 7.08.    Administration, Employee Communications, Cooperation. Following the date of this Agreement, Seller (and its subsidiaries) shall, and Purchaser (and its affiliates) shall, reasonably cooperate and use good faith efforts in all matters reasonably necessary to effect the transactions contemplated by this Article VII, including exchanging information and data relating to workers' compensation, employee benefits and employee benefit plan coverages (except to the extent prohibited by Law), making any and all required filings and notices, making any and all required communications with the Employees or Transferred Employees (provided that any communications by Seller to the Employees relating to Purchaser shall be subject to prior review and approval by Purchaser) and obtaining any governmental approvals required hereunder.

SECTION 7.09.    WARN Act. With respect to Employees, including those that become Transferred Employees, Seller shall be solely responsible for compliance with and liabilities relating in any way to the Worker Adjustment and Retraining Notification Act of 1988, as amended, and any similar Law (the "**WARN Act**") for any act or omission of any Seller prior to or on the Closing Date. With respect to Transferred Employees, Purchaser shall be solely responsible for compliance with and liabilities relating in any way to the WARN Act for any act or omission of Purchaser on or after the Closing.  Provided the U.S. threshold has been met with

51

respect to the U.S. Qualifying Offers being made to the U.S. Identified Employees, with respect to Employees, but excluding any individuals that become Transferred Employees, Seller shall be solely responsible for compliance with and liabilities relating in any way to the WARN Act for any act or omission of any Seller after the Closing.

SECTION 7.10.     ARD Employees

(a)     Purchaser shall timely determine, after good faith consultation with Seller and in compliance with applicable Law, the extent to which the sale of Business is a "transfer" within the meaning of the ARD and if so, and subject to the provision of this Section 7.10, each Identified Employee who is an ARD Employee will transfer automatically to Purchaser or any of its affiliates at the Closing. With respect to any Identified Employee who is determined to be an ARD Employee, Purchaser, or one of its affiliates, shall employ such ARD Employee whose employment transfers automatically by operation of Law, on terms necessary to comply with the ARD, unless such individual objects to the transfer in such a way as to prevent the transfer of their employment by operation of Law (if such a right exists under the Laws of the relevant jurisdiction).  Any Identified Employee who is determined to be an ARD Employee whose employment automatically transfers to Purchaser, or one of its affiliates, on Closing by operation of Law pursuant to the ARD (and who does not object to the transfer) shall be referred to herein as an "**ARD Transferred Employee**".  If an ARD Employee objects to his or her employment transferring to Purchaser or one of its affiliates pursuant to the ARD, Purchaser shall not, and shall cause its affiliates not to, solicit, entice away, employ, offer to employ, or contract with any such ARD Transferred Employee for a period of twelve (12) months following the Closing, except where prior written consent has been obtained from Seller.

(b)     With respect to any ARD Employee who Seller and Purchaser mutually agree after the date of this Agreement shall not transfer automatically by operation of Law or with respect to any ARD Employee's employment otherwise does not transfer to Purchaser or one of its affiliates in accordance with the ARD as intended, such ARD Employee shall then be a Non-ARD Employee.

(c)     Purchaser and Seller shall, and shall cause their subsidiaries to, reasonably cooperate in good faith to timely satisfy all information, notification and consultation obligations under applicable Law related to the transfer of employment of the ARD Employees.

SECTION 7.11.     No Third-Party Beneficiaries. Nothing contained herein shall be construed as requiring, and Seller shall take no action that would have the effect of requiring, Seller or Purchaser to continue any specific employee benefit plans or to continue the employment of any specific individual for any period of time or on any term or condition of employment. The provisions of this Article VII are for the sole benefit of the parties and nothing herein, expressed or implied, is intended or shall be construed to (a) constitute an establishment of or amendment to any of the compensation and benefits plans maintained for or provided to employees prior to or following the Closing, (b) prohibit or limit Purchaser or any of its affiliates from amending or terminating any benefit or compensation plan, program, policy, agreement or arrangement or the employment or engagement of any person at any time or for any or no reason, or (c) confer upon or give to any person, other than the parties hereto and their respective permitted

52

successors and assigns, any legal or equitable or other rights or remedies under or by reason of any provision of this Agreement.

ARTICLE VIII

CONDITIONS TO CLOSING

SECTION 8.01.        Conditions to Each Party's Obligation. The obligations of Purchaser and Seller to consummate the Closing are subject to the satisfaction (or waiver by Purchaser and Seller) at or prior to the Closing of the following conditions:

(a)        No Injunctions or Restraints. No Law or Judgment shall be in effect that prohibits, enjoins or otherwise restrains the Closing.

(b)        Sale Order. The Bankruptcy Court shall have entered the Sale Order in form and substance mutually acceptable to Purchaser and Seller and such Sale Order shall be a Final Order (unless such Final Order requirement is waived by Purchaser).

SECTION 8.02.        Conditions to Obligation of Purchaser. The obligation of Purchaser to consummate the Closing is subject to the satisfaction (or waiver by Purchaser) at or prior to the Closing of the following conditions:

(a)        Representations and Warranties. Each of (i) the Specified Representations shall be true and correct in all respects on the date of this Agreement and at the Closing (except, in each case, to the extent that such representation and warranty speaks only as of a specified date, in which case such representation and warranty shall be true and correct in all respects as of such specified date) except for any inaccuracies that are de minimis in nature and (ii) the representations and warranties (disregarding all qualifications and exceptions contained therein relating to materiality, including references to "Material Adverse Effect") of Seller set forth in this Agreement (other than the Specified Representations) shall be true and correct on the date of this Agreement and at the Closing (except, in each case, to the extent that such representation and warranty speaks only as of a specified date, in which case such representation and warranty shall be true and correct as of such specified date), except where the failure of any such representation and warranty of Seller described in this clause (ii) to be so true and correct would not reasonably be expected to have a Material Adverse Effect.

(b)        Performance of Obligations of Seller. Seller shall have performed or complied with or caused to be performed or complied with, in all material respects, the obligations and covenants required by this Agreement to be performed or complied with by it by the time of the Closing.

(c)        No Material Adverse Effect. Since the date of this Agreement, there shall not have been a Material Adverse Effect.

(d)        Unaudited Financial Statements. Seller shall have delivered to Purchaser unaudited historical carve-out balance sheet of the Business as of June 30, 2025 and related unaudited consolidated statements of operations of the Business, for the fiscal year ended June 30, 2025.

53

(e)     Bidding Procedures Order. The Bankruptcy Court shall have entered the Bidding Procedures Order in form and substance mutually acceptable to Purchaser and Seller and such Bidding Procedures Order shall be a Final Order (unless such Final Order requirement is waived by Purchaser).

(f)     Contracts. The Bankruptcy Court shall have entered one or more orders (which may be the Sale Order), in form and substance mutually acceptable to Purchaser and Seller, approving the assumption and assignment of the Transferred Contracts to Purchaser pursuant to Section 365 of the Bankruptcy Code and such order(s) shall be a Final Order (unless such Final Order requirement is waived by Purchaser).

SECTION 8.03.     Conditions to Obligation of Seller. The obligation of Seller to consummate the Closing is subject to the satisfaction (or waiver by Seller) on or prior to the Closing Date of the following conditions:

(a)     Representations and Warranties. Each of the representations and warranties (disregarding all qualifications and exceptions contained therein relating to materiality, including references to "Material Adverse Effect") of Purchaser set forth in this Agreement shall be true and correct on the date of this Agreement and at the Closing (except, in each case, to the extent that such representation and warranty speaks only as of a particular date, in which case such representation and warranty shall be true and correct as of such earlier date), except where the failure of any such representation and warranty of Purchaser to be so true and correct would not reasonably be expected to have a Purchaser Material Adverse Effect.

(b)     Performance of Obligations of Purchaser. Purchaser shall have performed or complied with or caused to be performed or complied with, in all material respects, the obligations and covenants required by this Agreement to be performed or complied with by Purchaser by the time of the Closing.

SECTION 8.04.     Frustration of Closing Conditions. Neither Purchaser, on the one hand, nor Seller, on the other hand, may rely on the failure of any condition set forth in this Article VIII to be satisfied if such failure was caused by such party's or its respective affiliates' failure to act in good faith or to comply with its agreements set forth herein on the terms and subject to the conditions herein.

ARTICLE IX

TERMINATION

SECTION 9.01.     Termination. This Agreement may be terminated and the Acquisition and the other transactions contemplated by this Agreement abandoned at any time prior to the Closing:

(a)     by mutual written consent of Seller and Purchaser;

(b)     by either Seller or Purchaser:

(i)     if the consummation of the Acquisition or any of the other transactions contemplated hereby is restrained, enjoined, declared unlawful or otherwise prohibited by any Judgment or if there is any Law enacted or issued by any Governmental Entity having competent jurisdiction that prohibits or makes illegal the consummation of the Acquisition or any of the other transactions contemplated hereby; provided, that such final Judgment or Law has not been vacated, reversed or stayed and not cured within fifteen (15) Business Days; provided, however, that the right to terminate this Agreement under this Section 9.01(b)(i) shall not be available to any party whose material failure to perform any of its obligations under this Agreement has been a substantial cause of the issuance of such Judgment or Law; or

(ii)     if the Closing does not occur on or prior to December 31, 2025 (the "**End Date**"); provided, however, that if (A) (1) the Completion Date occurs prior to the End Date but (2) the fifteenth (15th) day following the Completion Date occurs after the End Date, then the End Date shall be further extended until such fifteenth (15th) day; (B) the Purchaser has elected to delay the Closing pursuant to Section 2.01, the End Date shall be further extended until such date; and (C) the parties shall in good faith agree (such consent not to be unreasonably withheld, conditioned or delayed) to extend the End Date up to an additional thirty (30) days if the parties reasonably anticipate that the satisfaction (or, to the extent permitted, the waiver) of the conditions set forth in Article VIII (other than any condition which by its nature is to be satisfied at the Closing, but subject to satisfaction or waiver of all such conditions) will occur in such period; provided, however, that in no event shall the End Date extend beyond January 30, 2025, without Purchaser's prior written consent, in Purchaser's sole discretion; provided further that the right to terminate this Agreement under this Section 9.01(b)(ii) shall not be available to any party whose material failure to perform any of its obligations under this Agreement, including the obligations of Purchaser under Section 5.04, has been a substantial cause of the failure of the Closing not to have occurred on or before the End Date (or any extension thereof);

(iii)     if (A) Seller enters into a definitive agreement(s) with respect to an Alternative Transaction in accordance with the terms of the Bidding Procedures Order, (B) the Bankruptcy Court approves an Alternative Transaction or (C) Seller consummates an Alternative Transaction; or

(iv)     if any Bankruptcy Case is dismissed or converted to a case or cases under Chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers to operate or manage the financial affairs or reorganization of Seller is appointed in the Bankruptcy Cases;

(c)     by Purchaser:

(i)     if Seller shall have breached or failed to perform any of its representations, warranties, covenants or agreements contained in this Agreement, which breach or failure to perform (i) would give rise to the failure of a condition set forth in Section 8.01 or Section 8.02 and (ii) cannot be cured by Seller by the End Date, or if capable of being cured, shall not have commenced to have been cured by the earlier of (A) the thirtieth (30th) day following receipt by Seller of written notice of such material breach or failure to perform from Purchaser stating Purchaser's intention to terminate this Agreement pursuant to this Section 9.01(c)(i) and the basis for such termination and (B) three (3) Business Days prior to the End Date; provided, however, that Purchaser shall not have the right to terminate this Agreement pursuant to this

55

Section 9.01(c)(i) if Purchaser is then in breach of any representations, warranties, covenants or other agreements hereunder that would result in the conditions to Closing set forth in Section 8.01 and/or Section 8.03 not being satisfied (other than those conditions that (1) by their terms are to be satisfied at the Closing (but subject to such conditions being capable of being satisfied as of such date) or (2) the failure of which to be satisfied is attributable primarily to a material breach by Seller of its representations, warranties, covenants and agreements contained in this Agreement);

(ii)     if Purchaser is not the Successful Bidder or the Backup Bidder;

(iii)    if Seller withdraws or seeks authority to withdraw the motion seeking approval of the Bidding Procedures Order;

(iv)    if following entry by the Bankruptcy Court of the Bidding Procedures Order or Sale Order, such order, as applicable, is (A) amended, modified or supplemented in a manner adverse to the Purchaser without Purchaser's prior written consent pursuant to Section 6.01(b) or (B) voided, reversed or vacated or subject to a stay; or

(v)     if Seller or any of its affiliates sells any Transferred Asset to any person or group (as defined in Section 13 of the Securities Exchange Act of 1934, as amended) other than Purchaser and its affiliates; or

(d)     by Seller:

(i)     if Purchaser shall have breached or failed to perform any of its representations, warranties, covenants or agreements contained in this Agreement, which breach or failure to perform (i) would give rise to the failure of a condition set forth in Section 8.01 or Section 8.03 and (ii) cannot be cured by Purchaser by the End Date, or if capable of being cured, shall not have commenced to have been cured by the earlier of (A) the thirtieth (30th) day following receipt by Purchaser of written notice of such material breach or failure to perform from Seller stating Seller's intention to terminate this Agreement pursuant to this Section 9.01(d)(i) and the basis for such termination and (B) three (3) Business Days prior to the End Date; provided, however, that Seller shall not have the right to terminate this Agreement pursuant to this Section 9.01(d)(i) if Seller is then in breach of any representations, warranties, covenants or other agreements hereunder that would result in the conditions to Closing set forth in Section 8.01 and/or Section 8.02 not being satisfied (other than those conditions that (1) by their terms are to be satisfied at the Closing (but subject to such conditions being capable of being satisfied as of such date) or (2) the failure of which to be satisfied is attributable primarily to a material breach by Purchaser of its representations, warranties, covenants and agreements contained in this Agreement); or

(ii)    if (A) Purchaser is required to consummate the Closing pursuant to Section 2.01 and Purchaser fails to consummate the Closing by the date the Closing is required to have occurred pursuant to Section 2.01, (B) Seller has confirmed by notice to Purchaser that all conditions set forth in Section 8.03 have been satisfied or that it is willing to waive any unsatisfied conditions in Section 8.03 and (C) the Acquisition shall not have been consummated within one Business Day after delivery of such notice;

SECTION 9.02.    Effect of Termination.

