**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ANTHOLOGY INC., *et al.*,[1] | ) | Case No. 25-90498 (ARP) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**SECOND AMENDED JOINT CHAPTER 11 PLAN OF**
**ANTHOLOGY INC. AND ITS DEBTOR AFFILIATES**

**HAYNES AND BOONE, LLP**
Charles A. Beckham, Jr. (TX Bar No. 02016600)
Arsalan Muhammad (TX Bar No. 24074771)
Kourtney Lyda (TX Bar No. 24013330)
Re'Necia Sherald (TX Bar No. 24121543)
1221 McKinney Street, Suite 4000
Houston, Texas 77010
Telephone:      (713) 547-2000
Facsimile:      (713) 547-2600
Email:      charles.beckham@haynesboone.com
      arsalan.muhammad@haynesboone.com
      kourtney.lyda@haynesboone.com
      renecia.sherald@haynesboone.com

- and -

Charles M. Jones II (TX Bar No. 24054941)
2801 North Harwood Street, Suite 2300
Dallas, Texas 75201
Telephone: (214) 651-5000
Facsimile: (214) 651-5940
Email: charlie.jones@haynesboone.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Chad J. Husnick, P.C. (admitted *pro hac vice*)
Charles B. Sterrett (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:      chad.husnick@kirkland.com
      charles.sterrett@kirkland.com

- and -

Melissa Mertz (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:      melissa.mertz@kirkland.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases.stretto.com/Anthology.  The location of Debtor Anthology Inc.'s corporate headquarters and the Debtors' service address in these chapter 11 cases is 5201 Congress Avenue, Boca Raton, Florida 33487.

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................................1

**ARTICLE I DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW** ...................................................................................................................1
    A.    Defined Terms. .....................................................................................................1
    B.    Rules of Interpretation. .......................................................................................20
    C.    Computation of Time. .........................................................................................21
    D.    Governing Law. ..................................................................................................21
    E.    Reference to Monetary Figures. .........................................................................21
    F.    Reference to the Debtors, the Reorganized Debtors, or the Wind-Down Debtors. ...21
    G.    Controlling Document. ........................................................................................21
    H.    Consent Rights. ...................................................................................................22

**ARTICLE II ADMINISTRATIVE CLAIMS, PROFESSIONAL FEE CLAIMS, DIP CLAIMS, PRIORITY TAX CLAIMS, STATUTORY FEES, AND RESTRUCTURING EXPENSES** ............22
    A.    Administrative Claims. .......................................................................................22
    B.    Professional Fee Claims. .....................................................................................23
    C.    DIP Claims. .........................................................................................................24
    D.    Priority Tax Claims. ............................................................................................25
    E.    Payment of Statutory Fees. .................................................................................25
    F.    Payment of Restructuring Expenses. ..................................................................26

**ARTICLE III CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**............26
    A.    Classification of Claims and Interests. ..............................................................26
    B.    Treatment of Claims and Interests. ....................................................................27
    C.    Special Provision Governing Unimpaired Claims. ............................................32
    D.    Elimination of Vacant Classes. ..........................................................................33
    E.    Voting Classes; Presumed Acceptance by Non-Voting Classes. .......................33
    F.    Intercompany Interests. .......................................................................................33
    G.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code. .................33
    H.    Subordinated Claims and Interests. ....................................................................33
    I.    No Substantive Consolidation. ...........................................................................33
    J.    Controversy Concerning Impairment. ................................................................34

**ARTICLE IV MEANS FOR IMPLEMENTATION OF THE PLAN** ............................................34
    A.    General Settlement of Claims and Interests. ......................................................34
    B.    Reorganization Transaction. ...............................................................................34
    C.    Restructuring Transactions. .................................................................................37
    D.    Corporate Existence. ...........................................................................................38
    E.    Vesting of Assets in the Reorganized Debtors. ..................................................38
    F.    Corporate Action. ...............................................................................................38
    G.    New Organizational Documents. ........................................................................39
    H.    Directors and Officers of the Reorganized Debtors. ..........................................39
    I.    Employment Obligations. ...................................................................................39
    J.    Effectuating Documents; Further Transactions. .................................................40
    K.    New Management Incentive Plan. .......................................................................40
    L.    Indemnification Provisions. ................................................................................40
    M.    Acceptable Alternative Transaction. ..................................................................40
    N.    Sale Transactions. ...............................................................................................44
    O.    Transition Services Agreement(s). ......................................................................44
    P.    Tax Returns. ........................................................................................................45
    Q.    Cancellation of Existing Indebtedness and Securities. .......................................45
    R.    Exemption from Securities Laws. .......................................................................46
    S.    Section 1146 Exemption. ....................................................................................46

T.      Insurance Policies. ...................................................................................................... 47
U.      Director and Officer Liability Insurance. .................................................................. 47
V.      Preservation of Causes of Action. .............................................................................. 48
W.      Dissolution of the Committee. .................................................................................... 49
X.      UCC Settlement. ......................................................................................................... 49

**ARTICLE V TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ..................... 51**
A.      Assumption and Rejection of Executory Contracts and Unexpired Leases. ............. 51
B.      Claims Based on Rejection of Executory Contracts or Unexpired Leases. ............... 52
C.      Cure of Defaults for Assumed Executory Contracts and Unexpired Leases. ............ 52
D.      Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases. .......... 53
E.      Modifications, Amendments, Supplements, Restatements, or Other Agreements. ............ 54
F.      Reservation of Rights. ................................................................................................ 54
G.      Nonoccurrence of Effective Date. .............................................................................. 54

**ARTICLE VI PROVISIONS GOVERNING DISTRIBUTIONS .......................................................... 54**
A.      Distributions on Account of Claims Allowed as of the Effective Date. ..................... 54
B.      Disbursing Agent. ...................................................................................................... 55
C.      Rights and Powers of the Disbursing Agent. ............................................................. 55
D.      Delivery of Distributions and Undeliverable or Unclaimed Distributions. ............... 56
E.      Compliance with Tax Requirements. .......................................................................... 57
F.      Allocations. ................................................................................................................ 57
G.      No Postpetition Interest on Claims. ........................................................................... 57
H.      Foreign Currency Exchange Rate. ............................................................................. 58
I.      Setoffs and Recoupment. ........................................................................................... 58
J.      No Double Payment of Claims. .................................................................................. 58
K.      Claims Paid or Payable by Third Parties. .................................................................. 58

**ARTICLE VII PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND
DISPUTED CLAIMS ................................................................................................................ 59**
A.      Allowance of Claims and Interests. ........................................................................... 59
B.      Claims Administration Responsibilities. ................................................................... 59
C.      Disputed Claims Process. .......................................................................................... 60
D.      Estimation of Claims and Interests. ........................................................................... 60
E.      Adjustment to Claims or Interests Without Objection. .............................................. 60
F.      Time to File Objections to Claims. ............................................................................. 61
G.      Reservation of Rights to Object to Claims. ................................................................ 61
H.      Disallowance of Claims or Interests. ......................................................................... 61
I.      Amendments to Claims or Interests. .......................................................................... 61
J.      No Distributions Pending Allowance. ........................................................................ 61
K.      Distributions After Allowance. .................................................................................. 62

**ARTICLE VIII SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ..................... 62**
A.      Term of Injunctions or Stays. .................................................................................... 62
B.      Settlement, Compromise, and Release of Claims. ...................................................... 62
C.      **Release of Liens.** ...................................................................................................... 63
D.      **Releases by the Debtors.** ......................................................................................... 63
E.      **Releases by the Releasing Parties.** .......................................................................... 64
F.      **Exculpation.** ............................................................................................................ 66
G.      **Injunction.** .............................................................................................................. 67
H.      Protection Against Discriminatory Treatment. .......................................................... 68
I.      Document Retention. .................................................................................................. 68
J.      Reimbursement or Contribution. ............................................................................... 68

**ARTICLE IX CONDITIONS PRECEDENT TO CONFIRMATION AND THE EFFECTIVE DATE .......... 68**
A.      Conditions Precedent to the Effective Date. .............................................................. 68

|     |    |                                                              |     |
|-----|----|--------------------------------------------------------------|-----|
|     | B. | Waiver of Conditions. ....................................... | 70  |
|     | C. | Effect of Failure of Conditions to the Effective Date ....... | 70  |
|     | D. | Substantial Consummation. ................................... | 70  |

**ARTICLE X MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN** ............ **70**

|     |    |                                                              |     |
|-----|----|--------------------------------------------------------------|-----|
|     | A. | Modification and Amendments. ................................ | 70  |
|     | B. | Effect of Confirmation on Modifications. .................... | 70  |
|     | C. | Revocation or Withdrawal of the Plan. ....................... | 71  |

**ARTICLE XI RETENTION OF JURISDICTION** ........................................ **71**

**ARTICLE XII MISCELLANEOUS PROVISIONS** ...................................... **73**

|     |    |                                                              |     |
|-----|----|--------------------------------------------------------------|-----|
|     | A. | Immediate Binding Effect. ................................... | 73  |
|     | B. | Additional Documents. ....................................... | 73  |
|     | C. | Reservation of Rights. ...................................... | 73  |
|     | D. | Successors and Assigns. ..................................... | 73  |
|     | E. | Notices. .................................................... | 73  |
|     | F. | Enforcement of Confirmation Order. .......................... | 75  |
|     | G. | Entire Agreement. ........................................... | 75  |
|     | H. | Plan Supplement. ............................................ | 75  |
|     | I. | Nonseverability of Plan Provisions. ......................... | 75  |
|     | J. | Votes Solicited in Good Faith. .............................. | 75  |
|     | K. | Closing of the Chapter 11 Cases. ............................ | 76  |
|     | L. | Waiver or Estoppel. ......................................... | 76  |
|     | M. | Removal or Abandonment of Third Parties' Property. .......... | 76  |

**INTRODUCTION**

Anthology Inc. and the other above-captioned debtors and debtors in possession (collectively, the "Debtors") propose this joint chapter 11 plan (including all exhibits, supplements (including the Plan Supplement), appendices, and schedules, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof, this "Plan") for the resolution of outstanding Claims against, and Interests in, the Debtors.  Although proposed jointly for administrative purposes, this Plan constitutes a separate Plan for each Debtor. Holders of Claims or Interests may refer to the Disclosure Statement for a discussion on the Debtors' history, business, financial information, properties and operations, risk factors, a summary and analysis of this Plan, the Sale Transactions, and certain related matters.  Each Debtor is a proponent of this Plan within the meaning of section 1129 of the Bankruptcy Code.  The classification of Claims and Interests set forth in Article III of this Plan apply separately with respect to each Plan proposed by each Debtor, as applicable, and as set forth herein.  This Plan does not contemplate substantive consolidation of any of the Debtors.

ALL HOLDERS OF CLAIMS THAT ARE ENTITLED TO VOTE ON THIS PLAN ARE ENCOURAGED TO READ THIS PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN.

THE ISSUANCE OF ANY SECURITIES REFERRED TO IN THIS PLAN SHALL NOT CONSTITUTE AN INVITATION OR OFFER TO SELL, OR THE SOLICITATION OF ANY INVITATION OR OFFER TO BUY, ANY SECURITIES IN CONTRAVENTION OF APPLICABLE LAW IN ANY JURISDICTION.  NO ACTION HAS BEEN TAKEN, NOR WILL BE TAKEN IN ANY JURISDICTION THAT WOULD PERMIT A PUBLIC OFFERING OF ANY SECURITIES REFERRED TO IN THIS PLAN (OTHER THAN SECURITIES ISSUED PURSUANT TO SECTION 1145 OF THE BANKRUPTCY CODE IN A DEEMED PUBLIC OFFERING) IN ANY JURISDICTION WHERE SUCH ACTION FOR THAT PURPOSE IS REQUIRED.

**ARTICLE I**
**DEFINED TERMS, RULES OF INTERPRETATION,**
**COMPUTATION OF TIME, AND GOVERNING LAW**

A.   *Defined Terms.*

As used in this Plan, capitalized terms have the meanings set forth below.

1.    "*A Corp.*" means Astra Acquisition Corp, a company incorporated under the Laws of Delaware.

2.    "*Acceptable Alternative Transaction*" means, subject to prior consultation with the Committee, a transaction contemplating a sale of all or substantially all of the Remaining Assets to one or more third parties that (a) indefeasibly pays in full in Cash all DIP Claims and Prepetition Superpriority First Out Claims, (b) provides recoveries for each other class of claims equal to or greater than those otherwise provided for under this Plan, (c) is not subject to material contingencies, including, without limitation, financing, antitrust or other reasonably anticipated regulatory review and/or approvals, (d) does not (and is not reasonably expected to) result in any non-de-minimis new or increased risk or delay to consummation or the recoveries of any Holder of any prepetition or postpetition Claim otherwise provided for in this Plan, as compared to the transactions contemplated by this Plan, and (e) provides for releases, exculpation, indemnification obligations, and treatment of insurance policies consistent with those set forth in the RSA.

3.    "*Acceptable Alternative Transaction Documents*" means, if applicable, and solely if an amended Plan contemplating an Acceptable Alternative Transaction is confirmed and consummated, any Purchase Agreement, Sale Order, and all orders, agreements, documents, and instruments in connection with the Acceptable Alternative Transaction.

4.    "*Acceptable Alternative Purchaser*" means the purchaser(s) of all or substantially all of the Remaining Assets under a Purchase Agreement pursuant to an Acceptable Alternative Transaction or this Plan.

5.      "*Ad Hoc Group*" means that certain ad hoc group of lenders that are represented by the Ad Hoc Group Advisors.

6.      "*Ad Hoc Group Advisors*" means, collectively, (i) Davis Polk & Wardwell LLP, as counsel to the Ad Hoc Group, (ii) Lazard Frères & Co. LLC as financial advisor to the Ad Hoc Group, (iii) Alvarez and Marsal LLC, as financial advisor to the Ad Hoc Group, (iv) Milbank LLP, as counsel to certain lenders to the Debtors, (v) Porter Hedges LLP as Texas counsel to the Ad Hoc Group, and (vi) such other professionals as may be retained by or on behalf of the Ad Hoc Group or its steering committee members from time to time, including any local counsel and operational or industry advisors.

7.      "*Adjustment Reserve*" has the meaning set forth in the order entered by the Bankruptcy Court approving the Enterprise Operations Stalking Horse Purchase Agreement.

8.      "*Administrative Claim*" means a Claim against any of the Debtors arising on or after the Petition Date and before the Effective Date for a cost or expense of administration of the Chapter 11 Cases pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses of preserving the Estates and operating the business of the Debtors; (b) the Allowed Professional Fee Claims; and (c) all fees and charges assessed against the Estates pursuant to chapter 123 of the Judicial Code.

9.      "*Administrative Claims Bar Date*" means the deadline for Filing requests for payment of Administrative Claims, which shall be (a) 30 days after the Effective Date for Administrative Claims other than Professional Fee Claims and (b) 60 days after the Effective Date for Professional Fee Claims.

10.     "*Administrative Claims Objection Bar Date*" means the deadline for Filing objections to requests for payment of Administrative Claims (other than requests for payment of Professional Fee Claims and fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code), which shall be the later of (a) 60 days after the Effective Date and (b) 60 days after the Filing of the applicable request for payment of the Administrative Claims; *provided*, that the Administrative Claims Objection Bar Date may be extended by the Bankruptcy Court at the request of the Reorganized Debtors or the Wind-Down Debtors, as applicable, after notice and a hearing.

11.     "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code as if such entity was a debtor in a case under the Bankruptcy Code.

12.     "*Agents*" means, collectively, the Prepetition Superpriority Agent, the Prepetition Second Lien Agent, and the DIP Agent.

13.     "*Aggregate Rights Offering Amount*" means $35 million, which represents the aggregate purchase price of the New Preferred Equity Interests issued pursuant to the Equity Rights Offering.

14.     "*Allowed*" means, with respect to any Claim or Interest (or portion thereof), except as otherwise provided herein:  (a) a Claim or Interest that is evidenced by a Proof of Claim Filed by the applicable Claims Bar Date or a request for payment of an Administrative Claim Filed by the Administrative Claims Bar Date, as applicable (or for which Claim a Proof of Claim is not required under this Plan, the Bankruptcy Code, or a Final Order, including the DIP Order); (b) a Claim or Interest that is scheduled by the Debtors as not contingent, not unliquidated, and not Disputed, and for which no Proof of Claim or Proof of Interest, as applicable, has been timely Filed; or (c) a Claim or Interest allowed pursuant to this Plan or a Final Order, including the DIP Order; *provided*, that with respect to a Claim or Interest described in clauses (a) and (b) above, such Claim or Interest shall be Allowed only if and to the extent that with respect to such Claim or Interest no objection to the allowance thereof is interposed within the applicable period of time fixed by this Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim or Interest has been Allowed by a Final Order.  Any Claim or Interest that has been or is hereafter listed on the Schedules as contingent, unliquidated, or Disputed, and for which no contrary or superseding Proof of Claim or Proof of Interest is or has been timely Filed, or that is not or has not been Allowed by a Final Order, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.  Except as otherwise specified in this Plan or any

Final Order, and except as provided in sections 506(b) or 511 of the Bankruptcy Code, an Allowed Claim shall not, for purposes of computing Plan Distributions, include interest on such Claim from and after the Petition Date. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes the applicable Debtor, Reorganized Debtor, or Wind-Down Debtor, as applicable.  Notwithstanding anything to the contrary in this Plan, a Proof of Claim Filed after the applicable Claims Bar Date or a request for payment of an Administrative Claim Filed after the Administrative Claims Bar Date, as applicable, shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim.  "Allow" and "Allowing" shall have correlative meanings.

15.    "*Anthology*" has the meaning set forth in the RSA.

16.    "*Assumed Liability*" or "*Assumed Liabilities*" has the meaning set forth in the applicable Stalking Horse Purchase Agreements or other Purchase Agreement(s), as applicable.

17.    "*Astra HoldCo*" means Astra Intermediate Holding Corp., a company formed under the Laws of Delaware.

18.    "*Avoidance Actions*" means any and all actual or potential avoidance, recovery, subordination, or other Claims and Causes of Action, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including Claims, Causes of Action, or remedies arising under chapter 5 of the Bankruptcy Code or under similar or related local, state, federal, or foreign statutes or common law, including fraudulent transfer laws.

19.    "*Backstop Commitment Agreement*" means that certain backstop commitment agreement, dated as of November 21, 2025, by and among the Debtors and the Financing Parties, which agreement shall govern the terms of the New Money Backstop Commitments, the Equity Rights Offering, and the Direct Investment Preferred Equity Raise.

20.    "*Backstop Motion*" means the motion seeking approval of the Backstop Commitment Agreement.

21.    "*Backstop Order*" means the order entered by the Bankruptcy Court approving and authorizing the Debtors' entry into the Backstop Commitment Agreement and other applicable Equity Rights Offering Documents, which order may be the Conditional Disclosure Statement Order.

22.    "*Ballot*" means the applicable ballot, approved pursuant to the Conditional Disclosure Statement Order, distributed to Holders of Claims entitled or permitted to vote on this Plan, on which such Holders desiring to vote shall vote to accept or reject this Plan and, as applicable, make any additional elections contained in such ballot.

23.    "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as now in effect and hereafter amended.

24.    "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas.

25.    "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court, each, as amended from time to time, and as applicable to the Chapter 11 Cases.

26.    "*Bidding Procedures*" means procedures attached to the Bidding Procedures Order as Exhibit 1.

27.    "*Bidding Procedures Order*" means the order entered by the Bankruptcy Court approving the Bidding Procedures.

28.    "*Blackboard*" means Blackboard LLC, a company formed under the Laws of Delaware.

29.     "***Business Day***" means any day other than a Saturday, Sunday, "legal holiday" (as defined in Bankruptcy Rule 9006(a)), or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.  When a period of days ends on a day that is not a Business Day, then such period shall be extended to the next Business Day.

30.     "***Cash***" means the legal tender of the United States of America or the equivalents thereof, including bank deposits and checks.

31.     "***Cash Out Options***" means, collectively, the First Out Cash Out Option and the Second Out Cash Out Option, as set forth in Article III of this Plan.

32.     "***Cause of Action***" or "***Causes of Action***" means any and all Claims, interests, damages, remedies, causes of action, demands, rights, actions, controversies, proceedings, agreements, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, Liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, asserted or assertable, direct or derivative, matured or unmatured, suspected or unsuspected, whether arising before, on, or after the Petition Date, in contract, tort, law, equity, or otherwise.  Causes of Action also include:  (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or otherwise dispute Claims against, or Interests in, the Debtors; (c) claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any Avoidance Actions.

33.     "***Chapter 11 Cases***" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all the Debtors, the procedurally consolidated and jointly administered chapter 11 cases pending for the Debtors in the Bankruptcy Court.

34.     "***Claim***" has the meaning ascribed to it in section 101(5) of the Bankruptcy Code.

35.     "***Claims and Noticing Agent***" means Stretto, Inc. solely in its capacity as notice, claims, and solicitation agent for the Debtors in the Chapter 11 Cases.

36.     "***Claims Bar Date***" means, collectively, the date established by the Bankruptcy Court in the Claims Bar Date Order by which Proofs of Claim must be Filed with respect to such Claims, other than Claims for which the Claims Bar Date Order excludes the Holders of such Claims from the requirement of Filing Proofs of Claim.

37.     "***Claims Bar Date Order***" means that certain order entered by the Bankruptcy Court establishing the Claims Bar Date.

38.     "***Claims Register***" means the official register of Claims maintained by the clerk of the Bankruptcy Court or the Claims and Noticing Agent.

39.     "***Class***" means a class of Claims or Interests as set forth in Article III of this Plan pursuant to section 1122(a) of the Bankruptcy Code.

40.     "***Closing Date***" has the meaning ascribed to it in the applicable Stalking Horse Purchase Agreement or other Purchase Agreement, as applicable.

41.     "***CM/ECF***" means the Bankruptcy Court's Case Management and Electronic Case Filing System.

42.     "***Collateral***" means any property or interest in property of the Estates of any Debtors subject to a Lien, charge, or other encumbrance to secure the payment of a Claim, which Lien, charge, or other encumbrance is not subject to a Final Order ordering the remedy of avoidance of any such Lien, charge, or other encumbrance under the Bankruptcy Code.

43.     "**_Committee_**" means the official committee of unsecured creditors of the Debtors, appointed by the U.S. Trustee pursuant to section 1102 of the Bankruptcy Code on October 8, 2025 [Docket No. 109], the membership of which may be reconstituted from time to time.

44.     "**_Conditional Disclosure Statement Order_**" means the order (and all exhibits thereto), entered by the Bankruptcy Court, conditionally approving the Disclosure Statement, approving the other Solicitation Materials, and allowing solicitation of this Plan to commence.

45.     "**_Confirmation_**" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases.

46.     "**_Confirmation Date_**" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

47.     "**_Confirmation Hearing_**" means the hearing(s) to be held by the Bankruptcy Court to consider Confirmation of this Plan, and final approval of the Disclosure Statement, pursuant to Bankruptcy Rule 3020(b)(2) and sections 1125, 1128, and 1129 of the Bankruptcy Code, as applicable, as such hearing(s) may be adjourned or continued from time to time.

48.     "**_Confirmation Order_**" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code and approving the Disclosure Statement on a final basis pursuant to section 1125 of the Bankruptcy Code.

49.     "**_Consenting Lenders_**" has the meaning set forth in the RSA.

50.     "**_Consenting Sponsor_**" has the meaning set forth in the RSA.

51.     "**_Consummation_**" means the occurrence of the Effective Date as to the applicable Debtor.

52.     "**_Convenience Class_**" means the Class of Claims comprised of Holders of Allowed Convenience Class Claims.

53.     "**_Convenience Class Claim_**" means (a) all Allowed General Unsecured Claims in an amount not to exceed $10,000, (b) an Allowed General Unsecured Claim which the Holder thereof has elected to reduce the amount of such Allowed General Unsecured Claim to $10,000, or (c) all Allowed General Unsecured Claims where such Claim is Allowed at (or such Holder has elected to reduce the amount of such Allowed General Unsecured Claim to) between $10,001 and $100,000 and opts in to the Convenience Class in accordance with Article III.B.9 hereof.  To the extent a Holder of such Claim in subclause (b) or (c) does not elect to opt in to the Convenience Class on the applicable Ballot or otherwise send in a notice electing Convenience Class treatment by the earlier of (i) 14 calendar days following the entry of the Confirmation Order and (ii) one (1) Business Day prior to the anticipated Effective Date (provided that the Debtors shall file a notice on the docket at least three (3) Business Days prior to the anticipated Effective Date), such Claim shall receive the treatment of a General Unsecured Claim.

54.     "**_Cure_**" or "**_Cure Claim_**" means a monetary Claim (unless waived or modified by the applicable counterparty) in connection with any Executory Contract or Unexpired Lease assumed by the Debtors, Reorganized Debtors, or Wind-Down Debtors, as applicable, based upon a Debtor's default under any Executory Contract or Unexpired Lease at the time such Executory Contract or Unexpired Lease is assumed by such Debtor pursuant to section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

55.     "**_Cure Notice_**" means that certain notice of potential assumption or assumption and assignment of certain contracts or leases or any other notice of a proposed amount to be paid on account of a Cure Claim in connection with an Executory Contract or Unexpired Lease to be assumed pursuant to section 365 of the Bankruptcy Code and that has not otherwise or yet been assumed and assigned to a Stalking Horse Purchaser or other purchaser under this Plan or a Stalking Horse Purchase Agreement or other Purchase Agreement, as applicable, which notice shall include:

(a) procedures for objecting to the proposed assumption or assumption and assignment of Executory Contracts and Unexpired Leases; (b) proposed Cure Claims to be paid in connection therewith as of the date of such cure notice; (c) procedures for resolution by the Bankruptcy Court of any related disputes; (d) notice to the counterparty to such Executory Contract or Unexpired Lease that such party's Executory Contract or Unexpired Lease may be assumed under this Plan; and (e) a representation of the proposed assignee's (if applicable) ability to comply with the requirements of adequate assurance of future performance, including the assignee's financial wherewithal and willingness to perform under such Executory Contract or Unexpired Lease.

56.     "*Cure/Assumption Objection Deadline*" means the date that is 14 days after Filing of the Schedule of Assumed Executory Contracts and Unexpired Leases and service of the Cure Notice; *provided*, that if any Executory Contract or Unexpired Lease is added to the Schedule of Assumed Executory Contracts and Unexpired Leases after the Filing of the initial Schedule of Assumed Executory Contracts and Unexpired Leases, or an Executory Contract or Unexpired Lease proposed to be assumed by the Debtors is proposed to be assigned to a third party after the Filing of the initial Schedule of Assumed Executory Contracts and Unexpired Leases, then the Cure/Assumption Objection Deadline with respect to such Executory Contract or Unexpired Lease shall be the earlier of (a) 14 days after service of the amended Schedule of Assumed Executory Contracts and Unexpired Leases with such modification and (b) the date of the scheduled Confirmation Hearing or Sale Hearing, as applicable.

57.     "*D&O Liability Insurance Policies*" means all unexpired insurance policies (including any "tail policy" or run-off endorsement) that have been issued at any time to any of the Debtors providing current or former directors', managers', officers' and/or employees' liability coverage, and all agreements, documents, or instruments relating thereto.

58.     "*Debtor*" means Anthology Inc., Academic Management Systems, LLC, Admissions US, LLC, Anthology Inc. of Missouri, Anthology Inc. of NY, ApplyYourself, Inc., Astra Acquisition Corp., Astra Intermediate Holding Corp., AY Software Services, Inc., Bb Acquisition Corp., Bb Management LLC, Blackboard Campuswide of Texas, Inc., Blackboard Collaborate Inc., Blackboard Holdings, LLC, Blackboard International LLC, Blackboard LLC, Blackboard Student Services Inc., Blackboard Super Holdco, LLC, Blackboard Tennessee LLC, Campus Management Acquisition Corp., Edcentric Holdings LLC, Edcentric Midco, Inc., Edcentric, Inc., Higher One Real Estate SP, LLC, MyEdu Corporation, Orgsync, Inc., Perceptis, LLC, as applicable, each in its respective individual capacity as a debtor and debtor-in-possession in the Chapter 11 Cases.

59.     "*Debtors*" means, collectively, each and every Debtor.