(a)    In the event this Agreement is terminated pursuant to Section 9.01, this Agreement shall become null and void and no party hereto nor any of their respective partners, officers, directors, managers or equityholders will have any Liability under this Agreement, except pursuant to the surviving Sections of this Agreement as set forth in the next sentence. Section 9.01, this Section 9.02 and Article XII shall survive any such termination. If this Agreement is terminated pursuant to Section 9.01, the maximum Liability of Seller under this Agreement shall be equal to the Expense Reimbursement and the Breakup Fee to the extent payable. For the avoidance of doubt, the Expense Reimbursement and the Breakup Fee shall, if applicable, be paid upon termination of this Agreement in accordance with Section 9.01.

(b)    If this Agreement is validly terminated after entry of the Bidding Procedures Order pursuant to Section 9.01(b) or Section 9.01(c) then Seller shall pay to Purchaser by wire transfer of immediately available funds within three (3) Business Days following such termination of this Agreement an amount equal to the reasonable and documented out-of-pocket costs and expenses (including fees and expenses of counsel) incurred by Purchaser in connection with the negotiation, diligence, execution, performance and enforcement of this Agreement ("**Expense Reimbursement**").

(c)    In consideration for Purchaser having expended considerable time and expense in connection with this Agreement, if this Agreement is validly terminated after entry of the Bidding Procedures Order pursuant to Section 9.01(b)(iii), Section 9.01(b)(iv) or Section 9.01(c), Seller shall pay to Purchaser a break-up fee in an amount equal to (i) $3,000,000 (the "**Breakup Fee**"), *minus* (ii) any Expense Reimbursement previously provided to Purchaser pursuant to Section 9.02(b) by wire transfer of immediately available funds within three (3) Business Days following the consummation of any Alternative Transaction or any other plan of reorganization or liquidation in the Bankruptcy Cases. Each of the parties acknowledges and agrees that the agreements contained in this Section 9.02 are an integral part of this Agreement and that the Expense Reimbursement and the Breakup Fee are not a penalty. Rather, the parties agree that the Breakup Fee and Expense Reimbursement represent liquidated damages in a reasonable amount that will reasonably compensate Purchaser in the circumstances in which such Expense Reimbursement or Breakup Fee, as applicable, is payable for the efforts and resources expended and opportunities foregone by Purchaser while negotiating and pursuing this Agreement and in reasonable reliance on this Agreement and on the reasonable expectation of the consummation of the transactions contemplated hereby, which amount would otherwise be impossible to calculate with precision. Notwithstanding anything to the contrary in this Section 9.02, under no circumstance shall Seller's aggregate liability with respect to the Expense Reimbursement and the Breakup Fee exceed $3,000,000.

(d)    Within five (5) Business Days following the date of this Agreement (or, if later, the two (2) Business Days following the establishment of the Good Faith Deposit Escrow Account), Purchaser shall deposit into a separate escrow account (the "**Good Faith Deposit Escrow Account**") established pursuant to the terms of the Good Faith Deposit Escrow Agreement an amount in cash equal to the Good Faith Deposit Escrow Amount. The Remaining Good Faith Deposit Escrow Funds will be released by the Good Faith Deposit Escrow Agent and delivered to either Purchaser or Seller in accordance with the provisions of this Agreement and

the Good Faith Deposit Escrow Agreement. The Remaining Good Faith Deposit Escrow Funds will be distributed out of the Good Faith Deposit Escrow Account as follows (and Purchaser and Seller hereby agree to promptly deliver joint written instructions to the Good Faith Deposit Escrow Agent to the extent required by the Good Faith Deposit Escrow Agent to effect such distributions as and when required hereunder):

(i)     if the Closing occurs, Purchaser and Seller shall jointly instruct the Good Faith Deposit Escrow Agent in writing to disburse the Remaining Good Faith Deposit Escrow Funds to Seller by wire transfer out of the Good Faith Deposit Escrow Account as partial payment of the Purchase Price;

(ii)    if this Agreement is validly terminated by Seller pursuant to Section 9.01(d), Purchaser and Seller shall promptly (and in any event within two (2) Business Days of such termination) deliver joint written instructions to the Good Faith Deposit Escrow Agent directing the release of the Remaining Good Faith Deposit Escrow Funds to Seller out of the Good Faith Deposit Escrow Account; or

(iii)   if this Agreement is validly terminated for any reason other than as contemplated by Section 9.02(d)(ii), Purchaser and Seller shall promptly (and in any event within two (2) Business Days of such termination) deliver joint written instructions to the Good Faith Deposit Escrow Agent directing the release of the Remaining Good Faith Deposit Escrow Funds to Purchaser out of the Good Faith Deposit Escrow Account.

The parties hereto agree that the Seller's right to retain the Good Faith Deposit Escrow Amount pursuant to Section 9.02(d)(ii), shall not be a penalty and shall constitute liquidated damages for any and all losses, liabilities, costs and expenses suffered or incurred by Seller or any other person in connection with this Agreement and, notwithstanding anything in this Agreement that may be deemed to the contrary, the Good Faith Deposit Escrow Amount shall be the sole and exclusive remedy (whether at law, in equity, in contract, in tort or otherwise) of the Seller and its affiliates against Purchaser in connection with such termination or any loss or other liability of any kind under or related to this Agreement, except as provided in Section 12.14.

(e)     Pursuant to the Bidding Procedures Order, the Claim of Purchaser in respect of the Expense Reimbursement and the Breakup Fee is and constitutes an allowed superpriority administrative expense claim against Seller under sections 105(a), 503(b) and 507(a)(2) of the Bankruptcy Code with priority over all other administrative expenses of Seller of the kind specified in section 503(b) of the Bankruptcy Code; provided that the priority of such superpriority administrative expense claims shall be subject and subordinate to the Carve Out (as defined in the applicable DIP Order) in all respects.

ARTICLE X

INDEMNIFICATION; SURVIVAL

SECTION 10.01.     Indemnification by Seller. Subject to the limitations set forth in Section 10.04, from and after the Closing, Seller shall indemnify Purchaser and its affiliates and each of its officers, directors, employees, stockholders, agents and representatives (the "**Purchaser**

58

**Indemnitees**") from and against any and all losses, liabilities, damages or expenses, including reasonable third-party legal fees and expenses in connection with defending any Proceeding (collectively, "**Losses**"), to the extent arising or resulting from any of the following:

(a)     any breach of any covenant of Seller to be performed solely following the Closing contained in this Agreement; and

(b)     the failure of Seller to pay, perform or otherwise discharge when due and payable any Retained Liabilities.

SECTION 10.02.     Indemnification by Purchaser. Subject to the limitations set forth in Section 10.04, from and after the Closing, Purchaser shall indemnify Seller and its affiliates and each of its officers, directors, employees, stockholders, agents and representatives (the "**Seller Indemnitees**") from and against any and all Losses, to the extent arising or resulting from any of the following:

(a)     any breach of any covenant of Purchaser to be performed solely following the Closing contained in this Agreement; and

(b)     the failure of Purchaser or any of its affiliates to pay, perform or otherwise discharge when due and payable any Assumed Liability, including liabilities subject to Seller Credit Support Obligations.

SECTION 10.03.     Indemnification Procedures.

(a)     Third Party Claims. If any party (the "**Indemnified Party**") receives written notice of the commencement of any Proceeding or the assertion of any Claim by a third party or the imposition of any penalty or assessment (in each case other than with respect to Taxes) for which indemnity may be sought under Section 10.01 or Section 10.02 (a "**Third Party Claim**"), and such Indemnified Party intends to seek indemnity pursuant to this Article X, the Indemnified Party shall promptly (but no later than fifteen (15) days of receiving such notice) provide the other party (the "**Indemnifying Party**") with written notice of such Third Party Claim, stating the nature, basis, the amount thereof (to the extent known or estimated, which amount shall not be conclusive of the final amount of such Third Party Claim), the method of computation thereof (to the extent known or estimated), any other remedy sought thereunder, any relevant time constraints relating thereto, and, to the extent practicable, any other material details pertaining thereto, along with copies of the relevant documents evidencing such Third Party Claim and the basis for indemnification sought. Failure of the Indemnified Party to give such notice will not relieve the Indemnifying Party from its indemnification obligations hereunder, except to the extent that the Indemnifying Party is actually prejudiced thereby. The Indemnifying Party will have twenty (20) days from receipt of any such notice of a Third Party Claim to give notice to the Indemnified Party whether it is assuming and controlling the defense, appeal or settlement proceedings thereof with counsel of the Indemnifying Party's choice; provided that the Indemnifying Party shall not be entitled to assume the control and defense of such Third Party Claim, and shall pay the reasonable fees and expenses of counsel retained by the Indemnified Party, if (i) such Third Party Claim relates to, or arises in connection with, a criminal action; (ii) a material conflict of interest exists between the applicable Indemnified Party and the

59

Indemnifying Party with respect to the defense of such Third Party Claim (including if there are specific defenses available to the Indemnified Party that are different from or additional to those available to the Indemnifying Party and that could be materially adverse to the Indemnifying Party); (iii) upon petition by the Indemnified Party, an appropriate court of competent jurisdiction issues a Final Order that the Indemnifying Party failed or is failing to vigorously prosecute or defend such Third Party Claim; or (iv) the Third Party Claim seeks an order, injunction or other equitable relief or relief for other than money damages against the Indemnified Party.

(b)      So long as the Indemnifying Party has assumed the defense, appeal or settlement proceedings of the Third Party Claim in accordance herewith, (i) the Indemnified Party may retain separate co-counsel at its sole cost and expense and participate in (but not control) the defense, appeal or settlement proceedings of the Third Party Claim, (ii) the Indemnified Party will not admit any liability, file any papers or consent to the entry of any judgment or enter into any settlement agreement, compromise or discharge with respect to the Third Party Claim without the prior written consent of the Indemnifying Party and (iii) the Indemnifying Party will not admit to any wrongdoing by the Indemnified Party. The Indemnifying Party shall have the right to settle any Third Party Claim for which it obtains a full release of the Indemnified Party with respect to such Third Party Claim or to which settlement the Indemnified Party consents in writing (such consent not to be unreasonably withheld, conditioned or delayed). The parties will act in good faith in responding to, defending against, settling or otherwise dealing with Third Party Claims. The parties will also cooperate in any such defense, appeal or settlement proceedings, and give each other reasonable access to all information relevant thereto. Whether or not the Indemnifying Party has assumed the defense, appeal or settlement proceedings with respect to a Third Party Claim, such Indemnifying Party will not be obligated to indemnify the Indemnified Party hereunder for any settlement entered into or any judgment that was consented to without the Indemnifying Party's prior written consent (such consent not to be unreasonably withheld, conditioned or delayed).

(c)      Other Claims.

(i)      An Indemnified Party shall give the Indemnifying Party written notice (a "**Claim Notice**") of any matter that an Indemnified Party has determined in good faith has given or could give rise to a right of indemnification under this Agreement, within thirty (30) days of such determination, stating the amount of the Loss, if known (the "**Claimed Amount**"), and the method of computation thereof, and containing a reference to the provisions of this Agreement in respect of which such right of indemnification is claimed or arises. Failure of the Indemnified Party to give such notice will not relieve the Indemnifying Party from its indemnification obligations hereunder, except to the extent that the Indemnifying Party is actually prejudiced thereby.

(ii)      Within thirty (30) days after delivery of a Claim Notice, the Indemnifying Party shall deliver to the Indemnified Party a written response (the "**Response**") in which the Indemnifying Party will: (A) agree that the Indemnified Party is entitled to receive all of the Claimed Amount, and, within five (5) Business Days of the Indemnified Party's receipt of the Response, the Indemnifying Party will pay the Claimed Amount to the Indemnified Party by wire transfer of immediately available funds to the bank account to be designated by such Indemnified Party in a written notice at least three (3) Business Days before such payment; (B) agree that the Indemnified Party is entitled to receive part, but not all, of the Claimed Amount (such portion, the

"**Agreed Portion**"), and, within five (5) Business Days of the Indemnified Party's receipt of the Response, the Indemnifying Party will pay the Agreed Portion to the Indemnified Party by wire transfer of immediately available funds to the bank account to be designated by such Indemnified Party in a written notice at least three (3) Business Days before such payment; or (C) dispute that the Indemnified Party is entitled to receive any of the Claimed Amount. If no Response is delivered by the Indemnifying Party to the Indemnified Party within such 30-day period, then the Indemnifying Party shall be deemed to have disputed the Indemnified Party's right to receive any of the Claimed Amount.

(iii)    In the event that the Indemnifying Party disputes (or is deemed to have disputed) the Claimed Amount (or the portion of the Claimed Amount not comprising the Agreed Portion), such dispute will be governed by a Proceeding subject to the terms of Section 12.10, Section 12.11 and Section 12.12.

SECTION 10.04.    Limitations on Indemnification. Notwithstanding anything to the contrary contained in this Agreement, (a) no party shall have any liability for an otherwise indemnifiable Loss that is contingent unless and until such contingent Loss becomes an actual Loss of the Indemnified Party and is due and payable, so long as the Claim for such Loss was timely submitted pursuant to the provisions of this Article X and (b) no party hereto shall be liable for any otherwise indemnifiable Loss arising out of any breach of any covenant or agreement of such party unless a claim therefore is asserted in writing by the Indemnified Party timely in accordance with Section 10.08.

SECTION 10.05.    Calculation of Indemnity Payments.

(a)    The amount of any Loss for which indemnification is provided under this Article X or Article XI shall be (i) net of any amounts recovered by the Indemnified Party (including under insurance policies) with respect to such Loss and (ii) reduced to take account of any net Tax benefit or recovery realized by the Indemnified Party in a prior taxable period or the current taxable period, arising from the incurrence or payment of any Loss (net of reasonable expenses incurred in obtaining such benefit or recovery). In computing the amount of any such Tax benefit, the Indemnified Party shall be deemed to recognize all other items of income, gain, loss, deduction or credit before recognizing any item arising from the receipt of any indemnity payment hereunder or the incurrence or payment of any indemnified amount. The amount of any such Tax benefit for any taxable period shall be the amount of the reduction in Taxes payable to a Taxing Authority with respect to such taxable period taking into account any such Tax benefit as compared to the Taxes that would have been payable to a Taxing Authority in the absence of such Tax benefit, in each case computed at the highest marginal tax rates applicable to the recipient of such Tax benefit.