60.     "*Definitive Documents*" means, without limitation, the following documents:  (a) this Plan; (b) the Confirmation Order; (c) the Disclosure Statement; (d) the order or orders of the Bankruptcy Court approving the Disclosure Statement on a conditional basis and/or final basis and the other Solicitation Materials; (e) the Plan Supplement and the documents contained therein, including any documents that set forth the steps or other transactions that are required to effectuate the Restructuring Transactions; (f) the Restructuring Support Agreement; (g) each DIP Document, including, for the avoidance of doubt, the DIP Credit Agreement, the DIP Orders, and the DIP Motion; (h) any Sale Order; (i) the Bidding Procedures, the Bidding Procedures Order, the Stalking Horse Purchase Agreements, and any and all Purchase Agreements, as applicable; (j) any Transition Services Agreement; (k) the First Day Pleadings; (l) the New Organizational Documents, as applicable; (m) in the event the Required Consenting Stakeholders agree to the Debtors proceeding with an Acceptable Alternative Transaction, all documentation in respect of such Acceptable Alternative Transaction; (n) the Equity Rights Offering Documents; and (o) any other material exhibits, schedules, amendments, modifications, supplements, appendices, or other documents and/or agreements relating to any of the foregoing.

61.     "*DIP Agent*" means Alter Domus (US) LLC, in its respective capacities as administrative agent and collateral agent under the DIP Credit Agreement.

62.     "*DIP Claim(s)*" means Claims against any of the Debtors arising under, derived from, based on, or related to the DIP Loans or the DIP Credit Agreement.

63.     "*DIP Closing Date*" means the "Closing Date" under and as defined in the DIP Credit Agreement.

64.     "***DIP Credit Agreement***" means that certain Senior Secured Superpriority Debtor-In-Possession Term Loan Credit Agreement, dated as of DIP Closing Date, by and among Astra HoldCo, as holdings, A Corp., as administrative borrower, Blackboard, as an additional borrower, the DIP Agent, and the lenders from time to time party thereto, setting forth the terms and conditions of the DIP Facility.

65.     "***DIP Documents***" means the "Loan Documents" under and as defined in the DIP Credit Agreement, the DIP Motion, and the DIP Orders (including any amendments, restatements, supplements, or modifications of any of the foregoing).

66.     "***DIP Facility***" means the "DIP Term Facility" under and as defined in the DIP Credit Agreement.

67.     "***DIP Loans***" means the "Loans" under and as defined in the DIP Credit Agreement.

68.     "***DIP Motion***" means any motion filed with the Bankruptcy Court seeking approval of the DIP Facility.

69.     "***DIP Orders***" means, collectively, the Interim DIP Order and the Final DIP Order.

70.     "***Direct Investment Preferred Equity Raise***" means the consummation of a new money equity investment, on terms and conditions set forth herein, in the Equity Rights Offering Documents and as otherwise acceptable to the Financing Parties, pursuant to which the Reorganized Debtors will raise an aggregate amount of (i) $15 million, *plus* (ii) an additional amount not to exceed $22.7 million in New Preferred Equity Interests on the Effective Date.

71.     "***Disbursing Agent***" means the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, or the Entity or Entities selected by the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, with the consent of the Required Consenting Lenders, to make or facilitate distributions contemplated under this Plan, including the Plan Administrator, if applicable.

72.     "***Disclosure Statement***" means the disclosure statement for this Plan (including all exhibits, supplements, appendices, and schedules, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time) filed substantially contemporaneously herewith.

73.     "***Disputed***" means, as to a Claim or an Interest, any Claim or Interest:  (a) with respect to which a party in interest has Filed a Proof of Claim or otherwise made a written request to a Debtor for payment; (b) that is not Allowed; and (c) that is not disallowed by this Plan, the Bankruptcy Code, or a Final Order, as applicable.

74.     "***Distributable Cash***" means (a) all Net Sale Proceeds and (b) all other remaining cash of the Debtors and their subsidiaries, as applicable, including, for the avoidance of doubt, cash constituting the Excluded Assets, in each case after taking into account the consummation of the Restructuring Transactions, including, for avoidance of doubt, the New Money Investments, in accordance with the terms of this Plan (including, without limitation, the payment of DIP Claims and other applicable Administrative Claims and funding of reserves relating thereto, and the payment or reserves of any cash due pursuant to Article III hereof) and a minimum Effective Date cash balance equal to the Effective Date Minimum Cash Amount.

75.     "***Distribution Record Date***" means the record date for purposes of determining which Holders of Allowed Claims against the Debtors are eligible to receive distributions under this Plan, which shall be the later of (a) the Effective Date; (b) such other date as is announced by the Debtors with the consent of the Required Consenting Lenders; or (c) such other date as designated in a Final Order.

76.     "***DTC***" means the Depository Trust Company.

77.     "***Effective Date***" means the date on which (a) all conditions precedent to the occurrence of the Effective Date set forth in Article IX.A of this Plan have been satisfied or waived in accordance with Article IX.B of this Plan and (b) this Plan is declared effective by the Debtors.

78.     "***Effective Date Minimum Cash Amount***" means $50 million minimum cash on the balance sheet of the Reorganized Debtors and their subsidiaries, as applicable, as of the Effective Date; *plus*, in the event that the Effective Date occurs prior to March 31, 2026, with the approval of the Required Consenting Lenders, an incremental amount not to exceed $20 million.

79.     "***Ellucian***" means Ellucian Company, LLC.

80.     "***Employment Obligations***" means, to the extent applicable, all contracts, agreements, arrangements, policies, programs, and plans for, among other things, compensation, bonuses, reimbursement, indemnity, health care benefits, disability benefits, deferred compensation benefits, travel benefits, vacation and sick leave benefits, savings, severance benefits, including, in the event of a change of control after the Effective Date, retirement benefits, retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), welfare benefits, relocation programs, life insurance, and accidental death and dismemberment insurance, including contracts, agreements, arrangements, policies, programs, and plans for bonuses and other incentives or compensation for the Debtors' current and former employees, directors, officers, consultants, managers, and retirees, including executive compensation programs and existing compensation arrangements (including, in each case, any amendments thereto), in each case to the extent assumed or adopted by the Reorganized Debtors.

81.     "***Encoura***" means Encoura LE LLC.

82.     "***Enterprise Operations Assets***" means those certain assets of Anthology (or any debtor affiliate designated by Anthology) related to the Enterprise Operations Business, pursuant to the Enterprise Operations Stalking Horse Purchase Agreement.

83.     "***Enterprise Operations Business***" means the enterprise operations business segment of Anthology and its affiliates, which provides software-as-a-service or on-premise, as such business segment operated and existed as of the consummation of the transactions contemplated in the Enterprise Operations Stalking Horse Purchase Agreement.

84.     "***Enterprise Operations Stalking Horse Purchase Agreement***" means that certain binding purchase agreement, dated as of September 29, 2025, as amended by that certain Amended and Restated Asset Purchase Agreement, dated as of November 13, 2025, by and among the Enterprise Operations Stalking Horse Purchaser and the applicable Debtors, pursuant to which the Enterprise Operations Stalking Horse Purchaser has agreed to acquire the Enterprise Operations Assets, together with any ancillary or supplemental documents, instruments and agreements relating thereto, which in each case, shall be acceptable in form and substance to the Debtors and the Required Consenting Lenders.

85.     "***Enterprise Operations Stalking Horse Purchaser***" means Ellucian.

86.     "***Entity***" has the meaning set forth in section 101(15) of the Bankruptcy Code.

87.     "***Equity Rights Offering***" means the rights offering for the purchase of New Preferred Equity Interests on the terms and conditions described herein, in the Backstop Commitment Agreement, and in the other Equity Rights Offering Documents, as applicable.

88.     "***Equity Rights Offering Documents***" means any and all agreements, documents, and instruments delivered or entered into in connection with, or otherwise governing the New Money Investments, including, without limitation, the Backstop Commitment Agreement, the Backstop Motion, the Backstop Order, the Equity Rights Offering Procedures, and subscription forms in respect thereof, and any other materials distributed in connection with the Equity Rights Offering.

89.     "***Equity Rights Offering Participants***" means certain of the Consenting Lenders who duly subscribe for certain New Preferred Equity Interests pursuant to their Equity Subscription Rights in accordance with the Equity Rights Offering Documents and the terms hereof.

90. "*Equity Rights Offering Procedures*" means the procedures governing the Equity Rights Offering.

91. "*Equity Subscription Rights*" means those certain rights to purchase the New Preferred Equity Interests at the Per Unit Preferred Interest Purchase Price in accordance with the Equity Rights Offering Procedures, which will be received by Holders of Allowed Prepetition Superpriority First Out Claims that are entitled to participate in the Equity Rights Offering on account of such Claims as set forth herein.

92. "*Estate*" means, as to each Debtor, the estate created for such Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code upon the commencement of the applicable Debtor's Chapter 11 Case.

93. "*Excluded Assets*" or equivalent term has the meaning set forth in the applicable Stalking Horse Purchase Agreement or other Purchase Agreement, as applicable.

94. "*Exculpated Parties*" means, collectively, and in each case in its capacity as such:  (a) each of the Debtors; (b) the disinterested managers and directors of each of the boards of managers and boards of directors of the Debtors, as applicable; and (c) the Committee and each of its members, solely in their respective capacities as such.

95. "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption, assumption and assignment, or rejection under section 365 or 1123 of the Bankruptcy Code.

96. "*Existing Equity Interests*" means any Interests in Parent.

97. "*Federal Judgment Rate*" means the federal judgment interest rate specified by 28 U.S.C. § 1961 in effect as of the Petition Date.

98. "*File*," "*Filed*," or "*Filing*" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

99. "*Final DIP Order*" means the order entered by the Bankruptcy Court approving the DIP Facility on a final basis.

100. "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the relevant subject matter, that is in full force and effect and has not been reversed, stayed, modified, or amended, and as to which the time to appeal, seek certiorari, or move for a new trial, reargument, reconsideration, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceeding for a new trial, reargument, reconsideration, or rehearing shall then be pending; or as to which any right to appeal, petition for certiorari, new trial, reargument, reconsideration, or rehearing that has been taken or any petition for certiorari that has been or may be Filed has been resolved or shall have been waived in writing in form and substance satisfactory to the Debtors or, in the event that an appeal, writ of certiorari, new trial, reargument, reconsideration, or rehearing thereof has been sought, no stay pending appeal has been granted or such order of the Bankruptcy Court shall have been determined by the highest court to which such order was appealed, or certiorari, new trial, reargument, reconsideration, or rehearing shall have been denied and the time to take any further appeal, petition for certiorari, or move for a new trial, reargument, reconsideration, or rehearing shall have expired; *provided*, that the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed with respect to such order shall not preclude such order from being a Final Order.

101. "*Financing Commitment Premium*" means the commitment premium equal to 10.00% of the maximum total amount of New Money Investment, to be paid in-kind in New Preferred Equity Interests.

102. "*Financing Parties*" has the meaning set forth in the *Debtors' Motion for Entry of an Order (I) Authorizing Entry into the Backstop Commitment Agreement, (II) Approving the Payment of the Backstop Obligations Related Thereto, and (III) Granting Related Relief* [Docket No. 486].

103.     "***First Day Pleadings***" means any "first day" or "second day" pleadings that the Debtors determine are necessary or desirable to file with the Bankruptcy Court, including any pleadings seeking entry of the DIP Orders.

104.     "***First Out Cash Out Option***" has the meaning set forth in Article III of this Plan.

105.     "***Funded Reserve Account***" has the meaning set forth in the DIP Orders.

106.     "***Funded Reserve Account Remainder***" means, pursuant to and in accordance with the rights, limitations, and mechanics of the DIP Order and this Plan, if a Carve Out Trigger Notice (as such term is defined in the DIP Orders) has not been delivered prior to repayment and discharge of all DIP Claims, any amount remaining in the Funded Reserve Account following final approval and payment of all unpaid Professional Fee Claims.

107.     "***General Unsecured Claim***" means any Unsecured Claim that is:  (a) not entitled to priority under the Bankruptcy Code or an order of the Bankruptcy Court and (b) not an Administrative Claim, Priority Tax Claim, DIP Claim, Other Secured Claim, Other Priority Claim, Prepetition Superpriority Claim, Prepetition 2021 First Lien Claim, Prepetition Second Lien Claim, Intercompany Claim, Convenience Class Claim or a Claim that is secured, subordinated, or otherwise entitled to priority under the Bankruptcy Code; *provided*, that any General Unsecured Claim that is an Assumed Liability under any Definitive Documents shall be satisfied solely pursuant to the applicable Definitive Documents and shall not (i) be an obligation of the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, and/or (ii) constitute a General Unsecured Claim pursuant to this Plan.

108.     "***Governmental Bar Date***" means the date by which Proofs of Claim must be Filed with respect to such Claims held by Governmental Entities pursuant to the Claims Bar Date Order.

109.     "***Governmental Entity***" means any applicable federal, state, local, or foreign government or any agency, bureau, board, commission, court, or arbitral body, department, political subdivision, regulatory or administrative authority, tribunal, or other instrumentality thereof, or any self-regulatory organization.  For the avoidance of doubt, the term Governmental Entity includes any Governmental Unit (as such term is defined in section 101(27) of the Bankruptcy Code).

110.     "***GUC Cash Consideration***" means Collateral and proceeds thereof securing the DIP Claims and Claims under the Prepetition Credit Agreements (and, for the avoidance of doubt, including Collateral constituting the "Shared Collateral" under the Prepetition Pari First Lien Intercreditor Agreement and Prepetition First Lien/Second Lien Intercreditor Agreement (each as defined in the Final DIP Order)) consisting of Cash in the amount of $1.75 million.

111.     "***GUC Litigation Participation Amount***" means an amount equal to 50% of the first $6.5 million of net Cash recoveries (after deduction of the bona fide costs and expenses incurred by the Debtors, Reorganized Debtors, or any successors thereto related to pursuing such GUC Specified Litigation Claim) recovered by the Debtors, Reorganized Debtors, or any successor thereto from the GUC Specified Litigation Claims.[2]

112.     "***GUC Recovery Pool***" means the GUC Cash Consideration plus the additional amount equal to the GUC Litigation Participation Amount up to an aggregate of $5 million in Cash.

113.     "***GUC Specified Litigation Claims***" means those certain Claims and Causes of Action asserted by or on behalf of the Debtors or the Reorganized Debtors, as applicable, arising from or in connection with (i) *Astra Acquisition Corp. v. Vector Capital Credit Opportunity Master Fund LP et al.*, No. 652215/2025 (N.Y. Sup. Ct. filed Apr. 7, 2025) and (ii) *Anthology, Inc. v. Tarrant Cnty. Coll. Dist.*, No. 4:24-CV-00279-P (N.D. Tex. filed Mar. 27, 2024), in each case, including any additional Claims or Causes of Action arising from the same allegations as may be asserted by the Debtors or the Reorganized Debtors in any subsequent proceedings following removal, venue transfer, or any similar action, it being understood that the GUC Specified Litigation Claims (and any proceeds

---

[2]     The Debtors will provide to the advisors to the Committee and the Ad Hoc Group an accounting of all such costs and expenses incurred to date.

therefrom) consist of the Collateral securing the DIP Claims and Claims under the Prepetition Credit Agreements (and, for the avoidance of doubt, include Collateral (including general intangibles) constituting the "Shared Collateral" under the Prepetition Pari First Lien Intercreditor Agreement and Prepetition First Lien/Second Lien Intercreditor Agreement).

114.    "*Holder*" means an Entity holding a Claim against, or an Interest in, any of the Debtors, as applicable.

115.    "*Impaired*" means, when used in reference to a Claim or Interest, a Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

116.    "*Indemnification Provisions*" means each of the Debtors' indemnification provisions in place immediately prior to the Effective Date, whether in the Debtors' bylaws, certificates of incorporation or formation or other organizational or formation documents, for the Debtors' current and former officers, directors (including any such obligations that arise pursuant to agreements with the directors in their individual capacity as such and that have been shared with the Ad Hoc Group Advisors prior to the Petition Date), partners, managers, members, agents, or employees acting in a fiduciary capacity on behalf of the Debtors (excluding any provisions to the extent in favor of legal entities that are direct or indirect shareholders of the Debtors (or Affiliates of such direct and indirect shareholders) that are not the Debtors or the Debtors' subsidiaries), and not including any such provisions to the extent benefitting Persons or Entities that are not Released Parties.

117.    "*Independent Investigation*" means the investigation undertaken by the Special Committee, as described in greater detail in the Disclosure Statement.

118.    "*Intercompany Claim*" means any Claim held by a Debtor against another Debtor.   For the avoidance of doubt, all Intercompany Claims that are transferred to the Stalking Horse Purchasers, or other purchaser, pursuant to the Sale Transaction Documentation shall be satisfied by such purchaser(s) following the relevant Closing Date on the terms set forth in the Sale Transaction Documentation and shall not receive the treatment provided for Intercompany Claims under this Plan.

119.    "*Intercompany Interest*" means any Interest held by one Debtor in another Debtor.

120.    "*Interest*" means, collectively, the shares (or any class thereof), common stock, preferred stock, general or limited partnership interests, limited liability company interests, and any other equity, ownership, or profits interests of any Debtor, and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) of, common stock, preferred stock, general or limited partnership interests, limited liability company interests, or other equity, ownership, or profits interests of any Debtor (in each case whether or not arising under or in connection with any employment agreement and including any "equity security" (as such term is defined in section 101(16) of the Bankruptcy Code) in a Debtor).

121.    "*Interim Compensation Order*" means the order entered by the Bankruptcy Court approving interim compensation and reimbursement of expenses for Professionals.

122.    "*Interim DIP Order*" means the order entered by the Bankruptcy Court approving the DIP Facility on an interim basis.

123.    "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as amended from time to time.

124.    "*Law*" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

125.    "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

126.    "**Lifecycle Engagement Assets**" means those certain assets of Astra HoldCo and its subsidiaries (including Anthology's and its subsidiaries') related to the Lifecycle Engagement Business, pursuant to the Lifecycle Engagement and Student Success Stalking Horse Purchase Agreement.

127.    "**Lifecycle Engagement Business**" means the business, operations, and activities conducted by Astra HoldCo and its subsidiaries (including Anthology and its subsidiaries), including each product enumerated in clause (i) of the defined term "Business" in the Lifecycle Engagement and Student Success Stalking Horse Purchase Agreement, that are comprised of the lifecycle engagement business unit of Astra HoldCo and its subsidiaries (including Anthology and its subsidiaries), solely as such business units operate and exist as of the consummation of the transactions contemplated in the Lifecycle Engagement and Student Success Stalking Horse Purchase Agreement.

128.    "**Lifecycle Engagement and Student Success Stalking Horse Purchase Agreement**" means that certain binding purchase agreement, dated as of September 29, 2025, as further amended by that certain Amendment Letter, dated as of October 24, 2025, as amended by that certain Amendment Letter, dated as of November 10, 2025, as amended by that certain Amended and Restated Asset Purchase Agreement, dated as of November 11, 2025, by and among the Lifecycle Engagement and Student Success Stalking Horse Purchaser and the applicable Debtors, pursuant to which the Lifecycle Engagement and Student Success Stalking Horse Purchaser has agreed to acquire the Lifecycle Engagement Assets and the Student Success Assets, together with any ancillary or supplemental documents, instruments and agreements relating thereto, which in each case, shall be reasonably acceptable in form and substance to the Debtors and the Required Consenting Lenders.

129.    "**Lifecycle Engagement and Student Success Stalking Horse Purchaser**" means Encoura.

130.    "**Net Sale Proceeds**" means the net cash proceeds from the sale of the Sale Assets.

131.    "**New Board**" means the board of directors for the Reorganized Debtors, which will initially consist of seven directors to be appointed as set forth in the Reorganized Governance Term Sheet attached as Exhibit D to the RSA.

132.    "**New Common Equity Interests**" means a single class of common equity interests issued by the Reorganized Parent on the Effective Date on the terms and conditions set forth in the RSA, this Plan, the Governance Term Sheet, and the New Organizational Documents, as applicable.

133.    "**New Equity Interests**" means, collectively, the New Common Equity Interests and New Preferred Equity Interests.

134.    "**New Management Incentive Plan**" has the meaning set forth in the Restructuring Term Sheet.

135.    "**New Money Backstop Commitments**" has the meaning set forth in the Restructuring Term Sheet.

136.    "**New Money Investments**" has the meaning set forth in the Restructuring Term Sheet.

137.    "**New Organizational Documents**" means any and all governing documents and agreements of the Reorganized Debtors (including, without limitation, the certificates or articles of incorporation, limited liability company agreements, partnership agreements, stockholders agreements, registration rights agreements, or other applicable formation documents or governance documents of the Reorganized Debtors), and any and all documentation required to implement, issue, and distribute the New Equity Interests.

138.    "**New Preferred Equity Interests**" means a single class of convertible preferred equity interests issued by the Reorganized Parent on the Effective Date on the terms and conditions set forth in the RSA, this Plan, the Equity Rights Offering Documents, and the New Organizational Documents.

139.    "**Non-Debtor Affiliate**" means any Affiliate, including subsidiaries, of the Debtors that is not a Debtor in the Chapter 11 Cases.

140.     "***Ordinary Course Professional***" means an Entity (other than a Professional) retained or compensated by the Debtors in accordance with the Ordinary Course Professionals Order.

141.     "***Ordinary Course Professionals Order***" means that certain order entered by the Bankruptcy Court establishing the procedures for retaining the Ordinary Course Professionals.

142.     "***Other Priority Claim***" means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.

143.     "***Other Secured Claim***" means any Secured Claim other than a DIP Claim, Prepetition Superpriority First Out Claim, Prepetition Superpriority Second Out Claim, Prepetition Superpriority Third Out Claim, Prepetition 2021 First Lien Claim, and Prepetition Second Lien Claim.  For the avoidance of doubt, no Claims arising under the Prepetition Credit Agreements shall be deemed an Other Secured Claim.

144.     "***Parent***" means Astra Intermediate Holding Corp.

145.     "***Person***" means an individual, a partnership, a joint venture, a limited liability company, a corporation, a trust, an unincorporated organization, a group, a Governmental Entity, or any legal entity or association.

146.     "***Per Unit Preferred Interest Purchase Price***" means the price per unit of New Preferred Equity Interests issued pursuant to the New Money Investments.

147.     "***Petition Date***" means September 29, 2025, the date on which the Debtors commenced filing the Chapter 11 Cases.

148.     "***Plan***" has the meaning set forth in this preamble.

149.     "***Plan Administrator***" means, to the extent applicable, that Entity, or any successor thereto, to have all powers and authorities set forth in this Plan and the Plan Administrator Agreement.

150.     "***Plan Administrator Agreement***" means, to the extent applicable, that certain agreement that sets forth the identity of the Entity to serve initially as the Plan Administrator setting forth, among other things, the Plan Administrator's rights, powers, obligations, and compensation, all of which shall be consistent with the applicable provisions of this Plan.

151.     "***Plan Distribution***" means a payment or distribution to Holders of Allowed Claims in accordance with this Plan.

152.     "***Plan Supplement***" means, collectively, the compilation of documents and forms of documents, agreements, schedules, and exhibits to this Plan (in each case, as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and Bankruptcy Rules), which documents shall be reasonably acceptable to the Required Consenting Lenders, including, but not limited to, the following, as applicable:  (a) the Schedule of Assumed Executory Contracts and Unexpired Leases; (b) the Schedule of Rejected Executory Contracts and Unexpired Leases; (c) if applicable, the identity of any Plan Administrator, the terms of compensation of the Plan Administrator, and the Plan Administrator Agreement; (d) the Schedule of Retained Causes of Action; (e) the Schedule of Reserved Claims; (f) the New Organizational Documents; (g) the Restructuring Transactions Memorandum; (h) the Equity Rights Offering Documents; and (i) to the extent known and determined, the number and slate of directors or managers to be appointed to the New Board and any information to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code.  The Debtors shall have the right to alter, amend, modify, or supplement the documents contained in the Plan Supplement in accordance with this Plan on or before the Effective Date.  The Plan Supplement shall be deemed incorporated into and part of this Plan as if set forth herein in full; *provided*, that in the event of a conflict between this Plan and the Plan Supplement, the Plan Supplement shall control in accordance with Article I.G and Article XII.H of this Plan.

153.     "***Prepetition 2021 First Lien Credit Agreement***" means that certain First Lien Credit Agreement dated as of October 25, 2021 (as amended by that certain Amendment No. 1 to First Lien Credit Agreement, dated as of June 12, 2023, that certain Amendment No. 2, Consent and Waiver to First Lien Credit Agreement, dated as of April 19, 2024, that certain Amendment No. 3 to First Lien Credit Agreement, dated as of May 3, 2024 and as further amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time), among Astra HoldCo, as holdings, A Corp., as administrative borrower, Blackboard, as an additional borrower, JPMorgan Chase Bank, N.A., as administrative agent and collateral agent, certain additional borrowers and subsidiary guarantors from time to time party thereto, and the L/C issuers and lenders from time to time party thereto.

154.     "***Prepetition 2021 First Lien Claims***" means any Claim against any Debtor arising under, derived from, based on, or related to the Prepetition 2021 First Lien Credit Agreement.

155.     "***Prepetition Credit Agreements***" means, collectively, the Prepetition Superpriority Credit Agreement, the Prepetition 2021 First Lien Credit Agreement, and the Prepetition Second Lien Credit Agreement.

156.     "***Prepetition Second Lien Agent***" means Ankura Trust Company, LLC, as successor to UBS AG, Stamford Branch, solely in its capacity as administrative agent for the lenders under the Prepetition Second Lien Credit Agreement.

157.     "***Prepetition Second Lien Claims***" means any Claim against any Debtor arising under, derived from, based on, or related to the Prepetition Second Lien Credit Agreement.

158.     "***Prepetition Second Lien Credit Agreement***" means that certain Second Lien Credit Agreement, dated as of October 25, 2021 (as amended by that certain Amendment No. 1 to Second Lien Credit Agreement, dated as of June 12, 2023 and as further amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time) among Astra HoldCo, as holdings, A Corp., as administrative borrower, Blackboard, as an additional borrower, Ankura Trust Company, LLC, as administrative agent and collateral agent, certain additional borrowers and subsidiary guarantors from time to time party thereto, and the lenders from time to time party thereto.

159.     "***Prepetition Superpriority Agent***" means JPMorgan Chase Bank, N.A., in its capacity as administrative agent for the Holders of Prepetition Superpriority Claims under the Prepetition Superpriority Credit Agreement.

160.     "***Prepetition Superpriority Claims***" has the meaning set forth in the Restructuring Term Sheet.

161.     "***Prepetition Superpriority Credit Agreement***" means that certain First Lien Credit Agreement, dated as of April 19, 2024 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time) among Astra HoldCo, as holdings, A Corp., as administrative borrower, Blackboard, as an additional borrower, the other borrowers from time to time party thereto, the subsidiary guarantors from time to time party thereto, the L/C issuers and lenders from time to time party thereto, and the Prepetition Superpriority Agent.

162.     "***Prepetition Superpriority First Out Claims***" means all Claims arising out of or derived from the Prepetition Superpriority First Out Loans incurred under the Prepetition Superpriority Credit Agreement.

163.     "***Prepetition Superpriority First Out Loans***" means, collectively, the Prepetition Superpriority First Out Term Loans and the Prepetition Superpriority Revolving Loans (it being understood that, other than with respect to fees, expenses, indemnification or other amounts owing to the Prepetition Superpriority Agent, no tiering or distinction shall be made to differentiate Prepetition Superpriority First Out Claims for principal, interest, fees, or other amounts).

164.     "***Prepetition Superpriority First Out Term Loans***" means the "Tranche A Term Loans" under and as defined in the Prepetition Superpriority Credit Agreement.

165.     "***Prepetition Superpriority Letters of Credit***" has the meaning set forth in the Final DIP Order.

166. "*Prepetition Superpriority Revolving Loans*" means the "Revolving Credit Loans" under and as defined in the Prepetition Superpriority Credit Agreement.

167. "*Prepetition Superpriority Second Out Claims*" means all Claims arising out of or derived from the Prepetition Superpriority Second Out Loans incurred under the Prepetition Superpriority Credit Agreement.

168. "*Prepetition Superpriority Second Out Loans*" means the "Tranche B Term Loans" under and as defined in the Prepetition Superpriority Credit Agreement.

169. "*Prepetition Superpriority Third Out Claims*" means all Claims arising out of or derived from the Prepetition Superpriority Third Out Loans incurred under the Prepetition Superpriority Credit Agreement.

170. "*Prepetition Superpriority Third Out Loans*" means the "Tranche C Term Loans" under and as defined in the Prepetition Superpriority Credit Agreement.

171. "*Priority Tax Claim*" means any Claim of a Governmental Entity of the kind specified in section 507(a)(8) of the Bankruptcy Code.

172. "*Pro Rata*" means the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class.

173. "*Professional*" means an Entity (other than an Ordinary Course Professional): (a) employed, or proposed to be employed prior to the Confirmation Date, in the Chapter 11 Cases pursuant to a Final Order in accordance with sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date pursuant to sections 327, 328, 329, 330, or 331 of the Bankruptcy Code; or (b) for which compensation and reimbursement has been Allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

174. "*Professional Fee Claim*" means any Claim by a Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred on or after the Petition Date by such Professional through and including the Confirmation Date to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court. To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

175. "*Professional Fee Escrow Account*" means an interest-bearing account funded by the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, with Cash on the Effective Date in an amount equal to the Professional Fee Escrow Amount.