(b)    If an Indemnified Party recovers an amount from a third party in respect of Losses that are the subject of indemnification hereunder after all or a portion of such Losses have been paid by an Indemnifying Party pursuant to this Article X, then the Indemnified Party shall promptly remit to the Indemnifying Party the excess (if any) of (A) (i) the amount paid by the Indemnifying Party in respect of such Losses plus (ii) the amount received by the Indemnified Party in respect thereof minus (B) the full amount of the Losses. In the event that an Indemnified Party has any rights against a third party with respect to any occurrence, claim or loss that results

61

in a payment by an Indemnifying Party under this Article X, such Indemnifying Party shall be subrogated to such rights to the extent of such payment. Without limiting the generality of any other provision hereof, each Indemnified Party shall duly execute upon request all instruments reasonably necessary to evidence and perfect the subrogation and subordination rights detailed herein, and otherwise cooperate in the prosecution of such Claims.

(c)      Each party shall, and shall cause its respective subsidiaries to, take all reasonable steps to mitigate any Loss indemnifiable hereunder upon and after becoming aware of any event that could reasonably be expected to give rise to any Loss. No party shall be entitled to any payment, adjustment or indemnification more than once with respect to the same matter.

SECTION 10.06.      Exclusivity. Except with respect to the remedies contemplated by Section 12.14, from and after the Closing, Purchaser's sole and exclusive remedy with respect to any and all Claims relating to this Agreement, the Business, the Transferred Assets, the Assumed Liabilities, or the transactions contemplated by this Agreement shall be pursuant to the indemnification provisions set forth in this Article X. In furtherance of the foregoing, Purchaser hereby waives, from and after the Closing, any and all rights, Claims and causes of action whether based on warranty, in contract, in tort (including negligence or strict liability) or otherwise that Purchaser or any other Purchaser Indemnitee may have against Seller, any of its affiliates or any other person, arising under or based upon any Law (including with respect to environmental matters generally and any matters under the Comprehensive Environmental Response, Compensation, and Liability Act), except pursuant to Section 12.14, and the indemnification provisions set forth in this Article X. Notwithstanding anything to the contrary contained in this Agreement, no breach of any representation, warranty, covenant or agreement contained herein shall give rise to any right on the part of Purchaser, on the one hand, or Seller, on the other hand, after the consummation of the transactions contemplated by this Agreement, to rescind this Agreement or any of the transactions contemplated hereby. No past, present or future Representative, incorporator, member, partner or stockholder of Seller or any of its affiliates shall have any liability, whether based on warranty, in contract, in tort (including negligence or strict liability) or otherwise, for any obligations or liabilities of Seller or any of its affiliates arising under, in connection with or related to this Agreement or for any Claim based on, in respect of or by reason of the Acquisition, including any alleged non-disclosure or misrepresentations made by any such persons.

SECTION 10.07.      Tax Treatment of Indemnification. For all Tax purposes, Purchaser and Seller agree to treat any indemnity payment under this Agreement as an adjustment to the Purchase Price unless a final determination of a Taxing Authority provides otherwise.

SECTION 10.08.      Survival. None of the representations and warranties and the covenants and agreements of the parties which by their terms contemplate performance at or prior to the Closing contained in this Agreement shall survive the Closing and each such representation, warranty, covenant and agreement shall terminate at and as of the Closing. Covenants and agreements which by their terms contemplate performance after the Closing shall survive the Closing only until the expiration of the term of the undertaking set forth in such agreements and covenants. After the Closing, no party shall have any liability or obligation of any nature with respect to any representation, warranty, agreement or covenant after the termination thereof.

ARTICLE XI

TAX MATTERS

SECTION 11.01.     Tax Covenants.

(a)     Purchase Price Allocation. For U.S. federal and applicable state and local income Tax purposes, Purchaser and Seller shall (and shall cause its affiliates to) allocate the Purchase Price (and any Assumed Liabilities or other amounts treated as part of the purchase price for U.S. federal income Tax purposes) among the Transferred Assets in accordance with the methodology set forth in Section 11.01(a) of the Disclosure Schedule (the "**Allocation Methodology**"). As soon as commercially practicable, but no later than 90 days following the determination of the final Purchase Price, Purchaser shall provide a proposed allocation to Seller setting forth the allocation of the Purchase Price (and other amounts treated as part of the purchase price for U.S. federal Income Tax purposes) among the Transferred Assets in accordance with the Allocation Methodology (the "**Allocation**") for Seller's review, comment and consent (such consent not to be unreasonably withheld, conditioned or delayed). If Seller delivers a written objection within thirty (30) days after receipt of the draft Allocation, then Purchaser and Seller shall negotiate in good faith to resolve any such objection, and, if Seller and Purchaser cannot resolve such dispute within thirty (30) days of Purchaser's receipt of Seller's objection, then a nationally recognized accounting firm mutually acceptable to Purchaser and Seller shall resolve such dispute, with the costs of such resolution to be evenly split by Purchaser, on the one hand, and Seller, on the other hand, and the resolution of such dispute shall be final and binding on the parties. The parties and its affiliates shall file all Tax Returns in accordance with such agreed Allocation (as finally determined under this Section 11.01(a)) and not take any Tax-related action inconsistent with the Allocation, in each case, unless otherwise required by a "determination" within the meaning of Section 1313(a) of the Code.

(b)     Transfer Taxes. Seller and Purchaser agree to use commercially reasonable efforts to cooperate in good faith to timely sign and deliver (or cause to be timely signed and delivered) such agreements, certificates or forms as may be necessary or appropriate and otherwise reasonably cooperate to establish any available exemption from (or otherwise reduce) Transfer Taxes. Purchaser shall pay all Transfer Taxes. Purchaser and Seller shall, and shall cause their respective affiliates to, reasonably cooperate in timely making all filings, returns, reports and forms as may be required in connection with Purchaser's payment of any Transfer Taxes.

(c)     Cooperation. From and after the Closing Date, Seller and Purchaser shall reasonably cooperate, and shall cause its affiliates, officers, employees, agents, auditors and representatives reasonably to cooperate, in preparing and filing all Tax Returns relating to the Transferred Assets or the Business, including maintaining and making available to each other all records necessary in connection with Taxes and in resolving all disputes and audits with respect to all taxable periods relating to Taxes; provided that Seller shall be deemed to satisfy such obligation to provide such access with respect to income Tax Returns by providing such access to Tax Returns that are redacted in a form satisfactory to Seller in good faith. Seller and its affiliates will need access, from time to time after the Closing Date, to certain accounting and Tax records and information held by Purchaser or its affiliates to the extent such records and information pertain to events occurring prior to the Closing. Therefore, Purchaser shall, and shall

63

cause each of its affiliates to, (i) use its reasonable efforts to properly retain and maintain such records for up to four (4) years and (ii) allow Seller and its Representatives (and Representatives of any of its affiliates), at times and dates mutually acceptable to the parties, to inspect, review and make copies of such records as Seller or any of its affiliates may deem necessary or appropriate from time to time.

(d)      Employment Tax Reporting Responsibility. Purchaser shall (or shall cause its applicable affiliate to) follow the alternate procedure for United States employment tax withholding as provided in Section 5 of Revenue Procedure 2004-53, 2004-2 C.B. 320. Seller shall (or shall cause its applicable affiliate to) provide to Purchaser (or its applicable affiliate) all information required to be provided by the predecessor under such Revenue Procedure and any other information reasonably required by Purchaser (or its applicable affiliate) in connection with its reporting obligations thereunder. Purchaser (or its applicable affiliate) shall have full United States employment tax reporting responsibilities, in each case, for Transferred Employees following the close of business on the Closing Date for the tax year in which the Closing Date occurs.

(e)      Straddle Periods. For all purposes of this Agreement, in the case of a taxable period that includes (but does not end on) the Closing Date (a "**Straddle Period**"), all Taxes based on or measured by income, gross or net sales, or payments or receipts shall be allocated between the portion of such Straddle Period that ends on the Closing Date and the portion of such Straddle Period that begins after the Closing Date based on an interim closing of the books (except that exemptions, allowances or deductions that are calculated on an annual basis (including depreciation and amortization deductions), other than with respect to property placed in service after the Closing Date, shall be allocated on a daily basis) and any other Taxes shall be allocated between the portion of such Straddle Period that ends on the Closing Date and the portion of such Straddle Period that begins after the Closing Date on a per diem basis.

(f)      Post-Closing Actions. After the Closing, Purchaser shall not and shall not cause or permit any affiliate of Purchaser to make or change any material Tax election, amend any material Tax Return or take any material Tax position on any such Tax Return, in each case, with respect to the Transferred Assets and a Pre-Closing Tax Period, that would reasonably be expected to result in any increased Tax liability to Seller or any affiliate of Seller.

ARTICLE XII

MISCELLANEOUS

SECTION 12.01.      Assignment. Neither this Agreement nor any of the rights and obligations of the parties hereunder may be assigned by Purchaser, on the one hand, or Seller, on the other hand, without the prior written consent of Seller (in the case of Purchaser) or Purchaser (in the case of Seller), as applicable; provided that Purchaser may assign any of its rights hereunder to any of its affiliates without the consent of any other person, provided that no such assignment shall release the applicable assignor from any liability or obligation under this Agreement in the event its obligations are not performed. Subject to the first sentence of this Section 12.01, this Agreement shall be binding upon and inure to the benefit of the parties hereto and its successors

and permitted assigns. Any attempted assignment or transfer in violation of this Section 12.01 shall be null and void.

SECTION 12.02.    No Third-Party Beneficiaries. Except as provided in (a) Article X with respect to the Indemnified Parties, and (b) Section 7.11 for the benefit of any current or former directors, officers or employees, this Agreement is for the sole benefit of the parties hereto and its successors and permitted assigns and nothing herein expressed or implied shall give or be construed to give to any person, other than the parties hereto and such successors and assigns, any legal or equitable rights hereunder.

SECTION 12.03.    Expenses. Each of the parties shall pay its own legal, accounting and other fees and expenses incurred in connection with the preparation, execution and delivery of this Agreement and all documents and instruments executed pursuant hereto and the consummation of the transactions contemplated hereby and any other costs and expenses incurred by such party (including, for the avoidance of doubt, costs and expenses of Purchaser incurred in connection with the acquisition of the Transferred Assets and the assumption of the Assumed Liabilities or otherwise in connection with the operation or conduct of the Business on or after the Closing), except as otherwise expressly set forth herein or in any Ancillary Agreement.

SECTION 12.04.    Notices. All notices, requests, permissions, waivers and other communications hereunder shall be in writing and shall be deemed to have been duly given (a) five (5) Business Days following sending by registered or certified mail, postage prepaid, (b) when delivered, if delivered personally to the intended recipient, (c) one (1) Business Day following sending by overnight delivery via a national courier service and (d) when delivered by email (provided that, in the case of email, such notice shall be deemed delivered upon transmission unless the sender receives an automatic notification of non-delivery, in which case notice shall be effective only upon actual receipt by the intended recipient) and, in each case, addressed to a party at the following address for such party.

    (i)    if to Seller,

Anthology, Inc.
5201 Congress Avenue
Boca Raton, FL 33487
Attention:    Michael Pohorylo, Chief Legal
Officer, General Counsel &
Secretary
Heath C. Gray, Chief Restructuring
Officer
Email:    Michael.pohorylo@anthology.com;
Heath.Gray@fticonsulting.com

with copies to (which shall not constitute notice):

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022

65

Attention:   Peter Martelli, P.C.; Dave Gusella, P.C.; Dan Li

Email:   peter.martelli@kirkland.com;  dave.gusella@kirkland.com; dan.li@kirkland.com

(ii)   if to Purchaser,

c/o Encoura, LLC
1108 Lavaca St.
Suite 110-390
Austin, TX 78701
Attention: Dennis Syracuse
Email: dennis.syracuse@encoura.org

with copies to (which shall not constitute notice):

Milbank LLP
55 Hudson Yards
New York, NY 10001
Attention:   Rick Presutti; Lowell Dyer
Email:   rpresutti@milbank.com; ldyer@milbank.com

or to such other address(es) as shall be furnished in writing by any such party to the other party hereto in accordance with the provisions of this Section 12.04.

SECTION 12.05.   Interpretation; Certain Definitions.

(a)   Any matter set forth in any provision, subprovision, Section or subsection of the Disclosure Schedule shall be deemed to be disclosed for each other provision, subprovision, Section or subsection of the Disclosure Schedule to the extent it is reasonably apparent from the face of such disclosure that such disclosure is applicable to such other provision, subprovision, Section or subsection of the Disclosure Schedule. No reference to or disclosure of any matter or item in this Agreement or in the Disclosure Schedule, as applicable, shall be construed as an admission or indication that such matter or item is material or that such matter or item is required to be referred to or disclosed in this Agreement. Without limiting the foregoing, no such reference to or disclosure of a possible breach or violation of any Contract, Law or Judgment shall be construed as an admission or indication that a breach or violation exists or has actually occurred. The Disclosure Schedule is hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in the Disclosure Schedule or in any Exhibit but not otherwise defined therein, shall have the meaning as defined in this Agreement. References to defined terms in the singular shall include the plural and references to defined terms in the plural shall include the singular. The word "extent" in the phrase "to the extent" means the degree to which a subject or other thing extends, and such phrase does not mean simply "if". The descriptive headings of the several Articles, Sections and subsections of this Agreement, the Table of Contents to this Agreement and the Disclosure Schedule are inserted for convenience only, do not constitute a part of this Agreement and shall not affect in any way the meaning or interpretation of this Agreement. All references herein to "Articles", "Sections", "Exhibits" or

66

"Schedules" shall be deemed to be references to Articles or Sections hereof or Exhibits or Schedules hereto unless otherwise indicated. The terms "hereof", "herein", "hereby" and derivative or similar words refer to this entire Agreement, including all Exhibits and Schedules. The use of "or" has the inclusive meaning represented by the phrase "and/or". All references herein to a "day" or a number of "days" (without explicit reference to "Business Days") shall be interpreted as a reference to a calendar day or number of calendar days. If any action is to be taken or given on or by a particular calendar day, and such calendar day is not a Business Day, then such action may be deferred until the next Business Day. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is referenced in beginning the calculation of such period will be excluded (for example, if an action is to be taken within two days after a triggering event and such event occurs on a Tuesday, then the action must be taken on or prior to Thursday); and if the last day of such period is a non-Business Day, the period in question will end on the next succeeding Business Day. Reference to any agreement (including this Agreement), document or instrument shall mean such agreement, document or instrument as amended or modified and in effect from time to time in accordance with the terms thereof and, if applicable, the terms hereof. Reference to any legislation or to any provision of any legislation shall include any modification, amendment, re-enactment thereof, any legislative provision substituted therefore and all rules, regulations and statutory instruments issued or related to such legislation.