176. "*Professional Fee Escrow Amount*" means the reasonable estimate of the aggregate amount of Professional Fee Claims and other unpaid fees and expenses the Professionals have incurred or will incur in rendering services to the Debtors prior to and as of the Confirmation Date, which estimates Professionals shall deliver to the Debtors as set forth in Article II.B of this Plan.

177. "*Professional Fee Escrow Remainder*" means "Professional Fee Escrow Remainder" as it is defined in Article II.B.2 of this Plan.

178. "*Proof(s) of Claim*" means a written proof of Claim Filed against any of the Debtors in the Chapter 11 Cases by the Claims Bar Date, the Administrative Claims Bar Date, or the Governmental Bar Date, as applicable.

179. "*Proof of Interest*" means a written proof of Interest Filed against any of the Debtors in the Chapter 11 Cases.

180. "*Purchase Agreement*" means a purchase agreement executed by any Debtor and one or more purchasers, including a Stalking Horse Purchaser, in connection with a Sale Transaction.

181.    "***Reinstate***," "***Reinstated***," or "***Reinstatement***" means with respect to Claims and Interests, that the Claim or Interest shall not be discharged hereunder, and the Holder's legal, equitable, and contractual rights on account of such Claim or Interest shall remain unaltered by Consummation and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code. "Reinstate" and "Reinstatement" shall have correlative meanings.

182.    "***Related Funds***" has the meaning set forth in the RSA.

183.    "***Related Party***" means, collectively, with respect to any Entity, (a) such Entity's current and former Affiliates and (b) such Entity's and such Entity's current and former Affiliates' directors, managers, officers, shareholders, investment committee members, special committee members, equity holders (regardless of whether such Interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns (whether by operation of Law or otherwise), subsidiaries, current and former associated entities, managed or advised entities, accounts, or funds, Affiliates, partners, limited partners, general partners, principals, members, management companies, investment or fund advisors or managers, fiduciaries, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an entity), accountants, investment bankers, consultants, other representatives, restructuring advisors, and other professionals and advisors, and any such Entity's predecessors, successors, assigns, heirs, executors, estates, and nominees of the foregoing.

184.    "***Released Avoidance Action Parties***" means Holders of Allowed General Unsecured Claims and Convenience Class Claims against which the Debtors possess UCC Settlement Avoidance Actions.

185.    "***Released Parties***" means, collectively, and in each case, solely in their respective capacities as such:  (a) the Debtors and the Reorganized Debtor(s), as applicable; (b) the Consenting Lenders; (c) the Consenting Sponsor; (d) the Agents; (e) the Committee, as applicable, and each of its members (in their capacities as such); (f) the Stalking Horse Purchasers (if applicable); (g) the Releasing Parties; and (h) each Related Party of each Entity in clause (a) through clause (g).

186.    "***Releasing Parties***" means, collectively, and in each case, solely in their respective capacities as such:  (a) the Debtors and the Reorganized Debtor(s), as applicable; (b) the Consenting Lenders; (c) the Consenting Sponsor; (d) the Agents; (e) the Committee, as applicable, and each of its members (in their capacities as such); (f) the Stalking Horse Purchasers (if applicable); (g) all Holders of Claims or Interests who affirmatively opt in to the releases provided by this Plan; and (h) each Related Party of each Entity in clause (a) through clause (g) for which such Entity is legally entitled to bind such Related Party to the releases contained in this Plan under applicable non bankruptcy law.

187.    "***Remaining Assets***" means Debtors' assets, in aggregate, not otherwise sold pursuant to the Sale Transactions.

188.    "***Reorganized Debtor(s)***" means any Debtor(s) as reorganized pursuant to and under this Plan, or any successor or assignee thereto, by merger, consolidation, reorganization, or otherwise, in the form of a corporation, limited liability company, partnership, or other form, including Reorganized Parent, in accordance with the Restructuring Transactions Memorandum, as the case may be, on and after the Effective Date.

189.    "***Reorganized Governance Term Sheet***" means that certain Governance Term Sheet attached to the Restructuring Term Sheet as Exhibit D.

190.    "***Reorganized Parent***" means either (a) Parent, or any successor or assign thereto, by merger, consolidation, reorganization, or otherwise, in the form of a corporation, limited liability company, partnership, or other form, as the case may be, on and after the Effective Date, or (b) a new corporation, limited liability company, or partnership that may be formed to, among other things, directly or indirectly acquire substantially all of the assets and/or stock of the Debtors and issue the New Equity Interests to be distributed pursuant to this Plan.

191.    "***Required Consenting Lenders***" has the meaning set forth in the RSA.

192.     "***Required Consenting Stakeholders***" means, as of the relevant date, (a) the Required Consenting Lenders and (b) the Consenting Sponsor, solely to the extent of the Consenting Sponsor's consent rights as set forth in the RSA.

193.     "***Restructuring Expenses***" means all reasonable and documented prepetition and postpetition out-of-pocket costs and expenses of the Ad Hoc Group and members thereof (including the reasonable and documented fees and reasonable and documented out-of-pocket expenses of the Ad Hoc Group Advisors accrued since the inception of their respective engagements and not previously paid by, or on behalf of, the Debtors) incurred in connection with the Debtors, their restructuring process, the Restructuring Transactions, this Plan, the Backstop Commitment Agreement, the RSA, the DIP Facility, any Purchase Agreement, the Definitive Documents, and the other transactions contemplated and permitted hereby and thereby.

194.     "***Restructuring Term Sheet***" has the meaning set forth in the RSA.

195.     "***Restructuring Transactions***" has the meaning set forth in the RSA.

196.     "***Restructuring Transactions Memorandum***" means the summary of transaction steps to complete the Restructuring Transactions contemplated by this Plan or the Sale Transactions, as applicable, which shall be (a) included in the Plan Supplement; and (b) consistent with this Plan, the RSA, and otherwise acceptable to the Required Consenting Lenders.

197.     "***Reserved Claims***" means any and all Causes of Action set forth in the Schedule of Reserved Claims, to the extent applicable.

198.     "***Retained Causes of Action***" means those Causes of Action belonging to a Debtor or its Estate, all of which shall vest in the Debtors, the Reorganized Debtors, and/or Wind-Down Debtors, as applicable, on the Effective Date. For the avoidance of doubt, Retained Causes of Action shall not include any Avoidance Actions, or any Causes of Action that are settled, released, or exculpated under this Plan (including pursuant to Article VIII) or that are sold or assigned to the Stalking Horse Purchasers, as set forth in the applicable Stalking Horse Purchase Agreement, or as sold to any other purchaser pursuant to another Purchase Agreement, as applicable. For the avoidance of doubt, all Claims and Causes of Action against the non-Released Parties are Retained Causes of Action owned and retained by the Debtors' estates and vested in the Reorganized Debtors or Wind-Down Debtors, as applicable, whether or not listed on the Schedule of Retained Causes of Action.

199.     "***RSA***" or "***Restructuring Support Agreement***" means that certain restructuring support agreement, dated as of September 29, 2025, by and among the Debtors, the Consenting Lenders, and the Consenting Sponsor (each as defined in the RSA), including all exhibits thereto, as may be amended, modified, or supplemented from time to time, in accordance with its terms.

200.     "***Sale Assets***" has the meaning set forth in the Restructuring Term Sheet.

201.     "***Sale Hearing***" means a hearing to approve a Sale Transaction, and in the case of the Acceptable Alternative Transaction, the Confirmation Hearing.

202.     "***Sale Order***" means, with respect to any Sale Transaction, the order of the Bankruptcy Court approving such Sale Transaction.

203.     "***Sale Transaction***" has the meaning set forth in the RSA. For the avoidance of doubt, a Sale Transaction may include transactions contemplated by the applicable Stalking Horse Purchase Agreements and/or other sale transactions permitted in accordance with the express terms of the Bidding Procedures, in each case, that is reasonably acceptable in form and substance to the Required Consenting Lenders.

204.     "***Sale Transaction Documentation***" means all motions, Filings, documents, and agreements related to the Sale Transactions, including, the Stalking Horse Purchase Agreements or other Purchase Agreement(s), as

applicable, the Sale Orders, the Bidding Procedures, and the Bidding Procedures Order, pursuant to which the Debtors may effectuate the Sale Transactions.

205.    "*Schedule of Assumed Executory Contracts and Unexpired Leases*" means the schedule (including any amendments, supplements, or modifications thereto) of Executory Contracts and Unexpired Leases to be assumed by the Debtors, Reorganized Debtors, or Wind-Down Debtors, as applicable, which schedule (including any amendments, supplements, or modifications thereto) shall be in form and substance acceptable to the Required Consenting Lenders.  For the avoidance of doubt, the schedule shall be included in the Plan Supplement.

206.    "*Schedule of Rejected Executory Contracts and Unexpired Leases*" means the schedule of Executory Contracts and Unexpired Leases to be rejected by the Debtors, the Reorganized Debtors, or the Wind-Down Debtors pursuant to this Plan, which schedule shall be included in the Plan Supplement, as the same may be amended, modified, or supplemented from time to time and which schedule (including any amendments, supplements, or modifications thereto) shall be in form and substance acceptable to the Required Consenting Lenders.

207.    "*Schedule of Reserved Claims*" means the schedule of the Reserved Claims that shall vest in the Reorganized Debtors or the Wind-Down Debtors, as applicable, on the Effective Date, and which schedule (including any amendments, supplements, or modifications thereto) shall be in the form and substance acceptable to the Required Consenting Lenders.

208.    "*Schedule of Retained Causes of Action*" means the schedule of Causes of Action of the Debtors that shall vest in the Reorganized Debtors or the Wind-Down Debtors, as applicable, on the Effective Date, that are not settled, released, waived, exculpated, or transferred pursuant to this Plan or any Purchase Agreement, as the same may be amended, modified, or supplemented from time to time, and which schedule (including any amendments, supplements, or modifications thereto) shall be in the form and substance acceptable to the Required Consenting Lenders.  For the avoidance of doubt, the Schedule of Retained Causes of Action shall not include the UCC Settlement Avoidance Actions, and such Causes of Action shall not be Retained Causes of Action.

209.    "*Schedules*" means, collectively, the schedules of assets and liabilities, statements of financial affairs, lists of Holders of Claims and Interests, and all amendments or supplements thereto to be Filed by the Debtors pursuant to section 521 of the Bankruptcy Code, the official bankruptcy forms, and the Bankruptcy Rules.

210.    "*Second Out Cash Out Option*" has the meaning set forth in Article III of this Plan.

211.    "*Section 510(b) Claim*" means any Claim or Interest against or in a Debtor subject to subordination under section 510(b) of the Bankruptcy Code, whether by operation of Law or contract.

212.    "*Secured Claim*" means a Claim that is:  (a) secured by a Lien on property in which any of the Debtors has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Debtors' interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) Allowed pursuant to this Plan, or separate order of the Bankruptcy Court, as a secured claim.

213.    "*Securities Act*" means the Securities Act of 1933, as amended.

214.    "*Security*" means any security, as defined in section 2(a)(1) of the Securities Act.

215.    "*Settling Parties*" means the Debtors, the Committee, and the Ad Hoc Group (it being understood that the members of the Ad Hoc Group constitute the Required Consenting Lenders and the Required DIP Lenders), each in their capacity as participants in the UCC Settlement.

216.    "*Solicitation Materials*" means a disclosure statement for this Plan and any related materials for solicitation of votes for this Plan.

217.     "***Special Committee***" means, collectively, the special committee of independent and disinterested managers and directors of each of the boards of managers and boards of directors, as applicable, of each of the Debtors.

218.     "***Stalking Horse Purchase Agreements***" means, collectively, the Enterprise Operations Stalking Horse Purchase Agreement and the Lifecycle Engagement and Student Success Stalking Horse Purchase Agreement.

219.     "***Stalking Horse Purchasers***" means, collectively, the Enterprise Operations Stalking Horse Purchaser and the Lifecycle Engagement and Student Success Stalking Horse Purchaser.

220.     "***Student Success Assets***" means those certain assets of Astra HoldCo and its subsidiaries (including Anthology's and its subsidiaries') related to the Student Success Business, pursuant to the Lifecycle Engagement and Student Success Stalking Horse Purchase Agreement.

221.     "***Student Success Business***" means the business, operations, and activities conducted by Astra HoldCo and its subsidiaries (including Anthology and its subsidiaries), that are comprised of the Student Success business unit of Astra Holdco and its subsidiaries (including Anthology and its subsidiaries), solely as such business units operate and exist as of the consummation of the transactions contemplated in the Lifecycle Engagement and Student Success Stalking Horse Purchase Agreement.

222.     "***Transition Services Agreement***" means any transition services agreement to be entered into between the Debtors, Wind-Down Debtors, or Reorganized Debtors and the purchaser of any Sale Assets.

223.     "***UCC Monitor***" has the meaning set forth in Article IV.X.6 of this Plan.

224.     "***UCC Settlement***" means the comprehensive global settlement between the Settling Parties, as described in Article IV.X.

225.     "***UCC Settlement Avoidance Actions***" means any Avoidance Action Claims held by the Debtors against any Holders of Allowed General Unsecured Claims and Convenience Class Claims arising under section 544, 547, 548, or 549 of the Bankruptcy Code or under similar or related local, state, federal, or foreign statutes or common law.

226.     "***U.S. Trustee***" means the Office of the United States Trustee for the district of the Bankruptcy Court.

227.     "***Undeliverable Distribution***" means any distribution under this Plan on account of an Allowed Claim or Allowed Interest to a Holder that has not:  (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check within 180 calendar days of receipt after the Effective Date; (b) given notice to the Reorganized Debtors or the Wind-Down Debtors, as applicable, or the Disbursing Agent, as applicable, of an intent to accept a particular distribution within 180 calendar days of receipt after the Effective Date; (c) validly responded to the Debtors', Reorganized Debtors', Wind-Down Debtors', or Disbursing Agent's requests for information necessary to facilitate a particular distribution prior to the deadline included in such request for information; or (d) timely taken any other action necessary to facilitate such distribution.

228.     "***Unexpired Lease***" means a lease of nonresidential real property to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

229.     "***Unimpaired***" means with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

230.     "***Unsecured Claim***" means any Claim that is not a Secured Claim.

231.     "***Waterfall Recovery***" means, after the payment of DIP Claims (in accordance with the priorities set forth in the DIP Credit Agreement), Adequate Protection Claims (as defined in the DIP Orders and as applicable), Allowed Administrative Claims (for the avoidance of doubt, excluding any Allowed Administrative Claims that are

assumed and assigned to the Stalking Horse Purchasers or other purchaser(s)), Priority Tax Claims (to the extent applicable), Allowed Other Secured Claims (to the extent applicable), Allowed Other Priority Claims (to the extent applicable), Convenience Class Claim (to the extent applicable), and the indefeasible payment of Allowed Prepetition Superpriority First Out Claims (in each case, in accordance with this Plan), the distribution of remaining Distributable Cash (if any) to other Holders of Claims, in the following order of priority:  (a) first, in respect of Allowed Prepetition Superpriority Second Out Claims until indefeasibly paid in full; (b) second, in respect of Allowed Prepetition Superpriority Third Out Claims until indefeasibly paid in full; and (c) third, in respect of Allowed Prepetition 2021 First Lien Claims, Allowed Prepetition Second Lien Claims, and Allowed General Unsecured Claims on a ratable basis (*provided*, that as among the Claims described in this clause (c), priority shall be given to Allowed Prepetition 2021 First Lien Claims and Allowed Prepetition Second Lien Claims as and to the extent of the value of any collateral securing such Claims).

232.     "***Wind-Down***" means, solely in the event that the Debtors consummate an Acceptable Alternative Transaction, the wind down and dissolution of the Debtors' Estates, to be effectuated in accordance with Article IV.G hereof and the terms of the Plan Administrator Agreement.

233.     "***Wind-Down Amount***" means, solely in the event that the Debtors consummate an Acceptable Alternative Transaction, Cash sufficient to wind down the Debtors' Estates in an amount to be determined by and in a manner acceptable to the Debtors, the Required DIP Lenders, and, if the RSA is still in effect, the Required Consenting Lenders.

234.     "***Wind-Down Budget***" means, solely in the event that the Debtors consummate an Acceptable Alternative Transaction, the budget approved by the Bankruptcy Court pursuant to which the Wind-Down Debtors and the Plan Administrator shall fund the Wind-Down; *provided*, that in no event shall the Wind-Down Budget be used to pay any fees or expenses incurred by the Debtors' Professionals prior to the Effective Date.

235.     "***Wind-Down Debtor(s)***" means, solely in the event that the Debtors consummate an Acceptable Alternative Transaction, any Debtor(s) that shall continue in existence on or after the Effective Date.

236.     "***Wind-Down Debtors' Expenses***" means, solely in the event that the Debtors consummate an Acceptable Alternative Transaction, all actual and necessary costs and expenses incurred by the Wind-Down Debtors or Plan Administrator in connection with carrying out the obligations of the Wind-Down Debtors pursuant to the terms of this Plan and the Plan Administrator Agreement.

237.     "***Wind-Down Reserve***" means, solely in the event that the Debtors consummate an Acceptable Alternative Transaction, the account to be established and maintained by the Plan Administrator and funded with the amounts under the Wind-Down Budget to fund the Wind-Down and the Restructuring Transactions.

B.     *Rules of Interpretation.*

For purposes of this Plan:  (i) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (ii) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (iii) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented in accordance with this Plan or Confirmation Order, as applicable; (iv) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (v) unless otherwise specified, all references herein to "Articles" and "Sections" are references to Articles and Sections hereof; (vi) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to this Plan in its entirety rather than to any particular portion of this Plan; (vii) subject to the provisions of any contract, charter, certificate of incorporation, bylaw, partnership agreement, operating agreement, limited liability company agreement, or other organizational documents, or equityholder agreement(s), as applicable, instrument, release, or other agreement or document entered into in connection with this Plan, the rights and obligations arising pursuant to this Plan shall be governed by, and construed and enforced in accordance with the applicable Law, including the Bankruptcy Code and

Bankruptcy Rules; (ix) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; (x) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (xi) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (xii) references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (xiii) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (xiv) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (xv) references to "Proofs of Claim," "Holders of Claims," "Disputed Claims," and the like shall include "Proofs of Interest," "Holders of Interests," "Disputed Interests," and the like, as applicable; (xvi) any effectuating provisions (including any immaterial effectuating provisions) may be interpreted by the Debtors, the Reorganized Debtors, the Wind-Down Debtors, or the Plan Administrator in such a manner that is consistent with the overall purpose and intent of this Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, and such interpretation shall control; (xvii) all references herein to consent, acceptance, or approval may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail; (xviii) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; and (xix) except as otherwise provided in this Plan, any references to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter.

C.   *Computation of Time.*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to this Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

D.   *Governing Law.*

Except to the extent a rule of Law or procedure is supplied by federal Law (including the Bankruptcy Code or Bankruptcy Rules), and subject to the provisions of any contract, lease, instrument, release, indenture, or other agreement or document entered into expressly in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to conflict of laws principles.

E.   *Reference to Monetary Figures.*

All references in this Plan to monetary figures shall refer to the legal tender of the United States of America, unless otherwise expressly provided herein.

F.   *Reference to the Debtors, the Reorganized Debtors, or the Wind-Down Debtors.*

Except as otherwise specifically provided in this Plan to the contrary, references in this Plan to the Debtors, the Reorganized Debtors, or the Wind-Down Debtors shall mean the Debtors, the Reorganized Debtors, and the Wind-Down Debtors, as applicable, to the extent the context requires.

G.   *Controlling Document.*

In the event of an inconsistency between this Plan and the Disclosure Statement, the terms of this Plan shall control in all respects.  In the event of an inconsistency between this Plan and any document included in the Plan Supplement, including the schedules or exhibits, the terms of the relevant provision in the Plan Supplement shall control (unless expressly stated otherwise in the applicable provision of the Plan Supplement or in the Confirmation Order).  In the event of an inconsistency between the Confirmation Order and this Plan, including the Plan Supplement,

or the Disclosure Statement, the Confirmation Order shall control.  In the event of an inconsistency between the relevant Stalking Horse Purchase Agreement or other Purchase Agreement, as applicable, and any other document, including this Plan, Disclosure Statement, Confirmation Order, or Plan Supplement, the relevant Stalking Horse Purchase Agreement or other Purchase Agreement, as applicable, shall control.

Any and all rights and obligations of the parties set forth in the Stalking Horse Purchase Agreements or any other Purchase Agreement, as applicable, any Transition Services Agreement(s), and any other documents related to the Sale Transactions, the RSA, and the DIP Documents, including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents, shall not be modified by this Plan.  Failure to reference in this Plan the rights and obligations referred to in the immediately preceding sentence as such rights or obligations relate to any document referenced in the Stalking Horse Purchase Agreements or other Purchase Agreement, as applicable, shall not impair such rights and obligations.

H.   *Consent Rights.*

Notwithstanding anything herein to the contrary, any and all consent and/or consultation rights of the parties to the Restructuring Support Agreement, including with respect to the Required Consenting Stakeholders, as such rights are set forth in the Restructuring Support Agreement with respect to the form and substance of this Plan, the Definitive Documents, the Plan Supplement, all exhibits to this Plan and the Plan Supplement, including any amendments, restatements, supplements, or other modifications to such agreements and documents and to the Restructuring Support Agreement, and any consents, waivers, or other deviations under or from any such documents and the Restructuring Support Agreement, shall be incorporated herein by this reference (including to the applicable definitions in Article I, Section A hereof) and be fully enforceable as if stated in full herein, and all such documents shall be consistent with the Restructuring Support Agreement in all respects, except to the extent increased or additional rights for the Required Consenting Stakeholders are set forth in this Plan, which such additional or increased rights shall be valid and fully enforceable.

Failure to reference in this Plan the rights referred to in the immediately preceding paragraph shall not impair such rights and obligations.  Without limiting the generality of the foregoing, any document or deliverable referenced in this Plan shall be subject to the consent and right to be cooperated in good-faith and coordinated with rights of the Required Consenting Stakeholders in accordance with the Restructuring Support Agreement regardless of whether or not expressly stated herein.  For the further avoidance of doubt, any provision of this Plan or any other Definitive Documents that impacts, amends, modifies, or supplements the (a) the release provisions set forth in Article VIII hereof or (b) the directors' and officers' insurance policies and preservation of indemnities, in each, relative to the terms set forth in the Restructuring Support Agreement, shall be reasonably acceptable to the Consenting Sponsor and the Debtors shall obtain the Consenting Sponsor's reasonable consent prior to such implementation or effectiveness of such amendment, modification or supplement.  Furthermore, the Debtors shall cooperate in good-faith and coordinate with the Consenting Sponsor with respect to any provision of this Plan or any other Definitive Documents that impacts, amends, modifies, or supplements the structuring of the Restructuring Transactions in a tax-efficient manner, including the Restructuring Transactions Memorandum.

## ARTICLE II
## ADMINISTRATIVE CLAIMS, PROFESSIONAL FEE CLAIMS, DIP CLAIMS,
## PRIORITY TAX CLAIMS, STATUTORY FEES, AND RESTRUCTURING EXPENSES

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, DIP Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims set forth in Article III hereof.

A.   *Administrative Claims.*

Except as otherwise provided in this Plan, unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors, the Reorganized Debtors, the Wind-Down Debtors, or the Stalking Horse Purchaser(s), or any other purchaser, as applicable, and unless such Holder has been paid by any Debtor on account of such Allowed Administrative Claim prior to the Effective Date, each Holder of an Allowed Administrative Claim

(other than Holders of Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Allowed Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following:  (i) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date, or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (ii) if such Administrative Claim is not Allowed as of the Effective Date, no later than 10 days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (iii) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim; (iv) at such time and upon such terms as may be agreed upon by such Holder and the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable; or (v) at such time and upon such terms as set forth in an order of the Bankruptcy Court; *provided*, that any Allowed Administrative Claim that has been expressly assumed by the Stalking Horse Purchasers or any other purchaser under the Sale Transaction Documentation shall not be an obligation of the Debtors, the Reorganized Debtors, or Wind-Down Debtors as of or after the closing of any Sale Transactions.

Except as otherwise provided by Article II.A of this Plan or by a Final Order entered by the Bankruptcy Court (including the Claims Bar Date Order) on or prior to the Administrative Claims Bar Date, as applicable, unless previously Filed, requests for payment of Administrative Claims (other than requests for payment of Professional Fee Claims) must be Filed and served on the Debtors.  Objections to such requests, if any, must be Filed with the Bankruptcy Court and served on the requesting party no later than the Administrative Claims Objection Bar Date, subject to further extension by order of the Bankruptcy Court.  Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with the Bankruptcy Court with respect to an Administrative Claim previously Allowed.

Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims by the Administrative Claims Bar Date that do not File and serve such a request by the Administrative Claims Bar Date, shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Stalking Horse Purchasers or any other purchaser, the Debtors, the Reorganized Debtors, the Wind-Down Debtors, their Estates, or their property, and such Administrative Claims shall be deemed compromised, settled, and released as of the Effective Date without the need for any objection from the Debtors, the Reorganized Debtors, the Wind-Down Debtors, or the Plan Administrator, as applicable, or any notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

For the avoidance of doubt, any dispute with respect to the amount of an Assumed Liability, including with respect to Administrative Claims, under the Stalking Horse Purchase Agreements or other Purchase Agreement, as applicable, shall be resolved between (i) the relevant Stalking Horse Purchaser or other relevant purchaser and (ii) the Holder of such Assumed Liability.

At Closing (as defined in the Enterprise Operations Stalking Horse Purchase Agreement), the Debtors shall establish and fund the Adjustment Reserve with Cash in accordance with the requirements of Section 2.03(e) of the Enterprise Operations Stalking Horse Purchase Agreement.  The Adjustment Reserve shall be maintained in trust solely for the benefit of the Enterprise Operations Stalking Horse Purchaser and shall not be distributed or used to pay any costs or expenses until the resolution and payment of the Final Purchase Price (as defined in the Enterprise Operations Stalking Horse Purchase Agreement).

B. *Professional Fee Claims.*

1. Final Fee Applications and Payment of Professional Fee Claims.

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred during the period from the Petition Date through the Confirmation Date must be Filed no later than 60 days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and opportunity for a hearing in accordance with the procedures established by the Bankruptcy Court.  The Reorganized Debtors, the Wind-Down Debtors, or the Plan Administrator, as applicable, shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court Allows, including from funds held in the

Professional Fee Escrow Account and/or the Funded Reserve Account, as soon as reasonably practicable after such Professional Fee Claims are Allowed, and which Allowed amount shall not be subject to disallowance, setoff, recoupment, subordination, recharacterization, or reduction of any kind, including pursuant to section 502(d) of the Bankruptcy Code.  To the extent that funds held in the Professional Fee Escrow Account are insufficient to satisfy the amount of Professional Fee Claims owing to the Professionals, such Professionals shall have an Allowed Administrative Claim for any such deficiency, which shall be satisfied in accordance with Article II.A of this Plan.

        2.        <u>Professional Fee Escrow Account.</u>

As soon as possible after Confirmation and not later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount, which Professional Fee Escrow Account may be funded with amounts held in the Funded Reserve Account after satisfaction and discharge of all DIP Claims.  The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full pursuant to one or more Final Orders.  Such funds shall not be considered property of the Debtors' Estates.  The amount of Allowed Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals from funds held in the Professional Fee Escrow Account as soon as reasonably practicable after such Claims are Allowed by a Final Order.

When all such Allowed amounts owing to Professionals have been paid in full, any remaining amount in the Professional Fee Escrow Account (the "<u>Professional Fee Escrow Remainder</u>") and any Funded Reserve Account Remainder shall promptly be distributed as Distributable Cash in accordance with this Plan, without any further action or order of the Bankruptcy Court.  For the avoidance of doubt, the Professional Fee Escrow Remainder and Funded Reserve Account Remainder shall not be distributed in accordance with the Waterfall Recovery, as applicable, until all reasonable and documented legal, professional, or other fees and expenses related to administration of the Chapter 11 Cases, implementation of this Plan and Consummation incurred by the Debtors and/or the Committee have been paid, including in accordance with Article II.B.2 of this Plan.

        3.        <u>Estimation of Professional Fees and Expenses.</u>

Professionals shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred before and as of the Confirmation Date, and shall deliver such estimate and any other documents required by the Debtors to fund the Professional Fee Escrow Amount, including an applicable W-9, to the Debtors no later than 3 Business Days prior to the anticipated Effective Date; *provided*, that such estimates shall not be deemed to limit the amount of the fees and expenses that are the subject of each Professional's final request for payment in the Chapter 11 Cases.  If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.