(b)  For all purposes hereof:

"**Accounting Month End**" means September 30, 2025, and October 31, 2025, November 30, 2025 and December 31, 2025, as applicable.

"**affiliate**" means, with respect to any person, any person or entity controlling, controlled by or under common control with such person. For purposes of this definition, "**control**" means, with respect to any entity, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such entity, whether through the ownership of voting securities (or other ownership interest), by contract or otherwise.

"**AI**" has the meaning set forth in the definition of "AI Technology."

"**AI Input Data**" means any and all data, content, or materials of any nature, including text, images, photos, graphics, video, audio, or computer code used to train, validate, test, or improve any AI Technology.

"**AI Technology**" means any and all machine learning, deep learning, and other artificial intelligence ("**AI**") technologies, including statistical learning algorithms, models (including large language models), neural networks, and other AI tools or methodologies.

"**Alternative Transaction**" means any transaction (or series of transactions), whether direct or indirect, whereby any person or group of persons (other than Seller and its affiliates or Purchaser and its affiliates) acquires (i) beneficial ownership of a majority of the equity interests of Seller or (ii) a material portion of the Transferred Assets and Assumed Liabilities, in each case whether by merger, sale of assets or equity, recapitalization, plan of reorganization or otherwise.

Notwithstanding the foregoing, a liquidation or wind-down of Seller's estates shall not be an Alternative Transaction.

"**ARD**" means (i) in relation to any European Union member states, the Acquired Rights Directive pursuant to EC Directive no. 2001/23 dated 12 March 2001, as amended from time to time, and any domestic legislation implementing such directive into the national law, (ii) in relation to the United Kingdom, the Transfer of Undertakings (Protection of Employment) Regulations 2006, and (iii) in relation to any non-European Union member state, any national, provincial or local legislation that is broadly similar in effect to the provisions of the Acquired Rights Directive (2001/23/EC), in each case, as amended from time to time.

"**ARD Employee**" means an Employee who immediately before Closing is employed in a jurisdiction with ARD laws and Seller and Purchaser agree in good faith that such ARD laws are applicable to the transfer of the Employee.

"**Auction**" shall have the meaning ascribed to such term in the Bidding Procedures Order.

"**Base Purchase Price**" means $50,000,000.

"**Bidding Procedures Order**" means an order of the Bankruptcy Court approving (i) bidding procedures to be employed with respect to this Agreement and the Acquisition, and (ii) the execution, delivery, and performance of this Agreement by Seller (including payment of the Expense Reimbursement pursuant to Section 9.02(b) and Breakup Fee pursuant to Section 9.02(c)), which order shall be in form and substance mutually acceptable to Purchaser and Seller.

"**Business**" means the business, operations and activities conducted by Astra Intermediate Holding Corp. and its subsidiaries (including Seller and its subsidiaries), that are comprised of (i) the Lifecyle Engagement business unit of Astra Intermediate Holding Corp. and its subsidiaries (including Seller and its subsidiaries), including the following products of Astra Intermediate Holding Corp. and its subsidiaries (including Seller and its subsidiaries): Anthology Baseline; Anthology Beacon; Anthology Encompass; Anthology Engage; Anthology Illuminate; Anthology Milestone (including Anthology Occupation Insights); Anthology Raise; Anthology Reach; any other product within the Lifecycle Engagement Legacy product family, including ApplyYourself, AppReview, CampusNexus CRM, Connect, Radius, Retain and Talisma Fundraising; and any other product within the Lifecyle Engagement Other product family; and (ii) the Student Success business unit of Astra Intermediate Holding Corp. and its subsidiaries (including Seller and its subsidiaries), in each case of clauses (i) and (ii), solely as such business units operate and exist as of Closing.

"**Business Day**" means any day, other than a Saturday or a Sunday, on which commercial banks are not required or authorized to close in New York City.

"**Cash and Cash Equivalents**" means all cash and cash equivalents of the Business.

"**Claim**" means, collectively, any and all "claims" as defined in Section 101(5) of the Bankruptcy Code.

68

"**Closing Date Cure Payments**" means the aggregate Cure Payments as of the Closing Date for all Transferred Contracts.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Completion Date**" means the earlier to occur of (i) the date on which the Auction has been completed and (ii) the date on which the Sale Hearing has been completed.

"**Contract**" means any contract, subcontract, agreement, lease, sublease, license, commitment, sale and purchase order or other legally binding arrangement, agreement or instrument to which Seller is a party.

"**Cure Payment Escrow Agent**" means SRS Acquiom.

"**Cure Payment Escrow Agreement**" means the Escrow Agreement to be entered into among Purchaser, Seller and the Cure Payment Escrow Agent on the Closing Date, in a form reasonably acceptable to the parties hereto and thereto.

"**Cure Payment Escrow Amount**" means $100,000.

"**Cure Payment Escrow Funds**" means the amounts held in the Cure Payment Escrow Account, including any dividends, interest, distributions and other income received in respect thereof, less any losses on investments thereof, less distributions thereof in accordance with this Agreement and the Cure Payment Escrow Agreement.

"**Cure Payments**" means the amount required to be paid with respect to each Transferred Contract to cure all defaults under such Contract to the extent required by Section 365 of the Bankruptcy Code and to otherwise satisfy all requirements imposed by Section 365 of the Bankruptcy Code in order to effectuate, pursuant to the Bankruptcy Code, the assumption by Seller and its affiliates and assignment to Purchaser of each such Contract.

"**Data Protection Laws**" means all applicable Laws pertaining to data protection, data privacy, including children's privacy, data security, cybersecurity, cross-border data transfers, and general consumer protection laws as applied in the context of data privacy, data breach notification, electronic communication, telephone and text message communications, marketing by email or other channels, and other similar Laws, including the Family Educational Rights and Privacy Act, and any other U.S. Federal or state Laws governing the privacy of educational records.

"**Data Protection Requirements**" means (i) Data Protection Laws applicable to the conduct of the Business; (ii) Seller's internal and external public-facing written policies pertaining to data protection and data privacy, including with respect to Personal Data; (iii) applicable provisions of any Contracts binding on the Business relating to the collection, access, use, storage, disclosure, transmission, or cross-border transfer of Personal Data; and (iv) standards published by the Payment Card Industry Security Standards Council (e.g., PCI-DSS), if applicable.

"**Debtor Affiliates**" means, collectively, Astra Intermediate Holding Corp., a Delaware corporation, and the following subsidiaries thereof:  AY Software Services, Inc., a Delaware corporation, Blackboard Tennessee LLC, a Delaware limited liability company, Admissions US,

69

LLC, a Delaware limited liability company, Bb Acquisition Corp., a Delaware corporation, Campus Management Acquisition Corp., a Delaware corporation, Academic Management Systems, LLC, a Delaware limited liability company, Bb Management LLC, a Delaware limited liability company, Edcentric Holdings, LLC, a Delaware limited liability company, Blackboard Campuswide of Texas, Inc., a Texas corporation, Edcentric, Inc., a Delaware corporation, Astra Acquisition Corp., a Delaware corporation, Blackboard Collaborate Inc., a Delaware corporation, Edcentric Midco, Inc., a Delaware corporation, Blackboard Holdings, LLC, a Delaware limited liability company, Higher One Real Estate SP, LLC, a Delaware limited liability company, Blackboard International LLC, a Delaware limited liability company, MyEdu Corporation, a Delaware corporation, ApplyYourself, Inc., a Delaware corporation, Blackboard Student Services Inc., a Delaware corporation, OrgSync, Inc., a Texas corporation, Blackboard Super Holdco, LLC, a Delaware limited liability company, and Perceptis, LLC, a Ohio limited liability company.

"**Debtors**" means, collectively, the debtors-in-possession under the Bankruptcy Cases.

"**Delivered Source Code**" means (i) the source code for the software solutions set forth in Section 12.05(b)(vii) of the Disclosure Schedule, including with respect to all versions and releases of such source code in use by the Business, and (ii) with respect to such source code, any related source code level system documents other similar procedural code, and other information and documentation in the possession or control of Seller, in each case, that is reasonably necessary to allow Purchaser or its designees to use or maintain such source code in the conduct of the Business.

"**DIP Credit Agreement**" means that certain Senior Secured Superpriority Debtor-In-Possession Credit Agreement setting forth the terms and conditions of the DIP facility.

"**DIP Order**" means the Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief or the Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief, as applicable.

"**Effect**" means event, change, occurrence, fact, circumstance, development or effect.

"**Employee**" means each employee of a Seller (or any of its affiliates) who primarily provides services to the Business, which employees are listed on Section 12.05(b)(ii) of the Disclosure Schedule.

"**Employee Records**" means physical or electronic copies of all personnel records (including those as required by applicable Law and those pertaining to performance, training history, job experience and history, and for the three year period immediately preceding the Closing, compensation history) for current and former employees of the Business, except where (i) the transfer or disclosure of such records is prohibited by applicable Law or Collective

70

Bargaining Agreement or would include medical records, or (ii) consent of the relevant employee is required by applicable Law but not given.

"**Environmental Laws**" means all applicable Laws and Judgments relating to pollution, protection of the environment or natural resources, including Laws relating to exposure to, or releases or threatened releases of, Hazardous Materials, as the foregoing are enacted and in effect on or prior to the Closing Date.

"**Equity Interest**" means, with respect to any person (other than an individual), any direct or indirect equity ownership or participation in, equity security of, or ownership or profit interest in, such person, whether voting or non-voting and whether or not such ownership, participation or interest is authorized or otherwise existing on any date of determination, including shares of capital stock, units, partnership interests, limited liability company interests, units and membership interests.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**ERISA Affiliate**" means any entity that is included in a controlled group of corporations within which Seller is also included, as provided in Section 414(b) of the Code; or which is a trade or business under common control with Seller, as provided in Section 414(c) of the Code; or which constitutes a member of an affiliated service group within which Seller is also included, as provided in Section 414(m) or (o) of the Code.

"**Excluded Contracts**" means (i) all Contracts other than the Transferred Contracts, (ii) all Mixed-Use Contracts, and (iii) the Contracts set forth in Section 12.05(b)(iii) of the Disclosure Schedule.

"**Final Order**" means an order or judgment of the Bankruptcy Court, another court of competent jurisdiction, or any other Governmental Entity having competent jurisdiction which has not been reversed, vacated, or stayed and as to which (i) the time to appeal, petition for certiorari, or move for a new trial, re-argument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceeding for a new trial, re-argument, or rehearing shall then be pending, or (ii) if an appeal, writ of certiorari, new trial, re-argument, or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court or another court of competent jurisdiction, as applicable, shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, re-argument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari, or move for a new trial, re-argument, or rehearing shall have expired.

"**GAAP**" means United States generally accepted accounting principles.

"**Good Faith Deposit Escrow Agent**" means SRS Acquiom.

"**Good Faith Deposit Escrow Agreement**" means the Escrow Agreement to be entered into among Purchaser, Seller and the Good Faith Deposit Escrow Agent, in accordance with Section 9.02(d), in form reasonably acceptable to each of the parties hereto and thereto.

"**Good Faith Deposit Escrow Amount**" means the amount equal to $5,000,000.

"**Good Faith Deposit Escrow Funds**" means the amounts held in the Good Faith Deposit Escrow Account, including any dividends, interest, distributions and other income received in respect thereof, less any losses on investments thereof, less distributions thereof in accordance with this Agreement and the Good Faith Deposit Escrow Agreement.

"**Government Contract**" means any Contract, including any prime contract, subcontract, teaming agreement or arrangement, joint venture, basic ordering agreement, letter contract, purchase order, multiple award schedule contract, delivery order, task order, grant, cooperative agreement, bid, change order, arrangement or other commitment or funding vehicle of any kind, between (i) a Governmental Entity, (ii) any prime contractor to a Governmental Entity with respect to a Contract entered into with a Governmental Entity or (iii) any subcontractor with respect to any Contract described in clause (i) or (ii).

"**Hazardous Materials**" means any material or substance defined or regulated under any Environmental Law as a hazardous substance, hazardous waste, hazardous material, toxic substance, pollutant or contaminant, including asbestos and petroleum.

"**including**" (and, with correlative meaning, "include" and "includes") means including, without limiting the generality of any description preceding or succeeding such term, and the rule of *ejusdem generis* will not be applicable to limit a general statement preceded by, followed by or referable to an enumeration of specific matters, to matters similar to those specifically mentioned.

"**Income Tax**" or "**Income Taxes**" means all income or franchise Taxes imposed on or measured by net income (however denominated).

"**In-Scope Foreign Assets**" means any Transferred Asset that is located in or subject to the Law of a jurisdiction in which local applicable Laws require observance of specified formalities or procedures to legally effect a transfer of such Transferred Asset to Purchaser (or its designated affiliate).

"**In-Scope Foreign Liabilities**" means any Assumed Liability that is located in or subject to the Law of a jurisdiction in which local applicable Laws require observance of specified formalities or procedures to legally effect the assumption of such Assumed Liability by Purchaser (or its designated affiliate).

"**Intellectual Property**" means any and all United States, foreign and international intellectual property rights, which may exist under the laws of any jurisdiction in the world, including: (i) patents and patent applications, including continuations, divisionals, continuations-in-part, renewals, reissues, re-examinations, substitutions, extensions and related applications, (ii) trade names, trademarks and service marks, whether registered or unregistered, brand names, slogans, symbols, trade dress, logos, domain names, social media identifiers and other source identifiers and similar rights, and all registrations, renewals and applications for registration thereof together with all of the goodwill associated therewith (collectively, "**Trademarks**"), (iii) copyrights and other similar rights in works of authorship (registered or unregistered) and registrations and applications for registration thereof, (iv) rights in Software, and (v) confidential and proprietary information, trade secrets, methods, processes, models, algorithms, systems, tools, data, database rights, inventions, discoveries and know-how.