        4.        <u>Post-Confirmation Date Fees and Expenses.</u>

Except as otherwise specifically provided in this Plan, from and after the Confirmation Date, the Debtors and/or the Reorganized Debtors or Wind-Down Debtors, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses incurred by the Debtors, the Reorganized Debtors, and/or the Committee.  Upon the Confirmation Date, any requirement that Professionals comply with sections 327–331, 363, and 1103 of the Bankruptcy Code or the Interim Compensation Order in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

C.    *DIP Claims.*

All DIP Claims shall be deemed Allowed as of the Effective Date in an amount equal to the full amount due and owing under the DIP Credit Agreement, including, for the avoidance of doubt, (i) the principal amount outstanding under the DIP Facility on such date, (ii) all interest accrued and unpaid thereon through and including the date of payment, (iii) all premiums earned and payable thereon, including, for the avoidance of doubt, the Backstop Premium

(as defined in the DIP Orders), and (iv) all accrued and unpaid fees and expenses payable under the DIP Facility and the DIP Orders.  Except to the extent that a Holder of an Allowed DIP Claim agrees to a less favorable treatment, on the Effective Date, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed DIP Claim, each DIP Claim shall, except to the extent such DIP Claim is used to fund commitment obligations or subscriptions under the New Money Investments in respect of the New Equity Interests, in accordance with this Plan and/or the Equity Rights Offering Documents, be paid in full in Cash.  Except as otherwise provided in this Plan, all Liens and security interests granted by the Debtors to secure the obligations under the DIP Facility shall be of no further force or effect.  For the avoidance of doubt, the DIP Claims shall not be subject to any avoidance, reduction, setoff, recoupment, recharacterization, subordination (equitable or contractual or otherwise), counterclaim, defense, disallowance, impairment, objection, or any challenges under applicable Law or regulation.

D.   *Priority Tax Claims.*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to less favorable treatment, in full and final satisfaction, settlement, discharge, and release of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall receive Cash in an amount equal to the full unpaid amount of such Allowed Priority Tax Claim or such other treatment in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code, on the later of the Effective Date and the date that is 10 Business Days after the date on which such Priority Tax Claim becomes Allowed, in each case, or as soon as reasonably practicable thereafter.

To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in accordance with the terms of any agreement between the Reorganized Debtors and the Holder of such Claim, as may be due and payable under applicable non-bankruptcy law, including applicable local tax law, or in the ordinary course of business, subject, where applicable, to compliance with any formal procedures required for enrollment in official tax settlement or refinancing programs.

E.   *Payment of Statutory Fees.*

All fees due and payable pursuant to section 1930(a) of title 28 of the United States Code shall be paid by the Debtors, the Reorganized Debtors, or the Wind-Down Debtors (or the Disbursing Agent on behalf of the Reorganized Debtors, Wind-Down Debtors, or Plan Administrator), as applicable, for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.  All monthly reports shall be Filed, and all such fees due and payable, shall be paid by the Debtors, the Reorganized Debtors, or the Wind-Down Debtors (or the Disbursing Agent on behalf of the Reorganized Debtors, the Wind-Down Debtors, or Plan Administrator), as applicable, on the Effective Date.  Following the Effective Date, the Reorganized Debtors or the Wind-Down Debtors (or the Disbursing Agent on behalf of the Reorganized Debtors, Wind-Down Debtors, or Plan Administrator) shall (1) pay such fees as such fees are assessed and come due for each quarter (including any fraction thereof) and (2) File quarterly reports in a form reasonably acceptable to the U.S. Trustee.  Each Debtor shall remain obligated to pay such quarterly fees to the U.S. Trustee and to File quarterly reports until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

F.   *Payment of Restructuring Expenses.*

The Debtors, Reorganized Debtors, and Wind-Down Debtors, as applicable, shall pay in Cash all Restructuring Expenses in accordance with the terms and conditions of any applicable agreement with the Debtors, including the Prepetition Credit Agreements, DIP Documents, Backstop Commitment Agreement, and RSA (including, for the avoidance of doubt, Restructuring Transactions incurred following the Effective Date in connection with the implementation of this Plan and the Restructuring Transactions contemplated hereby), and if any such Restructuring Expenses are unpaid as of the Effective Date, such Restructuring Expenses shall be paid on the Effective Date or as soon as reasonably practicable thereafter, in each case, without any requirement to File a fee application with the Bankruptcy Court and without any requirement for Bankruptcy Court review or approval; *provided*, that the foregoing shall be subject to the Debtors' receipt of an invoice in summary form (but without the need for itemized time detail and may be redacted) from the applicable Entity entitled to such Restructuring Expenses.  All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date, and such estimates shall be delivered to the Debtors at least 3 Business Days before the anticipated Effective Date; *provided*, that such estimates shall not be considered an admission or limitation with respect to such Restructuring Expenses.  In addition, the Debtors and the Reorganized Debtors (as applicable) shall continue to pay, when due and payable in the ordinary course, Restructuring Expenses, whether incurred before, on, or after the Effective Date in accordance with, if applicable, the respective engagement letter or fee letter and solely upon receipt of an invoice requesting such Restructuring Expenses with reasonable detail (but without the need for itemized time detail).  Notwithstanding anything to the contrary contained herein, any unpaid Claim payable on account of the Restructuring Expenses that the Debtors are obligated to pay under the Restructuring Support Agreement, DIP Documents, Backstop Commitment Agreement, or any other applicable agreement with the Debtors, and for which the Debtors have received an invoice, shall constitute an Allowed Administrative Claim and shall be paid on a current basis in full in Cash on the Effective Date or as soon as reasonably practicable thereafter, or to the extent accrued after the Effective Date, on a current basis in full in Cash as invoiced.  Nothing herein shall require the Prepetition Superpriority Lenders to file applications, a Proof of Claim, or otherwise seek approval of the Bankruptcy Court as a condition to payment of such Allowed Administrative Claims.

# ARTICLE III
# CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.   *Classification of Claims and Interests.*

This Plan constitutes a separate Plan for each Debtor, and the classification of Claims and Interests set forth herein shall apply separately to each Debtor.  Except for the Claims addressed in Article II of this Plan, all Claims and Interests are classified in the Classes set forth in Article III herein for all purposes, including voting, Confirmation, and distributions pursuant to this Plan and in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or an Interest, or any portion thereof, is classified in a particular Class only to the extent that such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes.  A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under this Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

All of the potential Classes for the Debtors are set forth herein.  Voting tabulations for recording acceptances or rejections of this Plan shall be conducted on a Debtor-by-Debtor basis as set forth above.

This Plan groups the Debtors together solely for the purpose of describing treatment under this Plan, Confirmation, and making distributions in accordance with this Plan in respect of Claims against, and Interests in, the Debtors under this Plan.  Such groupings shall not affect any Debtor's status as a separate legal Entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal Entities, or cause the transfer of any assets, and, except as otherwise provided by or permitted under this Plan, including the Plan Supplement, all Debtors shall continue to exist as separate legal Entities after the Effective Date.

| Class | Claim/Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | Prepetition Superpriority First Out Claims | Impaired | Entitled to Vote |
| 4 | Prepetition Superpriority Second Out Claims | Impaired | Entitled to Vote |
| 5 | Prepetition Superpriority Third Out Claims | Impaired | Entitled to Vote |
| 6 | Prepetition 2021 First Lien Claims | Impaired | Entitled to Vote |
| 7 | Prepetition Second Lien Claims | Impaired | Entitled to Vote |
| 8 | General Unsecured Claims | Impaired | Entitled to Vote |
| 9 | Convenience Class Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 10 | Intercompany Claims | Unimpaired or Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| 11 | Intercompany Interests | Unimpaired or Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| 12 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 13 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

B.    *Treatment of Claims and Interests.*

Except to the extent that the Debtors or the Plan Administrator, as applicable, and a Holder of an Allowed Claim or Interest, as applicable, agree(s) to different treatment, each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under this Plan the treatment described below in full and final satisfaction, compromise, settlement, and release of and in exchange for such Holder's Allowed Claim or Allowed Interest, as applicable.  Unless otherwise indicated, each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the later of (i) the Effective Date (or, if payment is not then due, in accordance with its terms in the ordinary course) or as soon as reasonably practicable thereafter, and (ii) the date on which such Holder's Claim or Interest becomes Allowed.  In no event shall any Holder of a Claim receive more than such Holder's Allowed amount on account of such Claim.

1.    <u>Class 1—Other Secured Claims.</u>

(a)    *Classification*:  Class 1 consists of all Allowed Other Secured Claims.

(b)    *Treatment*:  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, in full and final satisfaction of such Allowed Claim, at the option of the Debtors or the Reorganized Debtors (with the consent of the Required Consenting Lenders):

(i)    each such Holder shall receive payment in full in Cash of such Allowed Claim, payable on the later of the Effective Date and the date that is 10 Business Days after the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, in each case, or as soon as reasonably practicable thereafter;

(ii)    such Holder's Allowed Other Secured Claim shall be reinstated; or

(iii)    such Holder shall receive such other treatment so as to render such Holder's Allowed Other Secured Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code.

(c)    *Voting*:  Class 1 is Unimpaired under this Plan.  Holders of Allowed Other Secured Claims are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the

Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject this Plan.

2.      Class 2—Other Priority Claims.

(a)     *Classification*:  Class 2 consists of all Allowed Other Priority Claims.

(b)     *Treatment*:  Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, in full and final satisfaction of such Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall receive, at the option of the Debtors or the Reorganized Debtors (with the consent of the Required Consenting Lenders):

(i)     payment in full in Cash; or

(ii)    such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code, payable on the later of the Effective Date and the date that is 10 Business Days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, in each case, or as soon as reasonably practicable thereafter.

(c)     *Voting*:  Class 2 is Unimpaired under this Plan.  Holders of Allowed Other Priority Claims are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject this Plan.

3.      Class 3—Prepetition Superpriority First Out Claims.

(a)     *Classification*:  Class 3 consists of the Prepetition Superpriority First Out Claims.

(b)     *Treatment*:  Except to the extent that a Holder of an Allowed Prepetition Superpriority First Out Claim agrees to less favorable treatment, on the Effective Date, or as soon as reasonably possible thereafter, each Holder of an Allowed Prepetition Superpriority First Out Claim shall receive, in full and final satisfaction, compromise settlement, release, and discharge of such Claim:

(i)     its *Pro Rata* share of the Distributable Cash, and

(ii)    (A)(1) its *Pro Rata* share of 99% of the New Common Equity Interests, subject to dilution on account of the New Management Incentive Plan; and (A)(2) the receipt of subscription rights to participate *Pro Rata* (based on its holdings of Prepetition Superpriority First Out Claims as of a record date to be agreed) in the Equity Rights Offering; *or* (B) at the election of such Holder (other than any Holder that is a Financing Party or an Affiliate or Related Fund thereof), in lieu of the consideration described in the foregoing clause (A), an amount of cash equivalent to such Holder's *Pro Rata* share (based on its holdings of Prepetition Superpriority First Out Claims as of a record date to be agreed, and prior to giving effect to any Cash Out Option) of $59.4 million (a "First Out Cash Out Option").

(c)     *Voting and Allowance*:  Class 3 is Impaired.  Holders of Allowed Prepetition Superpriority First Out Claims are entitled to vote to accept or reject this Plan.  The Prepetition Superpriority First Out Claims shall be deemed Allowed on the Effective Date with respect to all principal, interest, fees and premiums arising under or related to the Prepetition Superpriority First Out Loans in the amount of approximately $520 million.  For the avoidance of doubt, the Restructuring Expenses, fees, and indemnities in favor of the

28

Prepetition Superpriority Agent shall be Allowed and paid pursuant to the other applicable provisions in this Plan.

4.  Class 4—Prepetition Superpriority Second Out Claims.

(a)  *Classification*:  Class 4 consists of the Prepetition Superpriority Second Out Claims.

(b)  *Treatment*:  Except to the extent that a Holder of an Allowed Prepetition Superpriority Second Out Claim agrees to less favorable treatment, on the Effective Date, or as soon as reasonably possible thereafter, each Holder of an Allowed Prepetition Superpriority Second Out Claim shall receive, in full and final satisfaction, compromise settlement, release, and discharge of such Claim:

(i)  its *Pro Rata* share of:

A.  (1) 1% of the New Common Equity Interests, subject to dilution on account of the New Management Incentive Plan; and (2) approximately 1% of the total New Preferred Equity Interests to be issued on the Effective Date (prior to taking into account any Second Out Cash Out Option); *or*

B.  at the election of such Holder, in lieu of the consideration described in the foregoing clause (A), an amount of cash equivalent to such Holder's *Pro Rata* share (based on its holdings of Prepetition Superpriority Second Out Claims as of a record date to be agreed, and prior to giving effect to any Cash Out Option) of $2 million (a "Second Out Cash Out Option" and, together with the First Out Cash Out Option, the "Cash Out Options"); and

(ii)  its *Pro Rata* share of Distributable Cash, if any, in accordance with the Waterfall Recovery.

(c)  *Voting and Allowance*:  Class 4 is Impaired.  Holders of Allowed Prepetition Superpriority Second Out Claims are entitled to vote to accept or reject this Plan.  The Prepetition Superpriority Second Out Claims shall be deemed Allowed on the Effective Date with respect to all principal, interest, fees, and premiums arising under or related to the Prepetition Superpriority Second Out Loans in the amount of approximately $665 million. For the avoidance of doubt, the Restructuring Expenses, fees, and indemnities in favor of the Prepetition Superpriority Agent shall be Allowed and paid pursuant to the other applicable provisions in this Plan.

5.  Class 5—Prepetition Superpriority Third Out Claims

(a)  *Classification*:  Class 5 consists of the Prepetition Superpriority Third Out Claims.

(b)  *Treatment*:  Except to the extent that a Holder of a Prepetition Superpriority Third Out Claim agrees to less favorable treatment, on or after the Effective Date, each Holder of an Allowed Prepetition Superpriority Third Out Claim shall receive its *Pro Rata* share of Distributable Cash, if any, in accordance with the Waterfall Recovery.  In the event that there is no such Distributable Cash available for distribution to the Holders of Allowed Prepetition Superpriority Third Out Claims pursuant to the Waterfall Recovery, the Allowed Prepetition Superpriority Third Out Claims shall be discharged and released, and each Holder of a Prepetition Superpriority Third Out Claim shall not receive or retain any distribution, property, or other value on account of such Prepetition Superpriority Third Out Claim.

(c)     *Voting*:  Class 5 is Impaired.  Holders of Allowed Prepetition Superpriority Third Out Claims are entitled to vote to accept or reject this Plan.  The Prepetition Superpriority Third Out Claims shall be deemed Allowed on the Effective Date with respect to all principal, interest, fees and premiums arising under or related to the Prepetition Superpriority Third Out Loans in the amount of approximately $65 million.  For the avoidance of doubt, the Restructuring Expenses, fees, and indemnities in favor of the Prepetition Superpriority Agent shall be Allowed and paid pursuant to the other applicable provisions in this Plan.

6.      Class 6—Prepetition 2021 First Lien Claims.

(a)     *Classification*:  Class 6 consists of the Prepetition 2021 First Lien Claims.

(b)     *Treatment*:  Except to the extent that a Holder of a Prepetition 2021 First Lien Claim agrees to less favorable treatment, on or after the Effective Date, each Holder of an Allowed Prepetition 2021 First Lien Claim shall receive its *Pro Rata* share of Distributable Cash, if any, in accordance with the Waterfall Recovery.  In the event that there is no such Distributable Cash available for distribution to the Holders of Allowed Prepetition 2021 First Lien Claims pursuant to the Waterfall Recovery, the Allowed Prepetition 2021 First Lien Claims shall be discharged and released, and each Holder of a Prepetition 2021 First Lien Claim shall not receive or retain any distribution, property, or other value on account of such Prepetition 2021 First Lien Claim.

(c)     *Voting*:  Class 6 is Impaired.  Holders of Prepetition 2021 First Lien Claims are entitled to vote to accept or reject this Plan.

7.      Class 7—Prepetition Second Lien Claims.

(a)     *Classification*:  Class 7 consists of the Prepetition Second Lien Claims.

(b)     *Treatment*:  Except to the extent that a Holder of a Prepetition Second Lien Claim agrees to less favorable treatment, on or after the Effective Date, each Holder of an Allowed Prepetition Second Lien Claim shall receive its *Pro Rata* share of Distributable Cash, if any, in accordance with the Waterfall Recovery.  In the event that there is no such Distributable Cash available for distribution to the Holders of Allowed Prepetition Second Lien Claims pursuant to the Waterfall Recovery, the Allowed Prepetition Second Lien Claims shall be discharged and released, and each Holder of a Prepetition Second Lien Claim shall not receive or retain any distribution, property, or other value on account of such Prepetition Second Lien Claim.

(c)     *Voting*:  Class 7 is Impaired.  Holders of Prepetition Second Lien Claims are entitled to vote to accept or reject this Plan.

8.      Class 8—General Unsecured Claims.

(a)     *Classification*:  Class 8 consists of the General Unsecured Claims.

(b)     *Treatment*:  Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, on the Effective Date or as soon as reasonably practicable thereafter, each Holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of such Allowed General Unsecured Claim, its *Pro Rata* share of: (i) (A) the GUC Litigation Participation Amount and (B) the GUC Cash Consideration, in each case solely to the extent of any Cash remaining after payment to Holders of Allowed Convenience Class Claims in accordance with this Plan and any payments in respect of the UCC Monitor and (ii) the Distributable Cash, if any, in accordance with the Waterfall Recovery.  In the event

that there is no such Distributable Cash available for distribution to such Holders of Allowed General Unsecured Claims pursuant to the Waterfall Recovery, such Allowed General Unsecured Claims shall be discharged and released, and such Holder of a General Unsecured Claim shall not receive or retain any distribution, property, or other value on account of such General Unsecured Claim.

(c)     *Voting*:  Class 8 is Impaired.  Holders of Allowed General Unsecured Claims are entitled to vote to accept or reject this Plan.

9.     <u>Class 9—Convenience Class Claims.</u>

(a)     *Classification*:  Class 9 consists of Convenience Class Claims.

(b)     *Treatment*:  Except to the extent that a Holder of an Allowed Convenience Class Claim by amount or election agrees to a less favorable treatment, on the Effective Date or as soon as reasonably practicable thereafter, each Holder of an Allowed Convenience Class Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of such Allowed Convenience Class Claim, a Cash distribution from the then-existing GUC Recovery Pool in Cash in an amount equal to: the greater of (x) 100% of such Allowed Convenience Class Claim in an amount of $10,000 or less or (y) 15% of such Allowed Convenience Class Claim (subject to a maximum Claim amount of $100,000 with respect to any such Allowed Convenience Class Claim); *provided* that (i) acceptance of Convenience Class treatment shall constitute a waiver of any right to receive any additional recovery on account of such Allowed Claim, and (ii) to the extent that a Holder of a Convenience Class Claim against a Debtor holds any joint and several liability Claims, guaranty Claims, or other similar Claims against any other Debtor arising from or relating to the same obligations or liability as such Convenience Class Claim, such Holder shall only be entitled to a distribution on one Convenience Class Claim against the Debtors in full and final satisfaction of all such Claims.

(c)     *Voting*:  Class 9 is Unimpaired under this Plan.  Holders of Convenience Class Claims are conclusively presumed to have accepted this Plan pursuant to section 1126(f).  Therefore, such Holders are not entitled to vote to accept or reject this Plan.

10.     <u>Class 10—Intercompany Claims.</u>

(a)     *Classification*:  Class 10 consists of all Intercompany Claims.

(b)     *Treatment*:   On the Effective Date, all Intercompany Claims shall be (i) adjusted, (ii) reinstated, (iii) cancelled, or (iv) otherwise addressed, to the extent reasonably determined to be appropriate by the Reorganized Debtors with the consent of the Required Consenting Lenders.

(c)     *Voting*:   Class 10 is (i) Unimpaired under this Plan if the Intercompany Claims are reinstated or (ii) Impaired under this Plan if the Intercompany Claims are (1) adjusted, (2) cancelled, or (3) otherwise addressed.   Holders of Intercompany Claims are conclusively presumed to have accepted this Plan pursuant to section 1126(f) if the Intercompany Claims are Unimpaired and conclusively deemed to have rejected this Plan

if the Intercompany Claims are Impaired.  In either scenario, such Holders are not entitled to vote to accept or reject this Plan.

11.    Class 11—Intercompany Interests.

(a)    *Classification*:  Class 11 consists of all Intercompany Interests.

(b)    *Treatment*:  On the Effective Date, all Intercompany Interests shall be (i) adjusted, (ii) reinstated, (iii) cancelled, or (iv) otherwise addressed, to the extent reasonably determined to be appropriate by the Reorganized Debtors with the consent of the Required Consenting Lenders.

(c)    *Voting*:  Class 11 is (i) Unimpaired under this Plan if the Intercompany Interests are reinstated or (ii) Impaired under this Plan if the Intercompany Interests are (1) adjusted, (2) cancelled, or (3) otherwise addressed.  Holders of Intercompany Interests are conclusively presumed to have accepted this Plan pursuant to section 1126(f) if the Intercompany Interests are Unimpaired and conclusively deemed to have rejected this Plan if the Intercompany Interests are Impaired.  In either scenario, such Holders are not entitled to vote to accept or reject this Plan.

12.    Class 12—Existing Equity Interests.

(a)    *Classification*:  Class 12 consists of all Allowed Existing Equity Interests.

(b)    *Treatment*:  On the Effective Date, all Existing Equity Interests shall be cancelled, released, extinguished, and discharged, and will be of no further force or effect.  The Holder of Existing Equity Interests shall receive no recovery or distribution on account of the Existing Equity Interests.

(c)    *Voting*:  Class 12 is Impaired under this Plan.  Holders of Existing Equity Interests are conclusively presumed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders of Existing Equity Interests are not entitled to vote to accept or reject this Plan.

13.    Class 13—Section 510(b) Claims.

(a)    *Classification*:  Class 13 consists of all Allowed Section 510(b) Claims.

(b)    *Allowance*:  Notwithstanding anything to the contrary herein, a Section 510(b) Claim, if any such Claim exists, may only become Allowed by Final Order of the Bankruptcy Court.

(c)    *Treatment*:  All Section 510(b) Claims against any applicable Debtor shall be cancelled, released, and extinguished and will be of no further force or effect, and Holders of Section 510(b) Claims shall not receive or retain any distribution, property, or other value on account of such Section 510(b) Claims.

(d)    *Voting*:  Class 13 is Impaired under this Plan.  Holders (if any) of Allowed Section 510(b) Claims are conclusively presumed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Allowed Section 510(b) Claims (if any) are not entitled to vote to accept or reject this Plan.

C.    *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in this Plan, nothing under this Plan or the Plan Supplement shall affect, diminish, or impair the rights of the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable,

with respect to any Unimpaired Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

D.   *Elimination of Vacant Classes.*

Any Class of Claims against or Interests in the Debtors that does not have a Holder of an Allowed Claim or a Claim or Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Confirmation Hearing shall be considered vacant and deemed eliminated from this Plan for purposes of voting to accept or reject this Plan and for purposes of determining acceptance or rejection of this Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

E.   *Voting Classes; Presumed Acceptance by Non-Voting Classes.*

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject this Plan, this Plan shall be presumed accepted by the Holders of such Claims or Interests in such Class.

F.   *Intercompany Interests.*

To the extent Reinstated under this Plan, distributions on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience, and in exchange for the Debtors' agreement under this Plan to make certain distributions to the Holders of the Allowed Claims.  For the avoidance of doubt, to the extent Reinstated pursuant to this Plan, on and after the Effective Date, unless stated otherwise as set forth this Plan, all Intercompany Interests shall be owned by the same Reorganized Debtor or Wind-Down Debtor, as applicable, that corresponds with the Debtor that owned such Intercompany Interests immediately prior to the Effective Date.

G.   *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of this Plan by at least one Impaired Class of Claims.  The Debtors may seek Confirmation of this Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class(es) of Claims or Interests.  Subject to the consent rights set forth in the RSA, the Debtors reserve the right to modify this Plan in accordance with Article X hereof to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired or reclassifying Claims to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

H.   *Subordinated Claims and Interests.*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under this Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, reserve the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination rights relating thereto.

I.   *No Substantive Consolidation.*

Although this Plan is presented as a joint chapter 11 plan for administrative convenience, this Plan does not provide for the substantive consolidation of the Debtors' Estates, and on the Effective Date, the Debtors' Estates shall not be deemed to be substantively consolidated for any reason.  Except as expressly provided herein, nothing in this Plan, the Confirmation Order, or the Disclosure Statement shall constitute or be deemed to constitute a representation that any one or all of the Debtors is subject to or liable for any Claims or Interests against or in any other Debtor.

Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under this Plan on account of any Allowed Claim exceed the amount of the Allowed Claim.

J.     *Controversy Concerning Impairment.*

If a controversy arises as to whether any Claims against or Interests in the Debtors, or any Class of Claims against or Interests in the Debtors, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

## ARTICLE IV
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.     *General Settlement of Claims and Interests.*

Except as otherwise expressly provided in this Plan or the Plan Supplement, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under this Plan, upon the Effective Date, the provisions of this Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, satisfied, or otherwise resolved pursuant to this Plan, including resolutions of intercompany liabilities, allocation of value among the Debtors, and treatment of Holders of General Unsecured Claims against each of the Debtors. This Plan shall be deemed a motion, proposed by the Debtors, to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies, including as pursuant to the UCC Settlement, under Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors, their Estates, and Holders of Claims and Interests. Subject to Article VI hereof, all distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

Certain Claims and Causes of Action may exist between one or more of the Debtors and one or more of its Affiliates, which Claims and Causes of Action may have been settled, and such settlement, if applicable, is reflected in the treatment of the Intercompany Claims and Intercompany Interests.

Each distribution and issuance referred to in Article III of this Plan shall be governed by the terms and conditions set forth herein applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

1.        Cooperation of the Purchaser(s).

The Stalking Horse Purchasers or any other applicable purchaser shall give the Reorganized Debtors (or, if applicable, the Plan Administrator) reasonable access during normal business hours, upon reasonable prior notice, to their books and records to assist with any work reasonably required, including the preparation of any tax returns and providing responses to diligence requests related to the pursuit of any Claims' objections.

B.     *Reorganization Transaction.*

Unless the Debtors consummate an Acceptable Alternative Transaction, the following provisions shall govern:

1.        Sources of Consideration for Plan Distributions.

The Reorganized Debtors shall fund distributions under this Plan, as applicable with: (1) the New Money Investments; (2) Net Sale Proceeds from the sale of the Sale Assets; and (3) Cash on hand.

2.        <u>Issuance and Distribution of New Equity Interests.</u>

In connection with the Restructuring Transactions, the offering, issuance, and distribution of the New Equity Interests by the Reorganized Debtors contemplated by this Plan is hereby authorized without the need for any further corporate action or without any further action by the Holders of Claims or Interests.  The Reorganized Debtors shall, consistent with the Restructuring Transactions Memorandum, be authorized to issue a certain number of shares, units, or other equity interests (as the case may be based on how the New Equity Interests are denominated and the identity of the Reorganized Debtor issuing such shares, units, or equity interests) of New Equity Interests required to be issued under this Plan and pursuant to their New Organizational Documents.  On the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall issue or enter into all securities, notes, instruments, certificates, and other documents required to be issued or entered into pursuant to this Plan.  The New Organizational Documents shall be effective as of the Effective Date and, as of such date, shall be deemed to be valid, binding, and enforceable in accordance with its terms.  All Holders of Allowed Claims entitled to distribution of New Equity Interests hereunder shall be deemed to be a party to, and bound by, the New Organizational Documents, regardless of whether such Holder has executed a signature page thereto.

All of the New Equity Interests (whether denominated as shares, units, or other equity interests) issued or authorized to be issued by the Reorganized Parent pursuant to this Plan shall be duly authorized, validly issued, fully paid, and non-assessable.  Each distribution and issuance referred to in Article IV hereof, and each other issuance of New Equity Interests contemplated by this Plan, shall be governed by the terms and conditions set forth in this Plan applicable to such distribution or issuance and by the terms and conditions of the instruments, agreements, and other documents (including the New Organizational Documents), as applicable, evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.  For the avoidance of doubt, the acceptance of New Equity Interests by any Holder of any Claim or Interest shall be deemed as such Holder's agreement to the applicable New Organizational Documents, as may be amended or modified from time to time following the Effective Date in accordance with the terms thereof.

All New Equity Interests issued by the Reorganized Parent pursuant to this Plan and the Equity Rights Offering Documents (except to the extent described below) will be issued in reliance upon Section 1145 of the Bankruptcy Code to the fullest extent permitted under applicable Law, or, if Section 1145 of the Bankruptcy Code is not applicable, then the New Equity Interests and any other securities issued pursuant to this Plan will be offered, issued, and distributed pursuant to other applicable exemptions from registration under the Securities Act and/or any other applicable securities laws.