"**IP Assignment**" means an intellectual property assignment, from Seller to Purchaser, to be entered into on the Closing Date, in form reasonably acceptable to each of the parties hereto.

"**IT Systems**" means all information systems, including material electronic data processing, information, recordkeeping, communications, telecommunications, account management, inventory management and other computer systems (including all computer programs, Software, databases, firmware and hardware) leased, licensed by or otherwise used by Seller in the conduct of the Business.

"**Knowledge**", including the phrase "**Knowledge of Seller**", means the actual knowledge of the persons set forth on Section 12.05(b)(iv) of the Disclosure Schedule.

"**Liability**" means any and all Claims, debts, indebtedness, Liens, losses, damages, liabilities, fines, penalties, duties, responsibilities, commitments, obligations and expenses (including reasonable attorneys' fees and reasonable costs of investigation and defense) of any kind, character, or description, whether known or unknown, asserted or unasserted, direct or indirect, fixed, absolute or contingent, matured or unmatured, accrued or unaccrued, asserted or unasserted, ascertained or ascertainable, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, vested or unvested, executory, determined, determinable, in contract, tort, strict liability, or otherwise, or otherwise due or to become due.

"**Liens**" means, collectively, all encumbrances, charges, liens (as defined in section 101(37) of the Bankruptcy Code) (whether consensual, statutory, possessory, judicial, or otherwise), Claims, mortgages, leases, subleases, licenses, hypothecations, deeds of trust, pledges, levies, security interests or similar interest, title defect, options, rights of use or possession, rights of first offer or first refusal (or any other type of preferential arrangement), profit sharing interests, rights of consent, restrictive covenants, encroachments, orders, servitude, restrictions on transferability of any type, charge, easement, right of way, transfer restriction under any shareholder agreement, judgment, conditional sale or other title retention agreement or other similar arrangement or interest in real or personal property, whether imposed by Contract, Law, equity or otherwise.

"**made available**" means, with respect to any document, that such document (i) was in the electronic data room hosted by Datasite (the "**VDR**") at the close of business two (2) days prior to the date of this Agreement or (ii) was delivered to Purchaser or its Representatives by any of Seller or its affiliates or Representatives prior to the date of this Agreement.

"**Material Adverse Effect**" means any Effect that has, had or would reasonably be expected to have, a material adverse effect on the financial condition or results of operations of the Business; provided, however, that none of the following, and no Effect arising out of or resulting from the following, shall constitute or be taken into account, individually or in the aggregate, in determining whether there has been or will be a Material Adverse Effect: (i) any action by Seller or any of its affiliates (A) required by the express terms and conditions of this Agreement or (B) which Purchaser has expressly requested in writing; (ii) any Effect affecting the industry or industry sectors in which the Business operates generally or the United States or worldwide economy generally or credit or other financial markets, (iii) national, international or any foreign or domestic regional economic, financial or capital markets (including changes in interest rates,

73

foreign exchange rates or tariffs), social or political conditions (including changes therein) or events in general, including the results of any primary or general elections, or any statements or other proclamations of public officials, or changes in policy related thereto; (iv) any natural disaster or pandemic or any acts of terrorism, sabotage, military action or war (whether or not declared), or any escalation or worsening thereof, or any other *force majeure* event, whether or not caused by any person, or any national or international calamity or crisis; (v) any failure of the Business to meet internal or public forecasts, projections, predictions, guidance, estimates, milestones or budgets (it being understood that the facts, circumstances or occurrences giving rise or contributing to such failure, to the extent not otherwise excluded by another subclause of this proviso, may be taken into account in determining whether there has been, or would reasonably be expected to be, a Material Adverse Effect); (vi) the negotiation or execution of this Agreement or any Ancillary Agreement or the announcement or pendency of the Acquisition or a potential transaction involving the Business, including any loss of, or impact on the relation of the Business with, any employees, customers, suppliers, partners or distributors; (vii) any Effect exclusively on any Excluded Assets or Retained Liabilities, (viii) any change or prospective change in Laws or GAAP or the enforcement thereof (clauses (ii), (iii), (iv) and (viii), collectively, "**External Events**"), or (ix) any objections in the Bankruptcy Court to (A) this Agreement or any of the Acquisition, (B) the Sale Order, (C) the Bidding Procedures Order or (D) the assumption or rejection of any Transferred Contract; provided, however, that, in the case of an External Event, such External Event may be taken into account to the extent it adversely affects Seller in a disproportionate manner relative to other similarly situated participants in the industry in which Seller operates.

"**Mixed-Use Contracts**" means any Contract that includes both terms and conditions that are related to the Business and terms and conditions that relate to other businesses of Seller or its affiliates between (i) Seller or any of its affiliates, on the one hand and (ii) a supplier, vendor, distributor, reseller or customer of Seller, on the other hand.

"**Non-ARD Employee**" means any Employee who is not an ARD Employee.

"**Non-U.S. Non-ARD Employees**" means any Non-ARD Employee who is not located in the United States.

"**Open Source Software**" means any software (in source or object code form) that is subject to (i) a license commonly referred to as an "open source" or "free software" license (including any software licensed under the GNU General Public License, GNU Lesser General Public License, BSD License, or Apache Software License, or any other public source code license arrangement or any license defined as an open source license by the Open Source Initiative as set forth on www.opensource.org) or any other public source code license arrangement or any license defined as an open source license by the Open Source Initiative as set forth on www.opensource.org or (ii) any other license or other agreement that requires, as a condition of the use, modification or distribution of software subject to such license or agreement, that such software or other software linked with, called by, combined or distributed with such software be disclosed, distributed, made available, offered, licensed or delivered in source code form.

"**person**" means any individual, firm, corporation, partnership, limited liability company, trust, joint venture, Governmental Entity or other entity.

74

"**Personal Data**" means any information in any medium that identifies or can be reasonably linked to a natural person or household, or is otherwise regulated under applicable Laws pertaining to privacy, data security, or data protection, including an individual's name, address, telephone number, e-mail address, date of birth, photograph, Social Security number or tax identification number, credit card number, bank information, biometric identifiers, and medical, health or insurance information, or that is defined as "personal data", "personally identifiable information" or "personal information" under applicable Laws.

"**Plan Effective Date**" means the effective date of any chapter 11 plan filed by the Seller and confirmed pursuant to section 1129 of the Bankruptcy Code.

"**Pre-Closing Tax Period**" means all taxable periods ending on or prior to the Closing Date and the portion ending on the Closing Date of any taxable period that includes but does not end on the Closing Date.

"**Related to the Business**" means used or held for use primarily in or primarily arising out of the operation or conduct of the Business as currently conducted by Seller.

"**Remaining Cure Payment Escrow Funds**" means, as of the applicable time of determination, the amount of remaining Cure Payment Escrow Funds in the Cure Payment Escrow Account as of such time.

"**Remaining Good Faith Deposit Escrow Funds**" means, as of the applicable time of determination, the amount of remaining Good Faith Deposit Escrow Funds in the Good Faith Deposit Escrow Account as of such time.

"**Representatives**" means any directors, officers, employees, investment bankers, financial advisors, attorneys, accountants or other advisors, agents or representatives of a person.

"**Retained Business**" means any and all businesses of Seller, as conducted as of the Closing, other than the Business.

"**Retained Intellectual Property**" means all Intellectual Property other than the Transferred Intellectual Property.

"**Sale Hearing**" means the hearing for approval of, among other things, the Acquisition and entry of the Sale Order.

"**Sale Order**" means an order of the Bankruptcy Court approving this Agreement and the Acquisition, which order shall be in form and substance mutually acceptable to Purchaser and Seller.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Security Incident**" means an unauthorized occurrence that has actually impaired or is reasonably likely to impair the confidentiality, integrity or availability of any of the IT Systems or any of the information processed, stored or transmitted by the IT Systems.

"**Software**" means all (i) computer programs and software code, including any and all software implementation of algorithms, models and methodologies, mobile applications and other applications, and all firmware, in each case whether in source code, object code, human readable form or other form, and (ii) databases and compilations, including all data and collections of data.

"**Specified Representations**" means the representations and warranties of Seller set forth in Section 3.01 (Organization and Standing), Section 3.02 (Authority; Execution and Delivery; Enforceability) and Section 3.19 (Brokers and Finders).

"**subsidiary**" of any person means another person, an amount of the voting securities, other voting ownership or voting partnership interests of which is sufficient to elect at least a majority of its Board of Directors or other governing body (or, if there are no such voting interests, fifty percent (50%) or more of the equity interests of which) is owned directly or indirectly by such first person or by another subsidiary of such first person.

"**Tax**" or "**Taxes**" means all forms of taxation imposed by any federal, state, provincial, local, foreign or other Taxing Authority, including income, franchise, property, sales, use, excise, employment, unemployment, payroll, social security, estimated, value added, ad valorem, transfer, recapture, withholding, health and other taxes of any kind, including any interest, penalties and additions thereto.

"**Tax Return**" means any report, return, document, declaration or other information or filing required to be supplied to any Taxing Authority with respect to Taxes, including any amendment made with respect thereto.

"**Taxing Authority**" means any federal, state, provincial, local or foreign government, any subdivision, agency, commission or authority thereof or any quasi-governmental body exercising tax regulatory authority.

"**Transfer Taxes**" means all sales (including bulk sales), use, transfer, recording, value added, ad valorem, documentary, registration, conveyance, excise, license, stamp or similar fees and Taxes arising out of, in connection with or attributable to the transactions effectuated pursuant to this Agreement, including any related penalties, interest and additions thereto.

"**Transferred Contracts**" means (i) the Contracts set forth on Section 12.05(b)(v) of the Disclosure Schedule and (ii) the Transferred Mixed-Use Contracts.

"**Transferred Employees**" means Non-ARD Transferred Employees and ARD Transferred Employees.

"**Transferred Intellectual Property**" means all Intellectual Property owned by Seller that is Related to the Business, including as relates to the design, development, marketing, sale, offering, and provision any products or services of the Business or set forth on Section 12.05(b)(vi) of the Disclosure Schedule. For the avoidance of doubt, Delivered Source Code shall not be included in the Transferred Intellectual Property.

"**Transition Services Agreement**" means the transition services agreement, to be entered into between Seller (or any of its affiliates) and Purchaser on the Closing Date (subject to Section

5.14), in a form reasonably acceptable to each of the parties hereto and substantially consistent with the terms set forth in Exhibit D attached hereto (the "**TSA Term Sheet**").

"**TSA Term Sheet**" has the meaning set forth in the definition of "Transition Services Agreement."

"**U.S. Non-ARD Employees**" means any Non-ARD Employee who is located in the United States.

"**VDR**" has the meaning set forth in the definition of "made available."

SECTION 12.06.     Limitation on Damages. Notwithstanding anything to the contrary contained in this Agreement, in no event shall any party be liable for, and in no event shall "Losses" include, special, indirect, incidental, exemplary, punitive or consequential damages of the other party (including for lost or anticipated profits, revenues or opportunities or business interruption), or for any damages calculated by reference to a multiplier of revenue, profits, EBITDA or similar methodology, whether or not foreseeable or caused by or resulting from the actions of such party or the breach of its covenants, agreements, representations or warranties hereunder and whether or not based on or in warranty, contract, tort (including negligence or strict liability) or otherwise; provided, however, that nothing in this Section 12.06 shall preclude any recovery by an Indemnified Party against an Indemnifying Party for amounts payable to a third party in a Third Party Claim.

SECTION 12.07.     Counterparts. This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement, and shall become effective when each party hereto shall have received counterparts hereof signed by each of the other parties hereto. Any such counterpart, to the extent delivered by means of a facsimile machine or by .pdf, .tif, .gif, .peg or similar attachment to electronic mail (any such delivery, an "**Electronic Delivery**") shall be treated in all manner and respects as an original executed counterpart and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person. At the request of any party hereto, each other party hereto shall re-execute the original form of this Agreement and deliver such form to all other parties. No party hereto shall raise the use of Electronic Delivery to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of Electronic Delivery as a defense to the formation of a contract, and each such party forever waives any such defense, except to the extent such defense relates to lack of authenticity.

SECTION 12.08.     Entire Agreement. This Agreement, and the Exhibits and Disclosure Schedule annexed hereto, the Confidentiality Agreement and the Ancillary Agreements, and the other agreements, certificates, and other documents contemplated hereby and thereby constitute the entire understanding between the parties with respect to the subject matter hereof and thereof, and supersede all other understandings and negotiations with respect thereto. The parties agree to define their rights, liabilities and obligations with respect to such understanding and the transactions contemplated hereby exclusively in contract pursuant to the express terms and provisions of this Agreement, and the parties expressly disclaim that they are owed any duties or are entitled to any remedies not expressly set forth in this Agreement or any Ancillary Agreement. In the event of any conflict between the provisions of this Agreement

(including the Disclosure Schedule and Exhibits), on the one hand, and the provisions of the Confidentiality Agreement or the Ancillary Agreements (including the schedules and exhibits thereto), on the other hand, the provisions of this Agreement shall control.

SECTION 12.09.    Severability. In the event that any provision contained in this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any jurisdiction, such provision shall be ineffective as to such jurisdiction to the extent of such invalidity, illegality or unenforceability without invalidating or affecting the remaining provisions hereof or affecting the validity, legality or enforceability of such provision in any other jurisdiction.

SECTION 12.10.    Governing Law. This Agreement, the negotiation, execution or performance of this Agreement and any disputes arising under or related hereto (whether for breach of contract, tortious conduct or otherwise) shall be governed and construed in accordance with the Laws of the State of New York, without reference to its conflicts of law principles.

SECTION 12.11.    Jurisdiction. Each party irrevocably agrees that any proceeding against them arising out of or in connection with this Agreement or the transactions contemplated by this Agreement or disputes relating hereto (whether for breach of contract, tortious conduct or otherwise) shall be brought exclusively in the Bankruptcy Court, or, if such court does not have jurisdiction, the United States District Court for the Southern District of New York, or, if such court does not have jurisdiction, the state courts of New York located in New York County, and hereby irrevocably accepts and submits to the exclusive jurisdiction and venue of the aforesaid courts *in personam* with respect to any such proceeding and waives to the fullest extent permitted by Law any objection that it may now or hereafter have that any such proceeding has been brought in an inconvenient forum. Notwithstanding the foregoing, any final judgment in any suit, action or other proceeding may be enforced in other jurisdictions by suit on the judgment in any other manner provided by applicable Law.