In the event the Reorganized Debtors elect, on or after the Effective Date, to reflect any ownership of the New Equity Interests issued pursuant to this Plan through the facilities of the DTC, the Reorganized Debtors need not provide to DTC any further evidence other than this Plan or the Confirmation Order with respect to the treatment of such securities under the applicable securities laws.  Notwithstanding anything to the contrary in this Plan, no Entity, including, for the avoidance of doubt, DTC or any transfer agent, shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by this Plan, including, for the avoidance of doubt, whether the initial sale and delivery by the issuer to the holders of the New Equity Interests are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.  The Confirmation Order shall provide that DTC or any transfer agent shall be required to accept and conclusively rely upon this Plan or the Confirmation Order in lieu of a legal opinion regarding whether the New Equity Interests are exempt from registration and/or eligible for DTC-book-entry delivery, settlement, and depository services.

3.        <u>New Money Investments.</u>

On the Effective Date, the Reorganized Debtors shall consummate (i) the Equity Rights Offering, pursuant to which eligible participants may subscribe to purchase up to $35 million in New Preferred Equity Interests at the Per Unit Preferred Interest Purchase Price and (ii) the Direct Investment Preferred Equity Raise, pursuant to which the Debtors will raise an aggregate amount of (x) $15 million, *plus* (y) an additional amount not to exceed $22.7 million in New Preferred Equity Interests from the Financing Parties at the Per Unit Preferred Interest Purchase Price.

The Debtors shall distribute the Equity Subscription Rights to the Equity Rights Offering Participants as set forth in this Plan, the Backstop Commitment Agreement, and the Equity Rights Offering Procedures, consistent with the Restructuring Transactions Memorandum.  Pursuant to the Equity Rights Offering Procedures, the Equity Rights Offering shall be open to all Holders of Allowed Prepetition Superpriority First Out Claims.  Holders of Allowed Prepetition Superpriority First Out Claims shall be entitled to participate in the Equity Rights Offering up to a maximum amount of each eligible Holder's Pro Rata share of the Aggregate Rights Offering Amount.

In exchange for the Financing Commitment Premium and in accordance with the Backstop Commitment Agreement, the Financing Parties have committed, among other things, to severally, and not jointly, fully backstop the Equity Rights Offering.  Pursuant to the Backstop Commitment Agreement, if after following the procedures set forth in the Equity Rights Offering Procedures, there remain any unexercised Equity Subscription Rights, the Financing Parties shall purchase, severally and not jointly, their applicable portion of the New Preferred Equity Interests associated with such unexercised Equity Subscription Rights in accordance with the terms and conditions set forth in the Backstop Commitment Agreement and the Equity Rights Offering Procedures.

As consideration for the undertakings of the Financing Parties in the Backstop Commitment Agreement, the Financing Commitment Premium shall be paid to the Financing Parties based on their respective commitments under the Backstop Commitment Agreement.  The Financing Commitment Premium shall be fully earned on the date that the Backstop Commitment Agreement becomes effective and due and payable to the Financing Parties upon consummation of the New Money Investments or as soon as reasonably practicable thereafter; *provided*, that if the commitments of the Financing Parties terminate, the Backstop Commitment Agreement is otherwise terminated, or the emergence of the Debtors occurs, in each case prior to issuance of the New Money Investments, then the Financing Commitment Premium shall be fully due and payable in Cash promptly upon such termination (or such emergence date, as applicable) or as soon as reasonably practicable thereafter.

Equity Subscription Rights that an Equity Rights Offering Participant has validly elected to exercise shall be deemed issued and exercised on or about (but in no event after) the Effective Date.  Upon exercise of the Equity Subscription Rights pursuant to the terms of the Backstop Commitment Agreement and/or the Equity Rights Offering Procedures, the Reorganized Debtors shall be authorized to issue the number of New Preferred Equity Interests issuable pursuant to such exercise.

All New Preferred Equity Interests issued upon exercise of the Equity Rights Offering Participants' (including the Financing Parties') own Equity Subscription Rights and in connection with the Financing Commitment Premium will be issued in reliance upon Section 1145 of the Bankruptcy Code to the extent permitted under applicable law.  The New Preferred Equity Interests that are not subscribed for by holders of Equity Subscription Rights in the Equity Rights Offering and that are purchased by the Financing Parties in accordance with their backstop obligations under the Backstop Commitment Agreement will be issued in a private placement exempt from registration under Section 5 of the Securities Act pursuant to Section 4(a)(2) and/or Regulation D and/or Regulation S thereunder and will constitute "restricted securities" for purposes of the Securities Act.  In the Backstop Commitment Agreement, the Financing Parties will be required to make customary representations to the Debtors, including that each is either (x) an "accredited investor" (within the meaning of Rule 501(a) of the Securities Act) or a qualified institutional buyer (as defined under Rule 144A promulgated under the Securities Act) or (y) not a "U.S. Person" as such term is defined in Regulation S and is not acquiring the New Preferred Equity Interests to be issued pursuant to this Plan for the account or benefit of a U.S. Person (as defined in Regulation S).

All New Preferred Equity Interests issued pursuant to the Direct Investment Preferred Equity Raise will be issued in a private placement exempt from registration under section 5 of the Securities Act pursuant to section 4(a)(2) and/or Regulation D and/or Regulation S thereunder and will constitute "restricted securities" for purposes of the Securities Act and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom and subject to the restrictions in the New Organizational Documents.

Entry of the Confirmation Order shall constitute Bankruptcy Court approval of the New Money Investments (including the transactions contemplated thereby, and all actions to be undertaken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith).  On the Effective Date, as provided in the Restructuring Transactions Memorandum, the rights and obligations of the Debtors under the Backstop

Commitment Agreement shall vest in the Reorganized Debtors, as applicable. All New Preferred Equity Interests issued pursuant to the Equity Rights Offering Documents shall be duly authorized, validly issued, and non-assessable.

Each holder of Equity Subscription Rights that receives New Preferred Equity Interests as a result of exercising the relevant Equity Subscription Rights shall be subject to the provisions applicable to such holders of New Preferred Equity Interests as set forth in Article IV.B.2 of this Plan.

The Cash proceeds of the New Money Investments shall be used by the Debtors or Reorganized Debtors, as applicable, to (i) provide the Reorganized Debtors with at least $50 million in balance sheet cash as of the Effective Date, (ii) make distributions pursuant to this Plan, including funding the Cash Out Options, (iii) fund working capital, and (iv) fund general corporate purposes.

        4.    <u>Cash on Hand.</u>

The Debtors or Reorganized Debtors, as applicable, shall use Cash on hand, if any, to fund distributions to certain Holders of Claims. All excess liquidity, except for the Effective Date Minimum Cash Amount, will be distributed in accordance with the Waterfall Recovery.

C.  *Restructuring Transactions.*

On the Effective Date, the applicable Debtors or the Reorganized Debtors shall enter into any transactions and shall take any actions as may be necessary or appropriate to effectuate the Restructuring Transactions, including to establish the Reorganized Debtors and, if applicable, to transfer assets of the Debtors to the Reorganized Debtors or a subsidiary thereof. The applicable Debtor or the Reorganized Debtor will take any actions as may be necessary or advisable to effect a corporate restructuring of the overall corporate structure of the Debtors, in the Restructuring Transactions Memorandum, or in the Definitive Documents, including the issuance of all securities, notes, instruments, certificates, and other documents required to be issued pursuant to this Plan, one or more intercompany mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dissolutions, transfers, liquidations, or other corporate transactions, in each case, subject to the consent of the Required Consenting Lenders.

The actions to implement the Restructuring Transactions and the Restructuring Transactions Memorandum may include, without limitation: (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or reorganization containing terms that are consistent with the terms of this Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable parties may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, duty, debt, or obligation on terms consistent with the terms of this Plan and having other terms for which the applicable parties agree; (3) the filing of the New Organizational Documents and any appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable law; (4) the execution and delivery of the Equity Rights Offering Documents; (5) if applicable, all transactions necessary to provide for the purchase of substantially all of the assets or Interests of any of the Debtors by one or more Entities to be wholly owned by the Reorganized Debtors, which purchase, if applicable, may be structured as a taxable transaction for United States federal income tax purposes; (6) the settlement, reconciliation, repayment, cancellation, discharge, and/or release, as applicable, of Intercompany Claims consistent with this Plan; (7) implementation of the UCC Settlement; and (8) all other actions that the Debtors or the Reorganized Debtors determine to be necessary, including making filings or recordings that may be required by applicable law in connection with this Plan.

For purposes of consummating this Plan and the Restructuring Transactions, none of the transactions contemplated in this Article IV.C shall constitute a change of control under any agreement, contract, or document of the Debtors.

D.   *Corporate Existence.*

Except as otherwise provided in this Plan, the Restructuring Transactions Memorandum, or any agreement, instrument, or other document incorporated in this Plan or the Plan Supplement, on the Effective Date, each Debtor shall have the authority to continue to exist after the Effective Date as a Reorganized Debtor and as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other analogous formation or governing documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation or governing documents) are amended by this Plan or otherwise amended in accordance with applicable law.  To the extent such documents are amended, such documents are deemed to be amended pursuant to this Plan and require no further action or approval (other than any requisite filings required under applicable state, federal, or foreign law).

E.   *Vesting of Assets in the Reorganized Debtors.*

Except as otherwise provided in this Plan or any agreement, instrument, or other document incorporated in this Plan, the Plan Supplement or the Confirmation Order, on the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property (including all interests, rights, and privileges related thereto) in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to this Plan, including Interests held by the Debtors in any Non-Debtor Affiliates, shall vest in the applicable Reorganized Debtor, free and clear of all Liens, Claims, charges, encumbrances, or other interests, unless expressly provided otherwise by this Plan or Confirmation Order, subject to and in accordance with this Plan, including the Restructuring Transactions Memorandum and the UCC Settlement.  On and after the Effective Date, except as otherwise provided in this Plan or the Confirmation Order, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules.  Without limiting the foregoing, the Reorganized Debtors may pay the charges that they incur on or after the Confirmation Date for professional fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.

F.   *Corporate Action.*

On the Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by this Plan shall be deemed authorized and approved in all respects, including, each as applicable:  (1) execution and entry into each of the Equity Rights Offering Documents and consummation of the New Money Investments; (2) approval of and entry into the New Organizational Documents; (3) issuance and distribution of the New Equity Interests, including pursuant to the New Money Investments; (4) selection of the directors and officers for the Reorganized Debtors, in accordance with the Reorganized Governance Term Sheet and New Organizational Documents; (5) implementation of the Restructuring Transactions contemplated by this Plan; (6) adoption or assumption, if and as applicable, of the Employment Obligations; (7) the formation or dissolution of any Entities pursuant to and the implementation of the Restructuring Transactions and performance of all actions and transactions contemplated by this Plan, including the Restructuring Transactions Memorandum; (8) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (9) implementation of the UCC Settlement; and (10) all other actions contemplated by this Plan (whether to occur before, on, or after the Effective Date).  All matters provided for herein involving the corporate structure of the Debtors or the Reorganized Debtors, or any corporate, limited liability company, or related action required by the Debtors or the Reorganized Debtors in connection herewith shall be deemed to have occurred and shall be in effect in accordance with this Plan, including the Restructuring Transactions Memorandum, without any requirement of further action by the shareholders, members, directors, or managers of the Debtors or Reorganized Debtors, and with like effect as though such action had been taken unanimously by the shareholders, members, directors, managers, or officers, as applicable, of the Debtors or Reorganized Debtors.  Before, on, or after the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under this Plan (or necessary or desirable to effect the transactions contemplated under this Plan) in the name of and on behalf of the Reorganized Debtors.  The authorizations and approvals contemplated by this Article IV.F shall be effective notwithstanding any requirements under non-bankruptcy law.

G. *New Organizational Documents.*

On or immediately prior to the Effective Date, the New Organizational Documents shall be automatically deemed to have been adopted by the applicable Reorganized Debtors and become effective.  On or promptly after the Effective Date, to the extent required under this Plan or applicable non-bankruptcy law, the Reorganized Debtors will file their applicable New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in their respective states or jurisdictions of incorporation or formation in accordance with the corporate laws of such respective states or jurisdictions of incorporation or formation.  Pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Organizational Documents will prohibit the issuance of non-voting equity securities of the Reorganized Debtors, as applicable and to the extent required under section 1123(a)(6) of the Bankruptcy Code. Subject to Article IV.N hereof, after the Effective Date, the Reorganized Debtors may amend and restate their respective New Organizational Documents or otherwise restructure their legal Entity forms, without supervision or approval by the Bankruptcy Court and in accordance with applicable non-bankruptcy law.

H. *Directors and Officers of the Reorganized Debtors.*

As of the Effective Date, the term of the current members of the boards of directors of each Debtor shall expire, and the New Boards shall be appointed in accordance with the Reorganized Governance Term Sheet and the New Organizational Documents of each Reorganized Debtor.

Except as otherwise provided in this Plan, the Confirmation Order, the Plan Supplement, or the New Organizational Documents, the officers of the Debtors immediately before the Effective Date, as applicable, shall serve as the initial officers of the Reorganized Debtors on the Effective Date.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose in the Plan Supplement the identity and affiliations of any Person proposed to serve on the New Board, to the extent known at the time of Filing, as well as those Persons that will serve as an officer of the Reorganized Debtors.  To the extent any such director or officer is an "insider" as such term is defined in section 101(31) of the Bankruptcy Code, the nature of any compensation to be paid to such director or officer will also be disclosed. Each such director and officer shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents and may be replaced or removed in accordance with such New Organizational Documents.

I. *Employment Obligations.*

Except as otherwise expressly provided in this Plan or the Plan Supplement, or as otherwise terminated, amended, or superseded by mutual and consensual agreement of the parties to the relevant Executory Contract(s), the Reorganized Debtors shall honor the Employment Obligations (1) existing and effective as of the Petition Date, (2) that were incurred or entered into in the ordinary course of business prior to the Effective Date, or (3) as included on the Schedule of Assumed Executory Contracts and Unexpired Leases, subject to the consent of the Required Consenting Lenders on or prior to the Effective Date, unless such Employment Obligations have been assumed and assigned to the Stalking Horse Purchasers or any other purchaser in connection with the Sale Transactions.

To the extent that any of the Employment Obligations are executory contracts, pursuant to sections 365 and 1123 of the Bankruptcy Code, each of them shall be deemed assumed as of the Effective Date and assigned to the applicable Reorganized Debtor, unless, except to the extent such Employment Obligations are included on the Schedule of Rejected Executory Contracts and Unexpired Leases, subject to the consent of the Required Consenting Lenders, or otherwise rejected.  For the avoidance of doubt, the foregoing shall not (1) limit, diminish, or otherwise alter the Reorganized Debtors' defenses, claims, Causes of Action, or other rights with respect to the Employment Obligations, or (2) impair the rights of the Debtors or Reorganized Debtors, as applicable, to implement the New Management Incentive Plan in accordance with its terms and conditions and to determine the Employment Obligations of the Reorganized Debtors in accordance with their applicable terms and conditions on or after the Effective Date, in each case consistent with this Plan.

J.   *Effectuating Documents; Further Transactions.*

On or after (as applicable) the Effective Date, the Reorganized Debtors, the officers of the Reorganized Debtors, and the members of the New Boards are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of this Plan, the Restructuring Transactions, the New Organizational Documents, the Equity Rights Offering Documents, and the securities issued pursuant to this Plan, including the New Equity Interests, and any and all other agreements, documents, securities, filings, and instruments relating to the foregoing in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents except those expressly required pursuant to this Plan.   The authorizations and approvals contemplated by this Article IV shall be effective notwithstanding any requirements under non-bankruptcy law.

K.   *New Management Incentive Plan.*

Up to 15% of the New Common Equity Interests, on a fully diluted basis, shall be reserved for issuance in connection with the New Management Incentive Plan.   The participants in the New Management Incentive Plan, the allocations and form of the options and other equity-based compensation to such participants (including the amount of the allocations and the timing of the grant of the options and other equity-based compensation), and the terms and conditions of such options and other equity-based compensation (including vesting, exercise prices, base values, hurdles, forfeiture, repurchase rights, and transferability) shall be determined by the New Board.

L.   *Indemnification Provisions.*

On and as of the Effective Date, consistent with applicable Law, the Indemnification Provisions shall be assumed by the Reorganized Debtors and will remain in full force and effect and survive the effectiveness of this Plan unimpaired, in each case, in the form immediately prior to the Effective Date and shall not be limited, reduced, or terminated after the Effective Date (solely as to individuals for whom the Debtors are assuming Indemnifications Obligations pursuant to this Plan); *provided* that, for the avoidance of doubt, no Persons or Entities that are not Released Parties shall be entitled to benefit from such Indemnification Provisions.

M.   *Acceptable Alternative Transaction.*

Solely in the event that the Debtors elect to pursue an Acceptable Alternative Transaction in accordance with the RSA and subject to prior consultation with the Committee, and such Acceptable Alternative Transaction has been approved by the Bankruptcy Court through the Confirmation of an amended Plan reflecting the terms thereof, the following provisions shall govern (in addition to and consistent with those set forth in an amended plan of reorganization); *provided*, that for avoidance of doubt, all rights of the Consenting Lenders set forth in the RSA (including, but not limited to, pursuant to Section 9.04 of the RSA) are fully reserved with respect to any Acceptable Alternative Transaction and nothing herein or in the RSA shall be construed as the consent, acceptance, support, or vote in favor of any Acceptable Alternative Transaction by any lender, and all rights and any objections with respect thereto shall be fully preserved.   The Committee and the Consenting Lenders fully reserve all rights with respect to this Article IV.M and shall not be deemed to have waived any objections or requests for modification with respect hereof.

The abovementioned amended Plan, to the extent applicable, shall account for the Wind-Down of the Debtors' Estates, including, but not limited to, the implementation of the Wind-Down and the related mechanics, the Wind-Down Budget, the Wind-Down Debtors, the dissolution of the Wind-Down Debtors, the Wind-Down Reserve, the Plan Administrator (if applicable), the retention of professionals by the Wind-Down Debtors or Plan Administrator, costs and expenses borne by the Wind-Down Estates, and any and all other related aspects of the Wind-Down and/or Acceptable Alternative Transaction, including with respect to release, exculpation, and injunction

provisions and the vesting of assets free and clear of liens.  In addition to the provisions to be set forth in an amended Plan to the extent the Acceptable Alternative Transaction occurs, the following provisions shall also govern:

      1.      <u>Sources of Consideration for Plan Distributions.</u>

The Wind-Down Debtors will fund distributions under this Plan with (a) Cash on hand on the Effective Date and (b) the revenues and proceeds of all assets of the Debtors, including the Net Sale Proceeds and proceeds from all Causes of Action not expressly waived, relinquished, exculpated, released, compromised, or settled in this Plan or a Final Order, or sold pursuant to any Purchase Agreement, in accordance with section 363 or 1123(b) of the Bankruptcy Code.

      2.      <u>Corporate Existence.</u>

On and after the Effective Date, at least one of the Wind-Down Debtors shall continue in existence for purposes of (a) winding down the Debtors' business and affairs as expeditiously as reasonably possible; (b) resolving Disputed Claims; (c) making distributions on account of Allowed Claims as provided hereunder; (d) enforcing and prosecuting claims, interests, rights, and privileges under the Schedule of Reserved Claims in an efficacious manner and only to the extent the benefits of such enforcement or prosecution are reasonably believed to outweigh the costs associated therewith; (e) filing appropriate tax returns; (f) complying with their continuing obligations under the Purchase Agreement, if any; and (g) administering this Plan in an efficacious manner.  The Wind-Down Debtors shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (a) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court and (b) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Plan Administrator or the Wind-Down Debtors to file motions or substitutions of parties or counsel in each such matter.

      3.      <u>Corporate Action.</u>

Upon the Effective Date, all actions contemplated under this Plan, regardless of whether taken before, on, or after the Effective Date, shall be deemed authorized and approved in all respects, including:  (a) the implementation of the Acceptable Alternative Transaction; (b) closing of the applicable Purchase Agreement and satisfying all other Acceptable Alternative Transaction Documents; and (c) all other actions contemplated under or necessary to implement this Plan (whether to occur before, on, or after the Effective Date).  All matters provided for in this Plan or deemed necessary or desirable by the Debtors before, on, or after the Effective Date involving the corporate structure of the Debtors or the Wind-Down Debtors, and any corporate action required by the Debtors or the Wind-Down Debtors in connection with this Plan or corporate structure of the Debtors or Wind-Down Debtors, shall be deemed to have occurred and shall be in effect on the Effective Date, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors or the Wind-Down Debtors.  Before, on, or after the Effective Date, the appropriate officers of the Debtors or the Wind-Down Debtors, as applicable, shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under this Plan (or necessary or desirable to effect the transactions contemplated under this Plan) in the name of and on behalf of the Wind-Down Debtors.  The authorizations and approvals contemplated by this Article IV.M.3 shall be effective notwithstanding any requirements under non-bankruptcy law.

4.        Vesting of Assets in the Wind-Down Debtors.

Except as otherwise provided in this Plan, the Confirmation Order, the Purchase Agreements, or any agreement, instrument, or other document incorporated herein or therein, or in any agreement, instrument, or other document incorporated in this Plan or the Plan Supplement, on the Effective Date, the assets of the Debtors that are not transferred to any purchaser pursuant to the Purchase Agreements, if any, shall vest in the applicable Wind-Down Debtor free and clear of all Liens, Claims, charges, or other encumbrances, subject to and in accordance with this Plan.  On and after the Effective Date, except as otherwise provided for in this Plan, the DIP Orders, or the Purchase Agreements, the Debtors and the Wind-Down Debtors may, as applicable, operate their business and use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action.

5.        Effectuating Documents; Further Transactions.

Prior to the Effective Date, the Debtors and, on and after the Effective Date, the Wind-Down Debtors, the Plan Administrator, and the officers and members of the Wind-Down Debtors, are authorized to and may issue, execute, deliver, file, or record, to the extent not inconsistent with any provision of this Plan, such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of this Plan, without the need for any approvals, authorizations, notices, or consents, except for those expressly required pursuant to this Plan.

6.        Preservation of Causes of Action.

Unless any Cause of Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in this Plan (including pursuant to Article VIII) or a Final Order (including without limitation Causes of Action against the Released Parties and under the DIP Orders), or sold pursuant to any Purchase Agreement, in accordance with section 363 or 1123(b) of the Bankruptcy Code, the Wind-Down Debtors shall convey to the Plan Administrator all rights to commence, prosecute, or settle, as appropriate, any and all Retained Causes of Action whether arising before or after the Petition Date, which shall vest in the Plan Administrator pursuant to the terms of this Plan.  The Plan Administrator may enforce all rights to commence, prosecute, or settle, as appropriate, any and all such Retained Causes of Action, whether arising before or after the Petition Date, and the Plan Administrator's rights to commence, prosecute, or settle such Retained Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.  The Plan Administrator may, in its reasonable business judgment, pursue such Retained Causes of Action and may retain and compensate professionals in the analysis or pursuit of such Retained Causes of Action to the extent the Plan Administrator deems appropriate, including on a contingency fee basis.  No Entity may rely on the absence of a specific reference in this Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Wind-Down Debtors or the Plan Administrator will not pursue any and all available such Retained Causes of Action against them.  The Wind-Down Debtors and the Plan Administrator expressly reserve all rights to prosecute any and all such Retained Causes of Action against any Entity, except as otherwise expressly provided in this Plan (including pursuant to Article VIII); *provided*, that the Wind-Down Debtors, in consultation with the Plan Administrator after the Effective Date, may prosecute any such Retained Cause of Action against any party only in connection with their objection to and resolution of any Claim asserted by such party.  Unless any such Cause of Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in this Plan (including pursuant to Article VIII) or a Final Order, the Plan Administrator expressly reserves all such Retained Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Retained Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.  The Plan Administrator reserves and shall retain the foregoing Retained Causes of Action notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to this Plan.  The Plan Administrator shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Retained Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to, or action, order, or approval of, the Bankruptcy Court.

For the avoidance of doubt, in no instance will any Cause of Action preserved pursuant to this Article IV.M.6 include any Claim or Cause of Action with respect to, or against, a Released Party.

42

7.      Executory Contracts and Unexpired Leases.

On the Effective Date, except as otherwise provided herein, or in the Acceptable Alternative Transaction Documents, each Executory Contract or Unexpired Lease not assumed shall be deemed rejected as of the Effective Date, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease:  (1) is specifically described in this Plan, the Acceptable Alternative Transaction Documents, or any Purchase Agreement as to be assumed in connection with confirmation of this Plan or a Sale Transaction; (2) is identified on the Schedule of Assumed Executory Contracts and Unexpired Leases, or otherwise is specifically described in this Plan not to be rejected; (3) is the subject of a notice of assumption or motion to assume such Executory Contracts or Unexpired Leases, as applicable, that is pending on the Effective Date, regardless of whether the requested effective date of such assumption is on or after the Effective Date; (4) is to be assumed by the Debtors or assumed by the Debtors and assigned to another third party, as applicable, in connection with any sale transaction or otherwise; or (5) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with this Plan.  In the event of a conflict between this Plan and the Acceptable Alternative Transaction Documents with respect to assumption or rejection of Executory Contracts or Unexpired Leases, the Acceptable Alternative Transaction Documents shall control.  Entry of a Sale Order and/or the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions, assignments, and rejections, including the assumption and assignment of the Executory Contracts or Unexpired Leases as provided in the Acceptable Alternative Transaction Documents and the Plan Supplement, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Unless otherwise indicated, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to this Plan are effective as of the Effective Date, and assumptions or rejections pursuant to the Acceptable Alternative Transaction Documents are effective as of the closing of the Acceptable Alternative Transaction pursuant to the terms of the Acceptable Alternative Transaction Documents.

Any Cure Claims shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of such Cure Claims in Cash on or about the date set forth in this Plan, the closing of the Acceptable Alternative Transaction, the closing of any other applicable Sale Transaction, and subject to the limitations (i) described below, (ii) set forth in the Acceptable Alternative Transaction Documents, (iii) set forth in any other Purchase Agreement, and (iv) as described in Article IV.M.8 herein, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  Any Cure Claim shall be deemed fully satisfied, released, and discharged upon payment thereof by the Debtors, the Wind-Down Debtors, or the applicable purchaser.  The Debtors, prior to the Effective Date, or the Wind-Down Debtors after the Effective Date, as applicable, may settle any Cure Claim on account of any Executory Contract or Unexpired Lease without any further notice to or action, order, or approval of the Bankruptcy Court.

In the event of a dispute regarding (a) the amount of any payments to cure such a default, (b) the ability of the applicable purchaser or any assignee, to provide adequate assurance of future performance (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (c) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving the assumption.

8.      Wind-Down Debtors.

On the Effective Date, the Wind-Down Debtors shall become successors to the Debtors' rights, title, and interests to any Estate assets remaining following the closing of the Acceptable Alternative Transaction and other Sale Transactions, as applicable, which shall vest in the Wind-Down Debtors for the purpose of liquidating the Estates and Consummation of this Plan.  On and after the Effective Date, the Wind-Down Debtors shall continue in existence for purposes of:  (i) winding down the Debtors' business and affairs as expeditiously as reasonably possible in accordance with the Wind-Down Budget; (ii) resolving Disputed Claims; (iii) making distributions on account of Allowed Claims as provided hereunder; (iv) funding distributions in accordance with the Wind-Down Budget; (v) filing appropriate tax returns and regulatory notice; (vi) complying with their continued obligations under this Plan, the Confirmation Order, the Sale Transaction Documentation, and the DIP Orders (if applicable), (vii) performing the Debtors' obligations under any Sale Transactions, including the Stalking Horse Purchase Agreements or any other Purchase

Agreement, as applicable, and any related agreements entered into in connection therewith (to the extent agreed by the Wind-Down Debtors), and (viii) administering this Plan in an efficacious manner.

The Wind-Down Debtors shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (a) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court, (b) the DIP Orders (if applicable), and (c) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Plan Administrator to file motions or substitutions of parties or counsel in each such matter.

N.   *Sale Transactions.*

In any event, the following provisions set forth in Article IV.N–W shall apply:

1.   Enterprise Operations, Lifecycle Engagement, and Student Success Sales.

On or prior to the Effective Date, unless otherwise agreed by the Required Consenting Lenders, the Debtors will have consummated the Sale Transactions to be effectuated pursuant to section 363 of the Bankruptcy Code with respect to the Enterprise Operations Assets, the Lifecycle Engagement Assets, and the Student Success Assets in accordance with the Bidding Procedures.

The Debtors and the Stalking Horse Purchasers or other purchaser(s), as applicable, shall be authorized to take all actions, if any, as may be deemed necessary or appropriate in furtherance of the Sale Transactions pursuant to the terms of the applicable Stalking Horse Purchase Agreement or other Purchase Agreement, as applicable, Sale Order, and Plan.