SECTION 12.12.    Waiver of Jury Trial. EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT TO ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY ANCILLARY AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY OR DISPUTES RELATING HERETO OR THERETO. EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTY HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 12.12.

SECTION 12.13.    Amendments and Waivers. This Agreement may be amended, modified, superseded or canceled and any of the terms, covenants, representations, warranties or conditions hereof may be waived only by an instrument in writing signed by each of the parties or, in the case of a waiver, by or on behalf of the party waiving compliance. No course

of dealing between the parties shall be effective to amend or waive any provision of this Agreement.

SECTION 12.14.   Specific Performance. The parties agree that irreparable damage for which monetary damages, even if available, would not be an adequate remedy, would occur in the event that the parties do not perform their obligations under the provisions of this Agreement (including failing to take such actions as are required of them hereunder to consummate the transactions contemplated by this Agreement, including the Acquisition) in accordance with its specified terms or otherwise breach such provisions. The parties acknowledge and agree that (a) the parties shall be entitled to an injunction or injunctions, specific performance or other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in any court of competent jurisdiction without proof of damages or inadequacy of legal remedy and without the posting or provision of any bond or other security, this being in addition to any other remedy to which they are entitled under this Agreement and (b) the right of specific enforcement is an integral part of the transactions contemplated by this Agreement and, without that right, neither Seller nor Purchaser would have entered into this Agreement. The parties hereto agree not to assert that a remedy of specific enforcement is unenforceable, invalid, contrary to Law or inequitable for any reason, and not to assert that a remedy of monetary damages would provide an adequate remedy or that the parties otherwise have an adequate remedy at law. The parties hereto acknowledge and agree that any party seeking an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this Section 12.14 shall not be required to provide or post any bond or other security in connection with any such order or injunction.

SECTION 12.15.   Joint Drafting. The parties hereto have been represented by counsel in the negotiations and preparation of this Agreement; therefore, this Agreement will be deemed to be drafted by each of the parties hereto, and no rule of construction will be invoked respecting the authorship of this Agreement.

SECTION 12.16.   No Right of Set-Off. Purchaser, on its own behalf and on behalf of its affiliates and its and its successors and permitted assigns, hereby waives any rights of set-off, netting, offset, recoupment, or similar rights that Purchaser, any of its affiliates or any of its or its successors and permitted assigns has or may have with respect to the payment of the Purchase Price or any other payments to be made by Purchaser pursuant to this Agreement or any other document or instrument delivered by Purchaser in connection herewith.

SECTION 12.17.   Currency. Unless otherwise specified in this Agreement, all references to currency, monetary values and dollars set forth herein shall mean United States (U.S.) dollars and all payments hereunder shall be made in United States dollars.

[SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, Seller and Purchaser have duly executed this Agreement as of the date first written above.

**SELLER:**

ANTHOLOGY INC.

By: _Michael Pohorylo_ _____
Name:  Michael Pohorylo
Title:  Secretary

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

**SELLER:**

BLACKBOARD LLC

By:  Michael Pohorylo
      Name:  Michael Pohorylo
      Title:   Secretary

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

**SELLER:**

ANTHOLOGY INC. OF MISSOURI

By: _Michael Pohorylo_____

       Name:  Michael Pohorylo
       Title:   Secretary

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

**SELLER:**

ANTHOLOGY INC. OF NY

By: _Michael Pohorylo_ _____
     Name: Michael Pohorylo
     Title:   Secretary

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

**DEBTOR AFFILIATE:**

ADMISSIONS US, LLC

By: Michael Pohorylo
       Name: Michael Pohorylo
       Title: Secretary

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

**DEBTOR AFFILIATE:**

ACADEMIC MANAGEMENT SYSTEMS, LLC

By: _Michael Pohorylo_
      Name:  Michael Pohorylo
      Title:   Secretary

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

**DEBTOR AFFILIATE:**

ASTRA ACQUISITION CORP.

By: _Michael Pohorylo_ _____
        Name:  Michael Pohorylo
        Title:   Secretary

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

**DEBTOR AFFILIATE:**

APPLYYOURSELF, INC.

By: Michael Pohorylo

Name: Michael Pohorylo

Title: Secretary

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

Docusign Envelope ID: 1726E86C-9938-4C24-9041-D24E489C4A05

**DEBTOR AFFILIATE:**

ASTRA INTERMEDIATE HOLDING CORP.

By: _____

Name:  Michael Pohorylo

Title:   Secretary

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

Docusign Envelope ID: 1726E86C-9938-4C24-9041-D24E489C4A05

**DEBTOR AFFILIATE:**

AY SOFTWARE SERVICES, INC.

By: _Michael Pohorylo_ _____

      Name:  Michael Pohorylo
      Title:   Secretary

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

**DEBTOR AFFILIATE:**

BB ACQUISITION CORP.

By: Michael Pohorylo

      Name: Michael Pohorylo
      Title:  Secretary

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

**DEBTOR AFFILIATE:**

BB MANAGEMENT LLC

By: _Michael Pohorylo_ _____
       Name:  Michael Pohorylo
       Title:   Secretary

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

**DEBTOR AFFILIATE:**

BLACKBOARD CAMPUSWIDE OF TEXAS, INC.

By:  Michael Pohorylo
     Name:  Michael Pohorylo
     Title:   Secretary

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

**DEBTOR AFFILIATE:**

BLACKBOARD COLLABORATE INC.

By: _Michael Pohorylo_
Name:  Michael Pohorylo
Title:   Secretary

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

**DEBTOR AFFILIATE:**

BLACKBOARD HOLDINGS, LLC

By: _Michael Pohorylo_ _____
　　　Name:  Michael Pohorylo
　　　Title:   Secretary

Docusign Envelope ID: 1726E86C-9938-4C24-9041-D24E489C4A05

**DEBTOR AFFILIATE:**

BLACKBOARD INTERNATIONAL LLC

By: _____
Name:  Michael Pohorylo
Title:   Secretary

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

**DEBTOR AFFILIATE:**

BLACKBOARD STUDENT SERVICES INC.

By: _Michael Pohorylo_ _____
                Name:  Michael Pohorylo
                Title:   Secretary

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

**DEBTOR AFFILIATE:**

BLACKBOARD SUPER HOLDCO, LLC

By: Michael Pohorylo
  0A62C98353894A3...
  Name: Michael Pohorylo
  Title: Secretary

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

Docusign Envelope ID: 1726E86C-9938-4C24-9041-D24E489C4A05

**DEBTOR AFFILIATE:**

BLACKBOARD TENNESSEE LLC

By: _Michael Pohorylo_ _____
 Name:  Michael Pohorylo
 Title:   Secretary

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

**DEBTOR AFFILIATE:**

CAMPUS MANAGEMENT ACQUISITION
CORP.

By: Michael Pohorylo
      0A62C98353894A3...
      Name:  Michael Pohorylo
      Title:   Secretary

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

**DEBTOR AFFILIATE:**

EDCENTRIC HOLDINGS, LLC

By: _Michael Pohorylo_ _____

      Name:  Michael Pohorylo
      Title:   Secretary

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

**DEBTOR AFFILIATE:**

EDCENTRIC, INC.

By: _Michael Pohorylo_ _____
Name: Michael Pohorylo
Title:   Secretary

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

**DEBTOR AFFILIATE:**

EDCENTRIC MIDCO, INC.

By: Michael Pohorylo
Name: Michael Pohorylo
Title: Secretary

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

**DEBTOR AFFILIATE:**

HIGHER ONE REAL ESTATE SP, LLC

By: _Michael Pohorylo_ _____
      Name:  Michael Pohorylo
      Title:   Secretary

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

**DEBTOR AFFILIATE:**

MYEDU CORPORATION

By: _Michael Pohorylo_ _____
Name:  Michael Pohorylo
Title:   Secretary

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

**DEBTOR AFFILIATE:**

ORGSYNC, INC.

By: _Michael Pohorylo_ _____
         Name:  Michael Pohorylo
         Title:   Secretary

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

**DEBTOR AFFILIATE:**

PERCEPTIS, LLC

By: _____
Name: Michael Pohorylo
Title: Secretary

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

**PURCHASER:**

ENCOURA LE LLC

By: _____

Name:  Dennis Syracuse
Title:   Chief Executive Officer

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

**Exhibit A**
**Form of Bill of Sale**

*[Attached]*

*CONFIDENTIAL*
*EXECUTION VERSION*

## FORM OF BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT (this "**Agreement**") is entered into as of [●], by and among (a) Encoura LE LLC, a Delaware limited liability company ("**Purchaser**"), (b) Anthology Inc., a Florida corporation, Blackboard LLC, a Delaware limited liability company, Anthology Inc. of Missouri, a Delaware corporation, Anthology Inc. of NY, a Delaware corporation, each as in existence on the date hereof, or in its capacity as debtor-in-possession, reorganized debtor, as applicable, or any successor, assign, representative, or designee with respect to all or substantially all of the Seller's estates, including any trustee assigned in any chapter 11 cases or appointed in connection with a conversion to chapter 7, or any plan administrator or liquidating trustee under a confirmed chapter 11 plan (collectively and individually, as context requires, "**Seller**"), and (c) each affiliate of Seller set forth on Exhibit A hereto [1] (collectively and individually, as context requires, "**Other Transferor**"). Purchaser, Seller and Other Transferor are referred to herein, collectively, as the "**Parties**", and each, individually, a "**Party**". Each capitalized term used but not otherwise defined in this Agreement shall have the meaning ascribed to such term in the APA (as defined below).

WHEREAS, Purchaser and Seller have entered into that certain Asset Purchase Agreement, dated as of September 29, 2025 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**APA**"), pursuant to which Seller has agreed to (and to cause Other Transferor (which Other Transferor includes Astra Intermediate Holding Corp. and/or its subsidiaries (including Seller and its subsidiaries)) to), sell, transfer, assign and deliver to Purchaser, and Purchaser has agreed to purchase, acquire, assume and accept from Seller free and clear of all Liens and Liabilities (other than Permitted Liens, if any, and Assumed Liabilities), all of Seller's and Other Transferor's respective right, title and interest in, to and under the Transferred Assets, and assume the Assumed Liabilities as set forth therein, for good and valuable consideration and in accordance with the terms, and subject to the conditions, set forth in the APA;

WHEREAS, this Agreement constitutes the "Bill of Sale, Assignment and Assumption Agreement" referred to in the APA; and

WHEREAS, each of Seller and Other Transferor desires to deliver to Purchaser such instruments of sale, transfer, assignment, conveyance, contribution and delivery as are required to vest in Purchaser all of Seller's or Other Transferor's, as applicable, rights, title and interest in and to the Transferred Assets free and clear of any Liens and Liabilities (other than Permitted Liens, if any, and Assumed Liabilities), and Purchaser desires to deliver to Seller such instruments as are required in order to effectuate and evidence the assumption by Purchaser of the Assumed Liabilities.

NOW, THEREFORE, pursuant to the APA and in consideration of the mutual promises contained in the APA, and for other good and valuable consideration, the receipt and

---

[1] Note to Draft: To include any entity that is not a Seller under the APA that holds Transferred Assets.

sufficiency of which each of Seller, Other Transferor and Purchaser acknowledge, the Parties agree as follows:

1.      Transfer of Transferred Assets. Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, on the terms and subject to the conditions set forth in the APA, including Section 1.01 of the APA, and the Sale Order, each of Seller and Other Transferor hereby sells, assigns, transfers and delivers to Purchaser, and Purchaser hereby purchases, acquires, assumes and accepts from Seller and Other Transferor, all of Seller's and Other Transferor's right, title and interest in, to and under the Transferred Assets, free and clear of any Liens and Liabilities (other than Permitted Liens, if any, and Assumed Liabilities).

2.      Assumption of Assumed Liabilities. In accordance with the terms and subject to the conditions set forth in the APA, including Section 1.01 of the APA, and the Sale Order, Purchaser hereby assumes and agrees to pay, perform or discharge when due or required to be performed, as the case may be, the Assumed Liabilities. For the avoidance of doubt, notwithstanding the foregoing, Purchaser does not assume or agree to pay, perform or discharge when due or required to be performed any liabilities of Seller or its affiliates other than the Assumed Liabilities, and, on the terms and subject to the conditions set forth in the APA, the Parties agree that all such Retained Liabilities will remain the sole responsibility of Seller.

3.      Terms of the APA. This Agreement in no way modifies, replaces, supersedes, defeats, limits, expands, diminishes or otherwise alters any right, obligation, claim or remedy under the APA, including any rights any party may have under the representations, warranties, covenants, agreements and indemnities set forth in the APA. This Agreement is expressly made subject to the terms and provisions of the APA and shall be construed consistently therewith, and the APA shall remain in full force and effect on its terms, separate and apart from this Agreement. Notwithstanding any other provision in this Agreement to the contrary, in the event and to the extent that there shall be a conflict, ambiguity or inconsistency between any provision of this Agreement and any provision of the APA, the provision of the APA shall control.

4.      Miscellaneous.

(a)      Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement, the negotiation, execution or performance of this Agreement and any disputes arising under or related hereto (whether for breach of contract, tortious conduct or otherwise) shall be governed by and construed in accordance with the Laws of the State of New York, without reference to its conflicts of law principles.

(b)      EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT TO ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, THE APA OR ANY OTHER ANCILLARY AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY OR DISPUTES RELATING HERETO OR THERETO. EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER

2

PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 4(B).

5.    Each of Section 5.11 (*Further Action; Wrong Pockets*), Section 12.01 (*Assignment*), Section 12.02 (*No Third-Party Beneficiaries*), Section 12.03 (*Expenses*), Section 12.04 (*Notices*), Section 12.05 (*Interpretation; Certain Definitions*), Section 12.07 (*Counterparts*), Section 12.09 (*Severability*), Section 12.11 (*Jurisdiction*), Section 12.13 (*Amendments and Waivers*) and Section 12.15 (*Joint Drafting*) of the APA are hereby incorporated by reference into this Agreement, the terms of which shall apply to this Agreement, *mutatis mutandis* as though set forth herein.