2.   Assumed Liabilities in Connection with the Sale Transactions.

The Sale Transaction Documentation provides that as part of the Sale Transactions, the Stalking Horse Purchasers or any other purchaser will have assumed certain obligations owed by the Debtors.  Following such assumption by the applicable purchaser, the Stalking Horse Purchasers or other purchaser shall satisfy such obligations in accordance with the Sale Transaction Documentation, and for the avoidance of doubt, any obligations that were assumed by the Stalking Horse Purchasers or any other purchaser shall cease to be Claims against the Debtors following such assumption.

3.   Payments of Cures and Other Amounts.

If not already paid prior to the Effective Date, on the Effective Date, or as soon as reasonably practicable thereafter, the Debtors or Stalking Horse Purchasers, or any other purchaser, as applicable, shall pay all Cures that are required to be paid (if any) pursuant to and in accordance with sections 365 or 1123 of the Bankruptcy Code with respect to any Executory Contracts or Unexpired Leases that are assumed by the Debtors pursuant to this Plan, if any.

O.   *Transition Services Agreement(s).*

The Debtors, the Reorganized Debtors, and the Wind-Down Debtors, as applicable, shall be authorized to implement or otherwise continue adherence with any obligations set forth in the Transition Services Agreement(s) pursuant to each Stalking Horse Purchase Agreement or other Purchase Agreement, as applicable.  The Transition Services Agreement(s) shall help ensure that employees of the Debtors, the Reorganized Debtors, and the Wind-Down Debtors, as applicable, are available to provide transition services to the Stalking Horse Purchasers pursuant to the terms of the applicable Transition Services Agreement.  For the avoidance of doubt, the Reorganized Debtors or the Wind-Down Debtors, as applicable, shall succeed automatically to the rights of the Debtors under the Stalking Horse

Purchase Agreements or other Purchase Agreement(s), as applicable, Transition Services Agreement(s), and other Sale Transaction Documentation.

P.    *Tax Returns.*

Unless otherwise provided for in the Definitive Documents, after the Effective Date, the Plan Administrator or Reorganized Debtors, as applicable, shall complete and file all final or otherwise required federal, state, and local tax returns for each of the Debtors, and, pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

Q.    *Cancellation of Existing Indebtedness and Securities.*

Except as otherwise expressly provided in this Plan, the Confirmation Order, or any agreement, instrument, or other document entered into in connection with or pursuant to this Plan or the Restructuring Transactions, on the Effective Date, (1) all notes, bonds, indentures, certificates, securities, shares, equity securities, purchase rights, options, warrants, convertible securities or instruments, credit agreements, collateral agreements, subordination agreements, intercreditor agreements, or other instruments or documents directly or indirectly evidencing, creating, or relating to any indebtedness or obligations of, or ownership interest in, the Debtors, or giving rise to any Claims against or Interests in the Debtors or to any rights or obligations relating to any Claims against or Interests in the Debtors (except with respect to such agreements, certificates, notes, or other instruments or documents evidencing indebtedness or obligation of or ownership interest in the Debtors that is specifically Reinstated, amended and Reinstated, or entered into pursuant to this Plan), including, without limitation, the Prepetition Credit Agreements, shall be canceled without any need for a Holder to take further action with respect thereto, and the duties and obligations of all parties thereto, including the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, and any Non-Debtor Affiliates, thereunder or in any way related thereto shall be deemed satisfied in full, canceled, released, discharged, and of no force or effect, and the Agents and each of their respective agents, successors and assigns shall be automatically and fully discharged and released from all duties and obligations thereunder and (2) the obligations of the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, pursuant, relating, or pertaining to any agreements, certificates of designation, bylaws, limited liability company agreements, or certificate or articles of incorporation or formation or similar documents governing the notes, bonds, indentures, certificates, securities, shares, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of or Interests in the Debtors (except with respect to such agreements, certificates, notes, or other instruments or documents evidencing indebtedness or obligation of or ownership interest in the Debtors that is specifically Reinstated, amended and Reinstated, or entered into pursuant to this Plan), including, without limitation, the Prepetition Credit Agreements, shall be released and discharged in exchange for the consideration provided hereunder; *provided*, that notwithstanding Confirmation or the occurrence of the Effective Date, any such document or instrument that governs the rights, claims, or remedies of the Holder of a Claim or Interest, shall continue in effect solely for purposes of (a) enabling Holders of Allowed Claims to receive distributions under this Plan as provided herein, and allowing each of the applicable agents and indenture trustees to make or direct the distributions in accordance with this Plan as provided herein, and (b) allowing and preserving the rights of the Agents to (1) compensation, indemnification, expense reimbursement, priority of payment, subrogation, immunity, exculpation, or contribution, or any other claim or entitlement that the Agents may have under the Plan, the Prepetition Credit Agreements, and the Confirmation Order; (2) appear and be heard in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court, including to enforce any obligation under the Plan or the Confirmation Order owed to the Agents or Holders of such Claims; and (3) perform any functions that are necessary to effectuate the foregoing.   Notwithstanding the foregoing or anything to the contrary herein, any rights of the Agents to indemnification and reimbursement or other rights, obligations, immunities, and exculpations under the Prepetition Credit Agreements that would survive the satisfaction and discharge of all other obligations under the applicable Prepetition Credit Agreements shall survive the occurrence of the Effective Date, remain binding and enforceable in accordance with the terms of such documents, and shall not be subject to discharge, impairment, or release under this Plan or the Confirmation Order.   For the avoidance of doubt, notwithstanding anything to the contrary herein, payment of all fees, expenses, and indemnities in favor of the Prepetition Superpriority Agent shall be made by the Debtors on or before the Effective Date (which may occur concurrently with the Effective Date) and such amounts shall be treated as Administrative Expenses under this Plan.   On the Effective Date, each Holder of a certificate or instrument evidencing a Claim that is discharged by this Plan shall be deemed to have surrendered such certificate or instrument

in accordance with the applicable indenture or agreement that governs the rights of such Holder of such Claim.  Such surrendered certificate or instrument shall be deemed canceled as set forth in, and subject to the exceptions set forth in, this Article IV.R.  Notwithstanding anything to the contrary in the foregoing, the outstanding Prepetition Superpriority Letters of Credit and the cash collateral pledged or required to be pledged supporting such Prepetition Superpriority Letters of Credit shall remain in place and not be affected by this Plan.

R.    *Exemption from Securities Laws.*

No registration statement will be filed under the Securities Act, or pursuant to any state securities laws, with respect to the offer and distribution of Securities under this Plan.

1.    <u>Section 1145 Exemption.</u>

Pursuant to Section 1145 of the Bankruptcy Code, the offer, issuance, and distribution under this Plan of (i) the New Common Equity Interests (excluding New Common Equity Interests issued pursuant to the New Management Incentive Plan), (ii) the Equity Subscription Rights to participate in the Equity Rights Offering and the New Preferred Equity Interests issued upon exercise of such Equity Subscription Rights, and (iii) the New Preferred Equity Interests to the Financing Parties on account of the Financing Commitment Premium under the Backstop Commitment Agreement, shall (a) be exempt, without further act or actions by any Entity, from registration under the Securities Act and any other applicable U.S. state or local law requiring registration for the offer or sale of a security or registration or licensing of an issuer of, underwriter of, or broker or dealer in, a security to the fullest extent permitted by Section 1145 of the Bankruptcy Code, and (b) (i) not be "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (ii) be freely tradable and transferable by any initial recipient thereof that (w) is not an "affiliate" of the Reorganized Debtors as defined in Rule 144(a)(1) under the Securities Act, (x) has not been such an "affiliate" within ninety (90) calendar days of such transfer, (y) has not acquired such securities from an "affiliate" in a transaction or chain of transactions not involving any public offering within one year of the time of transfer, and (z) is not an entity that is an "underwriter" as defined in subsection (b) of Section 1145 of the Bankruptcy Code, subject to the restrictions in the New Organizational Documents, to the extent applicable.

2.    <u>Section 4(a)(2) of the Securities Act.</u>

To the extent that Section 1145 of the Bankruptcy Code is inapplicable, the offering, issuance, and distribution of (i) the Direct Investment Preferred Equity Raise and (ii) any unexercised Equity Subscription Rights to the Financing Parties in accordance with the Backstop Commitment Agreement, including the New Preferred Equity Interests issued upon the exercise of any such Equity Subscription Rights, shall be exempt (including with respect to an entity that is an "underwriter" as defined in subsection (b) of Section 1145 of the Bankruptcy Code) from registration under the Securities Act pursuant to Section 4(a)(2) thereof and/or Regulation D and/or Regulation S thereunder.  Therefore, such securities will be "restricted securities" subject to resale restrictions and may be resold, exchanged, assigned, or otherwise transferred only pursuant to registration or an applicable exemption from registration under the Securities Act and other applicable law.  In that regard, each recipient will be required to make, and each of the Financing Parties has made, customary representations to the Debtors, including that each is either (x) an "accredited investor" (within the meaning of Rule 501(a) of the Securities Act) or a qualified institutional buyer (as defined under Rule 144A promulgated under the Securities Act) or (y) not a "U.S. Person" as such term is defined in Regulation S and is not acquiring the New Preferred Equity Interests to be issued pursuant to this Plan for the account or benefit of a U.S. Person.

S.    *Section 1146 Exemption.*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any exchanges or transfers (whether from a Debtor to a Reorganized Debtor or Wind-Down Debtor, as applicable, or to any other Entity) of property under this Plan or pursuant to:  (i) the issuance, distribution, transfer, or exchange of any debt, equity security, property, or other Interest in the Debtors; (ii) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, Lien, or other security interest, or the securing of additional indebtedness by such or other means; (iii) the making, assignment, or recording of any lease or sublease; (iv) any Restructuring Transaction or assignments executed in connection with any Restructuring Transaction, (v) any grant of Collateral, or (vi) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in

connection with, this Plan (including in connection with any Acceptable Alternative Transaction) or the Confirmation Order, including any deeds, bills of sale, merger agreements, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to this Plan or the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate or bulk transfer tax, personal property tax, sales or use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate federal, state, or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forgo the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

T.   *Insurance Policies.*

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, shall be treated as Executory Contracts hereunder.  Unless otherwise provided in this Plan, on the Effective Date, the Debtors shall be deemed to have assumed or assumed and assigned to the Stalking Horse Purchasers or any other purchaser, solely to the extent set forth in the Stalking Horse Purchase Agreements or any other Purchase Agreement, as applicable, and as may be explicitly provided in the Schedule of Assumed Executory Contracts and Unexpired Leases, all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims; *provided*, that any insurance policies that are not assumed and assigned to the Stalking Horse Purchasers or other purchaser shall be assumed by the Debtors for the sole purpose of resolving any Claims covered by such insurance policies, resolving any Causes of Action retained in connection with such insurance policies, and collecting any and all outstanding deposits, restricted cash, and letters of credit related thereto (if any).

Nothing in this Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any other Final Order (including any other provision that purports to be preemptory or supervening), (1) alters, modifies, or otherwise amends the terms and conditions of (or the coverage provided by) any of such insurance policies or (2) alters or modifies the duty, if any, that the insurers or third-party administrators have to pay claims covered by such insurance policies and their right to seek payment or reimbursement from the Debtors (or the Stalking Horse Purchaser or any other purchaser, as applicable, solely to the extent assumed and assigned to such Stalking Horse Purchaser or other purchaser under the relevant Stalking Horse Purchase Agreement or other Purchase Agreement, as applicable) or draw on any Collateral or security therefor.

U.   *Director and Officer Liability Insurance.*

Notwithstanding anything in this Plan to the contrary, the Reorganized Debtors or Wind-Down Debtors, as applicable, shall be deemed to have assumed, without further notice to or action, order or approval of the Bankruptcy Court, all of the Debtors' D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code as of the Effective Date.  To the extent required, entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' or Wind-Down Debtors', as applicable, assumption of all such D&O Liability Insurance Policies, and all D&O Liability Insurance Policies and obligations thereunder shall remain in full force and effect in accordance with their terms.  For the avoidance of doubt, the Reorganized Debtors or Wind-Down Debtors, as applicable shall not have any obligation to pay any deductible, retention, or any other cost or expense under, arising from, or related to, the D&O Liability Insurance Policies in connection with any such policy or claim made thereunder. Notwithstanding anything to the contrary contained in this Plan, Confirmation of this Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of insurance policies and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Reorganized Debtors under this Plan as to which no Proof of Claim need be filed, and shall survive the Effective Date.

None of the Debtors, Reorganized Debtors, or Wind-Down Debtors, as applicable, shall, before and following the Effective Date, terminate or reduce the coverage under any D&O Liability Insurance Policies  (including, without limitation, any "tail policy" or agreements, documents or instruments related thereto) in effect prior to the Effective

Date, and any current and former directors, officers, managers and employees of the Debtors who served in such capacity at any time before or after the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such directors, officers, managers, or employees remain in such positions after the Effective Date; *provided*, that the foregoing shall not limit the Debtors' ability to utilize the D&O Liability Insurance Policies prior to the Effective Date.  For the avoidance of doubt, nothing in this Article IV.U shall create any new or additional obligation of any Debtor or Reorganized Debtor to indemnify, hold harmless, or create any other similar obligation, with respect to any Person or Entity.

For the avoidance of doubt, if the Sale Transactions are consummated, no such obligations shall be enforceable against the Stalking Horse Purchaser or other purchaser or any of its affiliates, unless stated otherwise in the applicable Stalking Horse Purchase Agreement or other Purchase Agreement, as applicable.

V.  *Preservation of Causes of Action.*

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII hereof, any applicable Final Order, and any applicable Sale Transaction Documentation, each Reorganized Debtor or Wind-Down Debtor, as applicable, shall retain and may enforce, all rights to commence and pursue as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any action specifically enumerated in the Schedule of Retained Causes of Action or the Schedule of Reserved Claims, and the Reorganized Debtors' or Wind-Down Debtors', as applicable, rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than those Causes of Action released by the Debtors pursuant to the releases and exculpations contained in this Plan, including Article VIII hereof, pursuant to a Final Order, or as assigned and transferred pursuant to any applicable Sale Transaction Documentation, which, in each case, shall be deemed released and waived by the Debtors as of the Effective Date.  For the avoidance of doubt, the Reorganized Debtors or Wind-Down Debtors, as applicable, will retain the right to enforce the terms of the Sale Transaction Documentation.  Any retained Causes of Action shall remain with the Debtors and shall vest with the Reorganized Debtors or the Wind-Down Debtors, as applicable, as of the Effective Date.  For the avoidance of doubt, the Retained Causes of Action shall not include the UCC Settlement Avoidance Actions and shall include the GUC Specified Litigation Claims.

The Reorganized Debtors or the Wind-Down Debtors, as applicable, may pursue any Retained Causes of Action.  **No Entity (other than the Released Parties) may rely on the absence of a specific reference in this Plan or the Disclosure Statement to any Retained Causes of Action against it as any indication that the Debtors will not pursue any and all available Causes of Action of the Debtors against it.  Except as specifically released under this Plan or pursuant to a Final Order or as assigned or transferred pursuant to any Sale Transaction Documentation, the Debtors expressly reserve all rights to prosecute any and all Retained Causes of Action against any Entity.**  Unless otherwise agreed upon in writing by the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, all objections to the Schedule of Retained Causes of Action or the Schedule of Reserved Claims must be Filed with the Bankruptcy Court within the 30-day period following the Effective Date.  Any such objection that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion against any Reorganized Debtor, or Wind-Down Debtor, as applicable, without the need for any objection or responsive pleading by a representative of any Reorganized Debtor or Wind-Down Debtor, as applicable, or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.  The Reorganized Debtor or Wind-Down Debtor, as applicable, may settle any such objection without further notice or action, order, or approval of the Bankruptcy Court.  If there is any dispute regarding the inclusion of any Causes of Action on the Schedule of Retained Causes of Action or the Schedule of Reserved Claims that remains unresolved by the Reorganized Debtors or the Wind-Down Debtors, as applicable, and the objecting party for 30 days, such objection shall be resolved by the Bankruptcy Court.  Unless any Causes of Action of the Debtors against an Entity are expressly waived, transferred, relinquished, exculpated, released, compromised, or settled in this Plan or a Final Order, or any applicable Sale Transaction Documentation, the Reorganized Debtors or the Wind-Down Debtors, as applicable, expressly reserve all Causes of Action, for later adjudication, and therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors or the Wind-Down Debtors, as applicable, reserve and shall retain such Retained Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contracts or Unexpired

Leases during the Chapter 11 Cases or pursuant to this Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, and except as expressly waived, relinquished, exculpated, released, compromised, or settled in this Plan or pursuant to Final Order, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors or the Wind-Down Debtors, as applicable, except as otherwise expressly provide in this Plan, including Article VIII hereof. The applicable Reorganized Debtors or Wind-Down Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors or Wind-Down Debtors, as applicable, shall have the right and authority to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgement any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

W.  *Dissolution of the Committee.*

On the Effective Date, the Committee and any other statutory committee formed in connection with the Chapter 11 Cases shall dissolve automatically and all members thereof shall be released and discharged from all rights, duties, and responsibilities arising from, or related to, the Chapter 11 Cases. After the Effective Date, the Committee may continue in existence for the sole purposes of (a) Filing and prosecuting applications for the payment of fees and the reimbursement of expenses incurred by the Committee or its Professionals; and (b) in the event that the Bankruptcy Court's entry of the Confirmation Order is appealed, participating in such appeal.

Upon the dissolution of the Committee (if applicable), the members of the Committee and their respective Professionals will cease to have any duty, obligation, or role arising from or related to the Debtors' Chapter 11 Cases and shall be released and discharged from all rights and duties from or related to the Debtors' Chapter 11 Cases. The Reorganized Debtors or Wind-Down Debtors, as applicable, shall not be responsible for paying any fees or expenses incurred by the members of or advisors to any statutory committee (including the Committee, as applicable) after the Effective Date, except with respect to the certain and limited purposes of the Committee's survival subsequent to the Effective Date, including clauses (a) and (b) of the first paragraph of this Article IV.W.

X.  *UCC Settlement.*

Following extensive, good-faith and arm's-length negotiations during the pendency of the Chapter 11 Cases, on January [20], 2026, the Settling Parties agreed to the UCC Settlement, a comprehensive, global settlement pursuant to Rule 9019 of the Bankruptcy Rules. The terms of the UCC Settlement, as described herein, constitute an integral part of the Plan and shall be approved by the Bankruptcy Court and implemented through the Plan. Except as otherwise expressly set forth herein or in the Confirmation Order, subject to the occurrence of the Effective Date during which time the Committee's Challenge deadline will have expired, the UCC Settlement constitutes a settlement of all potential issues, disputes, Causes of Action, and Claims arising between and among the Settling Parties (including, without limitation, all rights of the Committee to pursue or assert (or seek derivative standing to pursue or assert) a Challenge (as defined in the Final DIP Order) or any other Cause of Action assertable by the Committee, it being understood that, as of the date of filing of this second amended Plan, the Challenge rights of all parties in interest other than the Committee have become time barred).

To facilitate the UCC Settlement, it is agreed that certain assets constituting "Shared Collateral" (subject to, and as defined in, each of the Prepetition Pari First Lien Intercreditor Agreement and Prepetition First Lien/Second Lien Intercreditor Agreement) and proceeds thereof, and subject to the liens securing the DIP Claims, shall be made available for the funding of the GUC Recovery Pool, it being understood that, but for the use of such assets to pay Allowed General Unsecured Claims and Allowed Convenience Class Claims in accordance with this Plan, and to the extent such assets are distributed to the Holders of any Claims under the Prepetition Credit Agreements, the waterfall and turnover provisions set forth in such intercreditor agreements would apply to the receipt of such Shared Collateral (or proceeds thereof) during these Chapter 11 Cases.

The principal terms of the UCC Settlement are reflected in this Article IV.X and are incorporated into the Plan as further set forth herein.

1.      GUC Recovery Pool.

On the Effective Date, or as soon as reasonably practicable thereafter, the Debtors and/or Reorganized Debtors, as applicable, shall vest the GUC Recovery Pool with: (i) the GUC Cash Consideration and (ii) entitlement to receive the GUC Litigation Participation Amount.  The GUC Recovery Pool shall exclusively fund (x) distributions on account of such Allowed General Unsecured Claims and Convenience Class Claims in accordance with Article III.B.8–9 herein and (y) fees, costs, and expenses (if any) of the UCC Monitor.  For the avoidance of doubt, the aggregate consideration paid on account of all Allowed Convenience Class Claims, when taken together with any amount of the GUC Recovery Pool distributed to Holders of General Unsecured Claims or paid in connection with the UCC Monitor, shall not exceed the total amount of the GUC Recovery Pool.

2.      UCC Settlement Avoidance Actions.

On the Effective Date, all UCC Settlement Avoidance Actions shall be waived and/or released, as further set forth in Article VIII.D.

3.      Excluded Claims from General Unsecured Claims and Convenience Class Claims.

It is understood that, as a material component of the UCC Settlement, the Allowed General Unsecured Claims and Allowed Convenience Class Claims shall not include (i) Claims of Governmental Entities entitled to priority treatment under section 507(a) of the Bankruptcy Code, (ii) Claims held by Holders of prepetition equity Securities or other Interests in the Company, including the Consenting Sponsor,[3] (iii) Claims of Company "insiders" for indemnification or similar relief, or (iv) for the avoidance of doubt, Claims of Holders of Allowed Intercompany Claims or Intercompany Interests.

4.      Releases.

The Committee and each of its members, solely in their capacity as such, shall be Released Parties, Releasing Parties, and Exculpated Parties under the Plan.  Among other parties, the Settling Parties have agreed, following arm's-length and good faith negotiations, to the releases, injunction provisions, and exculpation provisions set forth in Article VIII.D–G herein.

5.      Committee Obligations; Standstill.

From the filing of this second amended Plan and for so long as the UCC Settlement is being actively pursued by the Settling Parties or otherwise remains in effect, the Committee agrees to:  (i) forgo pursuing, or seeking standing to pursue, any Claims and/or Causes of Action related to the Debtors and/or Reorganized Debtors and these Chapter 11 Cases, including any and all Claims and/or Causes of Action against the Debtors and/or Reorganized Debtors, as applicable, and otherwise not initiate, continue, join, or seek standing to pursue any litigation or investigation in connection with these Chapter 11 Cases except with the consent of the Debtors and the Ad Hoc Group; (ii) support Confirmation of the Plan, including the releases set forth herein, and encourage Holders of General Unsecured Claims and Convenience Class Claims to vote in favor of the Plan; and (iii) limit all work and incurrence of the Committee's Professional Fees Claims following January [20], 2026, to (a) only such work and Claims necessary to effectuate the terms of the UCC Settlement and fulfill the duties of the Committee pursuant to the Bankruptcy Code and (b) such other work and Claims in accordance with Article IV.W hereof.  The UCC Settlement resolves any and all Challenges and any other Claims, Causes of Action, and/or related rights otherwise held or that may be pursued or asserted (including on a derivative basis) by the Committee or the members thereof in connection with the Chapter 11 Cases in the Bankruptcy Court or any non-bankruptcy forum.

---

[3]      Subject to discussions with the Consenting Sponsor and Settling Parties.

6.      UCC Monitor.

The Committee may, in its discretion, appoint a representative (the "UCC Monitor") to, following the Effective Date, monitor (i) the Debtors' and/or Reorganized Debtors' reconciliation process with respect to General Unsecured Claims and Convenience Class Claims, as applicable and (ii) the settlement and prosecution of the GUC Specified Litigation Claims, and the Reorganized Debtors shall consult with the UCC Monitor with respect to such matters upon the UCC Monitor's reasonable request; *provided* that (x) none of the Debtors, their Estates, or the Reorganized Debtors shall be financially responsible for paying the fees, costs, or expenses of the UCC Monitor (and any such fees, costs, or expenses shall be payable from and limited by the GUC Recovery Pool) and (y) no Professional shall be entitled to any Professional Fee Claim for any such post-Effective Date monitoring activities.  For the avoidance of doubt, the Reorganized Debtors shall retain exclusive control of the Claims reconciliation process and the settlement and prosecution of the GUC Specified Litigation Claims, and nothing herein shall be construed to imply for the Committee or the UCC Monitor a consent right or entitlement to any specific outcome with respect to such matters.

## ARTICLE V
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

The following provisions apply to Executory Contracts and Unexpired Leases related to the Remaining Assets or otherwise not assumed and assigned in connection to a purchaser in connection with a Sale Transaction. Executory Contracts and Unexpired Leases that are or may be assumed and assigned in connection with a Sale Transaction shall be assumed and assigned in accordance with the procedures for assumption of Executory Contracts and Unexpired Leases set forth in the Bidding Procedures or relevant Purchase Agreements.

A.   *Assumption and Rejection of Executory Contracts and Unexpired Leases.*

Except in the event of an Acceptable Alternative Transaction or as otherwise provided herein, all Executory Contracts or Unexpired Leases will be deemed assumed as of the Effective Date, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those Executory Contracts or Unexpired Leases that: (1) previously were assumed or rejected by the Debtors; (2) are identified on the Schedule of Rejected Executory Contracts and Unexpired Leases; or (3) are the subject of a motion to reject such Executory Contracts or Unexpired Leases, as applicable, that is pending on the Effective Date, regardless of whether the requested effective date of such rejection is on or after the Effective Date.  The assumption or rejection of all Executory Contracts and Unexpired Leases not already assumed and assigned to a third party in the Chapter 11 Cases or in this Plan shall be determined by the Debtors, with the consent of the Required Consenting Lenders.  Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions, assumptions and assignments, and rejections of the Executory Contracts or Unexpired Leases as set forth in the Plan, the Schedule of Rejected Executory Contracts and Unexpired Leases, and/or the Schedule of Assumed Executory Contracts and Unexpired Leases, as applicable, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Any motions to reject Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order.  Each Executory Contract and Unexpired Lease assumed pursuant to this Article V.A or by any order of the Bankruptcy Court, which has not been assigned to a third party prior to the Confirmation Date or such later date as provided in this Article V.A, shall revest in and be fully enforceable by the Debtors or the Reorganized Debtors, as applicable, in accordance with such Executory Contract and/or Unexpired Lease's terms, except as such terms are modified by the provisions of this Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law.

To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to this Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease (including, without limitation, any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by this Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.  Notwithstanding anything to the contrary in this Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Schedule of Assumed Executory Contracts and Unexpired Leases and the Schedule of Rejected Executory Contracts and Unexpired Leases, as applicable, including by way of adding or removing a particular Executory

Contract or Unexpired Lease from the Schedule of Assumed Executory Contracts and Unexpired Leases and/or the Schedule of Rejected Executory Contracts and Unexpired Leases, at any time through and including 60 Business Days after the Effective Date, in each case, in a manner consistent with the consent rights set forth herein.

In the event of an Acceptable Alternative Transaction, all Executory Contracts and Unexpired Leases not already assumed and assigned to a third party shall be assumed, assumed and assigned, or rejected in accordance with Article IV of this Plan.

B.   *Claims Based on Rejection of Executory Contracts or Unexpired Leases.*

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the rejection, if any, of any Executory Contracts or Unexpired Leases as provided for in this Plan or the Schedule of Rejected Executory Contracts and Unexpired Leases that have not otherwise been previously assumed or rejected and will not be otherwise assumed in connection with the Plan.  Unless otherwise provided by a Final Order of the Bankruptcy Court, any Proof of Claim based on the rejection of the Debtors' Executory Contracts or Unexpired Leases, pursuant to this Plan or otherwise, must be Filed with the Bankruptcy Court and served on the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, within 30 days after the later of (i) entry of an order approving the rejection of any Executory Contract or Unexpired Lease of the Debtors, (ii) the effective date of such rejection, or (iii) the Effective Date.

Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Debtors' Estates, the Reorganized Debtors, the Wind-Down Debtors, or the property of the foregoing without the need for any objection by the Debtors, the Reorganized Debtors, the Wind-Down Debtors, or the Plan Administrator, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully compromised, settled, discharged, and released, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.  All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III.B.8 of this Plan.  For the avoidance of doubt, nothing provided herein shall extend any previously established deadline to File a Claim arising from the rejection of an Executory Contract or Unexpired Lease previously rejected by the Debtors.

C.   *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.*

Any monetary defaults under an Executory Contract or Unexpired Lease to be assumed by the Debtors as set forth in Article V.A herein and as reflected on the Cure Notice, shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of such Cures in Cash on the Effective Date, or as soon as reasonably practicable thereafter, subject to the limitations described below and set forth in Article V.C herein, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  For the avoidance of doubt, any payment of Cure Claims, directly or indirectly, by the Stalking Horse Purchasers, Debtors, or other purchaser in connection with Executory Contracts and Unexpired Leases assumed and assigned pursuant to the Stalking Horse Purchase Agreement or other Purchase Agreement, as applicable, shall be satisfied in full by the Stalking Horse Purchasers, Debtors, or other purchaser in accordance with the terms of the Stalking Horse Purchase Agreement or other Purchase Agreement, as applicable, and the applicable Sale Order.