6.    The Parties shall (a) execute and deliver, or cause to be executed and delivered, such documents and other instruments and (b) take, or cause to be taken, all such further actions as may be reasonably required to carry out the provisions of this Agreement and give effect to the transactions in accordance with the terms of this Agreement.

7.    This Agreement, the APA and the Exhibits and Disclosure Schedule annexed thereto, the Confidentiality Agreement and the other Ancillary Agreements, and the other agreements, certificates, and other documents contemplated hereby and thereby constitute the entire understanding between the Parties with respect to the subject matter hereof and thereof, and supersede all other understandings and negotiations with respect thereto. The Parties agree to define their rights, liabilities and obligations with respect to such understanding and the transactions contemplated hereby and thereby exclusively in contract pursuant to the express terms and provisions of the APA, and the Parties expressly disclaim that they are owed any duties or are entitled to any remedies not expressly set forth in the APA, this Agreement or any other Ancillary Agreement.

*[Remainder of this page is intentionally left blank]*

3

IN WITNESS WHEREOF, the Parties have caused this Bill of Sale, Assignment and Assumption Agreement to be executed and delivered as of the date first above written.

**SELLER:**

**ANTHOLOGY INC.**, a Florida corporation

By:
Name: [●]
Title:  [●]

[Signature Page to Bill of Sale, Assignment and Assumption Agreement]

**SELLER:**

**BLACKBOARD LLC**, a Delaware limited liability company

By:
Name: [●]
Title: [●]

[Signature Page to Bill of Sale, Assignment and Assumption Agreement]

**SELLER:**

**ANTHOLOGY INC. OF NY**, a Delaware corporation

By:
Name: [●]
Title:   [●]

[Signature Page to Bill of Sale, Assignment and Assumption Agreement]

**SELLER:**

**ANTHOLOGY INC. OF MISSOURI**, a Delaware corporation

By:
Name: [●]
Title:  [●]

**OTHER TRANSFEROR:**

**[●]**, a [●] [●]

By:
Name: [●]
Title:   [●]

**PURCHASER:**

**ENCOURA LE LLC**, a Delaware limited liability company

By: _____

Name: [●]

Title:  [●]

[Signature Page to Bill of Sale, Assignment and Assumption Agreement]

**EXHIBIT A**

1.  [_____]²

---

² Note to Draft: To include any entity that is not a Seller under the APA that holds Transferred Assets.

**Exhibit B**

[*Reserved*]

**Exhibit C**

[*Reserved*]

**Exhibit D**
**Transition Services Agreement Term Sheet**

*[Attached]*

**Exhibit 2**

**Notice of Sale and Auction**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ANTHOLOGY INC., *et al.*,[1] | ) | Case No. 25-90498 (ARP) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

**NOTICE OF AUCTION FOR THE
SALE OF THE DEBTORS' ASSETS FREE AND
CLEAR OF ANY AND ALL CLAIMS, INTERESTS, AND ENCUMBRANCES**

**PLEASE TAKE NOTICE** that on [●], 2025, the United States Bankruptcy Court for the Southern District of Texas (the "Court") entered the *Order (I) Approving Bidding Procedures for the Sale of Certain of the Debtors' Assets, (II) Scheduling Certain Dates With Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Stalking Horse Agreements and Bid Protections, (V) Approving Contract Assumption and Assignment Procedures, (VI) Authorizing the Sale of Assets Free and Clear, and (VII) Granting Related Relief* [Docket No. [●]] (the "Bidding Procedures Order"),[2] authorizing the above-captioned debtors and debtors in possession (collectively, the "Debtors") to conduct a marketing and sale process, potentially including an auction (the "Auction"), to sell the 363 Assets.  The sale process and Auction, if any, will be governed by the Bidding Procedures approved pursuant to the Bidding Procedures Order and attached to the Bidding Procedures Order as Exhibit 1 (the "Bidding Procedures").  **All interested bidders should carefully read the Bidding Procedures and the Bidding Procedures Order**.  To the extent that there are any inconsistencies between this notice and the Bidding Procedures or the Bidding Procedures Order, the Bidding Procedures or the Bidding Procedures Order, as applicable, shall govern in all respects.

Copies of the Bidding Procedures Order, the Bidding Procedures, or other documents related thereto are available on the Debtors' restructuring website at https://cases.stretto.com/Anthology or by telephone at (833) 882-2627 in the U.S. and Canada or +1 (949) 617-2255 internationally.

**PLEASE TAKE FURTHER NOTICE** that any person or entity who wishes to participate in the Auction must comply with the participation requirements, bid requirements, and other requirements set forth in the Bidding Procedures.  The Bid Deadline is **November 13, 2025 at**

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.stretto.com/Anthology.  The location of Debtor Anthology Inc.'s corporate headquarters and the Debtors' service address in these chapter 11 cases is 5201 Congress Avenue, Boca Raton, Florida 33487.

[2]   Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Bidding Procedures or the Bidding Procedures Order, as applicable.

**4:00 p.m. (prevailing Central Time)**.  The Auction will be held on **November 17, 2025 at 4:00 p.m. (prevailing Central Time)**, or such other time and place as the Debtors determine.  If the Auction is cancelled pursuant to the Bidding Procedures, the Debtors will file the Notice of Cancellation of Auction.

**PLEASE TAKE FURTHER NOTICE** that the Debtors expect to seek approval of any Sale Transaction at the Sale Hearing, which is presently scheduled to commence on **November 20, 2025 at [● a.m. / p.m.] (prevailing Central Time)**, before the Judge Pérez in the United States Courthouse, 515 Rusk Street, 4th Floor Courtroom 400, Houston, Texas 77002.

**PLEASE TAKE FURTHER NOTICE** that the Debtors reserve the right in their reasonable business judgment to modify the Bidding Procedures in accordance with the Bidding Procedures and/or terminate discussions with any Potential Bidders.

**PLEASE TAKE FURTHER NOTICE** that except as otherwise set forth in the Bidding Procedures Order with respect to objections to proposed cure amounts or the assumption and assignment of Assigned Contracts, objections, if any, to a proposed Sale Transaction **must**:  (a) be in writing; (b) comply with the applicable provisions of the Bankruptcy Rules, the Bankruptcy Local Rules, and any order governing the administration of these chapter 11 cases; (c) state with specificity the nature of the objection and, if the Cure Objection pertains to the proposed Cure Costs, state the cure amount alleged to be owed to the objecting Contract Counterparty, together with any applicable and appropriate documentation in support thereof; and (d) if you object to proposed Cure Costs, a proposed assignment to the Stalking Horse Bidder or Successful Bidder of any Assigned Contract or the ability of the Stalking Horse Bidder to provide adequate assurance of future performance with respect to any Assigned Contract, be filed with the Court and **actually received no later than November 14, 2025 at 4:00 p.m. (prevailing Central Time)** (the "**Cure Objection Deadline**"), if you object to the ability of the Successful Bidder other than a Stalking Horse Bid to provide adequate assurance of future performance with respect to any Assigned Contract, be filed with the Court and **actually received no later than November 19, 2025 at 4:00 p.m. (prevailing Central Time)** (the "**Supplemental Adequate Assurance Objection Deadline**"), and if you object to any other contract assumptions, be filed with the Court and **actually received no later than November 19, 2025 at 4:00 p.m. (prevailing Central Time)** (the "**Sale Transaction Objection Deadline**").

## CONSEQUENCES OF FAILING TO TIMELY MAKE AN OBJECTION

**ANY PARTY OR ENTITY WHO FAILS TO TIMELY MAKE AN OBJECTION TO A SALE ON OR BEFORE THE SALE TRANSACTION OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO SUCH SALE, INCLUDING WITH RESPECT TO THE TRANSFER OF THE SELLING DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, EXCEPT AS SET FORTH IN THE APPLICABLE PURCHASE AGREEMENT(S).**

## NO SUCCESSOR LIABILITY

The Sale Order is expected to provide, among other things, that the Successful Bidder and its affiliates, predecessors, successors, assigns, members, partners, principals, directors, officers, and shareholders (or equivalent) will have no responsibility for, and the assets will be sold free and clear of, any derivative, successor, transferee or vicarious liability, including the following:

To the greatest extent allowable by applicable law, by virtue of the consummation of the transactions contemplated under the Stalking Horse Agreements (in the case where a Stalking Horse Bidder is the Successful Bidder) or a separate purchase agreement entered into with the Successful Bidder (if a Stalking Horse Bidder is not the Successful Bidder): (i) the Successful Bidder is not a legal successor or otherwise deemed a successor, alter ego or continuation of any Debtor and its respective estate, there is not substantial continuity between the Successful Bidder and the Debtors, and there is no continuity of enterprise between the Debtors and the Successful Bidder; (ii) the Successful Bidder is not holding itself out to the public as a continuation of the Debtors or their respective estates; (iii) the transactions do not amount to a consolidation, merger, or *de facto* merger of the Successful Bidder and the Debtors and/or the Debtors' estates; (iv) there is no common identity between the Debtors and the Successful Bidder; and (v) the Successful Bidder is not a successor or assignee of the Debtors or their estates for any purpose including, but not limited to, under any foreign, federal, state or local statute or common law, or revenue, pension, ERISA, tax, labor, employment, environmental, escheat or unclaimed property laws, or other law, rule or regulation (including, without limitation, filing requirements under any such laws, rules, or regulations), with respect to any debts, claims, or obligations, or under any products liability law or doctrine, and the Successful Bidder shall have no liability or obligation under the Workers Adjustment and Retraining Act (the "WARN Act"),  929 U.S.C. §§ 210 et seq. or the Comprehensive Environmental Response Compensation and Liability Act and shall not be deemed to be a "successor employer" for purposes of the Internal Revenue Code of 1986, Title VII of the Civil Rights Act of 1964, as amended, the Age Discrimination in Employment Act, the Americans with Disability Act, the Family Medical Leave Act, the National Labor Relations Act, the Labor Management Relations Act, the Older Workers Benefit Protection Act, the Equal Pay Act, the Civil Rights Act of 1866 (42 U.S.C. 1981), the Employee Retirement Income Security Act, the Multiemployer Pension Protection Act, the Pension Protection Act, and/or the Fair Labor Standards Act.  Except for the Assumed Liabilities, (i) the transfer of the acquired 363 Assets to the Successful Bidder and (ii) the assumption and assignment to Successful Bidder of the Assigned Contracts do not and will not subject the Successful Bidder and its respective affiliates, predecessors, successors, assigns, members, partners, directors, officers, principals and shareholders (or equivalent) to any liability whatsoever for any claims against the Debtors or any of their predecessors or affiliates, and Successful Bidder shall have no successor or vicarious liabilities of any kind or character, including, without limitation, under any theory of antitrust, environmental, successor, or transfer reliability, labor law, de facto merger, mere continuation, or substantial continuity, whether known or unknown as of the sale closing, then existing, or thereafter arising, whether fixed or contingent, whether asserted or unasserted, whether legal or equitable, whether liquidated or unliquidated, including, without limitation, liabilities on account of warranties, intercompany loans, receivables among the Debtors and their affiliates, environmental liabilities, and any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of any of the acquired 363 Assets prior to the sale closing.

Houston, Texas
[●], 2025

/s/  *Draft*

**HAYNES AND BOONE, LLP**
Charles A. Beckham, Jr. (TX Bar No. 02016600)
Arsalan Muhammad (TX Bar No. 24074771)
Kourtney Lyda (TX Bar No. 24013330)
Re'Necia Sherald (TX Bar No. 24121543)
1221 McKinney Street, Suite 4000
Houston, Texas 77010
Telephone:      (713) 547-2000
Facsimile:      (713) 547-2600
Email:          charles.beckham@haynesboone.com
                arsalan.muhammad@haynesboone.com
                kourtney.lyda@haynesboone.com
                renecia.sherald@haynesboone.com

- and -

Charles M. Jones II (TX Bar No. 24054941)
2801 North Harwood Street, Suite 2300
Dallas, TX 75201
Telephone:      (214) 651-5000
Facsimile:      (214) 651-5940
Email:          charlie.jones@haynesboone.com


*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Chad J. Husnick, P.C. (*pro hac vice* pending)
Charles B. Sterrett (*pro hac vice* pending)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          chad.husnick@kirkland.com
                charles.sterrett@kirkland.com

- and -

Melissa Mertz (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          melissa.mertz@kirkland.com




*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

**Exhibit 3**

**Form of Notice of Successful Bidder**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ANTHOLOGY INC., *et al.*,[1] | ) | Case No. 25-90498 (ARP) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

**NOTICE OF SUCCESSFUL BIDDERS**

PLEASE TAKE NOTICE that, on [●], 2025, the United States Bankruptcy Court for the Southern District of Texas (the "Court") entered the *Order (I) Approving Bidding Procedures for the Sale of Certain of the Debtors' Assets, (II) Scheduling Certain Dates With Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Stalking Horse Agreements and Bid Protections, (V) Approving Contract Assumption and Assignment Procedures, (VI) Authorizing the Sale of Assets Free and Clear, and (VII) Granting Related Relief* [Docket No. [●]] (the "Bidding Procedures Order"), authorizing the Debtors to solicit and select the highest or otherwise best offer(s) for a Sale Transaction(s) one or more Asset Package(s) (collectively, the "363 Assets").[2]

PLEASE TAKE FURTHER NOTICE that, on **November 17, 2025 at 4:00 p.m. (prevailing Central Time)**, pursuant to the Bidding Procedures Order, the Debtors conducted the Auction with respect to the 363 Assets at Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022 and by videoconference.

PLEASE TAKE FURTHER NOTICE that, upon the conclusion of the Auction, the Debtors, in the exercise of their reasonable, good-faith business judgement have selected (i) (a) [●] as a Successful Bidder (the "[●] Purchaser"), and (b) [●] as a Back-Up Bidder with respect to the [●] Asset Package, (ii) (a) [●] as a Successful Bidder (the "[●] Purchaser"), and (b) [●] as a Back-Up Bidder with respect to the [●] Asset Package, and (iii) (a) [●] as a Successful Bidder (the "[●] Purchaser"), and (b) [●] as a Back-Up Bidder with respect to the [●] Asset Package.

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.stretto.com/Anthology.  The location of Debtor Anthology Inc.'s corporate headquarters and the Debtors' service address in these chapter 11 cases is 5201 Congress Avenue, Boca Raton, Florida 33487.