Assumption (or assumption and assignment) of any Executory Contract or Unexpired Lease pursuant to this Plan, Purchase Agreements, or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed (or assumed and assigned) Executory Contract or Unexpired Lease at any time before the date that the Debtors assume such Executory Contract or Unexpired Lease.  All liabilities reflected in the Schedules and any Proof of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed and Cured in full shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court; *provided*, that nothing herein shall prevent the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, from paying any Cure costs despite the failure of the relevant counterparty to File such request for payment of such Cure costs.  To the extent that (i) the Debtors, Reorganized Debtors, or Wind-Down Debtors, as applicable, do not list any Cure amount

associated with an Executory Contract or Unexpired Lease to be assumed and (ii) the counterparty to such Executory Contract or Unexpired Lease does not timely object to the Cure amount being $0.00, then such Cure Claim shall be $0.00 as of the Effective Date.

If there is any dispute regarding any Cure Claims, the ability of the Debtors, the Reorganized Debtors, the Wind-Down Debtors, or any other assignee, as applicable, to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption or assumption and assignment, then, to the extent consistent with the applicable Cure Notice, payment of any Cure Claims shall (a) be subject to the consent of the Required Consenting Lenders only when such amount exceeds $50,000 or the aggregate amount of applicable Cure Claims paid in accordance with this paragraph exceeds $1 million and (b) occur as soon as reasonably practicable after (x) entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment) or (y) as may be agreed upon by the Debtors, the Wind-Down Debtors, or the Stalking Horse Purchaser or any other purchaser, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.

The Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, reserve the right at any time to move to reject any Executory Contract or Unexpired Lease based upon the existence of any such unresolved Cure dispute. If the Bankruptcy Court determines that the Allowed Cure Claim with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the applicable Cure Notice, the Debtors, the Reorganized Debtors, or Wind-Down Debtors, as applicable, may add such Executory Contract or Unexpired Lease to the Schedule of Rejected Executory Contracts and Unexpired Leases, in which case such Executory Contract or Unexpired Lease will be deemed rejected as the Effective Date.

Unless otherwise agreed in writing by the parties to the applicable Executory Contract or Unexpired Lease, any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related Cure Claim made in accordance with this Plan must be Filed, served, and actually received by counsel to the Debtors no later than the Cure/Assumption Objection Deadline. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption or assumption and assignment, as applicable, made in accordance with this Plan of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption or assumption and assignment and any untimely request for an additional or different Cure Claim shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any of the Debtors without the need for any objection by the applicable Reorganized Debtors, Wind-Down Debtors, or any other party in interest, or any further notice to or action, order, or approval of the Bankruptcy Court. The Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, may reconcile and settle in the ordinary course of the Debtors' business any dispute (following a timely filed objection) regarding any Cure or any other matter pertaining to assumption without any further notice to or action, order, or approval of the Bankruptcy Court.

The assumption of any Executory Contract or Unexpired Lease pursuant to this Plan or otherwise shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary defaults, including defaults of provisions restricting the change in control or ownership interest composition or any bankruptcy-related defaults, arising at any time prior to the effective date of assumption. **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, shall be deemed disallowed and expunged as of the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such assumption, (2) the effective date of such assumption, or (3) the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.**

D.    *Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases.*

Rejection of any Executory Contract or Unexpired Lease pursuant to this Plan, in connection with the Sale Transactions, or otherwise, shall not constitute a termination of preexisting obligations owed to the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, under such Executory Contract or Unexpired Leases. In particular, notwithstanding any non-bankruptcy law to the contrary, the Reorganized Debtors or the Wind-Down Debtors, as applicable, and the Plan Administrator, as applicable, expressly reserve and do not waive the right to receive, nor any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations

with respect to goods previously purchased by the Debtors pursuant to rejected Executory Contracts or Unexpired Leases.

E. *Modifications, Amendments, Supplements, Restatements, or Other Agreements.*

Unless otherwise provided in this Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under this Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith, absent a Final Order of the Bankruptcy Court to the contrary.

F. *Reservation of Rights.*

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Assumed Executory Contracts and Unexpired Leases, nor anything contained in this Plan or Purchase Agreements, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor, Reorganized Debtor, or Wind-Down Debtor, as applicable, has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, unless otherwise stated in this Plan, the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, or the Plan Administrator shall have 90 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

G. *Nonoccurrence of Effective Date.*

If the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

## ARTICLE VI
## PROVISIONS GOVERNING DISTRIBUTIONS

A. *Distributions on Account of Claims Allowed as of the Effective Date.*

Except as otherwise provided in this Plan, in a Final Order, or as otherwise agreed to by the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, and the Holder of the applicable Allowed Claim on the Effective Date, the Reorganized Debtors or the Wind-Down Debtors, as applicable, shall make initial distributions under this Plan on account of Claims Allowed as of the Effective Date, subject to the Reorganized Debtors' or the Wind-Down Debtors', as applicable, right to object to Claims; *provided*, that (i) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practices, (ii) Allowed Priority Tax Claims shall be paid in accordance with Article II.D of this Plan, and (iii) Allowed Other Priority Claims and Allowed Other Secured Claims shall be paid in accordance with Article III.B of this Plan. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, and the Holder of such Claim or as may be due and payable under applicable non-bankruptcy Law or in the ordinary course of business.

In the event that any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII hereof. Except as otherwise provided in this Plan, Holders of Allowed Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in this Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

B. *Disbursing Agent.*

All distributions under this Plan shall be made by the Disbursing Agent. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. Additionally, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors or the Wind-Down Debtors, as applicable.

C. *Rights and Powers of the Disbursing Agent.*

1. <u>Powers of the Debtors and the Disbursing Agent.</u>

The Disbursing Agent shall be empowered to: (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under this Plan; (ii) make all distributions contemplated hereby; (iii) employ professionals to represent it with respect to its responsibilities; and (iv) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to this Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

2. <u>Expenses Incurred on or After the Effective Date.</u>

Except as otherwise ordered by the Bankruptcy Court, the reasonable and documented fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes other than taxes imposed with respect to income) and any reasonable compensation and expense reimbursement Claims (including reasonable attorney fees and expenses) made by the Disbursing Agent, in each case directly related to distributions under this Plan, shall be paid in Cash by the Reorganized Debtors or Wind-Down Debtors, as applicable, in the ordinary course of business. In the event that the Reorganized Debtors or Wind-Down Debtors, as applicable, object to all or any portion of the amounts requested to be reimbursed in a Disbursing Agent's invoice, the Reorganized Debtors or Wind-Down Debtors, as applicable, and such Disbursing Agent shall endeavor, in good faith, to reach mutual agreement on the amount of the appropriate payment of such disputed fees and/or expenses. In the event that the Reorganized Debtors or Wind-Down Debtors, as applicable, and the Disbursing Agent are unable to resolve any differences regarding

disputed fees or expenses, either party shall be authorized to move to have such dispute heard by the Bankruptcy Court.

D.   *Delivery of Distributions and Undeliverable or Unclaimed Distributions.*

1.    Record Date for Distribution.

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date.  If a Claim is transferred 20 or fewer days before the Distribution Record Date, the Disbursing Agent shall make distributions to the transferee only to the extent practical and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

2.    Delivery of Distributions in General.

Except as otherwise provided herein, the Disbursing Agent shall make distributions to Holders of Allowed Claims and Allowed Interests (as applicable) as of the Distribution Record Date, or if applicable, to such Holder's designee (to the extent prohibited under applicable Securities Laws), as appropriate (a) at the address for each such Holder as indicated on the Debtors' records as of the Distribution Record Date (or of a designee designated by the applicable Holder); (b) to the signatory set forth on any Proof of Claim or Proof of Interest Filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim or Proof of Interest is Filed or if the Debtors have not been notified in writing of a change of address); (c) at the addresses set forth in any written notices of address changes delivered to the Reorganized Debtors or Wind-Down Debtors, as applicable, or the applicable Disbursing Agent, as appropriate, after the date of any related Proof of Claim or Proof of Interest; or (d) on any counsel that has appeared in the Chapter 11 Cases on the Holder's behalf; *provided*, that the manner of such distributions shall be determined at the discretion of the Reorganized Debtors or Wind-Down Debtors, as applicable.

In the event that the Prepetition Superpriority Agent acts as a Disbursing Agent, the Prepetition Superpriority Agent shall not have any liability to any Entity with respect to distributions made or directed to be made thereby or with respect to actions taken in furtherance of such distributions.

3.    Minimum Distributions.

Notwithstanding any other provision of this Plan, neither the Reorganized Debtors, the Wind-Down Debtors, nor the Disbursing Agent, as applicable, shall have any obligation to make distributions of Cash less than $100 in value, and such Claim to which this limitation applies shall be settled, enjoined, and its Holder forever barred, pursuant to Article VI herein, from asserting Claims against the Debtors, the Reorganized Debtors, the Wind-Down Debtors, or their property.

4.    Undeliverable Distributions and Unclaimed Property.

If any distribution to any Holder of Allowed Claims or Allowed Interests (as applicable) is returned as undeliverable, no further distribution to such Holder shall be made unless and until the Disbursing Agent is notified in writing of such Holder's then-current address or other necessary information for delivery, at which time all currently due missed distributions shall be made to such Holder on the next distribution date without interest; *provided*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of 6 months from the date the distribution is first attempted to be made.  After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors or the Wind-Down Debtors, as applicable, automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat or unclaimed property Laws to the contrary), and the Claim or Interest of any Holder to such property or Interest in property shall be released, settled, compromised, and forever barred.

5.    Surrender of Cancelled Instruments or Securities.

On the Effective Date or as soon as reasonably practicable thereafter, each Holder of a certificate or instrument evidencing a Claim or an Interest that has been cancelled in accordance with Article IV.R hereof shall be deemed to have surrendered such certificate or instrument to the Disbursing Agent.  Such surrendered certificate or instrument shall be cancelled solely with respect to the Debtors, and such cancellation shall not alter the obligations or rights of any non-Debtor with third parties vis-à-vis one another with respect to such certificate or instrument, including with respect to any indenture or agreement that governs the rights of the Holder of a Claim or Interest, which shall continue in effect for purposes of allowing Holders to receive distributions under this Plan, charging Liens, priority of payment, and indemnification rights.  Notwithstanding anything to the contrary herein, this paragraph shall not apply to certificates or instruments evidencing Claims that are Unimpaired or Reinstated under this Plan.

6.   Manner of Payment Pursuant to this Plan.

All distributions of Distributable Cash to Holders of the applicable Allowed Claims under this Plan shall be made by the Disbursing Agent on behalf of the applicable Debtor, Reorganized Debtor, or Wind-Down Debtor.

At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtors.

E.   *Compliance with Tax Requirements.*

In connection with this Plan, to the extent applicable, the Reorganized Debtors, the Wind-Down Debtors, the Disbursing Agent, and any applicable withholding agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Entity, and all distributions pursuant to this Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in this Plan to the contrary, such parties shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under this Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.  The Reorganized Debtors and/or the Wind-Down Debtors reserve the right to allocate all distributions made under this Plan in compliance with all applicable wage garnishments, alimony, child support, and other similar spousal awards, Liens, and encumbrances.  Any amounts withheld and paid to the applicable Governmental Entity shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan.

Any Person entitled to receive any property as an issuance or distribution under this Plan shall, upon request, deliver to the applicable Disbursing Agent an appropriate IRS Form W-9 or (if the payee is a foreign Person) IRS Form W-8.

F.   *Allocations.*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest as Allowed therein.

G.   *No Postpetition Interest on Claims.*

Unless otherwise specifically provided for in the DIP Orders, this Plan, or the Confirmation Order, or required by applicable bankruptcy and non-bankruptcy Law, postpetition interest shall not accrue or be paid on any prepetition Claims (other than Prepetition Superpriority Claims to the extent such Claims are oversecured), and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on such Claim. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the

Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim, if any, becomes an Allowed Claim.

H.   *Foreign Currency Exchange Rate.*

        Except as otherwise provided in a Final Order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in The Wall Street Journal (National Edition), on the Effective Date.

I.   *Setoffs and Recoupment.*

        Except as expressly provided in this Plan, each Reorganized Debtor or Wind-Down Debtor, as applicable, may, pursuant to section 553 of the Bankruptcy Code, set off and/or recoup against any Plan Distributions to be made on account of any Allowed Claim, any and all claims, rights, and Causes of Action that such Reorganized Debtor or Wind-Down Debtor, as applicable, may hold against the Holder of such Allowed Claim to the extent such setoff or recoupment is either (i) agreed in amount by the relevant Reorganized Debtor(s) or Wind-Down Debtor(s), as applicable, and the Holder of the Allowed Claim or (ii) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided*, that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Reorganized Debtor and/or Wind-Down Debtor, as applicable, or its successor of any and all claims, rights, and Causes of Action that such Reorganized Debtor and/or Wind-Down Debtor, as applicable, or its successor may possess against the applicable Holder.  In no event shall any Holder of a Claim be entitled to recoup such Claim against any claim, right, or Cause of Action of the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors in accordance with Article XII.E hereof on or before the Effective Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

J.   *No Double Payment of Claims.*

        To the extent that a Claim is Allowed against more than one Debtor's Estate, there shall only be a single recovery on account of that Allowed Claim.  No Holder of an Allowed Claim shall be entitled to receive more than one payment in full of its Allowed Claim, and each Claim shall be administered and treated in the manner provided by this Plan only until payment in full on that Allowed Claim.

K.   *Claims Paid or Payable by Third Parties.*

        1.        <u>Claims Paid by Third Parties.</u>

        The Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor, a Reorganized Debtor, or a Wind-Down Debtor. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Reorganized Debtor or Wind-Down Debtor on account of such Claim, such Holder shall, within 14 days of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor or Wind-Down Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under this Plan exceeds the amount of such Claim as of the date of any such distribution under this Plan.  The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor or Wind-Down Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

        2.        <u>Claims Payable by Third Parties.</u>

        No distributions under this Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect

to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim shall be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

       3.       <u>Applicability of Insurance Policies.</u>

Except as otherwise provided in this Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in this Plan shall constitute or be deemed a waiver of a Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

       4.       <u>Indefeasible Distributions.</u>

Any and all distributions made under this Plan shall be indefeasible and not subject to clawback.

## ARTICLE VII
## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

A.   *Allowance of Claims and Interests.*

After the Effective Date, and subject to the terms of this Plan, the Debtors, the Reorganized Debtors, the Wind-Down Debtors, or the Plan Administrator shall have and retain any and all rights and defenses that the Debtors had with respect to any Claim or Interest immediately before the Effective Date.  Except as expressly provided in this Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim or Interest shall become an Allowed Claim or Allowed Interest unless and until such Claim or Interest, as applicable, is deemed Allowed under this Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim or Interest.

B.   *Claims Administration Responsibilities.*

Except as otherwise specifically provided in this Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Reorganized Debtors, the Wind-Down Debtors, and/or the Plan Administrator, as applicable, with the consent of the applicable Stalking Horse Purchaser or any other purchaser solely to the extent that such Claim or Interest is transferred to such Stalking Horse Purchaser or another purchaser pursuant to a Stalking Horse Purchase Agreement or other Purchase Agreement, as applicable, shall have the sole authority to:  (i) File and prosecute objections to Claims or Interests; (ii) settle, compromise, withdraw, litigate to judgment, or otherwise resolve objections to any and all Claims or Interests, regardless of whether such Claims or Interests are in a Class or otherwise; (iii) settle, compromise, or resolve any Disputed Claim or Interest without any further notice to or action, order, or approval by the Bankruptcy Court; and (iv) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, the Reorganized Debtors or the Wind-Down Debtors, as applicable, shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Claim or Interest (including any Disputed Claim or Interest), including the Causes of Action retained pursuant to Article IV.R of this Plan.  After the Effective Date, the Reorganized Debtors, the Wind-Down Debtors, and/or the Plan Administrator, as applicable, shall resolve Disputed Claims or Interests in accordance with their fiduciary duties and pursuant to the terms of this Plan.

C.   *Disputed Claims Process.*

If the Debtors (with the reasonable consent of the Required Consenting Lenders), the Reorganized Debtors, the Wind-Down Debtors, or the Plan Administrator, as applicable, dispute any Proof of Claim that is Filed on account of an Unimpaired Claim, such dispute shall be determined, resolved, or adjudicated, as the case may be, in the Bankruptcy Court.

The Debtors (with the reasonable consent of the Required Consenting Lenders), the Reorganized Debtors, or the Wind-Down Debtors, or solely to the extent that the assets or liabilities that give rise to such Claim or Interest are transferred to the Stalking Horse Purchasers or another purchaser pursuant to the Stalking Horse Purchase Agreements or another Purchase Agreement, as applicable, the Stalking Horse Purchasers or another purchaser, as applicable, shall have the exclusive authority to determine, without the need for notice to or action, order, or approval of the Bankruptcy Court, that a Claim subject to any Proof of Claim that is Filed is Allowed.  If the Debtors (with the reasonable consent of the Required Consenting Lenders), Reorganized Debtors, or the Wind-Down Debtors, as applicable, dispute any Impaired Claim that is not Allowed as of the Effective Date pursuant to Article III.B hereof or a Final Order entered by the Bankruptcy Court (which may include the Confirmation Order), the Debtors, Reorganized Debtors, the Wind-Down Debtors, or the Plan Administrator, as applicable, may File an objection with the Bankruptcy Court, in which case such dispute shall be determined, resolved, or adjudicated before, the Bankruptcy Court.

D.   *Estimation of Claims and Interests.*

Before, on, or after the Effective Date, the Debtors, the Reorganized Debtors, the Wind-Down Debtors, or the Plan Administrator, as applicable, with the reasonable consent of the applicable Stalking Horse Purchaser or another purchaser solely to the extent that the assets or liabilities that give rise to such Claim or Interest are transferred to such Stalking Horse Purchaser or another purchaser pursuant to the applicable Stalking Horse Purchase Agreement or other Purchase Agreement, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate the amount of any Claim or Interest pursuant to applicable law, including, without limitation pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the pendency of any appeal relating to such objection. Notwithstanding any provision to the contrary in this Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any Claim or Interest, such estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under this Plan (including for purposes of Plan Distributions) and may be used as evidence in any supplemental proceedings, and the Reorganized Debtors, the Wind-Down Debtors, or the Plan Administrator, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder Files a motion requesting the right to seek such reconsideration on or before 7 days after the date on which such Claim is estimated.  Each of the foregoing Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

E.   *Adjustment to Claims or Interests Without Objection.*

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Reorganized Debtors, the Wind-Down Debtors, or the Plan Administrator without the Reorganized Debtors, Wind-Down Debtors, or Plan Administrator, as applicable, having to File an application, motion, complaint, objection, or any other legal proceeding to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

F.   *Time to File Objections to Claims.*

Any objections to Claims or Interests shall be Filed on or before the later of (a) 180 days after the Effective Date and (b) such other period of limitations as may be specifically filed by the Reorganized Debtors or the Wind-Down Debtors, as applicable, or by a Final Order of the Bankruptcy Court for objecting to such Claims, or, in connection with a Sale Transaction, with the consent of the relevant Stalking Horse Purchaser, or other applicable purchaser, solely to the extent that such Claim or Interest is transferred to the Stalking Horse Purchaser, or other purchaser, pursuant to the relevant Stalking Horse Purchase Agreement or other Purchase Agreement, as applicable. For the avoidance of doubt, Administrative Claims are subject to the Administrative Claims Objection Bar Date and the period of limitation set forth herein shall not apply to Administrative Claims.

G.   *Reservation of Rights to Object to Claims.*

The failure of the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, to object to any Claim shall not be construed as an admission to the validity or amount of any such Claim, any portion thereof, or any other claim related thereto, whether or not such claim is asserted in any currently pending or subsequently initiated proceeding, and shall be without prejudice to the right of the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, to contest, challenge the validity of, or otherwise defend against any such claim in the Bankruptcy Court or non-bankruptcy forum.

H.   *Disallowance of Claims or Interests.*

Except as otherwise expressly set forth herein, all Claims and Interests of any Entity from which property is sought by the Debtors under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, allege is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, 553(b), or 724(a) of the Bankruptcy Code shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims or Interests may not receive any distributions on account of such Claims, if:  (i) the Entity, on the one hand, and the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (ii) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

**Except as otherwise provided herein or as agreed to by the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, any and all Proofs of Claims Filed after the Claims Bar Date or the Administrative Claims Bar Date, as applicable, shall be deemed disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims or Interests may not receive any distributions on account of such Claims, unless such late Proof of Claim has been deemed timely Filed by a Final Order.**

I.   *Amendments to Claims or Interests.*

On or after the Effective Date, no Claim or Interest shall be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors, Wind-Down Debtors, or applicable Stalking Horse Purchaser or other purchaser (solely to the extent that the assets or liabilities that give rise to such Claim or Interest are transferred to the Stalking Horse Purchasers, or other purchaser, pursuant to the Stalking Horse Purchase Agreements or other Purchase Agreement, as applicable, in connection with a Sale Transaction) and any such new or amended Claim or Interest Filed shall automatically be deemed disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court to the maximum extent provided by applicable law.

J.   *No Distributions Pending Allowance.*

Notwithstanding any other provision of this Plan, if any portion of a Claim or Interest is Disputed, no payment or distribution provided hereunder shall be made on account of the Disputed portion of such Claim or Interest unless and until such Disputed portion of such Claim or Interest becomes an Allowed Claim or Interest; *provided,* that the

non-Disputed portion of an otherwise valid Claim or Interest shall be deemed Allowed in the amount not Disputed and any payment or distribution shall be made in accordance with this Plan on account of such undisputed amount.

K.   *Distributions After Allowance.*

To the extent that a Disputed Claim or Disputed Interest ultimately becomes an Allowed Claim or Allowed Interest, distributions (if any) shall be made to the Holder of such Allowed Claim or Allowed Interest in accordance with the provisions of this Plan.  As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court Allowing any Disputed Claim or Disputed Interest becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim or Interest the distribution (if any) to which such Holder is entitled under this Plan as of the Effective Date, without any interest to be paid on account of such Claim or Interest.  The Register (as defined in the Prepetition Second Lien Credit Agreement) shall be closed as of the Effective Date, the Prepetition Second Lien Agent shall deliver such Register to the Disbursing Agent within 5 Business Days after the Effective Date, the Disbursing Agent shall be responsible for all distributions to the Holders of Allowed Prepetition Second Lien Claims (which shall be made directly by the Disbursing Agent to such Holders in accordance with the Plan and Confirmation Order), and the Prepetition Second Lien Agent shall have no responsibility or liability for such distributions.  From and after the Effective Date, Holders of Allowed Prepetition Second Lien Claims shall not be permitted to make assignments of record of their loans under the Prepetition Second Lien Credit Agreement.

## ARTICLE VIII
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.   *Term of Injunctions or Stays.*

Unless otherwise provided in this Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in this Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in this Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

B.   *Settlement, Compromise, and Release of Claims.*

Pursuant to the Bankruptcy Code and Bankruptcy Rules and in consideration for the distributions and other benefits provided pursuant to this Plan, including the applicable Stalking Horse Purchase Agreement(s) or other Purchase Agreement, as applicable, and except as otherwise specifically provided in this Plan, the Confirmation Order, or in any contract, instrument, or other agreement or document created pursuant to this Plan or the Plan Supplement, the distribution, rights, and treatment that are provided in this Plan shall be in complete settlement, compromise, discharge, satisfaction, and release, effective as of the Effective Date, of Claims, Intercompany Claims resolved or compromised after the Effective Date by the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors, the Reorganized Debtors, or the Wind-Down Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to this Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests related to service performed by employees of the Debtors before the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representation or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim or Proof of Interest based upon such debt, right, or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such Claim or Interest has accepted this Plan.  Any default by the Debtors or the Non-Debtor Affiliates with respect to any Claim or Interest immediately prior to or on account of Filing the Chapter 11 Cases shall be deemed cured on the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date.

C.  *Release of Liens.*

Except as otherwise expressly provided in this Plan, the Confirmation Order, any Purchase Agreement, any Acceptable Alternative Transaction Document, or any contract, instrument, release, or other agreement or document amended or created pursuant to this Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to this Plan and, in the case of a Secured Claim or any related Claim that may be asserted against a Non-Debtor Affiliate, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with this Plan, if any, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates or any Non-Debtor Affiliate shall be fully released and discharged, and all of the right, title, benefit, and interest of any Holder (and the applicable agents of such Holder) of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors or the Wind-Down Debtors and their successors and assigns without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors, the Reorganized Debtors, or the Wind-Down Debtors.  Any Holder of such Secured Claim or Claim against a Non-Debtor Affiliate (and the applicable agents of such Holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors or the Wind-Down Debtors, to release any Collateral or other property of any Debtor or Non-Debtor Affiliate (including any cash Collateral and possessory Collateral, except for the cash collateral supporting the outstanding Prepetition Superpriority Letters of Credit) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Reorganized Debtors or the Wind-Down Debtors to evidence the release of such Liens and/or security interest, including the execution, delivery, and filing or recording of such releases.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such mortgages, deeds of trust, Liens, pledges, and other security interest.

To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to this Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interest to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps reasonably requested by the Debtors, the Reorganized Debtors, or the Wind-Down Debtors that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests (except for the Liens and/or security interests on the cash collateral specifically pledged in support of the outstanding Prepetition Superpriority Letters of Credit), including the making of any applicable filings or recordings, and the Reorganized Debtors or the Wind-Down Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.

D.  *Releases by the Debtors.*

Except as otherwise expressly set forth in this Plan or the Confirmation Order to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, effective on the Effective Date, in exchange for good and valuable consideration, including the obligations of the Debtors under this Plan and the contributions and services of the Released Parties in facilitating the implementation of the Restructuring Transactions, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtors, the Reorganized Debtor(s), or the Wind-Down Debtors, as applicable, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Claims or Causes of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action, whether known or unknown, including any Avoidance Actions and derivative Claims, asserted or assertable on behalf of the Debtors, the Reorganized Debtor(s), the Wind-Down Debtors, or their Estates, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereafter arising, in law, equity, contract, tort, or otherwise, under federal or state statutory or common Law, or any other applicable international, foreign, or domestic Law, rule, statute, regulation, treaty, right, duty, requirement or otherwise that the Debtors, the Reorganized Debtor(s), the Wind-Down Debtors, or their Estates, Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming

under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor, the Reorganized Debtor(s), or their Estates, or any other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtor(s), the Wind-Down Debtors, or their Estates (including the capital structure, management, ownership, or operation thereof), the purchase, sale, or rescission of any Security of the Debtors, the Reorganized Debtor(s), or the Wind-Down Debtors, as applicable, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the business or contractual arrangements between or among any Debtor and any Released Party, the Prepetition Credit Agreements, the ownership and/or operation of the Debtors, the Reorganized Debtor(s), or the Wind-Down Debtors, as applicable, by any Released Party or the distribution of any Cash or other property of the Debtors, the Reorganized Debtor(s), or the Wind-Down Debtors, as applicable, to any Released Party, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors, the Reorganized Debtor(s) or the Wind-Down Debtors), the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among the Debtors or between the Debtors and their Non-Debtor Affiliates, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or Filing, as applicable, of the RSA, the First Day Pleadings, the Disclosure Statement, the Conditional Disclosure Statement Order, the DIP Documents the New Equity Interests, this Plan, the Plan Supplement, the Sale Transaction Documentation, the New Money Investments, the New Management Incentive Plan, the Equity Rights Offering Documents, including the Backstop Commitment Agreement, the Restructuring Transactions Memorandum, the New Organizational Documents, the UCC Settlement, or any contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by this Plan or the reliance by any Released Party on this Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with this Plan, the Plan Supplement, the RSA, the Disclosure Statement, the Conditional Disclosure Statement Order, the DIP Documents, the Sale Transaction Documentation, the New Management Incentive Plan, the Equity Rights Offering Documents, including the Backstop Commitment Agreement, the New Organizational Documents, the UCC Settlement, any other Definitive Document entered into before or during the Chapter 11 Cases, any Restructuring Transaction, the Filing of the Chapter 11 Cases, the pursuit of Confirmation of this Plan, the pursuit of Consummation of this Plan, the administration and implementation of this Plan, including the issuance or distribution of Securities pursuant to the Restructuring Transactions, the New Equity Interests, and/or this Plan, or the distribution of property pursuant to the Restructuring Transactions and /or this Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date.

Each Released Avoidance Action Party is deemed released and discharged by the Debtors, their Estates, and the Reorganized Debtors from any and all UCC Settlement Avoidance Actions.