[2]   Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Bidding Procedures or the Bidding Procedures Order, as applicable.

| 363 Asset(s) | Successful Bidder | Back-Up Bidder | Proposed Bid Protections | Key Terms of Proposed Sale |
|---|---|---|---|---|
|  |  |  |  |  |

**PLEASE TAKE FURTHER NOTICE** that the Debtors will seek approval of the Sale Transaction(s) of these Asset Package(s) to the Purchasers at the Sale Hearing scheduled to commence on **November 20, 2025 at [● a.m. / p.m.] (prevailing Central Time)** before the Honorable Judge Pérez, in the United States Courthouse, 515 Rusk Street, 4th Floor Courtroom 400, Houston, Texas 77002. The Sale Hearing may be adjourned by announcement in open Court or on the Court's calendar without any further notice required.

**PLEASE TAKE FURTHER NOTICE** that objections to proposed Cure Costs, the proposed assignment to the Successful Bidder of any Assigned Contract or if the Successful Bidder is a Stalking Horse Bidder, the ability of the Successful Bidder to provide adequate assurance of future performance with respect to any Assigned Contract specific to the Auction or Successful Bidders must be made on or before **November 14, 2025 at 4:00 p.m. (prevailing Central Time)** (the "Cure Objection Deadline"), if the Successful Bidder is not a Stalking Horse Bidder, objections to the ability of the Successful Bidder to provide adequate assurance of future performance with respect to any Assigned Contract specific to the Auction or Successful Bidders must be made on or before **November 19, 2025 at 4:00 p.m. (prevailing Central Time)** (the "**Supplemental Adequate Assurance Objection Deadline**"), and any other objections specific to the Auction or Successful Bidders must be made on or before **November 19, 2025 at 4:00 p.m. (prevailing Central Time)** (the "**Sale Transaction Objection Deadline**"). Objections must be made in writing, state the basis of such objection with specificity, and shall be filed with the Court, with a courtesy copy to chambers, and must be filed no later than the Auction Objection Deadline, as applicable, and must be served on the following parties (the "Notice Parties"): (i) the Debtors, Anthology Inc., 5201 Congress Avenue, Boca Raton, Florida 33487, Attn.: Heath C. Gray; (ii) proposed counsel to the Debtors (a) Kirkland & Ellis LLP, 333 West Wolf Point Plaza, Chicago, Illinois 60654, Attn.: Chad J. Husnick, P.C. (chad.husnick@kirkland.com) and Charles B. Sterrett (charles.sterrett@kirkland.com), (b) Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn.: Melissa Mertz (melissa.mertz@kirkland.com); (c) Haynes and Boone, LLP, 1221 McKinney Street, Suite 4000, Houston, Texas 77010, Attn.: Charles A. Beckham, Jr. (charles.beckham@haynesboone.com) and Arsalan Muhammad (arsalan.muhammad@haynesboone.com); (iii) the United States Trustee, [●], Attn.: [●]; (iv) counsel to the DIP Lenders, Davis Polk & Wardwell LLP, 450 Lexington Ave, New York, NY 10017, Attn.: David Schiff (david.schiff@davispolk.com), Joshua Y. Sturm (joshua.sturm@davispolk.com) and Amber Leary (amber.leary@davispolk.com) and (v) any statutory committee appointed in these chapter 11 cases (collectively, the "Objection Notice Parties").

**PLEASE TAKE FURTHER NOTICE** that, at the Sale Hearing, the Debtors will seek the Court's approval of the Successful Bid by the Purchaser. Unless the Court orders otherwise, the Sale Hearing shall be an evidentiary hearing on matters relating to the Sale Transaction, and there will be no further bidding at the Sale Hearing.

**PLEASE TAKE FURTHER NOTICE** that this Notice of Successful Bidder is subject to the terms and conditions of the Motion and the Bidding Procedures Order, with such Bidding Procedures Order controlling in the event of any conflict, and the Debtors encourage parties in interest to review such documents in their entirety.

**PLEASE TAKE FURTHER NOTICE** that copies of the Bidding Procedures, the Bidding Procedures Order, this notice, and any other related documents are available: (a) upon request to Stretto by calling (833) 882-2627; (b) by visiting the Debtors' restructuring website at https://cases.stretto.com/Anthology;   or   (c) for   a   fee   via   PACER   by   visiting https://ecf.txsb.uscourts.gov.

Houston, Texas
[●], 2025


/s/  *Draft*

**HAYNES AND BOONE, LLP**
Charles A. Beckham, Jr. (TX Bar No. 02016600)
Arsalan Muhammad (TX Bar No. 24074771)
Kourtney Lyda (TX Bar No. 24013330)
Re'Necia Sherald (TX Bar No. 24121543)
1221 McKinney Street, Suite 4000
Houston, Texas 77010
Telephone:      (713) 547-2000
Facsimile:      (713) 547-2600
Email:           charles.beckham@haynesboone.com
                    arsalan.muhammad@haynesboone.com
                    kourtney.lyda@haynesboone.com
                    renecia.sherald@haynesboone.com


- and -


Charles M. Jones II (TX Bar No. 24054941)
2801 North Harwood Street, Suite 2300
Dallas, TX 75201
Telephone:      (214) 651-5000
Facsimile:      (214) 651-5940
Email:           charlie.jones@haynesboone.com


*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Chad J. Husnick, P.C. (*pro hac vice* pending)
Charles B. Sterrett (*pro hac vice* pending)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:           chad.husnick@kirkland.com
                    charles.sterrett@kirkland.com


- and -

Melissa Mertz (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:           melissa.mertz@kirkland.com


*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

5

**Exhibit 4**

**Cure Notice**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ANTHOLOGY INC., *et al.*,[1] | ) | Case No. 25-90498 (ARP) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

**NOTICE TO CONTRACT PARTIES TO POTENTIALLY
ASSUMED EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

> **YOU ARE RECEIVING THIS NOTICE BECAUSE YOU
> OR ONE OF YOUR AFFILIATES IS A COUNTERPARTY TO AN
> EXECUTORY CONTRACT OR UNEXPIRED LEASE WITH ONE OR MORE
> OF THE DEBTORS AS SET FORTH ON <u>EXHIBIT A</u> ATTACHED HERETO.**

**PLEASE TAKE NOTICE** that on [●], 2025, the United States Bankruptcy Court for the Southern District of Texas (the "<u>Court</u>") entered the *Order (I) Approving Bidding Procedures for the Sale of Certain of the Debtors' Assets, (II) Scheduling Certain Dates With Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Stalking Horse Agreements and Bid Protections, (V) Approving Contract Assumption and Assignment Procedures, (VI) Authorizing the Sale of Assets Free and Clear, and (VII) Granting Related Relief* [Docket No. [●]] (the "<u>Bidding Procedures Order</u>"),[2] by which the Court approved procedures for the assumption and assignment of executory contracts and unexpired leases and granted related relief, as set forth in the Bidding Procedures Order.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Bidding Procedures and the terms of any Successful Bid, the Debtors **may** assume and assign to the Successful Bidder certain of the Contracts listed on **<u>Exhibit A</u>** hereto (the "<u>Potential Assumption List</u>"), which include Contracts to which you are a counterparty, upon approval of a sale or other transaction (including, as the case may be, confirmation of a chapter 11 plan). The Debtors have conducted a review of their books and records and have included in the Potential Assumption List the amount of unpaid monetary obligations under each Contract set forth therein (the "<u>Cure Costs</u>").

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.stretto.com/Anthology.  The location of Debtor Anthology Inc.'s corporate headquarters and the Debtors' service address in these chapter 11 cases is 5201 Congress Avenue, Boca Raton, Florida 33487.

[2]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Bidding Procedures or the Bidding Procedures Order, as applicable.

**PLEASE TAKE FURTHER NOTICE** that if you disagree with the proposed Cure Costs, object to the proposed assignment to the Stalking Horse Bid of any Assigned Contract, or object to the ability of the Successful Bidder to provide adequate assurance of future performance with respect to any Assigned Contract, your objection must: (i) be in writing; (ii) comply with the applicable provisions of the Bankruptcy Rules, Bankruptcy Local Rules, and any order governing the administration of these chapter 11 cases; (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed Cure Costs, state the cure amount alleged to be owed, together with any applicable and appropriate documentation in support thereof; and (iv) if you object to proposed Cure Costs, be filed with the Court and **actually received no later than November 14, 2025 at 4:00 p.m. (prevailing Central Time)** (the "Cure Objection Deadline"), if you object to the ability of the Successful Bidder other than a Stalking Horse Bid to provide adequate assurance of future performance with respect to any Assigned Contract, be filed with the Court and **actually received no later than November 19, 2025 at 4:00 p.m. (prevailing Central Time)** (the "Supplemental Adequate Assurance Objection Deadline") by the following parties: (i) the Debtors, Anthology Inc., 5201 Congress Avenue, Boca Raton, Florida 33487, Attn.: Heath C. Gray; (ii) proposed counsel to the Debtors (a) Kirkland & Ellis LLP, 333 West Wolf Point Plaza, Chicago, Illinois 60654, Attn.: Chad J. Husnick, P.C. (chad.husnick@kirkland.com) and Charles B. Sterrett (charles.sterrett@kirkland.com), (b) Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn.: Melissa Mertz (melissa.mertz@kirkland.com); (c) Haynes and Boone, LLP, 1221 McKinney Street, Suite 4000, Houston, Texas 77010, Attn: Charles A. Beckham, Jr. (charles.beckham@haynesboone.com) and Arsalan Muhammad (arsalan.muhammad@haynesboone.com); (iii) the United States Trustee, [●], Attn.: [●]; (iv) counsel to the DIP Lenders, Davis Polk & Wardwell LLP, 450 Lexington Ave, New York, NY 10017, Attn.: David Schiff (david.schiff@davispolk.com), Joshua Y. Sturm (joshua.sturm@davispolk.com) and Amber Leary (amber.leary@davispolk.com) and (v) any statutory committee appointed in these chapter 11 cases; *provided* that, the Debtors may modify the Cure Objection Deadline by filing a notice of such modification on the Court's docket (collectively, the "Objection Notice Parties").

**PLEASE TAKE FURTHER NOTICE** that, notwithstanding the foregoing, if the Debtors file one or more revised versions of this Cure Notice (a "Supplemental Cure Notice"), as set forth in the Bidding Procedures Order, any counterparty to a Contract that is (a) added to the Potential Assumption List pursuant to a Supplemental Cure Notice or (b) that is subject to an amended proposed cure amount shall have fourteen calendar days following the service of such Supplemental Cure Notice to file an objection.  Objections to the proposed assignment of any Contract to the applicable Successful Bidder (other than Cure Objections) shall: (i) be in writing; (ii) comply with the applicable provisions of the Bankruptcy Rules, Bankruptcy Local Rules, and any order governing the administration of these chapter 11 cases; (iii) state with specificity the nature of the objection; and (iv) be filed with the Court and **actually received** by the Objection Notice Parties listed above **no later than [●]** at **4:00 p.m. (prevailing Central Time)**.

**PLEASE TAKE FURTHER NOTICE** that if no objection to (a) the Cure Costs(s), (b) the proposed assignment and assumption of any Assigned Contract, or (c) adequate assurance of the Stalking Horse Bid's ability to perform is filed by the Cure Objection Deadline, or the adequate assurance of a Successful Bidder other than a Stalking Horse Bid is filed by the Supplemental Adequate Assurance Objection Deadline, then (i) you will be deemed to have

2

stipulated that the Cure Costs as determined by the Debtors are correct, (ii) you will be forever barred, estopped, and enjoined from asserting any additional cure amount under the proposed Assigned Contract, and (iii) you will be forever barred, estopped, and enjoined from objecting to such proposed assignment to the Successful Bidder on the grounds that the Successful Bidder has not provided adequate assurance of future performance as of the closing date of the Sale Transaction.

**PLEASE TAKE FURTHER NOTICE** that any Cure Objection in connection with the Successful Bid that otherwise complies with these procedures yet remains unresolved as of the commencement of the Sale Hearing, shall be heard at a later date to be fixed by the Court.

**PLEASE TAKE FURTHER NOTICE** that, notwithstanding anything herein, the mere listing of any Assigned Contract on the Cure Notice does not require or guarantee that such Assigned Contract will be assumed by the Debtors at any time or assumed and assigned, and all rights of the Debtors and the Successful Bidder with respect to such Assigned Contract are reserved.  Moreover, the Debtors explicitly reserve their rights, in their reasonable discretion, to seek to reject or assume each Assigned Contract pursuant to section 365(a) of the Bankruptcy Code and in accordance with the procedures allowing the Debtors and/or the Successful Bidder, as applicable, to designate any Assigned Contract as either rejected or assumed on a post-closing basis.

**PLEASE TAKE FURTHER NOTICE** that nothing herein (i) alters in any way the prepetition nature of the Assigned Contracts or the validity, priority, or amount of any claims of a counterparty to any Assigned Contract against the Debtors that may arise under such Assigned Contract, (ii) creates a postpetition contract or agreement, or (iii) elevates to administrative expense priority any claims of a counterparty to any Assigned Contract against the Debtors that may arise under such Assigned Contract.

Houston, Texas
[●], 2025

/s/  *Draft*

**HAYNES AND BOONE, LLP**
Charles A. Beckham, Jr. (TX Bar No. 02016600)
Arsalan Muhammad (TX Bar No. 24074771)
Kourtney Lyda (TX Bar No. 24013330)
Re'Necia Sherald (TX Bar No. 24121543)
1221 McKinney Street, Suite 4000
Houston, Texas 77010
Telephone:      (713) 547-2000
Facsimile:      (713) 547-2600
Email:          charles.beckham@haynesboone.com
                arsalan.muhammad@haynesboone.com
                kourtney.lyda@haynesboone.com
                renecia.sherald@haynesboone.com


- and -


Charles M. Jones II (TX Bar No. 24054941)
2801 North Harwood Street, Suite 2300
Dallas, TX 75201
Telephone:      (214) 651-5000
Facsimile:      (214) 651-5940
Email:          charlie.jones@haynesboone.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Chad J. Husnick, P.C. (*pro hac vice* pending)
Charles B. Sterrett (*pro hac vice* pending)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          chad.husnick@kirkland.com
                charles.sterrett@kirkland.com


- and -

Melissa Mertz (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          melissa.mertz@kirkland.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*