Notwithstanding anything to the contrary in the foregoing, the releases set forth herein do not release (i) any post-Effective Date obligations of any party or Entity under this Plan, the Confirmation Order, any Sale Transaction Documentation, any Restructuring Transaction, any other Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement this Plan, (ii) any Claims or Causes of Action specifically retained by the Debtors, the Reorganized Debtor(s), or the Wind-Down Debtors, as applicable, or the Stalking Horse Purchaser(s), as applicable, pursuant to the Schedule of Retained Causes of Action or the Schedule of Reserved Claims, or (iii) any criminal act or intentional fraud, willful misconduct, or gross negligence, in each case, as determined by a Final Order.

E.   *Releases by the Releasing Parties.*

Except as otherwise expressly set forth in this Plan or the Confirmation Order to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, on and after the Effective Date, in exchange for good and valuable consideration, including the obligations of the Debtors under this Plan and the contributions and services of the Released Parties in facilitating the implementation of the Restructuring Transactions, the adequacy of which is hereby confirmed, to the fullest extent permitted under applicable law, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged by each Releasing Party (other than the Debtors, the Reorganized Debtor(s), or the

Wind-Down Debtors, as applicable), in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Claims or Causes of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereafter arising, in law, equity, contract, tort, or otherwise arising under federal or state statutory or common Law, or any other applicable international, foreign, or domestic Law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise that such Holders or their Estates, Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, the Debtors, the Reorganized Debtor(s), or the Wind-Down Debtors, as applicable, or their Estates, or any other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtor(s), the Wind-Down Debtors, or their Estates (including the capital structure, management, ownership, or operation thereof), the purchase, sale, or rescission of any Security of the Debtors, the Reorganized Debtor(s), or the Wind-Down Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the business or contractual arrangements between or among any Debtor and any Released Party, the ownership and/or operation of the Debtors, the Reorganized Debtor(s), or the Wind-Down Debtors, by any Released Party or the distribution of Cash or other property of the Debtors or Reorganized Debtor(s), as applicable, to any Released Party, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors, the Reorganized Debtor(s) or the Wind-Down Debtors), the Prepetition Credit Agreements, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor or Affiliate of a Debtor and another Debtor or Affiliate of a Debtor, the Chapter 11 Cases, the New Equity Interests, the formulation, preparation, dissemination, negotiation, or Filing, as applicable, of the RSA, the New Money Investments, the New Management Incentive Plan, the Equity Rights Offering Documents, including the Backstop Commitment Agreement, the Restructuring Transactions Memorandum, the New Organizational Documents, as applicable, the UCC Settlement, the Disclosure Statement, the Conditional Disclosure Statement Order, the Sale Orders, the DIP Documents, this Plan, the Plan Supplement, the Sale Transaction Documentation, or any contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by this Plan or the reliance by any Released Party on this Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the RSA, this Plan, the Plan Supplement, the Disclosure Statement, the Conditional Disclosure Statement Order, the Sale Orders, the DIP Documents, the New Money Investments, the Equity Rights Offering Documents, the New Management Incentive Plan, the Restructuring Transactions Memorandum, the New Organizational Documents, as applicable, the UCC Settlement, the Sale Transaction Documentation, any other Definitive Document entered into before or during the Chapter 11 Cases, any Restructuring Transaction, the Filing of the Chapter 11 Cases, the pursuit of Confirmation of this Plan, the pursuit of Consummation of this Plan, the administration and implementation of this Plan, including the issuance or distribution of Securities pursuant to the Restructuring Transactions, the New Equity Interests, and/or this Plan or the distribution of property pursuant to the Restructuring Transactions and/or this Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes actual fraud, willful misconduct, or gross negligence, each solely to the extent as determined by a Final Order of a court of competent jurisdiction.

Notwithstanding anything to the contrary in the foregoing, the releases set forth herein do not release (i) any post-Effective Date obligations of any party or Entity under this Plan, the Confirmation Order, any Sale Transaction Documentation, any Restructuring Transaction, any other Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement this Plan or any Claim or obligation arising under this Plan or (ii) any Claims or Causes of Action specifically retained by the Debtors, the Reorganized Debtor(s), or the Wind-Down Debtors, as applicable, or the Stalking Horse Purchaser(s), as applicable, pursuant to the Schedule of Retained Causes of Action and Schedule of Reserved Claims.

Without limiting the foregoing, from and after the Effective Date, any Entity that opts in to the releases contained in Article VIII.E hereof is a Releasing Party and may not assert any Claim or other Cause of Action against any Released Party based on or relating to, or in any manner arising from, in whole or in part, the Debtors. From and after the Effective Date, any Entity that did not opt in to the releases contained in Article VIII.E hereof may not assert any Claim or other Cause of Action against any Released Party for which it is asserted or implied that such Claim or Cause of Action is not subject to the releases contained in Article VIII.D of this Plan without first obtaining a Final Order from the Bankruptcy Court (a) determining, after notice and a hearing, that such Claim or Cause of Action is not subject to the releases contained in Article VIII.D of this Plan, and (b) specifically authorizing such Person or Entity to bring such Claim or Cause of Action against any such Released Party. The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a Claim or Cause of Action constitutes a direct or derivative claim, is colorable, and, only to the extent legally permissible and as provided for in Article XI of this Plan, the Bankruptcy Court shall have jurisdiction to adjudicate the underlying Claim or Cause of Action.

F.   *Exculpation.*

Except as otherwise specifically provided in this Plan or the Confirmation Order, to the fullest extent permissible under applicable Law and without affecting or limiting the releases contained in Article VIII herein, effective as of the Effective Date, no Exculpated Party shall have or incur liability or obligation for, and each Exculpated Party is hereby released and exculpated from any Claim or Cause of Action related to any act or omission occurring from the Petition Date to the Effective Date in connection with, relating to, or arising out of, the Chapter 11 Cases, including, the formulation, preparation, dissemination, negotiation, or Filing of the Disclosure Statement, the Conditional Disclosure Statement Order, this Plan, the Plan Supplement, the Sale Transactions, the Sale Transaction Documentation, the Sale Orders, the Purchase Agreements, the RSA, the Prepetition Credit Agreements, the New Money Investments, the Equity Rights Offering Documents, the Restructuring Transactions Memorandum, the New Organizational Documents, or as applicable, any Restructuring Transaction, or any contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or this Plan, the Plan Supplement, the Filing of the Chapter 11 Cases, the Restructuring Transactions, the Sale Transactions, the Sale Transaction Documentation, the Purchase Agreements, the DIP Documents, the DIP Facilities, the New Money Investments, the Equity Rights Offering Documents, the Restructuring Transactions Memorandum, the New Organizational Documents, the UCC Settlement, any other Definitive Document, or any other agreement, contract, instrument, release, or document (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any other agreement, transaction, contract, instrument, release, or document contemplated by this Plan or the reliance by any Exculpated Party on this Plan or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the RSA, the Restructuring Transactions, the Sale Transactions, the Sale Transaction Documentation, the Disclosure Statement, this Plan, the Plan Supplement, any preference, fraudulent transfer, or other avoidance Claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the filing of the Chapter 11 Cases, the pursuit of Confirmation of this Plan, the pursuit of Consummation of this Plan, the administration and implementation of this Plan, including the issuance or distribution of Securities pursuant to this Plan (if applicable), or the distribution of property under this Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for Claims or liabilities arising out of or relating to any act or omission that is determined by a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence.

The Exculpated Parties have, and upon Confirmation shall be deemed to have, participated in good faith and in compliance with the applicable Laws with regard to the solicitation of votes and distribution of consideration pursuant to this Plan, and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable Law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan, or such distributions made pursuant to this Plan, including the transfer of property or the issuance of Securities thereunder. The exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and other applicable Laws, regulations, or rules protecting such Exculpated Parties from liability. Notwithstanding the foregoing, the exculpation set forth herein shall not release any obligation or liability of any Entity or any post-Effective Date obligation under this Plan, the

Confirmation Order, any other Definitive Document, or any post-Effective Date transaction contemplated by the Plan, any Definitive Document, or any other document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement this Plan.

Solely with respect to the exculpation provisions in Article VIII herein, notwithstanding anything to the contrary in this Plan, each of the Exculpated Parties shall not incur liability or obligation for any Cause of Action or Claim related to any act or omission in connection with, relating to, or arising out of, in whole or in part, (a) the solicitation of acceptance or rejection of this Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code or (b) the participation, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, in the Restructuring Transactions, including the offer, issuance, sale, or purchase of a Security, offered or sold pursuant to this Plan, and the Acceptable Alternative Transaction, as applicable.

G. **_Injunction._**

Upon entry of the Confirmation Order, all Persons and Entities shall be enjoined from taking any actions to interfere with the implementation or consummation of this Plan or the vesting of the Estates' assets in, and the enjoyment of such assets by, the Reorganized Debtors pursuant to this Plan.

Except as otherwise expressly provided in this Plan or the Confirmation Order, or for obligations or distributions issued or required to be paid pursuant to this Plan or the Confirmation Order, all Persons and Entities who have held, hold, or may hold Claims, Interests, or Causes of Action that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions (collectively, the "**Covered Matters**") against, as applicable, the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, the Exculpated Parties, or the Released Parties: (i) commencing, conducting, or continuing in any manner any action, suit, or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, liabilities, or Causes of Action; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, liabilities, or Causes of Action; (iii) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Persons and Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, liabilities, or Causes of Action; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Persons and Entities or against the property of such Persons and Entities on account of or in connection with or with respect to any such Claims, Interests, liabilities, or Causes of Action unless such Person or Entity has timely Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Person or Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable Law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, liabilities, or Causes of Action released or settled pursuant to this Plan.

Each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to this Plan, shall be deemed to have consented to the injunction provisions set forth in Article VIII.G herein. No Person or Entity may commence, pursue, or continue any action, employ any process, or take any other act to pursue, collect, recover, or offset any Claim, Interest, debt, obligation or Cause of Action relating to or is reasonably likely to relate to any act or omission of any kind in connection with, relating to, or arising out of a Covered Matter, without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim, Interest, debt, obligation, or Cause of Action represents a colorable Claim of any kind and (ii) specifically authorizing such Person or Entity to bring such Claim or Cause of Action. The Bankruptcy Court shall have sole and exclusive jurisdiction to determine whether any such Claim, Interest, debt, obligation, or Cause of Action is colorable and, only to the extent legally permissible and as provided for in Article XI, adjudicate the underlying colorable Claim, Interest, debt, obligation, or Cause of Action.

H.   *Protection Against Discriminatory Treatment.*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Entities, shall not discriminate against the Reorganized Debtors or the Wind-Down Debtors, or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors or the Wind-Down Debtors or another Entity with whom the Reorganized Debtors or the Wind-Down Debtors have been associated, solely because the Reorganized Debtors or the Wind-Down Debtors have been debtors under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

I.   *Document Retention.*

On and after the Effective Date, the Reorganized Debtors or the Wind-Down Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors or the Wind-Down Debtors.

J.   *Reimbursement or Contribution.*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless before the Confirmation Date:  (i) such Claim has been adjudicated as non-contingent; or (ii) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered before the Confirmation Date determining such Claim as no longer contingent.

## ARTICLE IX
## CONDITIONS PRECEDENT TO CONFIRMATION AND THE EFFECTIVE DATE

A.   *Conditions Precedent to the Effective Date.*

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to Article IX.B hereof:

1.      the Bankruptcy Court shall have entered the Confirmation Order, and the Confirmation Order shall not have been reversed, stayed, modified, or vacated on appeal;

2.      the Bankruptcy Court shall have entered the Sale Orders, and the Sale Orders shall remain in full force and effect;

3.      all governmental and third-party approvals and consents that may be necessary to implement and effectuate this Plan shall have been obtained, including under any applicable antitrust Laws, not be subject to unfulfilled conditions, and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on the Restructuring Transactions;

4.      the RSA shall be in full force and effect, no termination event or event that would give rise to a termination event under the RSA upon the expiration of the applicable grace period shall have occurred, and the RSA shall not have been validly terminated prior to the Effective Date; *provided*, that this clause (4) will not be deemed unsatisfied if the RSA automatically terminates pursuant to section 13.07 therein;

5.      all Professional fees and expenses of retained Professionals that require the Bankruptcy Court's approval shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date shall

have been placed in a Professional Fee Escrow Account pending the Bankruptcy Court's approval of such fees and expenses;

6.     the Closing(s) (as such term is defined and described in the Sale Transaction Documentation) shall have occurred in conjunction with the Effective Date, as applicable, including, to the extent applicable, the Acceptable Alternative Transaction Documents having been executed and all conditions precedent to the closing of the sale to the Acceptable Alternative Purchaser shall have occurred, been waived in accordance with the Acceptable Alternative Transaction Documents, or will occur substantially simultaneously with the effectiveness of this Plan, and shall become or remain in full force and effect;

7.     the Debtors shall have performed all of their obligations through the Effective Date under any Transition Services Agreement, as applicable;

8.     the DIP Orders shall have been entered by the Bankruptcy Court and shall remain in full force and effect and become Final Orders;

9.     the Backstop Order shall have been entered by the Bankruptcy Court and shall remain in full force and effect and become a Final Order;

10.    the New Money Investments shall have been fully consummated pursuant to the Equity Rights Offering Documents and consistent in all material respects with this Plan and the Restructuring Support Agreement;

11.    if applicable, the Wind-Down Budget shall have been funded in the Wind-Down Amount;

12.    implementation of the UCC Settlement;

13.    the following documents shall be in full force and effect substantially contemporaneous with the consummation of the Restructuring Transactions (and shall not be stayed, modified, revised, or vacated, or subject to any pending appeal), and shall not have been terminated prior to the Effective Date: (a) if applicable, the Sale Order(s); (b) such other motions, orders, agreements, and documentation necessary or desirable to consummate and document the transactions contemplated by this Plan; (c) to the extent not included in the foregoing, all financing documents needed to effectuate the Restructuring Transactions; and (d) all other material customary documents delivered in connection with transactions of this type (including any and all other documents implementing, achieving, contemplated by or relating to the Restructuring Transactions);

14.    no court of competent jurisdiction or other competent governmental or regulatory authority shall have issued a final and non-appealable order making illegal or otherwise restricting, preventing, or prohibiting the Consummation of the Restructuring Transactions;

15.    the Definitive Documents shall contain terms and conditions consistent in all material respects with this Plan, and shall have been executed or deemed executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived by the applicable party or parties;

16.    the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein, and all other schedules, documents, supplements and exhibits to this Plan shall be consistent with this Plan, the Definitive Documents, and otherwise approved pursuant to all applicable consent thresholds;

17.    (a) all Restructuring Expenses and all other fees and expenses owing to the Ad Hoc Group and members thereof under the DIP Orders and/or the RSA and (b) all fees and expenses owing to the Prepetition Superpriority Agent shall have been paid in full in Cash, which may occur concurrently with the Effective Date; and

18.    the Debtors shall have otherwise substantially consummated the applicable Restructuring Transactions, including, as applicable, the restructuring transactions with certain of the Consenting Lenders, in a manner consistent in all respects with this Plan.

B.   *Waiver of Conditions.*

Except as otherwise specified in this Plan, any one or more of the conditions to Consummation set forth in Article IX herein may be waived with the consent of the Debtors and the Required Consenting Lenders, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate this Plan.

C.   *Effect of Failure of Conditions to the Effective Date.*

If Consummation does not occur as to any Debtor, this Plan shall be null and void in all respects as to such Debtor, and nothing contained in this Plan or the Disclosure Statement shall:  (i) constitute a waiver or release of any Claims against or Interests in such Debtor held by any Holders of Claims or Interests; (ii) prejudice in any manner the rights of the Debtors, any Holders of Claims or Interests, or any other Entity with respect to such Debtor; or (iii) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity with respect to such Debtor *provided*, that all provisions of the RSA that survive termination thereof shall remain in effect in accordance with the terms thereof.  Notwithstanding the foregoing, the non-Consummation of this Plan shall not require or result in the voiding, rescission, reversal, or unwinding of any Sale Transaction under any Stalking Horse Purchase Agreement or other Purchase Agreement, as applicable, or the revocation of the Debtors' authority under such Sale Order to consummate such Sale Transaction.

D.   *Substantial Consummation.*

"Substantial Consummation" of this Plan, as defined in section 1101(2) of the Bankruptcy Code, shall be deemed to occur on the Effective Date.

### ARTICLE X
### MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.   *Modification and Amendments.*

Except as otherwise specifically provided in this Plan, the Debtors reserve the right to modify this Plan, with the consent of the Required Consenting Lenders (and to the extent that such modification impacts, amends, modifies, or supplements the consent rights of the Consenting Sponsor as set forth in the RSA, the Required Consenting Stakeholders), including, if a proposed modification constitutes a "Specified Consent Matter" as such term is defined in the RSA, the consent of those Consenting Lenders specified in clause (i) of the definition of Required Consenting Lenders set forth in the RSA, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan; *provided*, that such modifications are consistent with and implemented in accordance with the terms of the RSA and the UCC Settlement. Subject to those restrictions on modifications set forth in this Plan and the requirements of section 1127 of the Bankruptcy Code, Rule 3019 of the Federal Rules of Bankruptcy Procedure, and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, each of the Debtors expressly reserves its respective rights to revoke or withdraw, or to alter, amend, or modify this Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify this Plan, or remedy any defect or omission, or reconcile any inconsistencies in this Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of this Plan; *provided*, that any alterations, amendments, or modifications are consistent with and implemented in accordance with the terms of the RSA.

B.   *Effect of Confirmation on Modifications.*

Entry of the Confirmation Order shall mean that all modifications or amendments to this Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C. *Revocation or Withdrawal of the Plan.*

To the extent permitted by the RSA and with the consent of the Required Consenting Lenders, the Debtors, Reorganized Debtors, or Wind-Down Debtors, as applicable, reserve the right to revoke or withdraw this Plan, including the right to revoke or withdraw this Plan for any or all of the Debtors, prior to the Confirmation Date and to File subsequent plans of reorganization. In such event, the Classes pertaining to such Debtor(s) shall be removed from this Plan, and this Plan shall omit any treatment of the assets and liabilities of such Debtor(s). The removal of any Debtor from this Plan shall not affect this Plan with respect to any other Debtor. If the Debtors revoke or withdraw this Plan, or if Confirmation or Consummation does not occur, then:  (i) this Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in this Plan (including the fixing or limiting to an amount certain, and including the allowance or disallowance, of all or any portion of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected under this Plan, and any document or agreement executed pursuant to this Plan, shall be deemed null and void; and (iii) nothing contained in this Plan shall (a) constitute a waiver or release of any Claims or Interests, (b) prejudice in any manner the rights of such Debtor or any other Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity.

**ARTICLE XI**
**RETENTION OF JURISDICTION**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or relating to the Chapter 11 Cases and this Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

A.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

B.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or this Plan;

C.      resolve any matters related to:  (i) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cures pursuant to section 365 of the Bankruptcy Code; (ii) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (iii) the Reorganized Debtors or the Wind-Down Debtors, as applicable, amending, modifying, or supplementing, after the Effective Date, pursuant to Article V of this Plan, any Executory Contracts or Unexpired Leases to the Schedule of Assumed Executory Contracts and Unexpired Leases or otherwise; and (iv) any dispute regarding whether a contract or lease is or was executory or expired;

D.      grant any consensual request to extend the deadline for assuming or rejecting Executory Contracts and Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

E.      ensure that distributions to Holders of Allowed Claims and Allowed Interests (as applicable) are accomplished pursuant to the provisions of this Plan and adjudicate any and all disputes arising from or relating to distributions under this Plan;

F.      adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

G.      adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

H.      enter and implement such orders as may be necessary to execute, implement, or consummate the provisions of this Plan and all contracts, instruments, releases, indentures, and other agreements or documents created or entered into in connection with this Plan, the Confirmation Order, or the Disclosure Statement;

I.      enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

J.      enter an order concluding or closing the Chapter 11 Cases;

K.      enforce the terms of the Stalking Horse Purchase Agreements or other Purchase Agreement(s), as applicable, and any related documents or schedules thereto (if applicable), and adjudicate, decide, resolve any cases, controversies, suits, or disputes related to (and/or arising under, as applicable) the Sale Transactions, the Stalking Horse Purchase Agreements, or other Purchase Agreement(s), as applicable;

L.      resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of this Plan or any Entity's obligations incurred in connection with this Plan;

M.      issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of this Plan;

N.      resolve any cases, controversies, suits, disputes, or Causes of Action with respect to releases, discharge, injunctions, exculpations, and other provisions contained in this Plan, including Article VIII hereof, and enter such orders as may be necessary or appropriate to implement or enforce such releases, injunctions, and other provisions;

O.      resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI hereof;

P.      enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

Q.      determine any other matters that may arise in connection with or related to this Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with this Plan or the Disclosure Statement;

R.      adjudicate any and all disputes arising from or relating to distributions under this Plan or any transactions contemplated herein;

S.      consider any modifications of this Plan, cure any defect or omission, or reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

T.      determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

U.      hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with this Plan;

V.      hear and determine all disputes with respect to the UCC Settlement;

W.      hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

X.      enforce all orders previously entered by the Bankruptcy Court; and

Y.      hear any other matter not inconsistent with the Bankruptcy Code.

Nothing herein shall prejudice the right of the Debtors or Reorganized Debtors, as applicable, to remove, transfer, or otherwise seek to have any such pending motions, proceedings, matters, and/or applications related to the Retained Causes of Action (including the GUC Specified Litigation Claims) heard by the Bankruptcy Court.

## ARTICLE XII
## MISCELLANEOUS PROVISIONS

A.   *Immediate Binding Effect.*

Subject to Article IX.A of this Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of this Plan shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, any and all Holders of Claims or Interests (irrespective of whether the Holders of such Claims or Interests have, or are deemed to have, accepted this Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in this Plan, each Entity acquiring property under this Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  All Claims and Interests shall be fixed, adjusted, or compromised, as applicable, pursuant to this Plan regardless of whether any Holder of a Claim or Interest has voted on this Plan.

B.   *Additional Documents.*

Subject to and in accordance with the RSA, on or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan.  The Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable, all Holders of Claims or Interests receiving distributions pursuant to this Plan, and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan.

C.   *Reservation of Rights.*

Except as expressly set forth in this Plan, this Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur.  None of the Filing of this Plan, any statement or provision contained in this Plan, or the taking of any action by any Debtor with respect to this Plan or the Disclosure Statement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to Holders of Claims or Interests prior to the Effective Date.

D.   *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor, or assign, Affiliate, officer, director, manager, trustee, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

E.   *Notices.*

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by e-mail and/or facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by e-mail and/or facsimile transmission, when received and telephonically confirmed, addressed as follows:

| If to a Debtor: | If to the Ad Hoc Group: |
| --- | --- |

| | |
|---|---|
| Astra Acquisition Corp.<br>5201 Congress Avenue<br>Boca Raton, Florida 33487<br>Attention:<br>Heath Gray, Chief Restructuring Officer<br>Email address:<br>heath.gray@fticonsulting.com<br><br>with copies to:<br><br>Kirkland & Ellis LLP<br>333 West Wolf Point Plaza<br>Chicago, Illinois 60654<br>Attention:<br>Chad J. Husnick, P.C. and Charles B. Sterrett<br>Email addresses:<br>chad.husnick@kirkland.com;<br>charles.sterrett@kirkland.com<br><br>-and-<br><br>Kirkland & Ellis LLP<br>601 Lexington Avenue<br>New York, NY 10022<br>Attention:<br>Melissa Mertz<br>Email address:<br>melissa.mertz@kirkland.com | Davis Polk & Wardwell LLP<br>450 Lexington Ave<br>New York, NY 10017<br>Attention:<br>David Schiff, Joshua Sturm, and Amber Leary<br>Email addresses:<br>david.schiff@davispolk.com;<br>joshua.sturm@davispolk.com;<br>amber.leary@davispolk.com<br><br>-and-<br><br>Milbank LLP<br>55 Hudson Yards<br>New York, NY 10001<br>Attention:<br>Evan R. Fleck and Michael Price<br>Email addresses:<br>efleck@milbank.com;<br>mprice@milbank.com<br><br>-and-<br><br>Porter Hedges LLP<br>1000 Main Street, 36th Floor<br>Houston, Texas 77002<br>Attention:<br>John F. Higgins, M. Shane Johnson, and Megan N. Young-John<br>Email addresses:<br>jhiggins@porterhedges.com<br>sjohnson@porterhedges.com<br>myoung-john@porterhedges.com |
| If to the Consenting Sponsor: | If to the U.S. Trustee: |
| Veritas Capital Fund Management, L.L.C.<br>9 West 57th Street<br>New York, NY 10019<br>Attention: Dipo Ashiru<br>Email address:<br>dashiru@veritascapital.com<br><br>-and-<br><br>Gibson, Dunn & Crutcher LLP<br>200 Park Avenue<br>New York, NY 10166<br>Attention:<br>Jason Zachary Goldstein and Jonathan M. Dunworth<br>Email addresses:<br>jgoldstein@gibsondunn.com;<br>jdunworth@gibsondunn.com | Office of the U.S. Trustee for the Southern District of Texas<br>515 Rusk Street, Suite 3516<br>Houston, TX 77002<br>Attention:<br>Jayson Ruff and Ha Nguyen<br>Email addresses:<br>jayson.b.ruff@usdoj.gov;<br>ha.nguyen@usdoj.gov |

After the Effective Date, the Reorganized Debtors or the Wind-Down Debtors, as applicable, have authority to send a notice to Entities that in order to continue receiving documents pursuant to Bankruptcy Rule 2002, such

Entity must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Wind-Down Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

F.  *Enforcement of Confirmation Order.*

On and after the Effective Date, the Debtors, the Reorganized Debtors, the Wind-Down Debtors, and the Plan Administrator, as applicable, shall be entitled to enforce the terms of the Confirmation Order and this Plan (which shall include, for the avoidance of doubt, the Plan Supplement).

G.  *Entire Agreement.*

Except as otherwise indicated, including with respect to the Stalking Horse Purchase Agreements or other Purchase Agreement, as applicable, and without limiting the effectiveness of this Plan, this Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan.

H.  *Plan Supplement.*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of this Plan as if set forth in full in this Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at https://cases.stretto.com/Anthology or the Bankruptcy Court's website at https://ecf.txsd.uscourts.gov/. To the extent any exhibit or document in the Plan Supplement is inconsistent with the terms of this Plan, unless otherwise ordered by the Bankruptcy Court, the Plan Supplement document or exhibit shall control (unless stated otherwise in such Plan Supplement document or exhibit or in the Confirmation Order).

I.  *Nonseverability of Plan Provisions.*

If, prior to Confirmation, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter or interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted; *provided*, that any such alteration or interpretation shall be acceptable to the Debtors. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.

The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (i) valid and enforceable pursuant to its terms; (ii) integral to this Plan and may not be deleted or modified without the consent of the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable; and (iii) nonseverable and mutually dependent.

J.  *Votes Solicited in Good Faith.*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on this Plan in good faith and in compliance with section 1125(g) of the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, managers, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code, and, therefore no such parties nor individuals will have any liability for the violation of any applicable Law, rule, or regulation governing the solicitation of votes on this Plan.

K.   *Closing of the Chapter 11 Cases.*

The Reorganized Debtors or the Wind-Down Debtors, as applicable, shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.  All contested matters and adversary proceedings relating to each of the Debtors, including objections to Claims, shall be administered and heard in the Chapter 11 Case of any Reorganized Debtor or Wind-Down Debtor, as applicable, that remains open; *provided*, that for purposes of sections 546 and 550 of the Bankruptcy Code, the Chapter 11 Cases shall be deemed to remain open until the Chapter 11 Case of all other Reorganized Debtors or Wind-Down Debtors, as applicable, have been closed.

L.   *Waiver or Estoppel.*

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in this Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court before the Confirmation Date.

M.   *Removal or Abandonment of Third Parties' Property.*

Nothing in this Plan shall impose upon the Reorganized Debtors or the Wind-Down Debtors, as applicable, any obligation to store or protect any third party's property, all of which property will be deemed abandoned and surrendered to the Wind-Down Debtors if such property has not been removed (by its owner in a commercially reasonable manner, and with insurance to cover any damage from such removal) from any real property owned or leased by the Reorganized Debtors or the Wind-Down Debtors, as applicable, within 45 days after Confirmation of this Plan.  Following the abandonment and surrender of any such property, the Plan Administrator may sell, transfer, assign, scrap, abandon, or otherwise dispose of such property and retain any proceeds resulting therefrom.

*[Remainder of page intentionally left blank.]*

Respectfully submitted,

Dated:  January 20, 2026

Anthology Inc.
on behalf of itself and all other Debtors

/s/ *Heath Gray*

| | |
|---|---|
| Name: | Heath Gray |
| Title: | Chief Restructuring Officer |
| Company: | Anthology Inc. |